## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

GREGORY O'GARA, On Behalf Of The
ESTATE OF TAMARA PORTNICK,
Individually and On Behalf Of All Others
Similarly Situated,

                Plaintiff,

    vs.

COUNTRYWIDE HOME LOANS, INC., a
wholly-owned subsidiary of COUNTRYWIDE
FINANCIAL CORPORATION,

                Defendant.

Case No._____

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMAND**

       Plaintiff Gregory O'Gara, as Successor Trustee to Tamara Portnick, by his undersigned attorneys, brings this class action complaint against Countrywide Home Loans, Inc., a wholly-owned subsidiary of Countrywide Financial Corporation ("Countrywide"). Plaintiff's allegations are based upon knowledge as to his own acts and upon information and belief as to all other matters. Plaintiff's information and belief is based upon, among other things, the investigation undertaken by his attorneys, which investigation has included, without limitation: (a) interviews of witnesses; (b) review of Countrywide's published materials and information available on the internet; (c) analysis of public records and documents; (d) news sources, articles, and other publications; and (e) information contained in various newspapers, magazines and other publications concerning the conduct alleged herein. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a class action against Countrywide for breach of contract, unjust enrichment, and breach of the duty of good faith and fair dealing. Each claim is based upon Countrywide's conduct in overcharging and/or directing the overcharging of Plaintiff and a class of similarly situated individuals (the "Class") for costs and expenses, including attorneys' fees, in connection with enforcement of certain mortgage instruments between February 15, 2002 through and including the present (the "Class Period"). Specifically, prior to and throughout the Class Period, Countrywide has extracted and continues to extract improper costs, fees and expenses, including attorneys' fees, from members of the Class in excess of the amounts actually incurred or that were obligated to be paid by Countrywide in connection with enforcement and foreclosure proceedings.

2.    The Mortgage and Note, both Fannie Mae/Freddie Mac Uniform Instruments (collectively the "Mortgage Note"), executed by Plaintiff and other members of the Class, specifically authorizes the note holder to be *"paid back ... for all its costs and expenses in enforcing the note ... include[ing] ... reasonable attorneys' fees."* (emphasis added). *See* Note, annexed hereto as Exhibit A.[1] By virtue of this provision, Countrywide is necessarily limited to collect from borrowers only such costs, fees and expenses that were actually incurred or obligated to be paid in connection with any enforcement proceedings. Countrywide therefore breached and continues to breach the Mortgage Note when borrowers, subject to enforcement proceedings, pay sums demanded by Countrywide for excessive, unverified, and unreasonable costs, fees and expenses, including attorneys' fees.

---

[1]    The Mortgage counterpart likewise provides that the "Lender may charge Borrower fees for services performed in connection with Borrower's default ... including, but not limited to attorneys' fees, property inspection and valuation fees." See Mortgage annexed as Exhibit B hereto.

3.      There are various ways that improper and excessive costs, fees and expenses are extracted from borrowers. For instance, although Countrywide enters into fixed amount, per-case, fee arrangements ("flat-fee agreements") with attorneys acting on its behalf, Countrywide charges borrowers for attorneys' fees based on higher estimates, market rates, or some other figure above and beyond the flat fee it is obligated to pay or paid. Other improper costs, fees and expenses include, but are not limited to, clerk filing fees, service of process fees, statutory clerk fees, late charges, delinquency fees, appraisal fees, recording fees, unspecified foreclosure fees and costs, administrative fees, escrow fees, and interest charges. Often, these charged fees and expenses were not actually incurred by Countrywide and/or were incurred at lesser amounts than were billed to and paid by Class members, including the Plaintiff.

4.      Plaintiff, on his own behalf, and as a representative of a Class of similarly situated individuals, seeks to recover compensatory damages in the amount of costs, fees and expenses, including attorneys' fees, collected or obtained by Countrywide or its agents which exceeded any sums Countrywide actually incurred or was obligated to pay in connection with any enforcement actions involving Plaintiff and the members of the Class. Plaintiff also seeks injunctive relief ordering cessation of the offending practice and revision to the language of the Mortgage Note making its terms clear to unwitting borrowers.

## JURISDICTION AND VENUE

5.      This Court has diversity subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 ("CAFA"), which, *inter alia*, amends 28 U.S.C. § 1332, at new subsection (d), conferring federal jurisdiction over class actions where, as here: (a) there are 100 or more members in the proposed Class; (b) at least

3

some members of the proposed class have a different citizenship from Countrywide; and (c) the claims of the proposed Class members exceed the sum or value of five million dollars ($5,000,000) in the aggregate. *See* 28 U.S.C. § 1332(d)(2) and (6).

6.      This Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of the Court, Countrywide is incorporated in the State of Delaware, and by virtue of the fact that Countrywide systematically and continually conducts business throughout the State.

7.      Venue is proper because Countrywide is incorporated in this District, conducts substantial business in this District, and because certain of the violations affecting Class members residing in Delaware occurred in this District.

## PARTIES

8.      Plaintiff Gregory O'Gara, a resident of New Jersey, is the executor and Successor Trustee to the Estate of Tamara Portnick (deceased resident of Florida) who signed a Mortgage Note, was subject to certain enforcement proceedings on the Mortgage Note, received a demand from Countrywide for payment of costs, fees and expenses in excess of those Countrywide actually incurred or was obligated to pay in enforcing the Mortgage Note, paid such costs, fees and expenses, and suffered damages as a result.

9.      Countrywide is a Delaware Corporation that maintains its principal place of business at 4500 Park Granada Blvd., Calabasas, California.

10.      Countrywide is the nation's largest mortgage lender.   In 2006, Countrywide financed approximately $500 billion in home loans, or about $41 billion a month by financing approximately 177,000 to 240,000 loans per month.

4

11.    Countrywide was the successor in interest, beneficial owner and loan servicer on Plaintiff's Mortgage Note at the time enforcement proceedings were undertaken and was responsible for demanding and collecting costs, fees and expenses from the Plaintiff in excess of those it incurred or was obligated to pay.[2]

## CLASS ACTION ALLEGATIONS

12.    Plaintiff brings this class action on his own behalf and on behalf of all similarly situated individuals who: (i) executed a Mortgage Note providing the note holder is entitled to be "paid back … for all its costs and expenses in enforcing the note … include[ing] … reasonable attorneys' fees;" and (ii) have been subject to an enforcement action concerning the Mortgage Note by Countrywide; (iii) received a demand from Countrywide to pay costs, fees and expenses in excess of those Countrywide and/or its agents actually incurred or were obligated to pay; and (iv) suffered damages as a result.

13.    This action is properly maintainable as a class action.

14.    The Class is so numerous that joinder of all members is impracticable. By recent estimates, Countrywide holds millions of mortgage loans throughout the nation. In the past ten (10) years, the number of loans held by Countrywide has multiplied exponentially. During the Class Period, hundreds of thousands of these mortgages have fallen into foreclosure and were (or are currently) subject to the imposition and collection of improper foreclosure fees and expenses.

