## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PFIZER INC, <br> PFIZER IRELAND PHARMACEUTICALS, <br> WARNER-LAMBERT COMPANY, <br> WARNER-LAMBERT COMPANY, LLC <br> and <br> WARNER-LAMBERT EXPORT, LTD. <br><br> Plaintiffs, <br><br> v. <br><br> RANBAXY LABORATORIES <br> LIMITED, <br> RANBAXY PHARMACEUTICALS, INC <br> and RANBAXY INC. <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Civil Action No.  08- |

## COMPLAINT

Pfizer Inc., Pfizer Ireland Pharmaceuticals, Warner-Lambert Company, Warner-Lambert

Company, LLC and Warner-Lambert Export Limited, (collectively referred to as "Pfizer"), by

their attorneys, for their complaint against Ranbaxy Laboratories Limited ("Ranbaxy

Laboratories"), Ranbaxy Pharmaceuticals, Inc. ("Ranbaxy Pharmaceuticals") and Ranbaxy Inc.

("Ranbaxy Inc.")(collectively "Ranbaxy"), allege as follows:

1.    This is an action by Pfizer against Ranbaxy for declaratory judgment of

infringement of United States Letters Patent No. 6,087,511 ("the '511 patent) and United States

Letters Patent No. 6,274,740 ("the '740 patent'). A copy of the '511 patent is attached hereto as

Exhibit A. A copy of the '740 patent is attached hereto as Exhibit B.

2.    On July 11, 2000 the United States Patent and Trademark Office issued the '511

patent, entitled "Process for the Production of Amorphous [R-(R*,R*)]-2-(4-Fluorophenyl)-β,δ-

Dihydroxy-5-(1-Methylethyl)-3-Phenyl-4-[(Phenylamino)Carbonyl]-1H-Pyrrole-1-Heptanoic

Acid) Calcium Salt (2:1)", on an application filed by Min Lin, et al. and assigned to Warner-Lambert Company.

3.    On August 14, 2001 the United States Patent and Trademark Office issued the '740 patent, entitled "Process for the production of amorphous [R-(R*,R*)]-2-(4-fluorophenyl)-β, δ-dihydroxy-5-(1-methylethy)-3-phenyl-4-[(phenylamino) carbonyl]-1H-pyrrole-1-heptanoic acid calcium salt (2:1)", on an application filed by Lin Min, et al. and assigned to Warner-Lambert Company.

## PARTIES, JURISDICTION AND VENUE

4.    Pfizer Inc is a corporation organized and existing under the laws of the State of Delaware and has a place of business at 235 East 42nd Street, New York, New York 10017.

5.    Warner-Lambert Company is a corporation formerly organized under the laws of the State of Delaware with offices for service of process at 235 East 42nd Street, New York, New York 10017.  Warner-Lambert Company has been the owner of record of the '511 and the '740 patents since their issuance.

6.    Warner-Lambert Company became a wholly owned subsidiary of Pfizer Inc effective June 19, 2000.

7.    Warner-Lambert Company was converted into Warner-Lambert Company, LLC, a Delaware limited liability company by certificate dated December 31, 2002.  Warner-Lambert Company, LLC has offices located at 235 East 42nd Street, New York, New York 10017.

8.    Pfizer Ireland Pharmaceuticals is a partnership, organized and existing under the laws of Ireland, with registered offices at Pottery Road, Dun Laoghaire, Co. Dublin, Ireland. Pfizer Ireland Pharmaceuticals is a wholly owned, indirect subsidiary of Pfizer Inc.

9.    Warner-Lambert Export, Ltd. is a corporation formerly organized under the laws of Ireland with a registered office located at Pottery Road, Dun Laoghaire, Co. Dublin, Ireland.

2

10.     The exclusive licensee of the '511 patent is Pfizer Ireland Pharmaceuticals, formerly Warner-Lambert Export, Ltd.

11.     The exclusive licensee of the '740 patent is Pfizer Ireland Pharmaceuticals, formerly Warner-Lambert Export, Ltd.

12.     Pfizer holds an approved New Drug Application for a formulation comprised of the active ingredients amlodipine besylate and atorvastatin calcium, which it sells in the United States under the registered name Caduet®.

13.     Upon information and belief, Ranbaxy Laboratories is a corporation organized and existing under the laws of India, with corporate offices located at 19, Nehru Place New Delhi - 110019 India.

14.     Ranbaxy Inc. is a corporation organized and existing under the laws of the State of Delaware, and has a place of business located at 600 College Road East, Princeton, New Jersey 08540.

15.     Upon information and belief, Ranbaxy Inc. was formerly known as Ranbaxy Pharmaceuticals Inc.

16.     Upon information and belief, Ranbaxy Inc. is a wholly-owned subsidiary of Ranbaxy Laboratories.

17.     Ranbaxy Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware, and has a place of business located at 600 College Road East, Princeton, New Jersey 08540.

18.     Upon information and belief, Ranbaxy Inc. and Ranbaxy Pharmaceuticals Inc. are the agents for Ranbaxy Laboratories.

19.     This action arises under the Patent Laws of the United States, Title 35, United States Code.   This Court has subject matter jurisdiction over this action pursuant to the provisions of Title 28, United States Code, Sections 1331 and 1338.

20.     Upon information and belief, Ranbaxy Laboratories, Ranbaxy Pharmaceuticals and Ranbaxy Inc. are subject to personal jurisdiction in this District.

21.     Venue is proper in this District pursuant to the provisions of Title 28, United States Code, Sections 1391(c), (d) and 1400(b).

**FIRST CLAIM FOR RELIEF;**
**DECLARATORY JUDGMENT OF INFRINGEMENT OF THE '511 PATENT**

22.     Pfizer realleges paragraphs 1 through 21 above as if fully set forth herein.

23.     This count arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, based upon an actual controversy between the parties.

24.     Pfizer has received a letter dated January 24, 2007 from Ranbaxy Inc. (the "January 24, 2007 letter") which notified Pfizer that Ranbaxy Laboratories had filed an Abbreviated New Drug Application (ANDA), ANDA No. 78-747, seeking approval from FDA to engage in the commercial manufacture, use, and sale of a product containing amlodipine besylate and atorvastatin calcium as the active ingredients ("Ranbaxy's New ANDA Product") on a date which is prior to the expiration of the '511 patent.  A copy of the January 24, 2007 letter is attached hereto as Exhibit C.

25.     Ranbaxy has taken immediate and active steps to obtain FDA approval to sell in the United States and to commence sale in the United States of Ranbaxy's New ANDA Product immediately following FDA approval.

26.     Pursuant to 35 U.S.C. § 271(e)(2) and (e)(4), Pfizer obtained a judgment which enjoins the effective date of approval of Ranbaxy's ANDA No. 78-747 until the date of

expiration of United States Letters Patent Nos. 4,681,893 ("the '893 patent") and its patent term

extension (September 24, 2009, with attached six months of pediatric exclusivity ending on

March 24, 2010, to which Pfizer is entitled).

27.    The expiration date for the '511 patent is July 16, 2016.

28.    The '511 patent covers a method of making amorphous atorvastatin.

29.    Upon information and belief, Ranbaxy intends to import into the United States

and/or to offer to sell, sell or use within the United States, all for purposes not exempt under 35

U.S.C. § 271(e)(1),  Ranbaxy's New ANDA Product prior to the expiration of the '511 patent.

30.    Upon information and belief, Ranbaxy's New ANDA Product is made or is

intended to be made by a process which if practiced in the United States would infringe the '511

patent.

31.    Upon information and belief, Ranbaxy's importation for purposes not exempt

under 35 U.S.C. § 271(e)(1) into the United States and/or future offer to sell, sale or use for

purposes not exempt under 35 U.S.C. § 271(e)(1) within the United States of Ranbaxy's New

ANDA Product will infringe the '511 patent pursuant to 35 U.S.C. §271 (g).

32.    Pfizer will be irreparably harmed if Ranbaxy is not enjoined from infringing the

'511 patent.

### SECOND CLAIM FOR RELIEF;
### DECLARATORY JUDGMENT OF INFRINGEMENT OF THE '740 PATENT

33.    Pfizer realleges paragraphs 1 through 32 above as if fully set forth herein.

34.    This count arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and

2202, based upon an actual controversy between the parties.

35.    Pfizer has received a letter dated January 24, 2007 from Ranbaxy Inc. (the

"January 24, 2007 letter") which notified Pfizer that Ranbaxy Laboratories had filed an

Abbreviated New Drug Application (ANDA), ANDA No. 78-747, seeking approval from FDA

to engage in the commercial manufacture, use, and sale of a product containing amlodipine

besylate and atorvastatin calcium as the active ingredients ("Ranbaxy's New ANDA Product")

on a date which is prior to the expiration of the '511 patent. A copy of the January 24, 2007

letter is attached hereto as Exhibit C.

36.    Ranbaxy has taken immediate and active steps to obtain FDA approval to sell in

the United States and to commence sale in the United States of Ranbaxy's New ANDA Product

immediately  following FDA approval.

37.    Pursuant to 35 U.S.C. § 271(e)(2) and (e)(4), Pfizer obtained a judgment which

enjoins the effective date of approval of Ranbaxy's ANDA No. 78-747 until the date of

expiration of United States Letters Patent Nos. 4,681,893 ("the '893 patent") and its patent term

extension (September 24, 2009, with attached six months of pediatric exclusivity ending on

March 24, 2010, to which Pfizer is entitled).

38.    The expiration date for the '740 patent is July 16, 2016.

39.    The '740 patent covers a method of making amorphous atorvastatin.

40.    Upon information and belief, Ranbaxy intends to import into the United States

and/or to offer to sell, sell or use within the United States, all for purposes not exempt under 35

U.S.C. § 271(e)(1), Ranbaxy's New ANDA Product prior to the expiration of the '740 patent.

41.    Upon information and belief, Ranbaxy's New ANDA Product is made or is

intended to be made by a process which if practiced in the United States would infringe the '740

patent.

42.    Upon information and belief, Ranbaxy's importation for purposes not exempt

under 35 U.S.C. § 271(e)(1) and/or offer to sell, sale or use for purposes not exempt under 35

U.S.C. § 271(e)(1) within the United States of Ranbaxy's New ANDA Product will infringe the '740 patent pursuant to 35 U.S.C. §271 (g).

43.     Pfizer will be irreparably harmed if Ranbaxy is not enjoined from infringing the '740 patent.

WHEREFORE, Pfizer requests the following relief:

A.   A declaratory judgment that Ranbaxy's New ANDA Product is made by the use of the process claimed in the '511 patent and that its importation into the United States and its offer for sale, sale and/or use in the United States is an infringement of the '511 patent.

B.   A declaratory judgment that Ranbaxy's New ANDA Product is made by the use of the process claimed in the '740 patent and that its importation into the United States and its offer for sale, sale and/or use in the United States is an infringement of the '740 patent.

C.   A judgment permanently enjoining Ranbaxy, each of their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them or any of them, from making, using, selling, offering to sell, or importing the product described in Ranbaxy's ANDA No. 78-747 and made by the processes claimed in the '511 patent until July 16, 2016, the expiration date of the '511 patent.

D.   A judgment permanently enjoining Ranbaxy, each of their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them or any of them, from making, using, selling, offering to sell, or importing the product described in Ranbaxy's ANDA No. 78-747 and

made by the processes claimed in the '740 patent until July 16, 2016, the
expiration date of the '740 patent.

E.  Attorneys' fees in this action under 35 U.S.C. § 285;

F.  Costs and expenses in this action; and

G.  Such further and other relief as this Court may deem just and proper.

RESPECTFULLY SUBMITTED,


 /s/Rudolf E. Hutz
Rudolf E. Hutz (#484)
Jeffrey B. Bove (#998)
Mary W. Bourke (#2356)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, DE 19899
       (302) 658-9141
*Attorneys for Plaintiffs Pfizer Inc.,
Pfizer Ireland Pharmaceuticals,
Warner-Lambert Company,
Warner-Lambert Company, LLC
and Warner-Lambert Export, Ltd.*

# Exhibit "A"



US006087511A

# United States Patent [19]

## Lin et al.

[11] **Patent Number:** **6,087,511**

[45] **Date of Patent:** **Jul. 11, 2000**

[54] **PROCESS FOR THE PRODUCTION OF AMORPHOUS [R-(R\*,R\*)]-2-(4-FLUOROPHENYL)-β,δ-DIHYDROXY-5-(1-METHYLETHYL)-3-PHENYL-4-[(PHENYLAMINO)CARBONYL]-1H-PYRROLE-1-HEPTANOIC ACID) CALCIUM SALT (2:1)**

[75] Inventors: **Min Lin**, Plainsboro, N.J.; **Dieter Schweiss**, Holland, Mich.

[73] Assignee: **Warner-Lambert Company**, Morris Plains, N.J.

[21] Appl. No.: **08/983,369**

[22] PCT Filed: **Jul. 16, 1996**

[86] PCT No.: **PCT/US96/11807**

§ 371 Date: **Jan. 15, 1998**

§ 102(e) Date: **Jan. 15, 1998**

[87] PCT Pub. No.: **WO97/03960**

PCT Pub. Date: **Feb. 6, 1997**

[51] Int. Cl.⁷ .................... C07D 207/335; C07D 207/34; A61K 31/40

[52] U.S. Cl. .......................... 548/537; 514/422; 514/423; 514/429; 548/517

[58] Field of Search ...................................... 548/517, 537; 514/422, 423

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,681,893 | 7/1987 | Roth ......................................... | 514/422 |
| 5,003,080 | 3/1991 | Butler et al. ............................. | 548/517 |
| 5,097,045 | 3/1992 | Butler et al. ............................. | 549/373 |
| 5,103,024 | 4/1992 | Millar et al. ............................. | 549/373 |
| 5,124,482 | 6/1992 | Butler et al. ............................. | 564/169 |
| 5,149,837 | 9/1992 | Butler et al. ............................. | 549/333 |
| 5,155,251 | 10/1992 | Butler et al. ............................. | 558/442 |
| 5,216,174 | 6/1993 | Butler et al. ............................. | 548/517 |
| 5,245,047 | 9/1993 | Butler et al. ............................. | 548/517 |
| 5,248,793 | 9/1993 | Millar et al. ............................. | 548/375 |
| 5,273,995 | 12/1993 | Roth ......................................... | 514/422 |
| 5,280,126 | 1/1994 | Butler et al. ............................. | 548/517 |
| 5,342,952 | 8/1994 | Butler et al. ............................. | 546/245 |
| 5,397,792 | 3/1995 | Butler et al. ............................. | 514/326 |
| 5,446,054 | 8/1995 | Butler et al. ............................. | 514/326 |
| 5,969,156 | 10/1999 | Briggs et al. ............................. | 548/537 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0247633 | 12/1987 | European Pat. Off. . |
| 0330172 | 8/1989 | European Pat. Off. . |
| 0409281 | 1/1991 | European Pat. Off. . |
| 89/07598 | 8/1989 | WIPO . |
| 94/20492 | 9/1994 | WIPO . |

### OTHER PUBLICATIONS

*Pharmaceutical Research,* vol. 10, No. 10, 1993, pp. 1461–1465, Kearney, et al.

Baumann et al, Tetrahedron Letters, vol. 33, No. 17, pp. 2283–2284, 1992.

Konno, Chem. Pharm. Bull., vol. 38, No. 7, pp. 2003–2007, 1990.

*Primary Examiner*—Floyd D. Higel
*Attorney, Agent, or Firm*—Francis J. Tinney

[57] **ABSTRACT**

A process for the preparation of amorphous atorvastatin is described where crystalline Form I atorvastatin is dissolved in a non-hydroxylic solvent and after removal of the solvent affords amorphous atorvastatin.

**24 Claims, 3 Drawing Sheets**



FIG—1





FIG—3

6,087,511

**1**

**PROCESS FOR THE PRODUCTION OF AMORPHOUS [R-(R*,R*)] -2-(4-FLUOROPHENYL)-β,δ-DIHYDROXY-5-(1-METHYLETHYL)-3-PHENYL-4-[(PHENYLAMINO)CARBONYL]-1H-PYRROLE-1-HEPTANOIC ACID) CALCIUM SALT (2:1)**

This application is a 371 of PCT/US/96/11807 filed Jul. 16, 1996.

## BACKGROUND OF THE INVENTION

The present invention relates to a novel process for amorphous atorvastatin which is known by the chemical name [R-(R*,R*)]-2-(4-fluorophenyl)-β,δ-dihydroxy-5-(1-methylethyl)-3-phenyl-4-[(phenylamino) carbonyl]-1H-pyrrole-1-heptanoic acid hemi calcium salt which is useful as a pharmaceutical agent. Atorvastatin is useful as an inhibitor of the enzyme 3-hydroxy-3-methylglutaryl-coenzyme A reductase (HMG-CoA reductase) and is thus useful as a hypolipidemic and hypocholesterolemic agent.

U.S. Pat. No. 4,681,893, which is herein incorporated by reference, discloses certain trans-6-[2-(3- or 4-carboxamido-substituted-pyrrol-1-yl)alkyl]-4-hydroxy-pyran-2-ones including trans (±)-5-(4-fluorophenyl)-2-(1-methylethyl)-N,4-diphenyl-1-[(2-tetrahydro-4-hydroxy-6-oxo-2H-pyran-2-yl)ethyl]-1H-pyrrole-3-carboxamide.

U.S. Pat. No. 5,273,995, which is herein incorporated by reference, discloses the enantiomer having the R form of the ring-opened acid of trans-5-(4-fluorophenyl)-2-(1-methylethyl)-N,4-diphenyl-1-[(2-tetrahydro-4-hydroxy-6-oxo-2H-pyran-2-yl)ethyl]-1H-pyrrole-3-carboxamide, i.e., [R-(R*,R*)]-2-(4-fluorophenyl)-β,δ-dihydroxy-5-(1-methylethyl)-3-phenyl-4-[(phenylamino)carbonyl]-1H-pyrrole-1-heptanoic acid.

U.S. Pat. Nos. 5,003,080; 5,097,045; 5,103,024; 5,124,482; 5,149,837; 5,155,251; 5,216,174; 5,245,047; 5,248,793; 5,280,126; 5,397,792; and 5,342,952, which are herein incorporated by reference, disclose various processes and key intermediates for preparing atorvastatin.

Atorvastatin is prepared as its calcium salt, i.e., [R-(R*,R*)]-2-(4-fluorophenyl)-β,δ-dihydroxy-5-(1-methylethyl)-3-phenyl-4-[(phenylamino)carbonyl]-1H-pyrrole-1-heptanoic acid calcium salt (2:1). The calcium salt is desirable since it enables atorvastatin to be conveniently formulated in, for example, tablets, capsules, lozenges, powders, and the like for oral administration.

Concurrently filed U.S. Patent Applications titled "Crystalline [R-(R*,R*)]-2-(4-fluorophenyl)-β,δ-dihydroxy-5-(1-methylethyl)-3-phenyl-4-[(phenylamino)carbonyl]-1H-pyrrole-1-heptanoic Acid Calcium Salt (2:1)" and "Form III Crystalline [R-(R*,R*)]-2-(4-fluorophenyl)-β,δ-dihydroxy-5-(1-methylethyl)-3-phenyl-4-[(phenylamino)carbonyl]-1H-pyrrole-1-heptanoic Acid Calcium Salt (2:1)" commonly owned, attorney's Case Numbers PD-5250-01-FJT, Ser. No. 08/945,812, now U.S. Pat. No. 5,969,156, and PD-5333-01-FJT, Ser. No. 08/945,817, now abandoned, disclose atorvastatin in various new crystalline forms designated Form I, Form II, Form III, and Form IV.

Atorvastatin disclosed in the above United States Patents is an amorphous solid. We have found that after the advent of crystalline atorvastatin, the production of amorphous atorvastatin by the previously disclosed processes was not consistently reproducible.

It has been disclosed that the amorphous forms in a number of drugs exhibit different dissolution characteristics

**2**

and in some cases different bioavailability patterns compared to the crystalline form (Konno T., *Chem. Pharm. Bull.,* 1990;38:2003–2007). For some therapeutic indications one bioavailability pattern may be favored over another. Therefore, it is desirable to have a procedure for converting the crystalline form of a drug to the amorphous form.

The object of the present invention is a process which is amenable to large-scale production for converting crystalline Form I atorvastatin into amorphous atorvastatin.

We have surprisingly and unexpectedly found that solutions of atorvastatin in a non-hydroxylic solvent afford, after removal of the solvent, amorphous atorvastatin.

## SUMMARY OF THE INVENTION

Accordingly, the present invention is a novel process for the preparation of amorphous atorvastatin and hydrates thereof which comprises:

(a) dissolving crystalline Form I atorvastatin in a non-hydroxylic solvent; and

(b) removing the solvent to afford amorphous atorvastatin.

In a preferred embodiment of the invention, the non-hydroxylic solvent is selected from the group consisting of: tetrahydrofuran, and mixtures of tetrahydrofuran and toluene.

In another preferred embodiment of the invention, the solvent is removed in a vacuum dryer.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention is further described by the following non-limiting examples which refer to the accompanying FIGS. 1, 2, and 3, short particulars of which are given below.

FIG. 1 Diffractogram of Form I atorvastatin ground for 2 minutes (Y–axis=0 to maximum intensity of 3767.50 counts per second(cps))

FIG. 2 Diffractogram of amorphous atorvastatin (Y–axis=0 to maximum intensity of 1455.00 cps)

FIG. 3 Solid-state $^{13}C$ nuclear magnetic resonance spectrum with spinning side bands identified by an asterisk of Form I atorvastatin.

## DETAILED DESCRIPTION OF THE INVENTION

Crystalline Form I atorvastatin may be characterized by its X-ray powder diffraction pattern and/or by its solid state nuclear magnetic resonance spectrum (NMR).

### X-RAY POWDER DIFFRACTION

Amorphous and Form I Atorvastatin

Amorphous and Form I atorvastatin were characterized by their X-ray powder diffraction patterns. Thus, the X-ray diffraction patterns of amorphous and Form I atorvastatin were measured on a Siemens D-500 diffractometer with $CuK_\alpha$ radiation.

Equipment

Siemens D-500 Diffractometer-Kristalloflex with an IBM-compatible interface, software=DIFFRAC AT (SOCABIM 1992).

$CuK_\alpha$ radiation (20 mA, 40 kV, λ=1.5406 Å) Slits I and II at 1° electronically filtered by the Kevex Psi Peltier Cooled Silicon [Si(Li)]Detector (Slits: III at 1° and IV at 0.15°).

Methodology

The silicon standard is run each day to check the X-ray tube alignment.