---

[2]    County records for Palm Beach County, Florida list the current lender as The New York Mortgage Company ("NYMC"). NYMC's website represents that "The New York Mortgage Company is a division of IndyMac Bank, F.S.B., ("IndyMac"), a wholly owned subsidiary of IndyMac Bancorp, Inc., a division of IndyMac Bank, F.S.B." *See* http://www.nymc.com/about/index.shtml. Notwithstanding, through enforcement proceedings relevant to this action, Countrywide has represented itself to the Plaintiff as the current beneficial owner and loan servicer on the Mortgage Note.

15.    The number and identities of the loan borrowers whose Mortgage Notes are serviced by Countrywide can easily be determined from the mortgage records maintained by Countrywide or its agents. The disposition of their claims in a class action will be of benefit to the parties and to the Court.

16.    A class action is superior to other methods for the fair and efficient adjudication of the claims herein asserted, and no unusual difficulties are likely to be encountered in the management of this action as a class action. The likelihood of individual Class members prosecuting separate claims is remote.

17.    There is a well-defined community of interest in the questions of law and fact involved affecting the members of the Class. Among the questions of law and fact which are common to the Class, and which predominate over questions affecting any individual Class member are, *inter alia*, the following:

(a)    Whether Countrywide imposed on Class members inflated, unverifiable or false costs, fees and expenses associated with enforcement proceedings;

(b)    Whether imposition of those costs, fees and expenses violated the clear and unambiguous terms of the Mortgage Notes executed by Class members; and

(c)    Whether, and to what extent, Plaintiff and the members of the Class have been damaged by Countrywide's breach of the Mortgage Note, and the proper measure of damages;

18.    Plaintiff is a member of the Class and is committed to prosecuting this action. Plaintiff has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class in that he is seeking

compensatory damages for Countrywide's imposition of excessive foreclosure fees, including attorneys' fees in connection with enforcement actions filed against Plaintiff, the same claim being asserted on behalf of each individual Class member. Plaintiff does not have interests antagonistic to or in conflict with those he seeks to represent. Plaintiff is, therefore, an adequate representative of the Class.

19.     The likelihood of individual Class members prosecuting separate individual actions is remote due to the relatively small loss suffered by each Class member as compared to the burden and expense of prosecuting litigation of this nature and magnitude. Absent a class action, Countrywide is likely to avoid liability for its wrongdoing, and Class members are unlikely to obtain redress for the wrongs alleged herein.

20.     Adjudication of this case on a class-wide basis is manageable by this Court. The standard form Mortgage Notes issued to Plaintiff and the other members of the Class throughout the United States and its possessions are the same or so similar as to be legally and factually indistinguishable in all material respects, and the laws of the various states which may be applied to Plaintiff's breach of contract claim on behalf of the Class are largely identical or can otherwise be grouped into a small number of subsets based on any variations that may be deemed to be relevant to the Court. As a result, it will not be difficult for the Court or the jury to determine whether Countrywide has breached its contracts for each of the members of the Class. This Court is an appropriate forum for this dispute.

## SUBSTANTIVE ALLEGATIONS

### The Mortgage Note is a Contract of Adhesion

21.     The Mortgage Note executed by Plaintiff on June 19, 2003, and attached hereto as Exhibit A, is a standard Fannie Mae/Freddie Mac form contract, which is comparable in all material aspects and is substantially similar to the form Mortgage Note issued by Countrywide nationwide to its customers borrowing funds for home purchases.  In fact, the Mortgage Note explicitly provides that it is a "FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT." (Emphasis in the original).[3]  The Mortgage Note evidences the debt owed by the borrower to the holder of the note, and is the basic contractual instrument in financing a home.

22.     The Mortgage Note is a contract of adhesion, in that Plaintiff and the other members of the Class were not given any opportunity to negotiate any of its terms or conditions. Indeed, the Mortgage Note was offered to Plaintiff and other members of the Class on a "take it or leave it" basis.

### Under The Terms of the Mortgage Note, the Borrower's Liability Is Strictly Limited to Reimbursement of Actual Attorneys' Fees and Other Costs, Fees, and Expenses Actually Incurred by Countrywide

23.     The Mortgage Note sets forth the following provisions regarding the payment of foreclosure fees in the event of the borrower defaulting upon his or her obligations under the note:

> … the Note Holder will have the right to be *paid back* by me for
> all of *its* costs and expenses in enforcing this Note to the extent not

---

[3]   The terms of the ADJUSTABLE RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (annexed as Exhibit A) are identical in substance as relevant to this action.

> prohibited by applicable law. Those expenses include, for
> example, reasonable attorneys' fees.

Mortgage Note (Ex. A), Section 6(E). (Emphasis added).

24. The words "***paid back***" and "***its***" are clear and unambiguous.

25. The attorneys' fees for which the borrower can be held accountable are thus specifically and necessarily limited by the contractual provisions of the Mortgage Note to the fees *actually* incurred or obligated to be paid.

26. Plaintiff's counsel's investigation reveals that Countrywide has arrangements with attorneys for flat-fee, per-case rates. These rates are typically $300 to $500 per case. Pursuant to the Mortgage Note, therefore, a borrower subject to an enforcement action should be obligated to reimburse Countrywide for no more than $300-$500 (depending on the particular flat-fee arrangement).

27. Rather than seeking repayment of its flat-fee obligation, Countrywide, either directly or through its agents, collects a fee in an amount substantially in excess of (*i.e.*, up to four times) its flat-fee obligation. And, if these fees are not paid directly by the borrower, they are added to the settlement amount on a foreclosure sale of the subject property.

28. Similarly, there are a variety of fees, charges and expenses associated with foreclosure that are demanded of a borrower that is the subject of an enforcement action. These fees include, but are not limited to, clerk filing fees, service of process fees, statutory clerk fees, late charges, delinquency fees, appraisal fees, recording fees, unspecified foreclosure fees and costs, administrative fees, escrow fees, and interest charges.

29. Plaintiff's counsel's investigation reveals that many of the fees, costs and expenses that are demanded of the borrower are inflated, unverifiable or false. For instance,

borrowers are often charged for full appraisal fees when an appraisal was not actually conducted or a valuation was based on a "drive by" appraisal or brokers' opinion. Similarly, borrowers are charged for various court filing fees when foreclosure proceedings had not actually been commenced. Often, these overcharges are based on estimates provided by the attorneys rather than fees, costs, and expenses actually incurred by Countrywide.

### Under the Doctrine of *Contra Proferentum*, the Mortgage Note Must Be Read to Limit Fees to the Actual Amounts Countrywide Incurred or was Obligated to Pay

30.    The language in the Mortgage Note providing that the note holder and/or Countrywide is entitled to be "***paid back*** … for all of ***its*** costs and expenses in enforcing th[e] Note … includ[ing], for example, reasonable attorneys' fees" is naturally read to mean the borrower will be responsible for attorneys' fees Countrywide actually incurred or was obligated to pay in enforcing the Mortgage Note.