6,087,511

**3**

Continuous θ/2θ coupled scan: 4.00° to 40.00° in 2θ, scan rate of 6°/min: 0.4 sec/0.04° step (scan rate of 3°/min: 0.8 sec/0.04° step for amorphous atorvastatin).

Sample tapped out of vial and pressed onto zero-background quartz in aluminum holder. Sample width 13–15 mm (sample width ~16 mm for amorphous atorvastatin).

Samples are stored and run at room temperature.

Grinding

Grinding is used to minimize intensity variations for the diffractogram of Form I atorvastatin disclosed herein. However, if grinding significantly altered the diffractogram or increased the amorphous content of the sample, then the diffractogram of the unground sample was used.

Table 1 lists the 2θ, d-spacings, and relative intensities of all lines in the unground sample with a relative intensity of >20% for crystalline Form I atorvastatin. Table 1 also lists the relative intensities of the same lines in a diffractogram measured after 2 minutes of grinding. The intensities of the sample ground for 2 minutes are more representative of the diffraction pattern without preferred orientation. It should also be noted that the computer-generated, unrounded numbers are listed in this table.

TABLE 1

Intensities and Peak Locations of all
Diffraction Lines With Relative Intensity
Greater Than 20% for Form I Atorvastatin

| 2θ | d | Relative Intensity (>20%) No Grinding | Relative Intensity (>20%)* Ground 2 Minutes |
|---|---|---|---|
| 9.150 | 9.6565 | 37.42 | 42.60 |
| 9.470 | 9.3311 | 46.81 | 41.94 |
| 10.266 | 8.6098 | 75.61 | 55.67 |
| 10.560 | 8.3705 | 24.03 | 29.33 |
| 11.853 | 7.4601 | 55.16 | 41.74 |
| 12.195 | 7.2518 | 20.03 | 24.62 |
| 17.075 | 5.1887 | 25.95 | 60.12 |
| 19.485 | 4.5520 | 89.93 | 73.59 |
| 21.626 | 4.1059 | 100.00 | 100.00 |
| 21.960 | 4.0442 | 58.64 | 49.44 |
| 22.748 | 3.9059 | 36.95 | 45.85 |
| 23.335 | 3.8088 | 31.76 | 44.72 |
| 23.734 | 3.7457 | 87.55 | 63.04 |
| 24.438 | 3.6394 | 23.14 | 21.10 |
| 28.915 | 3.0853 | 21.59 | 23.42 |
| 29.234 | 3.0524 | 20.45 | 23.36 |

*The second relative intensity column gives the relative intensities of the diffraction lines on the original diffractogram after 2 minutes of grinding.

SOLID STATE NUCLEAR MAGNETIC
RESONANCE (NMR)

Methodology

All solid-state $^{13}$C NMR measurements were made with a Bruker AX-250, 250 MHz NMR spectrometer. High resolution spectra were obtained using high-power proton decoupling and cross-polarization (CP) with magic-angle spinning (MAS) at approximately 5 kHz. The magic-angle was adjusted using the Br signal of KBr by detecting the side bands as described by Frye and Maciel (Frye J. S. and Maciel G. E., *J. Mag. Res.*, 1982;48:125). Approximately 300 to 450 mg of sample packed into a canister-design rotor was used for each experiment. Chemical shifts were referenced to external tetrakis (trimethylsilyl)silane (methyl signal at 3.50 ppm) (Muntean J. V. and Stock L. M., *J. Mag. Res.*, 1988;76:54).

Table 2 shows the solid-state spectrum for crystalline Form I atorvastatin.

**4**



TABLE 2

Carbon Atom Assignment and Chemical Shift
for Form I Atorvastatin

| Assignment (7 kHz) | Chemical Shift |
|---|---|
| C12 or C25 | 182.8 |
| C12 or C25 | 178.4 |
| C16 | 166.7 (broad) and 159.3 |
| **Aromatic Carbons** | |
| C2–C5, C13–C18, C19–C24, C27–C32 | 137.0 |
| | 134.9 |
| | 131.1 |
| | 129.5 |
| | 127.6 |
| | 123.5 |
| | 120.9 |
| | 118.2 |
| | 113.8 |
| C8, C10 | 73.1 |
| | 70.5 |
| | 68.1 |
| | 64.9 |
| **Methylene Carbons** | |
| C6, C7, C9, C11 | 47.4 |
| | 41.9 |
| | 40.2 |
| C33 | 26.4 |
| | 25.2 |
| C34 | 21.3 |

Amorphous atorvastatin of the present invention can exist in anhydrous forms as well as hydrated forms. In general, the hydrated forms, are equivalent to anhydrous forms and are intended to be encompassed within the scope of the present invention.

As previously described, amorphous atorvastatin is useful as an inhibitor of the enzyme, HMG-CoA reductase and is thus useful as a hypolipidemic and hypocholesterolemic agent.

The present invention provides a process for the commercial preparation of amorphous atorvastatin.

Thus, crystalline Form I atorvastatin is dissolved in a non-hydroxylic solvent such as, for example, tetrahydrofuran, mixtures of tetrahydrofuran and toluene and the like at a concentration of about 25% to about 40%. Preferably, crystalline Form I atorvastatin is dissolved in tetrahydrofuran at a concentration of about 25% to about 40% containing up to about 50% toluene as a co-solvent. The solvent is removed using, for example, drying technology such as, for example, vacuum drying, spray drying, and the like. Preferably, the drying procedure uses an agitated pan dryer such as, for example, Comber Turbody Vertical Pan Dryer and the like. Drying initially is carried out at about 20° C. to about 40° C. and subsequently at about 70° C. to about 90° C. under vacuum at about 5 mm Hg to about

6,087,511

**5**

25 mm Hg for about 3 to about 5 days. Preferably, initial drying is carried out at about 35° C. and subsequently at about 85° C. at about 5 mm Hg to about 25 mm Hg for about 5 days. The initial solution dries to a brittle foam that is broken up by mechanical agitation to afford amorphous atorvastatin.

The following nonlimiting examples illustrate the inventors' preferred methods for preparing the compounds of the invention.

EXAMPLE 1

[R-(R*,R*)]-2-(4-Fluorophenyl)-β,δ-dihydroxy-5-
(1-methylethyl)-3-phenyl-4-[(phenylamino)
carbonyl]-1H-pyrrole-1-heptanoic Acid Hemi
Calcium Salt (Form I Atorvastatin)

A mixture of (2R-trans)-5-(4-fluorophenyl)-2-(1-methylethyl)-N,4-diphenyl-1-[2-(tetrahydro-4-hydroxy-6-oxo-2H-pyran-2-yl)ethyl]-1H-pyrrole-3-carboxamide (atorvastatin lactone) (U.S. Pat. No. 5,273,995) (75 kg), methyl tertiary-butyl ether (MTBE) (308 kg), methanol (190 L) is reacted with an aqueous solution of sodium hydroxide (5.72 kg in 950 L) at 48–58° C. for 40 to 60 minutes to form the ring-opened sodium salt. After cooling to 25–35° C., the organic layer is discarded, and the aqueous layer is again extracted with MTBE (230 kg). The organic layer is discarded, and the MTBE saturated aqueous solution of the sodium salt is heated to 47–52° C. To this solution is added a solution of calcium acetate hemihydrate (11.94 kg) dissolved in water (410 L), over at least 30 minutes. The mixture is seeded with a slurry of crystalline Form I atorvastatin (1.1 kg in 11 L water and 5 L methanol) shortly after addition of the calcium acetate solution. The mixture is then heated to 51–57° C. for at least 10 minutes and then cooled to 15–40° C. The mixture is filtered, wished with a solution of water (300 L) and methanol (150 L) followed by water (450 L). The solid is dried at 60–70° C. under vacuum for 3 to 4 days to give crystalline Form I atorvastatin (72.2 kg).

EXAMPLE 2

[R-(R*,R*)]-2-(4-Fluorophenyl)-β,δ-dihydroxy-5-(1-methylethyl)-3-phenyl-4-[(phenylamino)carbonyl]-
1H-pyrrole-1-heptanoic Acid Hemi Calcium Salt
(Amorphous Atorvastatin)

Crystalline Form I atorvastatin (Example 1) (30 kg) is dissolved with agitation in tetrahydrofuran (75 L) at ambient temperature under a nitrogen atmosphere. Toluene (49.4 L) is added slowly once solution is achieved. The solution is then transferred through a 0.45 micron Pall filter to a 200 L Comber Turbodry Vertical Pan Dryer. The transfer system is rinsed to the dryer with additional tetrahydrofuran (4.5 L). Full vacuum is applied, and the solution is concentrated at 35° C. with mild agitation. Near the end of the concentration process, the agitator is lifted. The product turns into a brittle glassy foam. The agitator is gradually lowered, breaking the brittle foam into a free flowing powder. The powder is agitated and the temperature is raised to 85° C. under vacuum (6 to 8 mm Hg) to lessen the residual solvent levels. After 4 days of drying, the desired residual solvent levels of 0.01% tetrahydrofuran and 0.29% toluene are achieved. The free flowing white powder (27.2 kg) is unloaded from the dryer. The product is amorphous by X-ray powder diffraction.

We claim:

1. A process for the preparation of amorphous atorvastatin or hydrates thereof which comprises:

**6**

(a) dissolving crystalline Form I atorvastatin having the formula



in a non-hydroxylic solvent; and

(b) removing the solvent by drying to afford said amorphous atorvastatin or hydrates thereof.

2. A process according to claim 1 wherein the non-hydroxylic solvent in Step (a) is selected from the group consisting of: tetrahydrofuran, and mixtures of tetrahydrofuran and toluene.

3. A process according to claim 2 wherein the solvent is a mixture of tetrahydrofuran and toluene.

4. A process according to claim 1 wherein the solvent in Step (b) is removed by vacuum drying or spray drying.

5. A process according to claim 4 wherein the solvent in Step (b) is removed by vacuum drying.

6. A process according to claim 5 wherein vacuum drying is initially carried out at about 20° C. to about 40° C. and subsequently at about 70° C. to about 90° C. under vacuum at about 5 mm Hg to about 25 mm Hg.

7. A process according to claim 6 wherein vacuum drying is initially carried out at about 35° C. and subsequently at about 85° C. under vacuum at about 5 mm Hg to about 25 mm Hg.

8. A process according to claim 5 wherein the material obtained after drying is a brittle foam which is broken up by mechanical agitation.

9. A process for the preparation of anhydrous amorphous atorvastatin which comprises:

(a) dissolving crystalline Form I atorvastatin having the formula



in a non-hydroxylic solvent; and

(b) removing the solvent by drying to afford said anhydrous amorphous atorvastatin.

10. A process according to claim 9 wherein the non-hydroxylic solvent in Step (a) is selected from the group consisting of: tetrahydrofuran, and mixtures of tetrahydrofuran and toluene.

11. A process according to claim 10 wherein the solvent is a mixture of tetrahydrofuran and toluene.

12. A process according to claim 9 wherein the solvent in Step (b) is removed by vacuum drying or spray drying.

13. A process according to claim 12 wherein the solvent in Step (b) is removed by vacuum drying.

6,087,511

7

14. A process according to claim 13 wherein vacuum drying is initially carried out at about 20° C. to about 40° C. and subsequently at about 70° C. to about 90° C. under vacuum at about 5 mm Hg to about 25 mm Hg.

15. A process according to claim 14 wherein vacuum drying is initially carried out at about 35° C. and subsequently at about 85° C. under vacuum at about 5 mm Hg to about 25 mm Hg.

16. A process according to claim 13 wherein the material obtained after drying is a brittle foam which is broken up by mechanical agitation.

17. A process for the preparation of hydrated amorphous atorvastatin which comprises:

(a) dissolving crystalline Form I atorvastatin having the formula



8

in a non-hydroxylic solvent; and

(b) removing the solvent by drying to afford said hydrated amorphous atorvastatin.

18. A process according to claim 17 wherein the non-hydroxylic solvent in Step (a) is selected from the group consisting of: tetrahydrofuran, and mixtures of tetrahydrofuran and toluene.

19. A process according to claim 18 wherein the solvent is a mixture of tetrahydrofuran and toluene.

20. A process according to claim 17 wherein the solvent in Step (b) is removed by vacuum drying or spray drying.

21. A process according to claim 20 wherein the solvent in Step (b) is removed by vacuum drying.

22. A process according to claim 21 wherein vacuum drying is initially carried out at about 20° C. to about 40° C. and subsequently at about 70° C. to about 90° C. under vacuum at about 5 mm Hg to about 25 mm Hg.

23. A process according to claim 22 wherein vacuum drying is initially carried out at about 35° C. and subsequently at about 85° C. under vacuum at about 5 mm Hg to about 25 mm Hg.

24. A process according to claim 21 wherein the material obtained after drying is a brittle foam which is broken up by mechanical agitation.

*　*　*　*　*

# Exhibit "B"



US006274740B1

(12) **United States Patent**
Lin et al.

(10) Patent No.: **US 6,274,740 B1**
(45) Date of Patent: **Aug. 14, 2001**

(54) **PROCESS FOR THE PRODUCTION OF AMORPHOUS [R-(R\*,R\*)]-2-(4-FLUOROPHENYL)-β, δ-DIHYDROXY-5-(1-METHYLETHY)-3-PHENYL-4-[(PHENYLAMINO) CARBONYL]-1H-PYRROLE-1-HEPTANOIC ACID CALCIUM SALT (2:1)**

(75) Inventors: **Min Lin**, Plainsboro, NJ (US); **Dieter Schweiss**, Holland, MI (US)

(73) Assignee: **Warner-Lambert Company**, Morris Plains, NJ (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/657,469**

(22) Filed: **Sep. 7, 2000**

**Related U.S. Application Data**

(62) Continuation of application No. 09/453,189, filed on Dec. 2, 1999, now abandoned, which is a continuation of application No. 08/983,369, filed as application No. PCT/US96/11807 on Jul. 16, 1996, now Pat. No. 6,087,511
(60) Provisional application No. 60/001,453, filed on Jul. 17, 1995.

(51) Int. Cl.[7] ..................... C07D 207/335; C07D 207/34
(52) U.S. Cl. ............................................. 548/537
(58) Field of Search ............................................. 548/537

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,681,893 | 7/1987 | Roth ...................................... | 514/422 |
| 5,003,080 | 3/1991 | Butler et al. .......................... | 548/517 |
| 5,097,045 | 3/1992 | Butler et al. .......................... | 549/373 |

| | | | |
|---|---|---|---|
| 5,103,024 | 4/1992 | Millar et al. ......................... | 549/373 |
| 5,124,482 | 6/1992 | Butler et al. ......................... | 564/169 |
| 5,149,837 | 9/1992 | Butler et al. ......................... | 549/333 |
| 5,155,251 | 10/1992 | Butler et al. ......................... | 558/442 |
| 5,216,174 | 6/1993 | Butler et al. ......................... | 548/517 |
| 5,245,047 | 9/1993 | Butler et al. ......................... | 548/517 |
| 5,248,793 | 9/1993 | Millar et al. ......................... | 548/375 |
| 5,273,995 | 12/1993 | Roth ...................................... | 514/422 |
| 5,280,126 | 1/1994 | Butler et al. ......................... | 548/517 |
| 5,342,952 | 8/1994 | Butler et al. ......................... | 546/245 |
| 5,397,792 | 3/1995 | Butler et al. ......................... | 514/326 |
| 5,446,054 | 8/1995 | Butler et al. ......................... | 514/326 |
| 5,969,156 | 10/1999 | Briggs et al. ........................ | 548/357 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0247633 | 12/1987 | (EP) . |
| 0330172 | 8/1989 | (EP) . |
| 0409281 | 1/1991 | (EP) . |
| 89/07598 | 8/1989 | (WO) . |
| 94/20492 | 9/1994 | (WO) . |

OTHER PUBLICATIONS

Kearney, et al., *Pharmaceutical Research*, vol. 10, No. 10, 1993, pp. 1461–1465.
Baumann, et al., *Tetrahedron Letters*, vol. 33, No. 17, pp. 2283–2284, 1992.
Konno, *Chem. Pharm. Bull.*, vol. 38, No. 7, pp. 2003–2007, 1990.
*Pharmaceutical Research*, vol. 10, No. 10, 1993, pp 1461–1465, Kearney, et al.

*Primary Examiner*—Jane C. Oswecki
(74) *Attorney, Agent, or Firm*—Francis J. Tinney

(57) **ABSTRACT**

A novel process for the preparation of amorphous atorvastatin is described where crystalline Form I atorvastatin is dissolved in a non-hydroxylic solvent and after removal of the solvent affords amorphous atorvastatin.

**3 Claims, 3 Drawing Sheets**







FIG-2



FIG-3

US 6,274,740 B1

1

## PROCESS FOR THE PRODUCTION OF AMORPHOUS [R-(R*,R*)]-2-(4-FLUOROPHENYL)-β, δ-DIHYDROXY-5-(1-METHYLETHY)-3-PHENYL-4-[(PHENYLAMINO) CARBONYL]-1H-PYRROLE-1-HEPTANOIC ACID CALCIUM SALT (2:1)

This application is a continuation of U.S. Ser. No. 09/453,189 filed Dec. 2, 1999, abandoned, which is a continuation of U.S. Ser. No. 08/983,369 filed Jan. 15, 1998, now U.S. Pat. No. 6,087,511 issued Jul. 11, 2000, which is a §371 filing from PCT/US96/11807 filed Jul. 16, 1996, which claims priority from U.S. provisional application No. 60/001,453 filed Jul. 17, 1995.

### BACKGROUND OF THE INVENTION

The present invention relates to a novel process for amorphous atorvastatin which is known by the chemical name [R—(R*,R*)]-2-(4-fluorophenyl)-β,δ-dihydroxy-5-(1-methylethyl)-3-phenyl-4-[(phenylamino) carbonyl]-1H-pyrrole-1-heptanoic acid hemi calcium salt which is useful as a pharmaceutical agent. Atorvastatin is useful as an inhibitor of the enzyme 3-hydroxy-3-methylglutaryl-coenzyme A reductase (HMG-COA reductase) and is thus useful as a hypolipidemic and hypocholesterolemic agent.

U.S. Pat. No. 4,681,893, which is herein incorporated by reference, discloses certain trans-6-[2-(3- or 4-carboxamido-substituted-pyrrol-1- yl)alkyl]-4-hydroxy-pyran-2-ones including trans (±)-5- (4-fluorophenyl)-2-(1-methylethyl)-N,4-diphenyl-1-[(2-tetrahydro-4-hydroxy-6-oxo-2H-pyran-2-yl)ethyl]-1H-pyrrole-3-carboxamide.

U.S. Pat. No. 5,273,995, which is herein incorporated by reference, discloses the enantiomer having the R form of the ring-opened acid of trans-5-(4-fluorophenyl)-2-(1-methylethyl)-N,4-diphenyl-1-[(2-tetrahydro-4-hydroxy-6-oxo-2H-pyran-2-yl)ethyl]-1H-pyrrole-3-carboxamide, i.e., [R—(R*,R*)]-2-(4-fluorophenyl)-β,δ-dihydroxy-5-(1-methylethyl)-3-phenyl-4-[(phenylamino)carbonyl]-1H-pyrrole-1-heptanoic acid.

U.S. Pat. Nos. 5,003,080; 5,097,045; 5,103,024; 5,124,482; 5,149,837; 5,155,251; 5,216,174; 5,245,047; 5,248,793; 5,280,126; 5,397,792; and 5,342,952, which are herein incorporated by reference, disclose various processes and key intermediates for preparing atorvastatin.

Atorvastatin is prepared as its calcium salt, i.e., [R—(R*, R*)]-2-(4-fluorophenyl)-β,δ-dihydroxy-5-(1-methylethyl)-3-phenyl-4-[(phenylamino)carbonyl]-1H-pyrrole-1-heptanoic acid calcium salt (2:1). The calcium salt is desirable since it enables atorvastatin to be conveniently formulated in, for example, tablets, capsules, lozenges, powders, and the like for oral administration.

Concurrently filed U.S. patent applications titled "Crystalline [R—(R*,R*)]-2-(4-fluorophenyl)-β,δ-dihydroxy-5-(1-methylethyl)-3-phenyl-4-[(phenylamino)carbonyl]-1H-pyrrole-1-heptanoic Acid Calcium Salt (2:1)"and" Form III Crystalline [R—(R*,R*)]-2-(4-fluorophenyl)-β,δ-dihydroxy-5-(1-methylethyl)-3-phenyl-4-[(phenylamino) carbonyl]1H-pyrrole-1-heptanoic Acid Calcium Salt (2:1)" commonly owned, Ser. No. 08/945,812 now U.S. Pat. No. 5,969,156, and, Ser. No. 08/945,817, abandoned, disclose atorvastatin in various new crystalline forms designated Form I, Form II, Form III, and Form IV.

Atorvastatin disclosed in the above United States Patents is an amorphous solid. We have found that after the advent of crystalline atorvastatin, the production of amorphous

2

atorvastatin by the previously disclosed processes was not consistently reproducible.

It has been disclosed that the amorphous forms in a number of drugs exhibit different dissolution characteristics and in some cases different bioavailability patterns compared to the crystalline form (Konno T., Chem. Pharm. Bull., 1990;38:2003–2007). For some therapeutic indications one bioavailability pattern may be favored over another. Therefore, it is desirable to have a procedure for converting the crystalline form of a drug to the amorphous form.

The object of the present invention is a process which is amenable to large-scale production for converting crystalline Form I atorvastatin into amorphous atorvastatin.

We have surprisingly and unexpectedly found that solutions of atorvastatin in a non-hydroxylic solvent afford, after removal of the solvent, amorphous atorvastatin.

### SUMMARY OF THE INVENTION

Accordingly, the present invention is a novel process for the preparation of amorphous atorvastatin and hydrates thereof which comprises:

(a) dissolving crystalline Form I atorvastatin in a non-hydroxylic solvent; and

(b) removing the solvent to afford amorphous atorvastatin.

In a preferred embodiment of the invention, the non-hydroxylic solvent is selected from the group consisting of: tetrahydrofuran, and mixtures of tetrahydrofuran and toluene.

In another preferred embodiment of the invention, the solvent is removed in a vacuum dryer.

### BRIEF DESCRIPTION OF THE DRAWINGS

The invention is further described by the following non-limiting examples which refer to the accompanying FIGS. 1, 2, and 3, short particulars of which are given below.

FIG. 1 Diffractogram of Form I atorvastatin ground for 2 minutes (Y-axis=0 to maximum intensity of 3767.50 counts per second(cps)).

FIG. 2 Diffractogram of amorphous atorvastatin (Y-axis=0 to maximum intensity of 1455.00 cps).