31.    With regard to attorneys' fees, since under no scenario will Countrywide ever incur or be obligated to pay more than the flat fee, pursuing the borrower for sums in excess of that amount is a self-evident breach of agreed upon terms.

32.    Likewise, if Countrywide seeks to collect costs, fees and expenses based on cost estimates, services not provided, costs and/or fees not incurred, or any amounts other than those actually paid or obligated to be paid by Countrywide, the clear terms of the Mortgage Note have been breached.

33.    Nonetheless, to the extent the language is subject to any ambiguity, it is a well-settled principle of contract law (*i.e., contra proferentum*) that any ambiguous term in the contract should be construed against the drafter and in accordance with the reasonable expectations of the borrower when he or she entered into the contract. This doctrine is

10

particularly applicable in situations, such as here, where a sophisticated lending institution, which frequently engages in lending transactions, enters into a standardized contract of adhesion with a less sophisticated borrower.

34.    Because the Mortgage Note does not authorize the lender to collect amounts in excess of its actual debts and obligations, it necessarily follows, then, that a reasonable borrower, at the time of contracting, would have interpreted the language to mean he or she would be responsible for only actual, reasonable and verifiable costs, fees and expenses associated with enforcement of the Mortgage Note.

35.    Accordingly, the only option available to Countrywide under the Mortgage Note is to charge Plaintiff and the Class the costs, fees and expenses actually paid or due.

**Borrowers Are Demanded to Pay Attorneys' Fees In Excess of the
Actual Amounts Countrywide Incurred or was Obligated to Pay**

36.    When a borrower fails to pay on the terms of the Mortgage Note, Countrywide institutes enforcement proceedings against the borrower up to and including foreclosure on the subject property.  Countrywide, either directly or through its agents, retains an attorney or law firm to pursue enforcement on the Mortgage Note (the "Enforcement Counsel").

37.    Plaintiff's counsel's investigation reveals that Countrywide customarily enters into flat-fee arrangements with Enforcement Counsel throughout the country to pursue enforcement against the borrowers who fall behind on the payments due under their Mortgage Notes.  Countrywide utilizes the services of Enforcement Counsel to make calls, send letters, and file foreclosure actions in its own name.

38.    Plaintiff's counsel's investigation further reveals that, at the end of the enforcement process, Countrywide, or one of its agents (including Enforcement Counsel), makes

11

a demand for payment to the borrower for costs, fees and expenses -- ostensibly under the authority of the Mortgage Note -- with attorneys' fees ranging from $1200-$2000.

39.    There is no contractual relationship between Enforcement Counsel and the borrowers subject to an enforcement action. The law firm has no independent authority, other than through its relationship with Countrywide, to collect any legal fees in connection with enforcement of the Mortgage Note. Therefore, under any circumstance, Enforcement Counsel act as agents of Countrywide collecting Countrywide's debt. This agency relationship is sufficient to make Countrywide directly responsible for Enforcement Counsel's actions in collecting fees in excess of those incurred.

**Borrowers are Demanded to Pay Other Fees, Expenses and Costs In
Excess of the Actual Amounts Countrywide Incurred or was Obligated to Pay**

40.    As noted above, Plaintiff's counsel's investigation reveals that many of the fees, expenses and charges that are demanded of the borrower in connection with enforcement on the Mortgage Note are inflated, unverifiable or false.

41.    One fee in particular, the appraisal fee ranging in cost from $300 to $500, is charged as a matter of course whether or not an appraisal is actually done on the borrower's home. In fact, Plaintiff's counsel's investigation reveals that such appraisals often are not, in fact, done and are sometimes no more than a "drive-by" check to see if the property exists.

42.    A proper appraisal, however, is far more involved and typically consists of an actual visit, wherein the appraiser actually gets out of his or her automobile. The appraiser is obligated to note any unique characteristics of the property and of the surrounding area, evaluate the specific architectural style of a building and its proximity to such things as major highways, commercial zones, and other valuation +/- factors. Appraisers should also take into account

12

additional aspects of a property like the condition of the home's foundation and roof and take note of any renovations that may have been done. After visiting and properly inspecting the property, the appraiser can then determine the fair value of the property by taking into consideration such things as comparable home sales, location, previous appraisals, and income potential. This information will form the basis of a detailed report, stating not only the value of the parcel, but the precise reasoning and methodology of how the appraiser arrived at the estimate.

43.    If proper appraisals are not being completed, demanding payment from the borrower is improper and in breach of the Mortgage Note.

44.    An article featured in *The New York Times* on November 6, 2007 entitled "Borrowers Face Dubious Charges in Foreclosures," highlights some of the unverifiable and false charges passed along to borrowers like the Plaintiff and members of the Class. The article stated, in part:

> Because there is little oversight of foreclosure practices and the fees that are charged, bankruptcy specialists fear that some consumers may be losing their homes unnecessarily or that mortgage servicers, who collect loan payments, are profiting from foreclosures.
>
> Bankruptcy specialists say lenders and loan servicers often do not comply with even the most basic legal requirements, like correctly computing the amount a borrower owes on a foreclosed loan or providing proof of holding the mortgage note in question.
>
> "Regulators need to look beyond their current, myopic focus on loan origination and consider how servicers' calculation and collection practices leave families vulnerable to foreclosure," said Katherine M. Porter, associate professor of law at the University of Iowa.

13

In an analysis of foreclosures in Chapter 13 bankruptcy, the program intended to help troubled borrowers save their homes, Ms. Porter found that questionable fees had been added to almost half of the loans she examined, and many of the charges were identified only vaguely. *Most of the fees were less than $200 each, but collectively they could raise millions of dollars for loan servicers at a time when the other side of the business, mortgage origination, has faltered.*

In one example, Ms. Porter found that a lender had filed a claim stating that the borrower owed more than $1 million. But after the loan history was scrutinized, the balance turned out to be $60,000. And a judge in Louisiana is considering an award for sanctions against Wells Fargo in a case in which the bank assessed improper fees and charges that added more than $24,000 to a borrower's loan.

\* \* \*

Questionable practices by loan servicers appear to be enough of a problem that the Office of the United States Trustee, a division of the Justice Department that monitors the bankruptcy system, is getting involved. Last month, It announced plans to move against mortgage servicing companies that file false or inaccurate claims, assess unreasonable fees or fail to account properly for loan payments after a bankruptcy has been discharged.

On Oct. 9, the Chapter 13 trustee in Pittsburgh asked the court to sanction Countrywide, the nation's largest loan servicer, saying that the company had lost or destroyed more than $500,000 in checks paid by homeowners in foreclosure from December 2005 to April 2007.

The trustee, Ronda J. Winnecour, said in court filings that she was concerned that even as Countrywide misplaced or destroyed the checks, it levied charges on the borrowers, including late fees and legal costs.