FIG. 3 Solid-state $^{13}C$ nuclear magnetic resonance spectrum with spinning side bands identified by an asterisk of Form I atorvastatin.

### DETAILED DESCRIPTION OF THE INVENTION

Crystalline Form I atorvastatin may be characterized by its X-ray powder diffraction pattern and/or by its solid state nuclear magnetic resonance spectrum (NMR).

#### X-ray Powder Diffraction

Amorphous and Form I Atorvastatin

Amorphous and Form I atorvastatin were characterized by their X-ray powder diffraction patterns. Thus, the X-ray diffraction patterns of amorphous and Form I atorvastatin were measured on a Siemens D-500 diffractometer with CuK$_α$ radiation.

Equipment

Siemens D-500 Diffractometer-Kristalloflex with an IBM-compatible interface, software=DIFFRAC AT (SOCABIM 1986, 1992).

CuK$_α$ radiation (20 mA, 40 kV, λ=1.5406 Å) Slits I and II at 1°) electronically filtered by the Kevex Psi Peltier Cooled Silicon [Si(Li)]Detector (Slits: III at 1° and IV at 0.15° ).

US 6,274,740 B1

| 3 | 4 |

### Methodology

The silicon standard is run each day to check the X-ray tube alignment.

Continuous θ/2θ coupled scan: 4.00° to 40.00° in 2θ, scan rate of 6°/min: 0.4 sec/0.04° step (scan rate of 3°/min: 0.8 sec/0.04° step for amorphous atorvastatin).

Sample tapped out of vial and pressed onto zero-background quartz in aluminum holder. Sample width 13–15 mm (sample width ~16 mm for amorphous atorvastatin).

Samples are stored and run at room temperature.

### Grinding

Grinding is used to minimize intensity variations for the diffractogram of Form I atorvastatin disclosed herein. However, if grinding significantly altered the diffractogram or increased the amorphous content of the sample, then the diffractogram of the unground sample was used.

Table 1 lists the 2θ, d-spacings, and relative intensities of all lines in the unground sample with a relative intensity of >20% for crystalline Form I atorvastatin. Table 1 also lists the relative intensities of the same lines in a diffractogram measured after 2 minutes of grinding. The intensities of the sample ground for 2 minutes are more representative of the diffraction pattern without preferred orientation. It should also be noted that the computer-generated, unrounded numbers are listed in this table.

TABLE 1

Intensities and Peak Locations of all
Diffraction Lines With Relative Intensity
Greater Than 20% for Form I Atorvastatin

| 2θ | d | Relative Intensity (>20%) No Grinding | Relative Intensity (>20%)* Ground 2 Minutes |
|---|---|---|---|
| 9.150 | 9.6565 | 37.42 | 42.60 |
| 9.470 | 9.3311 | 41.94 | 41.94 |
| 10.266 | 8.6098 | 75.61 | 55.67 |
| 10.560 | 8.3705 | 24.03 | 29.33 |
| 11.853 | 7.4601 | 55.16 | 41.74 |
| 12.195 | 7.2518 | 20.03 | 24.62 |
| 17.075 | 5.1887 | 25.95 | 60.12 |
| 19.485 | 4.5520 | 89.93 | 73.59 |
| 21.626 | 4.1059 | 100.00 | 100.00 |
| 21.960 | 4.0442 | 58.64 | 49.44 |
| 22.748 | 3.9059 | 36.95 | 45.85 |
| 23.335 | 3.8088 | 31.76 | 44.72 |
| 23.734 | 3.7457 | 87.55 | 63.04 |
| 24.438 | 3.6394 | 23.14 | 21.10 |
| 28.915 | 3.0853 | 21.59 | 23.42 |
| 29.234 | 3.0524 | 20.45 | 23.36 |

*The second relative intensity column gives the relative intensities of the diffraction lines on the original diffractogram after 2 minutes of grinding.

### Solid State Nuclear Magnetic Resonance (NMR)

### Methodology

All solid-state $^{13}C$ NMR measurements were made with a Bruker AX-250, 250 MHz NMR spectrometer. High resolution spectra were obtained using high-power proton decoupling and cross-polarization (CP) with magic-angle spinning (MAS) at approximately 5 kHz. The magic-angle was adjusted using the Br signal of KBr by detecting the side bands as described by Frye and Maciel (Frye J. S. and Maciel G. E., *J. Mag. Res.*, 1982;48:125). Approximately 300 to 450 mg of sample packed into a canister-design rotor was used for each experiment. Chemical shifts were referenced to external tetrakis (trimethylsilyl)silane (methyl signal at 3.50 ppm) (Muntean J. V. and Stock L. M., *J. Mag. Res.*, 1988;76:54).

Table 2 shows the solid-state spectrum for crystalline Form I atorvastatin.



TABLE 2

Carbon Atom Assignment and Chemical Shift
for Form I Atorvastatin

| Assignment (7 kHz) | Chemical Shift |
|---|---|
| C12 or C25 | 182.8 |
| C12 or C25 | 178.4 |
| C16 | 166.7 (broad) and 159.3 |
| Aromatic Carbons | 137.0 |
| C2–C5, C13–C18, C129–C24, | 134.9 |
| C27–C32 | 131.1 |
| | 129.5 |
| | 127.6 |
| | 123.5 |
| | 120.9 |
| | 118.2 |
| | 113.8 |
| C8, C10 | 73.1 |
| | 70.5 |
| | 68.1 |
| | 64.9 |
| Methylene Carbons | 47.4 |
| C6, C7, C9, C11 | 41.9 |
| | 40.2 |
| C33 | 26.4 |
| | 25.2 |
| C34 | 21.3 |

Amorphous atorvastatin of the present invention can exist in anhydrous forms as well as hydrated forms. In general, the hydrated forms, are equivalent to anhydrous forms and are intended to be encompassed within the scope of the present invention.

As previously described, amorphous atorvastatin is useful as an inhibitor of the enzyme, HMG-CoA reductase and is thus useful as a hypolipidemic and hypocholesterolemic agent.

The present invention provides a process for the commercial preparation of amorphous atorvastatin.

Thus, crystalline Form I atorvastatin is dissolved in a non-hydroxylic solvent such as, for example, tetrahydrofuran, mixtures of tetrahydrofuran and toluene and the like at a concentration of about 25% to about 40%. Preferably, crystalline Form I atorvastatin is dissolved in tetrahydrofuran at a concentration of about 25% to about 40% containing up to about 50% toluene as a co-solvent. The solvent is removed using, for example, drying technology such as, for example, vacuum drying, spray drying, and the like. Preferably, the drying procedure uses an agitated pan dryer such as, for example, Comber Turbodry Vertical Pan Dryer and the like. Drying initially is carried out at about 20° C. to about 40° C. and subsequently at about 70° C. to about 90° C. under vacuum at about 5 mm Hg to about 25 mm Hg for about 3 to about 5 days. Preferably, initial drying is carried out at about 35° C. and subsequently at

US 6,274,740 B1

| 5 | 6 |

about 85° C. at about 5 mm Hg to about 25 mm Hg for about 5 days. The initial solution dries to a brittle foam that is broken up by mechanical agitation to afford amorphous atorvastatin.

The following nonlimiting examples illustrate the inventors' preferred methods for preparing the compounds of the invention.

## EXAMPLE 1

[R—(R*,R*)]-2-(4-Fluorophenyl)-β,δ-dihydroxy-5-(1-methylethyl)-3-phenyl-4-[(phenylamino) carbonyl]-1H-pyrrole-1-heptanoic acid hemi calcium salt (Form I Atorvastatin)

A mixture of (2R-trans)-5-(4-fluorophenyl)-2-(1-methylethyl)-N,4-diphenyl-1-[2-(tetrahydro-4-hydroxy-6-oxo-2H-pyran-2-yl)ethyl]-1H-pyrrole-3-carboxamide (atorvastatin lactone) (U.S. Pat. No. 5,273,995) (75 kg), methyl tertiary-butyl ether (MTBE) (308 kg), methanol (190 L) is reacted with an aqueous solution of sodium hydroxide (5.72 kg in 950 L) at 48–58° C. for 40 to 60 minutes to form the ring-opened sodium salt. After cooling to 25–35° C., the organic layer is discarded, and the aqueous layer is again extracted with MTBE (230 kg). The organic layer is discarded, and the MTBE saturated aqueous solution of the sodium salt is heated to 47–52° C. To this solution is added a solution of calcium acetate hemihydrate (11.94 kg) dissolved in water (410 L), over at least 30 minutes. The mixture is seeded with a slurry of crystalline Form I atorvastatin (1.1 kg in 11 L water and 5 L methanol) shortly after addition of the calcium acetate solution. The mixture is then heated to 51–57° C. for at least 10 minutes and then cooled to 15–40° C. The mixture is filtered, washed with a solution of water (300 L) and methanol (150 L) followed by water (450 L). The solid is dried at 60–70° C. under vacuum for 3 to 4 days to give crystalline Form I atorvastatin (72.2 kg).

## EXAMPLE 2

[R—(R*,R*)]-2-(4-Fluorophenyl)-β,δ-dihydroxy-5-(1-methylethyl)-3-phenyl-4-[(phenylamino) carbonyl]-1H-pyrrole-1-heptanoic acid hemi calcium salt (Amorphous Atorvastatin)

Crystalline Form I atorvastatin (Example 1) (30 kg) is dissolved with agitation in tetrahydrofuran (75 L) at ambient temperature under a nitrogen atmosphere. Toluene (49.4 L) is added slowly once solution is achieved. The solution is then transferred through a 0.45 micron Pall filter to a 200 L Comber Turbodry Vertical Pan Dryer. The transfer system is rinsed to the dryer with additional tetrahydrofuran (4.5 L). Full vacuum is applied, and the solution is concentrated at 35° C. with mild agitation. Near the end of the concentration process, the agitator is lifted. The product turns into a brittle glassy foam. The agitator is gradually lowered, breaking the brittle foam into a free flowing powder. The powder is agitated and the temperature is raised to 85° C. under vacuum (6 to 8 mm Hg) to lessen the residual solvent levels. After 4 days of drying, the desired residual solvent levels of 0.01% tetrahydrofuran and 0.29% toluene are achieved. The free flowing white powder (27.2 kg) is unloaded from the dryer. The product is amorphous by X-ray powder diffraction.

What is claimed is:

1. A process for the preparation of amorphous atorvastatin or hydrates thereof which comprises:

    (a) dissolving crystalline Form I atorvastatin having the formula



in a non-hydroxylic solvent at a concentration of about 25% to about 40%; and

    (b) removing the solvent by drying to afford said amorphous atorvastatin or hydrates thereof.

2. A process for the preparation of anhydrous amorphous atorvastatin which comprises:

    (a) dissolving crystalline Form I atorvastatin having the formula



in a non-hydroxylic solvent at a concentration of about 25% to about 40%; and

    (b) removing the solvent by drying to afford said anhydrous amorphous atorvastatin.

3. A process for the preparation of hydrated amorphous atorvastatin which comprises:

    (a) dissolving crystalline Form I atorvastatin having the formula



in a non-hydroxylic solvent at a concentration of about 25% to about 40%; and

    (b) removing the solvent by drying to afford said hydrated amorphous atorvastatin.

* * * * *

# Exhibit "C"

# RANBAXY

Phone: (609) 720-5608 • Fax (609) 514-9779

## FACSIMILE COVER SHEET

DATE:     January 24, 2007               #OF PAGES: *56*
                                         (INCLUDING THIS COVER)

| | |
|---|---|
| TO: | Dr. Peter Richardson |
| | Pfizer, Inc. |
| FAX NO.: | (212) 573-1939 |

FROM:    Jay R. Deshmukh, Esq.
         Senior Vice President – Intellectual Property

**Re:   AMLODIPINE BESYLATE/ATORVASTATIN CALCIUM
       ANDA received by the FDA on December 29, 2006
       U.S. PATENT NOS.: 4,681,893; 5,273,995; 5,686,104; 5,969,156; 6,126,971;
       and 6,455,574**

Please see attached.

**CONFIDENTIALITY NOTE:**
The information contained in this facsimile message is strictly privileged and confidential,
intended only for the use of the individual or entity named above.

If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended
recipient, you are hereby notified that any dissemination, distribution or copying of this material is strictly prohibited.

If you have received this communication in error, please immediately notify us by telephone to arrange for the
destruction or the communication or the return, at our expense, of the original message.

# RANBAXY

RANBAXY INC., 60 ) COLLEGE ROAD EAST, PRINCETON, NJ 08540, PHONE: (609) 720-9200    FAX: (609) 720-1155

**Jay R. Deshmukh, Esq.**
**Senior Vice President — Intellectual Property**
Direct Dial: 609-720-5608
Facsimile: 609-514-9779
Email: jay.deshmukh@ranbaxy.com

January 24, 2007

*VIA FACSIMILE    (212) 573-1939*
**CONFIRMATION VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Dr. Peter Richardson.
Senior Assistant General Counsel
  and General Patent Counsel
Pfizer, Inc.
Legal Division
150 East 42nd Street, 5th Floor
New York, NY 10017-5755

> **Re:    AMLODIPINE BESYLATE/ATORVASTATIN CALCIUM**
>         **ANDA received by the FDA on December 29, 2006**
>         **U.S. PATENT NOS.: 4,681,893; 5,273,995; 5,686,104; 5,969,156;**
>         **6,126,971; and 6,455,574**

Dear Peter:

Pursuant to Section 505(j)(2)(B) of the Food, Drug and Cosmetic Act ("FDCA") and 21 C.F.R. 314.95, you are hereby notified as follows:

(1)    Ranbaxy Laboratories Limited ("RLL") has previously submitted and the FDA has received an abbreviated new drug application ("ANDA") under FDCA Section 505(j)(2)(B)(ii) which contains bioavailability or bioequivalence data in order to obtain approval to engage in the commercial manufacture, use or sale of a drug product containing a combination of amlodipine besylate and atorvastatin calcium.

(2)    RLL's ANDA referred to in paragraph (1) has not been assigned a number to date, but this will be supplied to you as it is available.

(3)    The established name for the drug product is amlodipine besylate; atorvastatin calcium, and the name of the drug product as listed on page 3-26 of the 26th edition of the FDA publication entitled *Approved Drug Products With Therapeutic Equivalence Evaluations (2006)* (the "Orange Book") is Caduet®, equivalent to 2.5 mg, 5 mg and 10 mg of amlodipine

A WHOLLY OWNED SUBSIDIARY OF RANBAXY LABORATORIES LIMITED, INDIA

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 2

besylate, each of which may be combined with 10 mg, 20 mg, and 40 mg of atorvastatin calcium. Additionally, the 5 mg and 10 mg amlodipine besylate dosages can be combined with 80 mg of atorvastatin, to make 11 different combinations of strengths.

(4)     RLL's proposed drug product is in the form of tablets (6 strengths, as follows), which contain the equivalent of 5 mg amlodipine/10 mg atorvastatin, 5 mg amlodipine/20 mg atorvastatin, 10 mg amlodipine/10 mg atorvastatin, 10 mg amlodipine/20 mg atorvastatin, 5 mg amlodipine/40 mg atorvastatin and 10 mg amlodipine/ 80 mg of atorvastatin as the active ingredient.

(5)     RLL's ANDA received by the FDA on December 29, 2006 (hereinafter "Ranbaxy's ANDA" or "ANDA", contains a Paragraph III certification with respect to U.S. Patent Nos. 4,572,909 and 4,879,303, indicating that RLL will not launch its product prior to the expiry of these patents. RLL's ANDA also certifies under FDCA Section 505(j)(2)(A)(vii), paragraph IV ("Paragraph IV certification"), that in the opinion of RLL and to the best of its knowledge, U.S. Patent Nos. 4,681,893, 5,273,995, 5,686,104; 5,989,156, 6,126,971 and 6,455,574 are invalid or will not be infringed by the manufacture, use, sale, or offer to sell of the drug product for which RLL's ANDA has been submitted. A detailed statement of factual and legal bases for this opinion follows.

(6)     With respect to the Paragraph IV certification made herein with respect to the Patent Term Extension ("PTE") for U.S. Patent No. 4,681,893 ("the '893 Patent"), Ranbaxy makes this certification contingent on the U.S. Supreme Court's acceptance of its petition for certiorari from the Federal Circuit's decision with respect to the PTE for the '893 Patent in Pfizer Inc. et al. v. Ranbaxy Laboratories Ltd., et al. (Fed. Cir. Docket No. 06-1179) decision of August 2, 2006 ("Ranbaxy's petition for cert.").

## I.     The Term Extension of U.S. 4,681,893 is Invalid Because Warner-Lambert did not Fulfill its Duty to Disclose Material Information

Under 35 U.S.C. §156(d)(4), a Patent Term Extension ("PTE") applicant is required to provide information to enable the Director to determine the eligibility of a patent for an extension. In connection with that requirement, the PTO has imposed a duty of candor and good faith on the applicant requiring the disclosure of information that is material to the grant of a PTE, 37 CFR §1.765. A PTE applicant's duty of disclosure is so critical to the determination of PTE eligibility that an extension will be denied even for a grossly negligent failure to disclose material information.

Charles Ashbrook was the Warner-Lambert attorney responsible for drafting and prosecuting the '893 PTE application. In that application, Mr. Ashbrook asserted that

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 3

"U.S. Patent No. 4,681,893 claims Lipitor (atorvastatin calcium)." In connection with that assertion, Mr. Ashbrook violated his duty of candor and good faith by failing to disclose material information.

In particular, to gain allowance of the '995 Patent over rejections based on the prior art '893 Patent, Warner-Lambert made numerous assertions about the '893 Patent, asserting that it neither teaches a person of ordinary skill how to make enantiomers, nor puts them in the possession of enantiomers. Warner-Lambert also candidly stated that the '893 Patent does not enable enantiomers. Such admissions are material *per se*. Additionally, Warner-Lambert distinguished the '893 Patent from atorvastatin calcium by asserting that atorvastatin calcium is not "even hinted at" in the '893 Patent. This emphatic and unconditional admission was clearly material to Mr. Ashbrook's later assertion that the '893 Patent *claims* atorvastatin calcium. Warner-Lambert also repeatedly told the PTO that the '893 Patent does not describe or disclose enantiomers. Moreover, the Board considered all of Warner-Lambert's admissions about the '893 Patent and concluded that the '893 Patent "at best, only describes the trans racemate." Again, Warner-Lambert's admissions and the Board's decision about the sufficiency of the '893 Patent's disclosure are directly relevant to a determination of what the '893 Patent "claims" under § 156.

At the time he filed the '893 PTE application, Mr. Ashbrook was aware of the foregoing admissions and the Board's decision about the '893 Patent, but failed to disclose them to the PTO. Further, Pfizer withheld from the Patent Office the very existence of the '995 patent, which specifically discloses and claims the enantiomer atorvastatin calcium.[1] At trial, Mr. Ashbrook argued that this information was not material because it had no bearing on the scope of the '893 Patent's claims and because the '893 and '995 Patents are not related by a common priority date. But Warner-Lambert's admissions and the Board's conclusion about the '893 Patent are material *per se*, and that the '893 and '995 Patents are not related by a common priority date is irrelevant. While such a distinction may play a role in construing claims for patent infringement purposes, it plays no role in determining what a patent claims or what information is considered to be material under the broad, inclusive duty of disclosure required of PTE applicants. At the very least, Mr. Ashbrook knew or should have known of the materiality of these admissions. Moreover, given the quantity of this information and his intimate awareness of it, Mr. Ashbrook's deliberate withholding of this material information supports a finding of both gross negligence and deceptive intent.

Thus, the '893 PTE is invalid pursuant to 35 U.S.C. §282.

---

[1] It is undisputed that Mr. Ashbrook was aware of all of this information, but chose not to submit it in connection with the PTE application.

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 4

## II.     The '893 Patent is Invalid as Obvious in View of EP 179 559

U.S. Patent No. 4,681,893, entitled "TRANS-6-[2-(3- OR 4-CARBOXAMIDO-SUBSTITUTED PYRROLE-1-YL)ALKYL]-4-HYDROXYPYRAN-2-ONE INHIBITORS OF CHOLESTEROL SYNTHESIS," issued on July 21, 1987 to Bruce D. Roth from application serial number 06/868,867 ("the '867 Application"), filed May 30, 1986. The '893 Patent does not claim priority to any foreign or domestic application. The '893 Patent was assigned to Warner-Lambert.

The European counterpart of the '893 Patent (EP 247 633, or "the '633 application") was filed May 29, 1987 and received a first examination report dated April 20, 1989. The Examiner found no inventive step for the claims of the '633 application over EP 179 559, a patent application filed by Warner Lambert listing as inventors Milton L. Hoefle, Bruce D. Roth, and Charlotte D. Stratton.[2] The European Examiner found, *inter alia*, that although the subject matter claimed in the '633 application met the novelty requirement, it was merely an obvious solution to the problem of provision of further 6(pyrrol-1-yl) alkyl pyran-2-one inhibitors of cholesterol synthesis in light of EP 179 559. As the Examiner noted, since EP 179 559 makes clear "that the 3- and 4-positions of the pyrazole [sic] ring can be substituted by a wide variety of substituents, including esters, without leading to a loss of the said pharmaceutical properties," the skilled artisan "would expect that the pyrazole [sic] was susceptible to further substitutions at the 3- and 4-position including other carboxy derivatives such as amides, without leading to a significant change in qualitative properties." The Examiner indicated that if data were presented demonstrating surprising effectiveness over the cited prior art (EP 179 559), the inventive step could be acknowledged.

In a response to this examination report, dated October 12, 1989, Warner-Lambert's representative stated that "[a]pplicants generally accept the Examining Division's arguments saying that a person skilled in the art would expect that the pyrazole [sic] ring was susceptible to further substitutions at the 3- and 4-position including other carboxy derivatives... without leading to a significant change in qualitative properties." Applicants sought to overcome this rejection by presenting "data clearly demonstrating a superior effect of compounds showing the substitution pattern of the present invention in the 3- and 4-positions of the pyrazole [sic] ring. It should be noted that both tested compounds are at least by the factor 10 more effective than the compounds according to EP-A-179 559. This effect is unexpected and was not to be forseen." (Warner-Lambert response of October 12, 1989 to EP examination report of April 20, 1989, emphasis in the original).

---

[2] The inventorship of the U.S. Patent which issued from the same family as EP 179 559, U.S. Patent No. 4,647,576, was eventually changed, in August 2003, to list Bruce D. Roth as sole inventor.