"The integrity of the bankruptcy process is threatened when a single creditor dishonors its obligation to provide a truthful and accurate account of the funds it has received," Ms. Winnecour said in requesting sanctions.

14

\* \* \*

*But these are not the only charges borrowers face. Others include $145 in something called "demand fees," $137 in overnight delivery fees, fax fees of $50 and payoff statement charges of $60. Property inspection fees can be levied every month or so, and fees can be imposed every two months to cover assessments of a home's worth.*

*"We're talking about millions and millions of dollars that mortgage servicers are extracting from debtors that I think are totally unlawful and illegal," ... "Somebody files a Chapter 13 bankruptcy, they make all their payments, get their discharge and then three months later, they get a statement from their servicer for $7,000 in fees and charges incurred in bankruptcy but that were never applied for in court and never approved."*

\* \* \*

Without proper documentation, families must choose between the costs of filing an objection or the risk of overpayment, Ms. Porter concluded.

She also found that some creditors ask for fees, like fax charges and payoff statement fees, that would probably be considered "unreasonable" by the courts.

Not surprisingly, these fees may contribute to the other problem identified by her study: a discrepancy between what debtors think they owe and what creditors say they are owed.

*In 96 percent of the claims Ms. Porter studied, the borrower and the lender disagreed on the amount of the mortgage debt. In about a quarter of the cases, borrowers thought they owed more than the creditors claimed, but in about 70 percent, the creditors asserted that the debt owed was greater than the amounts specified by borrowers.*

*The median difference between the amounts the creditor and the borrower submitted was $1,366; the average was $3,533, Ms. Porter said. In 30 percent of the cases in which creditors' claims were higher, the discrepancy was greater than 5 percent of the homeowners' figure.*

15

*Based on the study, mortgage creditors in the 1,733 cases put in claims for almost $6 million more than the loan debts listed by borrowers in the bankruptcy filings. The discrepancies are too big, Ms. Porter said, to be simple record-keeping errors.*

Michael L. Jones, a homeowner going through a Chapter 13 bankruptcy in Louisiana, experienced such a discrepancy with Wells Fargo Home Mortgage. After being told that he owed $231,463.97 on his mortgage, he disputed the amount and ultimately sued Wells Fargo.

In April, Elizabeth W. Magner, a federal bankruptcy judge in Louisiana, ruled that Wells Fargo overcharged Mr. Jones by $24,450.65, or 12 percent more than what the court said he actually owed. The court attributed some of that to arithmetic errors but found that Wells Fargo had improperly added charges, including $6,741.67 in commissions to the sheriff's office that were not owed, almost $13,000 in additional interest and fees for 16 unnecessary inspections of the borrowers' property in the 29 months the case was pending.

"Incredibly, Wells Fargo also argues that it was debtor's burden to verify that its accounting was correct," the judge wrote, "even though Wells Fargo failed to disclose the details of that accounting until it was sued."

A Wells Fargo spokesman, Kevin Waetke, said the bank would not comment on the details of the case as the bank is appealing a motion by Mr. Jones for sanctions. "All of our practices and procedures in the handling of bankruptcy cases follow applicable laws, and we stand behind our actions in this case," he said.

\* \* \*

(Emphasis added).

### Nationwide Investigations Into Countrywide's Mortgage Lending Practices

45.    An August 26, 2007 *New York Times* article entitled "Inside the Countrywide Lending Spree" reported that internal documents of Countrywide and interviews with former Countrywide employees and brokers who worked in different units of the company uncovered

16

that Countrywide's lending practices were often aimed at financing loans that were unfavorable to borrowers while resulting in the collection of more fees and greater profits for Countrywide. The article further stated that "Countrywide's entire operation, from its computer system to its incentive pay structure and financing arrangements, is intended to wring maximum profits out of the mortgage lending boom *no matter what it costs borrowers*." (Emphasis added).

46.     In October 2007, the U.S. Trustee, a division of the U.S. Justice Department that monitors the bankruptcy system, announced plans to move against mortgage servicing companies that file false or inaccurate claims, assess unreasonable fees, or fail to account properly for loan payments after a bankruptcy has been discharged.

47.     The U.S. Trustee has since sought in-depth information from Countrywide in several cases regarding fees that Countrywide imposed to borrowers in bankruptcy.    For instance, on October 9, 2007, the U.S. Trustee in Pittsburgh asked the court to sanction Countrywide, claiming that the company had lost or destroyed more than $500,000 in checks paid by homeowners in foreclosure from December 2005 to April 2007.    In court filings, the trustee, Ronda J. Winnecour, stated that she was concerned that even as Countrywide misplaced or destroyed the checks, it levied charges on those borrowers, including late fees and legal costs.

48.     More recently, on November 28, 2007, the U.S. Trustee initiated a federal probe into Countrywide's foreclosure practices and subpoenaed Countrywide's records to determine if its foreclosure practices were improper by, among other things, tacking on improper charges to loans made to homeowners.

49.     A January 31, 2008 *Wall Street Journal* article entitled "Countrywide Confirms Florida Subpoena" reported that the U.S. Trustee also announced that "it has seen widespread

17

mistakes by Countrywide about how much borrowers owed the company at the start of a bankruptcy and about improperly crediting borrower payments during bankruptcy, among other issues."

50.    Moreover, that same *Wall Street Journal* article disclosed that Countrywide received a subpoena from the Florida attorney general seeking information on its business practices.  The article reported that Florida Attorney General Bill McCollum is investigating whether Countrywide has charged excessive fees to borrowers in the foreclosure process.  In an interview, Attorney General McCollum noted that even bankruptcy judges have flagged these fees and have expressed concern that Countrywide "may be sticking people at the end of the process."

51.    Attorney General McCollum also revealed that his office has received more than 150 complaints during the past several months about Countrywide's lending practices and noted that Countrywide shows up in a "disproportionate" number of situations in which borrowers in Florida are struggling to stay in their homes.

52.    As that same *Wall Street Journal* article further reported, Florida joins several other states, including California and Illinois that have begun investigating Countrywide in connection with its mortgage lending practices.  Notably, in September 2007, the Illinois Attorney General issued a subpoena to Countrywide to investigate possible violations of the state's consumer-fraud and deceptive practices laws.

**A Demand For Payment of Any Costs, Fees or Expenses in Excess of
The Actual Amounts Countrywide Incurred or was Obligated to Pay
Constitutes  A Clear Breach of Contract Under the Mortgage Note**

53.     Upon entering into the contract with Countrywide, Plaintiff and other members of

the Class did not agree to pay any fees and/or expenses in excess of those actually incurred or

obligated to be paid in connection with an enforcement proceeding.  There was no meeting of the

minds between the parties at the time the contract was formed as to the payment of attorneys'

fees in excess of the flat-fee amount in the event of the borrower's default under the note or any

other fee or expense not actually incurred by Countrywide.  Yet, Plaintiff and the other members

of the Class, who ultimately ended up in enforcement proceedings, were indeed subjected to such

costs, fees and expenses they neither foresaw nor agreed to at the time they executed the

Mortgage Note.