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 5

The data referred to in the October 12, 1989 response is a comparison of CSI data[3] (presumably generated as set forth in the '633 application) generated from the sodium salts of compounds in the '633 application (compounds 1 and 3 from Table 1) with four hydroxy acid compounds of EP 179 559. However, the CSI data generated by Warner-Lambert with respect to at least the compounds of the '633 application is unreliable. The CSI assay is concentration based; that is, the $IC_{50}$ values[4] used to measure the activity of the test compound in the system were calculated based on a concentration curve. As noted by expert witnesses for both Ranbaxy and Pfizer in litigations in a number of jurisdictions, it is not be possible to quantify the results of the CSI assay without knowing the concentration of the test compound in the assay solution.

When reviewed in its entirety, the CSI data has extensive variability. For example, experiments run three weeks apart had an eighty fold variation in activity for racemic atorvastatin calcium. This variability is so large it is not possible to draw scientifically valid conclusions from any of the CSI data. Thus, the CSI values for compound 1 of the '893 application (0.035 micromolar) presented in the specification, and for the same compound presented in the European prosecution history of the '633 application (0.001 micromolar) show a difference which is three and a half times more than the purported difference between that compound and the prior art compound of EP 179 559.

The '893 patent claims are invalid as obvious over the disclosure of EP 179 559.[5] Compounds disclosed in claim 1 of the '893 patent, as admitted by Warner-Lambert in the prosecution of the counterpart '633 application, do not show inventive step over EP 179 559. The data relied upon by Warner-Lambert to ultimately gain issuance of their EP patent is unreliable. Claim 2 of the '893 patent does not add any patentable subject matter, as EP 179 599 discloses a "first preferred subgeneric chemical compound aspect," with X as $-CH_2CH_2-$. Claim 3 of the '893 patent does not add any patentable subject matter, as EP 179 599 discloses a "second preferred subgeneric chemical compound aspect," with $R_1$ as claimed. Claim 4 of the '893 patent does not add any patentable subject matter, as EP 179 599 discloses that $R_4$, in a second preferred subgeneric chemical compounds aspect, is alkyl of from one to four carbon atoms or trifluoromethyl. The definition of one to four carbon atoms is within the claimed range of from one to six carbon atoms, and the claim is otherwise obvious for the reasons given above. Claim 5 of the '893 patent is again obvious over the disclosure of EP 179 559. Compound 1 disclosed in claim 5 of the '893 patent, as admitted by Warner-Lambert in the prosecution

---

[3] Although the EP public record indicates that the data is COR data, in fact it is CSI data, as stipulated to by Pfizer in prior litigation (*Pfizer et al. v. Ranbaxy et al.*, in the U.S. District Court for the District of Delaware).

[4] $IC_{50}$ value refers to the concentration of the test compound that produced fifty percent inhibition of the conversion of radio labeled acetate to radioactive cholesterol.

[5] We further note that neither EP 179 559, nor any member of that application family was cited to the U.S. Examiner, so that the U.S. Examiner did not have an opportunity to review the patentability of claims to the '893 patent in light of the art confronted by Warner-Lambert in the European prosecution.

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 6

of the counterpart '633 application, does not show inventive step over EP 179 559. The data relied upon by Warner-Lambert to ultimately gain issuance of the claim to compound 1 in the EP prosecution is unreliable. Claim 6 of the '893 patent is again obvious over the disclosure of EP 179 559. Compound 2 disclosed in claim 6 of the '893 patent, as admitted by Warner-Lambert in the prosecution of the counterpart '633 application, does not show inventive step over EP 179 559. The data relied upon by Warner-Lambert to ultimately gain issuance of the claim to compound 2 in the EP prosecution is unreliable. Claim 7 of the '893 patent is again obvious over the disclosure of EP 179 559. Compound 3 disclosed in claim '7 of the '893 patent, as admitted by Warner-Lambert in the prosecution of the counterpart '633 application, does not show inventive step over EP 179 559. The data relied upon by Warner-Lambert to ultimately gain issuance of the claim to compound 3 in the EP prosecution is unreliable. Claim 8 of the '893 patent does not add any patentable subject matter, as EP 179 559 discloses the use of its compounds in pharmaceutical compositions, in hypercholesterolemic effective amounts. Claim 9 of the '893 patent does not add any patentable subject matter, as EP 179 559 discloses the use of its compounds in methods for inhibiting cholesterol biosynthesis through administration of pharmaceutical compositions, in hypercholesterolemic effective amounts.

Section 103 of the Patent Act focuses on differences between subject matter sought to be patented and the prior art. The Supreme Court's traditional approach looks to whether a person having ordinary skill in the art would have been capable of adapting extant technology to achieve a desired result, not whether such a person would have had motivation to adapt extant technology to achieve a desired result. *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273 (1976); *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57 (1960). Under *Sakraida* and *Anderson's-Black*, where an alleged invention is "an assembly of old elements," the court's inquiry goes to whether the claimed invention "only unites old elements with no change in their respective functions," or whether there is some interaction of combined elements with each other to yield a "new or different function" or "an effect greater than the sum of the several effects taken separately." Sakraida, 425 U.S. at 282. If there is no such function or effect, the claimed invention is obvious under 35 U.S.C. §103, and no further analysis is needed. Analysis of the existence of some "teaching, suggestion or motivation" that would have led a person of ordinary skill in the art to combine the relevant teachings in the manner claimed has no basis in the text of Section 103 and conflicts with Supreme Court precedent.[6] Where the situation is vitally altered between the time of the first judgment and the second, the prior determination may not be conclusive. For example, a judicial declaration intervening between the two proceedings may so change the legal atmosphere as to render the rule of collateral estoppel inapplicable. *Wilson v. Turnage*, 791 F.2d 151 (Fed. Cir. 1986). For at least the last 25 years, the Court of Appeals for the Federal Circuit, and U.S. District Courts have consistently required an analysis of teaching, suggestion or motivation as part of the test for obviousness although it is not statutorily recognized as such. A change in

---

[6] This same position is argued by Petitioners in *KSR International Co. v. Teleflex Inc. et al.* (Supreme Court Docket No. 04-1350).

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 7

controlling precedent to reduce or eliminate the role of these factors would constitute a significant change in the legal atmosphere of obviousness in patent law.

Here, the use of a carboxamide group in compounds of EP 179 559 was well within the capability of a person of ordinary skill in the art, and was directed to achieving further effective HMG-CoA reductase inhibitors. EP 179 559 in fact itself contains compounds containing such linkages, a fact which was apparently not appreciated by the European Examiner. (Compound XLI, in Reaction Sequence 8, page 25). There is no indication that the carboxamido group employed in the compounds of the '633 patent has any function other than the functions that carboxamido groups are known to have.

Consequently, all claims of the '893 patent are invalid over EP 179 599.

### III.    All Claims of U.S. Patent No. 5,273,995 Are Invalid or are not infringed

The Claims of the '995 patent

The claims are set forth below.

1.    [R-(R*R*)]-2-(4-fluorophenyl)-β,δ-dihydroxy-5-(1-methylethyl)-3-phenyl-4-[(phenylamino)-carbonyl]-1H-pyrrole-1-heptanoic acid or

(2R-trans)-5-(4-fluorophenyl)-2-(1-methylethyl)-N,4-diphenyl-1-[2-(tetrahydro-4-hydroxy-6-oxo-2H-pyran-2-yl)ethyl]-1H-pyrrole-3-carboxamide; or

pharmaceutically acceptable salts thereof.

2.    A compound of claim 1 which is [R-(R*R*)]-2-(4-fluorophenyl)-β,δ-dihydroxy-5-(1-methylethyl)-3-phenyl-4-[(phenylamino)-carbonyl]-1H-pyrrole-1-heptanoic acid.

3.    A compound of claim 1 which is (2R-trans)-5-(4-fluorophenyl)-2-(1-methylethyl)-N,4-diphenyl-1-[2-(tetrahydro-4-hydroxy-6-oxo-2H-pyran-2-yl)ethyl]-1H-pyrrole-3-carboxamide.

4.    The monosodium salt of the compound of claim 2.

5.    The monopotassium salt of the compound of claim 2.

6.    The hemicalcium salt of the compound of claim 2.

7.    The N-methylglucamine salt of the compound of claim 2.

8.    The hemimagnesium salt of the compound of claim 2.

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 8

        9.      The hemizinc salt of the compound of claim 2.

        10.     The 1-deoxy-1-(methylamino)-D-glucitol mixture with the compound of claim 2.

        11.     A pharmaceutical composition for treating hypercholesterolemia comprising a hypocholesterolemic effective amount of a compound of claim 1 and a pharmaceutically acceptable carrier.

        12.     A method of inhibiting cholesterol synthesis in a human suffering from hypercholesterolemia comprising administering a compound of claim 1 in unit dosage form.

A.   All claims of the '995 patent are Invalid for Anticipation or are obvious Over U.S. 4,681,893 or are not infringed

As construed by the Federal Circuit in *Pfizer Inc. et al. v. Ranbaxy Laboratories Ltd.*, et al., 457 F.3d :284 (Fed. Cir. 2006), U.S. 4,681,893 ("the '893 Patent") discloses both the racemate and the enantiomers of atorvastatin. Specifically, the court held that claim 1 of the '893 patent is correctly construed to include the enantiomeric trans-forms of the compounds of structural formula I. Under the Federal Circuit's construction, Compound I of the '893 Patent discloses the three possible stereo-forms of atorvastatin: the racemate, the S-trans enantiomer, the R-trans enantiomer (atorvastatin lactone) and unequal mixtures of enantiomers. Furthermore, the '893 Patent discloses acid and salt forms of Formula I, and states that "acids may be converted to a corresponding pharmaceutically acceptable salt by conventional means, if desired…" Thus, the '893 Patent anticipates claim 6 of the '995 Patent, because it discloses atorvastatin in its hemicalcium salt form.

Other particular metal salt claims (claim 4, to the monosodium salt; claim 5, to the monopotassium salt; claim 8, to the hemimagnesium salt; and claim 9, to the hemizinc salt) are also invalid for the same reasons, by anticipating disclosure in the '893 Patent, but these are also not infringed by the Ranbaxy product, which does not contain such compounds. Claim 7 to the methylglucamine salt, a standard, well-known and readily available amine salt, is *prima facie* obvious. The '893 Patent discloses various pharmaceutically acceptable *amine* salts of trans-5-(4-fluorophenyl)-2-(1-methylethyl)-N,4-diphenyl-1-[2-(tetrahydro-4-hydroxy-6-oxo-2H-pyran-2-yl)ethyl]-1H-pyrrole-3-carboxamide, including salts with ammonium and organic nitrogenous bases strong enough to form salts with carboxylic acids. Claim 7 is also not infringed by the Ranbaxy product as it does not contain such compounds. Claim 10, to a mixture with 1-deoxy-1-(methylamino)-D-glucitol, a standard, well-known and readily available amine derivative of sorbitol in admixture with the heptanoic acid form of the enantiomer of claim 1, is also *prima facie* obvious, for reasons similar to those presented for claim 7. Further, as Ranbaxy's proposed formulation does not include a mixture of any atorvastatin with a 1-

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 9

deoxy-1-(methylamino)-D-glucitol, Ranbaxy, additionally, does not infringe this claim of
the '995 Patent.

Claim 11 of the '995 Patent, drawn to a pharmaceutical composition for treating
hypercholesterolemia comprising an effective amount of either the lactone or the
heptanoic acid form of the enantiomer of claim 1, is also anticipated. The '893 Patent
discloses pharmaceutical compositions for treating hypercholesterolemia comprising a
hypocholesterolemic effective amount of the trans-5-(4-fluorophenyl)-2-(1-methylethyl)-
N,4-diphenyl-1-[2-(tetrahydro-4-hydroxy-6-oxo-2H-pyran-2-yl)ethyl]-1H-pyrrole-3-
carboxamide and a pharmaceutically acceptable carrier. In view of the claim construction
of the '893 Patent, the use of the enantiomer in such a composition is anticipated.

Claim 12 of the '995 Patent, drawn to a method of inhibiting cholesterol synthesis
in a human suffering from hypercholesterolemia by administering an effective amount of
either the lactone or the heptanoic acid form of the enantiomer of claim 1, is also
anticipated. The '893 Patent discloses methods for inhibiting cholesterol synthesis in
humans suffering from hypercholesterolemia by administering the trans-5-(4-
fluorophenyl)-2-(1-methylethyl)-N,4-diphenyl-1-[2-(tetrahydro-4-hydroxy-6-oxo-2H-
pyran-2-yl)ethyl]-1H-pyrrole-3-carboxamide in unit dosage form. The use of the
enantiomer in such a composition is anticipated.

B. The '995 is Invalid for Double Patenting Over U.S. 5,003,080 in view of the '893
   Patent

Claims 12 and 14 of U.S. 5,003,080 ("the '080 Patent") define a process, as well as
the products prepared by that process. The three claim construction issues regarding
claims 12 and 14 are: (1) the identity of the lactones that fall within the scope of Formula
Ia depicted in claim 12; (2) whether claim 14 incudes all of the process steps of claim 12,
thereby producing atorvastatin lactone and its acid and salts; and (3) the meaning of the
phrase "pharmaceutically acceptable salts."

Claim 12 of the '080 Patent recites, in part: "A process for the preparation of the
compound of Formula Ia [structural depiction] and the hydroxy acid and pharmaceutically
acceptable salts thereof, ..." Claim 12 also contains two lettered paragraphs delineated (a)
and (b). Step (a) affords "the compound of Formula Ia," which is in the lactone form.
Step (b) recites three substeps: (1) "and if desired, converting the resulting compound of
Formula Ia to a hydroxy acid" by "conventional hydrolysis," (2) "and further, if desired,
converting the hydroxy acid to a corresponding pharmaceutically acceptable salt by
conventional means," and (3) "if so desired, converting the hydroxy acid to a compound
of Formula Ia." When the lactone of Formula Ia is atorvastatin lactone, the process of
claim 12 also produces atorvastatin acid and pharmaceutically acceptable salts of
atorvastatin.

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 10

Claim 14, which depends from claim 12, recites, "A process according to claim 12 and for the preparation of [atorvastatin lactone]." This dependent claim incorporates all limitations of its antecedent claim, including process step (b) of claim 12. Thus, claim 14 is a process for preparing atorvastatin lactone, and if desired, atorvastatin acid and, if desired, its corresponding pharmaceutically acceptable salts. Construction of the phrase "pharmaceutically acceptable salts," as defined in the patent, means (1) metal salts formed with sodium, potassium, calcium, magnesium, aluminum, iron and zinc ions, and (2) amine salts formed with ammonia and organic nitrogenous bases. Therefore, claim 14 as properly construed, expressly recites the atorvastatin calcium salt (among other salts). Further, since the '893 Patent teaches that each of the lactone compounds of Formula I may be converted to pharmaceutically acceptable salts, and names calcium as one such suitable metal salt for such conversion, there is no patentable distinction between claims of the '995 Patent and claim 14 of the '080 patent, in view of the '893 Patent disclosure.

Thus, claims 1-3 of the '995 Patent are obvious in light of the express recitation of the process to make the subject matter of each of claims 1-3, in claims 12 and 14 of the '080 Patent. Also, claims 4-9 of the '995 Patent, which recite various salts of compounds, are all obvious in light of the express recitation of the processes to make the subject matter of each of claims 4-9, in claims 12 and 14 of the '080 Patent. Claim 10, to the mixture of 1-deoxy-1-(methylamino)-D-glucitol and the compound of claim 2 is not infringed by Ranbaxy's proposed atorvastatin/amlodipine tablets.

Claim 11 of the '995 Patent, drawn to a pharmaceutical composition for treating hypercholesterolemia comprising an effective amount of either the lactone or the heptanoic acid form of the enantiomer of claim 1, is also invalid for double patenting over the '080 Patent in light of the disclosure of the '893 Patent. The '893 Patent discloses pharmaceutical compositions for treating hypercholesterolemia comprising a hypocholesterolemic effective amount of the trans-5-(4-fluorophenyl)-2-(1-methylethyl)-N,4-diphenyl-1-[2-(tetrahydro-4-hydroxy-6-oxo-2H-pyran-2-yl)ethyl]-1H-pyrrole-3-carboxamide and a pharmaceutically acceptable carrier. In view of the claim construction of the '893 Patent, the use of the enantiomer in such a composition is obvious from the process of making the material in claims 12 and 14 of the '080 Patent.

Claim 12 of the '995 Patent, drawn to a method of inhibiting cholesterol synthesis in a human suffering from hypercholesterolemia by administering an effective amount of either the lactone or the heptanoic acid form of the enantiomer of claim 1, is also invalid for double patenting over the '080 Patent in light of the disclosure of the '893 Patent. The '893 Patent discloses methods for inhibiting cholesterol synthesis in humans suffering from hypercholesterolemia by administering the trans-5-(4-fluorophenyl)-2-(1-methylethyl)-N,4-diphenyl-1-[2-(tetrahydro-4-hydroxy-6-oxo-2H-pyran-2-yl)ethyl]-1H-pyrrole-3-carboxamide in unit dosage form. The use of the enantiomer in such a method of therapy is obvious from the process of making the material in claims 12 and 14 of the '080 Patent.

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 11

### C. The '995 is Unenforceable for Inequitable Conduct

During prosecution of the application for the '995 Patent, Warner-Lambert withheld highly material information concerning its own earlier patents and their subject matter and misrepresented the cholesterol inhibition activity of the compounds at issue. The inequitable conduct determination is a two-step analysis. First the court must determine whether the accused conduct (1) concerns information that satisfies a threshold level of materiality and (2) involves culpability that satisfies a threshold level of intent to mislead. Second, once the threshold levels of materiality and intent have been established, the trial court is required to weigh materiality and intent.

### 1.   Warner-Lambert Improperly Withheld Activity Data from the Patent Office

Warner-Lambert withheld highly material activity data from the Patent Office with deceptive intent. This activity data falls into two categories: (1) results from in vivo experiments ("AICS data"), and (2) results from in vitro experiments ("CSI data").

The AICS data were material, not cumulative, and contained results that directly refuted assertions made for patentability of the compounds claimed in the '995 Patent. Warner-Lambert has argued repeatedly that the R isomer of atorvastatin claimed in the '995 Patent has ten times the activity of the prior art compounds of the earlier '893 Patent. The AICS data show precisely the opposite of Warner-Lambert's arguments, that the activity level of the R isomer was, in fact, two times that of the racemic mixture, just as a chemist would have expected. Warner-Lambert's own internal documents, prepared before and after the filing of the '995 application, demonstrate that Warner-Lambert and the '995 inventor, Dr. Roth, believed that the AICS data were correct in showing only a two-fold difference. The deceptive intent is clearly inferable from the fact that Dr. Roth withheld the AICS data and made an argument for patentability which could not have been made had the information been disclosed. Also, his conscious misrepresentation of the data as "surprising and unexpected" when he had used the AICS data in memoranda bearing his signature to draw the opposite conclusion, constituted clear and convincing evidence of an intentional misrepresentation.

The CSI data were material, not cumulative, and contained results that directly refuted assertions made for patentability of the compounds claimed in the '995 Patent. The undisclosed CSI data directly refute Warner-Lambert's repeated assertions of an "unexpected" "ten times" difference in activity between the R isomer of atorvastatin and the racemic compounds. But even the disclosed CSI data had to be carefully manipulated to support those assertions. Dr. Roth admitted that a Warner-Lambert Vice President directed him to search for data showing the R isomer to have surprising and unexpected data over the racemate. Dr. Roth then searched his personal binder and selected data to show surprising and unexpected activity. Dr. Roth withheld other CSI data inconsistent with that activity. This behavior constitutes clear and convincing evidence that Dr. Roth intended to mislead and deceive the Patent Office.

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 12

Based on the same information referred to above, Justice Young of the Federal Court of Australia, on December 20, 2006, revoked Australian Patent No. 628198 (analogous to the '995 patent and having essentially the same specification), having reached the following conclusions:

> "(a)  The statements in the specification for the Enantiomer Patent that represented that Warner-Lambert had found that the R-trans enantiomer achieved surprising and unexpected inhibition of the biosynthesis of cholesterol in the order of a ten-fold increase above the activity levels of the racemate were false and misleading.

> (b)  The representation in the specification for the Enantiomer Patent that the results in the CSI table reflected all of the CSI data available to Warner-Lambert for the relevant compounds, and that the data as a whole provided reasonable grounds for the findings set forth in the CSI Table, were false and misleading.

> (c)  The representation by Warner-Lambert to the Patent office in its patent attorney's letter of 26 June 1992 that the R-trans isomer was ten times more active than its racemic mixture was false and misleading."

In reaching the above Conclusions, Justice Young found that:

> "Dr. Roth's evidence that the CSI data was perfectly fine and he saw no problems with it is not credible. I reject it. I carefully observed Dr. Roth in the course of his evidence. I formed the opinion that in relation to the CSI Table he was defending his own choice of data and, in effect, arguing Warner-Lambert's case rather than giving frank evidence. Moreover, the evidence he gave was not consistent with Warner-Lambert's own internal records, as detailed below."

Ranbaxy's position in regards to unenforceability due to withholding data has been fully vindicated by the Australian decision as is clear from the quotations above.

2.    Warner-Lambert Improperly Withheld All Information About the '080 Patent

Before Warner-Lambert filed the application for the '995 Patent, it had already applied for the '080 Patent, and a CIP application. The CIP application expressly claimed processes for making enantiomers identical to those Warner-Lambert later claimed in the '995 patent application. No information of record disclosed the enantiomers, and thus the CIP application was not cumulative. The claims presented in the CIP application undeniably teach one of ordinary skill in the art to use the recited process to make the recited enantiomers. Thus, those claims render obvious the '995 patent application's claims to the same enantiomers. Moreover, when two co-pending patent applications have

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 13

overlapping content in their specifications and claims, then the earlier is highly material to
the prosecution of the latter because it could conceivably serve as the basis for a double-
patenting rejection. Because the CIP application and the '080 patent were highly material,
deceptive intent may properly be inferred from commensurately less circumstantial
evidence. However, overwhelming evidence shows that Drs. Roth and Daignault
(Warner-Lambert's in-house patent attorney) knew of the CIP application and the '080
patent while prosecuting the '995 application, and knew or should have known of their
materiality.

### D. Claim 6 of the '995 Patent has been Held Invalid Under 35 U.S.C. §112, ¶4.

As held by the Court of Appeals for the Federal Circuit in *Pfizer Inc. et al. v.
Ranbaxy Laboratories Ltd.*, et al. (Fed. Cir. Docket No. 06-1179) decision of August 2,
2006, claim 6 of the '995 Patent is invalid for failure to comply with 35 U.S.C. §112, ¶4,
as an improperly dependent claim. Accordingly, there can be no infringement of this
claim.

For the same reason that claim 6 was held invalid, claims 4, 5 and 7-9 are also
invalid.