54.     By imposing upon Plaintiff and the other members of the Class any attorneys'

fees in excess of the flat-fee agreement or any amounts actually paid (or owed) to Enforcement

Counsel, Countrywide directly violated its obligations under the Mortgage Note.

55.     Likewise, by imposing upon Plaintiff and other members of the Class any costs,

fees and expenses based on cost estimates, services not provided, costs and/or fees not incurred,

or any amounts other than those actually paid or obligated to be paid, Countrywide violated its

obligations under the Mortgage Note.

56.     A borrower who desires to redeem or reinstate his or her mortgage has a

contractual right to do so by paying the arrearages, the costs of reinstatement or redemption and

the reimbursement of costs, fees and expenses incurred by Countrywide for any foreclosure

enforcement.  This right is frustrated by Countrywide's widespread practice of charging costs,

19

fees and expenses, including attorneys' fees, in excess of amounts actually paid or obligated to be paid by Countrywide. As a result of Countrywide's improper practice of overcharging costs, fees and expenses, those borrowers who have enough funds to pay past due debt and other foreclosure costs, but are unable to pay the greater sums, remain subject to losing their homes in foreclosure.

57.    In some cases, due to this overcharging, borrowers are also left unable to recoup residual equity from their homes upon foreclosure sales to third parties. Even after the terms of the Mortgage Note are otherwise satisfied, the excess charges are added to the knock-down price paid by the purchaser and retained by the attorneys. This has the effect of deleting or nullifying any possibility of surplus monies from the sale that all state laws require remain the property of the mortgagee-borrowers.

58.    Funds resulting from increased value that the borrowers are entitled to after satisfying the Mortgage Note now represent a windfall to Countrywide who was obligated to pay and/or accept lesser amounts.

59.    Countrywide's practice of directing or permitting the over-charging of fees and expenses in connection with enforcement and foreclosure proceedings in breach of the Mortgage Note is rendered even more egregious by the recent large-scale occurrence of home foreclosures. Indeed, on February 2, 2007, *Bloomberg.com*, reported that:

> *Defaults on mortgages to people with poor credit histories or large debt burdens rose in November above their worst levels during the last recession six years ago*, according to Friedman Billings Ramsey Group Inc.
>
> *The percentage of subprime (sic) mortgages packaged into bonds and delinquent by 90 days or more, in foreclosure or already turned into seized properties climbed to 10.09 percent from 9.08*

*percent in October*, analysts led by Michael D. Youngblood at the Arlington, Virginia-based firm said in a report today. …

*Defaults on subprime loans have surged as rates on ones made in 2002, 2003 and 2004 adjust higher as their fixed-rate periods end* following an increase in short-term interest rates from the lowest in 45 years. *Subprime mortgages made in 2005 and 2006 are suffering from slumping home prices and looser lending standards.*

*More than a dozen sub-prime mortgage lenders have closed in the past two months* including Middletown, Connecticut-based Mortgage Lenders Network USA Inc., Agoura Hills, California-based Ownit Mortgage Solutions, Charlotte, North Carolina-based Wachovia Corp.'s EquiBanc Mortgage and the Equity One unit of Puerto Rico's Popular Inc.

Subprime mortgages, home loans with rates generally at least 2 or 3 percentage points above safer prime loans, are given to people with low credit ratings or combinations of other attributes that make it more likely lenders will have to foreclose on their homes and sell them for losses.

*Foreclosures begun on subprime adjustable-rate mortgages, of ARMs, rose to a four-year high of 2.19 percent in the third quarter*, according to the mortgage bankers' group.

(Emphasis added).

60.     On July 23, 2007, half a year after the publication of the above-cited *Bloomberg*

article, *The Wall Street Journal*, in an article entitled "States Aim to Stem Tide of Home

Foreclosures With Funds For Refinancing," reiterated the disconcerting foreclosure statistics:

*More than one million American homes are expected to enter foreclosure this year*; the total represents about 2.3% of the nation's 44 million home loans, according to Freddie Mac… Freddie Mac says about 60% of those homes carry subprime mortgages.

*The projected foreclosure rate* -- higher than during the oil bust of 1987 but not as high as in the 2002 recession – *poses a significant threat to the housing sector, and possibly to the nation's economy*

21

> *if it spurs consumers to maintain a tight grip on their wallets.*
> "*Falling home prices hurt consumer spending,*" says Patrick
> Newport, an economist at consulting firm Global Insight.

(Emphasis added).

61.    On August 1, 2007, CNNMoney.com, in an article entitled "Why Stocks Can Shake Off Mortgage Meltdown" (the "CNN Article"), reported that yet another victim of the subprime mortgage meltdown, American Home Mortgage announced that "lenders had cut off its access to credit and that it may have to sell off its assets."  The CNN Article further noted that:

> *Problems in the risky debt and subprime mortgage sector have*
> *sparked wild swings in the market recently...*
>
> *There are reasons for concern.   ...The collapse of companies*
> *like American Home and other mortgage lenders could make*
> *home loans more expensive for borrowers.*

> (Emphasis added).

62.    On August 21, 2007, the Associated Press, in an article entitled "July Foreclosures Up 9 Percent From June," it was reported that "[t]he number of foreclosure filings reported in the U.S. [in July of 2007] jumped 93 percent from July of 2006 and rose 9 percent from June, the latest sign that homeowners are having trouble making payments and finding buyers during the national housing downturn."  According to the article:

> There were 179,599 foreclosure filings reported during July, up
> from 92,845 during the same period a year ago, Irvine-based
> RealtyTrac Inc. said Tuesday.  There were 164,644 foreclosure
> filings reported in June.
>
> *The national foreclosure rate in July was one filing for every 693*
> *households, the company said.*
>
> * * *
>
> In recent months, the mortgage industry has been battered by rising
> defaults and foreclosures, primarily driven by borrowers with

22

subprime loans and adjustable rate mortgages. Lagging home sales and flat or decreasing home prices have made it more difficult for homeowners who fall behind on payments to sell their homes and clear the debt, spurring the rise in foreclosure activity.

Loan types seeing higher delinquencies and defaults in general are home equity loans or second mortgages used to cover a downpayment, subprime loans to people with shaky credit histories, and Alt-A loans, which can include interest-only and adjustable rate mortgages sold with little or no documentation.

63.     On September 18, 2007, the Associated Press, in an article entitled, "U.S. Home Foreclosures Soar In August," reported that "[t]he number of foreclosure filings reported in the U.S. last month more than doubled versus August 2006 and jumped 36 percent from July, a trend that signals many homeowners are increasingly unable to make timely payments on their mortgages or sell their homes amid a national housing slump." The article further reported that:

A total of 243,947 foreclosure filings were reported in August, up 115 percent from 113,300 in the same month a year ago, Irvine, Calif.-based RealtyTrac Inc. said Tuesday.