### IV.    U.S. Patent No. 5,686,104 Is Not Infringed

U.S. Patent No. 5,686,104 ("the '104 patent") entitled "Stable Oral CI-981
Formulation and Process of Preparing Same" issued on November 11, 1997. This patent
contains a total of 22 claims, of which claims 1, 14, 15, and 21 are independent, while
claims 2-5, 7-13, 16-20 and 22 are dependent claims. Claims 2-13 depend directly or
indirectly from claim 1, claims 16-20 depend from claim 15, and claim 22 depends from
claim 21.

#### The Claims

Claims 1, 14, 15 and 21 are reproduced below.

1.      A pharmaceutical composition for the peroral treatment of
hypercholesterolemia or hyperlipidemia characterized by improved
stability comprising in a mixture, a compound as active ingredient of
structural formula I

Dr. Peter Richardson.
Pfizer, Inc.
January 24, 2007
Page 14

wherein X is —$CH_2$—, —$CH_2CH_2$—, —$CH_2CH_2CH_2$— or —$CH_2CH(CH_3)$;

$R_1$ is 1-naphthyl; 2-naphthyl; cyclohexyl, norbornenyl; 2-, 3-, or 4-pyridinyl; phenyl; phenyl substituted with flourine, chlorine, bromine, hydroxyl, trifluoromethyl, alkyl of from one to four carbon atoms, alkoxy of from one to four carbon atoms, or alkanoylalkoxy of from two to eight carbon atoms;

either $R_2$ or $R_3$ is —$CONR_5R_6$ where $R_5$ and $R_6$ are independently hydrogen; alkyl of from one to six carbon atoms; 2-, 3-, or 4-pyridinyl; phenyl; phenyl substituted with fluorine, chlorine, bromine, cyano, trifluoromethyl, or carboalkoxy of from three to eight carbon atoms; and the other $R_2$ or $R_3$ is hydrogen; alkyl of from one to six carbon atoms; cyclopropyl; cyclobutyl; cyclopentyl; cyclohexyl; phenyl; or phenyl substituted with fluorine, chlorine, bromine, hydroxyl, trifluoromethyl, alkyl of from one to four carbon atoms, alkoxy of from one to four carbon atoms, or alkanoyloxy of from two to eight carbon atoms;

$R_4$ is alkyl of from one to six carbon atoms, cyclopropyl, cyclobutyl, cyclopentyl, cyclohexyl, or trifluoromethyl;

M is a pharmaceutically acceptable metal salt;

*at least one stabilizing pharmaceutically acceptable alkaline earth metal salt additive;*

and comprising by weight of the total solid composition at least one binder selected from the group consisting of methyl cellulose, carboxymethylcellulose, hydroxypropylcellulose, hydroxymethylpropylcellulose, polyvinylpyrrolidone, polyvinylalcohol, starch, and hydroxymethylcellulose comprising by weight between about 0.5% and about 6%;

at least one diluent selected from the group consisting of microcrystalline cellulose, hydrous lactose, cornstarch, sucrose, and silicic anhydride comprising by weight between about 1% and about 80%;

at least one disintegrant selected from the group consisting of carboxymethylcellulose, croscarmellose and starch comprising by weight between about 1% and about 15%;

*at least one surfactant selected from the group consisting of polyoxyethylene sorbitan and polyoxyethylene-polyoxypropylene copolymer* comprising by weight between about 0.1% and about 4%;

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 15

at least one lubricant selected from the group consisting of magnesium stearate, stearic acid, palmitic acid, and talc comprising by weight between about 0.25% and about 2%;

and optionally at least one antioxidant selected from the group consisting of butylated hydroxanisole, sodium ascorbate, butylated hydroxytoluene, sodium metabisulfate, malic acid, citric acid, and ascorbic acid comprising by weight up to about 3%. (emphasis added to analyzed claim terms)

14.    A stabilized solid pharmaceutical composition for peroral treatment of hypercholesterolemia or hyperlipidemia comprising in solid unit dosage form an active ingredient R-(R*,R*)-2-(4-fluorophenyl)-β, δ-dihydroxy-5-(1-methylethyl)-    3-phenyl-4-[(phenylamino)carbonyl]-1H-pyrrole-1-heptanoic acid hemicalcium salt and *a stabilizer selected from the group consisting of calcium carbonate, calcium hydroxide, magnesium carbonate, magnesium hydroxide, magnesium silicate, magnesium aluminate, and aluminum magnesium hydroxide* and comprising by weight of the total solid composition at least one binder selected from the group consisting    of    methyl    cellulose,    carboxymethylcellulose, hydroxypropylcellulose,    hydroxymethylpropylcellulose, polyvinylpyrrolidone,    polyvinylalcohol,    starch,    and hydroxymethylcellulose comprising by weight between about 0.5% and about 6%;

at least one diluent selected from the group consisting of microcrystalline cellulose, hydrous lactose, cornstarch, sucrose, and silicic anhydride comprising by weight between about 1% and about 80%;

at least one disintegrant selected from the group consisting of carboxymethylcellulose, croscarmellose and starch comprising by weight between about 1% and about 15%;

*at least one surfactant selected from the group consisting of polyoxyethylene    sorbitan    and    polyoxyethylene-polyoxypropylene copolymer* comprising by weight between about 0.1% and about 4%;

at least one lubricant selected from the group consisting of magnesium stearate, stearic acid, palmitic acid, and talc comprising by weight between about 0.25% and about 2%;

and optionally at least one antioxidant selected from the group consisting of butylated hydroxanisole, sodium ascorbate, butylated hydroxytoluene, sodium metabisulfate, malic acid, citric acid, and

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 16

ascorbic acid comprising by weight up to about 3%. (emphasis added to analyzed claim terms)

15.    A method for preparing a stabilized pharmaceutical composition formulated for peroral therapy of hypercholesterolemia or hyperlipidemia comprising:

(a) milling an excess of the drug, Cl-981 Hemi-Calcium of the formula IA:



(b) *dissolving at least one binder additive in aqueous surfactant solution;*

(c) blending the milled drug with *at least one drug-stabilizing alkaline earth metal salt additive* and at least one diluent additive ingredient with the drug-stabilizing additive and one half of a disintegrant additive in a rotary mixing vessel equipped with a chopping device;

(d) granulating the blended drug mixture of step (c) with the surfactant/binder solution of step (b) in gradual increments in the chopper equipped mixing vessel;

(e) drying the granulated drug mixture overnight at about 50° C.;

(f) sieving the dried granulated drug mixture;

(g) tumble blending the sieved drug mixture with the remaining amount of the disintegrant additive;

(h) mixing separately an aliquot of the step (g) drug mixture with magnesium stearate, sieving same, and returning same to the drug mixture of step (g) and tumble blending the entire drug mixture; and compressing aliquots of the step (h) drug mixture into tablets. (emphasis added to analyzed claim terms)

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 17

     21.    A peroral pharmaceutical composition for treating hypercholesterolemia comprising an effective, cholesterol synthesis inhibitory amount of the enantiomer R-(R*,R*)-2-(4-fluorophenyl)-β, δ-dihydroxy-5-(1-methylethyl)-3-    phenyl-4-[(phenylamino)carbonyl]-1H-pyrrole-1-heptanoic acid, hemicalcium salt; *stabilized by calcium carbonate*, and comprising by weight of the total solid composition at least one binder selected from the group consisting of methyl cellulose, carboxymethylcellulose,                             hydroxypropylcellulose, hydroxymethylpropylcellulose, polyvinylpyrrolidone, polyvinylalcohol, starch, and hydroxymethylcellulose comprising by weight between about 0.5% and about 6%;

     at least one diluent selected from the group consisting of microcrystalline cellulose, hydrous lactose, cornstarch, sucrose, and silicic anhydride comprising by weight between about 1% and about 80%;

     at least one disintegrant selected from the group consisting of carboxymethylcellulose, croscarmellose and starch comprising by weight between about 1% and about 15%;

     *at least one surfactant selected from the group consisting of polyoxyethylene sorbitan and polyoxyethylene-polyoxypropylene copolymer* comprising by weight between about 0.1% and about 4%;

     at least one lubricant selected from the group consisting of magnesium stearate, stearic acid, palmitic acid, and talc comprising by weight between about 0.25% and about 2%;

and optionally at least one antioxidant selected from the group consisting of butylated hydroxanisole, sodium ascorbate, butylated hydroxytoluene, sodium metabisulfate, malic acid, citric acid, and ascorbic acid comprising by weight up to about 3%, in a dosage of solid enantiomer ranging from about 0.1 to about 8.0 mg/kg body weight per day. (emphasis added to analyzed claim terms)

## RLL's Formulation

     RLL has developed a specific formulation of tablets containing amorphous atorvastatin calcium and amlodipine besylate, having approximately 5 mg amlodipine besylate combined with 10 mg, 20 mg and 40 mg of atorvastatin calcium; and approximately 10 mg amlodipine besylate combined with 10 mg, 20 mg and 80 mg of atorvastatin calcium.

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 18

Non-Infringement Analysis

RLL does not literally infringe any claim of the '104 Patent because RLL's proposed formulation does not employ an "alkaline earth metal salt additive." Claims 1-13 and 15-20 of the 104 patent require a stabilized pharmaceutical composition or a method for preparing a stabilized pharmaceutical composition where the composition contains a "stabilizing alkaline earth metal salt additive" or a more specific such additive. The only alkaline earth metal salt additive proposed for use by RLL is magnesium stearate. However, magnesium stearate is specifically defined in the '104 patent as a lubricant and, therefore, cannot be an "alkaline earth metal salt additive."

More specifically, each of the ingredients of the core of the RLL tablets can be readily accounted for in the '104 patent, with the exception of mannitol, sodium carbonate, colloidal silicon dioxide, and sodium laurel sulfate. The mannitol serves as a diluent, colloidal silicon dioxide serves as a disintegrant while the sodium lauryl sulfate serves as a surfactant.

The sodium carbonate and sodium lauryl sulfate, as used in RLL's formulation, are sodium salts. Sodium an alkali metal and is located in Group I of the Periodic Table of the Elements; it is therefore monovalent. Sodium is not an alkaline earth metal. Alkaline earth metals are in Group II of the Periodic Table of the Elements and are divalent. Thus, RLL's proposed formulation cannot be considered to contain an "alkaline earth metal salt additive" as required by claims 1-13 and 15-20 of the '104 patent. Therefore, it does not literally infringe any of claims 1-13 or 15-20 of the '104 patent.

As noted above, claim 14 of the '104 patent is limited to a stabilized pharmaceutical composition having a stabilizer "selected from the group consisting of calcium carbonate, calcium hydroxide, magnesium carbonate, magnesium hydroxide, magnesium silicate, magnesium aluminate, and aluminum magnesium hydroxide." RLL's proposed formulation does not include any of these stabilizers, which are all alkaline earth metal salts. Thus, RLL's proposed formulation does not literally infringe claim 14 of the '104 patent.

As noted above, claim 21 is limited to a stabilized pharmaceutical composition stabilized by "calcium carbonate," and claim 22 is limited to a method of treatment comprising a dosage of the pharmaceutical composition of claim 21. RLL's proposed formulation does not include calcium carbonate, which is an alkaline earth metal salt. Thus, RLL's proposed formulation does not literally infringe claims 21 or 22 of the '104 patent.

Further, RLL's proposed formulation does not infringe claims 1-14, 17 or 21-22 of the '104 Patent because it does not employ the surfactant polyoxyethylene sorbitan or the polyoxyethylene-polyoxypropylene copolymer. Claims 1-14, 17 and 21-22 of the '104 patent are limited to a stabilized pharmaceutical composition or a method for preparing a

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 19

stabilized pharmaceutical composition where the composition contains at least one surfactant selected from the group consisting of polyoxyethylene sorbitan [Tween 80] and polyoxyethylene-polyoxypropylene copolymer. RLL's proposed formulation does not include either of these surfactants. Thus, RLL's proposed formulation does not literally infringe any of claims 1-14, 17 or 21-22 of the '104 patent.

RLL's proposed formulation does not infringe claims 15-20 of the '104 Patent because it does not employ aqueous surfactant solutions. Claims 15-20 of the '104 patent recite a method of preparing a stabilized pharmaceutical composition and require the steps of "dissolving at least one binder additive in aqueous surfactant solution." RLL's proposed process does not involve dissolving a binder, or any other additive, in an aqueous surfactant solution. RLL's proposed process for manufacturing atorvastatin calcium/amlodipine besylate tablets does not literally infringe claims 15-20 of the '104 patent.

Doctrine of Equivalents

RLL's proposed process and formulation for atorvastatin calcium/amlodipine besylate tablets does not infringe any claim of the '104 patent under the doctrine of equivalents. The scope of the claims of the '104 patent may not be broadened under the doctrine of equivalents to cover the use of sodium carbonate, or the use of a known alternative surfactant such as sodium lauryl sulfate.

The patentee is estopped from asserting that sodium carbonate is an equivalent metal salt additive. Originally filed claim 1 described a pharmaceutical composition containing "at least one stabilizing pharmaceutically acceptable metal salt additive." In response to a Section 112, first paragraph, rejection of claim 1, the applicants for the '104 Patent clearly narrowed claim 1 so that it recited "at least one stabilizing pharmaceutically acceptable *alkaline earth* metal salt additive."

Originally filed claim 16 (issued claim 15) described a method for preparing a stabilized pharmaceutical composition that required the step of "blending the milled drug with at least one drug-stabilizing additive." In response to a Section 112, first paragraph, rejection of claim 16, the applicants for the '104 Patent clearly narrowed claim 16 so that it recited "blending the milled drug with at least one drug-stabilizing *alkaline earth metal salt* additive."

The scope of original claims 1 and 16 may have covered sodium carbonate as a "metal salt additive" as recited in original claim 1 or as an "additive" as recited in original claim 16.[7] However, in response to a rejection of claims 1 and 16, the applicants for the

---

[7] However, there is no support in the '104 patent to provide written description or enablement of sodium carbonate as a "stabilizing" additive. Furthermore, there is no evidence to suggest that sodium carbonate exhibits the ability to "stabilize" atorvastatin.

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 20

'104 Patent voluntarily narrowed their claims to cover only an "alkaline earth metal salt additive." Thus, the patentee has surrendered coverage of sodium carbonate as an equivalent of an "alkaline earth metal salt additive."

Furthermore, the patentee cannot overcome this presumption of surrender. The patentee is estopped because the use of sodium carbonate in a solid pharmaceutical dosage form was well known as of the filing date of the '919 application. For example, U.S. Patent No. 4,976,949 to Mayer et al. describes the use of sodium carbonate in a solid pharmaceutical dosage form.

The patentee is also estopped from asserting that sodium lauryl sulfate is an equivalent surfactant. In response to a § 103 rejection, applicants for the '104 Patent narrowed originally filed claims 1, 13 and 20 (issued as claims 1, 14 and 21) by amending them to require "*at least one surfactant.*" These claims, as first amended, may have covered the use of sodium lauryl sulfate as a surfactant. However, the Examiner maintained the rejection of these claims in the second Office Action, and in response, applicants for the '104 Patent further narrowed claims 1, 13, and 20 so that they recited "at least one surfactant *selected from the group consisting of polyoxyethylene sorbitan and polyoxyethylene-polyoxypropylene copolymer.*" Thus, the patentee has surrendered coverage of sodium lauryl sulfate as an equivalent of a "surfactant selected from the group consisting of polyoxyethylene sorbitan and polyoxyethylene-polyoxypropylene copolymer."

Furthermore, the patentee cannot overcome this presumption. The patentee is estopped because the use of sodium lauryl sulfate as a surfactant in a solid pharmaceutical dosage form was well known as of the filing date of the '919 application. For example, U.S. Patent No. 4,963,509 to Radebaugh et al. describes the use of sodium laurel sulfate in a solid pharmaceutical dosage form.

Accordingly, the doctrine of prosecution history estoppel prevents the patentee from proving that RLL's proposed formulation of amorphous atorvastatin calcium/amlodipine besylate tablets or RLL's proposed method for manufacturing amorphous atorvastatin calcium/amlodipine besylate tablets infringe any claim of the '104 patent under the doctrine of equivalents.

Accordingly, the drug product for which RLL is seeking approval to market in the ANDA received by the FDA on December 29, 2006 does not infringe any claim of the '104 Patent.

## V.    U.S. Patent No. 5,969,156 Is Not Infringed

U.S. Patent No. 5,969,156 ("the '156 patent") entitled "Crystalline [R-(R*,R*)]-2-(4-difluorophenyl)-β,δ-dihydroxy-5-(1-methylethyl)-3-phenyl-4-[(phenylamino)carbonyl]-1H-pyrrole-1-heptanoic acid hemi calcium salt (Atorvastatin)," issued on October 19, 1999. This patent contains a total of 44 claims, of which claims 1-9, and 28-44 are

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 21

independent, while claims 10-27 are dependent claims. Claims 10 and 11 depend from claim 1, claims 12 and 13 depend from claim 2, claims 14 and 15 depend from claim 3, claims 16 and 17 depend from claim 4, claims 18 and 19 depend from claim 5, claims 20 and 21 depend from claim 6, claims 22 and 23 depend from claim 7, claims 24 and 25 depend from claim 8, and claims 26 and 27 depend from claim 9.

The Independent Claims

Claims 1–5 are independent claims directed to crystalline Form I atorvastatin hydrate characterized by its X-ray powder diffraction spectral characteristics. These claims recite:

1.    A crystalline Form I atorvastatin hydrate having an X-ray powder diffraction containing at least one of the following $2\theta$ values measured using $CuK_\alpha$ radiation: 11.9 or 22.0.

2.    A crystalline Form I atorvastatin hydrate having an X-ray powder diffraction containing the following $2\theta$ values measured using $CuK_\alpha$ radiation: 11.9, 21.6 and 22.0.

3.    A crystalline Form I atorvastatin hydrate having an X-ray powder diffraction containing the following $2\theta$ values measured using $CuK_\alpha$ radiation: 17.1, 19.5 and 21.6.

4.    A crystalline Form I atorvastatin hydrate having an X-ray powder diffraction containing the following $2\theta$ values measured using $CuK_\alpha$ radiation: 9.2, 9.5, 10.3, 10.6, 11.9, 12.2, 17.1, 19.5, 21.6, 22.0, 22.7, 23.3, 23.7, 24.4, 28.9 and 29.2.

5.    A crystalline Form I atorvastatin hydrate having an X-ray powder diffraction containing the following $2\theta$ values measured using $CuK_\alpha$ radiation: 9.150, 9.470, 10.266, 10.560, 11.853, 12.195, 17.075, 19.485, 21.626, 21.960, 22.748, 23.335, 23.734, 24.438, 28.915 and 29.234.

Claims 6–9 are independent claims directed to crystalline Form I atorvastatin hydrate characterized by its solid-state $^{13}C$ NMR spectral characteristics. These claims recite:

6.    A crystalline Form I atorvastatin hydrate characterized by solid state $^{13}C$ nuclear magnetic resonance having a chemical shift difference between the lowest ppm resonance and another resonance of 5.1 or 51.8.

7.    A crystalline Form I atorvastatin hydrate characterized by solid state $^{13}C$ nuclear magnetic resonance and having the following

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 22

chemical shift differences between the lowest ppm resonance and other resonances: 3.9, 5.1, 43.6, 46.8, 49.2 and 51.8.

8.    A crystalline Form I atorvastatin hydrate characterized by solid-state $^{13}$C nuclear magnetic resonance having the following chemical shift differences between the lowest ppm resonance and other resonances: 3.9, 5.1, 18.9, 20.6, 26.1, 43.6, 46.8, 49.2, 51.8, 92.5, 96.9, 99.6, 102.2, 106.3, 108.2, 109.8, 113.6, 115.7, 138.0, 145.4, 157.1 and 161.5.

9.    A crystalline Form I atorvastatin hydrate characterized by solid-state $^{13}$C nuclear magnetic resonance having the following chemical shifts expressed in parts per million: 21.3, 25.2, 26.4, 40.2, 41.9, 47.4, 64.9, 68.1, 70.5, 73.1, 113.8, 118.2, 120.9, 123.5, 127.6, 129.5, 131.1, 134.9, 137.0, 159.3, 166.7 (broad), 178.4 and 182.8.

Claims 28–31 are independent claims claiming crystalline Form II atorvastatin hydrate characterized by X-ray powder diffraction and recite:

28.    Crystalline Form II atorvastatin or a hydrate thereof having an X-ray powder diffraction containing the following $2\theta$ values measured using CuK$_\alpha$ radiation: 9.0 and 20.5.

29.    Crystalline Form II atorvastatin or a hydrate thereof having an X-ray powder diffraction containing the following $2\theta$ values measured using CuK$_\alpha$ radiation: 8.5 and 9.0.

30.    Crystalline Form II atorvastatin or a hydrate thereof having an X-ray powder diffraction containing the following $2\theta$ values measured using CuK$_\alpha$ radiation: 5.6, 7.4, 8.5, 9.0, 12.4 (broad), 15.8 (broad), 17.1–17.4 (broad), 19.5, 20.5, 22.7–23.2 (broad), 25.7 (broad) and 29.5.

31.    Crystalline Form II atorvastatin or a hydrate thereof having an X-ray powder diffraction containing the following $2\theta$ values measured using CuK$_\alpha$ radiation: 5.582, 7.384, 8.533, 9.040, 12.440 (broad), 15.771 (broad), 17.120-17.360 (broad), 19.490, 20.502, 22.706–23.159 (broad), 25.697 (broad) and 29.504.

Claims 32–35 are independent claims directed to crystalline Form II atorvastatin hydrate characterized by its solid-state $^{13}$C NMR spectral characteristics. These claims recite:

32.    Crystalline Form II atorvastatin or a hydrate thereof characterized by solid state $^{13}$C nuclear magnetic resonance having a chemical shift difference between the lowest ppm resonance and another resonance of 4.7 or 47.8.

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 23

       33.     Crystalline Form II atorvastatin or a hydrate thereof characterized by solid state $^{13}C$ nuclear magnetic resonance having the following chemical shift differences between the lowest ppm resonance and other resonances: 4.7, 44.5, 45.2, 46.2 and 47.8.

       34.     Crystalline Form II atorvastatin or a hydrate thereof characterized by solid-state $^{13}C$ nuclear magnetic resonance having the following chemical shift differences between the lowest ppm resonance and other resonances: 4.7, 17.4, 18.9, 19.5, 20.6, 44.5, 45.2, 46.2, 47.8, 91.9, 92.9, 94.3, 96.2, 97.5, 98.6, 100.1, 106.2, 110.5, 112.0, 117.7, 138.2, 140.2 and 158.2.