There were 179,599 foreclosure filings reported in July.

The filings include default notices, auction sale notices and bank repossessions. Some properties might have received more than one notice if the owners have multiple mortgages.

August's total represents the highest number of foreclosure filings reported in a single month since the company began tracking monthly filings two years ago.

***The national foreclosure rate last month was one filing for every 510 households, the company said.***

"The jump in foreclosure filings this month might be the beginning of the next wave of increased foreclosure activity, as a large number of subprime adjustable rate loans are beginning to reset now," RealtyTrac Chief Executive James J. Saccacio said.

> The mortgage industry has been rocked by a surge in defaults, particularly among borrowers with subprime loans and adjustable rate mortgages that initially had attractive "teaser" interest rates but then can adjust upward, resulting in a payment shock.
>
> Many of the loans, some of which adjust in as little as two years, were issued in 2005 and 2006 during the height of the housing boom.
>
> Lagging home sales and flat or decreasing home prices have also left homeowners unable to make their mortgage payments hard-pressed to find buyers.
>
> The latest figures also reflect an increase in the number of homes going into foreclosure that are not being picked up in estate sales and are ending up going back to lenders.
>
> The number of bank repossessions jumped to 42,789 in August, compared with 20,116 a year earlier, the RealtyTrac said. In July, there were 26,842 bank repossessions.
>
> (Emphasis added).

64.    Testifying before Congress on November 6, 2007, Mark Zandi, chief economist at Moody's Economy.com, estimated that two million families would lose their homes by the end of the current mortgage crisis.

65.    On February 18, 2008, *The New York Times*, in an article entitled "No Lull in Mortgage Pitches," reported that lenders have ramped up mortgage advertising in recent months despite the deepening foreclosure crisis and heightened scrutiny on the industry. The article stated further, that:

> More than 1.6 million mortgage holders missed payments in 2007, and more are expected to default this year, according to Moody's Economy.com.
>
> According to the Mortgage Bankers Association, the delinquency and foreclosure rate for all mortgages is 7.3 percent, higher than at any time since the group started tracking that data in 1979.

24

> On Friday, Countrywide Financial, the nation's largest mortgage
> lender, said that its foreclosures and late payments increased in
> January to levels nearly twice as high as a year ago. Bank of
> America is in the process of acquiring Countrywide.

66.    In this climate of mortgage meltdowns and widespread foreclosures, many

resulting from predatory lending practices, the imposition by Countrywide, directly or indirectly,

through its agents, including its Enforcement Counsel, of unduly high attorneys' fees, charges,

costs and expenses on Plaintiff and the Class, exacerbated the financial difficulties already

suffered by Plaintiff and the Class by making it more costly and sometimes downright

prohibitive to reinstate or redeem their mortgage loans.

67.    As a result of Countrywide's breach of its obligations under the Mortgage Note,

as described above, Plaintiff and the Class have been damaged in the amount of the costs, fees

and expenses, and other overcharges not actually incurred by Countrywide but charged to

Plaintiff and the Class.  Damages sustained by Plaintiff and the Class are a direct result of

Countrywide's breach of the Mortgage Note.  Accordingly, Countrywide is liable to Plaintiff and

the Class.

## COUNT I

### *Breach of Contract*

68.    Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

69.    Plaintiff and the other members of the Class entered into contracts for mortgages

with Countrywide with the understanding and agreement that they would be responsible for no

more than the costs and expenses, including attorneys' fees, actually incurred or obligated to be paid by Countrywide in connection with any enforcement action on the Mortgage Note.

70.    Countrywide breached its agreement with Plaintiff and the other members of the Class by causing, directing and/or allowing its agents, including attorneys, to charge borrowers for costs, fees and expenses in connection with enforcement or foreclosure proceedings in an amount in excess of amounts Countrywide actually incurred or was obligated to pay.

71.    As a result of Countrywide's breaches of the Mortgage Notes, Plaintiff and the other members of the Class were damaged by the amount of costs, fees, and expenses they overpaid in connection with enforcement and foreclosure proceedings pursued against them by Countrywide. Plaintiff and the other members of the Class are entitled to recover such amounts that were improperly demanded and paid.

## **COUNT II**

### *Unjust Enrichment*

72.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

73.    As a result of the breach of contract described above, Countrywide has been and will be unjustly enriched at the expense of Plaintiff and the Class by virtue of the unjustified earnings and/or profits received by Countrywide.

74.    Countrywide wrongfully over-charged Plaintiff and the members of the Class, and directed and/or permitted its agents, including its Enforcement Counsel, to retain costs, fees and expenses that were in excess of those agreed upon under the Mortgage Note, as well as the

interest or other profits earned on the proceeds, which were unlawfully received from Plaintiff and the other Class members.

75.    By reason of the foregoing, Plaintiff and each individual Class member are entitled to the return of the sums paid in excess of the costs, fees and expenses actually incurred or obligated to be paid by Countrywide in connection with Mortgage Note enforcement proceedings.

## COUNT III

### *Breach of Duty of Good Faith and Fair Dealing*

76.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

77.    Countrywide has a duty of good faith and fair dealing that is implied in each of its contracts with Plaintiff and the other Class members, including the duty to charge no more than its actual costs, fees and expenses, including attorneys' fees, in connection with enforcement and foreclosure proceedings, as is specifically provided for in the Mortgage Notes entered into by Plaintiff and the other Class members.

78.    Countrywide breached its duty of good faith and fair dealing by, *inter alia*, directly or indirectly, through its sub-servicers, warehouse lenders, wholesale lenders, retail lenders, document custodians, settlement agents, title companies, insurers and investors and others, pursuing enforcement and foreclosure proceedings and then, subsequently, causing, directing and/or giving approval to its agents to seek costs, fees and expenses, including attorneys' fees, from borrowers in excess of any amounts that Countrywide actually incurred or was obligated to pay.

27

79.     Based upon the foregoing, Plaintiff and the other Class members are entitled to a judgment that Countrywide has breached its duty of good faith and fair dealing implied in the Mortgage Note.

80.     As a result of Countrywide's breach, Plaintiff and the other members of the Class have been damaged in an amount equal to any and all costs, fees and expenses, including attorneys' fees, charged in excess of the amounts Countrywide actually incurred or was obligated to pay.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

(a)     Declaring that this lawsuit is properly maintainable as a class action and certifying Plaintiff as a representative of the Class;

(b)     Declaring that Countrywide breached its contract with Plaintiff and the members of the Class;

(c)     Declaring that Countrywide was unjustly enriched as a result of its breach of contract with Plaintiff and the members of the Class, and that Countrywide violated its duty of good faith and fair dealing towards Plaintiff and the Class;

(d)     Awarding damages against Countrywide, in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

(e)     Permanently enjoining and restraining Countrywide directly or indirectly, through its sub-servicers, warehouse lenders, wholesale lenders, retail lenders, document custodians, settlement agents, title companies, insurers and investors and others, from overcharging costs and expenses, including any attorneys' fees, in excess of the amounts actually

28

incurred or that were obligated to be paid in connection with enforcement and foreclosure proceedings;

(f) To the extent the Court finds any ambiguity in the form Mortgage Note used by Countrywide in provisions pertaining to a borrower's obligation to reimburse Countrywide, directly or indirectly, for its costs, fees and expenses, directing Countrywide to redraft the same in a manner that fully and fairly describes the obligations of the borrower;

(g) Awarding Plaintiff and the Class their costs and disbursements and reasonable allowances for Plaintiff's counsel and experts' fees and expenses; and

(h) Granting such other and further relief as may be just and proper.