       35.     Crystalline Form II atorvastatin or a hydrate thereof characterized by solid-state $^{13}C$ nuclear magnetic resonance having the following chemical shifts expressed in parts per million: 22.8 (broad), 27.5, 40.2, 41.7, 42.3, 43.4, 67.3, 68.0, 69.0, 70.6, 114.7, 115.7, 117.1, 119.0, 120.3, 121.4, 122.9, 129.0, 133.3, 134.8, 140.5, 161 (broad), 163 (broad) and 181 (broad).

Claims 36–40 are independent claims directed to crystalline Form IV atorvastatin hydrate characterized by its X-ray powder diffraction spectral characteristics. These claims recite:

       36.     Crystalline Form IV atorvastatin or a hydrate thereof having an X-ray powder diffraction containing at least one of the following $2\theta$ values measured using CuK$_\alpha$ radiation: 8.0 or 9.7.

       37.     Crystalline Form IV atorvastatin or a hydrate thereof having an X-ray powder diffraction containing the following $2\theta$ values measured using CuK$_\alpha$ radiation: 4.9, 8.0 and 9.7.

       38.     Crystalline Form IV atorvastatin or a hydrate thereof having an X-ray powder diffraction containing the following $2\theta$ values measured using CuK$_\alpha$ radiation: 8.0, 9.7 and 19.6.

       39.     Crystalline Form IV atorvastatin or a hydrate thereof having an X-ray powder diffraction containing the following $2\theta$ values measured using CuK$_\alpha$ radiation: 4.9, 5.4, 5.9, 8.0, 9.7, 10.4, 12.4, 17.7, 18.4, 19.2, 19.6, 21.7, 23.0, 23.7 and 24.1.

       40.     Crystalline Form IV atorvastatin or a hydrate thereof having an X-ray powder diffraction containing the following $2\theta$ values measured using CuK$_\alpha$ radiation: 4.889, 5.424, 5.940, 7.997, 9.680, 10.416, 12.355, 17.662, 18.367, 19.200, 19.569, 21.723, 23.021, 23.651 and 24.143.

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 24

Claims 41–44 are independent claims directed to crystalline Form IV atorvastatin hydrate characterized by its solid-state [13]C NMR spectral characteristics. These claims recite:

> 41.    Crystalline Form IV atorvastatin or a hydrate thereof characterized by solid state [13]C nuclear magnetic resonance having a chemical shift difference between the lowest ppm resonance and another resonance of 8.0 or 53.6.

> 42.    Crystalline Form IV atorvastatin or a hydrate thereof characterized by solid state [13]C nuclear magnetic resonance having the following chemical shift differences between the lowest ppm resonance and other resonances: 1.5, 2.4, 8.0, 45.6, 48.4, 50.0 and 53.6.

> 43.    Crystalline Form IV atorvastatin or a hydrate thereof characterized by solid-state [13]C nuclear magnetic resonance having the following chemical shift differences between the lowest ppm resonance and other resonances: 1.5, 2.4, 8.0, 22.1, 24.2, 25.5, 28.2, 45.6, 48.4, 50.0, 53.6, 97.8, 101.9, 104.8, 109.2, 111.3, 116.8, 120.2, 141.1, 148.2, 161.4, 163.5, 167.0 and 168.5.

> 44.    Crystalline Form IV atorvastatin or a hydrate thereof characterized by solid-state [13]C nuclear magnetic resonance having the following chemical shifts expressed in parts per million: 17.9, 19.4, 20.3, 25.9, 40.0, 42.1, 43.4, 46.1, 63.5, 66.3, 67.9, 71.5, 115.7, 119.8, 122.7, 127.1, 129.2, 134.7, 138.1 (broad), 159.0 (broad), 166.1 (broad), 179.3, 181.4, 184.9 and 186.4.

The written description of the '156 Patent provides X-ray powder diffraction and solid-state CP-MAS [13]C-NMR data for crystalline Forms I, II, and IV of atorvastatin calcium, as well as experimental procedures for producing atorvastatin calcium in each of these three crystalline forms. The written description emphasizes the distinctions between amorphous atorvastatin, admittedly disclosed in several prior art U.S. patents, and crystalline Form I atorvastatin.

During prosecution of the '156 Patent, the applicants distinguished the claimed crystalline forms of atorvastatin from amorphous atorvastatin on the ground that in diffractograms of amorphous atorvastatin there was the absence of any distinct x-ray powder diffraction lines. Applicants also asserted that the claimed chemical shift combinations are unique for each of the crystal forms. Declarations presented to the Patent Office used x-ray powder diffraction data, observations regarding tablet preparations, and stability determinations to further distinguish the claimed crystalline forms of atorvastatin from amorphous atorvastatin.

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 25

Non-Infringement Analysis

X-ray powder diffraction spectra of RLL's amorphous atorvastatin calcium are presented as Exhibit A. For these measurements, the powder was filled into an aluminum holder by the side-drift method and exposed to CuKα radiation (45 kV x 40 mA) in a wide-angle X-ray powder diffractometer (Model D5005), Siemens). The instrument was operated in the step-scan mode, in increments of 0.05°2Θ. The angular range was 5 to 40°2Θ and counts were accumulated for 1 sec at each step. The data collection program used was JADE 5.0. The resulting powder patterns of amorphous atorvastatin calcium indicate that the samples are amorphous

Thus, a straightforward comparison between RLL's amorphous atorvastatin and the subject matter of the independent claims of the '156 Patent reveals that RLL's amorphous atorvastatin is not crystalline, i.e., it does not fall within the literal meaning of the independent claims of the '156 Patent.

Doctrine of Equivalents

RLL's amorphous atorvastatin also does not infringe any claim of the '156 Patent under the doctrine of equivalents. Based on the arguments advanced by applicants during prosecution of the '156 Patent, RLL's amorphous atorvastatin could not infringe this patent under the doctrine of equivalents. This conclusion is based on determinations that the scope of the claims of the '156 Patent may not effectively be broadened under the doctrine of equivalents to cover material in the prior art.

Accordingly, the drug product for which RLL is seeking approval to market in the ANDA received by the FDA on December 29, 2006 does not infringe any claim of the '156 Patent.

VI.   U.S. Patent No. 6,126,971 Is Not Infringed

U.S. Patent No. 6,126,971 ("the '971 patent") entitled "Stable Oral CI-981 Formulation and Process for Preparing Same" issued on October 3, 2000. This patent contains a total of 19 claims, of which claims 1, 4, 7, 8, 13, 16, and 17 are independent, while claims 2-3, 5-6, 9-12, 14-15 and 18-19 are dependent claims. Claims 2-3 depend directly or indirectly from claim 1, claims 5-6 depend directly or indirectly from claim 4, claims 9-12 depend directly from claim 8, claims 14-15 depend directly or indirectly from claim 13, and claims 18-19 depend directly from claim 17.

The Independent Claims

Independent claim 1 of the '971 patent recites a composition, as follows:

1.    A pharmaceutical composition for the peroral treatment of hypercholesterolemia or hyperlipidemia characterized by improved stability comprising

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 26

in a mixture, about 1% to about 50% by weight of the composition of a compound as
active ingredient of structural formula I

formula I



wherein X is -CH$_2$-, -CH$_2$CH$_2$-, -CH$_2$CH$_2$CH$_2$- or -CH$_2$ CH(CH$_3$)[;]

R$_1$ is 1-naphthyl; 2-naphthyl; cyclohexyl, norbornenyl; 2-,3-, or 4-
pyridinyl; phenyl; phenyl substituted with fluorine, chlorine, bromine,
hydroxyl, trifluoromethyl, alkyl of from one to four carbon atoms, alkoxy
of from one to four carbon atoms, or alkanoylalkoxy of from two to eight
carbon atoms;

either R$_2$ or R$_3$ is -CONR$_5$R$_6$ where R$_5$ and R$_6$ are independently
hydrogen; alkyl of from one to six carbon atoms; 2-,3-, or 4-pyridinyl;
phenyl; phenyl substituted with fluorine, chlorine, bromine, cyano,
trifluoromethyl, or carboalkoxy of from three to eight carbon atoms; and
the other of R$_2$ or R$_3$ is hydrogen; alkyl of from one to six carbon atoms;
cyclopropyl; cyclobutyl; cyclopentyl; cyclohexyl; phenyl; or phenyl
substituted with fluorine, chlorine, bromine, hydroxyl, trifluoromethyl,
alkyl of from one to four carbon atoms, alkoxy of from one to four carbon
atoms, or alkanoyloxy of from two to eight carbon atoms;

R$_4$ is alkyl of from one to six carbon atoms, cyclopropyl, cyclobutyl,
cyclopentyl, cyclohexyl, or trifluoromethyl;

M is a pharmaceutically acceptable metal salt; and

about 5% to about 75% by weight of the composition of calcium carbonate
to stabilize the composition.

Claim 1 therefore requires, *inter alia*, that the pharmaceutical composition
comprise about 5% to about 75% by weight of the specific salt calcium carbonate.

Independent claim 4 of the '971 patent recites a composition, as follows:

4.    A pharmaceutical composition characterized by improved
stability comprising in a mixture, about 1% to about 50% by weight of the
composition of a pharmaceutically acceptable metal salt of [R-R*,R*)]-2-

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 27

(4-fluorophenyl-β,        Λ-dihydroxy-5-(1-methylethyl)-3-phenyl-4-
[(phenylamino)carbonyl]-1H-pyrrole-1-heptanoic acid; *and about 5% to
about 75% by weight of the composition of calcium carbonate* to stabilize
the composition.

Claim 4, like claim 1, therefore requires, *inter alia*, that the pharmaceutical
composition comprise about 5% to about 75% by weight of the specific salt calcium
carbonate.

Independent claim 7 of the '971 patent recites a composition, as follows:

7.    A pharmaceutical composition characterized by improved
stability comprising in a mixture, the Hemi-Calcium of Formula (IA):

(IA)



.1/2Ca

and an effective amount of calcium carbonate.

Claim 7, like claims 1 and 4, therefore requires, *inter alia*, that the pharmaceutical
composition comprise the salt calcium carbonate. However, unlike claims 1 and 4, claim
7 requires "an effective amount" of calcium carbonate rather than a specific weight
percent.

Independent claim 8 of the '971 patent recites a method of improving stability of a
composition, as follows:

8.    A method of improving the stability of a pharmaceutical composition
comprising as an active ingredient a compound having the structural formula I

formula I

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 28



wherein X is -CH$_2$-, -CH$_2$CH$_2$-, -CH$_2$CH$_2$CH$_2$- or -CH$_2$ CH(CH$_3$);

R$_1$ is 1-naphthyl; 2-naphthyl; cyclohexyl, norbornenyl; 2-,3-, or 4-pyridinyl; phenyl; phenyl substituted with fluorine, chlorine, bromine, hydroxyl, trifluoromethyl, alkyl of from one to four carbon atoms, alkoxy of from one to four carbon atoms, or alkanoylalkoxy of from two to eight carbon atoms;

either R$_2$ or R$_3$ is -CONR$_5$R$_6$ where R$_5$ and R$_6$ are independently hydrogen; alkyl of from one to six carbon atoms; 2-3- or 4-pyridinyl; phenyl; phenyl substituted with fluorine, chlorine, bromine, cyano, trifluoromethyl, or carboalkoxy of from three to eight carbon atoms; and the other of R$_2$ or R$_3$ is hydrogen; alkyl of from one to six carbon atoms; cyclopropyl; cyclobutyl; cyclopentyl; cyclohexyl; phenyl; or phenyl substituted with fluorine, chlorine, bromine, hydroxyl, trifluoromethyl, alkyl of from one to four carbon atoms, alkoxy of from one to four carbon atoms, or alkanoyloxy of from two to eight carbon atoms;

R$_4$ is alkyl of from one to six carbon atoms, cyclopropyl, cyclobutyl, cyclopentyl, cyclohexyl, or trifluoromethyl;

M is a pharmaceutically acceptable metal salt;

by adding an effective amount of an alkaline earth metal salt to the composition.

Claim 8 therefore requires a step of adding an amount of an alkaline earth metal salt sufficient to enhance the stability of the pharmaceutical composition.

Independent claim 13 of the '971 patent also recites a method of improving stability of a composition, as follows:

13.    *A method* of improving the stability of a pharmaceutical composition by adding *an effective amount of calcium carbonate* to a composition comprising a pharmaceutically acceptable metal salt of [R-R*,R*)]-2-(4-fluorophenyl-β,    δ-dihydroxy-5-(1-methylethyl)-3-phenyl-4-[(phenylamino)carbonyl]-1H-pyrrole-1 heptanoic acid.

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 29

Claim 13 therefore requires a step of adding an amount of the specific salt calcium carbonate sufficient to enhance the stability of the pharmaceutical composition.

Independent claim 16 of the '971 patent also recites a method of improving stability of a composition, as follows:

16.    *A method* of improving the stability of a pharmaceutical composition by *adding an effective amount of calcium carbonate* to a composition comprising the Hemi-Calcium of Formula (IA):

(IA)



.1/2Ca

Claim 16, like claim 13, therefore requires a step of adding an amount of the specific salt calcium carbonate sufficient to enhance the stability of the pharmaceutical composition.

Independent claim 17 of the '971 patent recites a composition, as follows:

17.    A pharmaceutical composition for the peroral treatment of hypercholesterolemia or hyperlipidemia characterized by improved stability comprising in a mixture, about 1% to about 50% by weight of the composition of a compound as active ingredient of structural formula I

formula I



wherein X is --$CH_2$--, --$CH_2CH_2$--, --$CH_2CH_2CH_2$-- or --$CH_2CH(CH_3)$[;]

$R_1$ is 1-naphthyl; 2-naphthyl; cyclohexyl, norbornenyl; 2-,3-, or 4-pyridinyl; phenyl; phenyl substituted with fluorine, chlorine, bromine,

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 30

> hydroxyl, trifluoromethyl, alkyl of from one to four carbon atoms, alkoxy
> of from one to four carbon atoms, or alkanoylalkoxy of from two to eight
> carbon atoms;
>
> either $R_2$ or $R_3$ is --$CONR_5R_6$ where $R_5$ and $R_6$ are independently
> hydrogen; alkyl of from one to six carbon atoms; 2-,3-, or 4-pyridinyl;
> phenyl; phenyl substituted with fluorine, chlorine, bromine, cyano,
> trifluoromethyl, or carboalkoxy of from three to eight carbon atoms; and
> the other of $R_2$ or $R_3$ is hydrogen; alkyl of from one to six carbon atoms;
> cyclopropyl; cyclobutyl; cyclopentyl; cyclohexyl; phenyl; or phenyl
> substituted with fluorine, chlorine, bromine, hydroxyl, trifluoromethyl,
> alkyl of from one to four carbon atoms, alkoxy of from one to four carbon
> atoms, or alkanoyloxy of from two to eight carbon atoms;
>
> $R_4$ is alkyl of from one to six carbon atoms, cyclopropyl, cyclobutyl,
> cyclopentyl, cyclohexyl, or trifluoromethyl;
>
> M is a pharmaceutically acceptable metal salt; and
>
> about 5% to about 75% by weight of the composition of at least one
> stabilizing pharmaceutically acceptable calcium or lithium salt additive.

Claim 17 therefore requires, *inter alia*, that the pharmaceutical composition comprise about 5% to about 75% by weight of the a stabilizing pharmaceutically acceptable salt that is either a calcium salt or a lithium salt.

In sum, as noted above, each of these independent claims requires the inclusion or the use of either the specific salt calcium carbonate (claims 1, 4, 7, 13 and 16), a calcium or lithium salt (claim 17), or a "alkaline earth metal salt" (claim 8).

Non-Infringement Analysis

RLL's proposed formulation does not literally infringe any claim of the '971 Patent because it does not employ an "alkaline earth metal salt additive," a "calcium or lithium salt additive," or the specific salt "calcium carbonate."

Claim 8 of the '971 patent require the step of adding "an alkaline earth metal salt." The only alkaline earth metal salt additive proposed for use by RLL is magnesium stearate. However, magnesium stearate is specifically defined in the '971 patent as a lubricant and, therefore, cannot be an "alkaline earth metal salt additive." *See*, '104 patent, col. 13, lines 6-9 ("Magnesium stearate can be selected from a group including other substances such as stearic acid, palmitic acid, talc or similar lubricating compounds.").

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 31

More specifically, each of the ingredients of the core of the RLL tablets can be readily accounted for in the '971 patent, with the exception of mannitol, sodium carbonate, colloidal silicon dioxide, and *sodium* lauryl sulfate. The mannitol serves as a diluent, colloidal silicon dioxide serves as a disintegrant while the sodium lauryl sulfate serves as a surfactant.

The sodium carbonate and sodium lauryl sulfate, as used in RLL's formulation, are sodium salts. Sodium an alkali metal and is located in Group I of the Periodic Table of the Elements; it is therefore monovalent. Sodium is not an alkaline earth metal, which are in Group II of the Periodic Table of the Elements and are divalent. Thus, RLL's proposed formulation cannot be considered to contain an "alkaline earth metal salt additive" as required by claims 1-13 and 15-20 of the '104 patent. Therefore, it does not literally infringe claim 8 or the claims that depend from it (claims 9 and 10).

As noted above, claim 17 of the '971 patent is limited to a pharmaceutical composition at least one "stabilizing pharmaceutically acceptable calcium or lithium salt." RLL's proposed formulation does not include any of such salt. Thus, RLL's proposed formulation does not literally infringe claim 17 or those claims that depend from it (claims 18 and 19).

As also noted above, claims 1, 4, 7, 13 and 16 are each limited to the inclusion or use of "calcium carbonate." RLL's proposed formulation does not include calcium carbonate, which is a specific alkaline earth metal salt. Thus, RLL's proposed formulation does not literally infringe claims 1, 4, 7, 13 or 16 of the '104 patent, or those claims that depend from any of them.

<u>Doctrine of Equivalents</u>

RLL's proposed process and formulation for atorvastatin calcium/amlodipine besylate tables does not infringe any claim of the '104 patent under the doctrine of equivalents. The scope of the claims of the '104 patent may not effectively be broadened under the doctrine of equivalents to cover the use of sodium carbonate, the use of a known alternative surfactant such as sodium lauryl sulfate, or a wholly solid-phase formulation method.

The patentee is estopped from asserting that sodium carbonate is an equivalent metal salt additive. As originally filed in the parent '919 application, claim 1 described a pharmaceutical composition containing "at least one stabilizing pharmaceutically acceptable metal salt additive." In response to a Section 112, first paragraph, rejection of claim 1, Mills et al. clearly narrowed claim 1 so that it recited "at least one stabilizing pharmaceutically acceptable *alkaline earth* metal salt additive."

Claim 16, as originally filed in the parent '919 application, described a method for preparing a stabilized pharmaceutical composition that required the step of "blending the milled drug with at least one drug-stabilizing additive." In response to a Section 112, first

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 32

paragraph, rejection of claim 16, Mills et al. clearly narrowed claim 16 so that it recited "blending the milled drug with at least one drug-stabilizing *alkaline earth metal salt* additive."

The scope of original claims 1 and 16 may have covered sodium carbonate as a "metal salt additive" as recited in original claim 1 or as an "additive" as recited in original claim 16.[8] However, in response to a rejection of claims 1 and 16, Mills et al. voluntarily narrowed their claims to cover only an "alkaline earth metal salt additive." Thus, under *Festo*, the patentee would be presumed to have surrendered coverage of sodium carbonate as an equivalent of an "alkaline earth metal salt additive." Moreover, while literal coverage of a "pharmaceutically acceptable . . . lithium salt additive" was regained in the child '982 application by virtue of claim 17, no such literal coverage was obtained for sodium salts such a sodium carbonate.

Furthermore, the patentee cannot overcome this presumption of surrender. The patentee is estopped because the use of sodium carbonate in a solid pharmaceutical dosage form was well known as of the filing date of the '919 application. For example, U.S. Patent No. 4,976,949 to Mayer et al. (entitled "Controlled Release Dosage Form" and issued December 11, 1990) describes the use of sodium carbonate in a solid pharmaceutical dosage form. Accordingly, the patentee will not be able to prove that the RLL compound infringes any claim of the '971 patent under the doctrine of equivalents.

Accordingly, the drug product for which RLL is seeking approval to market in the ANDA received by the FDA on December 29, 2006 does not infringe any claim of the '971 Patent.

## VIII.   U.S. Patent No. 6,455,574 is Invalid

The '574 Patent discloses methods of treating hypertension and hyperlipidemia by administering a single pharmaceutical composition comprising amlodipine and atorvastatin. The '574 Patent contains a total of 12 claims. Claims 1, 5 and 9 are independent.

Claim 1 is directed to a method for treating a mammal suffering from combined hypertension and hyperlipidemia. Claim 1 of the '872 Patent recites:

1.    A method for treating a mammal suffering from combined hypertension and hyperlipidemia comprising administering to said mammal

(a) an amount of a first compound, said first compound being

---

[8] However, there is no support in the '104 patent to provide written description or enablement of sodium carbonate as a "stabilizing" additive. Furthermore, there is no evidence to suggest that sodium carbonate exhibits the ability to "stabilize" atorvastatin.

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 33

amlodipine or a pharmaceutically acceptable acid addition salt thereof; and

(b) an amount of a second compound, said second compound being atorvastatin or a pharmaceutically acceptable salt thereof

wherein said first compound and said second compound are administered together in a single pharmaceutical composition with a pharmaceutically acceptable carrier or diluent.

Claim 5 is directed to a method of treating a mammal which has been diagnosed as suffering from hypertension and hyperlipidemia or the risk of hypertension and hyperlipidemia. Claim 5 of the '574 Patent recites:

5.    A method of treating a mammal which has been diagnosed as suffering from hypertension and hyperlipidemia or the risk of hypertension and hyperlipidemia which would benefit from therapy by the combined administration of the active ingredients designated as (a) and (b) below, and therefore administration of (a) and (b) has been prescribed, which comprises administering to said mammal so diagnosed and prescribed an amount of a first active ingredient

(a), said first active ingredient (a) being amlodipine or a pharmaceutically acceptable acid addition salt thereof; and an amount of a second active ingredient

(b), said second active ingredient (b) being atorvastatin or a pharmaceutically acceptable salt thereof;

wherein said first active ingredient (a) and said second active ingredient (b) are administered together in a single pharmaceutical composition with a pharmaceutically acceptable carrier or diluent.