Dated: February 25, 2008

## ROSENTHAL, MONHAIT & GODDESS, P.A.

By: _____ /s/ *Carmella P. Keener* _____
Carmella P. Keener (#2810)
Citzens Bank Center, Suite 1401
Wilmington, DE 19899-1070
Tel: (302) 656-4433
Fax : (302) 658-7567
ckeener@rmgglaw.com

*Attorneys for Plaintiffs*

**Of Counsel:**

**HARWOOD FEFFER LLP**
Robert I. Harwood, Esq.
Jeffrey M. Norton, Esq.
488 Madison Avenue
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
rharwood@hfesq.com
jnorton@hfesq.com

29

# EXHIBIT A

Loan Administration    2/7/2008 9:18 AM    PAGE    27/005    805-320-5019



# NOTE



| June 19, 2003 | New York | New York |
|---|---|---|
| [Date] | [City] | [State] |

6739 Jog Palm Drive    , Boynton Beach    , FL 33437
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 176,000.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is MortgageLine.com, division of The New York Mortgage Co,LLC

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    4.8750    %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the    1st    day of each month beginning on    August 1, 2003    . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on    July 1, 2018    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at    ,

or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $1,380.36

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

B8-03050069    2001002245    0

**FLORIDA FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

-5N(FL) (0005)    Form 3210 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3    MW 05/00    Initials: _____

 

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of        15        calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.0000        % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

---

88-03050069                                    2001002245                                              0

Form 3250 1/01

-5N(FL) (9905)                          Page 2 of 3                          Initials:

Loan Administration   2/7/2008 9:18 AM   PAGE   47/005   805-520-5019

 

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 11. DOCUMENTARY TAX

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower
Tamara E. Portnik

_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                  -Borrower

                                                          [Sign Original Only]

88-03050069                    2001002245                              0

-5N(FL) (0005)                  Page 3 of 3                   Form 3210 1/01

*NOTE RIDER*

June 19, 2003                                        $   176,000.00

_6739 Jog Palm Drive_                      Boynton Beach     FL 33437
                        *Property Address*

1.   SALE INTO THE SECONDARY MARKET

    I understand that the Lender intends to sell this Note into the secondary market. I further understand that in order to sell this Note to a secondary market investor, the Lender is required to warrant the truthfulness of the various information contained in my completed loan application. This information includes but is not limited to, the purpose of the loan, the amount and source of down payment, employment and income information, assets and liabilities and occupancy status.

2.   RELIANCE UPON BORROWER(S)

    I understand that the Lender's warranties to secondary market investors are based upon my certification that the information contained in my completed loan application is true and correct.

3.   BORROWER(S') MISREPRESENTATION

    In the event the Lender discovers that I have made a misrepresentation which would make this Note unsuitable for sale to its secondary market investors, I will be in default.

4.   DEFAULT DUE TO BORROWER(S) MISREPRESENTATION

    (A)  Notice of Default

    If I am in default because I have made a misrepresentation, the Lender may require me to pay the full amount of principal which has not been paid and all interest that I owe on that amount. The Lender will send me written notice by first class mail to the property address or at any other mailing address that I have given notice to the lender as my mailing address.

    (B)  Payment in Full

    If the Lender requires payment in full according to paragraph 4(A) above, I shall have at least thirty days to pay the amount to the Lender. If I do not pay the amount due to the Lender, the interest rate I will be required to pay on the balance due will be increased to 24% or the maximum amount allowed by law from the date notice of default is mailed to me. The Lender will also have the right to be paid back by me at 24% or the maximum rate allowed by law, together with all costs and expenses that the Lender incurs in enforcing this Note. In the event the Lender has sold this Note to a Secondary market investor and the investor is requiring the Lender to repurchase this Note because I have made a misrepresentation, I will be in default.

WITNESS THE HAND(S) AND SEAL(S)

_Tamara E. Portnick_
Tamara E. Portnick

# EXHIBIT B

Loan Administration   2/7/2008 9:31 AM   PAGE   27/018   805-520-5019

29390619

07/02/2003  15:08:21  20030391322
OR BK 15476 PG 0647
Palm Beach County, Florida
AMT 176,800.00
Deed Doc 616.00
Intang 352.00

Return To:
**RECORD & RETURN TO**
**Title Matters, LLC**
**301 Clematis St. #203**
**West Palm Beach, FL 33401**
UC #48

This document was prepared by:
Yelena Shulyatyeva

CHL

610  029390619  D2  001  002

ne For Recording Data

GAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated        June 19, 2003
together with all Riders to this document.
(B) "Borrower" is Tamara E. Portnick, a married woman joined
by her husband Irwin Portnick

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is MortgageLine.com

Lender is a division of The New York Mortgage Co, LLC
organized and existing under the laws of          New York

88-03050069                   2001002245                              D
FLORIDA Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01

-6(FL) (0005).01
Page 1 of 16        NW 05/02.01        Initials:

VMP MORTGAGE FORMS - (800)521-7291

BOOK 15470   PAGE 0648

Lender's address is  304 Park Avenue South,10th Flr, New York, NY 10010

Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated   June 19, 2003
The Note states that Borrower owes Lender One Hundred Seventy Six Thousand and
no/100                                                                 Dollars
(U.S. $ 176,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than   July 1, 2018        .