Claim 9 is directed to a method of treating combined hypertension and hyperlipidemia in a mammal which has been examined for both hypertension and hyperlipidemia. Claim 9 of the '574 Patent recites:

9.    A method of treating combined hypertension and hyperlipidemia in a mammal which has been examined for both hypertension and hyperlipidemia by a medical practitioner and diagnosed as in need of therapy for said hypertension and hyperlipidemia by the joint administration of the active ingredients designated as (a) and (b) below, which comprises administering to said mammal

(1) an amount of a first active ingredient (a), said first active ingredient

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 34

> (a) being amlodipine or a pharmaceutically acceptable acid addition salt thereof; and

> (2) an amount of a second active ingredient (b), said second active ingredient (b) being atorvastatin or a pharmaceutically acceptable salt thereof;

> wherein said first active ingredient (a) and said second active ingredient (b) are administered together in a single pharmaceutical composition with a pharmaceutically acceptable carrier or diluent.

Claims 2 and 4 depend from claim 1. Claims 2 and 4 recite:

> 2.    The method of claim 1, comprising amlodipine besylate.

> 4.    The method of claim 1, comprising the hemicalcium salt of atorvastatin.

Claim 3 depends from claim 2, and recites:

> 3.    The method of claim 2 comprising the hemicalcium salt of atorvastatin.

Dependent claims 6, 8 and 10 and 12 are identical to dependent claims 2 and 4 except that they depend from claim 5 and 9, respectively, instead of from claim 1. Likewise, dependent claims 7 and 11 are identical to dependent claim 3 except that they depend from claims 6 and 10 instead of from claim 2. Dependent claims 2-4, 6-8, and 10-12 specifically limit the compounds to amlodipine besylate or the hemicalcium salt of atorvastatin.

The '574 Patent states that hypertension and hyperlipidemia "frequently coexist" and may share a common mechanism. Without referencing a particular source, the '574 Patent continues, stating that patient compliance with hypertension therapies is generally better than with hyperlipidemia therapies, and concludes that "[i]t would therefore be advantageous for patients to have a single therapy which treats both of these conditions."

The '574 Patent issued from U.S. Application No. 09/512,914 (the '914 Application), filed February 25, 2000, which is a continuation of Application No. PCT/IB98/01225, filed August 11, 1998, which claims priority to U.S. Provisional Application No. 60/057,275 (the '275 Application) filed August 29, 1997.

Applicants responded to a Restriction Requirement on February 5, 2001, electing claims drawn to generic methods of treatment. Applicants also elected claims drawn to methods of treating hypertension and hyperlipidemia with traverse, and cancelled

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 35

nonelected claims. Applicants added independent claims which notably, unlike the originally filed method claims, left out the limitation that the composition produces an effect greater than the effect achieved when either compound is administered separately.

Applicants filed a Supplemental Information Disclosure Statement ("IDS") on March 26, 2001. Applicants revealed that an ongoing study of cardiovascular morbidity/mortality, funded by Pfizer ("the ASCOT study"), had been "underway from some years but the final results [were not] expected for several more years." According to Applicants, the study involved "the administration of amlodipine and atorvastatin." ASCOT was being conducted in foreign countries.

Applicants also revealed that in May 1997, Dr. Peter Sever presented posters describing the ASOCT trial at the WHO/ISH Blood Pressure Lowering Trialists' Collaboration Symposium in France. Applicants submitted these posters with the IDS. One poster described the evaluation of synergistic effects on total coronary or cardiovascular events from the use of atorvastatin and amlodipine. Applicants also submitted a press kit by Pfizer dated May 1997, that formally announced the ASCOT Trial. Applicants noted that the May 1997 activities were less than one year prior to the effective filing date of August 29, 1997, of the '914 Application.

Applicants further disclosed a July 3, 1996 letter from Peter Sever sent to all members of the British Hypertension Society ("BHS"). According to Applicants, the letter generally described a presentation by Sever during which he would formally announce the ASCOT study. The actual presentation was held on September 16, 1996. Applicants argued that although the presentation likely included a description of the evaluation of the use of atorvastatin and amlodipine in the ASCOT study, Sever's presentation did not occur in the U.S., nor was it more than a year prior to Applicants' August 29, 1997 claimed priority date.

Applicants argued that none of the above activities affected the patentability of the claims, since they did not describe the work of another. Specifically, Applicants asserted that the ASCOT study was funded by Pfizer and the art describing the ASCOT studies described the inventions of Jan Buch and Robert Scott, the named inventors on the '914 Application.

Applicants proceeded to describe the results of an investigation into the origination of the combination of amlodipine and atorvastatin for use in ASCOT. Applicants stated that Pfizer employees, with several organizations in the UK and Sweden, "proposed studies to assess the long term effects on coronary heart disease of different antihypertensive regimens, cholesterol lowering agents and antiplatelet therapy." According to Applicants, a December 3, 1993 proposal by BHS suggested evaluation of a "statin (unspecified) and a calcium channel blocker (e.g. amlodipine)." Applicants also noted that the use of amlodipine in combination with a statin, e.g., lovastatin and simvastatin, for antiatherosclerotic effects had also been proposed.

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 36

Although Applicants' response did not discuss any dates, Applicants discussed the organization of the ASCOT trial, including the choice of atorvastatin and amlodipine as the compounds to be used in the trial. According to Applicants, the suggestion of atorvastatin was first recorded in notes and minutes of a study meeting attended by Dr. Buch and Dr. Sever, among others. One of the documents listed in Applicants' IDS was a letter from Dr. Sever and Professor Dahlof of ASCOT, neither of whom are named inventors on the '914 application, dated March 4, 1996. The letter was addressed to Robin Kingswell at Parke-Davis and enclosed details of the ASCOT trial, and indicated that the use of atorvastatin in ASCOT was originally proposed by the British Hypertension Society. Applicants stated that they had "investigated the true origin of this proposal and...concluded that the suggestion actually was based on the information and proposal provided to Dr. Sever by Dr. Jan Buch." Thus, Applicants urged that the letter and presentation did not describe the work of another, and was not available as prior art under 35 U.S.C. §102(a) or (b).

In response to an Office Action of October 25, 2001, in "Amendments to the Present claims," Applicants disclosed that prior to Applicants' earliest filing date, Warner-Lambert had conducted clinical trials to test the safety and efficacy of atorvastatin as a hypolipidemic agent. Applicants noted some patients in the clinical trial may have been taking amlodipine for hypertension, and that it was possible that atorvastatin may have been administered to these patients. Applicants stressed that some individuals that were not hypertensive may have been taking amlodipine, and also that some individuals may have been hypertensive and taking anti-hypertensive therapeutics other than amlodipine. Applicants urged that if individuals had taken atorvastatin at the same time as amlodipine, the "administration [was] not prescribed by anyone with knowledge of the present invention or by anyone intending to take advantage of the benefits discovered by applicants." Applicants argued that in contrast to the situation where "some patients in the United States may by chance have ingested separate doses of both amlodipine and atorvastatin within a given span of time, this was accidental and not prescribed pursuant to any diagnosis made by a medical practitioner specifically aware of the advantages of joint administration of the two specific drugs. . .as taught in the present application and seeking to provide those advantages to the patient."

Applicants then addressed the availability of the Warner-Lambert atorvastatin trial as prior art. Without addressing the possibility that the Warner Lambert trial expressly meets each and every limitation of Applicants' claims, Applicants insisted that assuming that there was no confidentiality agreement regarding the trials, the trials should be analyzed under the theory of anticipation by inherency. Applicants argued that in establishing anticipation by inherency, the Examiner's burden of establishing that the characteristic as to which the prior art is silent must necessarily, inevitably and always be present is very high. According to Applicants, any chance separate administration of amlodipine was not inevitably and always practiced in the trial. Thus, Applicants urged, chance administration of atorvastatin to individuals who were taking amlodipine does not constitute anticipatory activity with respect to claims requiring awareness of the

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 37

advantages of joint administration of atorvastatin and amlodipine.  Applicants argued that
amended claims "now recite either that amlodipine and atorvastatin are administered
together in a single dosage form and/or that administration whether in single or in separate
doses is pursuant to recognition and with knowledge (and in some instances specific
diagnosis and prescription by a medical practitioner) of the benefits of joint treatment with
amlodipine and atorvastatin," which literally distinguishes them over any co-
administration in the Warner-Lambert trial.

Applicants argued that in addition to not meeting the requirements to establish
anticipation by inherency, the "inherent but unintended and unappreciated" administration
of atorvastatin to individuals taking amlodipine in the Warner-Lambert atorvastatin trial
could not be combined with other prior art in an obviousness-type rejection.  According to
Applicants, motivation to combine and a reasonable expectation of success cannot be
established where the art does not intend or recognize a particular event, even though the
event may have occurred.

According to Applicants, in the October 24, 2001 Interview, the Examiner
appreciated that claims limited to the administration of atorvastatin and amlodipine in a
single dose is distinguishable over the Warner-Lambert trials. Applicants also argued that
claims reciting methods for treating a mammal in need of therapy by the joint
administration of amlodipine and atorvastatin, require that "the benefits of the instant
invention [are] recognized and understood," although the Examiner did not make a
decision regarding whether this rendered the distinguishable over the Warner-Lambert
trials.

Applicants proceeded to discuss two U.S. Patent Applications submitted in the IDS
that accompanied the Amendment and Response.   The applications, which name Mason
as the inventor, teach combinations of amlodipine and atorvastatin, and their use in the
treatment of various cardiovascular diseases. According to Applicants, Mason had begun
a contractual relationship with Pfizer.  Applicants asserted that the priority date of the '914
Application precedes the earliest claimed priority date in either disclosed application.
Applicants asserted that they had reviewed the documents reflecting the work of Mason,
and concluded that although Mason disclosed the concept of an atorvastatin/amlodipine
combination and its possible synergism to one of the inventors named in the '914
application, at that time the inventors '914 Application had already begun reducing this
concept to practice.  Applicants also disclosed that Mason conducted experiments with
both atorvastatin and its metabolite, alone and in combination with amlodipine.
Applicants alleged that while experiments with an atorvastatin metabolite in combination
with amlodipine suggested a benefit for the combination, experiments with atorvastatin
itself did not reveal the advantages for the atorvastatin/amlodipine combination.

In traversing an obviousness rejection, Applicants stressed the existence of a vast
array of available compounds in the various classes of drugs (specifically calcium channel
blockers and lipid-lowering drugs).  Applicants urged that the cited art provides no
teaching that the particular compounds claimed should be selected, or reasonable

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 38

expectation of success of the claimed method were that to be done. Applicants argued that "generalized teachings about combining classes of drugs, and specific combinations of individual drugs (which do not include the specific combination claimed) cannot provide the required suggestion or motivation in the art necessary to meet the legal standard of *prima facie* obviousness…" Applicants emphasized that at best, the art renders the claimed combination "obvious to try". Applicants argued that combining known elements for the same purpose disclosed in the prior art is not sufficient to establish *prima facie* obviousness.

Applicants noted that neither Messerli and Nawrocki mention combination therapy. Applicants characterized the Examiner's assertion that it is *prima facie* obvious to combine known active agents useful into the same method into a single composition for the same purpose as erroneous. Applicants argued that the Examiner improperly used hindsight and Applicants' own disclosure by stating as a general proposition that it would have been obvious to combine the known active agents useful in the same method into a single composition for the same purpose. Applicants argued that at the time of Applicants' invention, the totality of the art, including the references relied upon the Examiner would not lead one of skill in the art to select and concentrate on amlodipine and atorvastatin from the "broad drug classes involved." Furthermore, Applicants argued that the references relied upon by the Examiner do not suggest combination therapy of any kind. Applicants reiterated their argument that the Examiner's rejection of the claims based on the fact that atorvastatin and amlodipine were previously used separately for the same purpose as the claimed composition was improper.

Applicants also argued that the Examiner's finding that Sever *et al.* provided motivation for the claimed method was erroneous. Specifically, Applicants cited language in Sever *et al.* regarding the necessity of evaluation of combinations of drugs, and that states that further trials are being planned or are in progress. Further, Applicants argued that Sever *et al.* does not teach a combination of atorvastatin and amlodipine thereby evidencing that the art at best provides motivation to try the combination. Applicants concluded by reiterating that the Examiner cannot rely on a general proposition that each drug is known *per se* or event that one or both were known to be particularly effective.

Applicants filed a Supplemental Amendment, amending claims by removing the phrase "optionally and independently" from the claims. According to Applicants, removal of this language was discussed during an interview. Applicants maintained that the "optionally and independently" language "was intended to encompass both fixed combinations of [atorvastatin and amlodipine] (in a single dosage form) or free combinations ((a) and (b) in separate dosage forms)," and that the amended claims were similar in scope. Applicants also alerted the Examiner to the fact that atorvastatin was commercialized in February 1997, and that as with the Warner Lambert trials, "chance events" in which individuals took both atorvastatin and amlodipine may have occurred, but that these events fell outside of the scope of Applicants' claims.

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 39

On March 12, 2002, the Examiner sent a Notice of Allowability, accompanied by a Statement of Reasons for Allowance. U.S. Patent No. 6,455,574 issued on September 24, 2002.

Invalidity of the 574 Patent

The following description provides a summary of prior art references that are relevant to the validity of the claims of the '574 Patent.

U.S. Patent No. 4,572,909

U.S. Patent No. 4,572,909 ("the '909 Patent") lists the assignee as Pfizer, Inc. and the inventors as Simon F. Campbell, Peter E. Cross and John K. Stubbs. The '909 Patent was filed on February 3, 1984. The '909 Patent is listed as a reference that was cited during the prosecution of the '574 Patent. The '909 Patent is prior art to the '574 Patent under 35 U.S.C. § 102(b); it was patented February 25, 1986, that is more than a year prior to the earliest domestic priority date for the '574 Patent.

The '909 Patent describes the invention as relating to "certain 1,4, dihydropyridines having a substituted-amino containing group attached to the 2-postion, which have utility as anti-ischaemic and antihypertensive agents." The '909 Patent describes amlodipine. The '909 Patent goes on to state that:

> [f]or administration to man in the curative or prophylactic treatment of cardiac conditions and hypertension, oral dosages of the compounds will be in the range of from 2-50 mg daily for an average adult patient (70kg). Thus for a typical adult patient, individual tablets or capsules are likely to contain from 1 to 10 mg of active compound . . .

'909 Patent at Col. 8, lines 8-15.

United States Patent No. 5,273,995

U.S. Patent No. 5,273,995 ("the '995 Patent") lists Bruce Roth as the inventor and Warner-Lambert Co. as the assignee. The '995 Patent was filed on February 26, 1991 and issued on December 28, 1993. The '995 Patent is listed as a reference that was cited during the prosecution of the '574 Patent. The '995 Patent is prior art to the '574 Patent under 35 U.S.C. § 102(b) since it was patented November 7, 1989, that is more than a year prior to the earliest priority date for the '574 Patent.

The '995 Patent discloses atorvastatin and pharmaceutically acceptable salts thereof. The '995 Patent states that [R-(R*, R*)]-2-(4-fluorophenyl)-$\beta$, $\delta$-dihydroxy-5-(1-methylethyl)-3-phenyl-4[(phenylamino)carbonyl]-1H-pyrrole-1-heptanoic acid, provides surprising inhibition of the biosynthesis of cholesterol, useful as hypolipidemic and hypocholesterolemic agents. The '995 patent teaches that:

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 40

> The compounds of the present invention utilized in the pharmaceutical
> method of this invention are administered to the patient at dosage levels of
> from 10 to 500 mg per day . . . The dosages may be preferably from 0.5 to
> 1.0 mg/kg/day . . . The unit dosage form for oral or parenteral use may be
> varied or adjusted from 10 to 500 mg.

'995 Patent at Col. 9, lines 14-25.

### Verispan Physician Drug & Diagnosis Audit, Drug Occurrences by Concomitant Product and Daily Dose January 1, 1997 to June 30 1997

The Verispan Physician Drug & Diagnosis Audit teaches that there were
approximately 13,000 joint prescriptions (in the form of a single prescription by a single
physician) of amlodipine and atorvastatin by physicians in the United States between
January 1, 1997 and June 30, 1997. Because the joint prescription data reflects
prescriptions prior to August 7, 1997, the data are prior art to the '574 patent under 35
U.S.C. §102(a). The Verispan Data was not considered by the Examiner during the
prosecution of the '914 Application. A copy of the Verispan Data is attached hereto as
Exhibit B.

### U.S. Patent No. 5,208,225

U.S. Patent No. 5,208,255 ("the '255 Patent") lists Roger Boissonneault and Henry
Miller as the inventors and Warner-Lambert Co. as the assignee. The '255 Patent was
filed on October 22, 1991 and issued on May 4, 1993. The '255 Patent was not
considered by the Examiner during the prosecution of the '574 Patent. The '225 Patent is
prior art to the '574 Patent under 35 U.S.C. § 102(b) since it was patented May 4, 1993,
that is more than a year prior to the earliest priority date for the '574 Patent.

The '225 Patent discloses a single pharmaceutical composition to deliver a
combination of active ingredients, i.e., a synthetic estrogenic agent and a synthetic
progestogenic agent. The '225 patent teaches that the following are advantages of using a
single dosage form to deliver a combination of active ingredients:

> ADVANTAGES - The compositions and processes of the invention
> have several advantages over those already known in the art. Principal
> among their advantages are:

> 1.  The compositions are fixed, i.e., constant or unitary,
>     quantities of both the estrogenic and progestogenic
>     agents. This simplifies manufacturing, storage, and
>     packaging.

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 41

2.      The use of a continuously dosed product minimizes patient compliance problems associated with an alternating sequence of dual therapies.

*\*\**

7.      The use of the new and improved process for preparing low tablet dosage forms involving the combination of two drugs in one solution eliminates any error that may occur with distribution of one drug more than the other.

8.      The new process also provides for processing to be carried out in one piece of equipment, *e.g.*, a P-K solids processor, from blending to addition of lubricant, thereby eliminating the need for transfer and drying.

Claims 1-12 of the '574 Patent are invalid under 35 U.S.C. § 103(a) as obvious over the '909 Patent and the '995 Patent, in view of the '225 Patent, and in further view of the Verispan Data.

Claim 1 recites "[a] method for treating a mammal suffering from combined hypertension and hyperlipidemia comprising administering to said mammal (a) an amount of a first compound, said first compound being amlodipine or a pharmaceutically acceptable acid addition salt thereof; and (b) an amount of a second compound, said second compound being atorvastatin or a pharmaceutically acceptable salt thereof; wherein said first compound and said second compound are administered together in a single pharmaceutical composition with a pharmaceutically acceptable carrier or diluent." Claims 5 and 9 differ from claim 1 only in their preambles, which recite "A method of treating a mammal which has been diagnosed as suffering from hypertension and hyperlipidemia or the risk of hypertension and hyperlipidemia which would benefit from therapy by the combined administration of the active ingredients listed as (a) and (b) below, and therefore administration of both (a) and (b) has been prescribed, which comprises administering to said mammal so diagnosed and prescribed" and "A method of treating combined hypertension and hyperlipidemia in a mammal which has been examined for both hypertension and hyperlipidemia by a medical practitioner and diagnosed as in need of therapy for said hypertension and hyperlipidemia by the joint administration of the active ingredients designated as (a) and (b) below."

Claims 2-4, 6-8 and 10-12 depend from claims 1, 5, and 9, respectively, and specify that that the pharmaceutical compositions comprise amlodipine besylate, and/or the hemicalcium salt of atorvastatin.

Under 35 U.S.C. § 103(a), an invention may be unpatentable "if the differences between the subject matter sought to be patented and the prior art are such that the subject

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 42

matter as a whole would have been obvious at the time the invention was made to a person
having ordinary skill in the art to which said subject matter pertains."

As discussed below, the prior art either expressly or inherently discloses each and
every limitation of claims 1-12 of the '574 patent except that atorvastatin and amlodipine
were administered in a single pharmaceutical composition.

The concurrence of hypertension and hyperlipidemia as recited in claims 1, 5, and
9 was well known prior to the claimed priority date for the '574 patent. This fact is
evidenced by the specification of the '574 Patent itself, which teaches that "hypertension
frequently exists with hyperlipidemia."

This is further evidenced by the Verispan data, which indicates that over a six
month time period, medical doctors prescribed atorvastatin and amlodipine in a single
prescription to more than 13,000 individuals. Amlodipine and atorvastatin are labeled for
the treatment of hypertension and hyperlipidemia. The prescribing physicians determined
that the individuals "suffer[ed] from combined hypertension and hyperlipidemia" as
recited in claim 1, "diagnosed [the individuals] as suffering from hypertension or
hyperlipidemia or the risk of hypertension or hyperlipidemia which would benefit from
therapy by the combined administration of atorvastatin and amlodipine", as recited in
claim 5, and "examined [the individuals] for both hypertension and hyperlipidemia. . . and
diagnosed [the individuals] as in need of therapy for said hypertension and hyperlipidemia
by joint administration" of amlodipine and atorvastatin" as recited in claim 9.

Both atorvastatin and amlodipine were well known compounds used in the
treatment of hypertension and hyperlipidemia, respectively, as evidenced by the teachings
of the '909 Patent and the '995 patent. The '909 teaches amlodipine compounds and
states that the compounds are "useful as antihypertensive agents." The '909 Patent
describes preferred dosages of amlodipine for prophylaxis and treatment of hypertension
and cardiac conditions. The '995 Patent teaches atorvastatin compounds, and states that
the compounds are useful as hypolipidemic and antihypercholesterolemic agents. The
'995 Patent provides preferred dosages of atorvastatin for the treatment of hyperlipidemia
or hypercholesterolemia.

As to the limitation that the amlodipine and atorvastatin compounds are
"administered together in a single pharmaceutical composition, the well-known benefits of
combining two agents into a single dosage form are illustrated," for example in the
teachings of the '225 Patent. Benefits of the combined pharmaceutical outlined in the
'225 Patent include simplification of manufacturing, storage and packaging and
minimization of patient compliance problems. In fact, the patentees recite these very same
factors as the motivation to combine atorvastatin and amlodipine. Specifically, the '574
Patent specification states that "it would. . . be advantageous for patients [who suffer from
hypertension and hyperlipidemia] to have a single therapy which treats both of these
conditions."

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 43

One of skill in the art at the time of filing of the '872 Patent would have had a reasonable likelihood of success in combining the amlodipine and atorvastatin compounds into a single composition. Because the '909 and '995 Patents disclose the amlodipine and atorvastatin compounds for treatment of hypertension and hyperlipidemia, respectively, and it would have been obvious to one of skill in the art to combine the two compounds into a single pharmaceutical composition, claims 1-12 of the '574 Patent are obvious.

The Applicants overcame an obviousness rejection during the prosecution of the '574 Patent by arguing that the Examiner's position that merely combining elements to achieve known effects is *prima facie* obvious was erroneous. Although the '574 Patent states that the combination provides synergistic results with the claimed combination, the '574 lacks any data to support the statements regarding synergy in the Summary of the Invention, and Applicants did not argue that the combination produced unexpected, synergistic results.