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider   ☐ Condominium Rider            ☐ Second Home Rider
☐ Balloon Rider           ☐ Planned Unit Development Rider  ☐ 1-4 Family Rider
☐ VA Rider                ☐ Biweekly Payment Rider        ☐ Other(s) [specify]

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

BB-03050069                         2001002245                                          0

-6(FL) (0005).01                    Page 2 of 16                  Initials: T.P.          Form 3010  1/01

BOOK 15470    PAGE 0649

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the                    [Type of Recording Jurisdiction]
of                                                                                    [Name of Recording Jurisdiction]:
*****THIS PROPERTY IS IMPROVED BY A ONE-TO-TWO FAMILY DWELLING ONLY*****

Parcel ID Number:                                              which currently has the address of
6739 Jog Palm Drive                                                                        [Street]
Boynton Beach                                    [City], Florida    33437                [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

88-03050069                          2001002245                                                        0

-6(FL) (0006).01                    Page 3 of 15                                    Form 3010    1/01

Loan Administration   2/7/2008 9:31 AM   PAGE   37/018   003-320-3018

BOOK 15470   PAGE 0650

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment

88-03050069                     2001002245                    Initial: _T.P._                        0

-6(FL) (0008).01                       Page 4 of 16                                          Form 3010   1/01

BOOK 15470    PAGE 0551

can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest

BB-03050069                     2001002245                                              0

Loan Administration   2/7/2008 9:31 AM   PAGE   17/018   803-020-0013

BOOK 15470   PAGE 0652

shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only as long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

88-03050069                    2001002245                                          D

-6(FL) (0005).01                Page 6 of 16                          Form 3010  1/01

BOOK 15470  PAGE 0653

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

Loan Administration   2/7/2008 9.31 AM   PAGE   9/018   800-520-9018

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

88-03050069                           2001002245                                        0

-6(FL) (0005).01                        Page 6 of 16                     Form 3010   1/01

Loan Administration   2/7/2008 9:31 AM   PAGE   10/018   805-520-5019

BOOK 15470   PAGE 0655

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

88-03050069                    2001002245                                    0

-6(FL) (0005).01               Page 9 of 18        Initials: TP        Form 3010   1/01

Loan Administration   2/7/2008 8:31 AM   PAGE   11/018   805-320-5015

BOOK 15470    PAGE 0656

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of

88-03050069                    2001002245                                    0

-6(FL) (0005).01                    Page 10 of 18            Initials:        Form 3010  1/01

BOOK 15470 PAGE 0657

any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers

BB-03050069                    2001002245                                               0

-8(FL) (0005).01                    Page 11 of 15                    Initials _____        Form 3010  1/01

Loan Administration

BOOK 15478   PAGE 0658

unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the

88-03050069                 2001002245                              0

-6(FL) (0005).01            Page 12 of 16            Initials        Form 3010   1/01

Loan Administration  2/7/2008 9:31 AM  PAGE  14/018  805-520-5019

purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

88-03050069                      2001002245                                    0

BOOK 15470   PAGE 0660

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

88-03050069                       2001002245                                           0

Initials 

_@_-6(FL) (0005).01                  Page 14 of 16                                      Form 3010   1/01

Loan Administration  2/7/2008 8:31 AM  PAGE  16/018

BOOK 15478   PAGE 0661

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

Witness Julie Krolak

_____ (Seal)
Tamara E. Portnick          -Borrower

Witness Barbara Williams

6739 Jog Palm Drive, Boynton Beach,
FL 33437                    (Address)

_____ (Seal)
                            -Borrower

_____ (Address)

_____ (Seal)      _____ (Seal)
                    -Borrower                              -Borrower

_____ (Address)   _____ (Address)

_____ (Seal)      _____ (Seal)
                    -Borrower                              -Borrower

_____ (Address)   _____ (Address)

_____ (Seal)      _____ (Seal)
                    -Borrower                              -Borrower

_____ (Address)   _____ (Address)

88-03050069                 2001002245                      0

-6(FL) (9305).01            Page 16 of 18               Form 3010  1/01

Loan Administration   2/7/2008 9:31 AM   PAGE   17/018   803-320-3010

BOOK 15470   PAGE 0662

STATE OF FLORIDA,                                    County ss: Palm Bch
   The foregoing instrument was acknowledged before me this      June 19, 2003      by
Tamara E. Portnick      and Irwin Portnick

who is personally known to me or who has produced    FL Driv. Lic      as identification.

Barbara J. Williams
Notary Public

88-03050069                    2001002245            Initials:              0

-6(FL) (9905).01              Page 16 of 16                         Form 3010   1/01

BOOK 15470   PAGE 0663
Dorothy H. Wilken, Clerk

# Exhibit A

Lot 65, JOG ESTATES - P.U.D., according to the Plat thereof, recorded in Plat Book 84, Page 24, of the Public Records of Palm Beach County, Florida.

Parcel Identification Number: 00-42-45-27-09-000-0650

File Number: 03-0483.

DoubleTime®

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)   PLAINTIFFS
GREGORY O'GARA, On Behalf Of The ESTATE OF
TAMARA PORTNICK, Individually and On Behalf
Of All Others Similarly Situated

### (b)   County of Residence of First Listed Plaintiff   Monmouth County,
NJ
(EXCEPT IN U.S. PLAINTIFF CASES)

### (c)   Attorney's (Firm Name, Address, and Telephone Number) (302) 656-4433
Carmella P. Keener, Esq., Rosenthal, Monhait &
Goddess, P.A., PO Box 1070, Wilmington, DE
19899-1070

## DEFENDANTS
COUNTRYWIDE HOME LOANS, INC., a wholly-
owned subsidiary of COUNTRYWIDE FINANCIAL
CORPORATION
County of Residence of First Listed Defendant

(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

- ☐ 1   U.S. Government Plaintiff
- ☐ 3   Federal Question (U.S. Government Not a Party)
- ☐ 2   U.S. Government Defendant
- ☒ 4   Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from another district (specify)
- ☐ 6   Multidistrict Litigation
- ☐ 7   Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:
Breach of contract

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE
DOCKET NUMBER

DATE
2/25/08

SIGNATURE OF ATTORNEY OF RECORD
Carmella P. Keener
(DSBA No. 2810)

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

AO 440 (Rev. 08/01) Summons in a Civil Action

# United States District Court

_____ DISTRICT OF DELAWARE _____

**SUMMONS IN A CIVIL CASE**

GREGORY O'GARA, on Behalf of The
ESTATE OF TAMARA PORTNICK,
Individually and On Behalf Of All Others
Similarly Situated,

        **V.**　　　　　　　　　　　　CASE NUMBER:

COUNTRYWIDE HOME LOANS, INC.,
a wholly-owned subsidiary of
COUNTRYWIDE FINANCIAL CORPORATION,

    **TO**:       **COUNTRYWIDE HOME LOANS, INC.,**
           **a wholly-owned subsidiary of**
           **COUNTRYWIDE FINANCIAL CORPORATION**
           **c/o The Prentice-Hall Corporation System, Inc.**
           **2711 Centerville Road, Suite 400**
           **Wilmington, DE 19808**

  **YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY(name and address)

                             Carmella P. Keener, Esquire
                             Rosenthal, Monhait & Goddess, P.A.
                             P. O. Box 1070
                             Wilmington, DE  19899-1070

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against
you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within
a reasonable period of time after service.

_____     _____
CLERK                                   DATE

_____
(BY) DEPUTY CLERK

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and Complaint was made by me[1] | |
| NAME OF SERVER (PRINT) | TITLE |

Check one box to indicate appropriate method of service:

☐     Served personally upon the defendant.  Place where served: _____
_____

☐     Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left: _____
_____
_____

☐     Returned unexecuted: _____
_____
_____

☐     Other (specify): _____
_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

    I declare, under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____      _____
            Date                             Signature of Server

                                             _____
                                             Address of Server

[1] As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.