In the absence of data demonstrating unexpected results, Applicants cannot overcome the obviousness argument articulated above since it is well-established that the combination of ingredients into a single form based on the prior art is obvious under 35 U.S.C. § 103(a). *Richardson-Vicks*, 122 F.3d, 1483-1484. Applicants' combination is analogous to the facts decided in *Richardson-Vicks*. In *Richardson-Vicks*, the claims at issue related to a cough and cold medication comprising ibuprofen and pseudoephedrine in combinatory immixture. Pseudoephedrine and ibuprofen were known decongestants and analgesics, respectively, and doctors had prescribed the two compounds, albeit not in a single combination. As such, the only difference between the Appellants' claimed invention and the prior art was that the two compounds were not in a single dosage form. During the prosecution of Appellants' Application, Appellants' presented evidence to the Patent and Trademark Office of unexpected, synergistic results of the combination of pseudoephedrine and ibuprofen. The court noted that "the Examiner placed singular reliance on the evidence of synergy to allow the claims." *Id.* at 1482. Nevertheless, the court held that even in view of Appellants' evidence of unexpected results, the district court's decision that Appellants' claims were obvious was correct. *Id.* at 1483.

In view of the above holding, claims 1-12 of the '574 Patent are invalid under 35 U.S.C. § 103(a). As with *Richardson-Vicks*, the individual compounds of the combined therapeutic were both known in the prior art to be effective at treating the claimed conditions, *i.e.*, hypertension and hyperlipidemia. This fact is evident by the teachings of the '574 Patent, which states that "atorvastatin is a potent lipid lowering compound" and that "amlodipine and amlodipine besylate are potent and long lasting calcium channel blockers" that are useful anti-hypertensive agents." '574 Patent at Col. 1, line 64, Col. 2, lines 27-31. Medical doctors had co-prescribed amlodipine and atorvastatin, although not in a single composition, as was the case in *Richardson-Vicks*. Unlike the case in *Richardson-Vicks*, however, the '574 Patentees did not provide evidence demonstrating that the combination of amlodipine and atorvastatin is synergistically effective at treating the claimed conditions. Rather, the Examiner relied upon the fact that the claims "are

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 44

limited to administration of amlodipine and atorvastatin <u>together in a single pharmaceutical composition</u> in methods for treating <u>combined hypertension and hyperlipidemia</u>.

The recitation of methods for treating a mammal "in need of therapy by the joint administration of amlodipine and atorvastatin" or the recitation that an individual has been diagnosed by a medical practitioner do not render the claims non-obvious over the prior art. Applicants' argued that these limitations require that "the benefits of the combination were recognized and understood," and also argued that the "narrower" claims reciting methods wherein an individual has been diagnosed as suffering from hypertension and hyperlipidemia or wherein medical practitioner has diagnosed an individual and co-prescribed atorvastatin and amlodipine "present even clearer method steps of the recognition of the benefits of the present invention." The Court of Appeals for the Federal Circuit has specifically held that these types of limitations are insufficient to overcome an obviousness rejection of a claimed combination that was known in the prior art.

In *In re Baxter Travenol Laboratories*, the court held that:

Mere recognition of latent properties in the prior art does not render nonobvious an otherwise known invention. *In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991) (citations omitted).

Further, Section 103 of the Patent Act focuses on differences between subject matter sought to be patented and the prior art. The Supreme Court's traditional approach looks to whether a person having ordinary skill in the art would have been capable of adapting extant technology to achieve a desired result, not whether such a person would have had motivation to adapt extant technology to achieve a desired result. *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273 (1976); *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57 (1960). Under Sakraida and Anderson's-Black, where an alleged invention is "an assembly of old elements," the court's inquiry goes to whether the claimed invention "only unites old elements with no change in their respective functions," or whether there is some interaction of combined elements with each other to yield a "new or different function" or "an effect greater than the sum of the several effects taken separately." *Sakraida*, 425 U.S. at 282. If there is no such function or effect, the claimed invention is obvious under 35 U.S.C. §103, and no further analysis is needed. Analysis of the existence of some "teaching, suggestion or motivation" that would have led a person of ordinary skill in the art to combine the relevant teachings in the manner claimed has no basis in the text of Section 103 and conflicts with Supreme Court precedent.[9]

Here, the combination of known atorvastatin calcium and known amlodipine besylate does not result in any "new or different function" for either component.

---

[9] This same position is argued by Petitioners in *KSR International Co. v. Teleflex Inc. et al.* (Supreme Court Docket No. 04-1350).

Dr. Peter Richardson
Pfizer, Inc.
January 24, 2007
Page 45

In conclusion, claims 1-12 of the '574 Patent are unpatentable as obvious over the '909 and '995 Patents, alone or in light of either the '225 Patent or the Verispan Data, or a combination of the two.

## OFFER OF CONFIDENTIAL ACCESS TO APPLICATION

Ranbaxy hereby extends an offer of confidential access to relevant portions of RLL's ANDA that is in the custody of Ranbaxy. The conditions for confidential access are provided in the attached Confidential Disclosure Agreement ("CDA"). This offer and CDA are provided solely for the purpose of allowing Pfizer Inc. to evaluate whether an action under 35 USC 271(e)(2)(A) should be brought for the filing of RLL's ANDA. This offer and the CDA contains restrictions as to persons entitled to access relevant portions of the ANDA, and on the use and disposition of any information accessed, as would apply if a protective order was entered for the purpose of protecting trade secrets and other confidential business information. Under section 505 of the Food, Drug and Cosmetic Act, a request for access to an application under an offer of confidential access is considered to be acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in the offer of confidential access, and those restrictions and other terms of the offer of confidential access shall be considered terms of an enforceable contract.

Very truly yours,

Jay R. Deshmukh
Senior Vice President – Intellectual Property

## Offer of Confidential Access to Application

WHEREAS Ranbaxy Laboratories Ltd. ("Ranbaxy") and Pfizer, Inc. ("Pfizer") compete in the pharmaceutical industry and this Offer of Confidential Access to Application may involve the disclosure of certain documents, things and information in the possession, custody or control of Ranbaxy that constitute or contain trade secrets or other confidential research, development or commercial information within the meaning of Rule 26(c)(7) of the Federal Rules of Civil Procedure; and

WHEREAS such confidential information must be protected in order to preserve the legitimate business interests of Ranbaxy;

THEREFORE, for good cause shown, pursuant to Rule 26(c), all documents and other materials provided by Ranbaxy to Pfizer shall be provided subject to the following conditions:

1.     This Offer of Confidential Access to Application shall apply to all documents, things, or information that are owned or controlled by Ranbaxy and contain its trade secrets or other confidential research, development, or commercial information, including without limitation documents and things ("Confidential Material").

2.     Ranbaxy shall have the right to designate as Confidential Material and subject to this Offer of Confidential Access to Application any or all of the ANDA and/or Drug Master File(s) referenced in the paragraph IV notification letter. The duty of Pfizer as bound by this Offer of Confidential Access to Application to maintain the confidentiality of Confidential Material so designated shall commence with such notice.

3.     Ranbaxy hereby designates as Confidential Material all documents and things provided in response to acceptance of this Offer of Confidential Access to Application.

4.     Pfizer and all other persons bound by the terms of this Offer of Confidential Access to Application shall use any Confidential Material for the sole purpose of evaluating whether to bring a civil action under 35 USC 271(e)(2)(A) and shall not use any Confidential

Material for any other purpose. The attorneys of record for Pfizer shall exercise reasonable care to insure that the information and documents governed by this Offer of Confidential Access to Application are (a) used only for the purpose specified herein, and (b) disclosed only to authorized persons.

5.      Confidential Material shall be retained by attorneys of record for Pfizer and may be disclosed only to:

      (a)      Outside Counsel retained by Pfizer;

      (b)      Outside experts and consultants retained by Pfizer or its Outside Counsel to assist in evaluating whether to bring an action under 35 USC 271(e)(2)(A) (and the expert's or consultant's staff, stenographic, and clerical employees whose duties and responsibilities require access to such materials), who are not past or present full-time employees of Pfizer, as provided in Paragraph 6., below; and

      (c)      Any other person agreed to by Ranbaxy and Pfizer.

6.      Before Outside counsel for Pfizer may disclose Confidential Material to a person described in Paragraph 5.b., above, that counsel shall give advance notice as follows: Counsel for Pfizer seeking to make the disclosure shall provide written notice (by facsimile followed by a hard copy sent next business day courier) to counsel for Ranbaxy, of the name, address, business affiliation and curriculum vitae of the person(s) to whom the Confidential Material is to be disclosed, as well as an executed copy of the Offer of Confidential Access to Application. Ranbaxy shall have seven (7) business days after receiving that notification within which to object to the proposed disclosure; such disclosure shall not occur before the time for any objection by Ranbaxy expires, and, if any such objection is made, before that objection is resolved. Any such objection shall be made in writing (by facsimile followed by a hard copy sent next business day courier) to the outside counsel for Pfizer seeking to make the disclosure. If the parties are unable to resolve the objection, the Confidential Material shall not be disclosed.

7.      In no event shall the Confidential Material be disclosed to any person allowed access under Paragraphs 5.a, 5.b, or 5.c until such person has been shown a copy of and executed this Offer of Confidential Access to Application acknowledging and agreeing to be bound by the

terms of this Offer of Confidential Access to Application. The Confidential Material shall not be disclosed to any person who refuses to execute the Offer of Confidential Access to Application.

8.    Upon reaching 45 days after receipt of the paragraph IV notification from Ranbaxy, unless otherwise agreed to in writing by Ranbaxy, Pfizer and its experts, consultants and outside counsel shall within thirty (30) days assemble and return all Confidential Material, including all copies, extracts, and summaries thereof, to Ranbaxy, except that any such materials that contain or constitute attorney work product may be destroyed rather than returned. All counsel of or for Pfizer shall make certification of compliance herewith and shall deliver the same to Ranbaxy not more than thirty (30) days after the running of the 45 day period mentioned above. In the event that litigation is initiated within the 45-day period, the provision regarding the return or destruction of Confidential Material shall be waived.

9.    No part of the restrictions imposed by this Offer of Confidential Access to Application may be terminated, except by written agreement executed by Ranbaxy.

10.    Notices under this Offer of Confidential Access to Application shall be to Ranbaxy and Pfizer at the addresses indicted below, unless this provision is modified by the parties in writing:

    (a)    notice to Ranbaxy shall be to George E. Heibel, Ranbaxy Inc., Suite 2100, College Road East, Princeton NJ 08540, facsimile (609) 514-9779, and

    (b)    notice to Pfizer shall be to

_____

_____

11.    Any violation of this Offer of Confidential Access to Application may constitute unlawful disclosure of trade secrets and/or confidential commercial information and may cause me to be potentially liable in a civil action for damages by Ranbaxy, and may subject Pfizer to such additional and further remedies as may be available to Ranbaxy.

_____    _____
George E. Heibel                                                                    Date
Senior Counsel –Intellectual Property

3

## CONFIDENTIALITY UNDERTAKING

I, _____, being duly sworn, state that:

(a)    My present residential address is _____

_____ _____.

(b)    My present employer is _____

_____ and the address of my present employer

is _____.

(c)    My present occupation or job description is _____

_____.

(d)    I have received and carefully read the Offer of Confidential Access to Application. I certify that I understand the terms of that Offer of Confidential Access to Application, recognize that I am bound by the terms of that Offer, and agree to comply with those terms. Further, I understand that unauthorized disclosure of any Confidential Material, or its substance, may constitute unlawful disclosure of trade secrets and/or confidential commercial information and may cause me to be potentially liable in a civil action for damages by Ranbaxy.


_____


SUBSCRIBED and SWORN to before me
this _____ day of _____, 200___.
_____ _____

Notary Public
My Commission Expires _____

4

# EXHIBIT A







# EXHIBIT B

Lipitor Norvasc Concom.txt

|  | ----YTD/JUN/1997---<br>Occur<br>(000) | Share<br>% |
|---|---|---|
| **Lipitor** | 1065 | 100.0 |
| Used Alone | 955 | 89.7 |
| Colestid | 20 | 1.8 |
| Aspirin | 19 | 1.7 |
| Niacin | 15 | 1.4 |
| Lopid | 14 | 1.3 |
| Norvasc | 13 | 1.2 |
| Tenormin | 11 | 1.0 |
| Bumex Non-Inj | 9 | 0.8 |
| Verapamil SR | 6 | 0.5 |
| Nifedipine XL | 6 | 0.5 |
| Normodyne | 6 | 0.5 |
| Pravachol | 5 | 0.5 |
| Hyzaar | 5 | 0.5 |
| Antioxidant | 5 | 0.5 |
| Trental | 5 | 0.5 |
| Questran Light | 5 | 0.4 |
| Vitamin E Oral | 4 | 0.4 |
| Lozol | 4 | 0.4 |
| Prinivil | 4 | 0.4 |
| Calan SR | 4 | 0.4 |
| Aspirin,Enteric-Coat | 4 | 0.4 |
| Lopressor HCT | 4 | 0.4 |
| Imdur | 4 | 0.4 |
| Gemfibrozil | 3 | 0.3 |
| Ecotrin Adlt Low Str | 3 | 0.3 |
| Garlic | 3 | 0.3 |
| Climara | 3 | 0.3 |
| Lanoxin | 3 | 0.3 |
| Cardene | 3 | 0.3 |
| Metamucil | 1 | 0.1 |
| Glynase Prestab | 1 | 0.1 |
| **Atorvastatin** | 44 | 100.0 |
| Used Alone | 26 | 58.9 |
| Aspirin | 8 | 18.6 |
| Metoprolol Tartrate | 6 | 13.3 |
| Lopid | 4 | 9.3 |
| Estradiol Oral | 4 | 9.3 |
| Premarin Tabs | 4 | 9.3 |
| Vitamin E Oral | 4 | 9.3 |
| Norvasc | 4 | 9.2 |

SOURCE: Verispan, PDDA

Page 1

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
PFIZER INC, PFIZER IRELAND PHARMACEUTICALS, WARNER-LAMBERT COMPANY, WARNER-LAMBERT COMPANY, LLC and WARNER-LAMBERT EXPORT, LTD.

**DEFENDANTS**
RANBAXY LABORATORIES LIMITED, RANBAXY INC. and Ranbaxy Pharmaceuticals, Inc.

**(b)** County Of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence Of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS AND TELEPHONE NUMBER)
Rudolf E. Hutz (#484)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 N. Orange Street, P.O. Box 2207
Wilmington, Delaware 19899       Telephone: (302) 658-9141

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (Place an "X" In One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" In One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" In One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br><br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☒ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410 |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | ☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities – Employment<br>☐ 446 Amer. w/Disabilities – Other<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br><br>**HABEAS CORPUS:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt Relations<br>☐ 730 Labor/Mgmt Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS - Third Party 26 USC 7609 | ☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
35 U.S.C. § 271

Brief description of cause:
Patent infringement.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND: _____
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ YES  ☒ NO

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____   DOCKET NUMBER _____
Pfizer Inc. et al. v. Ranbaxy, Farnan, J., Civil Action No. 03-209-JJF; Pfizer Inc. et al. v. Ranbaxy, Farnan, J., Civil Action No. 07-138-JJF;
Pfizer Inc. et al. v. Teva Pharmaceuticals. Inc., Civil Action No. 07-360-JJF; Pfizer Inc. et al. v. Cobalt Pharmaceuticals, Inc., Civil Action No. 07-790-JJF .

DATE   SIGNATURE OF ATTORNEY OF RECORD
**3/24/2008  /s/Rudolf E. Hutz (#484)**

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS–44

### Authority For Civil Cover Sheet

The JS–44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.       (a) Plaintiffs – Defendants.  Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys.  Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.      Jurisdiction.  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff.  (1)  Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant.  (2)  When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question.  (3)  This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship.  (4)  This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.     Residence (citizenship) of Principal Parties.  This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.     Nature of Suit.  Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.      Origin.  Place an "X" in one of the seven boxes.

Original Proceedings.  (1)  Cases which originate in the United States district courts.

Removed from State Court.  (2)  Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C. Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court.  (3)  Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened.  (4)  Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District.  (5)  For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6)  Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7)  Check this box for an appeal from a magistrate judge's decision.

VI.     Cause of Action.  Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statues unless diversity.**        Example:        U.S. Civil Statute: 47 USC 553
                                               Brief Description: Unauthorized reception of cable service.
VII.    Requested in Complaint.  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   Related Cases.  This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PFIZER INC,<br>PFIZER IRELAND PHARMACEUTICALS,<br>WARNER-LAMBERT COMPANY,<br>WARNER-LAMBERT COMPANY, LLC<br>and<br>WARNER-LAMBERT EXPORT, LTD.<br><br>Plaintiffs,<br><br>v.<br><br>RANBAXY LABORATORIES<br>LIMITED,<br>RANBAXY PHARMACEUTICALS, INC<br>and RANBAXY INC.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 08- |

## CORPORATE DISCLOSURE STATEMENT
## PURSUANT TO FED. R. CIV. P. 7.1

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, and to enable Judges and Magistrate Judges of the Court to evaluate possible disqualification or recusal, the undersigned counsel for Plaintiffs Pfizer Inc, Pfizer Ireland Pharmaceuticals, Warner-Lambert Company, Warner-Lambert Company, LLC and Warner-Lambert Export Limited, (collectively referred to as "Pfizer") respectfully submits the following corporate disclosure statement.

1. Pfizer Inc is a publicly held corporation. No publicly held company owns 10% or more of the stock of Pfizer Inc.

2. Pfizer Ireland Pharmaceuticals is a wholly owned, indirect subsidiary of Pfizer Inc.

3. Warner-Lambert Company, LLC is a wholly owned subsidiary of Pfizer Inc.

4. Warner-Lambert Company and Warner-Lambert Export Limited, are the former names of Warner-Lambert Company LLC and Pfizer Ireland Pharmaceuticals, respectively.

RESPECTFULLY SUBMITTED,

*/s/Rudolf E. Hutz*
Rudolf E. Hutz (#484)
Jeffrey B. Bove (#998)
Mary W. Bourke (#2356)
CONNOLLY BOVE LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, DE 19899
(302) 658-9141
*Attorneys for Plaintiffs-*
*Pfizer Inc, Pfizer Ireland Pharmaceuticals,*
*Warner-Lambert Company*
*Warner-Lambert Company, LLC and*
*Warner Lambert Export Ltd.*

Dated: March 24, 2008

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

PFIZER INC,
PFIZER IRELAND PHARMACEUTICALS,
WARNER-LAMBERT COMPANY,
WARNER-LAMBERT COMPANY, LLC,
and
WARNER-LAMBERT EXPORT, LTD.

      Plaintiffs,

      V.

RANBAXY LABORATORIES LIMITED,
RANBAXY INC, and
RANBAXY PHARMACEUTICALS, INC.

      Defendants.

**SUMMONS IN A CIVIL CASE**

CASE NUMBER:

TO: (Name and address of defendant)
RANBAXY INC.
c/o The Prentice Hall Corporation
2711 Centerville Road
Wilmington, DE 19808

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

      Rudolf E. Hutz, Esq.
      Connolly Bove Lodge & Hutz LLP
      1220 Market Street
      Post Office Box 2207
      Wilmington, Delaware  19899-2207

an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

**PETER T. DALLEO**

_____
CLERK

_____
DATE

_____
(BY) DEPUTY CLERK

## RETURN OF SERVICE

| | DATE |
|---|---|
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐    Served personally upon the defendant.  Place where served: _____

_____

☐    Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left: _____

☐    Returned unexecuted: _____

_____

_____

☐    Other *(specify)*: _____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____          _____
Date                                           Signature of Server

_____
Address of Server

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

PFIZER INC,
**PFIZER IRELAND PHARMACEUTICALS,**
**WARNER-LAMBERT COMPANY,**
**WARNER-LAMBERT COMPANY, LLC,**
**and**
**WARNER-LAMBERT EXPORT, LTD.**

     **Plaintiffs,**

     **SUMMONS IN A CIVIL CASE**

     **V.**     CASE NUMBER:

**RANBAXY LABORATORIES LIMITED,**
**RANBAXY INC, and**
**RANBAXY PHARMACEUTICALS, INC.**

     **Defendants.**

TO: (Name and address of defendant)
RANBAXY LABORATORIES LIMITED
c/o The Prentice Hall Corporation
2711 Centerville Road
Wilmington, DE 19808

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

     Rudolf E. Hutz, Esq.
     Connolly Bove Lodge & Hutz LLP
     1220 Market Street
     Post Office Box 2207
     Wilmington, Delaware 19899-2207

an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

**PETER T. DALLEO**

CLERK                          DATE

(BY) DEPUTY CLERK

## RETURN OF SERVICE

|  | DATE |
|---|---|
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐     Served personally upon the defendant.  Place where served: _____

_____

☐     Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
Name of person with whom the summons and complaint were left: _____

_____

☐     Returned unexecuted: _____

_____

_____

☐     Other *(specify)*: _____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
|  |  |  |

## DECLARATION OF SERVER

       I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.


Executed on _____          _____
               Date                                                    Signature of Server


                                              _____
                                              Address of Server

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

PFIZER INC,
**PFIZER IRELAND PHARMACEUTICALS,**
**WARNER-LAMBERT COMPANY,**
**WARNER-LAMBERT COMPANY, LLC,**
and
**WARNER-LAMBERT EXPORT, LTD.**

         **Plaintiffs,**

        **V.**

**RANBAXY LABORATORIES LIMITED,**
**RANBAXY INC, and**
**RANBAXY PHARMACEUTICALS, INC.**

         **Defendants.**

**SUMMONS IN A CIVIL CASE**

CASE NUMBER:

TO: (Name and address of defendant)
RANBAXY PHARMACEUTICALS, INC.
c/o The Prentice Hall Corporation
2711 Centerville Road
Wilmington, DE 19808

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

        Rudolf E. Hutz, Esq.
        Connolly Bove Lodge & Hutz LLP
        1220 Market Street
        Post Office Box 2207
        Wilmington, Delaware  19899-2207

an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

**PETER T. DALLEO**
_____
CLERK

_____
DATE

_____
(BY) DEPUTY CLERK

## RETURN OF SERVICE

|  | DATE |
|---|---|
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐    Served personally upon the defendant.  Place where served: _____
_____

☐    Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age
and discretion then residing therein.
Name of person with whom the summons and complaint were left: _____
_____

☐    Returned unexecuted: _____
_____
_____

☐    Other *(specify)*: _____
_____
_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing
information contained in the Return of Service and Statement of Service Fees is true and correct.


Executed on _____          _____
                    Date                                        Signature of Server


                                                   _____
                                                   Address of Server