**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

W.L. GORE & ASSOCIATES, INC.,

               Plaintiff,

    v.

CHARLES THOMAS ROSENMAYER,
Ph.D.,

              Defendant.

C.A. No. _____

## <u>NOTICE OF REMOVAL</u>

Defendant Charles Thomas Rosenmayer, Ph.D. ("Defendant"), by and through his

undersigned counsel, pursuant to 28 U.S.C. §§1332, 1441 and 1446, hereby provides

Notice of Removal of this action from the Court of Chancery of the State of Delaware to

the United States District Court for the District of Delaware, and in support thereof states:

     1.     On March 28, 2008, Plaintiff W.L. Gore & Associates, Inc., instituted this

action by filing a Verified Complaint titled *W.L. Gore & Associates, Inc. v. Charles*

*Thomas Rosenmayer, Phd.*, in the Court of Chancery of the State of Delaware, which it

appears as of the filing of this Notice has not received a docket number.  A true and

correct copy of the Verified Complaint is attached hereto as Exhibit "A".

     2.     Plaintiff also filed a Motion for Temporary Restraining Order,

Memorandum of Law in Support thereof, Proposed Form of Order and a Compendium of

Unpublished Cases, true and correct copies of which are attached hereto as Exhibits "B,"

"C," "D," and "E" respectively.

3.      Plaintiff also filed a Motion for Appointment of Special Process Server, along with a supporting Affidavit and Form of Order, a true and correct copy of which is collectively attached hereto as Exhibit "F."

4.      In its complaint, Plaintiff alleges breach of contract and seeks to enjoin Dr. Rosenmayer from commencing employment with a company in Texas.

5.      On March 29, 2008, plaintiff forwarded by email a copy of the above pleadings to defendant's counsel.

6.      This Notice is timely filed pursuant to 28 U.S.C. § 1446(b) in that it is filed within thirty days after receipt by the Defendant of the initial pleading.

7.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1332, because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and the action is between citizens of different states.

8.      Plaintiff is a Delaware corporation with its principal place of business in Newark, Delaware.

9.      Defendant is a Pennsylvania resident and is not a citizen of the forum state.

10.     Plaintiff seeks to enforce a restrictive covenant and preclude disclosure of its alleged trade secrets, the value of which satisfies the amount in controversy.

11.     A true and correct copy of this Notice of Removal will be promptly filed with the Clerk of the Court of Chancery of the State of Delaware as provided by 28 U.S.C. §1446(d).

Dated: March 30, 2008
       Wilmington, Delaware

Respectfully submitted,

BROWN STONE NIMEROFF LLC

/s/ Jami B. Nimeroff
Jami B. Nimeroff, Esquire (No. 4049)
4 East 8th Street, Suite 400
Wilmington, DE  19801
Tel: (302) 428-8142
Fax: (302) 351-2744

Mary Kay Brown, Esquire
BROWN STONE NIMEROFF LLC
1818 Market Street, Suite 2300
Philadelphia, PA 19103
Tel: (267) 861-5330
Fax: (267) 350-9050

*Attorneys for Defendant Charles Thomas Rosenmayer, Ph.D.*

## CERTIFICATE OF SERVICE

I, Jami B. Nimeroff, hereby certify that on this 30th day of March, 2008, I caused

to be served a true and correct copy of the foregoing Notice of Removal by electronic

mail upon the following:

        Martin S. Lessner, Esquire
        Young Conaway Stargatt & Taylor, LLP
        1000 West Street, 17th Floor
        P.O. Box 391
        Wilmington, Delaware  19899-0391

Dated: March 30, 2008

        BROWN STONE NIMEROFF LLC

        /s/ Jami B. Nimeroff
        Jami B. Nimeroff, Esquire (No. 4049)
        4 East 8th Street, Suite 400
        Wilmington, DE  19801
        Tel: (302) 428-8142
        Fax: (302) 351-2744

# EXHIBIT A

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

W.L. Gore. & Associates, Inc.,

                    Plaintiff,         C.A. No. _____

vs.

Charles Thomas Rosenmayer, PhD.,        **VERIFIED COMPLAINT**

                    Defendant.

Plaintiff W.L. Gore & Associates, Inc. ("Gore"), by and through its undersigned counsel, hereby alleges for its Verified Complaint, as follows:

## <u>INTRODUCTION</u>

1.      This action is brought to enjoin the defendant's announced intention to violate his contractual obligations to Gore of confidentiality and noncompetition.  These obligations are set forth in multiple confidentiality and noncompetition agreements signed by defendant during his sixteen years of employment with Gore.

2.      On or about March 13, 2008, defendant Charles Thomas Rosenmayer, PhD. ("Dr. Rosenmayer" or "defendant") advised Gore that he was considering accepting an offer of employment with Plastomer Technologies ("Plastomer") as its Vice President and General Manager.  Plastomer is a direct competitor of Gore and engaged in some of the same businesses as Gore.  Gore advised Dr. Rosenmayer that his proposed new employment was unacceptable insofar as it violated Dr. Rosenmayer's contractual obligations to Gore.  Gore offered to continue Dr. Rosenmayer's employment or to pay for a headhunter to assist Dr. Rosenmayer to find employment that did not violate his contractual obligations to Gore.  On March 25, 2008, Dr. Rosenmayer refused Gore's offer, proffered his resignation of

         

employment with Gore, and advised Gore that he intended to commence employment with Plastomer on Tuesday, April 1, 2008.

3.        Unless Dr. Rosenmayer is immediately enjoined from violating his contractual obligations to Gore, Gore will suffer irreparable harm.  Accordingly, Gore has commenced this action seeking temporary, preliminary, and permanent injunctive relief, and such other relief as the court deems just and proper.

## PARTIES

4.        Gore is a privately held corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 555 Papermill Road, Newark, Delaware.

5.        Founded in 1958, Gore currently employs approximately 8,000 associates in 45 locations around the world.  Gore's proprietary technologies encompassing polymers made or derived from the fluoropolymer polytetrafluoroethylene ("PTFE"), have resulted in numerous products and product applications for the wire and cable, fabric, medical, filtration membrane, sealant, and other applications in diverse industries.

6.        Dr. Rosenmayer, is a resident of the State of Pennsylvania, residing at 4 Edward Drive, Avondale, Pennsylvania.  From January 1992 until the present, Gore has employed Dr. Rosenmayer, most recently at one of its Elkton, Maryland facilities.  Dr. Rosenmayer is a materials scientist with a B.S. in metallurgical engineering from the University of Missouri, and a PhD. in materials science from Rice University.

7.        Dr. Rosenmayer has had regular contacts with Delaware over the course of his employment with Gore.  His Elkton, Maryland office was approximately 10 miles from Gore's corporate headquarters in Newark, Delaware, as is his Avondale, Pennsylvania

residence.  As part of his employment with Gore, Dr. Rosenmayer has attended training meetings in Delaware, including three training sessions on Intellectual Property and Development Planning in the last eighteen months.  Dr. Rosenmayer attended research and development meetings at Clayton Hall at the University of Delaware that are held on a monthly basis and which are open only to higher-level Gore associates.  Indeed, Dr. Rosenmayer was responsible for organizing the presentations for these Clayton Hall meetings on several occasions.  Dr. Rosenmayer participated in a number of Gore Intellectual Property Committee meetings that were held in Delaware, and has attended other work-related meetings regarding Gore's business in Delaware.  Patent applications filed by Gore based on inventions for which Dr. Rosenmayer was an inventor were processed and filed out of Gore's Delaware offices.  Dr. Rosenmayer's payroll and benefits were administered out of Delaware, and the special payments he received in consideration for signing the agreements discussed below were paid out of Gore's corporate payroll offices in Delaware.  Documents relating to Dr. Rosenmayer's employment, including copies of agreements at issue in this litigation, are maintained at Gore's corporate offices in Delaware.

## FACTUAL BACKGROUND

8.     Gore hired Dr. Rosenmayer in January 1992 to work as a materials scientist assigned to Gore's then-wire and cable manufacturing facility in Manor, Texas.  Since that time, Dr. Rosenmayer has worked for Gore in a number of locations, performing a number of important job duties that have involved increasing access to Gore's core technologies and research and development efforts.

9.     Dr. Rosenmayer had little, if any, substantive work experience with PTFE technology or products before coming to work at Gore.

10.    Dr. Rosenmayer transferred to a Gore facility in Eau Claire, Wisconsin in approximately 1995, where Gore manufactured semi-conductor technologies using PTFE microemulsions.  In this position, Dr. Rosenmayer worked closely with a Gore joint venture research facility in Shanghai, China (Shanghai Gore 3F FluoroMaterials Company, Ltd.) in working on the development of novel fluoropolymer materials to enhance the performance of semi-conductors and other microelectronics.

11.    In 2000, Dr. Rosenmayer was promoted to the position of Research and Development leader at Gore's Putzbrunn, Germany PTFE manufacturing facility.  In this position, Dr. Rosenmayer had considerable and intimate access with Gore's PTFE technology, polymerization processes, business plans and partnerships, and had the potential to improve or change those details through his activities.  As Research and Development leader, Dr. Rosenmayer served on Gore's world-wide core technology leadership team with other top Gore technology leaders throughout the world.  This team met regularly to discuss intimate details regarding Gore's research and development, technological processes, business plans and strategies.

12.    Dr. Rosenmayer transferred back to Gore's U.S. operations in approximately 2006, and has since that time officed out of a Gore facility in Elkton, Maryland.  Since 2007, Dr. Rosenmayer has served as Gore's worldwide Project Champion for the Gore Microelectronics Process Core Team.  In that position, Dr. Rosenmayer has been responsible for leading a small, extended team of Gore leaders in interfacing with other Gore business teams, including the sealant, industrial filtration, fabrics, wire and cable teams, in an effort to enhance and further develop Gore's existing PTFE applications business in the microelectronics industry.  As Project Champion, Dr. Rosenmayer assumed responsibility for

all aspects of this business, including research and development, manufacturing, marketing, sales, and the interaction with all other aspects of Gore's business.

13.    Dr. Rosenmayer is the named inventor on at least eight patents relating to Gore technology, including two that were only filed within the last year.

14.    Dr. Rosenmayer was a highly paid Gore employee, having received an annual salary in 2007 of over $150,000.

**Gore's Efforts To Protect Its Information**

15.    Gore has invested substantial money, time, and effort researching the attributes of PTFE and other fluoropolymers, their methods of manufacture, and refining their use for commercial applications.  This trade secret technology is extremely valuable to Gore.

16.    To maintain the secrecy of its information and maintain its competitive position, Gore spends substantial time, effort, and money to develop and maintain the confidentiality of its trade secrets.  Gore requires each employee to sign an agreement in which the employee acknowledges the nature of Gore's trade secret and confidential information, agrees not to disclose the information, and agrees not to compete with Gore after the termination of their employment.  In addition, Gore protects its trade secrets through complex, high-level security measures including security cameras, full-time security personnel, and an electronic key card system that regulates access to various areas within the facility and monitors and records the coming and going of all personnel.  Visitors to the facilities must sign in at the front entrance and must be escorted about the facility.  Gore regularly conducts workshops reminding its employees of the criticality of protecting Gore's trade secrets.

17.    Gore trade secret and confidential information is disclosed only on a need-to-know basis, and all associates are trained on this need-to-know policy.  The components, chemistry, manufacturing methods and processing, research and development of PTFE and PTFE-containing products are deemed by Gore to be secret and are even protected from open disclosure within Gore by additional confidentiality agreements ("TFE Agreements") and highly controlled access.  For example, Gore restricts access to certain areas within its facilities in which this work takes place, and documents and internal presentations at which this work is discussed, only to the relatively small group of employees who have signed the TFE Agreements.

**Dr. Rosenmayer's Service Agreement**

18.    On January 6, 1992, at the inception of his employment, Dr. Rosenmayer executed a standard Gore service agreement (the "Service Agreement").  (A copy of the Service Agreement is attached hereto as Exhibit A.)  In this agreement, Dr. Rosenmayer acknowledged that:

- Gore developed its "paper work, documents and know-how," including "customer lists, manufacturing processes, devices, techniques, plans, methods, drawings, blueprints reproductions, data, tables, calculations, and letters . . . at great expense and over a lengthy period of time;"

- this information is "unique and constitute[s] the exclusive property and trade secrets of Gore;"

- any use of this information by Dr. Rosenmayer "other than for the sole benefit of Gore" would be wrongful and would injure Gore irreparably;

- Dr. Rosenmayer could not disclose or use this information for his own benefit or the "direct or indirect" benefit of anyone other than Gore without Gore's written consent;

- if Dr. Rosenmayer violated the Agreement, Gore would be entitled to preliminary and permanent injunctive relief and an equitable accounting;

- if his employment was terminated, Dr. Rosenmayer would promptly deliver back to Gore all Gore information "in his possession or under his control" and would "not engage in any business activity in competition with Gore" for one year thereafter;

- if, during his employment or for three years afterward, Dr. Rosenmayer made or conceived "improvements or inventions" relating in any way to Gore's activities or business, Dr. Rosenmayer would promptly disclose them and they would be Gore's property exclusively; and

- upon termination of his employment, Dr. Rosenmayer would not "engage in any business activity in competition with Gore for a period of one (1) year thereafter."

## Dr. Rosenmayer's TFE Agreements

19.    As a condition of being granted access to Gore's TFE technology, Gore required Dr. Rosenmayer to execute a second agreement, entitled "Tetrafluoroethylene Polymers Confidentiality and Non-Competition Agreement" (the "TFE Agreement").  Dr. Rosenmayer was first asked to sign a TFE Agreement after his transfer to Gore's Eau Claire facility, and has signed successive TFE Agreements thereafter.  Dr. Rosenmayer received additional compensation from Gore each year in consideration of signing these agreements. For example, Dr. Rosenmayer received a $400 bonus in 2005, 2006, 2007, and 2008 for signing the TFE Agreement in each of those years.  A copy of the most recent agreement executed by Dr. Rosenmayer is attached hereto as Exhibit B.  In this agreement, Dr. Rosenmayer acknowledged that:

- Gore had invested "considerable time, effort, and many millions of dollars" in developing and refining technology involving PTFE and other tetrafluoroethylene polymers;

- Gore intended to continue to develop and refine this technology, and Gore's continued success depended upon this technology remaining the sole property of Gore, and not known to or used by others; and

- Gore had entrusted Dr. Rosenmayer with know-how, and Dr. Rosenmayer "recognizes the valuable and confidential nature of this know-how" and "understands that its use or knowledge by others would be detrimental to Gore."

20.    In the TFE Agreement, Dr. Rosenmayer agreed that:

- The TFE agreement was additional and supplemental to Dr. Rosenmayer's existing Service Agreement regarding confidentiality and noncompetition;

- Dr. Rosenmayer would "promptly and fully inform and disclose to Gore all inventions, design improvements, and discoveries" made or conceived during his employment with Gore, whether Dr. Rosenmayer conceived them "alone or with others and whether or not conceived during regular working hours.  All such inventions, designs, improvements and discoveries shall be the exclusive property of Gore;"

- while employed with Gore, Dr. Rosenmayer would "have access to and become familiar with various confidential know-how and trade secrets" of Gore, including information "used by Gore in manufacture, selection, purchasing and transportation of PTFE and other polymers containing TFE, the manufacturing of products from PTFE and other polymers containing TFE, dealing in products made therefrom, or research and development concerning the same;"

- Dr. Rosenmayer "shall not disclose any Gore confidential know-how or trade secrets, directly or indirectly, nor use them in any way, either during the term of this Agreement or any time thereafter, except in a manner authorized by Gore;"

- "[a]ll files, records, documents, drawings, specifications, equipment, and similar items relating to Gore's business or research activities, whether prepared by [Dr. Rosenmayer] or otherwise coming into his[] possession, shall remain the exclusive property of Gore" and Dr. Rosenmayer would "safeguard their confidentiality and return them to Gore when []he terminates;" and

- for two years after termination of his employment with Gore, Dr. Rosenmayer "shall not for any reason, directly or indirectly, by any means or device whatsoever . . . compete with Gore by associating himself[] in any way with a person or entity that is involved in the manufacturing, purchasing, selecting, or transportation of PTFE . . . or conducting research and development concerning the same."

**Dr. Rosenmayer's Access To Gore Trade Secret Information**

21.     For over ten years, Dr. Rosenmayer has worked on highly sensitive and proprietary Gore projects.  He has had intimate access to Gore's PTFE technology, manufacturing processes, intellectual property discussions, business plans and strategic planning.

22.     Dr. Rosenmayer is a global research and development leader for Gore, and from 2000 through 2006 was responsible for the manufacture, processing, and improvement of technologies relating to the manufacturing and process of PTFE.

23.     Dr. Rosenmayer is currently heading up a team of Gore associates responsible for the development of an entire line of business for Gore in the microelectronics area.

24.     Given his status with the Company, Dr. Rosenmayer has been allowed to attend meetings and receive internal documents in which the most sensitive of Gore trade secret information is discussed regarding all aspects of the Company's business, including Gore Intellectual Property Committee meetings, Clayton Hall meetings, and Gore Core Technology Leadership Team meetings.  In addition, as a core technology leader at Gore, Dr. Rosenmayer received regular "TFE Polymerization Platform Monthly Technical Reports," which are replete with proprietary technical detail, and summarized in technical detail the status of various Gore research and development projects throughout the company.  These reports included proprietary information on projects involving Gore's pioneering efforts in

other areas, including biomedical and fuel cell applications.  Each and every one of these

internal report were marked "CONFIDENTIAL GORE PTFE TECHNOLOGY" and the

distribution was limited to a handful of top Gore research and development leaders.  Further

dissemination of the reports were expressly limited to "PTFE Agreement signers only."

**Dr. Rosenmayer Announces His Intent to Breach His Contractual Obligations to Gore**

25.    Dr. Rosenmayer has voluntarily resigned his employment with Gore effective

March 31, 2008, and has advised Gore that he had accepted employment with Plastomer as

its Vice President and General Manager effective April 1, 2008.

26.    Plastomer is a division of EnPro Industries, Inc. ("EnPro").  EnPro operates 35

manufacturing facilities throughout North America, Asia and Europe, and purports to be a

"leading provider of engineered industrial products for the process and general

manufacturing industries worldwide."  EnPro's website indicates that EnPro's products and

services include PTFE films, sealant tapes, gaskets, compounds, PTFE machining and

fabrication, and fluoropolymer surface modifications

27.    Dr. Rosenmayer has provided Gore a copy of the job description for the job he

has accepted (the "Job Description").  It is attached as Exhibit C.

28.    The Job Description states that Plastomer is a "provider of PTFE . . . solutions

focusing on creative and innovative products . . . for a wide range of industrial arenas,"

including "wire and cable, filtration, electronic, medical, oral care, outdoor fabric and

countless others."  This statement is equally descriptive of Gore, as well.

29.    The Job Description states that Plastomer currently sells into the semi

conductor and medical industries, among others, and that "experience in these areas would

be beneficial."

30.     Indeed, Plastomer and Gore both manufacture PTFE and are engaged in processing PTFE into tapes and fibers for, among other uses, applications in industrial products, such as wire and cable, microelectronics, sealants and membranes.  As noted above, Dr. Rosenmayer served as Gore's Research and Development leader at Gore's Putzbrunn, Germany facility for approximately six years.

31.     Both Plastomer and Gore manufacture the same category of products utilizing PTFE technology, including tape for cable assemblies, and PTFE applications for the microelectronics industry, including semi-conductors.  Dr. Rosenmayer has been involved in all of these applications at Gore since he was hired in 1992, and has served as Gore's Project Champion for the Microelectronics Process Core Team (which has targeted, among other industries, the semi-conductor industry) since 2007.

32.     The Job Description states that as Vice President and General Manager of Plastomer, Dr. Rosenmayer will be responsible for the overall management of Plastomer, including: (1) developing business strategies and evaluating business opportunities; (2) developing marketing strategies and evaluating market conditions; (3) providing management leadership to all functional areas of Plastomer, including research, development and manufacturing personnel.

33.     The Job Description states that "the ideal candidate will have PTFE, performance polymer or composite experience."

## COUNT I

### (Breach of Contract)

34.     Gore restates and realleges all previous paragraphs.

35.    As a condition of his employment with Gore commencing in 1992, Dr. Rosenmayer signed the Service Agreement attached hereto as Exhibit A. Dr. Rosenmayer also signed successive versions of the TFE Agreement over the course of the last decade, the most recent of which is attached as Exhibit B.

36.    Gore has fully complied with all of its obligations under each of these agreements.

37.    Dr. Rosenmayer has repudiated and breached these agreements with Gore by accepting the above-referenced employment with Plastomer, and proceeding with his announced employment with Plastomer to begin on April 1, 2008. Dr. Rosenmayer's employment with Plastomer violates his  obligation as agreed to in the Service Agreement to refrain from engaging in any business activity in competition with Gore for a period of one year following the termination of his employment. Such employment also violates Dr. Rosenmayer's obligation as repeatedly agreed to in the TFE Agreements to refrain from directly or indirectly associating with any entity involved in the manufacturing, research or development of TFE-containing polymers, including PTFE, and products made therefrom.

38.    Given the high-level nature of his position with Gore, and the high-level nature of his anticipated position with Plastomer, it is inevitable that Dr. Rosenmayer would disclose proprietary and confidential Gore information to Plastomer in further breach of his duties of non-disclosure, as set forth in both the Service Agreement and the TFE Agreements.

39.    Gore has no adequate remedy at law for Dr. Rosenmayer's announced breach of contract. In both the Service Agreement and TFE Agreement, Dr. Rosenmayer agreed that a violation of the agreements entitled Gore to preliminary and permanent injunctive

relief.  If not enjoined, Dr. Rosenmayer will cause irreparable harm to the rights of Gore and to Gore's business, reputation, and goodwill.

WHEREFORE, Gore demands judgment against the defendant and respectfully requests that the Court:

1.    Issue a temporary restraining order in the form proposed herewith;

2.    Issue orders preliminarily and permanently enjoining Dr. Rosenmayer from all further unlawful conduct, as described above, and directing defendant to take appropriate steps to remedy any unlawful conduct, including but not limited to refraining from any further misconduct, accounting for and returning all Gore property and information in their possession or under their control; and

3.    Order all other relief that the Court deems proper and just in the circumstances.

YOUNG CONAWAY STARGATT & TAYLOR, LLP


 /s/ *Martin S. Lessner*
Martin S. Lessner, Esquire (No. 3109)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6698
Facsimile: (302) 576-3309

Attorneys for Plaintiff W.L. Gore & Associates, Inc.

Of Counsel:

Charles Knapp
Julie Giddings
FAEGRE & BENSON
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
(612) 766-1600

Dated: March 28, 2008

## **VERIFICATION**

STATE OF DELAWARE            )
                             )    SS.:
COUNTY OF NEW CASTLE         )


I, Paul Fischer, upon oath state that I am an authorized agent of W.L. Gore & Associates, Inc. ("Gore"), that I have read the foregoing Verified Complaint, and to the best of my knowledge, the facts alleged therein insofar as it concerns Gore is true, and insofar as it concerns all other persons, is believed by me upon information and belief to be true.

W.L. Gore & Associates, Inc.


BY: _____
      Paul Fischer
      Core Technology Division Leader


SWORN TO before me this 28th day of March 2008.

_____
Notary Public
Commission Expires 8/26/2010

Suzanne M. Hearn
Notary Public
State of Delaware

fb.us.2727901.04

15

# EXHIBIT A



# W. L. GORE & ASSOCIATES, INC.

7811 BURLESON-MANOR ROAD • P.O. DRAWER Q • MANOR, TEXAS 78653 • PHONE: 512/276-7600

Creative Technologies
Worldwide

## AGREEMENT

For and in consideration of the sum of One ($1.00) Dollar paid to the undersigned by W. L. Gore & Associates, Inc., (hereinafter called "GORE") at the date hereof, receipt of which is hereby acknowledged, and such other good and valuable consideration, including, but not limited to, employment by Gore commencing ___1/6/92___, the undersigned hereby agrees with Gore as follows:

(1) The undersigned acknowledges that the customer lists, manufacturing processes, devices, techniques, plans, methods, drawings, blueprints, reproductions, data, tables, calculations, letters or other paper work, documents and know-how of Gore were designed and developed by Gore at great expense and over lengthy periods of time, are secret and confidential, are unique and constitute the exclusive property and trade secrets of Gore and that any use of such property and trade secrets by the undersigned other than for the sole benefit of Gore would be wrongful and would cause irreparable injury to Gore.

(2) The undersigned shall not, at any time, without the express written consent of an officer of Gore, publish, disclose or divulge to any person, firm, or corporation, or use directly or indirectly, or use for his own benefit or for the benefit of any person, firm, corporation or use other than Gore, any property, trade secrets or confidential information of Gore, its subsidiaries and its affiliates learned or obtained by him from Gore, including, but not limited to, the information and things set forth in paragraph (1) hereinabove.

(3) This agreement shall be binding upon the undersigned, his personal representatives, successors and assigns, and shall run to the benefit of Gore, its successors and assigns.

(4) The undersigned hereby acknowledges and agrees that in the event of any violation hereof, Gore shall be authorized and entitled to obtain from any Court of competent jurisdiction preliminary and permanent injunctive relief as well as an equitable accounting of all profits or benefits arising out of such violation, which rights and remedies shall be cumulative and in addition to any other rights or remedies to which Gore may be entitled.

(5) Upon termination of this employment, the undersigned shall promptly deliver to Gore all drawings, blueprints, reproductions, manuals, letters, notes, notebooks, reports, data, tables, calculations or copies thereof, and all other secret and confidential property of Gore, its subsidiaries and affiliates, including, but not limited to, all property set forth in paragraph (1) herein above, which are in his possession or under his control.

(6) Upon termination of this employment, the undersigned agrees that he will not engage in any business activity in competition with Gore for a period of one (1) year thereafter.

**EXHIBIT A**

(7)  The undersigned shall promptly disclose any and all improvements and inventions conceived or made by him during the period of his said employment relating in any way to the activities or business of Gore, and any and all such improvements and inventions shall be the sole and exclusive property of Gore or its nominee and the undersigned shall do whatever is proper and necessary to vest title in all said improvements and all said inventions in Gore or its nominee.

Whenever requested to do so by Gore, the undersigned shall execute any and all applications, assignments and other instruments which Gore shall deem necessary in order to apply for and obtain Letters Patent of the United States and foreign countries covering said improvements or inventions coming within this Item 7 and in order to assign and convey to Gore or its nominee the sole and exclusive right, title and interest therein.

These obligations shall continue beyond the termination of the period of employment for a period of three years with respect to improvements or inventions conceived or made by the undersigned during the period of said employment, and shall be binding upon his assigns, executors, administrators or other legal representatives.

(8)  Inventions, patented or unpatented, made or conceived prior to the undersigned's employment by Gore are excluded from this Agreement.

(9)  With respect to inventions, patented or unpatented, made or conceived by the undersigned during his course of employment with Gore which inventions do not relate to or are not in connection with the said business products of Gore, Gore may, in its own discretion, grant a waiver or a release to the undersigned thereon but such waivers or releases shall be granted only after consideration by Gore of the undersigned's written request therefore and will not be withheld without good reason.

IN WITNESS WHEREOF, the undersigned has hereunto set his hand and seal the date and year first above written.

_Charles J. Braunagel_ ____ SEAL

Witness: _Belinda Keeling_

Date: _1-6-92_

W. L. GORE & ASSOCIATES, INC.

By: _____

# EXHIBIT B

## TETRAFLUOROETHYLENE POLYMERS CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

This Agreement is between W. L. Gore & Associates, Inc., ("GORE") a Delaware Corporation having a principal place of business at 555 Paper Mill Road, Newark, Delaware 19711 and Tom Rosenmayer ("ASSOCIATE").

BACKGROUND

W. L. Gore & Associates, Inc. ("GORE") has, over a period of years, invested considerable time, effort and many millions of dollars in developing and refining technology for the synthesis, characterization and processing of polytetrafluoroethylene (PTFE) and other polymers containing tetrafluoroethylene (TFE) into useful products. Some of this technology is patented. Much, however, is know-how that has been kept confidential by GORE. This confidential know-how is an extremely valuable asset of GORE and has significantly contributed to the success of GORE, enabling GORE to sell its products and provide its services throughout the world.

GORE intends to continue to develop and refine this technology. In order to ensure the continued success of the Company, it is essential that past, current and future know-how remain the sole property of GORE and not become known to, or used by others, particularly competitors.

GORE has entrusted ASSOCIATE with know-how. GORE desires to continue to disclose and entrust to ASSOCIATE its existing and future know-how and have ASSOCIATE work with, develop and refine such know-how. ASSOCIATE recognizes the valuable and confidential nature of this know-how and acknowledges that (s)he understands that its use or knowledge by others would be detrimental to GORE. ASSOCIATE agrees as follows:

Page 1 of 5                    (initials) *TR*

**EXHIBIT B**

I.    SUPPLEMENTAL AGREEMENT

This Agreement is in addition to and supplements ASSOCIATE'S existing confidentiality and non-competition agreement. The time periods during which ASSOCIATE agrees not to compete with GORE are not cumulative.

II.    INVENTIONS AND PATENTS

ASSOCIATE agrees that (s)he will promptly and fully inform and disclose to GORE all inventions, design improvements, and discoveries which (s)he has now made or conceived or may later make or conceive during his/her term of employment, which pertain or relate to the business of GORE or to any experimental work carried on by GORE, whether conceived by ASSOCIATE alone or with others and whether or not conceived during regular working hours. All such inventions, designs, improvements, and discoveries shall be the exclusive property of GORE. ASSOCIATE shall assist GORE at GORE's sole expense, to obtain patents on all such inventions, designs, improvements and discoveries, deemed patentable by GORE and shall execute all documents and do all things necessary to obtain letters patent, vest GORE with full and exclusive title thereto, and protect the same against infringement by others.

III.    TRADE SECRETS, KNOW HOW, CONFIDENTIAL INFORMATION

ASSOCIATE, during the course of employment with GORE, under this Agreement will have access to and become familiar with various confidential know-how and trade secrets including formulae, patterns, devices, secret inventions, processes, machines and compilations of information, records and specifications which are owned by GORE, and which are used by GORE in: manufacture, selection, purchasing and transportation of PTFE and other polymers containing TFE, the manufacturing of products from PTFE and other polymers containing TFE, dealing in products made therefrom, or research and development concerning the same. ASSOCIATE shall not disclose any GORE confidential know-how or trade secrets,

Page 2 of 5                    (initials) _TR_

directly or indirectly, nor use them in any way, either during the term of this Agreement or at any time thereafter, except in a manner authorized by GORE. All files, records, documents, drawings, specifications, equipment, and similar items relating to GORE's business or research activities, whether prepared by ASSOCIATE or otherwise coming into his/her possession, shall remain the exclusive property of GORE and the ASSOCIATE agrees to safeguard their confidentiality and return them to GORE when (s)he terminates.

IV.    PUBLIC KNOWLEDGE LIMITATION

ASSOCIATE shall not be permitted to justify disregard of his/her obligations of confidence under this Agreement because specific items of GORE'S know-how are embraced by more general information which is in the public domain. Nor shall a combination of items of know-how be deemed public knowledge because individual items of know-how are in the public domain. For a combination of items of know-how to be considered public knowledge, the combination and its principle of operation must be in the public domain.

V.    NON-COMPETITION BY ASSOCIATE

During the term of this Agreement, ASSOCIATE shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, corporate officer, director or in any other individual or representative capacity, engage or participate in any business that is involved in the manufacture, purchasing, selecting or transportation of PTFE and other polymers containing TFE, manufacturing products from PTFE and other polymers containing TFE, dealing in products made therefrom, or conducting research and development concerning the same.

Page 3 of 5                                    (initials) _TR_

VI.    RESTRICTIVE COVENANTS

In return for the consideration received by ASSOCIATE under the Agreement, ASSOCIATE agrees as part of and ancillary to this Agreement that ASSOCIATE for a reasonable period of time after the termination of his/her employment by GORE, shall not for any reason directly or indirectly, by any means or device whatsoever, for himself/herself or on behalf of, or in conjunction with any person or entity, do any one or more of the following:

(a)    compete with GORE by associating himself/herself in any way with a person or entity that is involved in the manufacturing, purchasing, selecting or transportation of PTFE and other polymers containing TFE or manufacturing of products from PTFE and other polymers containing TFE or dealing in products made therefrom, or conducting research and development concerning the same.

(b)    induce, entice, hire, or attempt to hire or employ any ASSOCIATE of GORE for the purpose of (a).

GORE & ASSOCIATE expressly agree that "a reasonable period of time" as used in this section shall be two (2) years.

GORE & ASSOCIATE further agree that Article VI shall accrue to GORE's benefit irrespective of the reason for termination of this Agreement or the termination of ASSOCIATE'S employment by GORE.

ASSOCIATE further agrees to show a copy of this Agreement to his/her new employer.

(initials) _TR_

VII.    <u>CONSIDERATION</u>

In return for accepting the restriction in this Agreement, GORE will pay ASSOCIATE $400.00/year in addition to his/her regular compensation as long as ASSOCIATE is employed in an activity requiring this Agreement.

VIII.    <u>REMEDIES</u>

ASSOCIATE agrees that in order to enforce this Agreement, GORE shall be entitled to all remedies available in law and equity including preliminary and permanent injunction.

Signed: _____    Date: _24 Jan 08_____

Associate ID #: ____13371_____

Witness: _____    Date: _1/24/08._____

Page 5 of 5                    (initials) _TR_

EXHIBIT C

**Confidential**

Position Specification

| | |
|---|---|
| **Title:** | **VP GM PLASTOMER TECHNOLOGIES** |
| **Company:** | PLASTOMER TECHNOLOGIES is a **35 million dollar** division of EnPro Industries and a leading provider of PTFE and engineered plastics solutions focusing on creative and innovative products with exceptional performance and customized solutions for a wide range of industrial arenas. |

Plastomer Technologies produces PTFE tape, fiber and film solutions used in such industries as wire and cable, filtration, electronic, medical, oral care, outdoor fabric and countless others.

Plastomer Technologies offers PTFE rods, cylinders, sheet and sealing solutions. PTFE is compression molded from a variety of blends and compounds to create optimal physical properties for each individual applications.

Plastomer Technologies Amicon Plastics Division offers machined and fabricated plastic components built to print from all types of engineered plastics. Amicon specializes in serving the tight tolerances required of critical industries.

Plastomer Technologies Porter Process Division offers floral polymer etching of film, sheet, tubing and three-dimensional shapes.

| | |
|---|---|
| **Website:** | www.plastomertech.com |
| **Enpro Industries:** | www.enproindustries.com |

EnPro Industries, an NYSE company (Symbol NPO), is a leading provider of engineered industrial products for the processing and general manufacturing industries worldwide. The company operates in three segments: Sealing Products, Engineered Products, and Engine Products and Services. Businesses in the EnPro family include well-known names such as: Garlock Sealing Technologies, Quincy Compressor, Stemco, GGB Bearing Technology, Pikotek, Plastomer Technologies, France Compressor Products, and Fairbanks Morse Engine.

EnPro operates 35 manufacturing facilities in North America, Europe, and Asia and employs 4,500 people worldwide selling

**EXHIBIT C**

products to more than 50,000 customers in over 100 countries around the globe. In recent years, EnPro has opened plants in growing markets such as China and Eastern Europe, and relocated businesses to better serve its customers while modernizing many of its facilities. Sales, segment profits, and segment profit margins have grown consistently since 2002, and record highs were achieved in all three during the second quarter of 2007.

**Location:**  Plastomer Technologies is located in Houston, Texas.

**Reporting relationships:**  The Vice President/GM will report to the President of Stemco. The position will have the following direct reports: Operations (2), Finance, Human Resources, Sales/Marketing.

**Basic Function:**  He/she will be responsible for the management of overall division profit and loss and to provide management leadership of all functional areas to ensure that a strong environment is established and maintained. He/she will direct leadership teams to provide reliable information necessary to manage operations and improve business performance and results, and for ensuring the division conforms to the company quality system procedures and continuous improvement philosophy. He/she will facilitate and direct the five-year strategic planning process and serve as a key member of the senior management team functioning as a strategic partner to the president.

**Roles & Responsibilities:**

1. Develop division long range strategies and objectives, and work with staff members to drive and ensure the success of these goals (20% of time).

2. Collaborate with the senior management team in the area of evaluating business opportunities, alliances and partnerships (20% of time).

3. Develop marketing strategies, evaluate market conditions and recommend policy changes to encourage maximum sales activity (15% of time).

4. Direct and coordinate promotion of products manufactured or services performed to develop new markets, increase share of market, and obtain competitive position in industry (15% of time).

5. Provide resources and direct the team to insure that there are sufficient internal controls to meet the financial reporting and

operational support needs of the company and to comply with regulatory requirements (10% of time).

6. Confer with divisional personnel and review activity, operating, and sales programs to determine if changes in programs and/or operations is required (10% of time).

7. Contribute and lead the professional development of personnel and employees within the division (10% of time).

Short and Mid Range goals of the position:

- Short term the goal will be to consolidate three manufacturing operations into two and three separate organizations into one strong organization.
- Mid to long term the goal will be to design a new business plan that will produce profitable growth through organic and acquisitive expansion while building the Plastomer Technology and key product brands.

**Requirements:**

The business is in the process of consolidating and building new manufacturing operations and developing a new culture. The ideal candidate will be a change manager who has experienced this type of transition.

The ideal candidate will have PTFE, performance polymer or composite experience.

Plastomer Technologies sells into the following industries and experience in these areas would be beneficial: aerospace, semi conductor, consumer products (medical), oil and gas and general industrial.

The ideal candidate will be functioning as a GM, or if he or she has strong potential, is currently functioning as a Business Manager, Sr. Product Manager, Sr. Sales and Marketing Manager or an Operations Manager for a respected global organization.

The candidate will be a strategic thinker who is equally adept at operational excellence.

**The preferred candidate will have experience in acquisitions as well as in business integration.**

The ideal candidate will have a chemical or polymer engineering degree with an MBA.

**Compensation:**

Compensation will be commensurate with experience and include excellent fringe benefits.

**Contact:**                      Jack Stroker, Partner
                                  L & J Associates
                                  Carnegie VIII Building
                                  5925 Carnegie Blvd., Suit 102
                                  Charlotte, NC 28209
                                  704-367-1998
                                  js@ljausa.com

**EXHIBIT B**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

W.L. Gore. & Associates, Inc.,

Plaintiff,          C.A. No. _____

vs.

Charles Thomas Rosenmayer, PhD.,

Defendant.

## MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiff W.L. Gore & Associates, Inc. (hereinafter "Gore"), by and through its attorneys, hereby moves this Honorable Court, pursuant to Court of Chancery Rule 65, for a temporary restraining order enjoining defendant from engaging in any employment with Plastomer Technologies, or otherwise acting in contravention of his contractual obligations to Gore. The grounds for this motion are set forth in Plaintiff's Verified Complaint and the accompanying Memorandum of Law in Support of Motion for Temporary Restraining Order, filed contemporaneously herewith.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Martin S. Lessner*
Martin S. Lessner, Esquire (No. 3109)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6698
Facsimile: (302) 576-3309

Attorneys for Plaintiff W.L. Gore & Associates, Inc.

Of Counsel:

Charles Knapp
Julie Giddings
FAEGRE & BENSON
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
(612) 766-1600

Dated: March 28, 2008

fb.us.2733425.01

**EXHIBIT C**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

W.L. Gore. & Associates, Inc.,

                              Plaintiff,              C.A. No. _____

vs.                                              **MEMORANDUM OF LAW IN
                                                 SUPPORT OF PLAINTIFF'S**
Charles Thomas Rosenmayer, PhD.,                 **MOTION FOR TEMPORARY
                                                 RESTRAINING ORDER**

                              Defendant.

## <u>INTRODUCTION</u>

This action is brought to enjoin the defendant's announced intention to violate his

contractual obligations to W.L. Gore & Associates, Inc. ("Gore" or "the Company") as set

forth in multiple confidentiality and non-competition agreements that he signed during his

sixteen years of employment with Gore as a research scientist and business leader.

Defendant Charles Thomas Rosenmayer ("Dr. Rosenmayer") has worked as a

materials scientist for Gore since 1992 in various important roles for the Company.  From

2000 through 2006, Dr. Rosenmayer was employed as Research and Development Leader of

a Gore polytetrafluoroethylene ("PTFE") manufacturing facility in Germany and, in that

capacity, served on Gore's world-wide Core Technology Leadership Team.  Since that time,

Dr. Rosenmayer has assumed responsibility as worldwide Project Champion for the Gore

Microelectronics Process Core Team in an effort to enhance and further develop Gore's

existing PTFE applications business in the microelectronics industry.  Dr. Rosenmayer has

had intimate access to, and indeed has created, a substantial body of proprietary and

confidential research, know-how and trade secrets regarding Gore's core technologies,

business plans and strategies.

At the outset and during the course of his employment with Gore, Dr. Rosenmayer signed a series of non-disclosure and non-competition agreements that prohibit him from the unauthorized disclosure or use of confidential Gore information, from conducting research and development concerning Gore's core technologies (including PTFE) for two years following the termination of his employment, and from otherwise competing with Gore for one year after the termination of his employment.

On March 25, 2008, Dr. Rosenmayer advised Gore that he had decided to accept a position of employment with a Gore competitor, Plastomer Technologies ("Plastomer"). Like Gore, Plastomer is in the business of manufacturing PTFE and developing innovative products using PTFE technologies, including PTFE-related products and services for the electronics, microelectronics, filtration, medical, and fabrics industries. Dr. Rosenmayer's prospective employment with Plastomer will be to serve as its Vice President and General Manager, responsible for overseeing all aspects of the company's operations. Dr. Rosenmayer advised that his last day of employment with Gore would be March 31, 2008, and that his first day of employment with Plastomer would be April 1, 2008.

Gore has advised Dr. Rosenmayer that his employment with Plastomer would be in contravention of his non-competition obligations with Gore. Gore also has advised Dr. Rosenmayer that given the nature of his employment at Gore, and the nature of his prospective employment at Plastomer, it would be inevitable that he would disclose trade secrets of Gore in the course of his employment at Plastomer, in violation of his non-disclosure obligations with Gore. Gore has offered to continue Dr. Rosenmayer's employment or, in the alternative, to pay for a headhunter in order for Dr. Rosenmayer to find other, suitable employment. Dr. Rosenmayer has refused.

By this motion, and pursuant to Chancery Court Rule 65, Gore seeks a temporary restraining order enjoining defendant Dr. Rosenmayer from working for Plastomer or otherwise engaging in any business activity which is in competition with Gore.

Copies of Gore's Verified Complaint, Motion for Temporary Restraining Order, and this Memorandum of Law have been delivered to Dr. Rosenmayer's attorney by e-mail and hard copy delivery. Gore also is attempting personal service of Dr. Rosenmayer.

## STATEMENT OF FACTS

### I.    THE PARTIES

#### A.    Gore

Gore is a privately-held corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 555 Papermill Road, Newark, Delaware. Verified Complaint ("Ver. Compl.") ¶ 4. Founded in 1958, Gore currently employs approximately 8,000 associates in 45 locations around the world. Ver. Compl. ¶ 5. Gore's proprietary technologies encompassing polymers made or derived from the fluoropolymer polytetrafluoroethylene ("PTFE") have resulted in numerous products and product applications for wire and cable, fabric, medical, filtration membrane, sealant, and other applications in diverse industries. Id.

#### B.    Charles Thomas Rosenmayer, Ph.D

Dr. Rosenmayer is a materials scientist with a B.S. in metallurgical engineering from the University of Missouri, and a Ph.D in materials science from Rice University. Ver. Compl. ¶ 5. Gore hired Dr. Rosenmayer in January 1992 to work at Gore's then-wire and cable manufacturing facility in Manor, Texas. Ver. Compl. ¶ 6. Dr. Rosenmayer has worked for Gore in a number of locations, and has worked the last several years out of one of Gore's

Elkton, Maryland facilities.  Ver. Compl. ¶ 5.  Over time, Gore has assigned Dr. Rosenmayer various important job duties that have involved access to Gore's core technologies and research and development efforts.  Ver. Compl. ¶ 6.  Indeed, Dr. Rosenmayer is the named inventor on at least eight patents relating to Gore technology, including two that were only filed within the last year.  Ver. Compl. ¶ 13.  Prior to his employment with Gore, Dr. Rosenmayer had little, if any, substantive work experience relating to PTFE, a fluoropolymer that is central to Gore's core technologies.  Ver. Compl. ¶  9.

In approximately 1995, Dr. Rosenmayer transferred to a Gore facility in Eau Claire, Wisconsin, where Gore manufactured semi-conductor technologies using PTFE microemulsions.  Ver. Compl. ¶ 10.  In this position, Dr. Rosenmayer worked closely with a Gore joint venture research facility in Shanghai, China (Shanghai Gore 3F FluoroMaterials Company, Ltd.) on the development of novel fluoropolymer materials to enhance the performance of semi-conductors and other microelectronics.  Id.

In 2000, Dr. Rosenmayer was promoted to the position of Research and Development Leader at Gore's Putzbrunn, Germany PTFE manufacturing facility.  Ver. Compl. ¶ 11.  In this position, Dr. Rosenmayer had considerable and intimate access with Gore's PTFE technology, polymerization processes, business plans and partnerships, and had the potential to improve or change those details through his activities.  Id.  As Research and Development leader, Dr. Rosenmayer served on Gore's world-wide core technology leadership team with other top Gore technology leaders throughout the world.  Id.  This team met regularly to discuss intimate details regarding Gore's research and development, technological processes, business plans and strategies.  Id.

Dr. Rosenmayer transferred back to Gore's U.S. operations in approximately 2006.

Ver. Compl. ¶ 12.  Since that time, Dr. Rosenmayer has served as Gore's worldwide Project

Champion for the Gore Microelectronics Process Core Team, officing out of one of Gore's

Elkton, Maryland facilities.  Id.  In that position, Dr. Rosenmayer has been responsible for

leading a team of Gore leaders in interfacing with other Gore business teams, including the

sealant, industrial filtration, fabrics, wire and cable teams, in an effort to enhance and further

develop Gore's existing PTFE applications business in the microelectronics industry.  Id.  As

Project Champion, Dr. Rosenmayer assumed responsibility for all aspects of this business,

including research and development, manufacturing, marketing, sales, and the interaction

with all other aspects of Gore's business.  Id.[1]

---

[1]    Given Dr. Rosenmayer's multiple and significant contacts with Delaware (see Ver. Compl. 7), the Court has personal jurisdiction over Dr. Rosenmayer.  See, e.g., Ciena Corp. v. Jarrard, 203 F.3d 312, 317-18 (4th Cir. 2000) (non-resident former employee who visited employer's headquarters in Maryland for training and regular meetings and entered into non-competition agreement with Maryland-based employer had sufficient contacts with state to support personal jurisdiction over her in case for breach of non-competition agreement); Equifax Services v. White & White Inspection and Audit Service, Inc., 905 F.2d 1355, 1357-59 (10th Cir. 1990) (court had personal jurisdiction over non-resident employee who visited employer's office in state, had regular contact with employees in state, and was paid from state; "when forum contacts are a natural result of a contractual relationship, it indicates purposeful affiliation with the forum through an interstate contractual relationship"); Alta Analytics Inc. v. Muuss,75 F. Supp. 2d 773, 776 (S.D. Ohio 1999) (Ohio court had jurisdiction over non-resident employee who executed non-competition agreement in different state where customer support, payroll, accounting, and human resources departments were in Ohio and employee regularly received written materials from state and communicated with individuals in Ohio); Sprint Corp. v. Deangelo, 12 F. Supp. 2d 1184, 1185 (D. Kan. 1998) (Kansas court had jurisdiction over non-resident former employee who visited Kansas several times per year and communicated with employer in Kansas); Century Data Systems, Inc v. McDonald, 428 S.E.2d 190 (N.C. Ct. App. 1993) (non-resident employees subject to personal jurisdiction where made trips to state, received training in state, and were administered paychecks and other services from employer in state).

II.    **GORE'S EFFORTS TO PROTECT ITS CONFIDENTIAL AND PROPRIETARY INFORMATION AND TRADE SECRETS, AND DR. ROSENMAYER'S CONTRACTUAL OBLIGATIONS TO GORE**

Gore has invested substantial money, time, and effort researching the attributes of PTFE and other fluoropolymers, their methods of manufacture, and refining their use for commercial applications.  Ver. Compl. ¶ 15.  This trade secret technology is extremely valuable to Gore.  Id.

To maintain the secrecy of its information and maintain its competitive position, Gore spends substantial time, effort, and money to develop and maintain the confidentiality of its trade secrets.  Ver. Compl. ¶ 16.  Gore requires each employee to sign an agreement in which the employee acknowledges the nature of Gore's trade secret and confidential information, agrees not to disclose the information, and agrees not to compete with Gore after the termination of their employment.  In addition, Gore protects its trade secrets through complex, high-level security measures including security cameras, full-time security personnel, and an electronic key card system that regulates access to various areas within the facility and monitors and records the coming and going of all personnel.  Id.  Visitors to the facilities must sign in at the front entrance and must be escorted about the facility.  Id.  Gore regularly conducts workshops reminding its employees of the criticality of protecting Gore's trade secrets.  Id.

Gore's trade secret and confidential information is disclosed only on a need-to-know basis, and all associates are trained on this need-to-know policy.  Id.  The components, chemistry, manufacturing methods and processing, research and development of PTFE and PTFE-containing products are deemed by Gore to be secret and are even protected from open disclosure within Gore by additional confidentiality agreements ("TFE Agreements") and

highly controlled access.  Id.  For example, Gore restricts access to certain areas within its facilities in which this work takes place, and documents and internal presentations at which this work is discussed, only to the relatively small group of employees who have signed the TFE Agreements.  Id.

**A.**      **Dr. Rosenmayer's Service Agreement**

At the inception of his employment on January 6, 1992, Dr. Rosenmayer executed (as required by all new employees) a service agreement with Gore (hereinafter, the "Service Agreement").  Ver. Compl. ¶ 18, Exh. A.  In that agreement, Dr. Rosenmayer acknowledged and agreed that:

- Gore developed its "paper work, documents and know-how," including "customer lists, manufacturing processes, devices, techniques, plans, methods, drawings, blueprints reproductions, data, tables, calculations, and letters . . . at great expense and over lengthy period of time;"

- this information is "unique and constitute[s] the exclusive property and trade secrets of Gore;"

- any use of this information by Dr. Rosenmayer "other than for the sole benefit of Gore" would be wrongful and would injure Gore irreparably;

- Dr. Rosenmayer could not disclose or use this information for his own benefit or the "direct or indirect" benefit of anyone other than Gore without Gore's written consent;

- if Dr. Rosenmayer violated the Agreement, Gore would be entitled to preliminary and permanent injunctive relief and an equitable accounting;

- if his employment was terminated, Dr. Rosenmayer would promptly deliver back to Gore all Gore information "in his possession or under his control" and would "not engage in any business activity in competition with Gore" for one year thereafter;

- if, during his employment or for three years afterward, Dr. Rosenmayer made or conceived "improvements or inventions" relating in any way

to Gore's activities or business, Dr. Rosenmayer would promptly disclose them and they would be Gore's property exclusively; and

- upon termination of this employment, Dr. Rosenmayer would not engage in any business activity in competition with Gore for a period of one (1) year thereafter.

Id.

## B.    Dr. Rosenmayer's TFE Agreements

As a condition of being granted access to Gore's core technology, Gore required Dr. Rosenmayer to execute a second agreement, entitled "Tetrafluoroethylene Polymers Confidentiality and Non-Competition Agreement" (the "TFE Agreement").   Ver. Compl. ¶ 19.   Dr. Rosenmayer was first asked to sign a TFE Agreement after his transfer to Gore's Eau Claire facility in the late 1990's, and has signed successive TFE Agreements thereafter. Id.  Dr. Rosenmayer received additional compensation from Gore each year in consideration of signing these agreements.  Id.  For example, Dr. Rosenmayer received a $400 bonus in 2005, 2006, 2007, and 2008 for signing the TFE Agreement in each of those years.  Id.  In this agreement, Dr. Rosenmayer acknowledged that:

- Gore had invested "considerable time, effort, and many millions of dollars" in developing and refining technology involving PTFE and other tetrafluoroethylene polymers;

- Gore intended to continue to develop and refine this technology, and Gore's continued success depended upon this technology remaining the sole property of Gore, and not known to or used by others; and

- Gore had entrusted Dr. Rosenmayer with know-how, and Dr. Rosenmayer "recognizes the valuable and confidential nature of this know-how" and "understands that its use or knowledge by others would be detrimental to Gore."

Ver. Compl. Exh. B.  Accordingly, Dr. Rosenmayer agreed in the TFE Agreements to

undertake the following supplemental obligations to Gore:

- Dr. Rosenmayer would "promptly and fully inform and disclose to Gore all inventions, design improvements, and discoveries" made or conceived during his employment with Gore, whether Dr. Rosenmayer conceived them "alone or with others and whether or not conceived during regular working hours.  All such inventions, designs, improvements and discoveries shall be the exclusive property of Gore;"

- while employed with Gore, Dr. Rosenmayer would "have access to and become familiar with various confidential know-how and trade secrets" of Gore, including information "used by Gore in manufacture, selection, purchasing and transportation of PTFE and other polymers containing TFE, the manufacturing of products from PTFE and other polymers containing TFE, dealing in products made therefrom, or research and development concerning the same;"

- Dr. Rosenmayer "shall not disclose any Gore confidential know-how or trade secrets, directly or indirectly, nor use them in any way, either during the term of this Agreement or any time thereafter, except in a manner authorized by Gore;"

- "[a]ll files, records, documents, drawings, specifications, equipment, and similar items relating to Gore's business or research activities, whether prepared by [Dr. Rosenmayer] or otherwise coming into his[] possession, shall remain the exclusive property of Gore" and Dr. Rosenmayer would "safeguard their confidentiality and return them to Gore when []he terminates;" and

- for two years after termination of his employment with Gore, Dr. Rosenmayer "shall not for any reason, directly or indirectly, by any means or device whatsoever . . . compete with Gore by associating himself[] in any way with a person or entity that is involved in the manufacturing, purchasing, selecting, or transportation of PTFE . . . or conducting research and development concerning the same."

Id.

C.    <u>Dr. Rosenmayer's Access To and Recognition of the Confidentiality of Gore Proprietary Information</u>

Dr. Rosenmayer has worked on highly sensitive and proprietary projects at Gore, and has had intimate access to Gore's PTFE technology, manufacturing processes, intellectual property discussions, business plans and strategic planning.  Ver. Compl. ¶ 21.  He has been employed as a global research and development leader for Gore, and from 2000 through 2006 was responsible for the manufacture, processing, and improvement of technologies relating to the manufacturing and process of PTFE at Gore.  Ver. Compl. ¶ 22.  He is currently heading up a team of Gore associates responsible for the development of an entire line of business for Gore in the microelectronics area.  Ver. Compl. ¶ 23.

Given his status with the Company, Dr. Rosenmayer has been allowed to attend meetings in which the most sensitive of Gore trade secret information is discussed regarding all aspects of the Company's business, including Gore Intellectual Property Committee meetings and Gore Core Technology Leadership Team meetings.  Ver. Compl. ¶ 24.  He also was invited to, attended and even organized internal research and development meetings at Clayton Hall at the University of Delaware that are held on a monthly basis and which are open only to higher-level Gore associates.  Ver. Compl. ¶ 7.

In addition, as a core technology leader at Gore, Dr. Rosenmayer has received internal written communications regarding highly confidential and proprietary trade secrets regarding all aspects of Gore.  Ver. Compl. ¶ 24.  For example, Dr. Rosenmayer received  regular "TFE Polymerization Platform Monthly Technical Reports,"  which are replete with proprietary technical detail, and summarized in technical detail the status of various Gore research and development projects throughout the company (not just those projects or products upon

which Dr. Rosenmayer worked).  Id.  These reports included proprietary information on projects involving Gore's pioneering efforts in other area, including biomedical and fuel cell applications.  Id.  Each and every one of these internal reports were marked "CONFIDENTIAL GORE PTFE TECHNOLOGY" and the distribution was limited to a handful of top Gore research and development leaders.  Id.  Further dissemination of the reports were expressly limited to "PTFE Agreement signers only."  Id.

## III.    DR. ROSENMAYER'S REPUDIATION OF HIS NON-COMPETE OBLIGATIONS AND ACCEPTANCE OF EMPLOYMENT WITH PLASTOMER TECHNOLOGIES

On or about March 13, 2008, Dr. Rosenmayer advised Gore that he was considering accepting an offer of employment with Plastomer as its Vice President and General Manager.  Ver. Compl. ¶ 2.  Because Plastomer is a direct competitor of Gore, Gore advised Dr. Rosenmayer that his proposed new employment was unacceptable insofar as it violated his contractual obligations to Gore.  Id.  Gore offered to continue Dr. Rosenmayer's employment or to pay for a headhunter to assist Dr. Rosenmayer to find employment that did not violate his contractual obligations to Gore.  Id.  However, on March 25, 2008, Dr. Rosenmayer refused Gore's offer, proffered his resignation of employment with Gore, and advised Gore that he intended to commence employment with Plastomer on Tuesday, April 1, 2008.  Id.

Plastomer is a division of EnPro Industries, Inc.  Ver. Compl. ¶ 26.  EnPro operates 35 manufacturing facilities throughout North America, Asia and Europe, and purports to be a "leading provider of engineered industrial products for the process and general manufacturing industries worldwide."  Id.  Like Gore, Plastomer represents itself to be a "provider of PTFE . . . solutions focusing on creative and innovative products . . . for a wide range of industrial arenas," including "wire and cable, filtration, electronic, medical, oral

care, outdoor fabric and countless others."  Ver. Compl. ¶ 27-30, Exh. C.  Like Gore,

Plastomer currently sells into the semi-conductor and medical industries, among others.  Id.

Indeed, both Gore and Plastomer manufacture PTFE and are engaged in processing PTFE

into tapes and fibers for, among other uses, applications in industrial products, such as wire

and cable, microelectronics, sealants and membranes.  Id.

Dr. Rosenmayer has provided Gore a copy of the job description for the job he has

accepted (the "Job Description").  Ver. Compl. ¶ 27, Exh. C.  According to the Job

Description, Plastomer considered as the ideal candidate for the position someone with PTFE

experience and with experience developing and selling PTFE applications in the semi

conductor, medical and general industrial industries.  Ver. Compl. Exh. C.  The Job

Description also makes clear that the position will be responsible for the overall management

of Plastomer's operations, including: (1) developing business strategies and evaluating

business opportunities; (2) developing marketing strategies and evaluating market

conditions; and (3) providing management leadership to all functional areas of Plastomer,

including research, development and manufacturing personnel. Id.

Both Plastomer and Gore manufacture the same category of products utilizing PTFE

technology, including tape for cable assemblies, and PTFE applications for the

microelectronics industry, including semi-conductors.  Ver. Compl. ¶ 31.  Dr. Rosenmayer

has been involved in all of these applications at Gore since he was hired in 1992, and has

served as Gore's Project Champion for the Microelectronics Process Core Team (which has

targeted, among other industries, the semi-conductor industry) since 2007. Id.  It is

inconceivable that he could perform the job required of him as General Manager of

Plastomer without utilizing his vast knowledge of Gore's trade secret technology, manufacturing processes, business plans and strategies.

## ARGUMENT

## I.    APPLICABLE LAW

A threshold issue in this matter is what law this Court should apply in deciding this motion.  With respect to what test the court should apply for determining whether a temporary injunction is appropriate, this Court should apply Delaware common law regarding the elements necessary to establish whether injunctive relief is appropriate. Deloitte & Touche U.S.A. LLP v. Lamela, Del. Ch., C.A. No. 1542-N, 2005 Del. Ch. LEXIS 164, at *17 (2005) ("The standard for determining whether to grant a preliminary injunction is procedural and therefore governed by Delaware law."); Custom Video v. N.A. Video, Del. Ch., C.A. No. 9261, 1987 Del Ch. LEXIS 488, at *2-3 (1987) (applying Delaware law standards for preliminary injunction where a different state's substantive law governed).

Although the Court should apply the Delaware common law test in determining whether a temporary restraining order is appropriate, the issue of what law the Court should apply in determining whether the plaintiff can satisfy that test is another issue.  See Custom Video, 1987 Del Ch. LEXIS 488, at *2-3.  In determining what state substantive law to apply, the court must follow Delaware's choice of law rules.  See Klaxon Co. v. Stentor Electric Manufacturing Co. Inc., 313 U.S. 487 (1941); Perez v. Short Line, Inc., Del. Super., 231 A.2d 642, 643 (1967).  Delaware law provides that a court need not engage in a choice of law analysis where no conflict has been established between the potentially applicable laws.  Merck & Co. v. SmithKline Beecham Pharms. Co., Del. Ch., C.A. No. 15443-NC,

1999 Del. Ch. LEXIS 242, at *49-50 (1999) ("Choice of law is an issue that need not be resolved. No party has pointed to any substantive difference in the laws of the various states having some contact with the matters at issue."); <u>Shook & Fletcher v. Safety National Casualty Corp.</u>, Del. Supr., 909 A.2d 125, 128 (2006) (absent conflict of law, no need for choice of law analysis and court may apply law of forum state); <u>Sun-Times Media Group, Inc. v. Royal & SunAlliance Ins.</u>, Del. Super., C.A. No. 06C-11-108 RRC, 2007 Del. Super. LEXIS 402, at *29 (2007) ("absent any conflict, the Court may apply general principles that are consistent with the law of either jurisdiction…choice of law is not an issue …at this time because there is no demonstrated conflict").  Here, the only potentially applicable laws are those of the State of Delaware and the State of Maryland.  Although Dr. Rosenmayer may argue that the law of the State of Maryland is more applicable given that he has been assigned to work in Maryland, the common law in both states in this area is substantially similar.  <u>Trinity Transport, Inc. v. Ryan</u>, Del. Ch., C.A. No. 922, 1986 Del. Ch. LEXIS 468, at *4-5 (1986).  Thus, absent an actual conflict of laws in this case, the Court should apply the laws of its own jurisdiction in this case.[2]

---

[2]      If there were an actual conflict between the laws of Delaware and Maryland, the choice of law question would be analyzed under the "most significant relationship" test. <u>Reese v. Wheeler</u>, Del. Super., C.A. No. 99C-04-002-RFS, 2003 Del. Super. LEXIS 388, at *9 (2003).  Under the test, a Court considers the following contacts in applying conflicts of law principles: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicil, residence, place of incorporation, and place of business of the parties.  <u>Id.</u>  Courts consider those factors in applying the following choice of law considerations:  (a) the needs of the interstate system; (b) the relevant policies of the forum; (c) the relevant policies of other interested states; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in determination and application of law to be applied.  <u>Travelers Indemnity Co. v. Lake</u>, Del. Supr., 594 A.2d 38, 47 (1991).  Under that test, Delaware's laws should still be applied to this case.  Delaware has a significant connection with the facts of this matter,

## II.    GORE IS ENTITLED TO A TEMPORARY RESTRAINING ORDER

### A.    Standard for Relief

In deciding whether to grant a motion for a temporary restraining order, the Court must consider the following factors:  (1) whether the plaintiff has demonstrated a colorable claim; (2) the possibility of irreparable harm to the plaintiff if the injunction is not granted; and (3) whether the balance of hardships favors the granting of an injunction after weighing the equities involved.  Robert M. Bass Group, Inc. v. Evans, Del. Ch., C.A. No. 9953, Jacobs, V.C. (June 10, 1988), transcript at 4-6; Cottle v. Carr, Del. Ch., C.A. No. 9612, 1988 Del. Ch. LEXIS 21, at*6-8, (Feb. 9, 1988).  Consideration of these factors demonstrates that Gore is entitled to the relief it seeks.

### B.    Gore Has Established a Colorable Claim

In reviewing whether a plaintiff has presented a "colorable claim," a court must accept the facts alleged as true.  UIS, Inc. v. Walbro Corp., Del. Ch., C.A. No. 9323, slip. op. at 3 (Allen, C.) (Oct. 5, 1987).  A colorable claim is one that "is not frivolous on its face." Newell & Assocs. v. Newell, Del. Ch., C.A. No. 16113-NC (Chandler, C.) (Dec. 29, 1997), transcript at 17.  As discussed below, Gore has asserted a colorable claim (and in fact, has a strong likelihood of success on the merits).

---

given that Gore is a Delaware corporation with its principal place of business in Delaware, the consideration for the agreements at issue was paid from Delaware, and Dr. Rosenmayer performed substantial duties, including the filing of several patents to which Dr. Rosenmayer is the named inventor, in Delaware.  Moreover, application of Delaware law would simplify the judicial task of this Court, as the Court presumably is more familiar with Delaware law than any other state law.  Also, application of Delaware law would advance the interests of Delaware, given the state's long history of recognizing the validity of restrictive covenants and significant interest in protecting corporations doing business in Delaware from the breaching of such contracts and the loss of trade secrets and confidential information.

Dr. Rosenmayer's announced employment with Plastomer clearly would constitute a breach of his Service Agreement and TFE Agreements with Gore. Dr. Rosenmayer's agreements with Gore impose enforceable contractual obligations on Dr. Rosenmayer. See, e.g., Bunnell Plastics, Inc. v. Gamble, Del. Ch., C.A. No. 5913, 1980 Del. Ch. LEXIS 629 (1980) (employer's protectable interest includes legitimate interest in protecting business secrets disclosed to employees) (citing Solari Industries, Inc. v. Malady, 55 N.J. 571, 264 A.2d 53 (1970)); Capital Bakers, Inc. v. Leahy, Del. Ch., 178 A. 648 (1935) (signing of covenant not to compete at inception of employment relationship provides sufficient consideration); Hammermill Paper Co. v. Palese, C.A. No. 7128 (1983) (payment to plaintiff in exchange for signed covenant not to compete constitutes adequate consideration).[3]

There can be little dispute that Dr. Rosenmayer has in fact announced his intention to act in violation of his Service Agreement and TFE Agreements. Dr. Rosenmayer has agreed to commence employment with a direct competitor of Gore in only a few days as its Vice President and General Manager. This is in violation of the commitment he made in his Service Agreement to refrain from engaging in any business activity in competition with Gore for a period of one year following his termination of employment. At Plastomer, Dr. Rosenmayer will oversee Plastomer's research, development, business strategies, and marketing strategies for the research, development, manufacture and application of PTFE. This is in violation of the commitment he made in the TFE Agreements to refrain for a

---

[3]    See also Becker v. Bailey, 268 Md. 93, 299 A.2d 835, 838 (1973) (covenants not to compete will be enforced to prevent misuse of employer's trade secrets); Gill v. Computer Equip. Corp., 266 Md. 170, 292 A.2d 54, 59 (1972) (signing of covenant not to compete at inception of employment provides sufficient consideration); Ruhl v. F.A. Bartlett Tree Expert Co., 245 Md. 118, 225 A.2d 288, 290 (1967) (increase in pay constitutes sufficient consideration).

period of two years following the termination of his employment with Gore from associating

with any entity that is involved in the research, development or manufacture of PTFE, or

involved in dealing with products made from PTFE.

In addition, it is inevitable that Dr. Rosenmayer will utilize Gore trade secrets in his

new capacity at Plastomer, in further violation of his contractual obligations to Gore.  Gore's

processes for the manufacture of PTFE, its recipes, its research and development for the

application of PTFE for various products, and its business plans and strategies relating to the

same are not generally known to others, they would be valuable to others, and they are

subject to measures to maintain their secrecy.  They qualify as trade secrets.  6 Del. C. §

2001(4); W.L. Gore & Associates, Inc. v. Wu, Del. Ch., C.A. No. 263-N, 2006 Del. Ch.

LEXIS 176, at *49-50 (2006);  Merck & Co., 1999 Del. Ch. LEXIS 242, at *50-64;

American Totalisator Co. Inc. v. Autotote Ltd., Del. Ch., C.A. No. 7268 (Longobardi, V.C.)

(Aug. 18, 1983) (granting plaintiff's motion for temporary restraining order against

disclosure of trade secrets by former employee and finding that "[t]he record can support a

finding that the contested material is 'secret' or 'substantially secret' and the duty to keep it

secret arose from the very relationship of employer and employee that existed between

Plaintiff and [the former employee]."); Perolin Co. v. West, Del. Ch., C.A. No. 670-K

(Hartnett, V.C.) (Dec. 8, 1980), Let. Op. at 5 (the "general rule . . . is that even in the absence

of a contractual restriction a former employee is precluded from using for his own advantage,

and to the detriment of his former employer, confidential information or trade secrets

acquired by or imparted to him in the course of his employment."); 6 Del. Code Ann. § 2001

(2003).[4]

In his position at Plastomer, it is inconceivable that Dr. Rosenmayer could perform his job in overseeing Plastomer's PTFE manufacturing operations, PTFE processing and product applications, research and development, and business planning without utilizing his vast knowledge of Gore's trade secret technology, manufacturing processes, research and development. business plans and strategies.  Because of the inevitability of such disclosure, injunctive relief also is appropriate.  See E.I. duPont de Nemours & Co. v. American Potash & Chemical Corp., Del.Ch., 200 A.2d 428 (1964) (court granted both a temporary restraining order and a preliminary injunction to prevent a former employee of the plaintiff from commencing his duties with a competitor of the plaintiff which contemplated the development of a chemical process for the competitor similar to the one then solely in the possession of the plaintiff); W.L. Gore, 2006 Del. Ch. LEXIS 176, at *49-50 (granting plaintiff's injunction due to inevitable disclosure because defendant's "knowledge would almost certainly filter into his work and result in disclosure of [plaintiff's] trade secrets"); American Hoechst Corp. v. Nuodex, Inc., Del. Ch., C.A. No. 7905, 1985 Del. Ch. LEXIS 441, at *7 (1985) ("Injunctions have been granted to protect former employers when an employee has taken a job with a competitor, the nature of which will demand that the employee disclose and use trade secrets of the former employer regardless of the employee's intent so to disclose or to make use of the trade secrets.").[5]

---

[4]    The same legal standards apply should the Court conclude that Maryland law applies. See Maryland Credit Fin. Corp. v. Haggerty, 216 Md. 83, 139 A.2d 230 (1958); Space Aero Prods. Co. v. R.E. Darling Co., 238 Md. 93, 208 A.2d 74, reh'g denied, 238 Md. 129, 208 A.2d 699, cert. denied, 382 U.S. 843 (1965); Md. Code § 11-1201, et seq.

[5]    See also Union Carbide Corp. v. UGI Corp., 731 F.2d 1186, 1189-91 (5th Cir. 1984)

### C.    Gore Will Suffer Irreparable Harm if Dr. Rosenmayer is Not Enjoined.

There can be no doubt that Gore and its employees will suffer irreparable harm unless

Rosenmayer is enjoined from employment with Plastomer.  Dr. Rosenmayer himself has

acknowledged the irreparable harm to Gore as a result of his conduct.  In the Service

Agreement, Dr. Rosenmayer acknowledged that, "the use of [Gore's confidential know-how]

and trade secrets by the undersigned other than for the sole benefit of Gore would be

wrongful and *would cause irreparable injury to Gore.*"  Ver. Compl. Exh. A. (emphasis

added).  Similarly, in the TFE Agreements, Dr. Rosenmayer acknowledged that not

disclosing Gore's confidential know-how "is essential" to the continued success of Gore.

Ver. Compl. Exh. B.

Courts regularly find the irreparable harm element satisfied and grant injunctive relief

when it is highly likely or inevitable that a former employee will use or disclose trade secret

information upon commencing employment with the plaintiff's competitor.  Pfizer Inc. v. ICI

Americas Inc., Del. Ch., C.A.  No. 7785, 1984 Del. Ch. LEXIS 566, at *21 (1984) ("The law

---

("failure of [new employer] to exclude [plaintiff's former employee] from a situation where disclosure of confidential information would be difficult to avoid"); FMC Corp. v. Varco Int'l, Inc., 677 F.2d 500, 504-05 (5th Cir. 1982) ("[plaintiff's former employee] has been placed in a comparable position with a direct competitor without restriction against using or disclosing [plaintiff's] trade secrets -- the fear of irreparable injury is realistic"); BIEC Int'l, Inc. v. Global Steel Servs., 791 F.Supp. 489, 551-52 (D. Pa. 1992) (granting plaintiff's injunction because "[i]n light of the vast amounts of technical and business information the defendants have committed to memory by [working for plaintiff], it would be impossible for defendants to compete in this area without drawing on at least some [of plaintiff's] confidential material.")  Air Products and Chemicals, Inc. v. Johnson, 442 A.2d 1114, 1124 (Pa. Super. Ct. 1982) (upholding trial court's ruling granting injunction because "[i]t would be impossible [for defendant] to perform his managerial functions in on-site work without drawing on the knowledge he possesses of [plaintiff's] confidential information"); Emery Industries, Inc. v. Cottier, 202 U.S.P.Q. (BNA) 829, 834 (S.D. Ohio 1978) ("There can be no doubt of the present threat of disclosure in any case in which the transfer of employment is to a head-to-head competitor and the responsibilities in the employments are comparable.").

is settled in this State that where an employee has expressly agreed as one of the terms of his contract of employment that he will not disclose to his employer's detriment any trade secrets or confidential information which he has acquired in the course of his employment, the employer is entitled to an injunction against a threatened use or disclosure of such confidential information by its former employee for his own benefit or for the benefit of a third person."); <u>American Hoechst Corp.</u>, 1985 Del. Ch. LEXIS 441, at *7; <u>American Totalisator Sys. v. Automatic Totalisators Ltd.</u>, Del. Ch., C.A. No. 5562, 1978 Del. Ch. LEXIS 529, at *6-7 (1978) (temporary restraining order and a preliminary injunction granted to prevent a former employee of the plaintiff from commencing his duties with a competitor of the plaintiff where former employee would likely use trade secrets).[6]

Because Gore and its employees will suffer irreparable harm if Dr. Rosenmayer is allowed to reveal its proprietary and confidential research and development to advance Plastomer's business and marketing strategies, research, and development, the Court should issue a temporary restraining order.  <u>See</u> <u>Allen v. Prime Computer, Inc.</u>, 540 A.2d 417, 421 (Del. 1988); <u>Gimbel v. Signal Cos.</u>, 316 A.2d 599, 603 (Del. Ch.), <u>aff'd</u>, 316 A.2d 619 (Del.

---

[6]    <u>See also</u> <u>SI Handling Systems, Inc. v. Heisley</u>, 753 F.2d 1244 (3d Cir. 1985); <u>PepsiCo, Inc. v. Redmond</u>, No. 94C6838, 1995 U.S. Dist. LEXIS 19437, at *84-85 (D. Ill. 1995) ("where trade secrets and confidential information are at issue, as they are here, irreparable harm flows necessarily from the actual or threatened loss of the important protectible business interests at stake.  Therefore, a preliminary injunction is the only remedy adequate to curtail the irreparable harm that would otherwise inevitably follow." (citing <u>Taiwan v. Tainan</u>, 730 F.2d at 63-64; <u>Franke v. Wiltschek</u>, 209 F.2d 493, 498 (2d Cir. 1953); <u>BIEC</u>, 791 F.Supp. at 551-52 (granting plaintiff's injunction in which defendant former employees started a competitor business because irreparable harm would ensue due to defendants' knowledge of plaintiff's trade secrets); <u>Penetone Corp. v. Palchem, Inc.</u>, 627 F. Supp. 997, 1005-07 (N.D. Ohio 1985)); <u>Allis-Chalmers Mfg. Co. v. Continental Aviation Eng. Corp.</u>, 255 F.Supp. 645 (E.D. Mich. 1966); <u>National Starch & Chem. Corp. v. Parker Chem. Corp.</u>, 219 N.J. Super. 158, 530 A.2d 31 (App. Div. 1987); <u>Air Products and Chemicals, Inc. v. Johnson</u>, 442 A.2d 1114 (Pa. 1982).

1974); <u>E.I. DuPont</u>, 200 A.2d at 431.  Once Dr. Rosenmayer commences employment with

Plastomer, Gore's trades secrets and confidential information regarding PTFE will be lost

permanently.

    **D.**    <u>**The Balance of Hardships Favors Gore.**</u>

    The balance of harm in this case weighs in favor of granting the temporary restraining

order.  As explained above, Gore and its employees would face irreparable harm if one of its

global technology leaders is allowed to take a position as general manager of a competing

company.  Gore's trade secret information inevitably would end up in the hands of its

competitor, and Gore will then have lost a competitive advantage it has earned through a

significant investment of time and money in certain research and development.

    In contrast, Dr. Rosenmayer is required to do nothing more than that which he

voluntarily agreed to do when he signed his Service Agreement and TFE Agreements.  An

order against Dr. Rosenmayer enforcing those agreements would not be unfair to Dr.

Rosenmayer, as he plainly was aware of his contractual obligations.  Moreover, in light of

Gore's prior offer to continue Dr. Rosenmayer's employment or pay for a headhunter to find

him other suitable employment, Dr. Rosenmayer would be hard pressed to establish any real

hardship.  Accordingly, weighing the hardships does not present a reason for refraining from

granting a temporary restraining order.  <u>See</u> <u>Technicon Data Sys. Corp. v. Curtis 1000 Inc.</u>,

Del. Ch., C.A. No. 7644 (Berger, V.C.) (Aug. 21, 1984) (injunction granted against

misappropriation of trade secrets where financial impact on defendant or the public interest

do not outweigh the harm to plaintiff); <u>SI Handling Systems, Inc. v. Heisley</u>, 753 F.2d 1244

(3d Cir. 1985) (balance of harms weighs in favor of plaintiff former employer where there is

risk of trade secret disclosure to defendant's new employer); <u>PepsiCo</u>, 1995 U.S. Dist.

LEXIS 19437, at *84-85 (same).

## **<u>CONCLUSION</u>**

For the reasons stated above plaintiff respectfully requests that this Court grant its

motion for a temporary restraining order.


YOUNG CONAWAY STARGATT & TAYLOR, LLP


 /s/ *Martin S. Lessner*
Martin S. Lessner, Esquire (No. 3109)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6698
Facsimile: (302) 576-3309

Attorneys for Plaintiff W.L. Gore & Associates, Inc.

Of Counsel:

Charles Knapp
Julie Giddings
FAEGRE & BENSON
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
(612) 766-1600

Dated: March 28, 2008

fb.us.2730021.06

**EXHIBIT D**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

W.L. Gore. & Associates, Inc.,

                          Plaintiff,            C.A. No. _____

vs.

Charles Thomas Rosenmayer, PhD.,

                          Defendant.

## <u>TEMPORARY RESTRAINING ORDER</u>

Having heard argument from counsel on plaintiff W.L. Gore & Associates, Inc.'s ("Gore") Motion for a Temporary Restraining Order, and having reviewed all papers submitted herein, and it appearing to the Court that plaintiff has satisfied the standards necessary for the granting of a temporary restraining order,

IT IS HEREBY ORDERED, this _____ day of _____, 2008, at __:____ __.m., that

1.      Defendant Charles Thomas Rosenmayer, and any persons acting in concert or participation with them, are hereby enjoined from:

      a.      disclosing or using any confidential, proprietary or trade secret research, information, know-how, and/or material of Gore, including without limitation any such research, information, know-how and materials related to fluoro ionomers and fluoropolymers;

      b.      commencing employment with Plastomer Technologies or any entity related to Plastomer Technologies; and

c.    engaging or participating in any business activity which is in competition with Gore, including without limitation the manufacture, sale, or research and development of polytetrafluoroethylene ("PTFE") or products made from, derived from, or related to PTFE.

2.    Plaintiff shall file with the Register in Chancery a bond on or before April ___, 2008, which bond need only be executed in the amount of  $_____ without surety for the payment of such costs and damages as may be incurred or suffered by defendants if they are found to have been wrongfully restrained.

3.    Unless further extended by the Court, this Order shall expire on April  ___, 2008.

4.    A preliminary injunction hearing on plaintiff's application to continue the effect of this Order shall be held on _____, 2008, commencing at __:__ _.m., in Wilmington, Delaware.

5.    The parties may conduct expedited discovery such that discovery will be completed within ___  business days before the preliminary injunction hearing.

_____
Chancellor

fb.us.2729795.02

# EXHIBIT E – Part 1

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

W.L. Gore. & Associates, Inc.,

|  |  |  |
|---|---|---|
| | Plaintiff, | C.A. No. _____ |

vs.

Charles Thomas Rosenmayer, PhD.,

Defendant.

## COMPENDIUM OF UNREPORTED CASES
## TO PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION
## FOR A TEMPORARY RESTRAINING ORDER

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Martin S. Lessner, Esquire (No. 3109)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6698
Facsimile: (302) 576-3309

Attorneys for Plaintiff W.L. Gore & Associates, Inc.

Of Counsel:

Charles Knapp
Julie Giddings
FAEGRE & BENSON
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
(612) 766-1600

Dated: March 28, 2008

051718.1001

# TABLE OF CONTENTS

American Hoechst Corp. v. Nuodex, Inc.,
    Del. Ch., C.A. No. 7905, 1985 Del. Ch. LEXIS 441 (1985)..........................................A

American Totalisator Sys. v. Automatic Totalisators Ltd.,
    Del. Ch., C.A. No. 5562, 1978 Del. Ch. LEXIS 529 (1978).........................................B

American Totalisator Co. Inc. v. Autotote Ltd.,
    Del. Ch., C.A. No. 7268 (Longobardi, V.C.) (Aug. 18, 1983)......................................C

Bunnell Plastics, Inc. v. Gamble,
    Del. Ch., C.A. No. 5913, 1980 Del. Ch. LEXIS 629 (1980).........................................D

Cottle v. Carr,
    Del. Ch., C.A. No. 9612, 1988 Del. Ch. LEXIS 21 (Feb. 9, 1988)...............................E

Custom Video v. N.A. Video,
    Del. Ch., C.A. No. 9261, 1987 Del Ch. LEXIS 488 (1987)...........................................F

Deloitte & Touche U.S.A. LLP v. Lamela,
    Del. Ch., C.A. No. 1542-N, 2005 Del. Ch. LEXIS 164 (2005).....................................G

Hammermill Paper Co. v. Palese,
    C.A. No. 7128 (1983) .................................................................................................H

Merck & Co. v. SmithKline Beecham Pharms. Co.,
    Del. Ch., C.A. No. 15443-NC, 1999 Del. Ch. LEXIS 242 (1999).................................I

Newell & Assocs. v. Newell,
    Del. Ch., C.A. No. 16113-NC (Chandler, C.) (Dec. 29, 1997) ......................................J

PepsiCo, Inc. v. Redmond,
    No. 94C6838, 1995 U.S. Dist. LEXIS 19437 (D. Ill. 1995) ..........................................K

Perolin Co. v. West,
    Del. Ch., C.A. No. 670-K (Hartnett, V.C.) (Dec. 8, 1980)............................................L

Pfizer Inc. v. ICI Americas Inc.,
    Del. Ch., C.A. No. 7785, 1984 Del. Ch. LEXIS 566 (1984).......................................M

Reese v. Wheeler,
    Del. Super., C.A. No. 99C-04-002-RFS, 2003 Del. Super. LEXIS 388 (2003)............N

<u>Robert M. Bass Group, Inc. v. Evans</u>,
     Del. Ch., C.A. No. 9953, Jacobs, V.C. (June 10, 1988) ................................................ O

<u>Sun-Times Media Group, Inc. v. Royal & SunAlliance Ins.</u>,
     Del. Super., C.A. No. 06C-11-108 RRC, 2007 Del. Super. LEXIS 402 (2007) ............ P

<u>Technicon Data Sys. Corp. v. Curtis 1000 Inc.</u>,
     Del. Ch., C.A. No. 7644 (Berger, V.C.) (Aug. 21, 1984) .............................................. Q

<u>Trinity Transport, Inc. v. Ryan</u>,
     Del. Ch., C.A. No. 922, 1986 Del. Ch. LEXIS 468 (1986) .......................................... R

<u>UIS, Inc. v. Walbro Corp.</u>,
     Del. Ch., C.A. No. 9323 (Allen, C.) (Oct. 5, 1987) ...................................................... S

<u>W.L. Gore & Associates, Inc. v. Wu</u>,
     Del. Ch., C.A. No. 263-N, 2006 Del. Ch. LEXIS 176 (2006) ...................................... T

fb.us.2735393.01

# EXHIBIT A

LEXSEE 1985 DEL. CH. LEXIS 441

American Hoechst Corporation v. Nuodex, Inc., et al

Civil Action #7950 (1985) - New Castle County

Court of Chancery of Delaware

*1985 Del. Ch. LEXIS 441*

March 26, 1985, Submitted
April 23, 1985

PRIOR HISTORY:    [*1] ON PLAINTIFF'S APPLICATION FOR PRELIMINARY INJUNCTION: DENIED.

COUNSEL: Rudolf ˙E. Hutz, Esquire, CONNOLLY, BOVE, LODGE & HUTZ, P.O. Box 2207, Wilmington, DE 19899

Richard D. Allen, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL, P.O. Box 1347, Wilmington, DE 19899

James T. Vaughn, Jr., Esquire, VAUGHN & VAUGHN, P.O. Box 454, Dover, DE 19903

OPINION BY: HARTNETT

OPINION

MAURICE    A.    HARTNETT,    III,    *VICE CHANCELLOR*

UNREPORTED OPINION

Plaintiff American Hoechst Corporation seeks to enjoin a former employee -- Zane Q. Robinson ("Mr. Robinson") -- from continuing to work for Nuodex, Inc. ("Nuodex"). Both plaintiff and Nuodex produce rigid polyvinyl chloride ("PVC") film. Plaintiff claims that Mr. Robinson possesses trade secrets gleaned from his experience as a Calendering Department Supervisor at plaintiff's Delaware City, Delaware, plant. It is claimed that these trade secrets will inevitably be passed on to Nuodex if Mr. Robinson is allowed to remain as Production Manager at Nuodex's Edison, New Jersey, plant. Mr. Robinson and Nuodex deny that any of Mr.

Robinson's knowledge constitutes trade secrets and also claim that even if Mr. Robinson does possess any of plaintiff's trade secrets, [*2] he does not intend, and will not be required, to disclose or to apply any of them in his work for Nuodex.

I find that plaintiff has not borne its burden of showing the reasonable probability that it has any trade secrets relating to matte PVC film which are known by Mr. Robinson or that Mr. Robinson, even if he knows of such trade secrets, is likely to divulge them to Nuodex. It therefore has not met the extraordinary burden necessary to warrant the imposition of a preliminary injunction and its application for injunctive relief is denied.

I

Rigid PVC film has numerous commercial and industrial uses. Among its uses are packaging for merchandise, covers for floppy discs ("diskettes"), and printed credit cards. It can be made in various thicknesses and with either a gloss or matte (dull) surface. Nuodex presently manufactures only matte film although it has the equipment to manufacture gloss film and imports and distributes gloss films manufactured by a Japanese firm. Plaintiff's Delaware City plant produces gloss film and embossed matte-gloss film. Plaintiff's Ottawa, Illinois, plant produces conventional matte film.

Mr. Robinson is a high school graduate who was employed [*3] as an automobile mechanic before 1965 when he began employment with Stauffer/Hoechst Polymer Corporation -- a predecessor of plaintiff. From 1965 to 1982 he was employed in the slitting department of the rigid PVC film production at plaintiff's Delaware City plant. The slitting department is separate from the actual production process and involves the cutting of the

finished product into the desired lengths and widths. Mr. Robinson began as an hourly worker and was subsequently promoted to foreman and then to supervisor of the slitting department.

In 1978 Mr. Robinson was temporarily assigned to plaintiff's plant in Sandusky, Ohio, which produced extruded high impact polystyrene used to make dairy and other containers. Around 1980 he made several trips to plaintiff's Ottawa, Illinois, plant in order to help to improve the slitting, central packaging, and reporting functions of that plant. In 1983 he visited plaintiff's parent plant in Germany to view a new technology and to determine if it could be applied in Delaware City.

Mr. Robinson became a Calender Supervisor at the Delaware City plant in July of 1982. He continued in that job until January 1, 1984, when he was put [*4] on special assignment related to the conversion of certain equipment purchased by plaintiff from Nuodex. This assignment lasted until January 1, 1985, when he returned to his old position as Calendering Supervisor.

During the autumn of 1984 Mr. Robinson developed the impression that plaintiff no longer wished to retain him and he began to seek employment elsewhere. He contacted John F. Dellevigne -- a former executive of plaintiff who had gone to work for Nuodex.Mr. Dellevigne informed him that there were no openings and suggested another company which might be hiring.

In January of 1985 Mr. Dellevigne contacted Mr. Robinson about a vacancy which had recently occurred as a Production Manager. After serveral conversations, during which various factors were discussed -- including salary and Mr. Robinson's obligations under confidentiality agreements he had with plaintiff -- Mr. Robinson was offered and accepted a job with Nuodex. He is to receive a base salary which is more than $8,000 per year greater than his salary with plaintiff. He will be responsible for all aspects of the production process of rigid PVC film -- including calendering -- at the New Jersey plant.

Mr. Robinson [*5] formally gave notice of his resignation from plaintiff and his intention to go to work for Nuodex on February 12, 1985. He claims that he had never made any secret of his intention to find alternate employment. On February 12, 1985, he was relieved of his duties with plaintiff. He was told that he could pick up his final paycheck on February 22, 1985, at which

time his resignation would become effective. Mr. Robinson states that no attempt was made to talk him out of his decision to leave.

The complaint in this action was filed on February 21, 1985. A hearing on an application for a temporary restraining order was heard the next day. That application was denied by my February 26, 1985, Opinion.

II

A preliminary injunction is an extraordinary remedy and plaintiff bears the burden of showing a reasonable probability of ultimate success on the merits. *Gimbel v. Signal Companies, Inc., Del. Ch., 316 A.2d 599 (1974)*, aff'd., *Del. Supr., 316 A.2d 619 (1974)*.

The Uniform Trade Secrets Act as set forth in 6 Del. C., Ch. 20 defines trade secret:

"Trade secret" shall mean information, including a formula, pattern, compilation, program, device, method, technique or [*6] process, that:

a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (63 Del. Laws, c. 218 § 1) *6 Del. C. § 2001(4)*.

"Misappropriation" shall mean:

a. Acquisition of a trade secret was acquired by improper means; or

b. Disclosure or use of a trade secret of another without express or implied consent by a person who:

1. Used improper means to acquire knowledge of the trade secret; or

2. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade was:

A. Derived from or through a person who had utilized improper means to acquire it;

B. Acquired under circumstances giving rise to a

duty to maintain its secrecy or limit its use; or

C. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

3. Before a material change of his position, knew or had reason to know that it was a trade [*7] secret and that knowledge of it has been acquired by accident or mistake." *6 Del. C. § 2002(2).*

Injunctions may issue in response to actual or threatened misappropriation. *6 Del. C. § 2002(a).* The effect of the Uniform Trade Secrets Act is to displace "conflicting tort, restitutionary and other laws of this State pertaining to civil liability for misappropriation of a trade secret." *6 Del. C. § 2007(a).* Its general purpose is to make the law with respect to trade secrets uniform among the states enacting it, and it should be applied and construed so as to effectuate that purpose. *6 Del. C. § 2008.*

Injunctions have been granted to protect former employers when an employee has taken a job with a competitor, the nature of which will demand that the employee disclose and use trade secrets of the former employer regardless of the employee's intent so to disclose or to make use of the trade secrets. See *E.I. duPont de Nemours & Co. v. American Potash & Chemical Corp., Del. Ch., 200 A.2d 428 (1964),* American Totalisator Co. v. Autotote Limited, Del. Ch., C.A. #7268, Longobardi, V.C., (August 18, 1983), *Allis-Chalmers Mfg. Co. v. Continental Aviation [*8] Eng. Corp., E.D. Mich., 255 F.Supp. 645 (1966),* and *Air Products and Chemicals, Inc. v. Johnson, Pa. Super., 442 A.2d 1114 (1982).*

III

Mr. Robinson does not contest the binding effect of a 1973 agreement which he entered into with plaintiff whereby he agreed not to disclose trade secrets or other confidential information. There is therefore no question that the provisions of *6 Del. C. § 2001(2)(b)(2)(B)* would apply if trade secrets were disclosed by Mr. Robinson. Although denying that he possesses any such trade secrets of the plaintiff, he agrees that if he possesses any trade secrets he would be bound not to disclose them. He alleges that his job at Nuodex is so different than his job with plaintiff that no trade secret knowledge which he could have obtained from plaintiff would be of any use at

his new job. He also asserts that he will not, in any event, disclose to Nuodex any trade secret belonging to plaintiff. On the other hand, plaintiff maintains that Mr. Robinson necessarily learned its trade secrets and that the requirements of Mr. Robinson's duties with Nuodex are such that he will be unable -- no matter how well meaning and diligent -- to refrain from [*9] disclosing plaintiff's trade secrets.

IV

There has been considerable discussion by the parties of the relevance of Mr. Dellevigne's defection to Nuodex sometime prior to Mr. Robinson's move there because plaintiff took no action to interfere with Mr. Dellevigne's employment by Nuodex. It is agreed that Mr. Dellevigne had a more comprehensive knowledge of plaintiff's confidential information than does mr. Robinson. Plaintiff seeks to draw a distinction by pointing out that Mr. Dellevigne holds an executive position in which he can more easily refrain from disclosure of plaintiff's trade secrets. Mr. Robinson, on the other hand, will be directly responsible for instructing workers and foremen on techniques used in all phases of the production of rigid PVC film. He will therefore be unable, according to plaintiff, to prevent his disclosure of plaintiff's trade secrets when they could be used to solve a problem which has arisen in the production process.

Plaintiff also points to bonus plans under which Mr. Robinson is now working and his hopes of future promotion. These, they say, will cause Mr. Robinson to inevitably use every means at his disposal to better Nuodex's production [*10] process -- including the disclosure and utilization of plaintiff's trade secrets. The rather voluminous record apparently does not disclose, however, whether Mr. Dellevigne is operating under a similar incentive. It seems likely that he is, however, and he would therefore have the same incentive to disclose plaintiff's trade secrets and a wider knowledge from which to extract them.

The most likely circumstances of Mr. Robinson's work which would cause him to disclose plaintiff's trade secrets is his on-the-scene work situation. He will have the responsibility of dealing with foremen or supervisors with production problems who will come directly to him for advice on the best means to remedy the difficulty. Plaintiff asserts that in this situation Mr. Robinson would be unable to separate his own ability to reason out and solve production problems from his knowledge of

plaintiff's confidential methods of solving similar problems.

V

Plaintiff has asserted that defendants have conceded that Mr. Robinson knows plaintiff's trade secrets. It appears from the record, however, that defendants only acknowledge that plaintiff does possess some trade secrets. The defendants do not concede [*11] that Mr. Robinson has knowledge of any of them. They furthermore assert that because of the differences between the production of gloss surface and matte surface PVC film, and between plaintiff's machinery and process and Nuodex's machinery and process, there will never be an occasion for Mr. Robinson to make use of any trade secret he might possess.

Plaintiff maintains that the only significant differencers between the processes for making gloss and matte film is that the last set of rolls in the calendering process is chrome-plated and smooth when making gloss film, and patterned and rough when making matte film. Mr. Dellevigne on the other hand, in his second affidavit, stresses differences in each of the production steps. The formulations, or recipes, for the products appear to differ. Gloss film is generally lower priced so the raw material cost is more significant in arriving at a formulation. The only difference in blending, apparently, is that since matte film is often pigmented -- while gloss is not -- knowledge of color technology and adjustment is important. Gloss film is made at three to four times the rate of matte. Fluxing capacity and rate of speed must therefore [*12] be greater when producing gloss film. When producing matte film, consistency and uniformity of flux are the chief concerns. The maintenance of the calender rolls is quite different and the rate of speed and temperature at which gloss calendering occurs are much higher than for matte film. The stripping process requires that different stripping rolls be used and a lower temperature for matte film than for gloss. Gloss film may be rapidly cooled -- whereas matte products may not. Finished gloss film may be wound into a roll whereas matte film is generally stacked into sheets while awaiting final trimming.

Mr. Robinson testified that now that he has become involved in Nuodex's operations and viewed the

production process used, he does not see any way that plaintiff's confidential technology could be applied to Nuodex's very different machinery.

VI

On the record before me, I find that plaintiff has not demonstrated a reasonable probability of ultimate success on the merits. From a review of the affidavits, deposition testimony, and the rest of the voluminous record, I am convinced that Mr. Robinson will have no occasion to use plaintiff's technology at Nuodex. Even if Mr. [*13] Robinson possesses some confidential information plaintiff has not shown that it has any trade secrets in the matte PVC film processing area and the possibility of a misappropriation of any trade secrets is too remote to constitute a realistic threat. This is true at least as long as Mr. Robinson is employed only in making matte PVC film with Nuodex's present procedures.

VII

Plaintiff also suggests that Nuodex has equipment for the production of rigid gloss PV film at its Edison, New Jersey, plant -- although it is not presently in operation. It is also claimed that Nuodex is presently negotiating or has contractual relations with Japanese concerns which produce rigid gloss PVC film and that Nuodex is planning to return to the production of such gloss film.

Even if plaintiff is arguably correct, the danger would only exist if Nuodex returns to the production of rigid gloss PVC film and Mr. Robinson is involved in that production. I cannot, however, prohibit Mr. Robinson from working for Nuodex, even if plaintiff is correct, simply because Nuodex may, at some time in the future, return to the production of rigid P/C film.

It is undisputed that Mr. Robinson may not disclose [*14] any of plaintiff's trade secrets, but his present position with Nuodex will, I am convinced, not lead to any such disclosure.

The application for a preliminary injunction is therefore denied.

IT IS SO ORDERED.

# EXHIBIT B

LEXSEE 1978 DEL. CH. LEXIS 529

**American Totalisator Systems, Inc., v. Automatic Totalisators (U.S.A.) Ltd.**

**Civil Action No. 5562**

**COURT OF CHANCERY OF DELAWARE**

*1978 Del. Ch. LEXIS 529*

**April 19, 1978, Submitted**
**April 20, 1978, Decided**

**COUNSEL:** [*1] Howard M. Handelman, Esquire, Jeffrey M. Weiner, Esquire, Bayard, Brill & Handelman, 300 Market Tower, 901 Market Street, Wilmington, Delaware 19801; Richard P. Beck, Esquire, Morris, James, Hitchens & Williams, Twelfth and Market Streets, Wilmington, Delaware; Douglas E. Whitney, Esquire, Morris, Nichols, Arsht & Tunnell, Post Office Box 1347, Wilmington, Delaware 19899

**OPINION BY:** BROWN

**OPINION**

GROVER C. BROWN, VICE-CHANCELLOR

UNREPORTED OPINION

The issue for determination at the present stage of the above proceeding is whether the temporary restraining order previously issued should be continued in the form of a preliminary injunction pending trial of the matter which is now scheduled to commence on May 8, 1978. Having considered the contentions and the authorities of the parties, I am of the opinion that it should be.

The defendant Boddie is a computer systems analyst and is conceded by the parties to be a person of considerable ability in his field as well as being a man of integrity and dedication to his duties. He has been employed by the plaintiffs from 1976 through March 30 of this year and during that period he has utilized his abilities in connection with [*2] the on-track, off-track and on-line daily lottery wagering systems being developed, leased and sold by the plaintiffs to several state governments as well as to various racetracks

throughout the country. However, due to a personal desire to engage in a more creative and innovative area of computer systems development, Boddie responded to an ad in a trade journal and eventually agreed to accept employment with the defendant Automatic Totalisators (U.S.A.) Ltd. (hereafter "ATUSA").

The plaintiffs (referred to hereafter as "AMTOTE") and ATUSA are competitors in the field of parimutuel and computerized wagering systems. AMTOTE contends that it has a present advantage over ATUSA with regard to lottery wagering systems and that ATUSA is attempting to develop a system which would permit it to compete with AMTOTE in this area also. Within the next 90 days it is anticipated that several large contracts dealing with lottery wagering will be awarded, the overall gross income from which will be in the many millions of dollars.

AMTOTE contends that as a result of Boddie's exposure to its systems as well as his work, along with other AMTOTE personnel, in developing its present systems, [*3] he is inescapably endowed with knowledge of facts and confidential procedures which constitute trade secrets of AMTOTE, the disclosure of which to one of AMTOTE's direct competitors, such as ATUSA, will result in disasterous financial consequences to AMTOTE that will be difficult to accurately ascertain. AMTOTE alleges that it has spent several years and some $15 million in developing its wager-tabulating systems to their present efficiency and that as a result it is in a superior position to ATUSA in bidding for new contracts. AMTOTE contends however, that with the knowledge he possesses, Boddie could, within a matter of days or weeks at the most, develop a computer systems design together with program applications which would enable ATUSA, at virtually no expense, to have capabilities

similar to those developed and now possessed by AMTOTE. While it recognizes Boddie's good intentions and professional integrity, AMTOTE contends that it will be impossible for Boddie to develop a competing system for ATUSA without dwelling upon his experience in having done the same thing for AMTOTE and that in the process, as part of properly performing his duties for his new employer, he will of [*4] necessity incorporate into any system for ATUSA many of the proven-workable features of the AMTOTE systems, which features legally belong to AMTOTE, which are confidential and vital to the continued superiority of its business product, and which therefore, constitute trade secrets of AMTOTE.

Moreover, it is not the purpose of AMTOTE to prevent Boddie from working for ATUSA. On the contrary, they seek to have him enjoined only from performing any work or providing any supervision with regard to the development of any type of wager-related computer systems for ATUSA. As to Boddie utilizing his abilities for ATUSA in any other area, AMTOTE has no concern.

Boddie views AMTOTE's position as one which seeks unlawfully to restrain him from using his professional skills in his chosen field of endeavor. He concedes that he has within his knowledge certain matters which do constitute trade secrets of AMTOTE, and he indicates that he will not intentionally disclose any of these matters to ATUSA while attempting to develop its competing systems. He further concedes that a former employer is entitled to protection as to knowledge confidentially gained by an employee, but he contends [*5] as a point of distinction that an employer cannot prevent its employee from using the skill and intelligence acquired through experience received in the course of employment. *Standard Brands, Inc. v. Zumpe, 264 F.Supp.254 (E.D.La.1967); Sarkes Tarzian, Inc. v. Andio Devices, Inc., 166 F.Supp. 250 (S.D.Cal.1958), aff'd 283 F.2d 695 (1960).* He feels that to temporarily enjoin him from working on lottery and wagering systems at ATUSA to any degree whatsoever violates this latter principle.

ATUSA echoes this sentiment, contending that Boddie can be assigned initially to certain tasks which would render it "very, very unlikely" that he would unintentionally utilize for ATUSA's benefit any trade secrets belonging to AMTOTE. ATUSA also urges that AMTOTE has engaged in inequitable conduct by

bringing this suit some 20 days after it learned of Boddie's intentions without first giving ATUSA any notification that it objected to Boddie's change of employment. This, says ATUSA, lulled it into calling off its urgent search for a key employee since it was satisfied that in Boddie it had found its man. ATUSA views this as a ploy by AMTOTE to snarl ATUSA's drive to develop [*6] a competitive lottery system when measured against the impending contract award dates.

On this latter point, however, ATUSA is hardly a naive entry into the industry, and while it did not set out to hire Boddie away from AMTOTE it certainly knew that it was hiring a former key employee of AMTOTE with a view toward utilizing his services for the same tasks he performed for AMTOTE.

Aside from this, two factors persuade me that the restraint should be kept in force. First of all, trade secrets are subject to protection through the injunctive powers of this Court. *Data General Corporation v. Digital Computer Controls, Inc., Del.Ch., 297 A.2d 433 (1971), aff'd, 297 A.2d 437 (1972).* On the record Boddie concedes that he is in possession of knowledge of what he views to be trade secrets of AMTOTE. And in *E.I. duPont de Nemours & Co. v. American Pot. & Ch. Corp., Del.Ch., 200 A.2d 428 (1964)* This Court, in a strikingly similar situation, granted both a temporary restraining order and a preliminary injunction to prevent a former employee of the plaintiff from commencing his duties with a competitor of the plaintiff which contemplated the development of a chemical process [*7] for the competitor similar to the one then solely in the possession of the plaintiff. Although the opinion there dealt with the defendant's motion for summary judgment made subsequent to the preliminary injunction, many of the pertinent facts of this case could be substituted for those of that opinion and it would read the same. Noting that an employee has a fiduciary duty not to disclose the trade secrets of his employer and that it is well recognized that equity will enjoin a threatened breach of a fiduciary duty, the Chancellor said as follows at *200 A.2d 435*:

"As I read this quoted testimony, [the employee] is saying that in situations where he recognizes that a possibly pertinent trade secret of plaintiff is involved, he will confine himself to the use of unrestricted material. I think it is evident even to one unsophisticated in chemical and engineering matters that at least at this stage it is impossible to say that all of plaintiff's trade secrets in

1978 Del. Ch. LEXIS 529, *7

those areas are susceptible of consciously being so isolated by [the employee]."

And as to the argument made here that it does not appear on the record that it is "inevitable" that Boddie will disclose or utilize [*8] AMTOTE's trade secrets in his new position, and that consequently AMTOTE has failed to demonstrate the imminence of irreparable injury that is necessary to sustain a preliminary injunction, the following remarks of the Chancellor found at *200 A.2d 436* seem equally appropriate:

". . . while a conclusion that a certain result will probably follow may not ultimately be vindicated, courts are nonetheless entitled to decide or 'predict' the likely consequences arising from a given set of facts and to grant legal remedies on that basis. I am satisfied that the degree of probability of disclosure, whether amounting to an inevitability or not, is a relevant factor to be considered in determining whether a 'threat' of disclosure exists."

I feel that the *duPont* case, *supra*, controls the present matter and warrants the continuation of the restraint which prevents Boddie from working on the development of of computerized wagering systems for ATUSA pending the outcome of the trial set to commence some two weeks hence.

Secondarily, I take note of the following factors. This suit was originally filed by AMTOTE against ATUSA only. Subsequent to the entry of the temporary restraining [*9] order and the posting of the $1,000 bond thereby required, counsel for AMTOTE and ATUSA agreed to forgo the preliminary injunction stage in favor of an immediate trial on the merits. This resulted in the unusually swift trial date.Thereafter the complaint was amended to add Boddie as a defendant. As I understand

it, his counsel, not being a party to the previous stipulation, chose to exercise Boddie's right to a preliminary injunction hearing. Thus the present application.

I view this state of affairs to have the following significance. As a result of the hearing on this matter, ATUSA has now taken the position that it has a critical, immediate need for Boddie's services with regard to its wagering systems. Yet only several days ago it was content to await the outcome of an expedited trial. Thus, the present element of urgency was interjected only by Boddie's joinder as a party and his decision as a result thereof. Yet I fail to see the basis for Boddie's personal need to commence work on wagering systems immediately rather than to content himself with other related endeavors for a period of a few weeks. His motivation for joining ATUSA was to have an opportunity [*10] to pursue his creative desires, and this opportunity is still available to him, and will be specifically so available to him with regard to an on-line lottery system should ATUSA prevail on the merits. In short, if ATUSA initially felt no immediate need to have the restraint lifted prior to the expedited trial date, I fail to comprehend why Boddie, as its employee, should have thereafter developed one -- unless, of course, there is some basis for AMTOTE's fears as to what might happen if there was no temporary restraint.

A preliminary injunction will be entered embodying the same terms and conditions as contained in the existing temporary restraining order. The temporary restraining order shall remain in effect until the new form of order is presented and signed. Should an increase in the amount of the bond be sought, application should be made for a time to present the basis therefor. Order on notice.

# EXHIBIT C

28

FILED 18 1983

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

AMERICAN TOTALISATOR CO., INC.,          )
                                         )
                    Plaintiff,           )
                                         )
          vs.                            )     Civil Action No. 7268
                                         )
AUTOTOTE LIMITED and ROBERT O.           )
RUPPRECHT,                               )
                                         )
                    Defendants.          )


                Submitted:   August 12, 1983
                Decided:     August 18, 1983


          Upon Plaintiff's Motion for a Temporary Restrain-
ing Order.  Granted.



          Howard M. Handelman of Bayard, Brill & Handelman,
Wilmington, and Herbert Prashker (argued) of Poletti Freidin
Prashker & Gartner, New York, for Plaintiff.


          Henry N. Herndon, Jr. and Edward M. McNally of
Morris, James, Hitchens & Williams, Wilmington, and Benjamin
R. Civiletti (argued) and Benson E. Legg of Venable, Baetjer
& Howard, New York, for Defendants.


LONGOBARDI, V.C.

The Plaintiff, American Totalisator Co., Inc. ("Amtote"), has moved for a temporary restraining order and preliminary injunction against Autotote, Limited ("Autotote") and Robert O. Rupprecht. The petition seeks to restrain the Defendants from using what Amtote describes as its "trade secrets."

Amtote is in the business of supplying equipment and accessory services related to the receipt of wagers, the computation and display of wagering odds and the payment of winning wagers at race tracks and other sporting facilities. It controls 75% of the market representing about 75 race tracks and a number of other betting facilities. Its contracts with these facilities were obtained through a process of bidding and/or negotiating and the usual contract has a term of five years. Most of their contracts were negotiated since 1977 so that a major portion of them will lapse on or before December 31, 1984. At the present time, two sealed bids are pending negotiation and settlement for the facilities at Hollywood Park and Louisiana Downs. These bids were submitted in April, 1983, and on June 20, 1983, respectively.

The Defendant Rupprecht was a vice-president in charge of financing with Amtote from 1975 until June, 1983, when he resigned and was immediately hired by the Defendant Autotote. Actually, this represents Autotote's second hiring of critical administrative officers of Amtote. In October, 1982, Amtote's former president, James H. Pierce, was hired

by Autotote. Rupprecht's responsibilities at Amtote included supervision of all company accounts, tax returns, financing, budget, supervision of the company's "strategic" planning for marketing and the analysis of and participation in the formulation of Amtote contract proposals. The word "strategic" was placed in quotes because it cannotes something more than mere knowledge and experience; it creates visions of a plan or design for long range operations. The use of the term was an intriguing strategic move in and of itself; however, as will be seen, there was more substance to its use than shallow semantical game-playing. By reason of his employment, Rupprecht naturally knew the details of the outstanding bids for Louisiana Downs and Hollywood Park.

Autotote has made it publicly known that it intends to vigorously attempt to capture a larger percentage of the market during the next eighteen months. It has raised additional capital to "allow it to compete more effectively for significant new contracts which become available within the next eighteen months." Draft circular attached to SEC Form T-1. On June 16, 1983, one day after the close of the refinancing, Rupprecht resigned from Amtote with a notice that he was being hired by Autotote.

Amtote is fearful that Rupprecht will pass on its "trade secrets" to Autotote and consequently give Autotote an unfair advantage in the up-coming bidding process. In support of its position, Amtote lists four categories of materials

which it contends fit within the definition of "trade secrets" and which Rupprecht intends to divulge to its chief competitor, his employer, Autotote.

They are as follows:

1.  Strategic Plans for Bidding.

After October, 1982, Amtote decided that with Pierce's defection to Autotote, they needed a long range comprehensive plan to maintain their control of the market. A specific task force was created which worked on these plans for four months.  Their product was not generally known to corporate officials.  As a matter of fact, the chairman of the group reported directly to Rupprecht who, in turn, briefed the president.  Only three or four copies of the written report are in existence.

2.  Detailed Profit and Loss Reports.

Plaintiff contends these are not the usual "bottom line" analyses that are widely distributed and known within the corporation.  It contends that Rupprecht's job gave him an understanding of the underlying factors that produced the numbers on the profit and loss statements.  In this regard, his peculiar knowledge gives him an advantage in knowing what categories of income or expenditures can be manipulated, shaped or shaved to better or worsen the financial picture for the Plaintiff.  In the bidding process, this can, of course, be of critical value to Amtote's competitors.

3.   Projected Costs and Profits on Contract Re-

newals.

Based on an understanding of the most current fi-

nancial trends both within and without the corporation, it

has projections on what is to be expected from existing con-

tracts.

4.   Specific Contract Proposals.

Rupprecht has specific knowledge of the bids put

out to Louisiana Downs and Hollywood Park.   The Plaintiff

contends that his knowledge of those proposals would unfairly

place Autotote at a bidding advantage in each of these cases.

Autotote argues that the material that Plaintiff

seeks to protect does not come within the statutory definition

of "trade secrets."   It contends that the statute was intended

to protect things like equations, formulae, designs or com-

pilations of material that· could be construed as "programs."

Furthermore, Defendants say that the information that is

sought to be protected is not secret, that the Plaintiff

never treated the material as confidential and, in fact,

someone with experience can readily ascertain it from

published materials.   In effect, this last argument encom-

passes the proposition that Plaintiff seeks to prevent

Rupprecht from employing the ordinary benefits of his ·life's

work and experiences.   If Rupprecht has information relative

to corporate finances or to the bidding process, Plaintiff

says, it was current and only valuable as of the immediate

- 4 -

future after June, 1983.  Because of its "transitory" nature, it would be of no particular advantage to Autotote in the bidding battles that will ensue within the next eighteen months.

The fundamental issue in this case is whether the material Plaintiff seeks to protect is in fact "trade secrets." The statute, 6 Del.C. §2001(4) defines a "trade secret" as follows:

> "Trade secret" shall mean information, including a formula, pattern, compilation, program, device, method, technique or process, that:
>
> a.  Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> b.  Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

In the construction of this relatively new statute, its plain language indicates that "information" can be a trade secret.  It may include a plan, design, equation or formula, but "information" as such is not limited to the named items. When a statute defining a subject matter uses the words "includes" or "including", such a statute is ". . . more susceptible to extension of meaning by construction than where the definition declares what a term 'means.'  Thus, it has been said that 'the word "includes" is usually a term of enlargement, and not of limitation . . . .  It, therefore, conveys the conclusion that there are other items includable, though not specifically enumerated . . .'"  2A Sutherland Statutory Construction §47.07 at 82 (4th Ed. 1972).  It is

- 5 -

apparent, however, that the words following the word "information" are words in pari materia and should be helpful in understanding the parameters of what was intended. Certainly, not all information can be protected as a trade secret. Valuable and indispensible information is gained through one's personal and vocational experiences and this core of basic information, some of it highly stylized, technical and specialized, becomes part and parcel of why some men are more valuable in the work force than others. To attempt any restriction of the use of such experience would be highly improper. So, "information" means more than that.

In a general sense, a great deal of the material that is sought to be termed trade secrets in this case can be described as information on prices and costs. The bidding process involves the utilization of one's intimate knowledge of costs incident to the field of endeavor and the necessary price to guarantee a favorable profit margin. Naturally, within a particular industry, the basic information is generally known. Cf. Great Lakes Carbon Corp. v. Koch Industries, 497 F.Supp. 462 (S.D.N.Y. 1980); E. V. Prentice Dryer Co. v. Northwest Dryer & M. Co., Ore.Supr., 424 P.2d 227 (1967).

This is not just the case of understanding the bid prices and the very narrow profit margins which Defendants contend is generally known and followed in this

industry. The Plaintiff's pleadings at oral argument ex-
plaining the affidavits demonstrate that Rupprecht was a
highly technical financial expert for the Plaintiff. His
job placed him in a position where he had the opportunity
to understand the underlying factors that made the bids
viable for the Plaintiff. This fundamental information de-
rived from a conglomeration of his personal knowledge but
it was also studded with the very particular knowledge of
this company's cost factors and how they could be manipulated
for varying the margin of profit. It has become a valuable
and advantageous bidding tool, and he got it all from the
Plaintiff.

As an illustration, Amtote devoted four months
after Pierce's departure to develop a long range plan for
the next bidding session that, if successful, will shape the
company's financial future into the 1990s. What the plan
includes is not known to the Court. But, based on repre-
sentations of counsel and supported by the pleadings, it is
apparent that the Plaintiff understood the imminent threat
of competition and decided it had to conduct its business
differently. This compilation of information, this plan
necessarily encompasses a philosophy for future operation
and, as such, possesses some proprietary value to Amtote
and a devastating advantage if it becomes available to its
competitors. To attempt to separate the various categories
of materials involved in this case would be impossible. To

know the plan would affect the bidding which would determine

profit and loss which would affect everything about this

Plaintiff doing business.  (And the same might be said if

one were to know any part of these materials.)  Rupprecht

was in a position to learn of these "strategic plans" while

he was in a position of trust with Amtote.

The Court, under these circumstances, finds the

cases which are somewhat more expansive in their interpre-

tation of "trade secrets" to be the more desirable.  In

Triangle Sheet Metal Works, Inc. v. Silver, Conn.Supr.,

222 A.2d 220 (1966), the Connecticut Supreme Court was faced

with deciding whether they would protect two classes of materials

as trade secrets.  One of them was the "financial details

of its costs, pricing and bidding."  Id. at 225.  The court

concluded they should be protected.  In Air Products and

Chemicals, Inc. v. Johnson, Pa.Super., 442 A.2d 1114 (1982),

the court was fully cognizant of the very intricate, expen-

sive and time consuming aspects of the bidding process.  The

court said:

> He knows Air Products costs and pricing methods
> and in some cases its capital investment.  All
> of these matters would be of great interest and
> benefit to a competitor.

(Trial Court Opinion pages 8-10.)

> We are convinced that the court below con-
> sidered this information and properly found that
> it was not generally known in the industry.  The
> evidence represents a compilation of facts which
> gave Air Products an advantage vis-a-vis its com-
> petitors who do not know these facts.  Thus, we
> hold that the decision of the trial court

- 8 -

regarding the existence of trade secrets was properly considered in light of the standard established in Restatement of Torts §757 and was correctly denied.

Id. at 1122; See also, Sperry Rand Corporation v. A-T-O, Inc., 447 F.2d 1387 (4th Cir. 1971); Black, Sivalls & Bryson, Inc. v. Keystone Steel Fab., 584 F.2d 946 (10th Cir. 1978).[1]

The second reason for taking an expansive view of the words "trade secret" is that the plain language of the statute prescribes such an interpretation. The Court thinks it is obvious that the information in question "derives independent economic value, . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." 6 Del.C. §2001(4)a. The Strategic Planning Report, the culmination of a four month secret study and the publication of its results would be of immense value to a competitor. It goes without saying that the details of the outstanding bids to Louisiana Downs and Hollywood Park would also give Autotote an unfair advantage during the anticipated negotiations.

Under 6 Del.C. §2002, Chancery is given jurisdiction to grant injunctive relief for threatened misappropriation of trade secrets.

---

[1] Most of these cases are not based on a statute such as the one under consideration; however, the language of the cases and the subject matter of the litigation make these cases pertinent to the present discussion.

- 9 -

"Misappropriation" is defined by 6 <u>Del.C.</u> §2001 as
follows:

> b.  Disclosure or use of a trade secret of an-
> other without express or implied consent by a
> person who:

* * *

> 2.  At the time of disclosure or use, knew
> or had reason to know that his knowledge of
> the trade was:

* * *

> B.  Acquired under circumstances giving
> rise to a duty to maintain its secrecy or limit
> its use; or

> C.  Derived from or through a person who
> owed a duty to the person seeking relief to main-
> tain its secrecy or limit its use.

The record can support a finding that the contested
material is "secret" or "substantially secret" and the duty to
keep it secret arose from the very relationship of employer
and employee that existed between Plaintiff and Rupprecht.
E. I. duPont de Nemours & Co. v. American Pot. & Ch. Corp.,
Del.Ch., 200. A.2d 428 (1964).  The Strategic Plan Report, for
instance, was produced with only two or three copies and one of
these was delivered to Rupprecht.

Defendants' argument that the materials are not
secret and, therefore, should not be protected and based on
the proposition that Pierce, the former president of Amtote,
who is now president of Autotote, knows all about these
materials, is without merit.  Without going into detail,
there can be no doubt that a great deal occurred within Amtote

- 10 -

after Pierce left.  Not the least of these things were the two
studies relative to future company operations.  One was the
Strategic Planning Report and the other was the projection for
profit and loss on existing contracts.  In addition, the two
outstanding bids were offered during this time frame.

Without in any way denigrating the expertise of the
Defendants, the Court is not convinced that these materials,
the information at issue, can be readily ascertained from
existing published materials.

Based on the pleadings, Defendants also contend that
Autotote will not use the information that Rupprecht has.  The
problem with this proposal is that without an injunction, it
would not be possible to separate the known information and
the subtle nuances of that knowledge from what could be an
objective attempt by Rupprecht and Autotote to do their jobs
on the up-coming bids without that information.  In short, it
is difficult to see how it would not be used.  Cf. E. I. duPont
de Nemours & Co. v. American Pot. & Ch. Corp., Id.

This Court is convinced that Plaintiff has demon-
strated a probability of success concerning the various sub-
stantive issues on "trade secrets", "secrecy", "misappropriation"
and the other necessary elements under 6 Del.C. Ch. 2000.  It
is equally clear that the Plaintiff will be irreparably injured
if the injunction is not granted.  In this regard, the loss
of any one of the imminent contracts might be calculable but,
in the long view, the unfair advantage gained from this material

and its inevitable results would not be calculable. Under
these circumstances, any remedy at law would be inadequate.
After weighing the equities involved, including the hardship
that Defendants could suffer, the Court is still convinced
the injunction should issue.

A temporary restraining order shall issue conditioned
upon a bond posted by the Plaintiff in the amount of $100,000.

The Plaintiff is requested to submit an order em-
bodying this decision.

IT IS SO ORDERED.

# EXHIBIT D

3 of 4 DOCUMENTS

BUNNELL PLASTICS, INC. v. GAMBLE

No. 5913

Court of Chancery of the State of Delaware, New Castle

*1980 Del. Ch. LEXIS 629*

September 24, 1980

**LexisNexis (TM) HEADNOTES - Core Concepts:**

OPINIONBY: [*1]

MARVEL

OPINION:

MARVEL, Chancellor

Plaintiff Bunnell Plastics, Inc. seeks the granting of permanent injunctive relief against alleged violations by the defendant Gamble of a covenant on his part not to compete with plaintiff after termination of his employment as provided for in an employment contract designed to protect plaintiff's alleged trade secrets, entered into between plaintiff and the defendant Gamble in the autumn of 1975. Also sought by plaintiff is an accounting from the defendants Gamble and Innovations Engineering, Inc., for damages allegedly resulting from the injuries claimed to have been suffered by plaintiff as a result of alleged violations of the aforesaid covenant as well as other alleged acts of unlawful and unfair competitive action on the part of both defendants in the area of providing roll coatings and insulators for the ends of dryer rolls in the pulp and paper industry.

Prior to reporting for work at Bunnell in the fall of 1975, the defendant Gamble executed an employment agreement, as noted above, under the terms of which the latter not only agreed to assign to plaintiff any new processes developed by him in the course of his employment, whether patentable [*2] or not but also specifically agreed not to compete with plaintiff's business in the area of roll coatings for a period of two years following termination of his employment by plaintiff. I am satisfied that Mr. Gamble fully understood and appreciated the import of such agreement, having in the past signed a similar employee agreement with his former employer, Fluorodynamics, Inc.

Bunnell Plastics began its present business operations in 1964 principally in the field of plastic extrusions, becoming eventually involved in the manufacture of both extruded plastic sleeves and coatings, each of which was designed to be applied to the outside of rolls used in the pulp and paper manufacturing business. In entering plaintiff's employ, Mr. Gamble also agreed to divest himself of his interest in his own competitive corporation, namely First State Industrial Sales Corporation. However, Mr. Gamble, at the inception of his employment by Bunnell, managed to minimize the impact of his agreement not to compete with his employer by seeking and obtaining leave to exclude from such agreement his claimed interest in a formula for a non-stick roll coating and the use of a mailing list of customers [*3] of his corporation, the defendant First State Industrial Sales, from the provisions of paragraphs 3 and 4 of the employee agreement. A description of such coating having been furnished to Bunnell, its basic substance proved to be Epo-Tec 360. At the beginning of Mr. Gamble's employment by Bunnell, such employer requested and was furnished a letter from First State, which reported that Mr. Gamble was no longer associated with it. However, it appears that not only did Mr. Gamble not dispose of his First

State stock, as agreed to, but, in fact, ultimately became the sole stockholder of such corporation, remaining in a managerial position at First State during the period of his employment by Bunnell. Mr. Gamble having had previous experience in the pulp and paper industry, on becoming an employee of Bunnell, became involved in manufacturing plastic sleeves and coatings to be applied to the outside of rolls in Bunnell's pulp and paper business.

Mr. Gamble's duties with Bunnell included the responsibility for directing the sales of chemical products, aiding in the development of such products as well as researching the development of possible new products. In the meantime, in the fall [*4] of 1976, Mr. Gamble had become the sole employee of Corcon (a former subsidiary of Bunnell which had been merged into Bunnell following Mr. Gamble's employment by Bunnell) and was entrusted with the developing and marketing of coatings through sales representatives who were required to report directly to him. He first experimented with his Epo-Tec 360 formula, but testing having demonstrated that it was unsuitable as a coating, it was ultimately rejected. Following discussions with Midland-Dexter in which Bunnell's staff reported on the release factor and other properties required for the coating required, a coating which proved acceptable was developed, which was then marketed by Corcon as its C78-2 black coating. The first apparently successful application of this material by Corcon was accomplished at Bowater in December, 1977, but the application proved to be unsatisfactory. Thereafter, the services of a company by the name of Broyles Refinishers were enlisted, and, in the summer of 1978, Bunnell and Corcon were able to apply such coating in a successful manner.

During this period, Mr. Gamble had arranged for the hiring of a new president for First State, obtained new financial [*5] books for such corporation and had its name changed to Innovations Engineering, Inc. In addition, he approached all of Bunnell's sales representatives, and by early 1979 had either signed exclusive contracts for marketing Innovations' products with such persons or had solicited customers for such corporation. It also appears that during this period Mr. Gamble attended a number of sales' conferences, ostensibly as an agent of Bunnell, but actually acting in the interest of his own corporation.

Plaintiff further claims that while an employee of Bunnell, Mr. Gamble breached the employee agreement in issue by giving out information acquired while he worked for Bunnell to Innovations. It is further claimed that during working hours at Bunnell, Mr. Gamble allegedly misrepresented that the Bunnell coatings were the work product of Innovations Engineering and at the same time caused the expenses incurred in the furtherance of the latter's business to be charged to and collected from Bunnell.

During his period of employment by Bunnell, Mr. Gamble also approached his employer with an idea he had developed concerning dryer end insulators. However, he did not divulge such idea to his [*6] employer, and in September 1978 filed an application on his own behalf for the issuance of a patent for such an insulator. Plaintiff contends that under the terms of the employment agreement that it is entitled to an assignment to it of such patent.

In April 1979, Bunnell first learned of Mr. Gamble's continuing business connection with Innovations Engineering, and, after investigation, Mr. Gamble was informed that Bunnell considered his actions to be in violation of the employee agreement. Mr. Gamble was thereafter discharged as an employee of Bunnell.

Defendants contend that during the period of Mr. Gamble's employment by Bunnell, the latter owned no trade secrets or unique processes entitled to protection and that plaintiff therefore is not entitled to an injunction barring him from using the general knowledge acquired by him while an employee of Bunnell in the management of his own pulp and paper business; that the idea of roll coatings was specifically excluded from the ambit of the employee agreement and the Bunnell accordingly has no proprietary rights in roll coatings or insulators, and that Mr. Gamble and Innovations Engineering have accordingly not engaged in any [*7] unfair competition with plaintiff which would entitle plaintiff to injunctive relief or damages.

The validity and enforceability of a covenant not to compete is governed by the law of the place where the contract containing such a covenant was made, *Award Incentives, Inc. v. Van Rooyen, 263 F.2d 173* (CA3, N.J. 1959). The contract here in issue was not only made in New Jersey, but was also to be performed in that State. Accordingly, New Jersey law clearly applies.

The covenant not to compete appears in the employee agreement as paragraph 8 and reads as follows:

"I recognize that as a result of my employment by BP I will be exposed to BP's trade secrets and practices, including, but not limited to, manufacturing techniques, products, research, and customer lists. In recognition of the significance of the aforementioned, I agree that for a period of two (2) years after the termination of my employment by BP, anywhere in the continental United States, I will not directly or indirectly, own, manage,

operate, control, participate in, or be connected in any manner with the ownership, management, operation or control of any business similar to the type of business then conducted, [*8] or activity contemplated, by BP at the time of the termination of my employment. I understand that any violation of the agreement made herein would result in irreparable harm to BP necessitating, in addition to other remedies, immediate injunctive relief."

As a general rule, a provision in an employment contract prohibiting an employee from competing with his former employer following termination of employment will be given effect to the extent it is reasonable. See *Solari Industries, Inc. v. Malady, 55 N.J. 571, 264 A.2d 53 (1970)* in which it is held that it will generally be found to be reasonable if it... simply protects the legitimate interests of the employer, imposes no undue hardship on the employee and it is not injurious to the public." Legitimate employer interests do not include preventing competition per se, the free enterprise system favoring competition, Blake, Employee Agreements Not to Compete, *73 Harv. L. Rev. 624, 652 (1960)*, and *Whitmyer Bros. Inc. v. Doyle, N.J. Supr., 274 A.2d 577 (1971)*. However, the employer does, as noted in the cited case have a "... patently legitimate interest in protecting his trade secrets as well as his confidential business information...." [*9]

In the case at bar, the dispute between the litigants centers around the art of applying roll coatings in the pulp and paper industry, plaintiff contending that the coating marketed as Corcon C78-2 for application to rolls, as developed during Mr. Gamble's employment by plaintiff, is a trade secret, while the defendant Gamble contends that such coatings in issue are not secret formulas but rather readily available commercial products, which can be purchased off the shelf, thus ignoring the need to experiment with such material. In the case of *Sun Dial Corporation v. Rideout, N.J. Supr., 108 A.2d 442, 445 (1954)* the Court noted that a "... trade secret may consist of a formula, process, device or compilation which one uses in his business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Additional factors to be considered in establishing the existence of a trade secret include the element of secrecy itself, the extent to which the alleged secret is known to others involved in the same general business, the effort and money expended in the development of the alleged secret, and the ease of its duplication by others. See 4 Restatement, [*10] Torts § 757, p. 5-6 (1939). The facts of record here indicate that the development of the coating here in issue involved experimentation over a period of at least one year until acceptable release levels

were obtained, while an additional six months of testing were required until such coating could be successfully applied on a commercial basis. Furthermore, the development of such process involved a substantial investment of money by Bunnell. In addition, secrecy was sought to be preserved by such acts as the removal of labels on all containers in which the coating material was stored and the replacing of such labels with coded Bunnell labels so as to prevent discovery of their contents. The fact that the coating in issue was being purchased from a commercial supplier does not preclude its specialized use from being a trade secret, the alleged secret being found in the fact that the compound in issue was apparently for the first time being used as a roll coating, thus giving Bunnell an advantage over competitors in the industry who did not know of such material's full capabilities, *Sun Dial Corporation v. Rideout, supra.* In light of the foregoing, I am of the opinion that the [*11]  use of the Corcon C78-2 composition in the manner here evolved through trial and error became a trade secret within the protection of the covenant here in issue.

In order to warrant the enforcement by injunction of a covenant made by a former employee not to compete with his employer, such covenant must be weighed in light of the surrounding facts and circumstances, protection of trade secrets having long been recognized as a legitimate interest of an employer, *Sun Dial Corp. v. Rideout, supra.* Accordingly, a covenant designed to protect a bona fide trade secret will be sustained if not unreasonably broad not only as to territory and time but also as to the subject matter of the covenant itself. Defendants, while not directly attacking the territorial and time periods of the covenant here in issue, namely the continental United States for a period of two years, do contend, however, that the covenant here in issue is unreasonably broad viewed in light of the nature of the material sought to be protected, *Hudson Foam Latex Products, Inc. v. Aiken, N.J. Super., 198 A.2d 136 (1964).* In the cited case, the Court held to be unreasonable a provision prohibiting a former employee from [*12] divulging, in addition to the basic secret information sought to be protected, "... any other information of whatever kind or nature, obtained by him in the course of employment" or making "... any use of such information except for and on behalf of the employer." In the present case, however, the restriction found in paragraph 1 of the employment agreement is expressly concerned with the disclosure of "... any confidential information or any other material relating to the business or operation of B.P." Unlike the broad restriction found in the case of *Hudson Foam Latex Products, Inc. v. Aiken, supra,* such provision does not

prohibit Mr. Gamble from using the general knowledge acquired by him in the course of his employment by Bunnell. Such covenant also is much more narrow as to the nature of the information it seeks to control, being concerned only with the protection of "confidential information" or "material relating to the business or operation of B.P." as opposed to "any other information of whatever kind or nature."

I conclude that the covenant here sought to be enforced is reasonable under the circumstances and should be given force and effect. Compare *Chas. S. Wood & Co.* [*13] *v. Kane, 42 N.J. Super. 122, 125 A.2d 872 (App. Div. 1956).*

Defendants go on to contend that, in any event, Mr. Gamble has not breached the employment agreement in issue, arguing that the concept of roll coatings does not fall within the terms of paragraph 3 of the employee agreement and furthermore that it was specifically excluded from the agreement by paragraph 7 of such agreement.

Paragraph 3 of the agreement provides:

"I hereby assign to BP all my rights, title, and interest in any invention or idea, patentable or not, made or conceived solely or jointly by me: (a) at any time during my employment with BP in any capacity; (b) which relates, directly or indirectly, to the actual or anticipated research or development by BP or any of its subsidiaries, or is suggested by or results from any facet of my immediate work responsibility, or work performed by me for or on behalf of BP."

Paragraph 7 stipulates that any inventions or ideas not encompassed in paragraph 3 of the agreement have been listed and described at the end of the employee agreement. A footnote on the first page of such agreement states:

"Under this Agreement, it is in your interest to indicate and verify [*14] that any inventions or idea encompassed by Paragraph 7 were made or conceived prior to your employment by BP. Paragraph 7 does not require that you disclose such inventions or ideas in detail, merely identify them by titles and dates of documents, if any, describing them. Should you wish to interest BP at any time in such inventions, and ideas you may submit them, in writing, to BP for consideration."

The only invention or idea to submitted by Mr. Gamble was for a "Non-stick Roll Coating," the date on such document being 2/20/74. However, no document dated 2/20/74 was produced by him. Indeed, a document dated 10/15/75, describing a "Non-stick Roller Coating" was submitted by Mr. Gamble and filed with the

employee agreement.

Covenants not to compete are to be construed in accordance with what the parties intended at the time that a contract was signed viewed in light of the surrounding facts and circumstances, *Tull v. Turek, Del. Supr., 147 A.2d 658, 661 (1958).* In the Court's opinion, the facts of this case establish that the invention or idea which Mr. Gamble intended to protect was the formula contained in the document dated 10/15/75 filed with the employee agreement, a [*15] formula which was subsequently found to be ineffective for the use intended and was in fact later abandoned.

Defendants nonetheless argue that the basic idea of roll coatings should be excluded from the agreement, it being conceded that paper rolls have been coated with teflon and other similar materials for up to twenty years and more. However, in the case at bar a description of the roll coating relied on by Mr. Gamble as his own conception was requested by Bunnell as part of the parties' agreement. In light of these facts the Court must reject the contention urged by the defendant Gamble, namely that all roll coatings were to be excluded from the employee agreement. Accordingly, the results of any work accomplished for the development of a successful roll coating subsequent to the abandonment of Mr. Gamble's original formula belong to Bunnell pursuant to the provisions of paragraph 3 of the employee agreement. Thus, Mr. Gamble's actions, in appropriating as his own, the improvements pertaining to roll coatings, which were developed during his employment by Bunnell, constituted a breach of his employee agreement and Bunnell is accordingly, entitled to an assignment by defendants [*16] of all right, title and interest in the roll coating formula presently being marketed by the defendant corporation.

Defendants further contend that Bunnell has no valid claim to rights under the employee agreement to Mr. Gamble's concept of dryer insulators. In my opinion, however, Mr. Gamble, by voluntarily entering into the employee agreement, parted with all of his rights in any idea which he might thereafter develop whether patentable or not, when he executed the assignment contained in the employee agreement. See *Misani v. Ortho Pharmaceutical Corp., N.J. Super., 198 A.2d 791,* reversed on other grounds, *N.J. Supr., 210 A.2d 609,* cert. denied, *382 U.S. 203, 15 L. Ed. 2d 270,* rehearing denied, *384 U.S. 923, 16 L. Ed. 2d 499 (1966).* Paragraph 3 states, in pertinent part, that:

"I hereby assign to B.P. all my rights, title and interest in any invention or idea, patentable or not, made or conceived solely or jointly by me:

1980 Del. Ch. LEXIS 629, *

"b. Which... is suggested by or results from any facet of my immediate work responsibility, or work performed by me for or on behalf of B.P."

Defendants argue, however, that since Bunnell evidenced no interest in and took no action with regard to insulators [*17] during the period of the Gamble employment, it thus freed Mr. Gamble from his duty to assign his ideas in such area developed during his employment by Bunnell. Such a modification of the contract, however, requires the mutual assent of the parties, *17 Am. Jur. 2d Contracts § 465*, which the Court finds lacking in this case. Therefore, Mr. Gamble's rights and interest in the dryer end insulators must be assigned to Bunnell as provided for in the employee agreement.

Inasmuch as an injunction will issue to enjoin the continuing breach of an employment contract not to engage in a rival business after termination of employment where the services of the employee have been such that he acquired knowledge of the employer's business methods and secrets, disclosure of which will result in irreparable injury to the employer, it follows that such an injunction must issue here. *Ideal Laundry Co. v. Gugliemone, 107 N.J. Eq. 108, 151 A. 617 (1930); Irvington Varnish & Insulator Co. v. Van Norde, supra,* and 43A C.J.S. Injunctions § 95.

In short, plaintiff, which appears to have been extraordinarily naive concerning the disloyalty of the defendant Gamble, has established by the preponderance [*18] of the evidence a showing of irreparable injury as a result of defendants' actions and consequently has established its right to permanent injunctive relief against the continued competition by defendants with plaintiff through use of plaintiff's trade secrets for a period of two years from the date of Mr. Gamble's termination of employment, namely until April 18, 1981. Defendants' contention that the granting of such an injunction will work an undue hardship on them is not persuasive. "The discretion exercised by courts of equity in refusing injunctions on the ground of greater injury to the defendant, is properly restricted to applications pendente lite." *Simmons v. City of Patterson, 60 N.J. Eq. 385, 45 A. 995 (1900)* and *Port of New York Authority v. City of Newark, 17 N.J. Super. 328, 85 A.2d 815 (1952)*. Where it is demonstrated that irreparable injury will continue to be suffered by a plaintiff as a result of a defendant's conduct after final hearing unless enjoined, permanent injunctive relief, regardless of the ensuing injury to the defendant, is nonetheless appropriate, *Port of New York Authority v. City of Newark, supra.*

Turning to the question of damages allegedly sustained [*19] by plaintiff as a result of the breach of the covenant here in issue, I am satisfied that because the damages, if any, suffered by plaintiff as a result of the breach here established are clearly unliquidated that it would be more appropriate for such amount of damages to be determined in the first instance by a jury at the bar of the Superior Court then by a single judge sitting in this Court, and that the issue as to claimed damages to be so decided should be framed for submission to such a jury, *Scotton v. Wright, 13 Del. Ch. 214, 117 A. 131, aff'd 13 Del. Ch. 402, 121 A. 69 (1923)*.

Finally, defendants having submitted no evidence in support of their counterclaim, it will be dismissed.

On notice, a form of order in conformity with the above may be submitted.

# EXHIBIT E

1ST CASE of Focus printed in FULL format.

Michael E. Cottle and Morris M. Rottman, Individually, as Class Representatives, and Derivatively, Plaintiffs, v. Fred Carr, George I. Rosenthal, Albert G. Handschumacher, Norman Barker, Jr., Warren G. Bennis, Ph.D., First Executive Corporation and I.C.H. Corporation, Defendants

Civil Action No. 9612

Court of Chancery of Delaware, New Castle

1988 Del. Ch. LEXIS 21

Submitted: February 8, 1988

February 9, 1988, Decided

COUNSEL: [*1]

Robert D. Goldberg, Esquire, of BIGGS & BATTAGLIA, and John C. Tucker, Esquire, and C. Timothy Smoot, Esquire, of LAW OFFICES OF FREDERIC F. BRACE, JR., Of Counsel, Attorneys for Plaintiffs.

Jesse A. Finkelstein, Esquire, and Gregory V. Varallo, Esquire, of RICHARDS, LAYTON & FINGER, Attorneys for Defendants Fred Carr, George I. Rosenthal, Albert G. Handschumacher, Norman Barker, Jr., Warren G. Bennis, Ph.D., and First Executive Corporation.

Kenneth J. Nachbar, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL, Attorneys for Defendant I.C.H. Corporation.

JUDGES:

ALLEN, Chancellor

OPINIONBY: ALLEN

OPINION:
ALLEN, Chancellor

This action was filed as a class action on behalf of the shareholders of First Executive Corporation, a Delaware corporation. Defendants are the members of First Executive's board of directors and I.C.H. Corporation, an unaffiliated corporation that is presently extending a cash tender offer for up to 15 % of First Executive's outstanding common stock. The complaint seeks an order preliminarily and permanently enjoining I.C.H., which is also a Delaware corporation, from purchasing any shares of First Executive common stock pursuant to its tender offer. If successful, this offer would result [*2] in I.C.H. owning approximately 25 % of First Executive's voting power.

In summary, the theory of the complaint is that the directors of First Executive owe -- and have breached -- a duty to candidly disclose to the Company's shareholders facts that plaintiffs claim show the price offered by I.C.H. to be grossly inadequate. Specifically, it is urged that in filing a Form 14D-9 pursuant to the Securities Exchange Act, the Company has failed to disclose material information relevant to an assessment of the fairness of the offer and, in doing so, has violated state law governing fiduciary duties. Plaintiffs assert that the directors are proceeding in this way because they have negotiated a standstill agreement with I.C.H. that gives them substantial control over shares to be acquired by I.C.H. Thus, the incumbent directors are now assertedly content to see I.C.H.'s stock holding increase to 25 % , since such a block in I.C.H.'s hand will protect the incumbent board from threats of an unsolicited attempt to take control of the Company. As the relief sought is directed primarily against I.C.H., the complaint seeks to throw the net of its liability theories over the offeror by attempting [*3] to allege an on-going conspiracy between I.C.H. and the individual defendants. I.C.H.'s aim in cooperating with the scheme is said to be to acquire a substantial stake in First Executive at a bargain price; its contribution to the plan is said to be, in part at least, the power over its First Executive stock that the standstill agreement grants to First Executive's board. In so proceeding, I.C.H. is said to knowingly be benefitting from and participating in the First Executive directors' asserted breach of duty.

I.C.H.'s tender offer was first extended on January 12, 1988. It may close no earlier than midnight February

9, 1988. The complaint in this matter was filed on January 28, 1988, shortly following the filing by First Executive of its Form 14D-9 on January 26, 1988. An application for a temporary restraining order was filed on February 2. Since there were a few days available before the scheduled closing of the tender offer, briefing of the motion, but no discovery, was had.

Three elements of imminent, irreparable injury are advanced to justify the issuance of a restraining order:

If a temporary restraining order is not issued, plaintiffs' class will suffer injury in at least [*4] three ways:

(1) the whole class will decide whether or not to tender based on insufficient and misleading statements from First Executive's directors and without material facts which First Executive's directors are withholding from their shareholders;

(2) persons who tender will receive a grossly inadequate price; and

(3) for at least five years, the remaining shareholders will lose the opportunity to receive an offer not approved by the directors that includes a control premium. They will be left with devalued stock because of the lock-up of 25 % of the company in I.C.H.'s hands.

Reply Brief In Support Of Plaintiffs' Motion For Temporary Restraining Order, at 4.

Defendants resist the granting of a restraining order on several grounds. First, they claim that plaintiffs have delayed too long in bringing on this application and that the remedy sought is, in the circumstances, barred by their laches. Second, they claim that where, as here, the tender offer involved will not, if completed, involve the assumption of control over the issuer, n1 the remedy of rescission or money damages will give full relief. Thus, it is said there is no need, in order to preserve the possibility of effective [*5] relief, for the Court to intervene before the facts are developed. Third, defendants assert that the complaint does not state a state law cause of action against the directors of First Executive because they have no duty in circumstances such as these n2 to supply shareholders with all or indeed any material information with respect to the adequacy of the offer, so long as any action they may elect to take is taken in good faith. That is, it is said that any obligation to supply information in such circumstances arises only out of Section 14 of the Exchange Act, which confers exclusive jurisdiction over claims it creates on the federal courts. As to I.C.H., it is asserted that no claim is stated because it owes no duty to shareholders to offer a price that is "fair" nor to supply information not in its possession and that the complaint does not allege facts that, if true, would make it liable as a conspirator of the individual defendants. The Court is reminded by I.C.H. that there is no claim that its tender offer documents are not adequate, but rather the claim is that relevant information in the possession of First Executive concerning the underlying value of the Company has not [*6] been disclosed by the issuer.

n1 Thus, it does not involve the threat of the tender offeror thereafter causing the issuer to engage in structural or other transactions that might not feasibly be undone.

n2 That is, where a third party makes a tender offer for less than a controlling block of the Company's stock.

* * *

A temporary restraining order is a distinctive remedy of a court of equity. It is not a preliminary injunction masquerading under another name and the legal test for its issuance, while involving similar elements to the test for a preliminary injunction, involves, in my opinion, a materially different emphasis: n3

A temporary restraining order is a very special remedy of short duration and available ex parte. It is designed primarily to prevent imminent irreparable injury. In assessing whether this remedy is to be granted, a court must, of course, be persuaded that a colorable claim has been made out if the facts alleged are created as true. In contrast to the situation when there is an application for preliminary injunction -- which is heard after the parties have had an opportunity to take discovery and develop a record -- the facts of the court on such [*7] a motion is not importantly upon an assessment of the probability of ultimate success, but is primarily upon the injury to plaintiff that is threatened and the possible injury to defendant if the remedy is improvidently granted. Practical concerns and limitations underlie this distinction between the inquiry on an application for preliminary injunction and for a restraining order. Typically, a court will be able to quickly evaluate the nature and impact of a threatened consequence; it is a much more difficult task to preliminarily evaluate the merits of a legal claim that frequently will turn upon contested facts.

UIS, Inc. v. Walbro Corp., Del. Ch., C.A. No. 9323, Allen, C. (October 6, 1987) at pp. 3-4. n4

n3 The question of the proper legal test for issuance of a restraining order is clouded by the fact that because of the emergency nature of the remedy, few written opinions and fewer still reported opinions dealing with the question seem to exist and those that do exist seem to blur the distinction between restraining orders and preliminary injunctions, rather

than clarifying it. For example, in *Petty v. Penntech Papers, Inc., Del. Ch., 347 A.2d 140 (1975),* the Court reports that it is deciding a temporary restraining order application but adopts the legal test articulated in *Gimbel v. Signal Companies, Inc., Del. Ch., 316 A.2d 599 (1974),* a preliminary injunction case, without acknowledging or discussing the functional and procedural differences.

[*8]

n4 Accord, *G.B.C., Inc. v. United States, 302 F. Supp. 1283 (E.D. Tenn. 1969)* "[On application for temporary restraining order] . . . if the balance of hardships tips decidedly towards the plaintiff, it is sufficient that the plaintiff has raised questions going to the merits which are so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus, for more deliberate investigation."

The essential predicate for issuance of the remedy is a threat of imminent, irreparable injury. See Court of Chancery Rule 65(b), Greenfield v. Caporella, Del. Ch., C.A. No. 8710, Hartnett, V.C. (December 3, 1986). Once that is shown, the remedy ought ordinarily to issue unless the Court is persuaded (1) that the claim asserted on the merits is frivolous or not truly litigable, (2) that the risk of harm in granting the remedy is greater than the risk to plaintiff of denying it, or (3) that plaintiff has not proceeded as promptly as it might, has therefore contributed to the emergency nature of the application and is guilty of laches. n5

n5 Laches is a particularly apt concept in the TRO setting because a TRO will generally be easier for a plaintiff to obtain than a preliminary injunction and, unless the Court is mindful of the implications of that fact, there could be a tendency for plaintiffs to wait until the eve of the event in question to seek judicial relief. While the ultimate outcome of a preliminary injunction would be no different were such a course followed, the ability to achieve even short term delay could lead some plaintiffs to prefer a restraining order application even where time for an expedited preliminary injunction hearing was available. The doctrine of laches offers protection against such risk.

[*9]

No hard and fast rule governing the extent to which a court may feel able to delve into the merits on such an application is, however, possible. In some instances, where for example, the defendant has notice and seeks to raise questions concerning the legal sufficiency of the plaintiff's pleading and there is time to consider that matter responsibly, a court on a restraining order application

can be expected not to be satisfied with determining that plaintiff's claims are colorable, but will address the legal sufficiency of the complaint. The more typical instance, however, will not present a purely legal question or, if presented, the procedural setting will not afford the time to responsibly address it. See *Panamanian Securities, Inc. v. Punta Alegre Sugar Corp., Del. Ch., 146 A.2d 808, 809 (1958).* Thus, for example, where the contesting positions on the merits are rooted in factual disputes, or where the threatened harm is so imminent that the application is heard ex parte (or notice is so short as to amount to the same thing), a court can be expected to focus almost entirely upon the irreparability of the injury and to pass over the merits with a light touch, asking only [*10] whether the claims urged are colorable, litigable, or do raise questions that deserve serious attention. In Hecco Ventures v. Sea-Land Corporation, Del. Ch., C.A. No. 8486, Jacobs, V.C. (May 19, 1986), this Court captured the thought well:

. . . of necessity, the approach often taken (but rarely articulated) [on a motion for temporary restraining order] . . . is whether the moving party has made a showing . . . sufficient to justify holding up the challenged act or transaction for the brief period required to develop an evidentiary record and to make an orderly presentation of a preliminary injunction motion.

Slip op. at 8-9.

Thus, while the complaint in this instance does raise interesting and perhaps novel questions of Delaware law, the time available for decision of this motion does not permit, nor does the motion require, decision on either the legal sufficiency of the complaint or the prospects of ultimate victory by plaintiffs. It is enough for present purposes to say that I regard the complaint as alleging facts that raise non-frivolous, litigable issues.

I pass over, therefore, the interesting questions of law that have been discussed by the parties and turn to an [*11] evaluation of the threat to the class that I.C.H.'s purchasing of 15 % of First Executive's stock may occasion in the circumstances alleged and to the balancing of other interests that is always a part of the granting of equitable remedies. I take this exercise to call for a practical evaluation of the injury in fact threatened. For the reasons that follow, I conclude that plaintiffs have not demonstrated that irreparable injury is likely to be experienced by members of the class should I.C.H. purchase stock pursuant to its offer.

* * *

As to the claim that non-tendering shareholders will be irreparably injured by I.C.H.'s acquiring a 25 % in-

terest in First Executive, that claim essentially urges that non-tendering shareholders "will lose the opportunity to receive an offer not approved by the directors that includes a control premium" and "that they will be left with devalued stock." Assuming that such injuries are legally cognizable, the short answer to this contention is that should plaintiffs prevail at trial, the Court can fashion an order requiring I.C.H. to divest itself of the stock it might acquire in the tender offer. The situation could then be returned to its status [*12] quo ante insofar as non-tendering shareholders are concerned. 1 do not regard it as a substantial injury that, in the interim before trial, the acquisition of an additional 15 % interest by I.C.H. might chill takeover attempts. The case should be prepared for trial quickly and can be tried as soon as the parties are ready. Moreover, the existence of any possible takeover attempt in the interim is only speculation; so far as can be seen now, there is no transaction proposed that might be chilled. Finally, this asserted "chilling" injury is not necessarily related to the claim purportedly asserted in any case. The posited "chilling" effect of a 25 % block would exist whether or not the price offered by I.C.H. was low, fair or extravagant. Thus, the interest of non-tendering shareholders to be free, while the case is prepared for trial, from the indirect impact of the facts alleged cannot be regarded as substantial.

The interests of tendering shareholders is more direct and substantial. If plaintiffs are correct, they will be selling their stock for less than its fair value. Of course, if plaintiffs are correct, everyone who has sold this stock on the market in recent months has [*13] suffered the same fate. But that, plaintiffs would say, is beside the point, as open market sellers have not sold in a setting in which the board had an obligation to inform them, as the board assertedly does in this setting, of all material facts relating to the decision to sell or not.

Assuming that plaintiffs do have a sound legal theory and can prove an entitlement to recovery under it, it nevertheless remains the case that tendering shareholders can be made whole through an award of damages following trial. Plaintiffs assert no good reason why this would not be the case. They suggest that perhaps their proof against I.C.H. might fail and they would be left with only a claim against the directors who might be unable to answer in damages. It is a curious support for a requested TRO that one's proof might ultimately be inadequate; as for the directors' ability to respond in damages, there is no reason to believe that there is such inability here. In short, I currently see no reason why a money award could not be fashioned to fully compensate tendering shareholders if the complaint alleges a claim and it is proven.

Having concluded that interests of both tendering and non-tendering [*14] shareholders can be protected by remedies available after trial, one would be justified in concluding this discussion. Plaintiffs, however, have asserted a third, more abstract argument in support of their claim of irreparable injury citing in support of it this Court's recent opinion in Eisenberg v. Chicago Milwaukee Corp., Del. Ch., C.A. No. 9374, Jacobs, V.C. (December 1, 1987). That claim is, in essence, that there is a right to make an informed decision on the tender itself and that right should (presumably in all instances) be specifically enforced. Eisenberg, however, does .not go so far and I know of no other authority for the proposition that a tender offer should in all events be preliminarily enjoined once it is determined that it is likely defective. Even less am I persuaded that a restraining order should issue based upon irreparable injury of this abstract kind, since such an order may issue without even a conclusion of a likelihood of ultimate success. The adoption of the interpretation of Eisenberg for which plaintiffs contend would risk making the issuance of TRO's against tender offers a matter of the greatest ease. Litigable claims of non-disclosure [*15] could satisfy the merits leg of the TRO test and the abstract right of free choice would constitute irreparable injury.

Eisenberg was not a TRO case. There a thorough evaluation of the merits led to a conclusion (albeit a preliminary one) that the board had, in making a self tender, attempted improperly to coerce shareholders by emphasizing that the Company intended to request delisting of the class of securities tendered for. The Court, in effect, ordered a corrective disclosure. Money damages were thought inadequate because ". . . the principal dispute is not that the offering price is unfair." Eisenberg, slip op. at 27. Here, however, the heart of the matter involves precisely what was not involved in Eisenberg -- a dispute about the adequacy of the tender offer price.

Many cases, of course, establish the proposition that money damages may provide an adequate remedy where a tender offer appears to be defective in terms of disclosure. See e.g., Vernon J. Rockler & Co. v. Minneapolis Shareholders Co., 425 F. Supp. 145 (D. Minn. 1977); Jewelcor Incorporated v. Pearlman, 397 F. Supp. 221 (S.D.N.Y. 1975). This principle is applicable to the case at bar so far [*16] as 1 am now able to determine.

* * *

In summary, therefore, I conclude that the complaint states colorable claims sufficient to support the granting of a temporary restraining order but that the sine qua non of such relief — the imminent threat of irreparable injury has not been shown. I have therefore no occasion

1988 Del. Ch. LEXIS 21, *16

to undertake the next essential analytical step that such motions call for, a balancing of the impacts that granting the relief might have upon others. The motion shall be denied.

IT IS SO ORDERED.

# EXHIBIT F

LEXSEE 1987 DEL. CH. LEXIS 488

**Custom Video v. N. A. Video**

**Civil Action No. 9261**

**Court of Chancery of Delaware, New Castle**

*1987 Del. Ch. LEXIS 488*

**Submitted: September 15, 1987**
**September 25, 1987, Decided**

**DISPOSITION:** [*1] ON PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION: GRANTED IN PART; DENIED IN PART.

**COUNSEL:** William W. Bowser, Esq., Charles Malcom Cochran, IV, Esquire.

Melvyn I. Monzack, Esquire, Walsh & Monzack, P.A.

**JUDGES:** Maurice A. Hartnett, III, Vice Chancellor

**OPINION BY:** HARTNETT

**OPINION**

MAURICE A. HARTNETT, III Vice-Chancellor

Plaintiff-Custom Video Systems, Inc., the former employer of defendant, Bennett R. Betz, claims Mr. Betz has breached an agreement not to compete with it, has misappropriated it's trade secrets, has interfered with it's contractual relationships with its customers, has engaged in a conspiracy with defendant North American Video Corporation to utilize plaintiff's proprietary and confidential information, and to solicit plaintiff's customers and has, with North American, fraudulently misrepresented plaintiff's future business activities.

The 10-page verified complaint and a motion for a temporary restraining order were filed on September 11, 1987 and the court, at the entreaty of plaintiff, set the matter for a hearing on the motion for a temporary restraining order on September 15. The plaintiff was advised on September 11, 1987 to immediately notify the defendants of [*2] the hearing but plaintiff did not do so

until September 14, 1987, the day before the hearing.

Defendants appeared with counsel and defendant Betz has submitted two affidavits in opposition to the allegations of plaintiff.

Plaintiff, in its motion for a temporary restraining order, seeks to enjoin Betz from:

"1. Engaging in the business of selling, designing, installing and/or servicing video surveillance systems within all the portions of the States of Pennsylvania, Maryland, Delaware and metropolitan Washington, D.C., serviced by Betz on behalf of Custom Video;

2. Disclosing or using any confidential or proprietary information received by him in the course of his employment with Custom Video;

3. Contacting any customers of Custom Video;

4. Making representations that Custom Video is withdrawing from the video surveillance and/or access control system business or that Custom Video is about to be sold;"

It also seeks to enjoin defendant North American from:

"1. Employing Betz to sell, design, install and/or service video surveillance systems and/or access control systems anywhere within all those portions of the States of Pennsylvania, Maryland, Delaware and metropolitan Washington, [*3] D.C., serviced by Betz on behalf of Custom Video;

2. Making representations that Custom Video is withdrawing from the video surveillance and/or access

1987 Del. Ch. LEXIS 488, *3

control systems business or that Custom Video is about to be sold;

3. Using Custom Video's confidential or proprietary information received by Betz."

It also seeks to require both defendants to:

". . . return all the property of plaintiff in their possession or in the possession of any agent or employee . . . "

In his two affidavits, Betz generally denies plaintiff's allegations except that he does not deny that he entered into a contract of employment with plaintiff which stated in part:

"*SEVENTH:* The Employee recognizes that, to fully perform his responsibilities fully and effectively, it will be necessary for CUSTOM VIDEO SYSTEMS, INC. to disclose to him information and data of a confidential nature and that, if such information and data were to be used in competition with CUSTOM VIDEO SYSTEMS, INC., CUSTOM VIDEO SYSTEMS, INC. would suffer a severe and unfair competitive loss. For that reason, the Employee agrees that, for a period of one (1) year after the date of termination of employment he will not compete with CUSTOM [*4] VIDEO SYSTEMS, INC., directly or indirectly, and thus will not directly or indirectly engage in the business of designing, installing and servicing video surveillance systems as an owner, employee, or agent, or independent contractor or consultant of any competitive company or enterprise anywhere within all of those portions of the states of Pennsylvania, Maryland, Delaware, and metropolitan Washington, D.C. serviced by Bennet R. Betz on behalf of Custom Video Systems, Inc. and more particularly the cities of Philadelphia, King of Prussia, Pittsburgh, Redding, Allentown, Lancaster, Harrisburg, Wilkes Barre, and Scranton in Pennsylvania; the cities of Baltimore, College Park, and Beltsville in Maryland; the cities of Wilmington and Dover in Delaware; and the metropolitan Washington, D.C. area. In recognition of the fact that a breach of this restrictive covenant will cause irreparable injury to CUSTOM VIDEO SYSTEMS, INC. for which a recovery of monetary damages will be inadequate remedy, the Employee recognizes and agrees that such a violation can and should be enjoined by any court of jurisdiction. In the event that the Employee should violate the provisions of this covenant then the [*5] time period for such restrictive covenant shall be extended for a period of time equal to the period of time during which such breach or breaches should occur; and in the event it is necessary to seek relief against such breach in any court, these restrictive covenants shall be extended for a period of time equal to the pendency of the proceedings before such court including all appeals."

* * * *

FOURTH: The Employee shall not, either during his employment or at any time after cessation of his employment, disclose to others or use any confidential information of CUSTOM VIDEO SYSTEMS, INC. which he acquired at any time as a result of his employment by CUSTOM VIDEO SYSTEMS, INC. The Employee shall not take with him, upon leaving the employment of CUSTOM VIDEO SYSTEMS, INC., any notes, records, charts, customer lists or other documents containing any such confidential information."

I

Plaintiff asserts, and defendants have not denied, that New Jersey law covers the dispute. Apparently New Jersey courts will enforce covenants not to compete where they are reasonable in view of all the circumstances of the particular case. For restrictive covenants to be reasonable they must be: [*6] (1) reasonable as to time, area and scope of activity; (2) necessary to protect a legitimate business interest of the employer; (3) not unduly burdensome upon the employee; and (4) not injurious to the public interest. *Solari Indus., Inc. v. Malady, N.J. Supr., 264 A.2d 75 (1982); Karlin v. Weinberg, N.J. Supr., 390 A.2d 1161 (1978); Raven v. A. Klein & Co., N.J. Super., 478 A.2d 1208 (1984).*

II

A temporary restraining order or a preliminary injunction are extraordinary remedies which are granted only in order to prevent truly irreparable injury. *Wylain, Inc. v. TRE Corp., Del. Ch., 412 A.2d 338 (1979); Gimbel v. Signal Companies, Inc., Del. Ch., 316 A.2d 599 (1974), aff'd., Del. Supr., 316 A.2d 619 (1974); Turek v. Tull, Del. Ch., 139 A.2d 368 (1958); Sandler v. Schenley Indus., Inc., Del. Ch., 79 A.2d 606 (1951).* And they are granted only to maintain the true status quo. *Smith v. Delaware Coach Co., Del. Ch., 70 A.2d 257 (1949); Thomas C. Marshall, Inc. v. Holiday Inn, Inc., Del. Ch., 174 A.2d 27 (1961).*

1987 Del. Ch. LEXIS 488, *6

An applicant has the burden of showing a reasonable probability of ultimate success on the merits although this burden is lesser in the [*7] case of an application for a temporary restraining order. *Sandler v. Schenley Indus., Inc., supra*; *Gropper v. North Cent. Tex. Oil Co., Del. Ch., 114 A.2d 231 (1955)*; *Bayard v. Martin, Del. Supr., 101 A.2d 329 (1953)*.

Even if the reasonable probability of ultimate success and the probability of irreparable harm is shown, the Court must still balance the competing equities between the parties. *Thomas C. Marshall, Inc. v. Holiday Inn, Inc., supra*; *Hollingsworth v. Szczesiak, Del. Ch., 84 A.2d 816 (1951)*. The preliminary injunctive relief must be denied when hardship outweighs benefit. *Eastern Shore Natural Gas Co. v. Stauffer Chemical Co., Del. Supr., 298 A.2d 322 (1972)*.

This Court has broad discretion in granting or refusing to grant interim injunctive relief. *Data General Corp. v. Digital Computer Controls, Inc., Del. Supr., 297 A.2d 437 (1972)* and preliminary relief is to be avoided, if possible, because controversies should only be determined after all the parties have had a reasonable opportunity to present the facts. Experience has shown that the true facts and the correct law are often difficult to ascertain without the advantage of a full hearing [*8] or discovery.

This Court is also especially reluctant to grant preliminary relief if by doing so it will grant all the relief which the applicant may ultimately be entitled to after trial. *Thomas C. Marshall, Inc. v. Holiday Inn, Inc., supra*.

III

In view of the affidavits of defendant Betz, I must find that, on the present record, plaintiff has not borne its burden of establishing the reasonable probability that the restriction not to compete provisions of the contract is reasonable as to area and scope of activity except that I find that it would be reasonable to restrict defendant Betz for one year from contacting any clients of plaintiff with whom Mr. Betz had contact while he was an employee of plaintiff.

I also cannot find from the present record that plaintiff has borne its burden of showing the reasonable probability that the restrictions are not unduly burdensome upon Mr. Betz except that I find that it would be reasonable to restrict Mr. Betz for one year from contacting any of the clients of plaintiff with whom Mr. Betz had contact while he was an employee of plaintiff.

IV

In view of the affidavits of Mr. Betz, I also must find that, on the present record, plaintiff [*9] has not borne its burden of establishing the reasonable probability that Mr. Betz has violated, or is about to violate, any other provisions of the agreement or any duty he may owe to plaintiff.

I will, therefore, enter an Order, if submitted by plaintiff, which will temporarily restrain Mr. Betz from contacting any potential customers of North American Video Corporation with whom he had business contact while he was an employee of plaintiff, upon plaintiff posting a cash bond, or bond with surety, in the sum of $ 25,000.00.

# EXHIBIT G

LEXSEE 2005 DEL. CH. LEXIS 164

**DELOITTE & TOUCHE USA LLP, and DELOITTE TAX LLP, Plaintiffs, v. JOSE S. LAMELA, JR., Defendant.**

**Civil Action No. 1542-N**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2005 Del. Ch. LEXIS 164*

**August 30, 2005, Submitted**
**October 21, 2005, Decided**
**October 21, 2005, Filed**

**NOTICE:**

[*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**SUBSEQUENT HISTORY:** Reargument denied by *Deloitte & Touche United States LLP & Deloitte Tax LLP v. Lamela, 2006 Del. Ch. LEXIS 27 (Del. Ch., Feb. 7, 2006)*

**COUNSEL:** Attorneys for Plaintiffs: Teresa A. Cheek, Esquire, YOUNG, CONAWAY, STARGATT & TAYLOR, LLP, Wilmington, Delaware.

Attorneys for Defendant: Joseph Grey, Esquire, STEVENS & LEE, PC, Wilmington, Delaware.

**JUDGES:** PARSONS, Vice Chancellor.

**OPINION BY:** PARSONS

**OPINION**

**MEMORANDUM OPINION**

Deloitte & Touche USA LLP and Deloitte Tax LLP (collectively "Plaintiffs" or "Deloitte") seek a preliminary injunction against Defendant Jose Lamela, Jr. to prevent him from soliciting any current, former, or prospective clients that he had contact with while employed by Deloitte. On August 9, 2005, I granted with modifications

Plaintiffs' proposed temporary restraining order. Subsequently, on August 12, 2005, I denied Lamela's motion to vacate the temporary restraining order as it relates to contacts with clients. [1] Plaintiffs now seek a preliminary injunction enforcing their rights under the noncompetition agreement they entered into with Lamela. The Court heard argument on this motion on August 30, 2005, and received supplemental submissions from both sides thereafter. For the reasons stated [*2] below, Plaintiffs' motion for a preliminary injunction is granted in part and denied in part.

1

> I granted Lamela's motion to vacate the TRO to the extent it prohibited contacts with employees of Deloitte. The pending motion for a preliminary injunction relates only to solicitations of current, former or prospective clients of Deloitte, not of employees.

**I. FACTS**

Lamela primarily works as a financial consultant advising clients on multistate tax matters. This highly sophisticated practice serves companies which conduct business in 45 states that impose income, sales, use and other taxes. [2] These laws are extremely complex and vary from state to state. Persons in the multistate tax practice provide advice to clients with multi-jurisdictional businesses concerning the complex network of state tax

laws and the impact on their tax liability in the various states of the manner in which they conduct business. [3]

2

Affidavit of Phillip M. Brunson, Deloitte's South East Region Tax Managing Partner, ("Brunson Aff.") P 31.

[*3]

3

Id.

Lamela began his career as a tax consultant at Arthur Andersen. While there, Lamela had contacts with numerous clients who eventually followed him to Deloitte. None of these clients, however, originated with Lamela; [4] instead, they were pre-existing clients of Arthur Anderson.

4

Lamela Dep. at 89-90. Citations in this form are to the deposition of the witness whose surname is indicated.

In May 2002, Deloitte admitted into their partnerships or hired a number of former tax partners, principals, directors and employees of Arthur Andersen, including Lamela. Deloitte hired a total of approximately 200 partners, principals and directors and approximately 2,000 employees of Arthur Andersen, all of whom were subject to post-resignation restrictive covenants relating to Arthur Andersen's personnel and clients. [5]

5

Affidavit of Chet Wood, Chairman and Chief Executive Officer of Deloitte Tax LLP, ("Wood Aff.") Ex. A; Wood Aff. P 4.

[*4] Around that same time Deloitte paid Arthur Andersen tens of millions of dollars to enable Lamela,

among others, to join Deloitte without the restrictions imposed by the restrictive covenants they had with Arthur Andersen. [6] In particular, the Deloitte/Arthur Andersen agreement released the group from their noncompetition agreements and allowed Deloitte to obtain certain licenses for intellectual property. [7] The agreement expressly did not include the purchase of any relationships, goodwill or book of business so that Deloitte could avoid any claim of successor liability. [8] Still, Deloitte's actions demonstrate a plan to attract the business of former Arthur Andersen customers by having them follow the former Arthur Andersen employees that Deloitte hired. Consistent with that plan, before Deloitte entered into the agreement with Arthur Andersen, Deloitte personnel conferred with individual Andersen partners about the nature, identity, and anticipated revenue from their clients. [9] Ultimately, approximately 80% of the clients served by the former Arthur Andersen tax partners followed them to Deloitte. [10]

6

Wood Dep. at 8-11.

[*5]

7

Id.

8

Id. at 15-16, 32.

9

Id. at 34-35; Brunson Dep. at 83.

10

Clavero Dep. at 25-26. Cesar Clavero was Deloitte's South Florida Tax Managing Partner.

Around the time he joined Deloitte, Lamela signed a partnership agreement with them that contained post-resignation restrictive covenants. In that agreement,

Lamela agreed to the following restrictions:

Each Party shall keep secret and confidential and shall not disclose to others, except to Active Parties, professional staff and other employees (in each case who need to know), except to others in the proper conduct of the business of the Partnership and except as required by law, the names of any clients of the Partnership or a Connected Entity, information regarding the services rendered to any such clients or the financial, business or other affairs of such clients, financial or other information relating to the past, present or projected operations of the Partnership or a Connected Entity, information relating to the past, present or future plans of [*6] the Partnership or a Connected Entity, trade secrets and information relating to technical and non-technical systems, methodologies, services, products, client development information, programs, procedures, policies and practices utilized by the Partnership or a Connected Entity; provided that the foregoing shall not restrict the use of information which is in the public domain other than as a result of a breach of this or any similar confidentiality covenant for the benefit of the Partnership or a Connected Entity. Each Party acknowledges and agrees that all manuals, training materials, technical materials, product and service information and other technical materials prepared by or for the Partnership or a Connected Entity and all directories, client files and records used in connection with the management and operation of the Partnership or a Connected Entity, in whatever form, are the proprietary property of the Partnership or a Connected Entity. Upon severing association with the Partnership, no Active Party shall retain or remove from the control of the Partnership, without the express written consent of the US Chief Executive Officer or the US Chief Executive Officer's designee, [*7] any of such proprietary property or other information described in this 9.04 and such Party shall return promptly to the Partnership any such proprietary property or other information so retained or removed. [11]

A Party not eligible to receive payments under Article 6 (including any person, firm, corporation or other entity with which such Party is associated) shall not, prior to or for a period of two years following severance of such Party's association with the Partnership, directly or indirectly solicit, assist others in obtaining as a client or accept an engagement to perform or perform any professional services (as defined in 9.061c), [12] other than on behalf of the Partnership or a Continuing Connected Entity, for any person, firm, corporation or other entity (a) for whom such Party (in any capacity on behalf of the Partnership or a Connected Entity) or any office of the Partnership or a Connected Entity located within seventy-five miles of any office with which such Party has been associated (including such associated office) has performed any professional services or maintained a client relationship on behalf of the Partnership or a Connected Entity during the three years [*8] prior to such severance of association or (b) with whom any such office, to the knowledge of such Party, is negotiating or proposing for the provision of any professional service at the time of such severance of association. [13]

In addition, Lamela acknowledged that as a result of "the uncertainty and difficulty in ascertaining damages resulting to the Partnership from any breach or violation" of the restrictive covenants, Deloitte could specifically enforce the restrictive covenants by injunction or other similar remedies. [14] The agreement further provides that it is governed by the laws of the jurisdiction of the Deloitte office where Lamela worked, i.e., Florida. [15] It also contains a forum selection clause which specifies that Delaware courts will hear any disputes arising out of the agreement. [16]

11

2005 Del. Ch. LEXIS 164, *8

Brunson Aff. Ex. A § 9.04.

12

    - The agreement defines "professional services" as services which "include public accountancy, auditing, tax, management consulting or advisory, systems, expert testimony, litigation support, budget, actuarial and other services performed by the Partnership or a Connected Entity." *Id.* P 9.061(c).

[*9]

13

*Id.* § 9.061(a).

14

*Id.* § 9.07.

15

*Id.* § 14.02.

16

*Id.* § 14.04.

After working at Deloitte for three years Lamela resigned on June 17, 2005. When Lamela left Deloitte he took his three-ring binder, which contained all the business cards he had collected since he began his career, with him to Alvarez and Marsal, Tax Advisory Services, LLC ("A&M"). [17] Specifically, the binder contains contact information for all clients Lamela served at Deloitte and Arthur Andersen, as well as his personal friends. [18] Lamela used this binder to create a Microsoft Outlook computerized client list at Deloitte (the "Deloitte Contact List"). [19] After leaving Deloitte, Lamela used the same binder to create a Microsoft Outlook computerized

client contact list at A&M (the "A&M Contact List"). [20]

17

Lamela Dep. at 54.

18

*Id.* at 46.

19

*Id.* at 52.

20

*Id.* at 54.

[*10]  On July 5, 2005, Lamela sent a mass e-mail to the A&M Contact List. [21] The e-mail informed the recipients that Lamela had joined A&M and provided his new contact information. Subsequently, Lamela solicited a number of the email recipients that Deloitte claims are its clients by means of additional emails, phone calls and personal visits. For example, in late June, Lamela called Jeff Pfaeffli of AutoNation, a client of Deloitte, to solicit AutoNation to become an A&M client. [22] Later, at a July 18, 2005 lunch meeting, Lamela and his colleagues discussed with representatives of AutoNation the tax issues it faced and the services offered by A&M. Lamela asked AutoNation's representatives how he and A&M could start providing tax services to them. [23]

21

*Id.* at 67.

22

*Id.* at 68-69.

23

*Id.* at 69.

2005 Del. Ch. LEXIS 164, *10

Lamela also contacted Bacardi, another Deloitte client. [24] At a dinner with two Bacardi representatives in late June 2005 Lamela explained A&M's business model [*11] and discussed Bacardi's tax situation. [25] He also stated that "A&M would like to service Bacardi in the tax area." [26]

[24]

Id. at 71.

[25]

Id. at 81-82; Diaz Dep. at 49-50, 64-71; Lowe Dep. at 52. Benjamin Diaz, III, is a former tax consultant in Deloitte's South Florida Multistate Tax Practice and a current employee of A&M. Robert N. Lowe, Jr., is the Chief Executive Officer of A&M.

[26]

Diaz Dep. at 49-50, 64-71; Lowe Dep. at 52.

As of August 29, 2005, Lamela had contacted 13 additional companies that Deloitte asserts are its clients or companies to which it has made proposals. [27] Furthermore, Lamela admitted that after joining A&M he performed professional tax services for Ryder Systems, Burger King Corporation and Andrx Corporation, all of which are Deloitte clients. [28] Lamela also testified that he believes he can contact at least 23 other purported Deloitte clients without violating his noncompetition agreement. [29] For example, Lamela contends that [*12] he can serve companies for which Deloitte performs audit services because the Sarbanes-Oxley Act ("Sarbanes-Oxley") bars Deloitte from also providing nonaudit services for those clients. [30] Deloitte disagrees, however, and asserts that it can perform consulting work for all of the clients Lamela served at the time of his resignation. [31] Moreover, at their depositions, neither Lamela, Diaz nor Lowe could identify a single client of

Deloitte's multistate tax practice that Deloitte can no longer serve because of an actual conflict under Sarbanes-Oxley. In addition, according to Deloitte even if Sarbanes-Oxley were to prevent it from doing both certain tax and audit work for a particular client, Deloitte and the client involved would have the option of having Deloitte provide either tax or audit services. Deloitte argues that Lamela has no right to usurp that decision.

[27]

Because Deloitte contends the identities of those 13 companies are part of its confidential information, they are listed in Confidential Appendix A to this Memorandum Opinion.

[28]

Lamela Dep. at 149-50.

[*13]
[29]

See Confidential App. B hereto for a list of such companies.

[30]

15 U.S.C. § 7231. In particular, 15 U.S.C. § 78j-1 bars accounting firms that provide audit services to a company from also providing them nonaudit services including "1) bookkeeping or other services related to the accounting records or financial statements of the audit client; 2) financial information systems design and implementation; 3) appraisal or valuation services, fairness opinions, or contribution-in-kind reports; 4) actuarial services; 5) internal audit outsourcing services; 6) management functions or human resources; 7) broker or dealer, investment adviser, or investment

banking services; 8) legal services and expert services unrelated to the audit; and 9) any other service that the [Public Company Accounting Oversight] Board determines, by regulation, is impermissible."

31

Brunson Dep. at 96.

On August 9, 2005 I entered a temporary restraining order that, using language drawn from the post-resignation restrictive [*14] covenants in the Lamela/Deloitte partnership agreement, enjoined Lamela from:

(a) directly or indirectly, alone or in concert with others, soliciting or inducing any partner, principal, employee or agent of any of the Deloitte U.S. Entities or a Connected Entity to leave the Deloitte U.S. Entities or a Connected Entity; (b) directly or indirectly, alone or in concert with others, soliciting, assisting others in obtaining as a client or accepting an engagement to perform or performing any Professional Services for any person, firm, corporation or other entity for whom Lamela (in any capacity on behalf of the Deloitte U.S. Entities or a Connected Entity) or any of the Miami, Fort Lauderdale and Palm Beach, Florida offices of the Deloitte U.S. Entities or a Connected Entity has performed any Professional Services or maintained a client relationship on behalf of the Deloitte U.S. Entities or a Connected Entity from June 17, 2002°through June 17, 2005 and of which person, firm, corporation or entity Lamela has knowledge or reasonably should have knowledge; (c) directly or indirectly, alone or in concert with others, soliciting, assisting others in obtaining as a client or accepting [*15] an engagement to perform or performing any Professional Services for any person, firm, corporation or other entity with whom any

of the Miami, Fort Lauderdale and West Palm Beach, Florida offices of the Deloitte U.S. Entities or a Connected Entity, to Lamela's knowledge, was negotiating or proposing for the provision of any Professional Service as of June 17, 2005; and (d) alone or in concert with others, using or disclosing to others client information and/or other confidential, proprietary or trade secret-protected information of the Deloitte U.S. Entities or a Connected Entity.

On August 12, 2005, I granted in part and denied in part Lamela's motion to vacate the TRO. Specifically, I vacated the TRO with respect to Lamela's contacting Deloitte employees (subparagraph (a) above), but denied the motion to vacate in all other respects.

At the hearing on Deloitte's motion for a preliminary injunction on August 30, 2005, Lamela argued that no preliminary injunction was necessary and that, in any event, the TRO was too broad. Deloitte tacitly acknowledged the need to identify more specifically the clients and prospective clients it seeks to prohibit Lamela from soliciting or [*16] working for in his new position at A&M. Deloitte pointed to three exhibits as encompassing its client list, for which it claimed trade secret protection. Those exhibits are: (1) a list of the clients Lamela serviced in the capacity of partner in charge while he was at Deloitte; [32] (2) a list of prospective clients that Lamela worked on or made proposals for new or additional business while at Deloitte; [33] and (3) a subset of the list of persons to which Lamela sent "bcc" emails (the "email list") advising them of his new contact information at A&M. [34] As to Lamela's email list, Deloitte conceded that its client list would include, at most, only those that it serviced while it employed Lamela. Because the exact contours of the Deloitte client list remained in flux the Court requested further submissions from both sides on the appropriate scope of any injunction that might be ordered. Thereafter, the parties filed a number of supplemental submissions on that issue. The final, consolidated client list for which Deloitte seeks protection contains 78 entities. [35]

32

Brunson Supp. Aff. Ex. A.

[*17]

33

Brunson Supp. Aff. Ex. B.

34

PX 1 at the August 30, 2005 hearing. Deloitte notes that Lamela did not produce the email list until after his deposition of August 17, 2005, and shortly before the preliminary injunction hearing.

35

See September 13, 2005 letter from Teresa A. Cheek to Court, Ex. A ("Final Client List").

## II. ANALYSIS

### A. Applicable Standard

The standard for determining whether to grant a preliminary injunction is procedural and therefore governed by Delaware law. [36] The party seeking a preliminary injunction has the burden of establishing a right to injunctive relief. [37] When seeking a preliminary injunction, the moving party must satisfy the Court that: (1) it has a reasonable probability of success on the merits at a final hearing, (2) it faces an imminent threat of irreparable injury, and (3) the balance of the equities tips in favor of issuance of the requested relief. [38] A preliminary injunction is an extraordinary remedy; therefore, such relief will not be granted "where the remedy sought is excessive [*18] in relation to, or unnecessary to prevent, the injury threatened." [39] This "extraordinary remedy . . . is granted only sparingly and only upon a persuasive showing that it is urgently necessary, that it will result in comparatively less harm to the adverse party, and that, in the end, it is unlikely to be shown to have been issued improvidently." [40]

36

*Custom Video v. N.A. Video, 1987 Del Ch. LEXIS 488, 1987 WL 17676, at \*2-3 (Del. Ch. Sept. 25, 1987)* (applying Delaware standards for preliminary injunction where New Jersey law governed enforceability of restrictive covenants).

37

*T. Rowe Price Recovery Fund, L.P. v. Rubin, 770 A.2d 536, 551 (Del. Ch. 2000).*

38

*Hollinger Inc. v. Hollinger Int'l, Inc., 858 A.2d 342, 371 (Del. Ch. 2004).*

39

*Aquila, Inc. v. Quanta Servs., Inc., 805 A.2d 196, 202-03 (Del. Ch. 2002)* (internal quotations omitted).

40

*Aquila, Inc., 805 A.2d at 203* (internal quotations omitted).

## [*19] B. Reasonable Probability of Success on the Merits

The parties agree that Florida law governs the enforceability of the restrictive covenants at issue. [41] In 1996, the Florida Legislature enacted *§ 542.335*, which sets forth the governing standards for enforceability of restrictive covenants. Under Florida law, the party seeking to enforce a restrictive covenant must

plead and prove that the contractually

specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction. If a person seeking enforcement of the restrictive covenant establishes prima facie that the restraint is reasonably necessary, the person opposing enforcement has the burden of establishing that the contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the established legitimate business interest or interests. If a contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the legitimate business interest or interests, a court shall modify the restraint and grant only the relief reasonably necessary to protect such interest or interests. [*20] 42

Thus, under § 542.335, courts do not simply enforce restrictive covenants as written. Rather, the proponent must demonstrate that the contractually specified restraint is reasonably necessary to protect a legitimate business interest before a court will enforce it.

41

> USH Ventures v. Global Telesystems Group, Inc., 796 A.2d 7, 23-24 (Del. Super. 2000) (applying law parties agreed governed the dispute).

42

> Fla. Stat. § 542.335(1)(c).

The statute provides that a "legitimate business interest" includes but is not limited to:

> (a) trade secrets, (b) valuable confidential business or professional information that otherwise does not qualify as trade secrets, (c) substantial relationships with specific prospective or existing customers or clients, (d) customer

or client goodwill associated with (i) an ongoing business or professional practice by way of trade name, trademark, service mark, or trade dress, (ii) a specific [*21] geographic location, or (iii) a specific marketing or trade area, or (e) extraordinary or specialized training. 43

In sum, a "legitimate business interest" as envisioned by the statute is "an identifiable business asset that constitutes or represents an investment by the proponent of the restriction such that, if that asset were misappropriated by a competitor (i.e., taken without compensation), its use in competition against its former owner would be unfair competition." 44 Further, the Florida restrictive covenant statute requires courts to "construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement." 45

43

> Fla. Stat. § 542.335(1)(b).

44

> John A. Grant & Thomas T. Steele, *Restrictive Covenants: Florida Returns to the Original "Unfair Competition" Approach for the 21st Century*, 70 Fla. B.J. 53, 54 (Nov. 1996) ("Grant & Steele").

45

> Fla. Stat. § 542.335(1)(h).

**[*22] 1. Is Deloitte likely to be able to prove that the restrictive covenant is enforceable and has been or is likely to be breached?**

Lamela contends that the restrictive covenant Deloitte seeks to enforce against him is not reasonably necessary to support any legitimate business interest. Lamela agrees, however, that Deloitte may have a

legitimate business interest in protecting business relationships with certain clients. [46] In particular, Lamela's supplemental affidavit identifies nine companies in which he admits Deloitte has a protectible, legitimate business interest. Deloitte has not presented any evidence that Lamela is likely to breach the restrictive covenant as to any of these clients. Instead, this dispute centers on the following five categories of clients in which Lamela contends Deloitte has no legitimate business interest: (1) clients Deloitte does not provide state and local tax ("SALT") services to, (2) clients Lamela did not service while at Deloitte, (3) clients subject to Sarbanes-Oxley restrictions, (4) SALT clients that Lamela serviced at Arthur Andersen, and (5) clients who put tax engagements out for competitive bidding. [47] Lamela argues that Deloitte [*23] has failed to plead and prove the necessary prerequisite under Florida law for an enforceable restrictive covenant as to clients in these five categories, and therefore has no right to a preliminary injunction.

46

> Lamela Supp. Aff. at 22.

47

> .

> Lamela's Proposed Form of Order.

To evaluate the merits of Lamela's argument that no injunction of any scope is warranted here, I address as an example whether Deloitte has a legitimate business interest in the SALT clients Lamela served at Arthur Andersen. [48]

48

> In his proposed order Lamela lists 25 companies that he claims fit within this category. Lamela's Proposed Form of Order Ex. D. After negotiations, the parties reduced this number to 21. *See* Final Client List.

Lamela argues that Deloitte does not have a legitimate business interest in his SALT clients [*24]

from Arthur Andersen because "the purpose of the statutory provision is to prevent an employee from taking advantage of a customer relationship which was developed during the term of the employee's employment." [49] Lamela further argues that because his former Arthur Andersen SALT clients were developed at Arthur Andersen, before Deloitte employed him, the noncompetition agreement cannot restrict him from contacting them.

49

> *Anich Indus., Inc. v. Raney, 751 So.2d 767, 771 (Fla. Dist. Ct. App. 2000)* (quoting *Bradley v. Health Coalition, Inc., 687 So.2d 329, 334-35 (Fla. Dist. 1997))*.

Courts have recognized that an employer who seeks to enforce a restrictive covenant may not have a legitimate business interest in clients an employee developed before his employment by that employer began. In *BDO Seidman v. Hirshberg*, the Court of Appeals of New York court held that restrictive covenants cannot extend to "personal clients of defendant who came to the firm **solely** [*25] to avail themselves of his services and **only** as a result of his own independent recruitment efforts, which" plaintiff **"neither subsidized nor otherwise financially supported"** as part of a program of client development." [50] A federal court in Florida, applying Florida law, cited *BDO Seidman* with approval but carefully limited its application to the holding quoted above. [51] Thus, for Lamela to prevail on this argument he would have to show that Deloitte did not spend any money to develop the former Arthur Andersen clients he seeks to contact and that those clients came to Deloitte only because of his efforts. Lamela has not shown either of these premises.

50

> *93 N.Y.2d 382, 712 N.E.2d 1220, 1225-26, 690 N.Y.S.2d 854 (N.Y. 1999)* (emphasis added).

51

> *Merrill Lynch, Pierce, Fenner &*

2005 Del. Ch. LEXIS 164, *25

*Smith v. Dunn, 191 F. Supp.2d 1346, 1353 (M.D. Fla. 2002)* (rejecting reliance on *BDO Seidman* in absence of evidence that defendant "obtained any of his clients solely as a result of his own recruitment efforts, which Plaintiff neither subsidized nor otherwise financially supported as part of a program of client development" and, in addition, because "there was no evidence that the defendant in BDO used the Plaintiffs' confidential information.").

[*26] In particular, Lamela's heavy reliance on *BDO Seidman* for the proposition that a noncompetition agreement cannot extend to pre-existing clients of the employee is misplaced. [52] First, unlike the situation in *BDO Seidman*, Deloitte invested in Lamela's clients from Arthur Andersen. The investment began when Deloitte agreed to pay tens of millions of dollars to Arthur Andersen to release Arthur Andersen's partners, principals, directors and employees from their restrictive covenants and to obtain licenses for certain intellectual property. [53] That agreement enabled Lamela to contact his former clients at Arthur Andersen and avoid losing contact with key individuals at those clients, as he might have if he had been subject to Andersen's 18 month restrictive covenant. In contending that *BDO Seidman* applies here, Lamela emphasizes that Deloitte did not purchase any Arthur Andersen client relationships, goodwill or book of business because it wished to avoid any claim of successor liability. According to Lamela, this fact precludes Deloitte from claiming any interest in his Andersen clients. I disagree. Based on the record developed at this preliminary stage, I find that Deloitte [*27] is likely to succeed in proving that it did subsidize or otherwise financially support the development of the Andersen clients. Deloitte supported the development of the former Arthur Andersen clients by investing money to facilitate the ability of the former Arthur Andersen personnel, including Lamela, to service those customers. Deloitte also financially supported that effort by having its highly trained and specialized personnel work for those customers during the three years Lamela was with Deloitte.

52

53

Wood Aff. P 5.

Second, Lamela has not presented any facts demonstrating that he obtained the former Arthur Andersen clients through his own independent recruitment efforts. Instead, the record indicates that these clients already used Arthur Andersen for tax services when Lamela joined that company.

Hence, Deloitte is likely to succeed in proving that it has a legitimate business interest under [*28] § 542.335 of the Florida Code in protecting as its own clients entities that Lamela worked for while at Arthur Andersen. Based on its efforts to develop those clients between June 2002 and June 2005, Deloitte has demonstrated a reasonable probability of being able to show that it has acquired either trade secrets or "valuable confidential business or professional information that otherwise does not qualify as trade secrets" relating to these clients or has substantial relationships with the former Arthur Andersen clients it seeks to protect in this action. The Florida statute explicitly recognizes each of those factors as reflecting the existence of a legitimate business interest. [54]

54

*Fla. Stat. § 542.335(1)(b).*

The other cases cited by Lamela are readily distinguishable. [55] Accordingly, Deloitte is likely to succeed in showing that it has a legitimate business interest in the clients Lamela served while employed by Arthur Andersen.

55

In *Reddy v. Comty. Health Found. of Man, 171 W. Va. 368, 298 S.E.2d 906, 916 (W. Va. 1982)*, the court stated that the

employee could show that the asset in question belonged to him, "either because he brought it with him when he entered his employer's service or because he paid' for it during the term of his employment." In this case, absent Deloitte's actions Lamela probably could not have serviced the former Arthur Andersen clients for a period of time, and there is no evidence of Lamela's own client development efforts. Similarly, in *Lawley v. A & M Logistix, Inc.,* 1998 WL 34182467, at *4 (E.D. Mich. Feb. 18, 1998) the court held that: "In the case of customers that defendant knew prior to joining plaintiffs company, unless that information is transferred or sold to plaintiff, it is not the proper subject. matter for a restrictive covenant." Here, Arthur Andersen effectively sold information relating to its clients to Deloitte by enabling its former partners to contact them. Thus, the *Lawley* case supports Deloitte's position.

[*29] Moreover, Deloitte is likely to be able to show that Lamela has breached or threatened to breach the restrictive covenant with respect to several Deloitte clients that he previously served at Arthur Andersen. For example, at Lamela's deposition he testified that he serviced Andrx while employed by Deloitte and earlier by Arthur Andersen. After leaving Deloitte Lamela not only sent Andrx a change of address e-mail, but also called them and had a lunch meeting with two of their representatives for the purpose of continuing his "relationship with them in the hope of generating tax work from them." [56] At his deposition Lamela also listed at least five additional former Arthur Andersen clients that he contacted via telephone at least in part to solicit their business on behalf of A&M. [57] Therefore, Deloitte has demonstrated that it is likely to succeed in showing that Lamela breached or threatened to breach his restrictive covenant by contacting Deloitte clients that Lamela formerly served at Arthur Andersen. Thus, Deloitte has made a sufficient showing on the merits to

justify at least some form of preliminary injunctive relief against Lamela, provided they meet the other requirements [*30] for such relief in terms of irreparable harm and a balancing of the hardships involved.

56

Lamela Dep. at 99-100.

57

Confidential App. C.

Lamela opposed Deloitte's motion for a preliminary injunction on several other grounds related to the merits of their claims. Those grounds involve the other categories of clients as to which Lamela argues Deloitte has no legitimate business interest. The parties presented the details of these arguments in the context of their dispute over the scope of any preliminary injunction that might issue. Accordingly, I have addressed them in the same light.

**2. The appropriate scope of any preliminary injunction**

Lamela challenges Deloitte's right to enforce its restrictive covenant as to four additional categories of clients. I will discuss each of these categories in turn.

**a. Clients who held out their multistate tax work for competitive bids** [58]

58

Lamela's Proposed Form of Order Ex. E. Lamela lists ten companies who put their tax engagements out to bid, of those nine are still in dispute.

[*31] Lamela argues that Deloitte does not have a substantial relationship with "specific prospective or existing customers" [59] who put their tax services out for competitive bid. Citing *Shields v. Paving Stone Co.,* Lamela argues that because such clients only care about price, the relationship between Deloitte and the potential customer has no bearing on their decision regarding

which company should provide them with multistate tax services. 60

59

> *Fla. Stat. § 542.335(1)(b).*

60

> *796 So.2d 1267, 1269 (Fla. App. 4th Dist. Oct 17, 2001)* (holding a noncompetition agreement unenforceable "because Paving Stone . did not have exclusive relationships with any of its customers and information on customers was readily obtainable through the yellow pages and trade subscriptions, the nonsolicitation/nondisclosure agreement was not reasonable to protect Paving Stone's customer base. Moreover, Paving Stone conceded that it had no control over contracts awarded through open bidding."). *See also Anich Indus., Inc., 751 So.2d at 770-71.*

[*32] Plaintiffs argue that clients do not come to Deloitte purely based on competitive bidding. Their brief, however, cites no evidence to support this proposition. 61 They assert that multistate tax clients really come to a company because of established relationships developed between the client and Deloitte, which take years to develop. 62 According to Deloitte, companies do not accept the lowest bid; rather, they choose a tax company based upon a mixture of cost and prior experience with that company.

61

> Pls.' Main Br. in Supp. of their Mot. for a Prelim. Inj. ("POB") at 30. Plaintiffs cited no evidence to support their statement that "Deloitte Tax's Multistate Tax Practice clients normally do not request competitive bids for their

multistate tax work but base their work on the established relationships developed between them and Deloitte Tax, relationships that takes years to develop."

62

> POB at 30.

The cases cited by Lamela in support of his claim that the noncompetition agreement [*33] at issue does not apply to clients acquired through a competitive bidding process are persuasive. In those cases the court found that the company seeking to enforce a restrictive covenant did not have a substantial relationship with the client, because due to the nature of the business the extent of any such relationship would have had no bearing on which company received the winning bid. 63 For example, in *Anich* the court held that:

> "Substantial relationships" have not been shown. The customers who testified on Anich's behalf all acknowledged that they made their industrial tool and equipment purchases based primarily on cost and the supplier's ability to provide the goods quickly. There is little evidence of any exclusive or other kind of relationship that could be construed as "substantial" within the meaning of the statute. Alternatively, under Raney's interpretation, it is obvious that in less than three months with Anich she did not have the opportunity to develop a "substantial relationship" with any of her customers. 64

63

> The Florida restrictive covenant statute lists as a legitimate business interest "substantial relationships with specific prospective or existing customers, patients, or clients." *Fla. Stat. 542.335(1)(b)(3)*

[*34]

64

*Anich Indus. Inc., 751 So.2d at 771* (internal quotations omitted).

Similarly, in this case Deloitte has not presented any evidence to show that in competitive bidding situations the nine companies identified by Lamela do not base their decision on price alone. Although Lamela worked for Deloitte for three years, which gave him far greater time to establish a relationship with the customers than the defendant in *Anich,* Deloitte has not presented any persuasive evidence that the tax business for the clients in question does not operate in a competitive bidding manner similar to that in *Anich.* To the contrary, the evidence shows that companies listed on Lamela Ex. E put their work out for competitive bidding and supports a reasonable inference at this preliminary stage of the litigation that they base their decisions solely on price. Therefore, Plaintiffs have not demonstrated a likelihood of success in showing that they have a legitimate business interest in the nine identified clients who put their services out for "open bidding." Thus, those clients will [*35] not be included in the proscriptive provisions of any preliminary injunction order. [65]

65

This is a preliminary ruling only. If Deloitte ultimately proves that it does have a legitimate business interest as to those clients and Lamela breaches the restrictive covenant as to any of them, Deloitte would be entitled to appropriate relief.

**b. Clients Deloitte allegedly could not serve due to the requirements of Sarbanes-Oxley** [66]

Lamela argues that because Deloitte provides audit services to certain clients, Sarbanes-Oxley bars it from

providing multistate tax services to those clients. [67] According to Lamela an injunction covering those clients would be inappropriate because *Florida Statute § 542.335(1)(g)* specifically permits a court to consider as a defense the inability of the person seeking to enforce a restrictive covenant to continue in the line of business that is the subject of the enforcement action. At argument on Deloitte's motion for a preliminary injunction, [*36] Lamela complained that Deloitte had failed to produce requested documents relating to concerns expressed by clients about using Deloitte for SALT work based on the requirements of Sarbanes-Oxley. [68] Deloitte did not seriously dispute this criticism of its production. Therefore, I will assume for purposes of Deloitte's motion that Lamela's allegations relating to concerns about Sarbanes-Oxley are true and that each of the seven companies Lamela identified has decided not to use Deloitte for both audit work and the tax-related work specified in Exhibit C to Lamela's Proposed Order.

66

Lamela's Proposed Form of Order Ex. C. Lamela lists seven companies that fit within this exception, all of which are still in dispute.

67

*See supra* n.30.

68

Tr. at 61-63.

Deloitte asserts that Deloitte Tax LLP ("Deloitte Tax") currently is "able to perform work for all of the clients Lamela served at the time of his resignation from [Deloitte]." [69] The evidence also suggests [*37] that the fact that an audit client of Deloitte may be subject to Sarbanes-Oxley does not necessarily mean that Deloitte Tax cannot provide any tax services to that client. [70] Furthermore, even "when Sarbanes-Oxley does prevent Deloitte from doing both certain tax work and the audit work for a particular client, [Deloitte], together with the applicable client, have the option of providing the tax

work or the audit work." [71]

69

    POB at 10; Brunson Dep. at 96.

70

    Brunson Dep. at 91-95; *see* Lamela Dep. at 119 ("certain enumerated services" are precluded); Brunson Supp. Aff. P 2.

71

    Brunson Supp. Aff. P 4.

There is no dispute that Deloitte's restrictive covenant with Lamela, by its terms, prohibits him from soliciting or performing any professional services on behalf of A&M for any of the seven Deloitte clients alleged to have Sarbanes-Oxley concerns. Therefore, the Court must decide whether Deloitte pled and proved that this contractual restraint is reasonably [*38] necessary to protect the legitimate business interests Deloitte relies upon to justify it.

As previously discussed, Deloitte has proven that it has a legitimate business interest in the identified Deloitte clients who Lamela worked with while at Arthur Andersen. Four of the seven clients alleged to have Sarbanes-Oxley concerns had been clients of Arthur Andersen. Thus, Deloitte has a legitimate business interest as to those clients. Because the other three clients did not come from Arthur Andersen they presumably originated with Deloitte. Hence, Deloitte is likely to be able to prove that it had a sufficiently substantial relationship with those clients to give it a legitimate business interest in maintaining them.

In arguing that Deloitte has no protectible interest in the clients with Sarbanes-Oxley concerns, Lamela essentially contends that an injunction including those seven clients would be overbroad. Under *Florida Statute § 542.335*, however, the burden is on Lamela to show that the restriction is overbroad or otherwise not reasonably necessary to protect Deloitte's legitimate

business interest. In evaluating whether Lamela has met that burden, the [*39] Court is mindful of its finding that Deloitte has a legitimate business interest in the identified clients. In other words, Deloitte has made an investment in developing these clients and its trade secrets or confidential information relating to them such that their misappropriation by Lamela and his use of them in competition with Deloitte would be unfair competition. [72]

72

    Grant & Steele, *70 Fla. B.J.* at 54.

The record shows that most likely Deloitte has at least some nonaudit work within the meaning of "professional services" under the restrictive covenant that Deloitte could perform for a client, even if it also provided audit services for that client. [73] Absent an injunction, however, Lamela and A&M could compete with Deloitte for that work. In addition, as Deloitte has demonstrated, both it and its clients have the continuing flexibility to decide to provide or offer either audit or consulting services in each individual case. [74] Lamela seeks to deprive Deloitte of that flexibility. [*40]

73

    *See* Brunson Dep. at 91-95.

74

    *Id.*

I do not consider *Florida Statute § 542.335(1)(g)*, cited by Lamela, applicable on the facts of this case. That statute only applies when the company "no longer continues in business in the area or line of business" that is subject to the restrictive covenant. [75] It has been applied, for example, where a company went out of business. [76] Here, neither party asserts that Deloitte no longer serves clients in the state and local tax area. Therefore, the limitations imposed by Sarbanes-Oxley do not create a situation such as that contemplated by § 542.335(1)(g).

75

*Fla. Stat. § 542.335(1)(g).*

76

> *See Wolf v. Barrie, 858 So.2d
> 1083, 1086 (Fla. Dist. Ct. App.
> 2003) (holding that §
> 542.335(1)(g) applied when the
> former employer no longer
> operated his business).*

[*41] Based on the preliminary record available, I conclude that Lamela has not carried his burden of proving that including clients with Sarbanes-Oxley concerns within the prohibitions of an injunction would be unreasonable. Thus, Deloitte is reasonably likely to succeed on the merits of the Sarbanes-Oxley issue.

### c. Clients Lamela did not provide tax services to at Deloitte [77]

77

> *See Lamela's Proposed Form of
> Order Exs. A & B. Lamela lists
> "non-Deloitte SALT clients" and
> clients Lamela did not service
> while at Deloitte in separate
> categories. For purposes of this
> opinion, however, the analysis for
> each category is the same; thus, I
> address both categories together. In
> Exhibit A Lamela lists 15
> non-Deloitte SALT clients of
> which six are still in dispute.
> Exhibit B lists 59 clients Lamela
> allegedly did not service while at
> Deloitte, of those 22 are still in
> dispute.*

Lamela asserts that Deloitte does not have a legitimate business interest in clients he did not serve or provide SALT services [*42] to while at Deloitte, because Lamela did not gain any knowledge with respect to those clients with which he could engage in unfair competition. Thus, he argues that as to these clients Deloitte does not have a legitimate business interest that this Court needs to protect, as Lamela is on equal footing,

competitively, with individuals who never worked at Deloitte.

Deloitte may have a substantial relationship with companies within these categories. It has not shown, however, a reasonable likelihood of success in proving that Lamela had a relationship with them or knowledge of trade secrets or confidential information about them that would have enabled him to compete unfairly with Deloitte for their business. For example, even though Deloitte submitted 96 pages of timesheets for work done for its client Republic Services, Inc., none of those timesheets show any work done by Lamela. [78] Hence, Deloitte appears unlikely to succeed in showing that it has a legitimate business interest in clients for whom Lamela did not provide professional services while he was a partner at Deloitte. [79]

78

> *See Affidavit of George Sumrow
> Jr., the Controller for the Southeast
> Region for Deloitte Tax LLP
> ("Sumrow Aff.") Ex. D, part
> 29(a-d).*

[*43]

79

> *See Lamela's Proposed Form of
> Order Ex. A & B. Deloitte has
> demonstrated, however, that
> contrary to Lamela's assertions, he
> did have substantial contacts with
> Wackenhut. See Sumrow Aff. Ex.
> D, part 37 (Deloitte's timesheets
> show that Lamela billed 50.5 hours
> of work to this client).
> Accordingly, a preliminary
> injunction encompassing
> Wackenhut would be appropriate.*

### C. Irreparable Harm

Under Florida law, the violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of the restrictive covenant. [80] Lamela has failed to rebut this presumption. After leaving Deloitte, Lamela admittedly served at least

three Deloitte clients and personally approached at least 13 more to become A&M clients in the multistate tax area before the entry of the temporary restraining order. 81 Thus, absent a preliminary injunction Lamela probably will actively encourage other Deloitte clients to give their business to A&M. If this occurs, Deloitte is likely to find it difficult to "unscramble the eggs" and reacquire those [*44] lost clients. 82

80

    *Fla. Stat. § 542.335(1)(j).*

81

    Lamela Dep. at 149-50.

82

    Lamela also argues that Deloitte has not shown irreparable injury because Deloitte can calculate its damages and therefore has an adequate remedy at law. I did not find Lamela's evidence on this issue convincing and believe Deloitte could have difficulty quantifying its damages. In short, Lamela did not rebut Deloitte's statutory presumption of irreparable injury.

## D. The Balance of the Equities

The Florida statute provides that, in determining the enforceability of a restrictive covenant, a court "shall not consider any individualized economic or other hardship that might be caused to the person against whom enforcement is sought." 83 Lamela has stated that, if granted, this preliminary injunction will "have a severe

and devastating effect" on him and "cripple him professionally." 84 The Florida statute expressly prohibits consideration of this type [*45] of harm. Furthermore, Lamela's employer has stated he will retain him even if this Court grants Plaintiffs' preliminary injunction motion. 85

83

    *Fla. Stat. § 542.335(1)(g)(1).*

84

    POB at 27.

85

    Lowe Dep. at 13.

For the reasons discussed above, Deloitte would be subject to a significant risk of competitive harm if no preliminary injunction issues. Therefore, the balance of the equities weighs in favor of granting a preliminary injunction to the extent it favors either side.

## III. CONCLUSION

Deloitte has demonstrated a reasonable probability of success on the merits, irreparable harm in the absence of an injunction and that its need for protection against possible loss of legitimate business interests outweighs any harm that can reasonably be expected to befall Lamela if a preliminary injunction were granted. The scope of the preliminary injunction sought by Deloitte, however, is too broad in the respects indicated above. Therefore, [*46] Deloitte's motion for a preliminary injunction is granted in part and denied in part.

An appropriate Order consistent with this Memorandum Opinion will be entered.

# EXHIBIT H

JUN 15 1983

UNREPORTED OPINION ]

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

HAMMERMILL PAPER COMPANY, a
Pennsylvania corporation,

    Plaintiff,

  vs.

ROBERT D. PALESE, an individual
Delaware resident, GALER & HULTS
OF DELAWARE, INC., a Delaware cor-
poration, and GALER & HULTS, INC.,
a Pennsylvania corporation,

    Defendants.

Civil Action No. 7128

Submitted: April 20, 1983
Decided: June 14, 1983

   Upon Plaintiff's Motion for a Preliminary In-
junction: Granted.

   Gerard P. Kavanaugh, Jr., of Murdoch & Walsh,
Wilmington, for Plaintiff.

   Bettina C. Ferguson, Wilmington, for Defendants.

LONGOBARDI, V.C.

In 1956, Robert D. Palese ("Palese") began employment as a sales representative for Advance Janitor Supply and Superior Sanitary Products. In the mid-1970's, these two companies were combined with Almond Paper Company and Brandywine Paper Company. The four companies became a single Delaware corporation, Advance Paper & Chemical Company ("Advance"). Between 1974-1980, Mr. Palese worked for Advance.

On June 2, 1980, Hammermill Paper Company ("Hammermill") purchased Advance and transformed it into an operating division of Hammermill. William H. Thorne, III became president of the new division. On June 3, 1980, Mr. Palese, who had continued working for Advance throughout the acquisition, was asked to sign the non-competition agreement at issue in this case. Palese knew that the signing of the agreement was a precondition of his employment with the new division. On February 3, 1983, Palese resigned from Hammermill. On February 18, 1983, Palese began working for Galer & Hults of Delaware, Inc. ("Galer & Hults"), a competitor of Hammermill.

Plaintiff charges that Palese and Galer & Hults have knowingly violated the non-competition agreement which Palese signed in June, 1980. They contend Palese has contacted former customers and encouraged them to deal with his new employer. They also argue that Palese has delivered to Galer & Hults a list of Palese's Hammermill clients as well as copies of Hammermill's "Detailed Sales Analysis", "Detailed Commission Reports" and other confidential sales information pertaining to these customers. Defendants do not contest the

allegations that the agreement has been violated.  They
contend that the agreement is void.  Their argument is that
(1) the agreement was not supported by adequate consideration;
(2) there was a failure of consideration if consideration is
found; (3) the agreement violates public policy because its
sole purpose is to restrain competition; (4) there are no
interests of the Plaintiff which qualify for protection;
(5) the agreement is overly broad; and (6) the Plaintiff will
suffer no irreparable injury whereas Defendant Palese will be
forced into unemployment if the injunction is granted.
Hammermill seeks a preliminary injunction prohibiting Palese
and Galer & Hults from dealing with Palese's Hammermill cus-
tomers for twelve months from the date on which an order is
entered.  Moreover, Plaintiff requests the return of all con-
fidential information in the possession of Palese and Galer
& Hults and damages.

The non-competition agreement entered into by
Hammermill and Palese is an agreement which restricts Palese's
activities in the sales area in which he worked as a Hammermill
employee.  Such agreements are not per se illegal.  Capital
Bakers v. Leahy, Del.Ch., 178 A. 648, 649 (1935); John G.
Bryant Co. v. Sling Testing & Repair, Inc., Pa.Supr., 369
A.2d 1164, 1169-70 (1977).  A non-competition agreement
will be deemed invalid, however, if it is shown not to satisfy
the "reasonableness" standard applied to such covenants.
The covenant is "reasonable" if it is (a) reasonable in time

and scope; (b) if it is necessary for the protection of the employer; and (c) if it does not impose an undue hardship on the employee.   See Faw, Casson & Co. v. Cranston, Del. Ch., 375 A.2d 463 (1977).

The agreement at issue here provides that Palese "recognizes and acknowledges" that the identity of the customers obtained by a salesman for Hammermill, as well as business information concerning these customers, constitutes valuable confidential information belonging to Hammermill. Palese, by entering into the covenant, has agreed that for a period of twelve months after leaving Hammermill's employ, he will not directly or indirectly solicit or promote the sale of any products which compete with the Hammermill products he sold when employed by Hammermill.   The restriction, however, applies only to those individuals or businesses Palese "had dealt with, called upon, solicited, sold to or sales to whom he had supervised . . ." while at Hammermill.

Additionally, Palese agreed to not divulge or transmit to any Hammermill competitor any information "pertaining to the Employer's business including but not limited to names of customers of Employer, such customers' requirements, prices, identity of products purchased and/or any other information which would relate to the business transacted between Employer and Employer's customers for so long as Salesman is employed by Employer for a period of twelve months after termination of this employment . . . ."   If

- 3 -

the contract is breached by Palese, the agreement "shall be
automatically extended for a period of one year from and
after the later of (i) the date on which the Salesman per-
manently ceases such violation, or (ii) the date of entry by
a court of competent jurisdiction of an order or judgment
enforcing any such covenant . . . ." It is expressly pro-
vided that in no event is the covenant to extend for a period
beyond two years from the date of termination of Palese's
employment. Finally, the contract notes that if any re-
strictions contained in the agreement are seen as too broad
to permit enforcement, "the parties hereby consent and agree
that such scope may be judicially modified in any proceeding
brought to enforce such restriction."

The record indicates that Palese has indirectly,
if not directly, contacted clients he served as a Hammermill
employee in an attempt to promote the sale of Galer & Hults
products. The record also demonstrates that Palese has given
Galer & Hults a list of his 239 Hammermill customers. He
has discussed this list with Galer & Hults personnel. Palese
has also given Galer & Hults information regarding items sold
and the purchasing patterns and the prices charged his
Hammermill customers. Palese, in essence, has given a
Hammermill competitor information which he contractually
recognized to be confidential and has aided this competitor
in making inroads on the Hammermill market, all within two

- 4 -

months of leaving Hammermill and all in apparent violation
of the agreement he had signed with Hammermill.

Galer & Hults hired Palese fully aware that he
had signed a non-competition agreement with Hammermill.   It
was its belief, however, that the agreement was invalid and
could be overturned.   First, Galer & Hults insists that the
agreement was unsupported by adequate considerations.   It
argues that Palese has been continually employed since 1956
by various entities now embodied in a single division of
Hammermill.   The only consideration Palese received for
entering into the covenant, it contends, was the prospect
of continued employment with Hammermill.   In its view, con-
tinued employment is insufficient consideration to support
the contract.   Palese remained an employee at will with no
guarantee that his employment would be continued after the
agreement was made.

However, this is not a case where an employee,
after years of continued service with one company, is asked
to enter into such an agreement without there being any bene-
ficial change in his employment status.   Cf. Burroughs Cor-
poration v. Cimakasky, E.D.Pa., 346 F.Supp. 1398 (1972);
Wilmar, Incorporated v. Liles, N.C.App., 185 S.E.2d 278, (1971)
cert. den., 186 S.E.2d 178 (1971).   At the time that Palese
signed the agreement, he was given a $100 per week raise or
a $5,200 annual increase in salary.   This beneficial change
in Palese's status is in itself sufficient consideration to

support the agreement.  See Faw, Casson & Co. v. Cranston, 375 A.2d 467.  Additionally, though Palese had worked for years for the predecessors of Hammermill's new division, this is not a situation where a company suddenly decides to force a new restrictive policy on an old employee, offering nothing in return.  Hammermill was the new management and possessed the prerogative to implement whatever policies it chose to further its legitimate business objectives.  Palese would continue in his position and thereby begin to be employed by Hammermill only if he signed the agreement, an agreement, it should be noted, which is similar to one he had earlier signed as an employee of Advance.

In the absence of contractual commitments, the new owners of Advance were not bound to retain existing employees.  Under these circumstances, when ownership and management is changed, there is no reason why the promise of employment with the successor business entity cannot itself constitute sufficient consideration to support a post-employment non-competition contract.  Hogan v. Bergen Brunswig Corp., N.J.Super.A.D., 378 A.2d 1164, 1167 (1977).  The likelihood of discharge, of which Palese was aware, should be sufficient consideration since the decision that Palese's employment depended on the execution of the covenant was not made "post-employment" but was actually a condition of employment.

The Defendants argue, without citing any authority,
that the contract should be overturned due to a subsequent
failure of consideration.  The agreement apparently centers
on allegedly "intolerable" changes in Palese's working con-
ditions at Hammermill.  These circumstances forced Palese,
they argue, to leave the company.  The primary claim is that
approximately 25% of Palese's accounts were reassigned to
other salesmen, a situation that was unreasonable in Palese's
view.  The reassignment of these accounts was apparently
discussed by Mr. Thorne, President of the Hammermill-Advance
division, and Mr. Palese.  Palese himself reviewed his client
list and made comments on the reassignments.  The reassign-
ments represented less than $30,000 worth of annual business
which Palese would no longer handle.  Compared to his annual
sales total of well over $600,000 worth of business for
Hammermill, the reassignment was quite inconsequential.

However, even if the reassignment was "intolerable"
in Palese's eyes, Palese had no guarantee from Hammermill,
orally or in writing, that in exchange for signing the non-
competition agreement, his accounts would not be assigned to
other salesmen.  On the current record, it is at best doubt-
ful that Hammermill was acting in any way that was unreason-
able or unrelated to its perceived business objectives.  The
contract cannot be deemed invalid on this basis.

Nor can the contract be deemed unenforceable as
violative of public policy.  Defendants argue that the agree-
ment was not ancillary to a written employment contract,

- 7 -

that its sole purpose is to restrain competition and that
it is, therefore, invalid.  They offer no authority, however,
for the proposition that the employment contract to which a
covenant is ancillary or related must be written.  Case law,
in fact, suggests that "the enforcement of . . . restrictive
covenants does not depend upon the existence of a written
contract of employment, for such contracts need not be in
writing but may be evidenced by conduct rather than words
. . . ."  Hogan v. Bergen Brunswig Corp., 378 A.2d 1166.
Valid oral contracts concerning employment can exist.

Palese's continued employment by Hammermill for a
two and one-half year period after the signing of the covenant
certainly evidences some agreement concerning duties, salary
and general expectations involving the employment status.
Moreover, the covenant was not imposed after the original
proposal of employment as a Hammermill employee but was con-
temporaneous with that offer.  The fact that Palese was
working for Advance the day that Hammermill acquired the com-
pany, June 2, and that no covenant was signed until June 3
does not alter the situation.  The time frame is too com-
pressed to illustrate anything other than contemporaneity.
Palese's agreement was essential to his being retained as
an employee.  The fact that the covenant was signed on June
3, one day after Hammermill's acquisition, does not demon-
strate either that the terms of Palese's employment were
unclear to him or that Hammermill somehow waived its right

- 8 -

to the covenant as a condition precedent to employment. Cf.
Faw, Casson & Co. v. Cranston, 375 A.2d 467.

A contract designed solely for the purpose of re-
straining competition and unrelated to any employment agree-
ment between the parties could amount to an illegal restraint
on trade. See 54 Am.Jur.2d Monopolies §514 at 961. In such
circumstances, the public would be injured as a result of the
artificial obstacles to open competition. In situations
where the interests of the public would be damaged by up-
holding a post-employment non-competition agreement, the
agreement could be deemed invalid under Delaware law.
Knowles-Zeswitz Music, Inc. v. Cara, Del.Ch., 260 A.2d 171,
175 (1969). However, the recognition that agreements which
are not tied to the legitimate interests of the employer and
which are solely anticompetitive in nature are invalid is not
to state, as Defendants suggest, that there is a standing
policy in Delaware that all such agreements by definition
are per se invalid. Defendants suggest that this public
policy of invalidity is embodied in 6 Del.C. §2103 which
states in pertinent part: "Every contract, combination
in the form of trust or otherwise, or a conspiracy, in re-
straint of trade or commerce of this State shall be unlawful."

The language of this statute is virtually identical
to the opening provision of the Sherman Antitrust Act, 15
U.S.C.A. §1 and it was the Delaware Legislature's intention
to adopt not only the language but the judicial interpretation

and application of the Sherman Act.  This is manifestly evident upon reading 6 Del.C. §2113.  "This chapter [i.e., Ch. 21] shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes."

The judicial interpretation of section 1 of the Sherman Act, which is similar to 6 Del.C. §2103, clearly demonstrates that covenants not to compete are not per se invalid.  In fact, courts have adopted a "rule of reason" analysis which requires the court to weigh all the circumstances of a given case to determine whether the disputed practice constitutes an "unreasonable restraint on competition."  United States v. Topco Associates, Inc., 405 U.S. 596, 607 (1972); see Standard Oil Co. v. United States, 221 U.S. 1 (1911).  Post-employment restraints which reasonably limit the scope of a former employee's activities have been held not to fall within the narrow category of per se violations of the Sherman Act.  See Bradford v. New York Times Company, 501 F.2d 51 (2nd Cir. 1974); Capital Bakers v. Leahy, 178 A. 650.  As noted in a case which Defendants themselves cite, the focus of judicial scrutiny should be the reasonableness of the restrictions which exist, not the mere existence of the restrictions.  Blank v. Preventative Health-Programs, Inc., 504 F.Supp. 416 (S.D.Ga. 1980).  If a court determines that the anticompetitive effects of the restrictive practices outweigh the pro-competitive justifications it offers,

the contract employing it will be struck down. <u>Pomanowski</u>
<u>v. Mammoth City Bd.</u>, N.J.Supr., 446 A.2d 83, 88 (1982).

There appears to be little difference between
this analysis and the traditional criteria applied to cove
nants not to compete under Delaware law. Both examine the
necessity for protecting the legitimate interests of the em-
ployer and the reasonableness of the restraints imposed on
the employee. <u>Cf. Faw, Casson & Co. v. Cranston</u>, 375 A.2d
463; <u>Bradford v. New York Times Company</u>, 501 F.2d 56-61;
see also 6A <u>Corbin on Contracts</u> §1401 (2nd Ed. 1962). To
the extent the antitrust analysis emphasizes public economic
detriment, an examination of the agreement in issue does not
demonstrate any injury to the public resulting from the re-
strictions placed on Mr. Palese. Galer & Hults is not banned
under the contract from doing business in a free market but
only from using Palese and the information he obtained from
Hammermill to pursue a particular clientele. Even employing
a "rule of reason" analysis, the agreement cannot be designated
an unreasonable restraint on competition.

The restraints placed on Palese cannot be deemed
unreasonable because the agreement is necessary to protect
legitimate interests of Hammermill. The law recognizes that
the good will built up by Palese with particular clients was
part of a relationship he built as a Hammermill employee
serving Hammermill's interests. Hammermill has a right to
protect the good will it bought and fostered through its

- 11 -

employees. See Knowles-Zeswitz Music, Inc. v. Cara, 260
A.2d 175; Sidco Paper Company v. Aaron, Pa.Supr., 351 A.2d
250, 254 (1976). Clearly it is impossible to separate the
component parts of the relationship between Palese, the
customers and Hammermill. But this exercise is not rele-
vant. It is obvious that the products, service and Palese's
personality all contributed to what are the essentials of
"good will." What is important is that "good will" was
established, no matter the contribution of the component parts,
and Hammermill bought and fostered it through its employee,
Palese. As a condition of his employment, he was given the
privilege of working, contributing towards the "good will"
goal. In return, he promised not to utilize that good will
for his own benefit in the event of his termination.

Hammermill's interest in information which Palese
acquired while in its employ is more tangible than good will
but no less protectable. The list of Palese customers, plus
product and price information on these customers are also
protected confidential material which (1) is not generally
known or ascertainable; (2) which provides a demonstrable
competitive advantage; (3) which was gained at Hammermill's
expense and which (4) Hammermill intended to keep confidential.
See Eaton Corp. v. Appliance Valves Corp., N.D.Ind., 526 F.Supp.
1172 (1981).

The list, for instance, is part of a comprehensive
list of Advance's customers for which Hammermill paid $129,000

- 12 -

when it acquired Advance. Defendants have not demonstrated that either this list or the price and product information for which Hammermill paid is generally known to or easily obtained by its competitors or that it was not confidential in Hammermill's view. In fact, the contract itself supports Hammermill's contention that both Palese and Hammermill agreed that all such information was valuable and confidential. Such information seems clearly important to Hammermill's position in the market. Hammermill has demonstrated a loss of customers since Palese's departure. This, in part, is the natural result of customers following a trusted sales representative to his new company. To some undetermined degree, though, it is also the result of this representative courting old customers and employing confidential information to facilitate their move to Galer & Hults. This information, which can prove damaging in the hands of a competitor, is worthy of reasonable protection.

The agreement is not overly broad in time or scope and is not, therefore, unenforceable. The twelve month limitation, as the Plaintiff notes, is within the parameters of time restrictions accepted by courts of this State. Faw, Casson & Co. v. Cranston, 375 A.2d 463 (two years); Knowles-Zeswitz Music, Inc. v. Cara, 260 A.2d 171 (two years). While the agreement does not contain the usual limitations on geographical areas of competition, it does restrict Palese as a Galer & Hults employee from directly or indirectly aiding

his new employer in selling its goods to his old Hammermill
customers.  Admittedly, the contract itself prohibits Palese
from involvement with those individuals and businesses he
"had dealt with, called upon, solicited to or sales to whom
he had supervised."  However, the Plaintiff contends it is
attempting to enforce the contract only with respect to those
clients he had at Hammermill.  To the extent the contract
suggests more than this, the Court determines its provisions
are overly broad and burdensome and hereby modifies the con-
tract to conform to Plaintiff's representations.  Such modifica-
tion is permissible under this State's law concerning the review
of such contracts.  Knowles-Horwitz Music, Inc. v. Cara, 360
A.2d 175.  It is also consistent with the expressed intentions
of the parties embodied in the agreement itself permitting
and accepting any judicial modification of the contract's
terms.

Beyond such change, the contract needs no further
alterations to be enforceable.  Its terms are specific.
They preempt Palese from dealing only with a limited number
of businesses.  He is fully capable of soliciting business
from hundreds of other potential clients in the area.  He
is able to handle other accounts on Galer & Hults's behalf.
After twelve months have passed, he will be able to re-
establish contact with the businesses he had dealt with at
Hammermill.  None of the restrictions he must suffer now
will present any undue hardship considering his experience

- 14 -

and expertise.  Any inconveniences he will now suffer were ones he must have been aware of when he signed the agreement with Hammermill and ones he had to know of when entering the employ of Galer & Hults.  Since the agreement appears to meet the criteria for "reasonableness" required by law, it should be deemed valid, enforceable and binding on the De-fendants.  Faw, Casson & Co. v. Cranston, 375 A.2d 463.

A party moving for preliminary injunctive relief must demonstrate that (1) he has a reasonable probability of ultimate success on the merits of his case; (2) that he will suffer irreparable harm if the injunction is not issued; and (3) that the harm he will suffer if the injunction is not issued outweighs the harm suffered by the non-movant if the injunction is issued.  Gimbel v. Signal Companies, Inc., Del.Ch., 316 A.2d 599, 602-03 (1974); aff'd., 316 A.2d 619 (1974).

Plaintiff in this case has clearly shown the Court that there is a substantial likelihood of its ultimate success on the merits.  It has also demonstrated to this Court's satis-faction that its business may well be irreparably injured if Galer & Hults' use of Palese and the information he possesses is not curtailed.  There has been no convincing showing by Galer & Hults that it will be substantially harmed if the contract is enforced.  All that Galer & Hults will lose are the benefits of a bargain with Palese which was not theirs to have.  Though Palese argues that enforcement of the agree-ment will force him into the unemploy ment line, the Court is

unconvinced that this claim is anything but mere speculation.
Moreover, the Court feels that any inconvenience Palese suf-
fers from enforcement of the agreement is the result of his
own informed decision making.  In balancing the harms in-
volved, neither Defendant  has demonstrated how the injury
each claims it will suffer outweighs the injury which the
Plaintiff will realize.

Mr. Palese will be enjoined immediately from di-
rectly or indirectly assisting Galer & Hults or any other
Hammermill competitor in dealing with the 239 Hammermill
customers at issue pending a final determination of the is-
sues involved at a hearing for permanent injunctive relief.
None of the information which Palese obtained from Hammermill
concerning these customers, including the customer list, is
to be used by Galer & Hults or any affiliate during the
interim in its dealings with any Hammermill customers.  All
such information and copies of such information will, for
the time being, be placed in the custody of this Court.

Galer & Hults is not totally prohibited from
soliciting business from the Hammermill customers of Palese.
Such a prohibition, even at this preliminary stage, would
come close to establishing a broad anticompetitive bar de-
signed more to punish Galer & Hults than protect Hammermill's
legitimate interest.  Such a bar is not contemplated by the
agreement and may well injure the interest of the public in
free and open competition.  See Knowles-Zeswitz Music, Inc. v.

Cara, 260 A.2d 175.  Galer & Hults, therefore, may use other personnel in soliciting business from Palese's former Hammermill customers.  It may use Palese to solicit business from Hammermill customers who were not previously his clients at Hammermill or from any other actual or potential customer of Galer & Hults. However, Galer & Hults is prohibited, pending the outcome of a final hearing, from employing Palese in any capacity in its dealings with the 239 businesses and individuals in question. A proposed order conforming to the findings of the Court should be presented by the Plaintiff.

IT IS SO ORDERED.

# EXHIBIT I

LEXSEE 1999 DEL. CH. LEXIS 242

**MERCK & CO., INC., Plaintiff, v. SMITHKLINE BEECHAM PHARMACEUTICALS CO., SMITHKLINE BEECHAM HOLDINGS CORPORATION, SMITHKLINE BEECHAM CORPORATION, and SMITHKLINE BEECHAM BIOLOGICALS S.A., Defendants.**

**C. A. No. 15443-NC**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*1999 Del. Ch. LEXIS 242*

**June 29, 1999, Date Submitted**
**August 5, 1999, Date Decided**

**COUNSEL:** [*1] Richard D. Allen, Mary B. Graham, Julia Heaney and Bradley J. Enna, of MORRIS NICHOLS ARSHT & TUNNELL, Wilmington, Delaware; OF COUNSEL: Paul D. Matukaitis and Kevin J. McGough, of MERCK & CO., INC., Rahway, NJ; Attorneys for Plaintiff.

Richard K. Herrmann and Mary B. Matterer of BLANK ROME COMISKY & MCCAULEY LLP, Wilmington, Delaware; Donald R. Dunner, Susan H. Griffen, Howard W. Levine, John R. Alison and York M. Faulkner of FINNEGAN HENDERSON FARABOW GARRETT & DUNNER LLP, Washington, D.C.; OF COUNSEL: James K. Grasty, Yuriy P. Stercho of SMITHKLINE BEECHAM, Philadelphia, PA; Attorneys for Defendants.

**JUDGES:** CHANDLER, Chancellor.

**OPINION BY:** CHANDLER

**OPINION**

OPINION

CHANDLER, Chancellor[*]

[*] The following table of contents is included solely for the purpose of aiding the reader and is not part of the Court's official opinion. Therefore, all publishers should feel comfortable repaginating this table for any subsequent publication.

I. FACTS

A. THE PARTIES AND THE NATURE [*2] OF THE ACTION

B. VACCINE PRODUCTION PROCESSES

C. COMPLICATIONS IN MAKING VARICELLA VACCINE

D. BIKEN'S DEVELOPMENT AND LICENSING OF THE OKA STRAIN OF VARICELLA VIRUS

E. SMITHKLINE'S 1985 LABORATORY PROCESS

F. SB'S EFFORTS TO REDEVELOP THE 1985 PROCESS

*1. SB's Initial Work and the VA30 Series (VA30-34)*

*2. Didelez's Fall 1989 Attempt at a "Most Plausible Scheme"*

*3. Didelez's New "Most Plausible Scheme" and the Need for a "Fresh Start" in March 1990*

*4. The Admitted "Failure" as of June 1990*

*5.*

G. THE VISITS TO BIKEN

*1. The December 6, 1990 Visit*

*2. The January 1991 Visit*

## II.  ANALYSIS  OF  MERCK'S MISAPPROPRIATION CLAIM

A. CHOICE OF LAW

B. BIKEN'S PROCESS KNOW-HOW IS A TRADE SECRET

*1. The Biken Process is a Valuable Commercial Process*

*2. The Biken Process is Not Generally Known or Readily Ascertainable by Proper Means*

*3. Biken Has Taken Reasonable Efforts to Maintain the Secrecy of its Process*

C. SB'S EFFORTS TO MARKET ITS VARICELLA VACCINE IN THE UNITED STATES AND CANADA CONSTITUTE MISAPPROPRIATION OF BIKEN KNOW-HOW

D. SB USED BIKEN'S TRADE SECRETS TO GUIDE THE DEVELOPMENT OF ITS VACCINE

E. UNDER ITS AGREEMENT WITH BIKEN, [*3] SB IS PROHIBITED FROM USING BIKEN KNOW-HOW TO PRODUCE A VACCINE FOR SALE IN THE UNITED STATES AND CANADA

F. MERCK IS ENTITLED TO AN INJUNCTION

## III.  FACTS  SURROUNDING  SB'S COUNTERCLAIMS  AND  AFFIRMATIVE DEFENSES

A. THE OPTION AGREEMENT

B. JUNE 1975 TO MAY 1977: SB ENCOUNTERS INITIAL PROBLEMS LEADING TO AN EXTENSION OF THE OPTION PERIOD

*1. SB's Problems*

*2. Initial Merck Contacts with Biken*

C. APRIL 1977 TO JUNE 1978: ADDITIONAL DELAYS LEADING TO A SECOND EXTENSION OF THE OPTION AGREEMENT

*1. The Second Extension*

*2. Contacts Between Merck and Biken*

D. JUNE 1978 TO DECEMBER 1978: THE OPTION AGREEMENT EXPIRES

*1. Expiration of the Agreement*

*2. Contacts by Merck with Biken*

E. JANUARY TO MAY 1979: MERCK OBTAINS INFORMATION FROM PLOTKIN AND LEARNS THAT BIKEN EXPECTS TO CONCLUDE A LICENSE AGREEMENT

*1. Contacts with Plotkin*

*2. SB Similarly Obtained Information from Clinical Investigators About Merck's Vaccine*

*3. Merck Learned that Biken Expected to Enter a License Agreement with SB*

F.  JUNE  TO  NOVEMBER  1979: DETERIORATION  OF  THE  SB/BIKEN RELATIONSHIP

*1. SB Fails to Sign a License Agreement*

*2. SB's Development Problems*

[*4] *3. Merck Initiates Additional Contacts with Biken*

*4. The Alleged False Statement by Woodruff*

*5. The Termination Letter*

G. JANUARY 1980 TO FEBRUARY 1982: BIKEN NEGOTIATES LICENSE AGREEMENTS WITH SB

## IV. CONCLUSIONS OF LAW

A. CERTAIN OF SB'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS AND LACHES

B. DOCTRINE OF UNCLEAN HANDS

*1. Standard for Unclean Hands*

*2. Merck's Claims Are Not Barred by Unclean Hands*

a) SB Has Failed to Establish Unclean Hands due to Tortious Interference

(1) Contractual Relationship and Knowledge

1999 Del. Ch. LEXIS 242, *4

(2) Intentional Act, Proximate Cause, and Damages

(i) SB Has Failed to Establish that Merck Induced Biken to Breach the Option Agreement

(ii) SB Has Established a Breach of the Option Agreement's Confidentiality Provision

(iii) No Proximate Causation or Damages

b) Justification for Any Interference

*3. SB Has Failed To Show That Merck Was Unjustly Enriched*

*4. Woodruff's November 1979 Statement Violated No Rights of SB*

a) There Was No Knowing Misstatement

b) Biken Did Not Rely on Woodruff's Statement

## V. SUMMARY OF CONCLUSIONS

This lawsuit involves claims of misappropriation of a trade secret--the process [*5] for producing a vaccine to prevent varicella (commonly known as chicken pox). After a two week trial and post-trial submissions by the parties, this is the Court's findings of fact and conclusions of law. In short, I find in favor of plaintiff Merck on its claim of misappropriation of a trade secret and I dismiss defendant SmithKline's affirmative defenses and counterclaims for various reasons, including laches and the statute of limitations.

The Court's decision is organized as follows. Part I describes the parties, the nature of Merck's claims, and the background facts, including my findings of fact where the parties disagree. Part II represents my analysis of these claims and my conclusions of law. Part III describes the facts relating to SmithKline's affirmative defenses and counterclaims, including my findings of fact, where necessary. Part IV sets forth my analysis of these defenses and counterclaims and my conclusions of law. Finally, Part V summarizes all of these conclusions.

## I. FACTS

*A. The Parties and The Nature of the Action*

The varicella vaccine which is the subject of this lawsuit was developed by the Research Foundation for Microbial Diseases of Osaka [*6] University ("Biken" or

the "Foundation") using a strain of virus known as the Oka strain. Plaintiff Merck & Co., Inc. ("Merck") seeks to enjoin Defendants SmithKline Beecham Corporation ("SB Corp."), SmithKline Beecham Biologicals S.A. ("SB Biologicals"), formerly called "RIT," SB Pharmaceuticals Company ("SB Pharmaceuticals"), and SmithKline Beecham Holding Corporation ("SB Holding"), from marketing varicella vaccine in the United States and Canada. [1]

> [1] SmithKline & French ("SK&F") was the actual party to the Option Agreement. RIT was the entity within SK&F responsible for developing vaccines for the company. SK&F, RIT and the defendants are collectively referred to herein as "SB".

Biken is the Japanese entity that entered into license agreements with both SB and Merck regarding the Oka strain. The Research Institute for Microbial Diseases of Osaka University (the "Research Institute" or "Institute") performs basic scientific research in vaccines and preventive medicines, while Biken commercially develops [*7] products resulting from that research (Tr. 772-74). [2]

> [2] Definitions.
>
> For the sake of clarity, what follows is a glossary of terms that I employ freely in the course of this Opinion.
>
> * Antigen: both dead and live virus--measured in Elisa units.
>
> * BSA (bovine serum albumin): albumin is the major protein in serum and serves as a carrier to the cells of the other serum nutrients; component of FBS that can be measured (see definition of "Serum or FBS" below).
>
> * Cell culture: growing cells as "host" cells for virus in an artificial environment (*e.g.* laboratory or production).
>
> * CPE (cytopathic effect): visible consequence of cells being infected (term is used in a culture system).
>
> * Culture vessels: the vessels in which cells are being grown.
>
> * Growth or cell culture medium: mixture of

sugars, salts, amino acids, vitamins and other nutrients for the host cells.

* Kinetics: refers generically to the split ratios (or MOI's) and harvest times of the viral passages.

* Maintenance medium: separate culture medium tailored more for cells no longer growing but which have been infected with virus.

* MOI (multiplicity of infection): ratio of infectious units to uninfected cells at the initiation of a viral passage (measured by PFU's and counting cells). The terms MOI and split ratio are close in meaning (see "Split ratio" below) and relate to the ratio of infected cells that are used to infect uninfected cells. SB speaks of split ratio as a ratio of the surface area of infected cell sheet to the cell sheet being infected. MOI looks at that ratio in terms of the number of infected cells rather than surface area. When the cell sheet is 100% infected, split ratio and MOI are the same. When the cell sheet is less than 100% infected the split ratio is higher than the MOI--e.g. Biken's [TEXT REDACTED BY THE COURT.] split ratio resulted in an MOI of [TEXT REDACTED BY THE COURT.] because Biken's cell sheet was about [TEXT REDACTED BY THE COURT.] infected Tr. 954-55).

* PDL (passage doubling level): number of population doublings that the cells have undergone since the cell culture was started.

* Potency: strength of vaccine or amount of live virus--measured in titer or plaque forming units (PFU's).

* Serum or · FBS (fetal bovine serum): collection of proteins that are added to the growth or maintenance medium to enhance cell growth and maintenance. As noted above, BSA is the major protein.

* Split ratio: in the context of viral passaging, ratio of surface area of the infected cell culture to the surface area of the target cell culture to be infected; in the context of cell culturing, ratio of surface area of the fully grown cell culture to the surface area of the fresh, unoccupied vessels into

which these cells are being placed.

* Titration: method for measuring the amount of live virus.

* Viral passage: cycle of virus growth in cell culture, which involves incubation at a set temperature and time period in culture vessels.

### [*8] B. Vaccine Production Processes

Viruses are microorganisms consisting of genes wrapped in layers of proteins (Tr. 11). [3] Viruses reproduce by infecting a host cell and pirating the genetic "machinery" (DNA and RNA) of the cell to make more viruses (Tr. 12-13). When viral infection occurs in humans (or animals), the infected host cells are destroyed, resulting in disease or death (Tr. 13-14). The human immune system, however, may respond and cure the infection before disease spreads. A viral vaccine uses a form of virus to trigger an immune response without causing disease (Tr. 15). There are three general types of viral vaccines: recombinant DNA (e.g., hepatitis B vaccine); inactivated or killed (e.g., hepatitis A vaccine); and live attenuated (e.g., measles, mumps, rubella, and varicella) (Tr. 16-19). A live viral vaccine uses a virus that has been weakened through attenuation. Attenuation consists of passaging (i.e., reproducing) the virus numerous times by growing it in atypical cells, such as guinea pig cells, and finding a passage level, if possible, at which the virus is strong enough to generate an immune response but too weak to cause disease. [*9] The viruses used for live attenuated vaccines are generally both fragile and complex in structure (Tr. 20-21). Varicella, the virus that causes chicken pox, is among the largest and most structurally complex of viruses (Tr. 12, 1942-43).

> 3 Citations in the form "Tr. ___ " refer to the trial transcript and "dep. ___ " to deposition pages of the identified witness. Other citations are self-explanatory.

The American Academy of Pediatrics and other authorities have long expressed a need for a vaccine to prevent chicken pox, because it can be life-threatening and accounts annually for many illnesses. While vaccines were developed for other common childhood viral illnesses in the 1960's (measles, mumps, rubella), attempts to develop a chicken pox vaccine were not successful.

A live viral vaccine is made from a stock of attenuated virus and host cells from a bank (Tr. 70). The basic steps are: (1) preparing additional quantities of the attenuated virus by further passaging; (2) growing host cells in culture vessels [*10] (such as Roux bottles, T-flasks, cell factories, or cell cubes); (3) infecting the host cell culture with virus under conditions causing the virus to multiply; (4) harvesting the virus from the infected cell culture; and (5) clarifying the harvested material to make bulk vaccine (Tr. 64-66). The bulk vaccine is generally frozen and at a later time processed into vials of final vaccine and is then lyophilized, *i.e.*, freeze dried, to remove moisture, stabilize the vaccine, and facilitate handling until the vaccine is reconstituted for administration to humans (Tr. 1429-30).

A commercial production process for making a vaccine must be able to produce large quantities of potent, safe vaccine from limited supplies of materials. The vaccine must be of consistent quality and characteristics and satisfy regulatory requirements. A commercial production process must also meet practical, cost, and safety concerns. It also must be robust enough that the quality of the vaccine is maintained even when the process is run on a frequent basis in a manufacturing environment where relatively unskilled labor may perform the process, and where equipment and materials may cause variations in the [*11] product (Tr. 52-64; PTX 700-748).

Development of a commercial vaccine production process is difficult and lengthy. Typically, basic scientific principles are first explored and established in a research laboratory and then passed on to scientists or engineers working in a production development area (Tr. 920-21). These developers conduct further experiments in an environment that takes into account the requirements of a commercial production process, although initially at smaller scale (Tr. 922-23). If the developers achieve some success, experiments will normally be conducted at production scale in order to test the parameters before making the expensive commitment to begin consistency lots (Tr. 923-27). Consistency lots are consecutive lots (generally five) produced by the same process in all five lots. Consistency lots are required for FDA approval in order to show that both the process and the vaccine produced (which then undergoes clinical trials) are consistent.

In both the research laboratory and subsequent

development, the possible steps of the vaccine process are explored, and the parameters and conditions, including materials and equipment, determined by rigorous experimentation. [*12] The possibilities are numerous and all of the process steps are interconnected and not easily studied independently. This non-linear characteristic means that changes made to the parameters of one step may require changes to other steps, thus complicating and lengthening the development effort (Tr. 127-28).

In any scientific experimentation to establish a production process, the experiments to establish the parameters and conditions must be repeated in order to verify results (Tr. 924-25). This is particularly true for biological processes, which include vaccines, because they experience significant variability, so that repetition and statistical analysis of results is essential (Tr. 924-25). If more than one parameter is varied in an experiment, interpretation of the results is even more difficult.

Titration, the method for measuring the amount of live virus (*i.e.*, potency or titer) present in a sample, further complicates the development process for two reasons. It is very time-consuming, requiring six or seven days just to perform the part of the titration involving the viral infection and almost as much time beforehand to prepare the cell culture for infection. It is [*13] also imprecise, such that even a well-developed titration method experiences variability on the order of about 20% (Tr. 115-16). Where a developer cannot rely on the titration results, such blindness in comparing experiments, in addition to the need for numerous repetitions, will seriously impede development (Thysman dep. 596; Duchene dep. 206-07).

*C. Complications in Making Varicella Vaccine*

The varicella virus has characteristics that make production of vaccine more difficult than for other common viruses. Varicella is an intracellular virus, at least in artificial (*i.e.*, production and laboratory) environments--meaning that when the varicella virus infects a cell culture, the virus does not leave the cell and continue with further infection, but rather remains stuck as buds on the outside surface of the cell (Tr. 41-43, 1638). This intracellular characteristic makes producing varicella vaccine more complicated. At the point of beginning a varicella virus passage, in order for the infection to be efficient, the cells must be at the point of confluency, *i.e.*, the cells must cover the entire surface of

the culture vessel and touch each other (Tr. 76, 92-93). After [*14] the passage of varicella virus is completed, unlike in production of other vaccines, the infected cells must be broken in order to release the varicella virus, such as by sonication, homogenization, or other means (Tr. 132-35).

A further complication is that in a varicella vaccine production process, after the infected cells are broken, the varicella virus remains attached to the cell debris. At the same time, it must be assumed that there could be some whole cells remaining. Any such remaining whole cells must be removed from bulk varicella vaccine by clarification for safety reasons (the safety concern is that injecting whole cells into people could potentially cause tumors (Tr. 136-37)). The difficulty for a production process is that the virus may unintentionally be removed when whole cells are removed (called "clarification") because large aggregates of cell debris (to which the virus remains attached) may also be removed (Tr. 137-40). Also, whole cells can vary in size and the clarification conditions must be sufficiently rigorous to remove even the smallest whole cells.

Yet another complication is that only about one in 100,000 to one in 1,000,000 of the varicella particles [*15] grown in a cell culture are actually infectious (as compared to measles or mumps where about one in 1,000 of the viruses leaving a cell are infectious) (Tr. 43-44). Because of this natural inefficiency of a varicella infection in cell culture, the parameters of the varicella virus growth cycle (i.e., passaging) in a commercial production process must have carefully tailored timing, temperature, composition of the medium, and multiplicity of infection ("MOI") in order to maximize efficiency of the infection and, ultimately, the quantity of vaccine that can be produced from the limited seed stock (Tr. 108-18). For varicella, viral passaging involves first creating an intermediate population of virus at a given MOI or split ratio and then using that intermediate virus population as starting material for production of the bulk vaccine (Tr. 71-72).

Furthermore, varicella's structural complexity negatively affects its physical stability, such that outside the human body its infectivity decreases more rapidly than other viruses under comparable conditions (Tr. 1943). This poor stability (i.e., loss of titer) impacts a number of process steps, including the steps of breaking open [*16] the cells, clarification, and lyophilization,

because the secondary drying cycle occurs at elevated temperatures where the risk to stability is greater (Tr. 1458). The presence of greater amounts of cellular debris in varicella vaccine (due to its intracellular nature) may also impact the choice of lyophilization parameters and the vaccine's stability (Tr. 1940-41).

For varicella, any fetal bovine serum ("FBS") used in the culture medium to help grow and maintain the cells creates a safety concern. FBS contains bovine serum albumin ("BSA"), generally considered to be unsafe for injection into humans (Tr. 120-21). Any washing technique must be sufficiently rigorous to get rid of the substantial amounts of FBS that are trapped within the cell sheet in order to get rid of all BSA (Tr. 122-23). At the same time, cells are fragile and washing must not be so harsh as to break them prematurely (Tr. 125). If the cells are broken during washing, the varicella virus will also be discarded with the FBS in the washing solution (Tr. 125). [4]

> 4    There are different washing techniques. A "spin wash" involves centrifuging infected cells in the rinsing or detachment liquid solution, which washes away the culture medium (including FBS) that may be trapped in the cell sheet and separates the cells from the liquid by centrifugal force. A "prewash" is a wash of the surface of the infected cell sheet with a washing solution (e.g., a phosphate buffered saline solution) prior to detachment and harvest of the infected cells.

[*17] D. Biken's Development and Licensing of the Oka Strain of Varicella Virus

The Oka strain varicella virus was isolated in 1970 by Dr. Michiaki Takahashi of the Research Institute (Tr. 779). Takahashi attenuated the strain and produced in his laboratory a varicella vaccine that was successfully tested in clinical trials (Tr. 779-80). In 1974, Takahashi published an article concerning his work with the Oka strain and his initial success in developing a vaccine in his laboratory (TX1393). This publication prompted interest by a number of companies, including SB and Merck, which on their own had been attempting (unsuccessfully) to develop a varicella vaccine (PTX325, PTX336).

In 1975, SB obtained from Biken an option agreement giving SB the exclusive right for a two-year period to study the Oka strain (PTX306). SB received

from Biken a sample of the strain as well as confidential technical information on the laboratory process developed by Takahashi (PTX1). That option agreement was subsequently extended twice (PTX324, PTX338), but ultimately lapsed. [5]

5 *See* pp. 68-78 *infra*.

[*18] In late 1980, Biken and Merck entered into a licensing agreement granting Merck nonexclusive rights in the United States and Canada to the use of the strain and the Biken know-how (PTX551). Through subsequent amendments, Merck's rights in the United States and Canada became exclusive, and Merck received non-exclusive rights elsewhere. In February 1982, Biken and SB entered into a licensing agreement granting SB nonexclusive rights in Europe in the Oka strain and Biken know-how. The agreement states that it sets forth "the terms under which [Biken] will provide to" SB the trade secrets. The agreement grants rights only in the contract territory (PTX552). Biken offered SB nonexclusive rights in the United States and several other countries, but SB chose instead to accept nonexclusive rights in Europe (PTX472; PTX552). SB later was able to acquire additional nonexclusive rights in other countries of the world, but not the United States or Canada (PTX569). By the time SB acquired those nonexclusive rights, Biken had already granted Merck exclusive rights in the United States and Canada.

Biken intended to produce a commercial varicella vaccine and retained for itself exclusive [*19] rights in Japan and Korea and nonexclusive rights elsewhere (until it granted Merck exclusive rights in the United States and Canada). Thus, in 1979, Takahashi's laboratory process was transferred to the production facility at Kanonji, Japan, which thereafter developed a process for producing varicella vaccine on a commercial scale (Tr. 780, 842).

In 1986, Biken received approval from the Japanese Ministry of Health to sell its varicella vaccine for healthy individuals and subsequently received similar approval in Korea (Tr. 781, 783). Biken was the first entity to be approved to sell a varicella vaccine for healthy individuals, although SB received approval to market the vaccine to immunocompromised individuals in 1984. As of 1990, the commercial process developed at Kanonji had a capacity of [TEXT REDACTED BY THE COURT.] doses per year and Biken was actually producing between [TEXT REDACTED BY THE

COURT.] doses annually (Tr. 783).

*E. SmithKline's 1985 Laboratory Process*

Prior to obtaining the Oka strain from Takahashi in 1975, SB had worked with other strains of varicella virus (PTX632, A554-604). SB was not successful, however, and sought the Oka strain as the "strain [*20] of choice for large scale production for wider application in normal children and possibly in elderly" (TX2220; Tr. 1664). After receiving the strain, SB first attempted to make vaccine in its laboratory. The contemporaneous documents that still exist from the late 1970's show that SB in fact looked to Biken and benefited from Biken's help. When Erik D'Hondt in 1975 began his laboratory work at SB with the Oka strain, he received Takahashi's laboratory method, which included such information as Biken's use of for incubation of the varicella virus (PTX1). Although SB's experience with other varicella strains was to incubate at [TEXT REDACTED BY THE COURT.] SB adopted Biken's [TEXT REDACTED BY THE COURT.] incubation for the Oka strain (Tr. 1886-88, 1893-94; TX1396, TX2163).

SB asserts that it was interested only in the Oka strain and not in Takahashi's method for producing a vaccine (SB Br. n.5) and points to a 1974 SB document stating that Biken has "very little experience in sonication" (TX 2164). Nevertheless, in 1977 and again in 1978, Dr. N. Zygraich and Dr. Stan Huygelen, D'Hondt's supervisors, wrote to Takahashi that SB was "unable to get cell-free virus using our regular [*21] sonication method" and requested information on Biken's sonication method (PTX3, PTX8). Biken provided the requested information both times, including details on the specifications of its sonication equipment (PTX4, PTX9). In addition, SB's and Biken's records reflect that Huygelen and Takahashi exchanged visits relating to varicella at least in 1979 and 1982 (PTX12, PTX13, PTX 14, PTX187, PTX188). D'Hondt later acknowledged his dependence on Biken in a memo to management that stated that the procedure used to prepare experimental batches "was a mixture of the Takahashi data and our own data and experience" (PTX21).

SB made its first batch of Oka strain varicella vaccine for use in clinical trials in D'Hondt's laboratory in 1977 (Tr. 1692-93). Several more batches were made in the laboratory in late 1979 and clinically tested (Tr. 1697-99). These were all small-scale.

SB sought registration in Europe of its varicella vaccine for immunocompromised children in 1983 and around that time decided to transfer its varicella vaccine process from R&D to production. Michel Duchene, the SB employee in charge of the transfer, testified that SB's attempt to make that transfer "faced a great [*22] deal of difficulties . . . particularly linked to the great sensitivity of the virus," and that SB experienced "numerous failures" (Duchene dep. 32, 44). As a result, Duchene had to "reproduce to the letter everything that was done in R&D," rather than use SB's standard manufacturing practices, in order to achieve adequate viral yield (*id.* at 44, 50-55).

Although SB already had extensive experience in the development of large scale manufacturing processes for producing vaccines (SB Post-tr. Br. at 5), SB was not able to use commercial production parameters for its 1985 process for varicella vaccine (Duchene dep. at 69). For example, SB was not able to adapt the varicella process to normal working hours, but rather had to make "a strict application of the approach employed by R&D" which involved production outside of normal working hours (*id.* at 61; PTX17; (inoculation of [TEXT REDACTED BY THE COURT.] viral passage on [TEXT REDACTED BY THE COURT.]); Biken itself had this same need, however. SB also had to adopt the same small scale of production in its production department as it had used in D'Hondt's research and development laboratory, whereas for other vaccines, SB [*23] was able to scale up [TEXT REDACTED BY THE COURT.] (Duchene dep. at 36). D'Hondt stated that SB's 1985 process was "more lab-scale than industrial" (PTX632). Biken, on the other hand, was producing [TEXT REDACTED BY THE COURT.] doses of vaccine per year in 1990 (Tr. 2010).

SB's "Laboratory Method" for varicella vaccine (written in 1985 and approved by Duchene) was the standard operating procedure ("SOP") that confirmed the parameters SB had been applying for production of varicella vaccine for the immunocompromised market (PTX17). The 1985 process did not specify the BSA content of the vaccine produced, and the vaccine in fact did not meet the WHO standard later adopted by SB (based on concerns) to have less than 25 ng/dose of BSA (Tr. 534, 1929).

Because the market for immunocompromised individuals was very small, SB was able to make varicella vaccine for that market, even though its process had not been designed to produce large quantities of vaccine at reasonable cost (Tr. 1915-17). SB did not expect that the vaccine would be a commercial success, and knew that its sales would be limited (Tr. 1915-16). From 1985 through 1992 SB actually sold a total of only [TEXT REDACTED [*24] BY THE COURT.] doses to satisfy the "market need" (TX2616).

## F. SB's Efforts to Redevelop the 1985 Process

I note here, by way of introduction, that SB provided at trial a list of fourteen steps in its production of the varicella vaccine. For each of the steps it claimed that either: (a) SB independently developed it; (b) SB used it in its 1985 process or disclosed it to the FDA by 1983; (c) Biken had published it; or (d) the step was either not disclosed or SB's process differs from what was disclosed by Biken. Because Merck need only prove that SB misappropriated one of the steps to obtain an injunction and because addressing all of the steps would lengthen this opinion to the over 900 pages submitted by the litigants [6] (almost half of which are SB's proposed findings of fact and conclusions of law), I will limit my discussion as much as possible to just two of these steps. Therefore, I need not reach an opinion as to whether SB misappropriated any of the remaining twelve steps.

> [6] Although I lament the length of the submissions, it is understandable given the complexity of the issues and the tremendous volume of documents and exhibits introduced at trial. Moreover, I thank counsel for providing the post-trial briefs on hyper-linked CD-ROM discs. It would not have been possible to review the record and the legal arguments and issue this decision as promptly without this high-tech advantage.

[*25] I. SB's Initial Work and the VA30 Series (VA30-34)

In anticipation of seeking approval of its varicella vaccine for use in healthy individuals, SB continued after 1985 to try to develop a commercial production process. The 1985 varicella process was the "starting point" for that effort, and the task facing the developers was "essentially to move from the [1985] process to a large-scale commercial production process" (Didelez dep. 18, 304).

Duchene and Luc Ostyn began the work, with Jean Didelez taking over for Duchene in 1987 or 1988 (Didelez dep. 17). In the view of Didelez, the 1985 process was "more close to a lab process than an industrial process" and "was adapted to discount production but not to large scale production" (Didelez dep. 10-11). It was "quite clear" to him that "you could not increase the size, the batch size with this type of process" and that "you had to redevelop a new process" (Didelez dep. 61-62).

In 1986, SB received an additional supply of Oka varicella seed from Biken, Oka M2001, along with documentation about Biken's process for making the seed (D'Hondt dep. 435-36; TX2312, TX2485). SB used this new seed as the starting material in its production [*26] of experimental lots beginning in 1986. During the period from 1986 through spring 1989, several experimental bulk lots were made, (Ostyn dep. 30) and numerous other experiments were performed (TX2731).

Instead of leading SB to its goal, the result of this work was that the production process was "once again brought into question" (Ostyn dep. 30, 223). The Product Development Committee ("PDC"), SB's top management committee responsible for "defining the strategy [and] setting the priorities" for varicella and other vaccines, reported as of the end of April 1989 that in the technical development "there is no consistency of production yields" and "further work has to be undertaken" (PTX37).

One reason the production process was again brought into question was "the size, which was not sufficiently industrial" and did not allow production of [TEXT REDACTED BY THE COURT.] (Ostyn dep. 31, 223-24). A separate concern was that the lots had "high BSA content" (id.). The concern over BSA stemmed from SB's decision in early 1988 to meet the draft standard promulgated by the WHO for the maximum amount of residual BSA (TX2717; Ostyn dep. 31). This decision created a further obstacle [*27] in the development--"it was not simple to produce a vaccine with a low BSA content" (Ostyn dep. 31).

2. Didelez's Fall 1989 Attempt at a "Most Plausible Scheme"

On September 21, 1989, Didelez prepared "a fast varicella position and a proposal for a program" for his superiors, Christian Vandecasserie and Jean Stephenne, Vice President of Production and R&D (PTX40; Tr.

2298). The proposal called for production of two lots of bulk vaccine "following the most plausible scheme today," and completion of development by the end of 1989. Then, in January-March 1990, Didelez expected there would be production of "3 lots following a refined method" (id. at PTX40).

Didelez's "most plausible scheme" called for: (1) new kinetics--"MOI [TEXT REDACTED BY THE COURT.] last passage" and "harvest towards [TEXT REDACTED BY THE COURT.] hours"; (2) reduction of BSA, by substituting [TEXT REDACTED BY THE COURT.] for [TEXT REDACTED BY THE COURT.] as the maintenance medium; and (3) clarification by [TEXT REDACTED BY THE COURT.] instead of centrifugation which SB had been using (id.). Didelez did not propose any particular culture vessel.

The points addressed by Didelez's most plausible [*28] scheme were fundamental. MOI is critical, because it directly affects the quantity of vaccine that can be produced (Tr. 117). An MOI of [TEXT REDACTED BY THE COURT.] uses half as much viral seed (the starting material) relative to the amount of uninfected cells and infects at a slower rate, as compared to an MOI of [TEXT REDACTED BY THE COURT.] (Tr. 110-14). Thus, [TEXT REDACTED BY THE COURT.] provides twice as many doses as [TEXT REDACTED BY THE COURT.] assuming the pfu titer per ml of bulk is maintained. Maintaining the pfu's was the challenge, and it could not be known without experimentation whether that was possible (Tr. 115-17). The harvest time was relevant to SB's concern to harvest during the day (Tr. 545-46). BSA had to be reduced because of the WHO standard, while clarification was critical to removal of whole cells.

SB proceeded in October 1989 to make the two planned experimental bulk lots (VA35 and VA36) with "the most plausible scheme," and two additional experimental lots (VA37 and VA38) in early 1990 with different kinetics (Ostyn dep. 294-95, 313, 318-21, 325-32, 338-40, 342-44). Three different culture supports were tested: [TEXT REDACTED BY THE [*29] COURT.] These experiments failed to meet expectations. In some instances, no conclusions were noted; in others, it was noted, it was "impossible to draw conclusions" (PTX47) or there were "no titers" (PTX47). BSA was "still quite high" (Ostyn dep. 335).

The October 1989 trial gave titer for an MOI of

[TEXT REDACTED BY THE COURT.] of only half that using an MOI of--[TEXT REDACTED BY THE COURT.] pfu versus [TEXT REDACTED BY THE COURT.] pfu prior to clarification (PTX45). This was the only trial of an MOI of [TEXT REDACTED BY THE COURT.] prior to the visit by Biken to SB in December 1990.

SB asserts that, because the values in that one trial "after clarification *were identical*, SB concluded that there was not a significant difference between the [TEXT REDACTED BY THE COURT.] ratios" (SB Br. 15). Because of the possibility of variability, (Tr. 2283-84), however, SB witnesses testified that it was necessary to perform multiple experiments (Thysman dep. 222-23, 431; Didelez dep. 669, 720-21). It is important to note that the comparison in that trial was with [TEXT REDACTED BY THE COURT.] hours, not [TEXT REDACTED BY THE COURT.] hours that SB had established as optimal [*30] (PTX45). So SB could not have concluded that [TEXT REDACTED BY THE COURT.] hours were just as good as [TEXT REDACTED BY THE COURT.] hours at this stage of development. SB did not make that comparison until after the Biken visit (PTX120).

**3. Didelez's New "Most Plausible Scheme" and the Need for a "Fresh Start" in March 1990**

After this experimentation, on March 2, 1990, Didelez wrote a memo to his superiors (PTX56), the purpose of which was to provide a "summary of the status of the development and information of the next experiments to be conducted" (Didelez dep. 703). The memo recites that he was attaching "the production scheme retained as being the most plausible."

That scheme contemplated using [TEXT REDACTED BY THE COURT.] and, unlike the September 1989 scheme, either [TEXT REDACTED BY THE COURT.] as the MOI for the last viral passage, with "harvest depending on timing to be determined" (PTX56). (Didelez dep. 703-04). While SB claims [TEXT REDACTED BY THE COURT.] was compared to [TEXT REDACTED BY THE COURT.] because it had more experience working with a [TEXT REDACTED BY THE COURT.] MOI, I do not find that credible. If SB had determined a [TEXT REDACTED [*31] BY THE COURT.] MOI was optimal and preferable to [TEXT REDACTED BY THE COURT.] because it yielded twice as much virus, it would only be

natural for SBI to use [TEXT REDACTED BY THE COURT.] as its new base line.

Didelez, having concluded that SB's development needed a "fresh start," in March 1990 hired Pierre Thysman, a recent graduate in chemical engineering. (Thysman dep. 10-13, 214-16). Thysman's first work was application of the "production scheme" proposed in Didelez's March 2 memo (Ostyn dep. 357-58). Had the scheme turned out well, Didelez planned that "batches will be produced in May to June [1990] adopting the optimal parameters that have been decided upon" (Ostyn dep. 348; A265). However, the scheme did not work at all. In Ostyn's words--"all the results were bad," "catastrophic," "very weak," or "all weak" (Ostyn dep. 359-60, 381, 388).

SB asserts, based on trial testimony of Didelez, that from these trials it knew all along the kinetics that it would use (SB Br. 16-17). According to SB, it had decided from the single trial in October 1989 to use kinetics of [TEXT REDACTED BY THE COURT.] MOI and harvest at [TEXT REDACTED BY THE COURT.] hours, unless it [*32] could do even better with an MOI of [TEXT REDACTED BY THE COURT.] which it decided in May 1990 it could not (SB Br. 15-16). But this factual scenario is contradicted by overwhelming evidence. Before trial, Didelez testified that "none of the experiments after September '89 [and before June 1990] allowed [him] to draw any conclusions with respect to kinetics" (Didelez dep. 764). That testimony applies to the October 1989 trial of [TEXT REDACTED BY THE COURT.]. In his March 2, 1990 status memorandum, Didelez articulated that either [TEXT REDACTED BY THE COURT.] or [TEXT REDACTED BY THE COURT.] was "most plausible" (PTX56; OB 20-21). The document did not say that [TEXT REDACTED BY THE COURT.] looked good, but [TEXT REDACTED BY THE COURT.] might be better. In a June 19, 1990 memorandum (PTX61), Didelez characterized the results from the [TEXT REDACTED BY THE COURT.] MOI trial in October 1989 as "very disappointing" (PTX61).

SB admits that after June 1990 it did no further work on MOI until January 1991--after Biken's visit to SB (SB Br. 16-17). All the trials in the interim were with [TEXT REDACTED BY THE COURT.] MOI, leading me to conclude that SB had not decided [*33] upon [TEXT REDACTED BY THE COURT.] (PTX183).

4. The Admitted "Failure" as of June 1990

Didelez on June 19, 1990 gave management a "succinct summary of the development work conducted since '88" (PTX61). That memo did not report that SB had actually resolved any of the issues that had been the subject of its experiments. He gave no "most plausible scheme." On kinetics, Didelez reported, based on the work conducted prior to fall 1989, that "the maximum amount of infectious titer is reached around [TEXT REDACTED BY THE COURT.]" and an MOI of [TEXT REDACTED BY THE COURT.]. He did not suggest that any different conclusion had been reached from the October 1989 test of [TEXT REDACTED BY THE COURT.] As noted above, he characterized the pfu titer from that condition as "very disappointing" (PTX61). On clarification, Didelez expressed that "it is possible to clarify . . . by [TEXT REDACTED BY THE COURT.] . . . with results comparable to clarification by [TEXT REDACTED BY THE COURT.] (PTX61). Didelez preferred [TEXT REDACTED BY THE COURT.] for practical reasons and because it posed less risk of contamination (Didelez dep. 617-18).

Didelez directed the remainder of his summary [*34] to the BSA problem, apprising management that the effort to reduce BSA "is now a failure" (PTX61). At that point, SB had spent about a year and a half attempting to solve the BSA problem by the use of [TEXT REDACTED BY THE COURT.] in lieu of FBS. Didelez theorized about the role of BSA, but had no answer, and said that, "before pursuing the development it is still necessary to determine whether [TEXT REDACTED BY THE COURT.] works" during cell culture or virus harvest (PTX61). While Didelez was unsure about how to address the BSA problem, he had reason to believe that Biken had done so successfully (PTX61). In July 1989, SB obtained samples of Biken's vaccine which it tested for BSA and pfu's (PTX38, PTX73). Those tests indicated that Biken had achieved both low BSA and high pfu's. Thus, Didelez in his June 1990 memorandum tellingly wrote, "It would be very useful in comparison to know what Takahashi has done." (PTX61).

5.

The evidence does not support SB's assertions that it had resolved the problem of low pfu's, separately or otherwise. The three steps that SB cites as having increased pfu's did not succeed, and SB was not able to achieve its objectives. As Thysman [*35] admitted, the results of the fall trials were all unacceptable (Thysman

dep. 507, 511-12, 521, 558-60, 589-90, 652-53, 656). No data shows that pfu's "steadily" increased as the fall 1990 trials pregressed (SE Br. 22), despite SB's statement to the contrary (SB Br. 22).

SB made at least one change which may have succeeded in giving high pfu's--the change to [TEXT REDACTED BY THE COURT.] using Biken's conditions (Tr. 1007-09). But this change did not occur until *after* the Biken visit, and I find that SB must have learned this key step from Biken in that visit. SB had not settled upon the [TEXT REDACTED BY THE COURT.] parameters by December 6, 1990, had not tested different [TEXT REDACTED BY THE COURT.] at all, had never tested [TEXT REDACTED BY THE COURT.] (Biken's conditions) (Tr. 2190-92), and had not even decided to [TEXT REDACTED BY THE COURT.] rather than [TEXT REDACTED BY THE COURT.] (PTX61; C7.8; Didelez dep. 1010-29). SB admits that it had not completed its development work prior to Biken's visit. It admits that "work that needed to be completed prior to beginning the consistency lots concerned the [TEXT REDACTED BY THE COURT.] step and a test combining [*36] all of the final parameters that SB independently developed" (SB Br. 24). [7]

> [7] Without addressing the law at this point, I note that SB's "publication" defense for this step must fail on the facts:
>
> [TEXT REDACTED BY THE COURT.] was published in November 1993 while SB first used those parameters in December 1990--after observing Biken's process.

## G. The Visits to Biken

### 1. The December 6, 1990 Visit

In the fall of 1990, SB decided to seek Biken's assistance. On October 31, 1990, Stephenne initiated a request to Takahashi through Dr. Dirk Teuwen to "share with us an update on the method of bulk production for the OKA strain as well as the lyophilisation process currently applied at Handai-Biken" (PTX89). At a meeting shortly thereafter, SB arranged that Biken personnel would come to SB's Belgian facility on December 6 for a meeting that "would allow us to bring together our people from clinical and production to review with Takahashi and Takeo Konobe various aspects on varicella" (PTX92). A draft agenda, [*37]

provided to Didelez and D'Hondt on November 19, called for a presentation by Biken of its "OKA vaccine production characteristics" (PTX94).

As of 1990 when SB sought Biken's help, Biken had vast experience in the commercial production of vaccines, and actually was producing on a regular basis large amounts of varicella vaccine. SB's claim that it was not seeking help from Biken when it asked for extensive information on Biken's process is implausible and not supported by any evidence. According to Stephenne, his principal interest was "to check whether they [Biken] have something better than us or not" and "the only thing we were doing is to compare to what they were doing" (Stephenne dep. 139, 152). Teuwen confirmed that Stephenne, who initiated the requests to Biken, wanted to "be able to observe all steps of the manufacturing" and "look at the steps on the varicella production" (Teuwen dep. 180, 201).

On December 6, 1990, Takahashi, Konobe, and Iwao Yoshida from Biken made a presentation to Didelez and others from SB of the Biken production method used to make its successful vaccine. Biken presented a detailed flow diagram of its process by way of slides that were then given [*38] to SB, and "reviewed the different steps of the production" (PTX105; Didelez dep. 279, 939). Didelez and others took detailed notes, recording the kinetics, washing, and clarification schemes (PTX106; Didelez dep. 1031-35). SB was able to and did ask questions (Yoshida dep. 136).

SB was also "interested by the consistency of the [pfu] results from batch to batch," which SB thought "was very, very consistent" (Didelez dep. 279-80). Didelez testified that the SB personnel "were quite impressed by these consistent results and so we realized that we had some progress to make in that field" (Didelez dep. 281). It was confirmed during the meeting that Didelez and Duchene would travel to Japan.

Following the meeting, Didelez "transferred [the Biken] slides to my team and we have certainly reviewed the slides in detail" (Didelez dep. 295). The team paid attention to both similarities and differences (Didelez dep. 935; Thysman dep. 694, 698), so that SB could focus its efforts on differences that might account for Biken's success (Didelez dep. 941). Biken's process had enough commonalities with SB's efforts that SB was able to identify and make changes quickly. As Dr. Daniel Wang [*39] explained, SB "did not see anything on the

flow sheet . . . --any piece of equipment, or any process in there--which is outside of the realm of what SmithKline is able to practice" (Tr. 993).

Before the Biken visit, Didelez had investigated and found that Biken's vaccine had both high pfu's and low BSA (PTX38; PTX73; Didelez dep. 1041-42), which SB had been unable to obtain in combination. The Biken visit showed Didelez that, to achieve high pfu's and low BSA, Biken had not had to resort to a [TEXT REDACTED BY THE COURT.] proposed by D'Hondt (PTX95)) and, instead, had achieved success by use of [TEXT REDACTED BY THE COURT.] to remove BSA and [TEXT REDACTED BY THE COURT.] to maintain potency (Tr. 997-1000, 1007-09). Because SB had experimented with [TEXT REDACTED BY THE COURT.], it was able quickly to settle on that approach from among the options it had considered (Tr. 997-98). It was also able quickly to test and incorporate Biken's [TEXT REDACTED BY THE COURT.] technique.

On December 6, 1990, immediately after the Biken presentations and following the team's discussion of the Biken procedure, Thysman directed a technician, Etienne De Waele, to run the Biken bulk vaccine [*40] procedure in trial 061290EVA (Didelez dep. 998). The December 6 trial involved certain "comparative points studied" (PTX110), most notably comparison of [TEXT REDACTED BY THE COURT.] schemes: SB's standard varicella [TEXT REDACTED BY THE COURT.] (denominated "reference"); Biken's [TEXT REDACTED BY THE COURT.] which the technician specifically attributed to "BIKEN"; and [TEXT REDACTED BY THE COURT.] which had been Didelez's preference because "we use [it] in all the other vaccines so we had more experience and it is more practical" (Didelez dep. 999).

The December 6, 1990 trial was the SB's team's first with [TEXT REDACTED BY THE COURT.]--which was significantly different than SB's standard [TEXT REDACTED BY THE COURT.] condition. In particular, [TEXT REDACTED BY THE COURT.] (Tr. 988). SB got further data about the significance of the different [TEXT REDACTED BY THE COURT.] schemes during the January visit to Biken which soon followed.

As to kinetics, Biken's presentation on December 6, 1990 of its detailed process diagram contained all the information necessary for SB, an experienced vaccine

manufacturer, to determine that Biken successfully used an MOI of [TEXT [*41] REDACTED BY THE COURT.] and incubation of [TEXT REDACTED BY THE COURT.] in its final viral passage (PTX105). As Wang explained at trial, the information in Biken's diagram was all SB needed to make a reasonable assumption that the bottles Biken used were only about [TEXT REDACTED BY THE COURT.] infected, so that Biken's MOI in its final viral passage was [TEXT REDACTED BY THE COURT.] (Tr. 954-56). Even if SB did not figure this out, however, I believe it must have learned that Biken was using an MOI substantially [TEXT REDACTED BY THE COURT.] because, if SB had assumed that Biken's infectivity was [TEXT REDACTED BY THE COURT.], the MOI would then have been [TEXT REDACTED BY THE COURT.], and an infectivity of less than [TEXT REDACTED BY THE COURT.] would result in an even lower MOI (Tr. 954-55).

Notably, on January 3, 1991, SB ran a light kinetics trial in which it tried the preferable, more diluted MOI successfully used by Biken [TEXT REDACTED BY THE COURT.] harvest (Tr. 2277-80). This was the first SB trial using [TEXT REDACTED BY THE COURT.] since the fall of 1989. SB began its first potential consistency lot, VA101, on January 17, 1991. Didelez acknowledged [*42] that January 1991 was the first time SB used in combination all the steps selected for VA101 (Tr. 2306). For VA101, SB selected kinetics like Biken's with an MOI of [TEXT REDACTED BY THE COURT.] and [TEXT REDACTED BY THE COURT.] with the Biken conditions, although SB's preference had been for [TEXT REDACTED BY THE COURT.], and its trials before the Biken visit gave just as good results with [TEXT REDACTED BY THE COURT.] (Tr. 664, 669, 672-73). SB does not deny that the [TEXT REDACTED BY THE COURT.] parameters it adopted after Biken's visit were precisely the same as Biken's.

SB argues that Biken did not state the [TEXT REDACTED BY THE COURT.] it used for [TEXT REDACTED BY THE COURT.] and, therefore, Biken's [TEXT REDACTED BY THE COURT.] conditions were meaningless (SB Post-Tr. Br. 37-38). But Biken's flow diagram did contain the only information SB needed ([TEXT REDACTED BY THE COURT.]) to see that Biken's [TEXT REDACTED BY THE COURT.] conditions differed from SB's and to adopt Biken's. SB had to believe that its [TEXT REDACTED BY THE

COURT.] equipment was comparable to Biken's, given the volumes involved, so all SB had to do was "go straight ahead and [*43] do the [TEXT REDACTED BY THE COURT.]" in its own equipment, [TEXT REDACTED BY THE COURT.] (Tr. 162-63). [8] Indeed (and perhaps most telling), SB specifically attributed [TEXT REDACTED BY THE COURT.] condition to "BIKEN" in its December trial right after the Biken visit (Tr. 2147). This fact alone refutes SB's claim that it "was lacking critical information necessary . . . in order to compare the Biken process to the SB process" (SB Br. 38)--immediately following the Biken visit, SB made that exact comparison. The Biken [TEXT REDACTED BY THE COURT.] conditions were significantly different from any conditions tested previously by SB, involving only [TEXT REDACTED BY THE COURT.] applied under SB's conditions [TEXT REDACTED BY THE COURT.]. Use of such conditions by Biken was counterintuitive, as Wang testified (Tr. 1007-09).

> [8]   There are only a few designs of [TEXT REDACTED BY THE COURT.] equipment capable of handling the volumes being used by Biken and SB; a person familiar with [TEXT REDACTED BY THE COURT.] could estimate the [TEXT REDACTED BY THE COURT.] (Tr. 160-62).

[*44] SB also does not assert an independent development story with respect to [TEXT REDACTED BY THE COURT.]. Didelez testified only that he does not remember how SB ended up selecting the identical Biken conditions [TEXT REDACTED BY THE COURT.] (Tr. 2148-49). SB's speculation that it simply set its [TEXT REDACTED BY THE COURT.] (SB Br. 38) and by coincidence ended up with the Biken technique is not credible. No SB witness previously made this alleged "logical" speculation (SB Br. n.41), which is based on one clear misstatement of fact--that its December 6 test compared Biken's "[TEXT REDACTED BY THE COURT.] against conditions [TEXT REDACTED BY THE COURT.]" (*id.*). The comparison was to SB's standard condition of [TEXT REDACTED BY THE COURT.] (PTX110). Thus, while SB attempts to explain the change in [TEXT REDACTED BY THE COURT.], it fails to explain the important change from [TEXT REDACTED BY THE COURT.].

2. The January 1991 Visit

In late January 1991, Didelez and Duchene went to

Biken's production facility in Kanonji (PTX254). During the five days, they were able to observe most steps of Biken's production process, and received descriptions and other information [*45] about the process steps that they were unable actually to observe (Tr. 799-800, 803-04). When not observing the production process, they met with Biken personnel to discuss the process and have questions answered (Tr. 804; Akiyama dep. 314-15). The Biken employees had been instructed by Dr. Fukai, the chairman of Biken, to provide whatever information SB requested (Tr. 790).

One subject discussed was Biken's [TEXT REDACTED BY THE COURT.] of the bulk vaccine by [TEXT REDACTED BY THE COURT.]. As reflected in Biken employee Terumasa Otsuka's notes (PTX254), SB asked about the relationship between [TEXT REDACTED BY THE COURT.]. In response, Biken provided the results of a study (PTX254) showing that [TEXT REDACTED BY THE COURT.] resulted in significantly less potent bulk vaccine (Tr. 812-13). SB saw the [TEXT REDACTED BY THE COURT.] process (Tr. 812) and specifically asked about the [TEXT REDACTED BY THE COURT.], which caused the Biken personnel to take them to a room in which equipment catalogs are kept and show them the [TEXT REDACTED BY THE COURT.] catalog (Tr. 813-14). That catalog showed, among other things, the [TEXT REDACTED BY THE COURT.] (Tr. 814-15). SB [*46] asked specifically whether [TEXT REDACTED BY THE COURT.] was preferable (Tr. 811). While Otsuka did not recall the details of that discussion, his personal view was that [TEXT REDACTED BY THE COURT.] was the better method (Tr. 888). Biken also discussed its kinetics with SB, and how Biken's experiments had shown that its parameters were optimal (PTX124).

Following the visit to Biken, Didelez and Duchene prepared a report of their trip for their superiors, including Stephenne. The cover page stated:

> The purpose of the visit was to observe a bulk Varicella production and the pertinent QC in detail.
>
> It is unfortunate that this visit took place so late and that nobody from SKB had ever visited the Kanonji factory previously.
>
> It is in fact quite clear a posteriori that

precious time could have been saved both in production as well as in QC if this visit had been made several years ago. [9]

(PTX124).

> [9] Didelez claimed at trial that the time savings referred to was related to the time SB spent speculating as to whether Biken's process was superior (Tr. 2008-09). I find this reading to be highly tortured, in conflict with the plain language written, and not credible.

[*47] The report notes that the Biken process "complies exactly" with the process description SB had previously received and states, "We were able to observe in detail the successive operations and eliminate the last remaining doubts, and come away with a certain number of important operational details." (PTX124). With respect to [TEXT REDACTED BY THE COURT.] the trip report notes:

> [TEXT REDACTED BY THE COURT.] important to limit losses: see attached [TEXT REDACTED BY THE COURT.] table. (PTX124). The report thus confirmed that the [TEXT REDACTED BY THE COURT.] was important to limit the loss of potency, and elsewhere the report noted that the loss "is [TEXT REDACTED BY THE COURT.]," and referenced specifically to attachment 3 the charts which Biken provided showing the correlation between [TEXT REDACTED BY THE COURT.]. The fact that Didelez recorded Biken's [TEXT REDACTED BY THE COURT.] conditions as being [TEXT REDACTED BY THE COURT.], is further acknowledgement that he felt it was unnecessary to do so because their equipment was comparable.

With respect to kinetics, the report confirmed that Biken's split ratio of REDACT was "optimal" [10] and that the "maximum [*48] infectious titer in released virus [*i.e.* fo the last viral passage] was not reached until [TEXT REDACTED BY THE COURT.]:"

> Experiments done with the [TEXT REDACTED BY THE COURT.] MOIs showed that [TEXT REDACTED BY THE COURT.]

10    Biken's [TEXT REDACTED BY THE COURT.] equated to an MOI of [TEXT REDACTED BY THE COURT.] (Tr. 954-55).

The [TEXT REDACTED BY THE COURT.] applied today seems optimal. [TEXT REDACTED BY THE COURT.] (PTX124).

The trip report prepared by Didelez and Duchene expressly states that SB was able to "eliminate the last remaining doubts, and come away with a certain number of important operational details," and indicates that the elimination of "remaining doubts" refers to the use of [TEXT REDACTED BY THE COURT.] and the split ratio [TEXT REDACTED BY THE COURT.], both of which SB had learned about from Biken in early December and thereafter incorporated into its first production lot (PTX124). The reference to "important operational details" indicates that SB learned [*49] some additional information of value, and the memo on its face confirms the savings of time as a result of the information received from Biken (PTX124).

## II. ANALYSIS OF MERCK'S MISAPPROPRIATION CLAIM

### A. Choice of Law

Choice of law is an issue that need not be resolved. No party has pointed to any substantive difference in the laws of the various states having some contact with the matters at issue. No single state has "the most significant relationship" to the matters at issue. *See Travelers Indem. Co. v. Lake, Del. Supr., 594 A.2d 38, 47 (1991)* (citing *Restatement (Second) of Conflicts § 145*). Two of the parties are incorporated in Delaware, one in New Jersey, one in Pennsylvania and one in Belgium. The FDA, to which SB has made filings which include trade secret disclosures, is in Maryland. California and New York are where SB conducted clinical trials. And SB's Phase III clinical trial apparently is being conducted in a number of locations (Pietrusko dep. 16-17). The conduct that Merck seeks to prevent (marketing of SB's varicella vaccine) will occur throughout the United States and Canada. Another relevant factor on choice of law, the place [*50] where the parties' relationship is centered, does not suggest any particular state--Merck is a New Jersey corporation and the "relationship" giving rise to its claims is the agreement under which it has exclusive United States and Canadian rights to the Biken know-how.

Insofar as it is necessary to resolve the choice of law, these factors lead to application of the Uniform Trade Secrets Act ("UTSA"), which codifies the basic principles of common law trade secret protection and has been adopted by over forty states, including Delaware (*6 Del. C. §§ 2001-09*), Maryland (*Md. Code Ann., Commercial Law §§ 11-1201 to 11-1209*), and California (*Cal. Civ. Code §§ 3426 to 3426.11*). Pennsylvania law does not apply, because only a single factor (one defendant is a Pennsylvania corporation) favors its application. Therefore, to the extent I must rely on a particular jurisdiction's substantive law, I will rely on the UTSA.

### B. Biken's Process Know-How is a Trade Secret

A process is a trade secret if it derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who ean obtain economic value from [*51] its disclosure or use, and is the subject of efforts to maintain its secrecy that are reasonable under the circumstances. *6 Del. C. § 2001(4); Miles, Inc. v. Cookson America, Inc., Del. Ch., 1994 Del. Ch. LEXIS 221*, C.A. No. 12310, 1994 WL 676761, Hartnett, J. (Nov. 15, 1994). The Biken process meets all the elements of a trade secret.

### 1. The Biken Process is a Valuable Commercial Process

A commercial production process consisting of a "combination of the principles and details used to make a product" can be a trade secret, as can elements of the process. *Miles, 1994 Del. Ch. LEXIS 221*, *30, 1994 WL 676761. The combination of steps into a process is a trade secret, even if all the component steps are known, so long as it is a "unique process which is not known in the industry." *Salsbury Labs., Inc. v. Merieux Labs., Inc., 735 F. Supp. 1555, 1569 (M.D. Ga. 1989), aff'd, 908 F.2d 706 (11th Cir. 1990); see also Miles, 1994 Del. Ch. LEXIS 221*, *23, 1994 WL 676761, at * 11; accord, Imperial Chem. Indus. Ltd. v. National Distillers & Chem. Corp., 342 F.2d 737, 742 (2d Cir. 1965)* ("A trade secret can exist in a combination of characteristics and components, each [*52] of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.") This principle simply recognizes that the choice of individually known components and techniques to create

a working manufacturing process is often, as here, a difficult undertaking. Where at individual steps of a process there are a variety of alternatives, the choice made through much effort of specific ingredients, materials, conditions, and steps in an actual, working process constitutes a trade secret. *See, e.g., Salsbury Labs., 735 F. Supp. at 1569.*

The changes needed to convert a known laboratory process into a manufacturing process can constitute protectable trade secrets. For example, in *Salsbury Laboratories*, the court found that plaintiff's commercial process for manufacturing an avian vaccine was a trade secret even though laboratory production methods were generally known. *Id.* On appeal, the Eleventh Circuit noted that "producing MG-BAC on a commercial scale was a novel accomplishment which took several years to achieve," that the existence of small-scale [*53] method did not change:

> Nor was the development of MG-BAC merely an extension of the existing methods of producing an MG vaccine on a small scale. . . . While the autogenous MG vaccine provided the basis for commercial development, there is ample evidence that much time, labor and money were expended by plaintiff in developing a new process and product.

*Salsbury Labs.*, 908 F.2d at 711.

In *Monovis, Inc. v. Aquino, 905 F. Supp. 1205 (W.D.N.Y. 1994)*, the court held that trade secret protection extends to the practical problem-solving that enables commercial application of theoretical concepts:

> Zimmern's Know-How serves as a guide, charting the way through the many problems and decisions faced in designing a single-screw compressor and developing a practical manufacturing technique. . . . To date, Zimmern and his licensees are alone in having successfully maneuvered the entire course and achieved commercially-viable single-screw compressors.

*Id. at 1231*. As the court pointed out, "Zimmern does not claim to be the 'inventor' of the single-screw compressor.

He credits past scientists such as DaVinci and [*54] Archimedes with the initial concepts underlying the screw. What he does claim responsibility for is solving the hundreds of practical problems encountered in actually building a working single-screw compressor, as opposed to merely appreciating the possibility in general or theoretical terms." *Id. at 1216*.

Biken developed a successful commercial production process for varicella vaccine and used that process to manufacture large amounts of high potency vaccine beginning in late 1986. That process is indisputably valuable.

2. The Biken Process is Not Generally Known or Readily Ascertainable by Proper Means

Under the Uniform Trade Secrets Act, information is not a trade secret if it is generally known to, or readily ascertainable by proper means by, others. *6 Del. C. § 2001*. This also is the standard under the Restatement of Torts. 1 *Milgrim On Trade Secrets § 1.07[2]* at 1-349. The mere fact that aspects of a trade secret process can be found in publications does not mean that the process is not a trade secret. For this reason, courts have rejected the argument that one who has learned particular information from a trade secret process is not liable [*55] if it can show that the information learned is somewhere "published":

> [Defendants] thus argue, for example, that because the Chilton Patent is "in the public domain," Zimmern cannot claim as a trade secret *any aspect which his manufacturing method has in common with that discussed in such patent.* This argument is premised on an overly restrictive view of trade secret protection which this Court rejects. It is, as earlier noted, only because of Aquino's confidential relationship with Zimmern (and the litigation its breach has generated) that the defendants are now able to select particular items from a vast sea of public information and contend that they "could" have divined therefrom *the needed critical information;* such is the very approach rejected in *Franke v. Wiltschek, supra.* Items such as the Chilton Patent were publicly available, but

were by no means obvious; they were not accompanied by instructions explaining where they were useful and where they were not, *or what particular elements they described were relevant and helpful and which were not*, or indeed why they should be selected over some other publicly available information. It is this type [*56] of knowledge which is the heart of Zimmern's Know-How.

*Monovis, Inc. v. Aquino, 905 F. Supp. 1205, 1228 (W.D.N.Y. 1994)* (emphasis added); *accord, Rohm and Haas Co. v. Adco Chem. Co., 689 F.2d 424, 433 (3d Cir. 1982)*. Because a process consisting entirely of generally known elements is protectable as a trade secret, *689 F.2d at 433-434*, the value of trade secrets would be lost if a defendant could obtain the process, learn thereby the important choices made by the trade secret owner at various process steps, use the information gained for its benefit, and avoid liability by then saying that the particular information used is "published."

In *Monovis, Inc.*, defendants argued that two patents disclosed "much" of the claimed trade secret for manufacturing single-screw compressors. Although the court agreed that the references disclosed some of the elements of the process, it held that more was needed:

> The defendants have not explained how an engineer uneducated in Zimmern's processes would be led to the [Redacted] process or the [Redacted] method by studying the patents; indeed, Zimmern's Patent would likely discourage [*57] the engineer from using the scraping method described by Chilton. In short, it is only because the defendants have been exposed to Zimmern's method that they have been able to locate public documents that make references, often oblique or disparaging, to elements of Zimmern's secret manufacturing method.

*905 F. Supp. at 1227* (emphasis added); *see also 905 F. Supp. at 1228* (armed with the trade secret information, defendants "are now able to select particular items from a vast sea of public information and contend that they 'could' have divined therefrom the needed critical information"). The court also rejected defendants' claim

that the "Chilton patent" negated plaintiffs' trade secret claim, in part because the patent did not lead to a viable commercial process: "Chilton's patent was merely a 'paper patent' describing a process that has not--and could not--be used to successfully produce a commercially-viable screw because it embodied a mistake that Zimmern had remedied." *905 F. Supp. at 1226*.

In *Rohm & Haas, 689 F.2d at 424*, the court required defendants to do more than point to individual elements of the trade secret process in the literature. In fact, defendants' [*58] own expert admitted that neither he nor defendants knew of the publications before the lawsuit. *Id. at 431 & n.5 (citing Heyden Chem. Corp. v. Burrell & Neidig, Inc., 2 N.J. Super. 467, 64 A.2d 465, 467 (N.J. 1949)* ("The truth is, of course, that only a person who knew the . . . process could make the selection of literature references which were offered in evidence.")). The court found that plaintiff had established the existence of a trade secret, noting that there was "no reason to suspect that defendants could have duplicated the Process through skill and effort using the available literature." *689 F.2d at 431*.

The three cases cited by SB to support its "publication" defense turned on their particular facts and are not relevant here. In *American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc., 114 F.3d 108 (8th Cir. 1997)*, the plaintiff attempted to change its definition of its trade secret from a combination of five elements comprising a yield management system to a combination of four of those elements. The District Court granted summary judgment because there was no evidence the defendant had received "any detailed algorithms [*59] or formulae describing how the five demand forecasting elements were to be incorporated, but had only received four of the general elements at the conceptual level without information as to how the concepts were to be combined." *114 F.3d at 110*. In *American Can Co. v. Mansukhani, 742 F.2d 314 (7th Cir. 1984)*, the alleged trade secrets were formulas for certain inks. However, the Court found that a patent "disclosed each of the ingredients (except dyes) in the trade secret formulas, and proportions for these ingredients," *742 F.2d at 327*, and that, under those circumstances, the trade secret could only consist of "precise proportions of the ingredients," *id.*, and because the defendants' precise proportions were different, there was no trade secret misappropriation. In *Flotec, Inc. v. Southern Research, Inc., 16 F. Supp. 2d*

*992 (S.D. Ind. 1998)*, the Court found that the defendant had not used any information received from the plaintiff but instead had developed its process independently through reverse engineering. *Id. at 1008.*

SB has not cited any case in which a court has allowed what SB has done--gained [*60] valuable information from access to a trade secret process and attempted to avoid liability by pointing to some publication of the particular information used. What the cases such as *Monovis, Salsbury,* and *Rohm & Haas* hold is that a trade secret process can consist of a combination of steps each of which has been publicly disclosed, and a defendant that has had access to such a process may not evade misappropriation on the basis that particular information learned from its access could be found in a publication.

The references that SB claims render the Biken Know-How "generally known" or "readily ascertainable" are similar to the rejected references in *Salsbury Laboratories* and *Monovis*, and, at best, relate to laboratory approaches for making a varicella vaccine. They do not indicate that they are in fact used for commercial vaccine production, that they could be used for commercial production, or that they solve the practical problems that would be encountered in a manufacturing environment.

Nothing in several publications by Takahashi during the 1970's cited by SB discloses specific information in Biken's commercial process used by SB. Those 1970's publications [*61] (TX1393; TX1400, TX1527) concern the *laboratory* process developed by Takahashi, and not Biken's *commercial* process that was developed in the 1980's by people other than Takahashi (Tr. 842-43).

Biken's '726 patent application from 1993 describes the formulation of a improved stabilizer for varicella vaccine; it does not purport to disclose commercial production process (Tr. 194-95). Example 2 describes the use of 20 Roux bottles (TX1465), to make 150 to 400 ml. of vaccine, which is too small for a commercial process (Tr. 195-96). Example 2 also differs in numerous respects from Biken's actual commercial process--

[TEXT REDACTED BY THE COURT.] (Tr. 196-97). For these reasons, nothing in the patent suggests that the brief description in Example 2 is part of Biken's or anyone's commercial production process.

Merck's '736 patent (TX1476) does not publish Biken's [TEXT REDACTED BY THE COURT.] method for several reasons. First, as Dr. Provost testified, that statement was not in the context of any commercial process, but described the manner in which [TEXT REDACTED BY THE COURT.] (Tr. 367). A statement in the patent plainly confirms Provost's testimony:

[TEXT REDACTED [*62] BY THE COURT.] Second, the patent describes other [TEXT REDACTED BY THE COURT.] methods:

[TEXT REDACTED BY THE COURT.] This statement appears in the "Detailed Description of the Invention," which makes it clear that [TEXT REDACTED BY THE COURT.] was not being disclosed as the preferred method. In addition, the patent discusses other [TEXT REDACTED BY THE COURT.] parameters in other examples (TX1476; Tr. 372). Finally, the Merck patent makes no reference at all to Biken, and therefore would not be read as a disclosure of information about Biken's commercial process.

Nothing in the publications indicates that either the [TEXT REDACTED BY THE COURT.] steps described are actually used in Biken's commercial process or any commercial process. SB offered no testimony that one skilled in vaccine production could reach any conclusion from these publications. SB chose not to call its expert witness on publications (Dr. Griffiths) at trial.

Because the ability to produce a varicella vaccine commercially and the practical knowledge needed to implement the production is at the heart of the Biken know-how, the references cited by SB do not render the know-how generally known or [*63] readily ascertainable. Courts have uniformly rejected efforts by trade secret defendants to argue that a process is generally known or readily ascertainable by pointing to elements in the published literature only after the defendant has been exposed to the trade secret information.

Section 8.03 of the SB/Biken agreement removes a confidentiality obligation to the extent Biken information ceases to be secret. Because no publication discloses either Biken's process or any particular step actually used in Biken's process, Section 8.03 gives SB no greater right to use or disclose information.

3. Biken Has Taken Reasonable Efforts

to Maintain the Secrecy of its Process

Biken has made reasonable efforts to maintain the secrecy of its commercial production process. It imposes secrecy obligations on its employees, and greatly restricts access to its production operation (Tr. 785-86). Except for its "publication" arguments, SB has not claimed that Biken's efforts to maintain the secrecy of its process are deficient in any way.

*C. SB's Efforts to Market its Varicella Vaccine in the United States and Canada Constitute Misappropriation of Biken Know-How*

Unauthorized use [*64] of trade secret information and unauthorized disclosure of trade secret information constitutes misappropriation. *6 Del. C. § 2001(2)*; *Miles, 1994 Del. Ch. LEXIS 221*, *22, 1994 WL 676761, at *9; *A.L. Labs., Inc. v. Philips Roxane, Inc., 803 F.2d 378 (8th Cir. 1986), cert. denied, 481 U.S. 1007, 95 L. Ed. 2d 206, 107 S. Ct. 1632 (1987)*; *General Elec. Co. v. Sung, 843 F. Supp. 776, 778 (D. Mass. 1994)*. Unauthorized use includes use by one who acquired the trade secret "under circumstances giving rise to a duty to . . . limit its use." *6 Del. C. § 2001(2)(b)(2)(B)*. Thus, even though SB was entitled in 1990 to obtain Biken's process information, use of that information outside the contract territory (Japan, Korea, the United States, and Canada) constitutes misappropriation.

*D. SB Used Biken's Trade Secrets to Guide the Development of its Vaccine*

Trade secret protection "extends not only to the misappropriated trade secret itself but also to materials 'substantially derived' from that trade secret." *General Electric, 843 F. Supp. at 778*. A process developed with "explicit reference" to the trade secrets is substantially [*65] derived from the trade secrets. *Id. at 779*. See *Mangren Research & Dev. Corp. v. National Chem. Co., 87 F.3d 937, 944 (7th Cir. 1996)* ("defendants misappropriated Mangren's trade secrets even if defendants created a new product if defendants could not have done so without use of Mangren's trade secret"); *In re Innovative Constr. Sys., Inc., 793 F.2d 875, 887 (7th Cir. 1986)* ("Were the law of trade secrets not flexible enough to reach the modifications in the instant case, when it is evident that the formulas were substantially derived from Innovative's, it would indeed be hollow.").

Misappropriation occurs even where the trade secret is used only as a starting point or guide in developing a process. *See, e.g., Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabrication, Inc., 584 F.2d 946 (10th Cir. 1978)* ("Based on the evidence, a jury could reasonably infer that [the trade secret] was helpful to Smalling as a starting point for his calculations . . . . If nothing else, a jury could find that Smalling did not have to experiment with the broad range of disclosed coefficients to determine the proper starting [*66] point."); *Reinforced Molding Corp. v. General Elec. Co., 592 F. Supp. 1083 (W.D. Pa. 1984)* (noting that "during the days [defendant's engineer] spent observing the manufacturing of the brace parts, he acquired knowledge which later greatly assisted Defendant in subsequently manufacturing the parts themselves," and holding "If nothing else, Plaintiff's research and design were used as a starting point for Defendant's product development."); *accord, 4 Milgrim on Trade Secrets § 15.01[1][d][vii] at 15-89* ("a plaintiff may prevail on a trade secret claim by establishing that defendant used plaintiff's trade secret as the helpful starting point for defendant's own development efforts").

Misappropriation also occurs where a defendant uses a plaintiff's trade secrets to understand "what pitfalls to avoid." *See Affiliated Hospital Products, Inc. v. Baldwin, 57 Ill. App. 3d 800, 373 N.E.2d 1000, 1006, 15 Ill. Dec. 528 (Ill. App. 1978)*, ("Even accepting their denial of any literal copying of MPL drawings, these drawings aided defendants in the design of Hypomed machinery, if only to demonstrate what pitfalls to avoid"); *see also Glaxo Inc. v. Novopharm Ltd., 931 F. Supp. 1280, 1299 (E.D.N.C. 1996)* [*67] ("A trade secret need not necessarily be comprised of positive information, such as a specific formula, but can include negative, inconclusive, or sufficiently suggestive research data that would give a person skilled in the art a competitive advantage he might not otherwise enjoy but for the knowledge gleaned from the owner's research investment."), *aff'd, 110 F.3d 1562 (Fed. Cir. 1997)*.

"Misappropriation of trade secrets may be proven by circumstantial evidence," *see Miles, 1994 Del. Ch. LEXIS 221*, *34, 1994 WL 676761, at *13, and more often than not, "plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place." *Greenberg v. Croydon*

*Plastics Co., 378 F. Supp. 806, 814 (E.D. Pa. 1974).* Here, both direct and circumstantial evidence establish SB's use of the Biken know-how to guide its own development of its process.

The fact that SB sought and obtained Biken's assistance, and the fact that SB's personnel responsible for developing its process were the ones who became familiar with [*68] Biken's trade secret technology, "give[s] rise to a compelling inference that [SB's process] was substantially derived from [Biken's] trade secrets." *General Electric, 843 F. Supp. at 779; see also USM Corp. v. Marson Fastener Corp., 392 Mass. 334, 467 N.E.2d 1271, 1284 (Mass. 1984).*

Courts are skeptical of an independent derivation defense where--after being exposed to the trade secrets--the defendant has a "purportedly epiphanic episode." *American Can Co. v. Mansukhani, 814 F.2d 421, 426 (7th Cir. 1987).* For example, in *Monovis,* the court rejected defendants' independent derivation defense, pointing out that if defendants had already developed their own compressor--as they claimed--they would not have needed plaintiffs' information. *See 905 F. Supp. at 1215-16.* The court also pointed out that, even after receiving plaintiffs' trade secret information, defendants asked to visit one of plaintiffs' manufacturing facilities, bringing with them a "list of topics we would like to discuss." *905 F. Supp. at 1219.* The court observed that: "The fact that [defendant] still had questions . . . is more [*69] probative than whether he received immediate answers." *Id.; see also FMC Corp. v. Varco Int'l, Inc., 677 F.2d 500, 503-04 (5th Cir. 1982)* (after experiencing difficulty in duplicating plaintiff's product, defendant hired plaintiff's former employee who had the requisite "competitive background").

*Monovis* is similar to this case. The defendants had obtained the trade secret information under a licensing agreement. Taking what the court described as a "'deny everything' approach," *Monovis, 905 F. Supp. at 1231,* the defendants argued that their method of production was different, *id. at 1232,* that they had essentially completed their work before getting access to the know-how, *905 F. Supp. at 1214-1215,* and that all of the specific information the plaintiff claimed as know-how could be found in assorted publications or patents, *905 F. Supp. at 1225-1226.* As noted, the court rejected the "publication" defense. It also found that the defendants' denial of use was refuted both by the circumstantial

evidence (in particular the fact that the defendants sought the plaintiff's assistance), *905 F. Supp. at 1219,* [*70] and by the contemporaneous documents reflecting the assistance received, *905 F. Supp. at 1220.* And while the defendants' process was different, the court found the use of the trade secret know-how to have provided both "a guide, charting the way through the many problems and decisions," *905 F. Supp. at 1231,* and "a springboard" to the solution of the problems, *905 F. Supp. at 1232.*

Also analogous is *Salsbury Laboratories, Inc. v. Merieux Laboratories, Inc., 735 F. Supp. 1555 (M.D. Ga. 1989), aff'd 908 F.2d 706 (11th Cir. 1990).* The court found misappropriation of both the entire process and specific aspects of the process: "In addition to the overall production process, the court finds that the fact Salsbury uses certain ingredients and methods during each step of its process constitutes trade secret information." *Salsbury, 735 F. Supp. at 1569.* The court then found that the defendant's use of specific steps learned from Salsbury constituted trade secret misappropriation including: the use of "a particular potency scoring test," *id.,* even though there were published articles concerning that test, [*71] *735 F. Supp. at 1565;* the use of Salsbury's unique medium, *735 F. Supp. at 1569,* even though "various media in the public domain contain ingredients that are contained in Salsbury's medium," *735 F. Supp. at 1563;* the use of a particular inhibitor even though it was one of a number of generally available inhibitors, *735 F. Supp. at 1564;* and the use of a particular strain, *735 F. Supp. at 1569,* which was one of several strains available, *735 F. Supp. at 1570.*

SB's independent development defense is unsupported. SB's assertion that it did not use any Biken know-how in its process or even seek help from Biken, claiming instead that it had resolved all of its problems prior to December 6, 1990, is contradicted by SB's conduct, by its statements in communications to Biken, and by its own records. I find that SB used Biken know-how in resolving its problems and finalizing its production process. Such conduct constitutes misappropriation of Biken's trade secrets.

> *E. Under its Agreement with Biken, SB is Prohibited from Using Biken Know-How to Produce a Vaccine for Sale in the United States and Canada*

The licensing agreement [*72] between Biken and SB granted SB a license as follows:

> 2.01 The Foundation hereby grants to SK&F a non-exclusive right and license to use the Strain and Know-How to make, have made, use and sell the Vaccine in the Contract Territory.

(PTX551) § 2.01). The "Contract Territory" originally was "the countries of Europe" (PTX552, § 1.03) and, by subsequent amendments, was extended to "all the countries of the world except Japan, Republic of Korea, United States of America and Canada" (PTX568-569).

Under the agreement the licensed "Know-How" was defined as:

> without limitation, all technical information and know-how regarding preparation and propagation of the Strain and commercial production of the Vaccine which are presently in the possession of the Foundation or are acquired hereafter by the Foundation during the term of this Agreement.

(PTX552, § 1.05). The information that Biken provided to SB in 1990 and 1991 concerning commercial production, including its own production process, fell within the definition of Know-How. Accordingly, SB was only entitled to use that Know-How to make, use or sell its vaccine in the Contract Territory, and not in the [*73] United States or Canada.

The circumstances clearly indicated that the parties' intent was to limit SB to its Contract Territory--that was the extent of the license, SB was precluded from filing information with regulatory agencies except in the Contract Territory, and Biken was giving territorial rights to Merck and also keeping rights in Japan and Korea. SB points to nothing indicating that the parties intended that SB was not limited to its Contract Territory.

SB's claim that the licensing agreement allowed it to perform clinical trials "outside the contract territory, so long as SB did not commercially market a vaccine in such a territory before the Biken patents expired" (SB Br. 64-65) is unsupported. The agreement grants only a right "to use the Strain and Know-How to make, have made,

use and sell the Vaccine in the Contract Territory" (PTX552, § 2.01). Using its vaccine in clinical trials unquestionably is a "use" limited to the Contract Territory, a conclusion reinforced by other sections of the agreement, which authorized SB "to pursue clinical evaluation and to seek appropriate government approvals to market the vaccine[]" (PTX552, § 5.01), but which limited-the disclosure [*74] of information in connection therewith to "governmental authorities within the Contract Territory" (PTX552, § 8.04).

The territorial limitation continued even after the licensing agreement expired in 1995. The term of the Biken/SB licensing agreement was as follows:

> This Agreement shall continue to be effective in each country of the Contract Territory for a period of ten (10) years from the date of this Agreement or until the expiration or invalidation of the Patent in such country, whichever period is longer, unless otherwise terminated pursuant to the provisions hereof.

(PTX552, § 12.01). The agreement expired completely on March 12, 1995, upon the expiration of Biken's Belgian patent.

A trade secret is protectable for so long as it continues to be a trade secret--*i.e.*, not generally known and not readily ascertainable. 2 Roger M. Milgrim, *Milgrim on Trade Secrets § 8.02[6]* at 8.21; 3 Roger M. Milgrim, *Milgrim on Licensing § 27.01* at 27-2. It is because of this ability to protect valuable information indefinitely that commercial production processes (which cannot be discovered by reverse engineering or other scientific methods) are frequently [*75] protected as trade secrets rather than patented.

Because of the ability to protect trade secrets indefinitely, it is essential that a trade secret licensing agreement specify the rights of the parties with respect to the trade secret after expiration of the agreement:

> If the parties to a trade secret license fail to indicate whether the licensee will be entitled to use the licensed matter beyond the contractual term of the license, they may later face the question of whether the licensee may continue use or has an

implied duty to cease using.

*Id.* at 27-4.

The SB/Biken agreement specifically addressed SB's rights after expiration:

> Upon expiration of this Agreement pursuant to the provisions of Section 12.01 hereof neither party shall be relieved of any rights and obligations which have accrued prior to expiration including those listed in Section 12.06, paragraphs (a)-(c) hereof, and SK&F shall continue to be entitled to exercise the rights and licenses granted herein without further payments to the Foundation.

(PTX552, § 12.07) (emphasis added). As noted, in relevant part the license "granted herein" was "a nonexclusive right and license [*76] to use the . . . Know-How to make, have made, use and sell the vaccine in the Contract Territory." Accordingly, after expiration of the agreement SB could continue royalty-free to use the Know-How "in the Contract Territory," but not otherwise.

The licensing agreement imposed on SB an affirmative obligation to keep the Know-How confidential (PTX552, § 8.01) but allowed disclosures to regulatory agencies (which keep such information confidential) in connection with seeking government approval:

> 8.04 These obligations of non-disclosure shall not apply to any information which SK&F may be required to disclose in order to obtain essential or desirable authorizations or rights relating to the Vaccines from governmental authorities within the Contract Territory or as otherwise required by law.

(PTX552, § 8.04). Thus, SB was only entitled to disclose Biken Know-How to "governmental authorities within the Contract Territory," and was not entitled to do so in the United States or Canada.

SB's assertion that Section 8.01 entitles SB to disclose Biken's Know-How after 1997 is incorrect for

two reasons. First, SB's claim as to a 1997 "disclosure" date rests on the assertion [*77] that, because the agreement ceased to be effective in some countries in 1992 under Section 12.01, the obligations of Section 8.01 similarly ceased to be effective and SB then became free to disclose the Know-How in those countries beginning five years later. However, unlike Section 12.01, Section 8.01 does not refer to being "effective" on a country-by-country basis, but speaks only of "the term of this Agreement and for five (5) years thereafter." The term of the agreement necessarily means when the agreement expired under Article 12, which SB concedes was March 1995 (TX2640). It would make no sense to allow disclosure of confidential information on a country-by-country basis. Thus, even assuming Section 8.01 at some time allows disclosure by SB of Biken's confidential information, the earliest such disclosure could occur is March of 2000, five years after the agreement expired in 1995. The fact that SB has not done what it claims it is entitled to do--disclose all of Biken's Know-How beginning in 1997--is further evidence that SB does not actually believe it has the right it claims.

Second, even in the year 2000, Section 8.01 does not give SB the right to disclose Biken Know-How. [*78] The affirmative obligation in Section 8.01 "to take every reasonable precaution" to keep information confidential ends at that time. However, that does not mean that SB is thereafter free to disclose Biken's Know-How--nothing in Section 8.01 or elsewhere in the agreement gives SB such a right.

Given that SB had a continuing right, under Section 4.01, to obtain technical information "during the effective period of this Agreement," SB's construction--under which it could acquire Biken's process information as late as 1995 and disclose it shortly thereafter--is unreasonable. A five-year limit on SB's affirmative obligation to take precautions is reasonable. After five years, any Biken Know-How incorporated in SB's process would continue to be protected in the way SB protects its process information. And any Biken Know-How which SB acquired but chose not to use in all likelihood would have been destroyed or stored in old records from which disclosure was unlikely.

Every agreement contains an implied duty to act in good faith, *Greco v. Columbia/HCA Healthcare Corp., Del. Ch., C.A. No. 16801, 1999 Del. Ch. LEXIS 24* at

*30, Strine, V.C. (Feb. 11, 1999), which also precludes any [*79] publication by SB of Biken's Know-How. Even under SB's interpretation of its "disclosure" right, which would allow SB to disclose and use the Biken Know-How without limit beginning in either 1997 or 2000, it still obtained an improper and significant head start by the commencement of United States approval activities in 1993.

### F. Merck is Entitled to an Injunction

This Court is authorized under *6 Del. C. § 2002(a)* to grant an injunction to remedy misappropriation of a trade secret. An injunction is meant "'to protect the secrecy of the misappropriated information, eliminate the unfair advantage obtained by the wrongdoer and reinforce the public policy of commercial morality.'" *Miles Inc. v. Cookson America, Inc., 1994 Del. Ch. LEXIS 221*, *52, 1994 WL 676761 at *20 (Del. Ch. Nov. 15, 1994) (quoting *General Elec. Co. v. Sung, 843 F. Supp. 776, 778 (D. Mass. 1994))*. Thus, the length of the injunction is based on the time advantage obtained by the defendant as a result of its misappropriation: "An injunction should last for as long as is necessary, but no longer than is necessary, to eliminate the commercial advantage or 'lead time' with respect to good faith competitors [*80] that a person has obtained through misappropriation." Uniform Trade Secrets Act (U.L.A.) § 2 Comments at 450 (1979); *see also Miles, 1994 Del. Ch. LEXIS 221*, *53, 1994 WL 676761, at *20; *K-2 Ski Co. v. Head Ski Co., 506 F.2d 471, 474 (9th Cir. 1974)*.

Courts have consistently recognized that the development of a commercial process takes many years and have not hesitated to impose lengthy injunctions where the defendant has obtained a significant gain in the time required to develop a process. *See, e.g., Miles* (three year production injunction as to certain pigments and two year injunction as to others); *General Elec. Co. v. Sung*, (seven year production injunction); *Televation Telecomms. Sys. Inc. v. Saindon, 169 Ill. App. 3d 8, 522 N.E.2d 1359, 1366, 119 Ill. Dec. 500 (Ill. App. 1988)* (three year production injunction). As the *Saidon* Court noted, "The appropriate injunction period should be the time required to legally produce a competing product, not merely the disputed portions of the product." *522 N.E.2d at 1367* (citations omitted).

The record establishes that SB obtained a time advantage of three to five years as a result of its misappropriation [*81] (Tr. 1346-51). Development of a

commercial process for the production of varicella vaccine is an especially long undertaking, as shown by the experience of the three companies that have done it.

The substantial time required to develop such a commercial process is a function of the many variables that must be considered in any vaccine production process (Tr. 52-64), compounded by the particular difficulties associated with varicella. Those difficulties include the small amount of virus that can be produced relative to other viruses and the intracellular and fragile nature of varicella (Tr. 41-44, 108-18, 132-35). Moreover, there is substantial time involved in conducting, obtaining the results of, and successfully repeating experiments (Tr. 924-25; Didelez dep. 720-21; Thysman dep. 221).

In addition, the production process for varicella vaccine is nonlinear, so that a change in one step may have unexpected consequences elsewhere (Tr. 127-28, 1021-22; Didelez dep. 230, 232). Thus, a company may think that it is almost to the point of having a successful process but in fact what appears to be just a little way left to go is a major problem. For example, SB thought it was almost [*82] done with its development in September 1989 when Didelez proposed his most plausible scheme, but in fact, the scheme did not work at all. The substantial savings of time acknowledged in SB's trip report following the Biken visit also confirms the time advantage it obtained (PTX124). SB has not provided significant counter-arguments to the three to five year estimate, merely arguing that "SB did not save three-five minutes based on the visit to Japan--much less the three-five years advocated by Dr. Wang." I think the evidence, overwhelmingly, is to the contrary. As a result, I will enter an injunction against SB for three years.

Because SB has not yet obtained approval to market its vaccine in either the United States or Canada and the actual approval date is uncertain, the injunction must run from the date approval is obtained in order to deprive SB of the time advantage it has improperly gained. Considering that SB saved at least three years in the development of its commercial process, Merck is entitled to an injunction against SB from marketing its varicella vaccine in the United States or Canada for a period of three years from the date it receives approval to market its [*83] vaccine in those countries.

### III. FACTS SURROUNDING SB'S COUNTERCLAIMS AND AFFIRMATIVE DEFENSES

11

> 11  Some of these facts may be repetitive of those
> in the fact section concerning Merck's claim, but
> because the reader last encountered those facts 60
> or so pages ago, I feel compelled to repeat them.

### A. The Option Agreement

On June 1, 1975, Biken and SB entered into an Option Agreement, under which SB would evaluate the Oka strain (PTX306). The Option Period was two years (PTX306, Art. 3), or until June 1, 1977. SB initially had asked for a three-year Option Period (PTX310) and then a thirty-month period (PTX305), but Biken had been unwilling to agree to a period longer than two years. Biken's insistence on only a two-year Option Period indicates the importance to Biken of SB's successful development of a vaccine and the subsequent agreement to a license on terms acceptable to Biken.

Under the agreement, SB had to notify Biken whether it desired a license at least three months prior to the expiration [*84] of the Option Period (PTX306, Art. 4). If SB did not want a license or if a licensing agreement was not reached within six months after SB notified Biken that it desired a license, the agreement terminated (*id.* at PTX306). Thus, the agreement gave SB twenty-one months, until March 1, 1977, in which to evaluate the Strain and to notify Biken if it wanted a license. If SB did want a license, an agreement had to be finalized by September 1, 1977. SB was not required to take a license under the Option Agreement. Likewise, Biken was not required to grant a license, except on terms acceptable to it.

Article 3 of the Agreement defined the Option Period as "twenty-four (24) months from the date of this Agreement," and several obligations of the Agreement were tied expressly to the Option Period (as opposed to the term of the agreement). Article 1, paragraph 2 of the Option Agreement imposed the following limit on Biken:

> The Foundation agrees not to give such option or any license for manufacture, sale or use of a varicella vaccine made from their Strain to any third party during the Option Period as specified in Article 3 and for three months thereafter.

While the [*85] Option Agreement limited Biken's ability to actually grant a license to a third party during the defined period, the Option Agreement imposed no limit on Biken's ability to meet or to negotiate at any time with third parties who were interested in a license.

Article 5, paragraphs 1 through 4 of the Option Agreement imposed confidentiality obligations on the parties, as follows:

> 1. [SB] agrees that the Strains as well as information and data as furnished by the Foundation hereunder shall be kept strictly secret and confidential with the best possible care and safeguards during the term of this Agreement, as well as a period of five years thereafter, with respect to any third party unless it has obtained the prior consent of the Foundation.

> 2. [SB] further agrees that its officers or employees or any third party including its affiliate companies who will be given access to the Strain and information and data furnished hereunder for the purposes agreed to between the parties shall be under the same obligations as those of SB hereunder.

> 3. In case [SB], its officers or employees or any other party furnished by [SB] with the Strain and information and data with [*86] a prior written or implied consent of the Foundation shall have committed a substantial default, non-fulfillment or breach of the covenants or provisions herein contained, [SB] shall be responsible for any and all damages caused to the Foundation due to such default, non-fulfillment or breach.

> 4. The Foundation also agrees during the Option period and during the term of any license agreement executed pursuant thereto not to disclose the Strain and information and data relating thereto, including any data, strains, or information provided by [SB], to any third party except to enable the Foundation to conduct research testing in the field, to publish or release the same to scientific and/or academic institutions, and to deposit a

limited quantity of its own Strain to ATCC, U.S.A., or other accredited depositories for the purpose of facilitating the Foundation's patent applications.

Biken's obligations under Article 5, paragraph 4 were limited expressly to the duration of "the Option Period" and "the term of any license agreement executed pursuant thereto." Thus, if a license agreement was not reached by the end of the Option Period, those obligations lapsed. In addition, [*87] under the express terms of Article 5, paragraphs 2 and 3, SB was responsible for any disclosures of confidential information made by third parties to whom SB had given the Oka strain or information related thereto.

*B. June 1975 to May 1977: SB Encounters Initial Problems Leading to an Extension of the Option Period*

1. SB's Problems

Shortly after signing the Option Agreement, SB received a sample of the Oka strain from Biken. Both that sample and a subsequent sample were found to have mycoplasma contaminants (TX2188). SB encountered additional problems as well; there was a delay of several months because SB could not use the lab where it prepared batches of diploid cells (PTX315). In addition, there were technical difficulties with the Oka strain (PTX317), including "yield problems" (PTX334), and failure of SB's sonication method (PTX316).

These factors collectively caused SB to seek an extension of the Option Period (TX2324). In January 1977, Huygelen told Takahashi that, notwithstanding these problems, SB needed only a three or four month extension (PTX315). A month later, however, Huygelen wrote to Brown of SB that "new difficulties were encountered a few days ago with [*88] Osaka strain" and, as a result, the "best estimate now for beginning of clinical evaluation is now mid-summer and completion end of year" (PTX317), which required more than a three or four month extension. .

Thus, in April 1977 SB requested and received a ten-month extension of the Option Agreement (PTX324). The Option Period was extended from June 1, 1977 to March 31, 1978. SB had to inform Biken if it desired a license by December 31, 1977, and any licensing agreement had to be finalized by June 30, 1978. Ten months was the length of the extension SB sought

(PTX324), and Huygelen believed SB could make a decision by the end of 1977, the new deadline (PTX320). There is no persuasive evidence to support SB's argument that ten months was thought at the time to be insufficient.

2. Initial Merck Contacts with Biken

During the initial two-year period of the Agreement, SB was aware that Merck had approached Biken about receiving the Oka strain. In early May 1976, Dr. Maurice Hilleman of Merck had spoken with Takahashi at a conference in Atlantic City, NJ, and thereafter had written to Dr. Yoshiami Okuno, Takahashi's superior, expressing interest in the Oka strain (TX1002). In a telex [*89] of May 24, 1976, Ray Kutsunai, SB's Japanese representative, reported that Takahashi "has turned down Dr. Hillman's [*sic*] request for strain" (TX2192). [12] In July 1976, Dr Boyd Woodruff of Merck visited Takahashi and Okuno and learned that Biken had entered-into an exclusive agreement with SB and that Merck would be unable to obtain a sample of the Oka strain (TX1005). They discussed aspects of Takahashi's vaccine published in the literature and Woodruff was given three unpublished papers.

> [12] Merck argues that this statement is hearsay; because I ultimately find for Merck, I do not reach a decision on this objection.

SB also learned of this meeting--in August 1976, Kutsunai of SB reported that "Dr. Woodruff of Merck personally called on Dr. Takahashi and made a strong pitch for their strain" (TX2199). There is no persuasive evidence that SB viewed the contacts between Takahashi and Merck as not permitted under the Option Agreement. Likewise, there is also no persuasive evidence that any of the information [*90] conveyed by Takahashi to Woodruff was confidential and no evidence that the unpublished papers contained any information that had not been published elsewhere in some level of detail.

Following that meeting, Woodruff wrote to Okuno, noting "I am disappointed that it will not be possible to study your vaccine in the Merck, Sharp & Dohme Research Laboratories, however, we understand the reasons that the attenuated virus cannot be released at this time" (PTX312). There is no evidence that Merck knew of Biken's specific obligations under the Option Agreement. Neither Woodruff nor any other Merck representative ever saw a copy of the Agreement (Tr. 145).

*C. April 1977 to June 1978: Additional Delays Leading To A Second Extension Of The Option Agreement*

1. The Second Extension

After receiving the ten-month extension, SB encountered additional problems. Huygelen wrote that the Oka strain was "more difficult than other strains with regard to virus release from cells" (PTX328), that "we encountered problems in releasing the virus from the cells" (PTX364) and "this resulted in new delays of a few months" (*id.*). Another SB memo refers to "last minute problems in the testing of [*91] the diploid cells" (PTX331). On December 20, 1977, eleven days before the extended deadline for advising Biken whether it wanted a license, Brown wrote to Biken requesting an additional three-month extension (PTX336).

On January 12, 1978, in response to SB's request, Biken sent a proposed amendment to the Option Agreement granting the extension but on the condition that, if SB did not take a license, it could not manufacture any varicella vaccine for three years (PTX340). Clinton H. Brown of SB reported that "Osaka will approve extension but on conditions I consider unsatisfactory" (PTX342). In another memo he noted that the conditions imposed by Biken "suggest that Osaka has lost patience with our test program" (PTX343).

As of March 1978, another extension of the Option Agreement had not been agreed to and Brown traveled to Osaka (PTX347). He learned that Biken was very unhappy with SB (*id.*). In a memorandum summarizing the meeting, Brown wrote that Biken "had been shocked to learn that SB was working on a strain [of varicella virus] of its own" and that Takahashi "felt SB had deceived him" (*id.*). Although SB had received the Oka strain from Biken, it continued to [*92] develop another strain (Tr. 1638). An SB document indicates that Kutsunai of SB had advised Huygelen not to mention to Takahashi that SB was working on other varicella strains (Brown dep. 6/3/98 at 41).

Ultimately, Biken learned of SB's potentially competing endeavors. Biken's ensuing belief that it had been deceived by SB was, as Brown noted, "a serious problem" (PTX347) involving "a serious situation and something not at all desirable for SB, especially in this country where reputations play such an important role and are quickly spread" (PTX347). Following further negotiations, Biken agreed to delete the provision to

which SB objected (PTX350). Then, however, SB proposed an extension of nine months (rather than the three months it had earlier requested) in consideration for "a modest amount" (PTX349), but Brown subsequently reported that the Biken board "was quite displeased with recent events" and he recommended signing the amended three-month extension that Biken was willing to accept (PTX355).

On April 24, 1978, SB signed the amendment, which extended the Option Period to June 30, 1978 (PTX357). In the forwarding letter, SB provided notice of its desire to receive a license, [*93] retroactive to March 31, 1978 (*id.*). The signed amendment reflected Biken's intention to put a limit on the on-going negotiations, expressly providing that the Foundation "shall not agree to further extension of the term of the AGREEMENT for any reason whatsoever," (PTX357 Item 3), and requiring that SB provide Biken with a written explanation of why it had become necessary to extend the Option Period twice (PTX357 Item 2). Under this extension, the Option Period was extended to June 30, 1978, and the period for concluding a license agreement was extended to September 30, 1978 (PTX357). If a licensing agreement was not concluded by that time, the Option Agreement terminated by its terms (PTX306, Art. 4). SB was aware that it was required to finalize a license agreement by September 30, 1978 (PTX361). Brown's memo of his March 1978 meeting with Biken also noted:

> Dr. Kawamata seemed to keep focusing the discussion on the USA, and while I did not mention anything about it I am concerned lest SB's general indifference towards vaccines in the USA prove to be another source of misunderstanding in the future.

(PTX347).

In May 1978, John Chappell, a Vice President [*94] of SB, visited Biken. In an apparent attempt to address Biken's interest in development of a vaccine for the United States, he asserted in a follow-up letter that while "we are not very active in the US market at the moment, we do have the capability to mount clinical trial and secure product registrations" and in support of that statement said, "SB' Rubella vaccine is registered and marketed in the US" (PTX361).

The record, however, reflects that Chappell's statement was untrue. SB had withdrawn its rubella vaccine from the United States market in 1976--two years earlier (Huygelen 11/4/98 dep. at 12). Thus, in contrast to Chappell's statement to Biken that "SB's Rubella vaccine is . . . marketed in the US," SB was reporting to the FDA that SB "has not marketed Cendevax [rubella] in the United States since late 1976" (PTX445). Rubella was the only vaccine SB had ever sold in the United States (Huygelen 11/4/98 dep. at 12), and SB did not again market a vaccine in the United States until the late 1980's ( *id. at 13-14*).

2. Contacts Between Merck and Biken

After Woodruff's visit in July 1976, there were no further contacts between Biken and Merck until April 15, 1977, when **[*95]** Hilleman wrote to Okuno stating:

> I am writing to inquire how things are coming along. Do you still have your relationship with another company or is there any possibility that the matter can be reopened? We continue to be most desirable of some sort of arrangement with you, if that is possible. Could you please let me know.

(PTX322).

Okuno responded:

> Our Foundation is still within the period of Option Agreement with another company. His program seems working not so well as expected, and we have not received a definite answer from him but must have it within this year. If a satisfactory agreement is not established with him, I wish to have some sort of arrangement with you.

(PTX323).

In reply, Hilleman requested that Okuno let Merck know "if your current correspondent ceases to display interest so that we can initiate talks with you" (TX1009).

Merck next contacted Takahashi and Okuno in September 1977 when Woodruff and Edgar H. Philbrick, Jr. visited to determine "if the option had expired"

(TX1012). At that meeting, they learned that SB's option was scheduled to expire in March 1978 (*id.*). During the course of that meeting, Woodruff was **[*96]** asked whether the existence of the Option Agreement required Biken to enter into a license agreement. Woodruff accurately responded that it "usually did not" (*id.*). Following the meeting, Philbrick wrote to Okuno stating:

> [Merck was] pleased to learn that the option, under which your varicella strain is being studied, will expire in March. At that time if there are no further contractual obligations, we would be very interested in discussing this matter with you again. (PTX329).

Around this time Biken also received an inquiry from Sclavo Institute concerning the Oka strain (PTX330). Therefore, Biken was aware of growing commercial interest in its Oka strain and wanted SB to move promptly toward a decision and to finalize a license agreement.

The next contact occurred in December 1977 when Hilleman wrote to Okuno saying:

> It is nearing year's end and I would wish to express our continued interest in your and Dr. Takahashi's chicken pox vaccine. Are things at the point which we could discuss them at this time? (PTX335).

On January 5, 1978, Okuno informed Hilleman of the three-month extension SB had requested (PTX339) and Hilleman again deferred **[*97]** discussion (PTX341). In early February 1978, Dr. Martin F. Malkin and Tatsuo Asada of Merck visited Okuno and Takahashi "to reconfirm Merck's interest in evaluating the vaccine" (TX1016). Malkin was told that [TEXT REDACTED BY THE COURT.] there is no evidence such information was confidential or that its disclosure caused any harm to SB.

On March 30, 1978, a Mr. Tsuji of Biken advised Malkin of SB's three-month extension and Malkin, in turn, reported that to Hilleman (TX1017). On June 13, 1978, Woodruff met with Takahashi "to reinforce prior statements of interest in his varicella vaccine" (TX1021). During the meeting, Woodruff was shown a letter

apparently describing the clinical trial of Dr. Max Just on SB's vaccine--a study that Dr. Francis E. Andre of SB characterized as a "simple trial" involving only twenty people (Andre dep. at 24). The only specific information that Woodruff reported receiving was that [TEXT REDACTED BY THE COURT.] (TX1020).

In addition, Just presented the complete results of his clinical investigations publicly in Berne, Switzerland sometime prior to August 7, 1978 (PTX370, Huygelen 11/4/98 dep. at 120), and again at an SB symposium in Belgium in [*98] November 1978 (Huygelen 11/4/98 dep. at 119, Huygelen 12/15/98 dep. at 91). Takahashi told Woodruff that the results of Just's trial were about to be presented at a vaccine meeting (TX1021), which indicates that the information was not particularly secret. Takahashi also told Woodruff that [TEXT REDACTED BY THE COURT.] SB's contention that the information was extremely sensitive (SB Br. at 67) is supported only by testimony relating to different information--[TEXT REDACTED BY THE COURT.] (Andre dep. at 145). There is no persuasive evidence that this general statement on [TEXT REDACTED BY THE COURT.] made by Takahashi in 1978 involved extremely sensitive information.

Woodruff was also told that "to meet minimal titer needs" [TEXT REDACTED BY THE COURT.] (TX1021). There also is no persuasive evidence such information was confidential. Huygelen of SB admitted that "the titer of the vaccine used is information you would expect to be exchanged among the investigators" (Huygelen 12/15/98 dep. at 89-90). The conclusion that such information was not, in fact, confidential is further supported by testimony related to a document found in SB's files concerning information on the [*99] titer of Merck's vaccine (PTX300). SB's own witness testified that such information "we would also feel could be released without any problem or hesitation for our vaccine" (Andre dep. at 163). In any event, assuming that this information would have fallen under Biken's confidentiality obligation under the Agreement, that obligation ended on June 30, 1978, when the Option Period ended.

During the meeting with Takahaski, Woodruff was told that SB's agreement with Biken ran until the end of September. Woodruff told Takahashi that he would visit him again in October, following expiration of the Option Agreement (TX1021). As reflected above, Merck timed

its approaches to Takahashi to coincide with what it understood to be the expiration of the Option Agreement, and was careful to inquire if Biken was in a position to discuss licensing with Merck. SB also complains that in June 1978 Hilleman received "Biken's actual method for producing an Oka strain varicella vaccine" (SB Br. at 32). Takahashi had sent the information to Dr. Anne A. Gershon, a clinical investigator, who in turn sent it to Dr. C. Henry Kempe, another investigator, who, unsolicited, sent it to Hilleman (PTX 363). [*100] There is no persuasive evidence, however, that Merck sought such information.

### D. June 1978 to December 1978: The Option Agreement Expires

#### 1. Expiration of the Agreement

In March 1978, when agreement was reached on the second extension of the Option Agreement, Brown had proposed that an earlier letter he submitted to Biken be viewed "as a framework" for a license (PTX347). As indicated in a later document, Biken sent a "draft of the formal license agreement on July 26, 1978" (PTX457). There is no evidence SB responded to that draft.

An SB document of June 15, 1978 had recommended that SB "stall further, allow clinical studies currently being conducted to be completed, as well as several small scale . . . surveys in major markets to be conducted" (PTX366). That recommendation may have reflected SB management's view that "varicella/zoster . . . vaccine [is] of relatively low commercial interest," (PTX313), as well as [TEXT REDACTED BY THE COURT.] (id.).

In early September 1978, Biken sent another draft licensing agreement to SB which provided for a license only in the United States, Belgium, England, and France (TX2252). On September 18, 1978, Brown wrote to Dr. [*101] Junichi Kawamata of Biken stating:

> It will be difficult if not impossible to conclude final signing by September 30, the date called for in the Option Agreement itself. You and we will probably need several more weeks in this regard. We would regard this as an extension of the *negotiating period* rather than of the option period which, as you know, we in effect fulfilled via my notification to you of April 24, 1978. We

trust you are understanding and agreeable
to this request.

(PTX373) (emphasis in original). Thus, SB expressly
disclaimed seeking an extension of the Option Period,
even though several obligations in the Option Agreement
expressly were tied to it. There is no document from
Biken agreeing to this proposal.

On September 28, 1978, a Mr. Ueda of SB reported
that Tsuji of Biken stated that Biken would "continue
negotiation for aiming conclusion of license agreement
although Option Period expires on Sept. 30" (PTX375).
13 Tsuji's statement indicated only that Biken agreed to
continue negotiating, notwithstanding the expiration of
the Agreement. The same document noted that Biken
"showed great dissatisfaction on Huygelen's explanation
on present [*102] development status and future plan for
clinical study" (id.). Since no license agreement was
finalized by September 30, 1978, the Option Agreement
expired by its terms.

> 13    SB argues that this document constitutes
> inadmissible hearsay. For three reasons I find that
> the document is admissible. First, it is an
> admission by a party-opponent and therefore is
> not hearsay, under Rule of Evidence 801(d)(2), as
> Ueda was an employee of SB. Second, it falls
> under the "ancient document" exception to the
> hearsay rule (Rule 803(16)), as it has been in
> existence for over 20 years. Third, it falls under
> the "business records" exception (Rule 803(6)), as
> it is a "memorandum" "made at or near the time
> by" "a person with knowledge" and "kept in the
> course of a regularly conducted business activity."

While SB claims otherwise, the evidence shows that
both SB and Biken understood that the Option
Agreement had expired--or more precisely, that there was
no legally binding relationship in effect. For example, a
1979 memo [*103] by Huygelen recited that "our Option
Agreement with the Foundation in Osaka has expired"
(PTX446). In addition, Brown of SB, who had written to
Biken proposing an extension of the "negotiating period,"
admitted that "there was not an extension of the
negotiating period" (Brown dep. at 225-26).

While it may have continued cordial discussions with
SB, Biken also understood that the agreement had
expired as of September 30, 1978, as reflected in the
December 1978 Biken board minutes referring to "the

no-agreement state" with SB (PTX393) and the minutes
of the subsequent February meeting which note "the
validity of our Option Agreement with [SB] has expired
and we are under no agreement officially" (PTX403).
Put simply, I do not view Biken's on-going negotiations
and apparent resistance to cutting off all discussions with
SB as any indication that an enforceable contractual
agreement requiring the two entities to continue their
business relationship existed after September 30, 1978.

2. Contacts by Merck with Biken

In October 1978, Woodruff and Asada again met
with Takahashi. Woodruff was told that the Option
Agreement had expired (PTX378), which further
confirms Biken's understanding [*104] of its contractual
obligations. Takahashi told Woodruff that SB had
decided to [TEXT REDACTED BY THE COURT.] in
the production of the varicella vaccine (PTX379). There
is no persuasive evidence such information was
confidential, and the evidence establishes that it was not.
One SB witness testified that [TEXT REDACTED BY
THE COURT.] as not something that SB wanted to keep
secret (Andre dep. at 122), while another SB witness
admitted that all vaccine manufacturers at that time
[TEXT REDACTED BY THE COURT.] Huygelen
11/4/98 dep. at 63-64). Huygelen also stated in a letter to
Takahashi that "researchers all over the world are [TEXT
REDACTED BY THE COURT.] for the production of
killed and live vaccines" (TX1623). Moreover, SB's
[TEXT REDACTED BY THE COURT.] had been
reported to the World Health Organization (TX2264) and
to clinical investigators such as Dr. Stanley A. Plotkin of
the Children's Hospital of Philadelphia (PTX388). 14
There is no evidence that SB's [TEXT REDACTED BY
THE COURT.] was confidential.

> 14    SB argues that this document, a letter written
> by Andre, an SB employee, constitutes
> inadmissible quintuple(!) hearsay. I do not need
> to rely on this document to make my decision in
> this case, but in any event, I also find that the
> document is admissible. First, at least two layers
> of the hearsay are stripped away because an
> admission by a party-opponent is not hearsay
> under Rule of Evidence 801(d)(2); Andre was an
> employee of SB and Plotkin regularly performed
> work for SB as a clinical researcher, even if not a
> full-time employee. Second, it falls under the
> "ancient document" exception to the hearsay rule

(Rule 803(16)), as it has been in existence for over 20 years. Third, it falls under the "business records" exception (Rule 803(6)), as it is a "memorandum" "made at or near the time by" "a person with knowledge" and "kept in the course of a regularly conducted business activity."

[*105] In any event, information concerning SB's [TEXT REDACTED BY THE COURT.] and the improved effects caused by [TEXT REDACTED BY THE COURT.] was provided to Biken in November 1978 (TX2263). The Option Agreement previously had expired or September 30, 1978, and the confidentiality obligations of Biken had expired three months earlier, at the end of the Option Period.

Woodruff also was informed that SB still was having difficulty making a [TEXT REDACTED BY THE COURT.] vaccine (PTX379). There is no evidence such general information was confidential. Woodruff also discussed with Takahashi how Merck should submit a proposal to obtain release of the Oka strain from Biken (id.). Following that meeting, Woodruff--having been told that the Option Period had expired--reported to Hilleman that "the time is right for Merck to make a proposal . . ." (id.).

On November 10, 1978, Mary McDonald of Merck sent a letter expressing Merck's "firm interest in conducting an evaluation of your varicella vaccine with a view toward determining its medical and market potential" (PTX386). Woodruff separately informed Kawamata and Takahashi that Merck was "prepared to sign an agreement containing [*106] time limitations" (TX1029). At a meeting on December 13, 1978, the Biken board reviewed the status of negotiations with SB (PTX393). The minutes mention SB's [TEXT REDACTED BY THE COURT.] and note that "we decided to watch the progress in the no-agreement state" (PTX393). The minutes also noted that a proposal had been received from Merck (id.). These facts confirm that, despite Merck's dogged interest in obtaining the rights to the Oka strain, SB's potential ability to secure a license was still very much alive at this point.

On December 26, 1978, Kawamata responded to Merck's letter stating:

As may be you are already informed, we are carrying on negotiations concerning our varicella vaccine with another

company; I regret, therefore, that I cannot negotiate with you at present on confidential disclosure agreement.

(PTX395). Biken's decision to continue to deal exclusively with SB presumably was based on SB finally having shown progress in its work with the vaccine. On December 21, 1978, Huygelen had given Kawamata an update on SB's work, which stated that an Investigational New Drug application ("IND") had been filed on December 15 and that "our first [*107] clinical trial is expected to start now very soon in the Philadelphia area by Dr. S. Plotkin" (TX1630). The letter also reported that SB expected soon to begin three other clinical trials as well (id.).

*E. January to May 1979: Merck Obtains Information from Plotkin and Learns that Biken Expects to Conclude a License Agreement*

1. Contacts with Plotkin

Plotkin, of the Children's Hospital of Philadelphia, conducted clinical trials with the varicella vaccines of Biken, SB, and Merck (TX2347, TX2412). Plotkin was one of only a few United States clinical investigators interested in varicella vaccine (Andre dep. at 48-49). In late November 1978, SB met with Plotkin to discuss clinical testing of SB's vaccine (PTX388). At that meeting SB learned from Plotkin, that:

Merck has its own strain of varicella vaccine and is accelerating its program. Data exist for healthy children but not immunosuppressed children. (*Id.*).

As of that time, Plotkin already had committed to doing a comparative study of Biken's Oka strain vaccine and Merck's KMcC strain vaccine (PTX390), which refutes SB's assertion that Hilleman arranged for the comparative study only after learning [*108] that Plotkin would be testing SB's vaccine (SB Br. at 33). Under the Option Agreement Biken was allowed to use its vaccine in clinical trials, and SB knew Biken was working with several United States investigators, including Plotkin, and had provided them with vaccine samples and information (PTX381, PTX384). Nothing in the Option Agreement precluded United States studies by Biken, and there is no evidence that SB, which knew of such studies, believed Biken was precluded from conducting them.

In February 1979, Merck's Hilleman learned that Plotkin, without Merck's consent, had substituted SB's vaccine for Biken's, and had written to Plotkin stating:

> The agreements made with you in the discussion of 11/16/78 (see attached) were that you would be testing our KMcC strain vaccine and Oka strain vaccine prepared in Japan by the Biken Institute as stated in your November 16 protocol.
>
> In our discussion you advised me that the Biken produced vaccine was recently stated by BoB to be unsatisfactory because of Mycoplasma contamination. You stated further that because of this, you substituted a lot of vaccine produced by SB that was represented to have been made using the same seed strain. [*109] You did say that your research committee did approve the substitution. You also stated that to your best knowledge the varicella vaccine made at SB had never been used in people, or at least in children, to date.
>
> We are very concerned about this substitution and our concern may be expressed as follows:
>
> > (a) We were not advised or consulted about the substitution.
> >
> > (b) The SB vaccine was not approved by us.
> >
> > (c) We knew nothing about the preparation or testing of the SB vaccine. We had confidence with the Biken-produced vaccine since it had had very extensive prior use in man in Japan.
> >
> > (d) The vaccine was given in the community where Dr. Wiebel works using Dr. Wiebel's contacts and with a consent form

> that bears both Dr. Arbeter and Dr. Wiebel's signature.
>
> Our feeling is that the truth of the situation was not revealed in the conduct of the trial and this could prove troublesome if any untoward effects result from use of that vaccine.
>
> Because of these circumstances, we ask that you send to us promptly:
>
> > (a) The release protocol for the SB lot of vaccine covering those aspects that relate to safety and potency.
> >
> > (b) A sample of the SB vaccine so [*110] that we can test it for viral infectivity and particle count.

(PTX401). Dr. Robert E. Weibel of Children's Hospital complied with Hilleman's request (TX1044).

Merck had a legitimate reason to seek the release protocol for SB's vaccine relating to safety and potency as well as a sample of the SB vaccine to obtain information on viral infectivity and particle count, and there is no evidence to suggest that Merck had any other reason. There is no evidence that Plotkin was precluded in any way from providing the information and sample to Merck. Plotkin had signed no confidentiality agreement with SB (Andre dep. at 43-45), and SB never had discussed confidentiality obligations with Plotkin or any other clinical investigator ( *id. at 44, 46*). Moreover, even if the information Plotkin provided could in some way be viewed as covered by the Option Agreement (then expired), a disclosure by Plotkin would be a breach by SB since Plotkin, under Article 5, paragraph 3 of the Option Agreement, was an "other party furnished by SB with the Strain," and SB was responsible for any disclosure by him (PTX306).

SB offered no persuasive evidence that the specific safety data that Plotkin [*111] sent to Hilleman was at the time confidential. The documents contained no

indication of confidentiality on their face. An SB witness testified that safety data sent to clinical investigators is "in the public domain" and not confidential (Huygelen dep. at 101). Andre also testified that information of the type found in SB's files concerning Merck's vaccine--which included titer, dose, storage, and use information (PTX300)--was not confidential as to either Merck's or SB's vaccine (Andre dep. at 62, 162-63). SB also offered no evidence that the vaccine sample used in the comparative study was at the time confidential. Andre of SB testified:

> I was not concerned because I didn't--the only concern I had was the fact that he was proposing the [comparative] study. I mean, everybody knew around that time what was in our vaccine, because it had been presented at meetings, and so there was no information that I felt would help Merck that had been passed to them.

(Andre dep. at 58-59).

> 2. SB Similarly Obtained Information from Clinical Investigators About Merck's Vaccine

On September 3, 1979, Huygelen forwarded to Takahashi information he had received concerning [*112] Merck's vaccine, including that it contained 800 pfu per dose, that Merck's vaccine was not freeze-dried, that Plotkin had no major clinical reactions with Merck's vaccine, and that Gershon had indicated that one of the two normal seronegative adults that she had inoculated developed varicella (TX2311). Huygelen specifically requested that Takahashi "keep this information strictly confidential" (TX2311).

In February 1980, SB received from Dr. Allan M. Arbeter, an associate of Plotkin, a copy of a contractual proposal submitted to NIAD (TX2347), which included a discussion of the varicella vaccine trials already conducted by Dr. Stuart E. Starr, Arbeter, and Plotkin using Biken's vaccine, SB's vaccine, and Merck's vaccine (TX2347), as well as the detailed results of clinical trials of Merck's KMcC vaccine (TX2347).

> 3. Merck Learned that Biken Expected to Enter a License Agreement with SB

As of February 1979, the Biken Board of Directors believed that a license agreement with SB would soon be finalized (PTX403), and in March, Biken sent SB a revised draft agreement (PTX401). On April 25, Brown sent Kawamata a revised proposal (PTX415). In other words, even at this late [*113] date and despite all of the allegedly "inequitable" acts SB attempts to ascribe to Merck, those acts seemed to have no affect on Biken's Board's willingness to enter into a license with SB.

In March 1979 Woodruff called Takahashi based on his understanding of the expiration of a "3-Month 'No-Negotiation' Period (Ended in Mid Feb)" (PTX407). He was told that SB had obtained good test results in Switzerland, had improved the yield and purity of its vaccine by [TEXT REDACTED BY THE COURT.] that Kawamata was moving closer to continuing with SB, and that Merck's chances "[were] almost nil" (TX1050).

SB has offered no persuasive evidence that the general information concerning improved yield as a result of [TEXT REDACTED BY THE COURT.] was confidential. In any event, any confidentiality obligations of Biken had ended on June 30, 1978, when the Option Period ended.

Believing that the Agreement between Biken and SB had expired, McDonald of Merck (who had written to Kawamata in November 1978) suggested that a final effort be made to "discourage [Biken] from 're-entering' into a relationship with [SB] and to encourage them to cooperate with Merck" and that "[Biken should] be [*114] presented with the reasons for choosing Merck over [SB], e.g., greater research and marketing expertise, etc." (TX1052). Woodruff and Asada, therefore, met in April with Kawamata and Tsuji and again learned that SB and Biken were close to agreement (PTX413). They were informed that, within the technical staff of Biken, there was "dissatisfaction with the progress of [SB]" but that the Biken directors were "fearful that cancellation of the contract by Osaka University based on poor performance, would result in prolonged legal problems, possibly even a law suit which would be very detrimental to the image of the Institute" (id.).

In a follow up letter of May 1, 1979, from Woodruff to Kawamata, Merck again expressed its interest in Biken's Oka strain if "it becomes necessary for you to separate from your existing contractual arrangement" (PTX416). There were no other contacts between Merck and Biken for the next six months. At that time, Merck

expected to proceed with its own KMcC vaccine, which had performed satisfactorily--achieving a 100% seroconversion rate, but also causing some minor reactions (TX1060, TX1061).

*F. June to November 1979: Deterioration of the* [*115] *SB/Biken Relationship*

1. SB Fails to Sign a License Agreement

As of June 1979, nearly nine months had passed since Brown's letter requesting an extension of the negotiating period of "several weeks," and nearly two years had passed since the original deadline for concluding a licensing agreement; however, no licensing agreement had been reached between Biken and SB. Reflecting Biken's growing impatience, Kawamata sent SB a letter on June 8, 1979, stating:

> Enclosed, please find our final license agreement draft in duplicate to respond to your recent letter of April 25, 1979, in which your agreement draft was also enclosed.
>
> Whether this is acceptable to you or not, we must regretfully state that this would be our final agreement reviewing all of our past discussions, your comments in the letter as well as your draft sent to us.
>
> Because there are a number of other parties showing their interest in our varicella vaccines, we are being forced to set a deadline on this matter so that you may please indicate within ten (10) days of your receipt as to whether you can accept or decline this agreement.

(PTX418). SB understood that Biken was offering its final proposal: [*116] "the letter here was clear. He said it was the final agreement." (Huygelen 11/4/98 dep. at 146). The final draft agreement offered by Biken offered exclusive rights in most European and North and South American countries and non-exclusive rights in many countries (PTX423).

Notwithstanding the express ten-day deadline, Biken had not received a response from SB as of July 21, 1979 (PTX425). By the end of September 1979, SB still had not replied to Biken. Huygelen wrote to Kawamata

indicating that Brown "had not had the time yet to rewrite the Varicella agreement" (PTX433). A week later, Brown of SB acknowledged that Biken was unhappy with SB's failure to respond (PTX434, PTX438).

These documents refute SB's assertion that "Biken was *not* negotiating in good faith" (SB Br. at 14, 22) (emphasis in original). SB has offered no persuasive evidence or plausible reason why Biken would not have wanted to reach an agreement on a license.

2. SB's Development Problems

By the fall of 1979 Biken became unhappy with SB's continued failure to make a satisfactory vaccine more than four years after the signing of the Option Agreement.

[TEXT REDACTED BY THE COURT.] In a letter of October 23, 1979, Takahashi [*117] reported to Plotkin that Biken had tested SB's vaccine, that it was not satisfactory, and that "I and [the] Board of our Foundation are seriously anxious about the manufacturing of Oka strain vaccine [in SB]" (PTX437).

SB was fully aware of Biken's unhappiness. An internal SB memorandum in October 1979 reported that:

> [TEXT REDACTED BY THE COURT.] They are unhappy about trials with this material enough so if they proceed a license may be denied . . . Ray [Kutsanai] concerned about [SB's] reputation in the face of what is perceived as [SB's] inability to produce and/or to do what they say they will do.

(PTX438).

On October 22, Kutsanai, SB's representative in Japan, attended a meeting requested by Kawamata. His memo describes the meeting:

> They were all cordial at first but as we exchanged our usual greetings, one could sense that something was brewing. They were trying to find the right timing to bring out the bad news.
>
> Dr. Kawamata started off by saying that it was unfortunate that SB was taking

so long to produce an effective varicella vaccine.

[TEXT REDACTED BY THE COURT.] A mention was also made that the agreement draft discussion cannot [*118] be continued in the same spirit in which it was started.

(PTX443).

Kutsunai's memo also described a telephone conversation with Takahashi on October 31: "His attitude at that time was very cold and he clearly stated that no relationship existed any more between [SB] and Biken," and that Takahashi "did not want [SB] to have anything to do with the Oka strain." (id.). A later SB telex described the situation as "very grim" (PTX439). On November 2, 1979, Kutsunai again met with Drs. Kawamata, Kubo, Takahashi, and Tsuji, and his memo recording that meeting stated:

> [TEXT REDACTED BY THE COURT.] . . . After they had spoken their minds, attempt was made to explain to them that the multiple center won't be starting until January or February 1980 and fortunately a new batch of vaccine will become available in December. Their reply to that was they doubted whether the vaccine can be made available for use in such a short time. The vaccine will have to go through various tests and the testing itself will take almost 2 months to complete. They were unwilling to accept my word that a usable supply of vaccine will be made available by [SB] by the time the multicenter [*119] study is ready to commence.

(PTX443).

There is no evidence that Takahashi or any director of Biken had any motive to speak against SB other than unhappiness with SB's development work and concern that SB would hurt the reputation of the Oka strain (PTX443). Neither Biken nor Takahashi had incentive to favor Merck or to criticize SB unfairly. To the contrary, the logical inference is that to expedite commercialization of its vaccine Biken would have preferred that SB

succeed, rather than have another company, such as Merck, start anew with the Oka strain.

For these reasons, SB's assertion that Takahashi was engaged in a "conspiracy" with Merck to undermine SB is unsupported and implausible. [15] SB also knew, as Huygelen reported on November 9 in a memo to A.J. Dalby, the SB executive responsible for international markets, that:

> Our option agreement with the Foundation in Osaka has expired and the license agreement has not been signed yet. This puts us in a difficult situation because of all the time and effort spent on the project.

(PTX446).

15 In its reply brief SB admits that the favorable initial results of Plotkin's second clinical trial were not received by SB or Biken until January 1980 (SB Reply Br. at 30). SB suggested in its opening brief that Biken and Merck knew of such results in the fall of 1979 (SB Br. at 36-37).

[*120] At its October 1979 meeting, the Biken Board of Directors discussed "whether to cancel the [Option] agreement or not?" (TX1690). On November 19, 1979, the Biken Board of Directors decided "as to the contract situation with [SB], over a year has passed and if left like this it could affect the credibility of the Oka strain so we have decided that we will notify them of our intention to cancel the option agreement" (PTX451).

3. Merck Initiates Additional Contacts with Biken

After Woodruff's letter of May 1, 1979, to Kawamata, there were no contacts between Biken and Merck for the next six months. On November 2, 1979, upon learning that SB's vaccine was doing poorly in United States clinical trials, Hilleman asked Woodruff to contact Takahashi to see whether "a door has been opened" (PTX441). Woodruff contacted Takahashi on November 12, 1979, and on November 15 sent a letter to Kawamata, again expressing Merck's interest and requesting a meeting to discuss it (PTX450).

The record reflects that at least initially, Merck did not seek to exclude SB's participation with the Oka strain, but only to be allowed to participate as well--Woodruff's

November 15, 1979 letter to Kawamata [*121] stated that "the difficulties encountered in producing satisfactory varicella vaccine may offer possibility for more than one company to share in commercial production of vaccine in various areas of the world" (id.).

4. The Alleged False Statement by Woodruff

On November 27, Kawamata agreed to meet with Woodruff. Woodruff then wrote to Takahashi:

> I have since been in touch with Dr. Hilleman and have learned more details of the clinical trials with various vaccine preparations which have been completed in the United States. With these facts available I believed I should again present to the Research Foundation for Microbial Diseases management the advantages of participation by the Merck Sharp and Dohme Research Laboratories in additional clinical evaluations, if there is to be any real hope of developing a major market position for the vaccine quickly in America. As you know, SKF has essentially withdrawn from vaccine research and marketing . . . .
>
> I believe the meeting to be extremely important to the future of the research with the vaccine in America. Our company has become by far the dominant commercial organization in vaccine research and development in the United [*122] States. I have confidence that our participation as a non-exclusive licensee would greatly advance the study of your vaccine, as well as the eventual extension of experimental approaches to the normal population.

(PTX453). In a meeting with Kawamata and Takahashi on December 5, 1979, Woodruff reported that they again discussed the fact that SB had "essentially withdrawn from vaccine research and marketing" as giving justification for Biken "to withdraw from [SB] for the US market" (PTX454).

Woodruff's statement was based on a confidential report by Henri Lipmanowicz, a senior Merck employee, who had conducted a high level review of the vaccine business at the direction of Merck's chairman PTX426, tr.

160-61, 165. The report excluded SB from the companies that "remain in the U.S. vaccines market" (PTX426), and expressly noted that "two companies have recently abandoned the field (Dow and SB)" (PTX426). A 1976 SB document confirms that "Dow has essentially collapsed its vaccine business, and is no longer selling or producing" (PTX311). It was reported separately to Woodruff that SB "discontinued sale of their rubella vaccine in the United States in February 1977" (PTX456), [*123] a significant fact since "the U.S. market is quickest to adopt new pediatric vaccines" (id.).

As of 1979, SB had, in fact, largely abandoned the United States vaccine market--it was selling no vaccine in the United States and in 1976 had withdrawn from the market the only vaccine (rubella) it had ever sold in the United States (PTX405); (Huygelen 11/4/98 dep. at 12). SB's own documents from that period confirmed its limited interest in vaccines, especially in the United States, saying:

> [TEXT REDACTED BY THE COURT.] (PTX313); and "I am concerned lest SB's general indifference toward vaccines in the U.S.A. prove to be another source of misunderstanding [with Biken] in the future" (PTX347).

The statement by Woodruff, which in context concerned the United States market and was qualified by the word "essentially," was based on an internal Merck report and was consistent with SB's own documents. During the period of the Option Agreement, SB had a limited interest in vaccines, especially in the United States (PTX311, PTX313, PTX319, PTX347), and SB knew that its absence from the United States market was a point Merck legitimately could argue to Biken (Huygelen dep. at 57).

[*124] 5. The Termination Letter

On December 18, 1979, the Biken Board reviewed and approved a letter prepared since the November Board meeting canceling the Option Agreement (PTX566). On December 20, 1979, Biken sent the letter to SB stating:

> We hereby terminate, as of the date of this letter, the said Option Agreement (including the said Memorandum) for the following reason:
>
> Since we sent you our

draft of the formal license agreement on July 26, 1978, the negotiations have been carried on between both parties relating to the terms and conditions of such license agreement, but any final agreement relating thereto has not yet been reached. Accordingly, a 'more formal agreement' as specified in Article 4 of the Option Agreement is not concluded within 6 months after the end of the Option period extended under the Memorandum, namely June 30, 1978.

(PTX457). Although Biken terminated its exclusive dealings with SB on December 20, 1979, the December Biken Board minutes contain no reference to Merck or to Woodruff's statement concerning SB.

The Option Agreement had expired as of September 30, 1978. Biken's letter of December 20 expressly referred to that in the [*125] last sentence quoted above. That letter, therefore, should be construed fairly as an effort to eliminate any uncertainty in light of the subsequent dealings of the parties and to clarify the termination of the relationship.

*G. January 1980 to February 1982: Biken Negotiates License Agreements with SB*

In a memo of January 7, 1980, Brown of SB acknowledged that "Handai-Biken's termination is within their rights--indeed we have been at their mercy ever since the second extension of the original (June 1, 1975) Option Agreement expired in '78." (PTX461). His memo indicated that Kutsunai would be contacting Biken to see "whether the door is firmly shut." (*id.*).

On January 30, 1980 SB received preliminary results of Plotkin's second clinical trial of SB's vaccine, which were positive (TX2343). On January 30, 1980 SB sent two letters: the first letter advised Takahashi on SB's progress with its vaccine (TX1720). The second letter

from Brown to Kawamata stated SB's continued interest in a licensing agreement (TX2346). On March 1, 1980, SB met with Biken and learned that "the way is open to proceed with negotiations on both varicella and mumps." (PTX465).

Biken immediately [*126] began negotiations with Merck. SB knew the details of those negotiations (PTX479, PTX480). Biken also continued to negotiate a licensing agreement with SB and in May 1980 SB was offered non-exclusive rights in the United States, Belgium, and Switzerland (PTX472), with an understanding that Biken would "consider adding further territories when [SB] has successfully produced vaccine" (PTX473). SB rejected Biken's offer of such rights (PTX472) and requested that "such a limited agreement *not* be submitted to the Osaka board for approval" (PTX470) (emphasis in original).

At that time, SB and Biken were negotiating license agreements for both varicella and mumps vaccines. Biken was willing to offer SB non-exclusive worldwide rights to its mumps strain (PTX475). In June 1980, SB decided to proceed with the mumps negotiations, but to do so "independently from varicella because we would like to think it over again especially in view of large initial payment in relation to small market potential for varicella" (PTX476). By July 1, 1980, Kutsunai advised Huygelen that SB "will proceed with mumps letter of intent [with Biken] but will not discuss varicella" (PTX477).

In November [*127] 1980, Merck and Biken entered into a licensing agreement giving Merck non-exclusive rights to the Oka strain and Biken know-how in the United States and Canada (PTX551). On April 1, 1981, D. E. Boultbee of SB wrote to Brown that "I want mumps signed and sealed before approaching [Biken] about varicella again" (PTX486). On June 23, 1981, Biken offered Institu Merieux a non-exclusive license for "the countries of European Community except Belgium, on equal terms with that of Merck & Co." (PTX490).

On November 10, 1981, Biken offered SB non-exclusive varicella rights (TX2400). SB understood that it was receiving "exactly the same conditions" as were offered to Institut Merieux (*id.*). On February 18, 1982, SB and Biken entered into a licensing agreement giving SB non-exclusive rights to the Oka strain and Biken know-how in the countries of Europe (PTX552).

## IV. CONCLUSIONS OF LAW

### A. Certain of SB's Claims are Barred by the Statute of Limitations and Laches

Claims for intentional interference with contract or prospective business relations are subject to the three-year statute of limitations of *10 Del. C. § 8106*; *Williams v. Caruso, D. Del. 966 F. Supp. 287, 293 (1997).* [*128] Although statutes of limitations do not directly apply, equity follows the law and, in appropriate circumstances, applies the statute of limitations by analogy, denying relief when claims are brought after the analogous statutory period. *See In re Dean Witter Partnership Litig., Del. Ch., C.A. No. 14816, 1998 Del. Ch. LEXIS 133* at *11-12, (July 17, 1998).

In addition, "where the statute bars the legal remedy, it shall bar the equitable remedy in analogous cases or in reference to the same subject matter." *Kahn v. Seaboard Corp., Del. Ch., 625 A.2d 269, 272 (1993); see also United States Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc., Del. Supr., 677 A.2d 497, 502 (1996).* Thus, SB's claim for unjust enrichment likewise is subject to a three-year bar.

The statute begins to run at the time of the alleged wrongful act "even if the plaintiff is ignorant of the cause of action." *In re Dean Witter, 1998 Del. Ch. LEXIS 133* at *15. SB's counterclaims, first asserted in June 1998, involve matters that occurred between 1976 and 1979. Accordingly, SB's counterclaims are barred absent some basis for tolling. SB [*129] has the burden of showing a basis for tolling of the statute. *See, e.g., Playtex, Inc. v. Columbia Cas., Del. Super., C.A. No. 88 C-MR-233, 1993 Del. Super. LEXIS 286* at *10, Del Pesco, J. (Sept. 20, 1993). Under Delaware law, tolling applies only in very limited circumstances--where the injuries were inherently unknowable, *see, e.g., Pack & Process, Inc. v. Celotex Corp., Del. Super: 503 A.2d 646, 651 (1985)*, or where there has been fraudulent concealment, *see, e.g., Playtex, 1993 Del. Super. LEXIS 286* at *9. Even when tolled, the statute of limitations is suspended only until a plaintiff discovers his rights or, by exercising reasonable diligence, should have discovered such rights. *See In re Dean Witter, 1998 Del. Ch. LEXIS 133* at *21.

SB argues that its claims are not barred "because Merck's tortious and inequitable actions have been concealed until unearthed during discovery in this litigation" (SB Br. at 73), and because SB did not know

of Merck's conduct (SB Br. at 74). However, concealment is not enough to toll the statute--there must be fraudulent concealment, which requires "that something affirmative [*130] be done by a defendant, some 'actual artifice' which prevents a plaintiff from gaining knowledge of the facts, or some misrepresentation which is intended to put the plaintiff off the trail of inquiry." *Halpern v. Barran, Del. Ch., 313 A.2d 139, 143 (1973)* (citations omitted). The three instances of supposed concealment alleged by SB fall far short of fraudulent concealment and do not otherwise establish a basis-for tolling the statute.

SB first complains that Takahashi told SB in 1976 that he had turned down Merck's request for the Oka strain and that there was not the "slightest possibility" that he would give the Oka strain to Merck (SB Br. at 73). Takahashi's statement cannot reasonably be termed a concealment since there is no evidence that, at the time, he harbored a secret intent to give the strain to Merck. Accepting, *arguendo*, that Takahashi actually made that statement (which is hearsay), it is indisputable that in 1976 (and all the way through 1979) Merck was unable to obtain the Oka strain from Biken. Moreover, SB knew, at least by 1980, that Merck in fact had obtained a license and had received the strain. Thus, any "concealment" ended 18 years [*131] before SB filed its counterclaims. [16]

> 16  In its reply brief SB says that the fact Merck obtained the strain in 1980 "does not mean SB had any reason to know about the continual meeting between Merck and Biken *during the time the Option Agreement remained effective*" (SB Reply Br. 48-49) (emphasis in original). SB's contention is wrong for two reasons. First, if the basis for tolling is the supposed statement that Biken would not give the strain to Merck, once that fact is no longer "concealed," any basis for tolling ends. Second, SB's own documents show that it in fact knew Takahashi was meeting with Merck during the Option Agreement and attempting to obtain rights to the Oka strain.

SB next complains that Takahashi asked Woodruff to conceal their conversations from Takahashi's supervisors (SB Br. at 73). On one occasion Takahashi requested that Woodruff not attribute Takahashi's November 12, 1979 comments to him in discussions with Kawamata because Biken had not yet reached consensus on issues related

[*132] to licensing of the Oka strain (Trial Tr. 154-56). There is no evidence supporting SB's assertion that Takahashi wanted to conceal his discussions with pharmaceutical companies (including Merck) from Kawamata for some nefarious reason. Indeed, SB's contention is refuted by the fact that on other occasions Takahashi, in the presence of Kawamata, met with Woodruff (TX1005, TX1012). Most importantly, SB does not allege that Takahashi was attempting to conceal information from SB. Moreover, the most that was "concealed" was a conversation related to Merck receiving a license, a fact which SB ultimately knew by 1980.

The third "concealment" of which SB complains is that "Biken continued to deny that any information was transmitted to Merck during the duration of the Option Agreement as late as the April 1998 deposition of Mr. Kamada." (SB Br. at 73). SB has not established that there were any "denials" (*i.e.*, instances in which there was a concealment) by Biken to SB at any time from 1975 to 1998, let alone any misrepresentation. Thus, SB has pointed to nothing that constitutes fraudulent concealment such as to justify tolling of the statute of limitations.

The policies underlying [*133] laches and the statute of limitations also support dismissal of SB's claims. SB essentially has presented a paper record of events occurring more than 20 years ago, from which it asks the Court to draw inferences about motive and conduct not reflected in the documents themselves. All of the critical witnesses--the Biken board members who ultimately made the decision to cease dealing exclusively with SB--are deceased, inhibiting the ability of Merck and Biken to defend against these claims.

*B. Doctrine of Unclean Hands*

1. Standard for Unclean Hands

Well established law dictates that "when a party who seeks relief in this Court 'has violated conscience or good faith or other equitable principles in his conduct, then the doors of the Court of Equity should be shut against him.'" *E.J. Stephen, Inc. v. Ceccola, No. 7578, Del. Ch., 1984 Del. Ch. LEXIS 596* at *5 (July 9, 1984)(citing Bodley v. Jones, Del. Supr., 30 Del. Ch. 480, 59 A.2d 463 (1947)); see also Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 78 L. Ed. 293, 54 S. Ct. 146 (1933)*(denying relief to an intellectual property holder

due to its unclean hands); *ONTI, Inc. v. Integra Bank, 1998 Del. Ch. LEXIS 168*, *3, No. 14514, Del. Ch., 1998 WL 671263, [*134] at *3 (Aug. 25, 1998); *Sherwood, Inc. v. Cottman Transmission Sys., Inc., 1982 Del. Ch. LEXIS 422*, Del. Ch., C. A. No. 6768, 1982 WL 17882, at *2 (April 15, 1982) (denying injunctive relief to plaintiff because of his unclean hands due to breach of contract). 17

> 17      As stated in *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814, 89 L. Ed. 1381, 65 S. Ct. 993 (1945)*:
>
>     The guiding doctrine in this case is the equitable maxim that "he who comes into equity must come with clean hands." This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.

In fashioning a remedy for unclean hands, the Court has a wide range of discretion in refusing to aid the "unclean litigant." *Monsanto Co. v. Rohm & Haas Co., 3d Circ., 456 F.2d 592, 598 (1971).* [*135] The application of the doctrine of unclean hands is not "bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245-46, 78 L. Ed. 293, 54 S. Ct. 146 (1933).* Moreover, this Court specifically has rejected a "no harm, no foul" exception to the application of this doctrine. *Nakahara v. The NS 1991 Am. Trust, Del. Ch., 739 A.2d 770, 794* (March 20, 1998). 18

> 18      "A court of equity will not use its equitable powers to condone such activity. Equity does not reward those who act inequitably, even if it can be said that no tangible injury resulted." *Id.*

SB has levied a claim of unclean hands against Merck for allegedly inequitable acts that it committed on its own behalf. SB also has levied a claim of unclean hands against Biken for certain acts which SB argues should bar any claim which Biken could bring against SB. As Biken's exclusive licensee [*136] in the United States and pursuant to a separate contract with Biken, Merck has asserted that it has standing to sue SB for trade

secret misappropriation. In order for Merck to have standing to sue in its own name, well established law dictates that Merck's exclusive license with Biken *must* constitute an assignment. *See Waterman v. Mackenzie, 138 U.S. 252, 255, 34 L. Ed. 923, 11 S. Ct. 334 (1891); Minco, Inc. v. Combustion Eng'g, Inc., Fed. Circ., 95 F.3d 1109, 1116-17 (1996).*

In this regard, Merck explicitly has argued "in terms of the right to sue for misappropriation . . . we, to use [SB's counsel's] words, stand in Biken's shoes as to a claim of misappropriation." (TX 1295 at 80:11-22.). Therefore, as Merck contends that as Biken's exclusive licensee in the United States, it "stands in Biken's shoes," any defenses SB has against Biken are fully applicable to Merck. *See, e.g., Mid-Atlantic Equip. Corp. v. Elder, E.D. Pa., 1995 U.S. Dist. LEXIS 10588, *2 n.2, No. 95-CV 886, 1995 WL 447602, at *5 n.2 (July 25, 1995)* ("As Yamaha's assignee, Mid-Atlantic 'stands in the shoes' of the assignor and assumes the assignment subject to all defects and defenses. [*137] "); *K.B. v. State Farm Fire and Cas. Co., Ariz. Supr., 189 Ariz. 263, 941 P.2d 1288, 1292 (1997)* (holding that "an assignee steps into the shoes of her assignor" and "cannot alter the defenses or equities of the third party"). *Smith v. Cumberland Group, Ltd., Pa. Super., 455 Pa. Super. 276, 687 A.2d 1167, 1172 (1996)* ("Where an assignment is effective, the assignee stands in the shoes of the assignor and assumes all of his rights . . . conversely an assignee's right against the obligor is subject to all of the limitations of the assignor's right, to all defenses thereto . . . and counterclaims which would have been available against the assignor had there been no assignment . . . ."); *Florida v. Family Bank of Hallandale, Fla. Dist. Ct. App., 667 So. 2d 257, 259 (1995)* ("The assignee steps into the shoes of the assignor and is subject to all equities and defenses that could have been asserted against the assignor had the assignment not been made."). [19]

> 19   In fact, in earlier proceedings in this case the Court allowed the litigation to proceed without the addition of Biken as an involuntary plaintiff under Del. Ch. Ct. R. 19 only "so long as [Biken's] commitment is adequate to make sure that SmithKline is *prejudiced* neither in the discovery nor potentially the trial." (TX 1295 at 96:21-24)(emphasis added).

[*138] Thus, at least in theory, if SB is able to establish inequitable conduct on *either* Merck's or Biken's

part it should succeed on its claim of unclean hands against Merck. For the reasons specified below, I find the evidence simply does not establish conduct that requires the Court to reject Merck's claims against SB by operation of the doctrine of unclean hands.

### 2. Merck's Claims Are Not Barred by Unclean Hands

SB bears the burden of establishing that Merck has "unclean hands," *see, e.g., Greco v. Columbia/HCA Healthcare Corp., Del. Ch., 1999 Del. Ch. LEXIS 24 at *24, Strine, V.C. (Feb. 11, 1999)*, and must show that Merck "violated conscience or good faith or other equitable principles" in its conduct, *E.J. Stephen, Inc. v. Ceccola, Del. Ch., 1984 Del. Ch. LEXIS 596 at *5, Berger, V.C. (July 9, 1984)*. Ultimately, the "unclean hands doctrine is aimed at providing a court of equity with a shield from the potentially entangling misdeeds of the litigants in any given case." *Nakahara v. The NS 1991 Am. Trust, Del. Ch., 718 A.2d 518, 522 (1998)*. Ultimately, the doctrine is about public policy, and the Court has the broad discretion [*139] to refuse relief if SB can establish that Merck does not meet a very basic though inexact standard: "where the litigant's own acts offend the very sense of equity to which he appeals." *Id.*

### a) SB Has Failed to Establish Unclean Hands due to Tortious Interference

SB attempts to support its contention that Merck's claims are tainted by alleging three forms of inequitable conduct: 1) that Merck induced Biken to breach the Option Agreement by, among other things, frustrating negotiations with SB; 2) that Merck improperly obtained confidential material and information from clinical researchers and through Takahashi; and 3) that Woodruff fraudulently misrepresented SB's vaccine business. These are the same allegations that formed the basis for SB's claim for tortious interference. SB has been unable to establish that Merck tortiously interfered with SB's existing or prospective contractual relationship with Biken. Thus, SB's unclean hands claim must also fail on this point.

To establish tortious interference with either an existing contract or prospective contractual relation, a party must demonstrate (1) the existence of a contract or a prospective contractual relationship [*140] (2) about which the accused party knew and (3) an intentional act that is a significant factor in causing a breach of that

contract or termination of that prospective contractual relationship (4) absent a justification for the interference and (5) causing damages to the party whose contract was breached or whose relationship was disrupted. *See CPM Indus., Inc v. Fayda Chems. & Minerals, Inc., Del. Ch., 1997 Del. Ch. LEXIS 175, *23, C.A. No. 15996, Jacobs, V.C. (Nov 26, 1997).*

(1) Contractual Relationship and Knowledge

As far as the first two requirements are concerned, the Option Agreement was a contract between Biken and SB, and Merck knew at least generally of its existence. However, insofar as SB claims that Merck induced a breach of Biken's confidentiality obligation, there is no evidence that Merck knew of that provision, let alone its scope. Neither Woodruff nor any other Merck employee saw a copy of the Option Agreement, and there is no evidence that Merck was aware of its specific terms.

Insofar as SB complains that it did not receive a "worldwide exclusive license" (*see, e.g.*, SB Br. at 1), SB never had a contract right to such a license, either before or after expiration [*141] of the Option Agreement. The Agreement itself conferred no right to a license *per se*, but only the right to evaluate the Oka strain and thereafter attempt to negotiate a license. And even assuming Biken agreed to extend the negotiating period as SB claims, SB continued to have only some expectation of a license. Even then, its expectancy interest was less than a worldwide exclusive license because Biken only offered SB limited exclusive rights in some areas. Thus, SB at most had an expectancy interest in a limited license and not a contract right to one. In addition, any such expectancy interest was terminable at will by either party. Assuming that these details do not totally preclude SB from making its claim, my analysis continues.

(2) Intentional Act, Proximate Cause, and Damages

The third requirement has two parts: an intentional act and evidence that the act was a significant factor, *i.e.*, the proximate cause of the claimed damage. [20] As mentioned above, SB has identified three actions that purportedly caused it to be damaged: 1) that Merck induced Biken to breach the Option Agreement; 2) that Merck improperly obtained confidential material and information [*142] from clinical researchers and through Takahashi; and 3) that Woodruff fraudulently misrepresented SB's vaccine business. As outlined below, SB has failed to prove any induced breach of any

implied or explicit term of the Option Agreement by Merck.

> 20 I am sensitive to the fact that while there may be numerous "significant" causes in a tortious interference action in the colloquial sense of the word "significant." To make sense of the tort, the Court chooses to examine whether or not the acts of which SB currently complains can be fairly viewed together or individually as the proximate cause(s) of the alleged damage.

(i) SB Has Failed to Establish that Merck Induced Biken to Breach the Option Agreement

Generally, the language of a contract must be given its ordinary meaning and, "absent ambiguity, the parties' intent must be determined by reference to the express terms of the Agreement." *Cincinnati SMSA Ltd. Partnership v. Cincinnati Bell Cellular Sys. Co., Del. Ch., 1997 Del. Ch. LEXIS 109, *17, C.A. No. 15388 [*143]* (Aug. 13, 1997), *aff'd, Del. Supr., 708 A.2d 989 (1997).* Where the language of the agreement "is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Trust v. Continental Cas. Co., Del. Supr., 624 A.2d 1191, 1198 (1993)*(citing *Citadel Holding Corp. v. Roven, Del. Super., 603 A.2d 818, 822 (1992)).* The "language of an agreement ... is not rendered ambiguous simply because the parties in litigation differ concerning its meaning." *Id.* In addition, when the words of a contract are not subject to different interpretations and when the words do not otherwise create ambiguity when viewed in the light of other contractual provisions, this Court "will not consider extrinsic evidence to interpret the meaning of the agreement." *Cincinnati SMSA, 1997 Del. Ch. LEXIS 109 at *15.*

The Option Agreement did not prohibit communications between Merck and Biken. The only limit imposed by the Option Agreement on Biken's dealings with other prospective licensees was that Biken agreed "not to [*144] give such option or any license for manufacture, sale or use of a varicella vaccine made from their Strain to any third party during the option period as specified in Article 3 and for three months thereafter" (PTX306, Art. 1, P2). Article 1, paragraph 2 imposed no limit on Biken's ability to communicate or negotiate with third parties at any time during the term of the Option Agreement. SB's claim that "Biken could *not* negotiate

with anyone else" (SB Br. at 1) is directly contradicted by the unambiguous language of the agreement.

Although the unambiguous language of the agreement precludes consideration of extrinsic evidence, SB's claim also is unsupported by any such evidence. No testimony from any Biken or SB employee involved in the negotiation of the Option Agreement suggests that the parties understood Biken to be limited in the way SB claims. Similarly, no document relating to the negotiations of the Option Agreement suggests any such limit on Biken's ability to talk or to negotiate with others.

The contemporaneous conduct also refutes SB's claim that Biken was precluded from speaking to other potentially interested parties. As noted, SB was fully aware that Takahashi [*145] met with representatives of Merck during the period of the Option Agreement on the subject of Merck's interest in the Oka strain. There is no evidence that SB viewed such meetings as prohibited by the Option Agreement.

SB's reliance on the testimony of Yoshio Kamada regarding his interpretation of the contract restrictions on Biken's ability to meet with Merck is misplaced. Kamada had no involvement in negotiation of the Option Agreement (Kamada dep. at 33-34), no involvement in discussions concerning its meaning (id.), and, as SB concedes, no personal knowledge concerning any aspect of the Option Agreement (id. at 33-35, SB Br. at 5 n. 4). In addition, SB's attempt, in a Rule 30(b)(6) deposition, to inquire into the contentions of Merck as to the meaning and legal effect of the parties' rights under the Option Agreement was improper. *See, e.g., Teigel Mfg. Co. v. Globe-Union, Inc.*, D. Del., C.A. No. 84-483, Stapleton, J. (Oct. 5, 1984), Oral Ruling at 14 ("[A] lay person shouldn't be required to formulate a party's contention in response to deposition questioning."). Moreover, such testimony cannot contradict the plain language of the agreement.

SB's reliance [*146] on Kawamata's letter stating "I cannot negotiate with you at present" cannot be used to modify the language of the agreement. Moreover, in that letter Kawamata expressly declined negotiating with Merck prior to 1980, and there was never any exchange of licensing proposals between Merck and Biken before that time. In any event, even if Biken and SB had "understood" that Biken could not negotiate with others, the various meetings between Woodruff and Takahashi and other communications in which Merck expressed its

interest in the Oka strain did not constitute "negotiations." In fact, Merck did not authorize negotiations with Biken until April 1980 (PTX467). Thus, Merck did not induce Biken to breach any provision of the Agreement by engaging Biken agents in these discussions during the effective period of the Agreement.

(ii) SB Has Established a Breach of the Option Agreement's Confidentiality Provision.

Biken's confidentiality obligations under the Agreement are contained in Article 5, paragraph 4. The specific language is as follows:

> The Foundation also agrees during the option period and during the term of any License Agreement executed pursuant thereto not to disclose [*147] the Strain and information and data relating thereto, including any data, strains, or information provided by [SB], to any third party except to enable the Foundation to conduct research testing in the field, to publish or release the same to scientific and/or academic institutions, and to deposit a limited quantity of its own Strain to ATCC, U.S.A., or other accredited depositories for the purpose of facilitating the Foundation's patent applications. (B13).

(PTX306). By its terms, the limit on disclosure by Biken applied only "during the option period and during the term of any license agreement executed pursuant thereto . . ." (PTX306, Art. 5, P4). Because no license agreement was ever executed, the confidentiality obligation ultimately applied only "during the Option Period" which ended June 30, 1978. There is no persuasive evidence that the "Option Period" ever was extended beyond that date.

Biken and SB clearly separated the Option Period and the negotiating period and clearly limited Biken's confidentiality obligations to the Option Period. A court may not disregard unambiguous language of a contract, even if it views such language as unreasonable. *See Daniel D. Rappa, Inc. v. Engelhardt, Del. Supr., 256 A.2d 744 (1969)*; [*148] *Ramsey v. Department of Natural Resources and Envtl. Control, Del. Super., C.A. No. 96*

*A-03-001, 1997 Del. Super. LEXIS 143* at *9, Terry, J. (Mar. 20, 1997).

There is nothing unreasonable, however, about the express language of the Agreement. Because SB was required under the terms of the Agreement to begin negotiations for a license three months prior to the expiration of the Option Period and finalize such license within three months following the expiration of the Option Period, Biken sensibly could have concluded that it wanted to be able, once the Option Period had expired and if no licensing agreement had been reached, to actively begin eliciting the interests of other parties--which could require disclosure (under appropriate confidentiality provisions) of the strain and related information to such parties.

SB's argument (SB Reply Br. at 43 n.31) that the Court may imply an additional obligation is incorrect where, as here, the parties expressly and unambiguously specified when Biken's confidentiality obligation ended. *Cincinnati SMSA, 1997 Del. Ch. LEXIS 109* at *22 ("When the express terms of the contract do not suggest the omission of such [*149] an obligation and the implied obligation sought to be enforced conflicts with the express terms, the Court will not supply a term allegedly omitted."). For these reasons, insofar as SB complains about disclosures after June 30, 1978, any such disclosures did not violate the Option Agreement. [21]

> 21   The June 30, 1978 cut-off date for Biken's non-disclosure obligations also applies to any argument that SB might have that related to non-Biken clinical researchers (*e.g.*, Dr. Plotkin) who SB argues potentially could be viewed as constrained by Biken's non-disclosure commitment.
>
> In any event, there is no evidence that Plotkin or any of SB's clinical investigators violated a confidentiality obligation to SB by providing information to Merck. SB admits that its clinical investigators did not sign confidentiality agreements (Andre dep. at 118). Although SB claims there was a "general practice in the industry" (SB Br. at 72) concerning confidentiality by investigators, the testimony provides no real basis for that statement nor is there any other persuasive evidence that could act as a legal hook for the claim that there was a contractual or quasi-contractual obligation in this

particular case. Andre admitted that his only experience was in Europe (Andre dep. at 5, 9-10), that he had no personal knowledge of what the general practice was in the United States (*id. at 41, 45)*, that until he dealt with Dr. Plotkin he had never been involved in clinical trials in the United States (*id. at 41*), that he knew of no agreement that Plotkin had signed (*id. at 43*), and that he had never had any discussion with Plotkin or any other clinical investigator about confidentiality obligations (*id. at 44, 46)*.

> Moreover, SB received from Plotkin information about Merck's KMcC vaccine, received from Gershon information on her tests of Merck's vaccines, and forwarded such information to Takahashi with a request that it be kept "strictly confidential" (PTX430). SB later received the detailed clinical results of Plotkin's studies of the Merck vaccine (TX2347). SB cannot reasonably complain that Merck's receipt of such information was improper, but that SB's was not.

[*150]   SB, however, has pointed to disclosures which occurred *before* June 30, 1978. SB claims that these allegedly impermissible disclosures--which were made by Takahashi--amount to a breach of Biken's confidentiality obligations under the Agreement. SB goes on to argue that if Biken is tainted by a breach of contract, that breach must be imputed to Merck and must operate to foreclose the misappropriation claims that Merck asserts in this litigation as Biken's assignee. [22]

> 22   In response to SB's argument Merck argues that 1) the non-disclosure provision did not apply to Takahashi and 2) the provision only applies to the Foundation and *not* to its officers and employees. Both of these arguments, while immaterial, are ridiculous. First, while Takahashi may have been technically employed by the Institute (*i.e.*, his paycheck came from the Institute) he clearly operated as an agent of the Foundation (Kamada dep. at 194; Ichikawa dep. at 23). Moreover, Merck's own witness recognized that the distinction between the Institute and the Foundation was a fiction (TX1021). Second, if the non-disclosure provision in the Agreement did not apply to the officers and employees of the Foundation, then to

whom did it apply? Merck's reading of the non-disclosure agreement is simply inappropriate as it would force the Court to accept an implausible interpretation of the provision.

[*151] Pursuant to the Option Agreement, Biken explicitly agreed to a clear prohibition on the disclosure of information. Despite that fact, it seems that Takahashi shared certain protected information with Merck. For instance, Biken provided Merck with information on its own clinical trials related to the Strain. Biken informed Merck that [TEXT REDACTED BY THE COURT.] (TX1016, TX1016-2, TX1016-3).

On June 13, 1978, Merck and Biken met yet again. At this meeting, Takahashi showed Woodruff a letter describing the clinical trial results of Just, an SB consultant who was evaluating SB's Oka strain varicella vaccine in Europe (TX1021, TX1021-6, Tr. 47, TX1598, TX1599, Woodruff dep. at 101-04). As testified by Merck's Hilleman, this information was valuable as it represented the first clinical trial with the Oka strain performed in a Western country with a Caucasian population with different antigens:

> Q. And you wanted to see how the Biken strain would do against your own strain?
>
> A. Yeah. I need to know is that Biken strain going to be horrendously virulent, for instance, in Caucasians? It is going to be immunogenic in Caucasians? You have two completely different distributions [*152] for HLA antigens.

(Hilleman dep. at 42.)

The prior Japanese clinical trial data was not detailed sufficiently to permit a commercial manufacturer to determine if the vaccine was safe and effective. For this reason, such information was relevant to understanding the viability of developing the Oka strain into a vaccine for world-wide use (Huygelen dep. at 28-29).

At the June 13th meeting, Takahashi also provided Woodruff with information regarding the titer of SB's vaccine, the yields of varicella vaccine obtained through SB's production process, and additional information regarding the results of Biken's clinical trials (Woodruff Tr. at 47-49, TX1021, TX1021-7).

As mentioned above, Takahashi's sharing with Merck the detailed results of Biken's continuing clinical trials in Japan, unpublished papers, SB's clinical trial data, the yields obtained through SB's process, and other information regarding the Oka strain violated Biken's explicit obligation not to disclose such information under Article 5.4 of the Option Agreement (TX1533). While I have found that, as a matter of fact, some of this information cannot be viewed fairly as confidential, that determination does [*153] not change the legal conclusion that Biken breached the Agreement's non-disclosure provisions. Biken's non-disclosure obligations prior to June 30, 1978, clearly precluded the exchange of this sort of information.

Merck unsuccessfully tries to fit itself under the scientific/academic exclusion provided in Article 5.4. Woodruff testified in his capacity as a 30(b)(6) witness and at trial that Takahashi treated him the same way he treated clinical investigators (Woodruff dep. at 133; tr. 59-60). Likewise, at trial, Woodruff testified that:

> Well it certainly was clear that I was receiving information that was developed at RIT as well as information that was developed in Takahashi's area. What we were having were the typical open kind of discussions that you have when you go visit a researcher, who talks about what he has done, what other people have done who are working with his material.

(Tr. 174.)

Woodruff's trial testimony is truly extraordinary as it concedes that Biken violated both the text and the underlying rationale of Article 5.4 of the Option Agreement. Although Article 5.4 did allow Biken to disclose information in certain narrow circumstances to [*154] enable Biken to conduct research in the field or to deposit the Oka strain in a depository, Merck's Woodruff did not fall within these exceptions. (TX1533).

Woodruff claimed that he was justified in receiving such information because he worked for Merck Research Laboratories and was not a commercial individual (tr. 93). This justification is simply not credible. Woodruff did not visit Biken for scientific curiosity but for the very specific *commercial* purpose of obtaining a sample of the Oka strain so that Merck could *commercially* develop the

strain into a varicella vaccine. As provided by the agreement, Biken simply should not have provided to Merck *any* non-public data and information it generated related to the strain or any information and data that Biken received from SB. Thus, the fact that Takahashi disclosed such information was a violation of the Option Agreement.

Even if Biken did breach its non-disclosure obligation there is no indication that this breach was "induced" by Merck. While Merck may have been a happy recipient of information from Takahashi, I am unpersuaded that during the effective time of Biken's non-disclosure obligations Merck in any way [*155] coerced or improperly encouraged Takahashi to divulge information. As described in detail above, the evidence gathered at trial shows that, despite contractual limitations and alleged "general practices" of confidentiality in the industry, prior to the development of commercial manufacturing processes a significant amount of information about different companies' research initiatives and developments flowed somewhat freely between and among the companies. This flow came through academic clinical researchers as well as through company-sponsored scientists.

As mentioned, however, even if Merck's conduct would not merit the application of the unclean hands doctrine to Merck, Biken's conduct could transitively affect Merck as Merck is prosecuting Biken's claims. Thus, the question is whether Biken's breach of its non-disclosure obligation is so offensive that, as a matter of public policy, the Court should turn a deaf ear to the misappropriation of trade secrets claim. I find that Biken's breach of contract does not merit the application of the unclean hands doctrine.

First, unlike Merck's trade secrets claims where there were discrete confidential pieces of information that SB misappropriated, [*156] there is little or no persuasive evidence that the vast majority of information Merck received from Biken while Biken was limited by its non-disclosure obligations was confidential. As detailed in my findings of fact above, most of the information was either not confidential, was not detailed, or, even if confidential, was shortly released to the public domain. Of course, those facts do not relieve Biken of its confidentiality obligation, but at the same time they certainly limit the repugnancy of the breach.

Second, and most importantly, Takahashi's

disclosure amounts to a simple breach of contract. Breach of contract, alone, does not *necessarily* require the application of the unclean hands doctrine. Our courts have recognized, even if only by implication, that in appropriate circumstances breach of contract is justified and efficient. *See E.I. DuPont de Nemours & Co. v. Pressman, Del. Supr., 679 A.2d 436, 445 (1995); see generally*, Richard Craswell, *Contract Remedies, Renegotiation, and the Theory of Efficient Breach, 61 S. Cal. L. Rev. 629 (1988).* Of course there may be situations where, in the process of breaching a contract, a party [*157] acts so inequitably that the doctrine of unclean hands must apply. This is simply not that case. After closely examining the particular circumstances involved, the Court is unconvinced that as a matter of public policy Biken's actions were so offensive that the Court should not endeavor to address Merck's claims. [23]

> [23]    At least in theory, though the doctrine of unclean hands is of no help to SB, it is not as if my legal conclusion would leave similarly situated litigants without a remedy. SB could have brought a breach of contract claim against Biken for damages. Of course, because of the statute of limitations and laches, SB could not now assert that claim. Biken's breach, of which SB was on notice more than 20 years ago, is well past ripeness for adjudication.

Thus, even to the extent that SB has demonstrated that there was a breach of contract on Biken's part on the issue of disclosure, there is insufficient evidence that Merck or Biken acted inequitably to establish that either entity's actions "transgressed [*158] equitable standards of conduct" in any way that might justify the application of the unclean hands doctrine. *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 815, 89 L. Ed. 1381, 65 S. Ct. 993 (1945).* To hold otherwise would yield an absurd result. If every breach of contract automatically evoked the unclean hands doctrine, then any non-breaching party to a breached contract would have the effective ability to act inequitably against the breaching party with impunity (even as late as 20 years after the breach). Any future complaint by the breaching party would be barred by the doctrine of unclean hands. This is not a sound rule of law, and I refuse to recognize such a policy.

(iii) No Proximate Causation or Damages

As mentioned, tortious interference also requires a

showing that the alleged interference proximately caused a breach of the contract or termination of the prospective contractual relationship and resulting damage. *CPM Indus.* at 18-19. Merck's conduct prior to June 1979 was not the cause of any damage that SB currently claims, *i.e.,* SB's loss of its claimed expectancy interest in an exclusive worldwide license. [*159] Simply put, on June 8, 1979, Biken proposed to SB a licensing agreement that included exclusive rights in most European and North and South American countries (including the United States) and non-exclusive rights elsewhere (PTX418). This proposal was accompanied by a letter stating that it was Biken's final proposal (*id.*). SB failed to accept Biken's offer. Thus, the only significant and proximate cause of SB's failure to secure a license for itself was SB's independent decision to reject Biken's offer.

The only conduct of Merck after June 1979--Woodruff's statement about SB withdrawing from vaccine marketing and research in the United States--did not cause Biken to end·its relationship with SB, as discussed below. Moreover, in April 1980, SB also refused to accept a non-exclusive license that included rights in the United States.

b) Justification for Any Interference

Another necessary element for a claim of tortious interference is the absence of justification for the alleged interference. *CPM Indus.* at 18-19. As a competitor, Merck was justified in seeking from Biken a license for the Oka strain, even if that resulted in SB receiving a more limited license or even [*160] no license at all. *Bowl--Mor Co. v. Brunswick Corp., Del. Ch., 297 A.2d 61, 64 (1972).* "One is privileged purposely to cause a third person not to enter into or continue a business relationship with a competitor of the actor" if the relation concerns a matter involved in the competition and improper means are not used. *DeBonaventura v. Nationwide Mut. Ins. Co., Del. Ch., 419 A.2d 942, 947 (1980).*

In determining whether a competitor used wrongful means to interfere with another's prospective contractual relations, the factors set forth in *Section 767 of the Restatement (Second) of Torts* are considered. *See, e.g., Shearin v. E.F. Hutton Group, Inc., Del. Ch., 652 A.2d 578, 589-90 (1994).* These factors are: the nature of the actor's conduct; the actor's motive; the interests of the other with which the actor's conduct interferes; the interests sought to be advanced by the actor; the social

interests in protecting the freedom of action of the actor and the contractual interests of the other; the proximity or remoteness of the actor's conduct to the interference; and the relations between the parties.

There is no evidence that [*161] Merck engaged in improper means in seeking a license with Biken. If anything, both Merck and Biken were overly respectful of SB's rights. Merck's various contacts with Biken in which it expressed its interest were timed carefully to coincide with what it understood to be the expiration of the Agreement. And Biken declined to negotiate or to discuss licensing terms with Merck, even though there was no limit on its ability to do so. Furthermore, as detailed below, the only arguably improper act that can be attributed to Merck--Woodruff's statements about SB's exit of the U.S. market--was not, in fact, improper.

3. SB Has Failed To Show That Merck Was Unjustly Enriched

SB's claim that Merck unjustly was enriched is based on the same three allegations of inequitable conduct, *i.e.,* that Merck induced Biken to breach the Option Agreement, that Merck improperly obtained confidential material and information, and that Woodruff fraudulently misrepresented SB's vaccine business.

Merck did not retain unjustly any benefit to SB's detriment nor did Merck's retention of such benefit violate "the fundamental principles of justice or equity and good conscience." *Cantor Fitzgerald, L.P. v. Cantor, Del. Ch., 724 A.2d 571, 585 (1998).* [*162] In addition, because SB did not accept the license offered by Biken in June 1979 that included exclusive United States rights and also did not accept a later offer of non-exclusive United States rights, there was nothing "unjust" about SB's loss of such rights to Merck.

4. Woodruff's November 1979 Statement Violated No Rights of SB

SB claims that Woodruff's statement in late 1979 concerning SB's withdrawal from the United States vaccine business was a fraudulent misrepresentation (SB Br. at 59). The elements that must be shown to sustain an action for fraudulent misrepresentation are a false representation of a material fact, made with knowledge of its falsity or recklessness as to whether it is true or false, with the intent of misleading another into relying on it, justifiable reliance on the misrepresentation, and resulting

injury proximately caused by such reliance. *See, e.g., Brzoska v. Olson, Del. Supr., 668 A.2d 1355, 1367 (1995)*; *Hudson v. Wesley College, Inc., Del. Ch., 1998 Del. Ch. LEXIS 235* at *43, Steele, V.C. (Dec. 23, 1998). SB has failed to establish any of these elements.

### a) There Was No Knowing Misstatement

Even if Woodruff's **[*163]** statement could be construed as inaccurate, there is no evidence that Woodruff believed it to be inaccurate. Fraudulent misrepresentation requires that the person "must have knowledge of the falsity of his representation." *Brzoska, 668 A.2d at 1367*. A representation that is believed to state the truth but, because of careless expression, is misleading cannot constitute fraudulent misrepresentation. *Restatement (Second) of Torts § 528*. Woodruff based his statement on information contained in a high-level Merck document on which he reasonably believed he could rely, and there is no evidence that Woodruff though his statement was inaccurate in any respect.

### b) Biken Did Not Rely on Woodruff's Statement

In any event, there is no evidence that Biken actually relied on Woodruff's statement, and three separate facts strongly indicate it did not. First, well before Woodruff's statement, Biken was extremely unhappy with SB's lack of progress and its failure to sign a licensing agreement. In October 1979, the Biken board was considering whether to cancel its exclusive dealings with SB. On November 19, 1979, the Biken board decided to cancel the relationship. This **[*164]** decision, made before the alleged Woodruff statement, conclusively demonstrates that the statement was not a factor in Biken's decision.

Second, no Biken document makes any reference to Woodruff's statement, and there is no evidence that the statement even was reported to Biken's board. And third, after Biken terminated its exclusive dealings with SB in December 1979, it continued to negotiate with SB, offering SB non-exclusive rights in the United States and other countries in 1980. In addition, Biken granted SB a license for Biken's mumps vaccine in 1980. If Biken had relied on Woodruff's statement, it would have been unwilling to offer SB any licensing rights in the United States. [24]

> [24] In its reply brief, SB says that Huygelen had told Biken that SB was "actively attempting" to resume rubella sales in the United States (SB Reply Br. at 35). Of course, SB never did resume its rubella sales in the United States. In any event, that reinforces the conclusion that the Biken Board did not base its decision on Woodruff's statement, since it had SB's contrary position and since it thereafter offered SB United States rights.

## [*165] V. SUMMARY OF CONCLUSIONS

For the foregoing reasons, SB is enjoined from marketing its varicella vaccine in the United States or Canada for a period of three years from the date it receives approval from all regulatory agencies having appropriate jurisdiction within the United States and Canada to market its vaccine in those countries. Furthermore, judgment is entered in favor of Merck on SB's counterclaims. An Order has been entered consistent with these conclusions.

# EXHIBIT J

7a

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

NEWELL & ASSOCIATES, INC.,      :
                                :
            Plaintiff,          :
                                :
      vs.                       :      Civil Action
                                :      No. 16113-NC
MARLENE NEWELL,                 :
                                :
            Defendant.          :

— — —

                     Chancery Court Chambers
                     Herrmann Courthouse
                     Wilmington, Delaware
                     Monday, December 29, 1997
                     4:45 p.m.

— — —

BEFORE:  HON. WILLIAM B. CHANDLER, III, Chancellor.

— — —

TELEPHONE CONFERENCE

— — —

APPEARANCES (by telephone):

            MARTIN S. LESSNER, ESQ.
            Young, Conaway, Stargatt & Taylor
              for Plaintiff

            MARLENE NEWELL, the Defendant

CHANCERY COURT REPORTERS
135 Herrmann Courthouse
Wilmington, Delaware   19801
(302) 577-2447

2

1      MR. LESSNER:  I just want to note

2  procedurally that Miss Newell does not have an

3  attorney with her.  I've spoken with her previous

4  attorney, a Mr. Craig Morton, who told me that he

5  would not be representing Miss Newell in any Chancery

6  proceedings.  He gave me Miss Newell's phone number.

7      I contacted Miss Newell --

8  Mrs. Newell, I'm sorry -- at work, and she told me

9  that she was to see Ed McNally tomorrow regarding

10  representation.  He was not available today.  And I

11  told her -- she agreed to speak -- she agreed to

12  speak at this conference with Your Honor.

13      THE COURT:  All right.

14      Has she had a chance -- Mrs. Newell,

15  have you had a chance to review or look at any of the

16  documents that have been filed in this action?

17      MRS. NEWELL:  No, I have not.  I just

18  finished getting most of them from the fax machine.

19      THE COURT:  So you have faxed copies?

20      MRS. NEWELL:  Yes.

21      THE COURT:  Your intentions are to

22  meet with Mr. McNally tomorrow?

23      MRS. NEWELL:  Yes.

24      MR. LESSNER:  Your Honor, if I could

3

1   explain why the corporation needs relief -- temporary

2   relief immediately.

3              Mrs. Newell, I understand with the

4   aid of a locksmith, broke the lock and went into the

5   corporation's facilities over the weekend and

6   stole -- and removed corporation property, including

7   the computers, which contain all the corporation's

8   accounts and files.  She also removed corporation

9   papers, including attorney-client privileged

10  materials, I understand, between myself and the

11  corporation, and other items which have been detailed

12  in the affidavit of Miss Janis Hengel.  Miss Wood,

13  the president of the company, is on vacation in

14  Texas.  She is currently flying home and she will be

15  home tomorrow.

16             The company at this point, though,

17  has, from what I understand, no ability to go on.

18  They don't have their computers.  They don't have

19  their customer lists.  They are without the ability

20  to continue in the course of business.  They have 15

21  employees who rely on the corporation for employment,

22  and their paychecks have been taken.

23             And I also understand that

24  Mrs. Newell has arranged a transfer of bank accounts

4

1   where she's purported to act with authority for the

2   corporation and has withdrawn the corporation's

3   operating funds.  So, I understand that the

4   corporation now has come to a standstill at this

5   point.

6            We also have customers who depend on

7   our services of document imaging, who will be

8   adversely affected now.

9            We request a temporary restraining

10  order ordering Mrs. Newell to return all of the

11  property that she has taken immediately and to not

12  engage in any contact or interference with the

13  company until Mrs. Newell brings whatever hearing she

14  feels necessary to establish whatever claim she

15  evidently feels necessary.

16            THE COURT:  Mrs. Newell -- are you

17  through, Mr. Lessner?

18            MR. LESSNER:  Yes, I am.

19            THE COURT:  Mrs. Newell?

20            MRS. NEWELL:  Yes.

21            THE COURT:  Were you able to hear all

22  of that?

23            MRS. NEWELL:  Yes, I was.

24            THE COURT:  And do you have any

CHANCERY COURT REPORTERS

5

1    response to it?

2                    MRS. NEWELL:  Yes.  That is not

3    totally accurate.

4                    I went to the locksmith.  I did not

5    break in.  I contacted a locksmith.  Apparently

6    Miss Wood saw to it and the locks had been changed,

7    and did not give or notify the main office that she

8    changed the locks, which is against the rental

9    agreement.  I showed the locksmith my legal papers

10   showing that I am the executor of the estate.  I am

11   the wife of Donald Newell, the only owner of the

12   company.  He had no partner.  The information I

13   showed him he said was more than enough, and he let

14   me in.

15                   I went to the bank.  I have not

16   touched those funds.  They are still in there.  I had

17   signed a new signature paper, a card for them to have

18   on file.  I showed them all my papers and they said,

19   you have more than enough to prove that you are the

20   president and owner of this company.

21                   THE COURT:  Well -- wait a second,

22   Mr. Lessner.  I want to be sure that she's through.

23                   Do you have anything else to add,

24   Mrs. Newell?

6

1        MRS. NEWELL:  No.  No, I don't think

2   so.

3        THE COURT:  Okay.

4        MR. LESSNER:  Chancellor, the

5   dispute -- the facts as set out in our complaint,

6   Mr. Newell, Mrs. Newell's deceased husband, died.

7   There was a stock purchase agreement pursuant to

8   which the shares of Mr. Newell were deemed to have

9   been offered back to the corporation.  The

10  corporation accepted that offer and has made an offer

11  of $185,000 as payment on the repurchase.

12        Mrs. Newell has at no time ever been

13  an employee or an officer or had anything doing with

14  the operations of the company.  As far as the

15  corporation is concerned, the estate -- her authority

16  she's purportedly acting on is as the personal

17  representative of the estate.  The corporation -- she

18  has no authority under that pursuant to the stock

19  purchase agreement, because the shares have been

20  effectively repurchased.

21        As another matter, Mrs. Newell has

22  filed papers in the Maryland action requesting the

23  authority of that court to even pursue claims.  That

24  petition has been opposed by beneficiaries of the

7

1   estate, who oppose it on the grounds that the estate

2   is being offered $185,000 with interest and it would

3   be a waste of the estate to pursue any further

4   claims.

5           What we're really talking about is

6   that Mrs. Newell has no intention of ever operating

7   the company.  This is not a case where she's

8   purporting that she is the rightful person who should

9   be running the company.  Mrs. Wood, who along with

10  Mr. Newell were the only stockholders of the company,

11  has been an officer and director of the company for a

12  long time.  Upon Mr. Newell's death, Miss Wood has

13  been running the company.

14          The company, as I said, is a

15  currently operating company with employees and

16  customers that depend on the company for a

17  livelihood.  There have been long negotiations

18  between the corporation and Miss Newell's counselor.

19  As of the beginning of December there is an offer

20  outstanding -- not an offer.  The offer was accepted

21  in May.  But there is the valuation, and the money

22  has been offered to Mrs. Newell for the repurchase of

23  her shares and for repayment of the loan.  There were

24  negotiations between Mrs. Newell's attorney and

8

1  myself regarding payment terms and other details of

2  the repurchase.

3           What Mrs. Newell has done is

4  basically taken property under no right -- under no

5  claim of right.  There's not any -- outside of the

6  fact that she's not a stockholder or an officer or

7  anything to do with the company other than the

8  personal representative of the estate, and outside of

9  the fact that there's currently motions pending in

10 the Maryland court on whether Mrs. Newell even has

11 authority to pursue claims against the corporation on

12 behalf of the estate, regardless of all that, what

13 she's done is basically outright theft or

14 destruction.  She's taken computers that the only

15 thing you can do is cripple the business to no gain

16 for Mrs. Newell.

17          So outside of any claims -- outside

18 of any claims of right of Mrs. Newell, which is not

19 before the Court, what she has done -- the relief we

20 seek is to restore the status quo and to restrain

21 Mrs. Newell from any further actions until

22 Mrs. Newell establishes in any court, be it the

23 Maryland court or by bringing her own action, that

24 she has any right at all to the corporation.

9

1          THE COURT:  I think I've heard enough

2  in order to make a determination at this point.  But,

3  Mrs. Newell, although it isn't customary, I will give

4  you another opportunity to add any thoughts you might

5  have, based on what Mr. Lessner just said or

6  otherwise.

7          MRS. NEWELL:  Yes.  First of all, my

8  husband worked this business from out of the back of

9  his car.  He started in May of 1989.  He then went

10  home, in our home, and he and I worked on his

11  records.  So, yes, I worked with my husband in this

12  business.  I have also been in the Bear office

13  working for his business.  This was a joint effort.

14  This was a marriage.  I had to provide my husband

15  with my ability to fund loans for his business to

16  keep it running.

17          Miss Wood has never invested any

18  money.  She has not lived up to the stockholders

19  agreement.  It is stated in this agreement that the

20  face value of the amount of the life insurance, that

21  will be paid by cash or personal check.  The face

22  value was 200,000.  Anything above that would be paid

23  in 40 equal quarterly payments.  She has offered for

24  her figures of 185,000, which I dispute, 40,000 up

10

1  front and the remainder to be paid off.  40,000 is

2  not 200,000.

3                     If they say that life insurance is

4  there and it's not part of the business and isn't in

5  the value of the business, then that 200,000 should

6  have been put aside in a special account to wait for

7  this buy/sell agreement.  She has dwindled that fund

8  down to 79,000 as of the end of November.  She has

9  not been running this business successfully because

10  she has dipped into the excess of 100,000 to keep

11  this business going.

12                     She was given a salary of 30,000 by

13  my husband.  My husband took a salary of 35,000

14  yearly.  That is on our tax records.  Miss Wood saw

15  to it that she gave herself a raise to $50,000 a

16  year.  She has also decided to give herself five

17  weeks' vacation.  That company cannot run with a

18  salary of $50,000 going to that person.

19                     My feelings were, she has spent the

20  money.

21                     I have some illegal action on her

22  part documented in papers, and I do not feel that she

23  is living up to this buy/sell agreement and has no

24  intention to.

11

1                  MR. LESSNER:  Do you request a

2    response, Your Honor?

3                  THE COURT:  Why don't you,

4    Mr. Lessner.

5                  MR. LESSNER:  Okay.  What we're

6    talking about here is that the corporation under the

7    terms of the buy/sell agreement --

8                  MRS. NEWELL:  Excuse me.  One more

9    thing.  My husband also had me down as secretary to

10   his business.  He put me down on his legal documents

11   that I was secretary.

12                  THE COURT:  Okay.

13                  MR. LESSNER:  Your Honor, we don't

14   have any records of Mrs. Newell being an officer of

15   the company.  At the time of Mr. Newell's death,

16   Mr. Newell was the president and Mrs. Wood or

17   Ms. Wood was the vice president, the treasurer.  They

18   were the only two directors of the company.  They

19   had -- Mr. Newell and Miss Wood had a buy/sell -- had

20   a stock purchase agreement between them for the

21   purpose of providing that the company would continue

22   after his death and that Miss Wood -- Miss Wood, who

23   is basically operating the company, would continue on

24   in place.  The buy/sell was executed.  The provisions

12

1   of the buy/sell have been implemented.

2              Now, Miss Newell has been the subject

3   of discussions. We, the corporation, have stated

4   that there is -- based on the agreement, the purchase

5   price of the stock is based on the greater of book

6   value or fair market value. We have provided the

7   books and records as of the valuation date under the

8   agreement. We have also caused a fair market value

9   analysis to be done. The book value is greater. We

10  detailed this all.

11             THE COURT: Excuse me for

12  interrupting, Mr. Lessner. I'm aware of most of what

13  you're saying because I read through everything,

14  including the stockholders agreement. But

15  specifically with respect to the insurance proceeds,

16  I suppose those were purchased as key man insurance

17  in order to buy back the shares. And where are those

18  funds?

19             MR. LESSNER: The purpose of the key

20  man insurance was to provide for the continued

21  operation of the corporation. The funds were used --

22  were basically used as operating capital, not one

23  penny of it has gone to any personal -- there's no

24  waste or anything like that. The money has gone to

13

1   pay the debts of the company, to pay off credit

2   lines, to provide operating -- to provide operating

3   expenses.   In August of this year Mrs. Newell had

4   withdrawn -- under the guise of authority, had

5   withdrawn $20,000 of operating money of the company.

6   Some of those funds -- the insurance funds were used

7   to cover that, to pay the employees.

8            What the insurance proceeds were

9   envisioned to be was to cover the debts of a key man,

10  Mr. Newell, was to cover the expenses of the company

11  and allow it to continue on.   The stock purchase

12  agreement envisions that the valuation methodology

13  will be the greater of book value or fair market

14  value.   We have put that together and we have made

15  that offer -- we have put that together to repurchase

16  Miss Newell's shares at that price.   We have had

17  discussions with her and her counsel.

18            Miss Newell has said that she wants

19  $200,000, and she wants it in one lump sum.   The

20  corporation -- unable to do that based on the

21  financial condition of the corporation, we have

22  offered her the valuation, which is 185, and we have

23  come up with a lump sum and payment terms, and that

24  was where we were as far as discussions and what we

14

1   could work out.

2          There's a lot of other history, Your

3   Honor, that I'm omitting.  But the important fact to

4   remember here is that we have an ongoing operating

5   company that has been ongoing and doing business,

6   employing people and servicing customers.

7          When Miss Newell speaks of her --

8   she's acting -- she has certain papers, that, Your

9   Honor, she has not.  She has not gone to court at any

10  point to get a declaration of her rights.  She has

11  not -- she has just recently gone to the probate

12  court in Maryland and asked for the authority to

13  pursue her remedies and that is being opposed by the

14  other beneficiaries, who believe the trust would be

15  better off -- or the estate would be better off if

16  she simply took the $185,000 into the estate rather

17  than attempt what we believe is simply to liquidate

18  the business for whatever it's worth.  And the

19  company itself, basically it's a service company.

20          THE COURT:  What does it do?

21          MR. LESSNER:  They microfilm record

22  storage for customers.  So the company is very much a

23  service-oriented company, and it relies almost

24  exclusively on -- at this point on Nancy Wood with

15

1   her contacts and her running the business.

2                   THE COURT:  How many other employees

3   are there?

4                   MR. LESSNER:  About 15.

5                   THE COURT:  And they all are engaged

6   in this service industry?

7                   MR. LESSNER:  That's right.  And

8   there's offices in Bear, Delaware, and in Salisbury,

9   Maryland.  And the only assets of the company are

10  some cameras -- the camera equipment that does the

11  microfilming, et cetera.

12                  So what we're faced with here is

13  basically the assets of the company or the records --

14  the computers of the company have been seized under

15  no claim of right by Mrs. Newell.

16                  Now, if Mrs. Newell has a claim

17  against the company and she -- and we believe she

18  does not have a claim and we believe that under the

19  agreement her stock has been repurchased -- and all

20  we're talking about is that she wants an adjustment

21  in the payment and in the terms, then that's a

22  different story than somebody breaking into the

23  company in the middle of the night and stealing its

24  assets and bringing it to a halt.

16

1          What we would look for is the
2   ordering of her to return the assets, for her not to
3   interfere with the company, for the process -- we
4   have an offer on the table -- for the process to go
5   forward, if she believes that there is a better way
6   to finance the offer, whatever.  And in the end, if
7   she is unsatisfied with the process, then her remedy
8   is to get authorization from the Maryland court as
9   the personal representative of the estate and to seek
10  whatever remedies.  She has not done this.  What she
11  has done is self-help of the worst kind.  She's
12  broken into the company and she's taken what's not
13  hers, and she's not attempted to do that through
14  legal means.
15          THE COURT:  All right.  I've had a
16  chance to listen to both sides in this controversy,
17  which at this point is very early in its life.  The
18  matter has just been filed with the Court of
19  Chancery.  I've had a chance at this point only to
20  read the complaint, the exhibits that are attached to
21  the complaint, and the motion for a temporary
22  restraining order.  From that I get two very
23  different pictures of what's at stake here, both from
24  Ms. Newell and from Mr. Lessner on behalf of Newell &

17

1  Associates.

2          Under our law, at least at this

3  preliminary stage, I'm not required to make a

4  determination that one side is more likely to win

5  than another because, frankly, at this point I simply

6  can't tell who's likely to win and who isn't likely

7  to win.  You both make arguments convinced of your

8  own position, but I at this vantage point can't say

9  for sure who's likely to prevail ultimately.  Though

10 I need to find at this stage if plaintiff, Newell &

11 Associates, Inc. -- the complaint has been filed --

12 if that complaint states a colorable claim; that is,

13 a claim that is not frivolous on its face.  And from

14 the complaint at least it appears that that test or

15 standard is met.

16          The other requirement for obtaining a

17 temporary restraining order, and it's the most

18 critical one at this stage, is whether or not there's

19 a threat of irreparable harm or injury if the

20 injunction is not granted.  It strikes me that it's

21 in no one's interest -- it's not in Mrs. Newell's

22 interest, it's not in the interest of Miss Wood or

23 Newell & Associates or the employees of Newell &

24 Associates for this company simply to be forced into

18

1   a standstill where it can't do business, can't

2   service customers, can't operate.  If that happens,

3   and it seems to me it won't be long before the

4   company is reduced to having no value, that's not a

5   result that I think is in anyone's interest.

6                  Mrs. Newell believes, and I

7   understand her position, that her husband was the

8   significant if not the major stockholder, owning 300

9   shares; that he built the company and she assisted

10  him in doing that; and she believes, and perhaps

11  understandably so, that she's entitled to operate and

12  run the company.  But at this point what I'm

13  concerned about is that in the discussions and the

14  negotiations that are pursuant to this stockholder

15  agreement, there may be an unintentional act that

16  causes the company to be destroyed and essentially

17  driven into bankruptcy or liquidation or insolvency

18  proceedings because it can't operate, and that's the

19  only thing that I'm concerned about at this point.

20                  So for that reason, I think there is

21  a threat of irreparable harm or injury unless I can

22  get all sides to step back and maintain the status

23  quo and not change the basic operating and

24  functioning ability of the company.  And to a

19

1   accomplish that, I think it's appropriate and I'm

2   persuaded on this record that an injunction of some

3   form or fashion is necessary.

4              Now, the form of order that you

5   propose, Mr. Lessner, would require two things.  It

6   would require Mrs. Newell not to interfere with the

7   operations or management of the company or interfere

8   with its employees, and that seems to me to be a

9   reasonable compromise until at least we can hear at a

10  later date all of the arguments.

11             And, in particular, Mrs. Newell, I

12  want you to have legal counsel, because right now you

13  don't.  And I think it's important that you go ahead

14  and meet with Mr. McNally because I'm going to

15  schedule this for another hearing.

16             So that's what I want you to

17  understand first:  Even though I'm entering an order

18  today, it's not the final order.  This is not the end

19  of the case.  This simply sets the stage for the next

20  hearing, and I'll set that next Monday at 2:00 p.m.,

21  on the 5th of January.  At that time Mr. McNally, or

22  whoever you want to have as your counsel, can

23  represent you and can persuade me that this order

24  that I'm going to enter today is in error, is a

20

1   mistake or is wrong.  And if they convince me of

2   that, then I'll vacate this order and restore you to

3   full control of the corporation.

4               But at this point I'm going to enter

5   the order that enjoins you from any further

6   interference with the management or operations of the

7   company, at least until I can have both sides

8   represented and can hear again the different

9   positions.

10              MR. LESSNER:  Your Honor, part of our

11  order also requests that she return the computer

12  equipment and other equipment, including all of the

13  files that were taken that are essential to the

14  running of the corporation.

15              THE COURT:  That's what I'm coming

16  to.  That's the second half of the order that's in

17  front of me, is to return the property of the

18  corporation, and that being the computer equipment,

19  software and vendor information, all that information

20  that you removed.  I'm going to direct you to return

21  it.

22              Now, this leaves open the issue,

23  Mr. Lessner, of funds.  There are funds evidently of

24  the corporation moneys.  And my thinking is that

21

1   between now and Monday, are those funds going to be

2   an issue or can we simply say that if those funds are

3   kept in some kind of segregated account, that that's

4   all we need to do to be able to account for them?

5               MR. LESSNER:  Yes, Your Honor.  The

6   funds are in a segregated account right now, and I

7   will direct my client not to touch those moneys.  I

8   don't envision -- I haven't spoken with her on the

9   subject.  I don't envision that they'll have some

10  emergency between now and then that would require

11  some payment of money.  If that were the case, I

12  would approach the Court.  But I would hope that that

13  certainly would be necessary -- unnecessary, and I

14  will instruct my client to just simply maintain that

15  account and not do anything with it.

16              THE COURT:  And there will have to be

17  an accounting for this, so that she has to

18  demonstrate that there have been no further

19  withdrawals or any expenditure until there's approval

20  from the Court.  Is that understood?

21              MR. LESSNER:  Yes, Your Honor.  I

22  understand that there will be no -- we will not

23  take -- the corporation will take no money.  That

24  money will just stay there, and we'll certify that

22

1    that money will not go anywhere.

2                    THE COURT:  Can you certify how much

3    is there today?

4                    MR. LESSNER:  I believe that it is

5    between seventy-nine and -- between seventy-nine and

6    eighty thousand dollars, I believe.  And,

7    unfortunately, Miss Newell, when she said that

8    figure, may know better because she may have taken

9    the records to indicate exactly how much is there.

10   But I believe that that figure -- I believe it is

11   between seventy-nine and eighty thousand dollars.

12                   THE COURT:  All right.  Mrs. Newell,

13   is there anything that I've said that you don't

14   understand or that you want to ask me about?

15                   MRS. NEWELL:  Give me the date again.

16   It's January 5th and what time?

17                   THE COURT:  2:00 p.m.

18                   MRS. NEWELL:  Where at?

19                   THE COURT:  That's in the Chancery

20   Courtroom in the Public Building or the Daniel L.

21   Herrmann Courthouse on King Street, on January 5th --

22   Monday, January 5th, at 2:00 p.m.

23                   MRS. NEWELL:  What's the street over

24   from that, from King?

23

1    THE COURT:  Mr. Lessner, do you want

2    to tell her? Because I'm not familiar with

3    Wilmington enough to give the answer to that.

4    MR. LESSNER:  I will be glad to speak

5    with Miss Newell, where the instructions are, without

6    you being required to be on the line.

7    THE COURT:  I assume if Mr. McNally

8    is going to be your counsel, you can inform him of

9    this conversation and he certainly can contact

10   Mr. Lessner and get any further details about it.

11   And I would hope, in fact, that they would both talk

12   about this matter before Monday and decide whether --

13   it doesn't strike me that this is a company that

14   ought to be spending large sums of money fighting

15   this matter out in the Court of Chancery.  But that's

16   what we're for.  If you can't resolve it and find

17   another way to resolve it, then we will hear the

18   matter and decide it.

19   MR. LESSNER:  Your Honor, while Your

20   Honor -- I think it might be helpful just -- while

21   you're on the phone, I would like to ask Miss Newell

22   for the particulars on how she will return the

23   equipment to the company and what arrangements can be

24   made for doing that on an immediate basis.

24

1          MRS. NEWELL:  How do you want them

2  returned?

3          MR. LESSNER:  I will see if I can

4  make arrangements to have you deliver them first

5  thing tomorrow morning to the Bear site.

6          MRS. NEWELL:  I do work.  Someone

7  would have to be there very early.

8          MR. LESSNER:  What time?  6:00 in the

9  morning?

10          MRS. NEWELL:  Yes.

11          MR. LESSNER:  Your Honor, I don't

12  want to trouble you any further with this.  I assume

13  that I'll be able to work with Miss Newell and to --

14  to getting the equipment returned by first thing

15  tomorrow morning.

16          THE COURT:  Well, I can get off the

17  line and let you arrange that.  But if she's willing

18  to drop them off at the Bear site at 6:00 a.m., then

19  my recommendation is that you find somebody from the

20  company who can be there at 6:00 a.m. to receive

21  them.

22          MR. LESSNER:  That's exactly what I

23  will attempt to do, Your Honor.

24          THE COURT:  If there's some problem

25

1   with that, maybe you can arrange some neutral site

2   for her to turn over the equipment.  I don't know.

3   I'll leave that up to you and Mrs. Newell.

4                   MR. LESSNER:  Okay.

5                   THE COURT:  Is there anything

6   further, then, that I need to consider or deal with

7   today?

8                   MR. LESSNER:  No, Your Honor.

9                   THE COURT:  Mrs. Newell?

10                  MRS. NEWELL:  The only thing that I

11  would like to have looked at in great detail is on

12  the buy/sell agreement Section 4, agreement terms,

13  the type of payment.  That to me is stating that the

14  face amount of the life insurance, which was 200,000,

15  shall be paid in cash or by check and the excess --

16  if the business is worth over 200,000, the excess

17  over the life insurance would be spread out in

18  payments.  I have been offered $40,000 on what they

19  say is $185,000 money due me.  I have a problem with

20  that.

21                  THE COURT:  Mrs. Newell, I understand

22  your problem.  That's an important question, and I

23  think what we'll need to do is face that on Monday,

24  though, and I'll be prepared, I'm sure your attorney

26

1   will, and then maybe we'll get to the bottom of it.

2                   MRS. NEWELL:  Okay.

3                   THE COURT:  All right?

4                   MRS. NEWELL:  Yes.

5                   THE COURT:  Thank you, ma'am.

6                   Thank you, Mr. Lessner.

7                   (Teleconference adjourned at

8   4:20 p.m.)

9                           - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

27

1                          <u>CERTIFICATE</u>

2                I, DIANE G. McGRELLIS, Official

3   Reporter for the Court of Chancery of the State of

4   Delaware, do hereby certify that the foregoing pages

5   numbered 2 through 28 contain a true and correct

6   transcription of the proceedings as stenographically

7   reported by me at the hearing in the above cause

8   before the Chancellor of the State of Delaware, on

9   the date therein indicated.

10               IN WITNESS WHEREOF I have hereunto

11  set my hand at Wilmington, this 9th day of January

12  1998.

13

14

15

16                _Diane B. McGrellis_

17                      Official Reporter for the
                        Court of Chancery of the
18                      State of Delaware

19

20

21

22

23

24

**EXHIBIT E – Part 2**

# EXHIBIT K

LEXSEE 1995 U.S. DIST. LEXIS 19437

**PepsiCo, Inc., Plaintiff, -vs- William E. Redmond, Jr., et al., Defendants.**

No. 94 C 6838

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1995 U.S. Dist. LEXIS 19437*

· January 26, 1995, DATED; December 15, 1994, NUNC PRO TUNC

**COUNSEL:** [*1] For PEPSICO INC, a corporation, plaintiff: James A. Clark, Roger Pascal, Stuart Irwin Graff, Schiff, Hardin & Waite, Chicago, IL.

For WILLIAM E REDMOND, JR, defendant: Bradford P. Lyerla, Debbie Lynn Moeckler, Jenner & Block, Chicago, IL. For QUAKER OATS COMPANY, THE, a corporation, defendant: Helene D Jaffe, Marc Bratman, Weil, Gotshal & Manges, New York, NY.

**JUDGES:** GEORGE W. LINDBERG, United States District Judge

**OPINION BY:** GEORGE W. LINDBERG

**OPINION**

**MEMORANDUM AND ORDER**

The court has reviewed both parties' proposed findings of fact and conclusions of law. Plaintiff's submission accurately portrays both the facts and the law applicable to this case. The court is therefore adopting as its own the proposed findings of fact with modification where appropriate and conclusions of law submitted by plaintiff, with the addition of a conclusion of law and modification of the relief granted to better reflect the appropriate balance between plaintiff's and defendants' rights required in this case. [1]

> 1    In addition, defendants have moved to supplement the record. Defendants' motion to supplement the record after proofs were closed, on the basis of newly discovered evidence, is

granted. However, the substance of the Wall Street Journal article of December 2, 1994, having been considered by the court, does not affect the court's ruling on the request for a preliminary injunction for essentially the reasons stated in plaintiff's memorandum in opposition to the motion to supplement the record. The article is hearsay with respect to the truth of its contents, including whether the FOBOs do or do not maintain the confidentiality of information received from plaintiff. The non-hearsay purpose of the article is a very limited one; to the extent that purportedly secret information of plaintiff's actually appears in the article, it may not in fact be confidential or trade secrets. Because there is very little in the way of accurate information about plaintiff's purported secrets in the article, the additional evidence does not affect this court's ruling on the request for a preliminary injunction.

[*2] Certain of the evidence presented by plaintiff contains trade secrets or confidential information. That material was protected from disclosure in this proceeding by an Agreed Protective Order. Indeed, the Illinois Trade Secrets Act expressly provides that: "In an action under this Act, the court shall preserve the secrecy of an alleged trade secret by reasonable means, which may include . . . holding in-camera hearings [and] sealing the records of the action. . . ." *765 ILCS 1065/6.* Accordingly, the court will only indirectly refer to the secret material so as to maintain its secrecy.

Since the preceding paragraph does not affect in any way the meaning or purport of the court's Order of December 15, 1994, this Order is entered *nunc pro tunc.*

1995 U.S. Dist. LEXIS 19437, *2

## FINDINGS OF FACT

### I. Subject Matter Jurisdiction

Plaintiff, PepsiCo, Inc. ("PepsiCo"), is a North Carolina corporation with its principal place of business in the state of New York. PepsiCo is a citizen of North Carolina and of New York. Pepsi-Cola North America ("PCNA") is an unincorporated division of PepsiCo through which PepsiCo transacts business.

Defendant, William E. Redmond, Jr. ("Redmond"), at the time of filing [*3] of this lawsuit, was a citizen of the state of California. Defendant, The Quaker Oats Company ("Quaker"), is a New Jersey corporation with its principal place of business in Illinois. Quaker is a citizen of New Jersey and of Illinois. Gatorade North America is an unincorporated division of Quaker through which Quaker transacts business.

The matter in controversy among the parties exceeds $ 50,000, exclusive of interest and costs.

### II. The Parties

PepsiCo is a major food and beverage company. PCNA markets carbonated soft drinks, sports drinks, prepackaged tea and fruit drinks, waters, and many other beverages excluding alcohol- and dairy-based drinks. Among PCNA's competitors is Quaker, with its Gatorade and, prospectively, Snapple businesses.

PCNA is divided into eleven business units each having responsibility for a geographic region of the U.S. and Canada. Each of those units is run by a General Manager. Other business units exist for PepsiCo's franchise-owned bottlers and for national accounts.

Quaker is a world-wide grocery products and beverage company. Its sports drink, Gatorade, was Quaker's principal beverage product, and one of its most profitable products as [*4] of November 2, 1994. On that date, Quaker announced that it was acquiring Snapple Beverage Corp. ("Snapple"), through an Agreement and Plan of Merger and a Tender Offer for shares of common stock of Snapple.

PCNA launched its "All Sport" isotonic drink on a national basis in March and April, 1994. Prior to that time, All Sport had been available only in a few test markets. All Sport's main competitor is Quaker's Gatorade, which has a dominant market share. Quaker's

market share in the isotonic beverage category is approximately ten times that of PCNA.

In recent years, PepsiCo has entered into joint ventures with Thomas J. Lipton Company to produce ready-to-drink tea products, and with Ocean Spray Cranberries, Inc. to market certain fruit drinks. In the "new age" category, including ready-to-drink teas and fruit drinks, PCNA's share is approximately 1/2 that of Snapple.

William E. Redmond, Jr. was employed by PepsiCo in its PCNA division for approximately ten years prior to his resignation on November 10, 1994. In June, 1993, he was promoted to the position of General Manager of the Northern California Business Unit. In July 1994, Redmond was promoted to the position of General Manager [*5] of the newly-created business unit covering all of California and became responsible for the profit and loss of a business having annual revenues of more than 1/2 billion dollars--about 20 percent of the PCNA's profit for the entire U.S. Redmond's position was a very senior level within PepsiCo's organization.

Like other PepsiCo management employees, as a condition of Redmond's employment with PepsiCo, and at the outset of that employment, Redmond signed a Confidentiality Agreement with PepsiCo. The Confidentiality Agreement provides in part that

> [Redmond] will not disclose at any time,
> to anyone other than officers or employees
> of [PepsiCo] or make use of, confidential
> information relating to the business of
> [PepsiCo] . . . obtained while in the
> employ of [PepsiCo], which shall not be
> generally known or available to the public
> or recognized as standard practices . . . .

Redmond admits that he is bound by the terms of the Confidentiality Agreement.

### III. Redmond Is Recruited By Quaker And Uzzi

Quaker's initial contact with Redmond, for the purpose of recruiting him for employment at Quaker, was through Donald Uzzi ("Uzzi"). Uzzi himself had been [*6] a PCNA employee for seven years, until March, 1994, when he resigned to become President of Gatorade. Uzzi received a written offer of employment from Quaker dated December 1, 1993, which offer recited that Quaker

understood that Uzzi wanted to delay acceptance of an offer from Quaker and his departure from PepsiCo for approximately two months. Uzzi claims not to know or remember how Quaker came to have such an understanding. At the time of Uzzi's departure, any PepsiCo confidential information that he had in his possession was less critical, as a consequence of the timing of his departure, than the information that is now in Redmond's possession.

Around the beginning of 1994, Uzzi accepted a promotion by PCNA from the position of General Manager of the Mid-Atlantic Business Unit of PCNA to Senior Vice President and Chief Customer Officer of PCNA, without advising anyone at PCNA that he had already received an offer of employment from Quaker, with whom he was then in serious discussions regarding a position. Uzzi held the position of Senior Vice President and Chief Customer Officer for a very short time during which he was engaged "purely" in transition to the position.

Uzzi accepted [*7] the position as the President of Gatorade in January or February, 1994 and resigned from PepsiCo some time in March, 1994.

At the time of Uzzi's departure from PepsiCo, Brenda Barnes (PCNA's Chief Operating Officer) advised all of the business unit General Managers, including Redmond, that they needed to be careful in talking with Uzzi because he now was working for a competitor. Barnes asked Redmond to talk with her if he ever were to consider leaving PepsiCo, and Redmond assured Barnes that he had no intention of leaving PepsiCo.

Uzzi, acting on behalf of Quaker bought dinner for Redmond in May, 1994, in San Francisco. During dinner, Uzzi raised the question of Redmond coming to work for Gatorade. Shortly after Uzzi's dinner with Redmond in San Francisco, Uzzi gave Redmond's name to Barbara Pickens, an executive recruiter, who started calling Redmond approximately once a week for the next several months. In August, 1994, Redmond met at Quaker headquarters in Chicago with William D. Smithburg, Quaker's Chairman and Chief Executive Officer, Philip A. Marineau, Quaker's President and Chief Operating Officer, James F. Doyle, Quaker's Senior Vice President and President of Gatorade [*8] Worldwide, as well as with Uzzi. On October 20, 1994, Quaker offered Redmond the position of Vice President - On Premise

Sales for Gatorade. Redmond did not accept that offer, but rather, continued to negotiate for more money.

When, in July, 1994, Redmond was promoted by his boss, Barnes, to the position of Business Unit General Manager of all of California, he did not tell anyone at PepsiCo that he was then being actively recruited by a competitor, Quaker.

Quaker had interviewed three candidates for the position of Vice President - On Premise Sales. All three, including Redmond, were employed by PCNA. The court finds that it is not unreasonable to infer that Quaker's interest in exclusively PCNA employees resulted from an interest that went beyond PCNA employees' general business experience.

On November 8, 1994 at a breakfast meeting, Uzzi, on behalf of Quaker, delivered to Redmond a written offer for the position of Vice President-Field Operations for Gatorade. Redmond accepted that offer unequivocally, unconditionally and without qualification, in the course of the breakfast meeting.

## IV. Redmond's Resignation

After accepting a position with Quaker at breakfast on [*9] November 8, 1994, Redmond called PCNA and spoke with William Bensyl, the Senior Vice President of Human Resources for PCNA.

In the course of that call, Redmond told Bensyl that he had an offer from Quaker and gave Bensyl the financial details of the offer. Redmond:

> (a) falsely told Bensyl that he had *not* accepted the offer
>
> (b) told Bensyl that his job would be Chief Operating Officer of the combined Gatorade and Snapple company; and
>
> (c) asked Bensyl if he should carry out his plans to make calls upon certain PCNA customers without telling Bensyl of his previous acceptance of the Quaker job.

Not knowing that Redmond had already accepted the Quaker position, Bensyl told Redmond to make the customer visits. Redmond did so.

On November 9, 1994, Redmond falsely told Craig Weatherup ("Weatherup"), the President and Chief Executive Officer of PCNA, that he had not accepted the Quaker offer, and that he was uncertain whether he would accept or reject that offer.

On November 10, 1994, Redmond went to PCNA headquarters in Somers, New York for a previously scheduled meeting with his immediate superior, Barnes. Barnes' primary responsibility as PCNA's Chief Operating [*10] Officer is to run the field operations for the Pepsi Cola business in the U.S. and in Canada that produce, sell and distribute beverages in those countries.

Redmond met in the morning with Barnes and told her, again falsely, that he was considering, but had not yet decided to accept the Quaker offer. In speaking with Barnes, Redmond also sought to determine if a more senior position such as Barnes' job might be available for him.

In the three days immediately preceding his resignation, Redmond told at least six PCNA employees, including Weatherup, Barnes and Bensyl, that the job he had been offered by Quaker was Chief Operating Officer of Gatorade.

## V. Redmond's Position at Quaker

### A. As It Was Known Before This Litigation

Whatever Redmond's duties may be in his new position at Quaker, it is conceded by defendants that he "could be faced with a decision that could be influenced by certain confidential information that [he] obtained while employed at Pepsico." Redmond himself concedes that he possesses confidential information of PCNA that he would not feel free to disclose to Quaker.

Although the written offer from Quaker that Redmond accepted on November 8, 1994 [*11] denominated his new job as "Vice President, Field Operations," Redmond did not, in his own mind, distinguish that job from the job of "Chief Operating Officer." Redmond purports to describe his new job in his declaration but he testified that he is unclear on his job and can only speculate on what it will be. In other testimony, Redmond describes his new job as managing the entire sales effort of Gatorade at the field level, possibly including strategic planning.

### B. As Defendants Have Described It In This Litigation

Uzzi says that Redmond's job will be to execute marketing, promotion and sales plans in the marketplace. That job will include consulting with regional directors about their spending of discretionary marketing funds. Uzzi agrees that Quaker will be going to market differently with Gatorade and Snapple after the two distribution systems are integrated than before.

In his declaration Redmond asserts that his primary task for the next few months will be to execute an existing "business plan" to integrate the Gatorade and Snapple distribution systems. That "business plan" however, consists only of a formal contract among a single Snapple distributor, Select Beverages, [*12] Inc., Snapple and Stokely Van Camp, and/or a two-page "contract terms summary" that sets forth the changes in the renegotiated Select agreement.

Regardless of what Quaker says constitutes the business plan, in fact Redmond himself has no knowledge of any such business plan. Although Redmond swears that his new boss--Uzzi--told him of this plan, Uzzi himself knows of no one who transmitted such hearsay to Redmond.

Uzzi has publicly stated that the plan for integrating the Gatorade and Snapple distribution systems is something that will happen in the future. In so doing, Uzzi is consistent with another Quaker executive, Mr. Robb, who also has told the public that the integration plan for the two distribution systems has yet to be designed. The integration aspect of Redmond's job is neither mentioned nor even hinted at in personnel files, executive search files, or any other piece of paper relating to Redmond's job in the possession of Quaker, Redmond or Uzzi other than the declarations fashioned by Quaker after this case was filed.

If Redmond were to take on the task of integrating Quaker's and Snapple's distribution systems, he could not reasonably expect to force distributors to [*13] accept a renegotiated distributor agreement in the form of the business plan that is the Select agreement because:

> (a) The Select agreement was negotiated not at arm's length, but rather with a distributor (Select) that is controlled by Thomas H. Lee & Co., one of the major selling shareholders of Snapple

(b) A group of Snapple distributors has openly expressed concern about the "plan" represented by the Select distributor agreement, particularly about "changes caused by competition"

(c) The distribution plan itself, as distinguished from the integration plan, contemplates taking away from existing Snapple distributors certain Snapple packages that they have heretofore distributed.

Quaker has no plan whatever for renegotiating the Snapple distributor agreements if Snapple distributors do not accept the terms sought by Snapple. Thus, while Quaker claims to have a plan or "vision" for the integrated distribution system after all Snapple distributor agreements have been renegotiated, Quaker has no plan to achieve the renegotiation with 350 distributors.

If Redmond were to take on the integration task, he could be "influenced by certain confidential information [he] [*14] obtained while employed at PepsiCo," as he contemplates in his declaration, because:

(a) The integration plan itself requires renegotiation of actual merchandising co-operative programs, advertising co-operative programs and pricing increase formulae, distribution targets and equipment placement programs;

(b) Quaker makes available to distributors marketing funds that are discretionary at the regional level to be used to meet in-market competitive responses "on a regional meeting competitive basis" by regional directors who report to Redmond, and who consult with Redmond on decisions regarding the use of such funds; and

(c) The current Quaker/Gatorade distribution system has very little experience with store-door delivery systems such as the Snapple system. Redmond, on the other hand, has PepsiCo confidential information regarding its contemplated and tested new selling and

delivery system, that PCNA recently has developed with Redmond's involvement.

Uzzi has testified that Redmond has never seen the Snapple strategic marketing plan that he is supposed to execute. Quaker has not yet embraced this plan, because Uzzi has only skimmed it and disagrees strongly with [*15] certain premises of it. Additionally, Uzzi cannot confirm that this plan was created prior to Redmond's employment by Quaker, as he swore in his declaration Likewise, there is no Snapple 1995 National Sales and Marketing Plan, which will include an allocation of Snapple's resources, its 1995 marketing tactics, its budget allocation for promotions, and its product mix, among other things.

Redmond's use of PepsiCo's confidential information and trade secrets in his new job does not depend upon its title. He will use that information because he is a senior executive with Gatorade who will have responsibility for packaging, pricing, costs, margins, distribution systems, products, channels, and marketing, and therefore will necessarily suffer the influence of PepsiCo's trade secrets.

The court finds that Defendants' credibility regarding Redmond's duties at Quaker has been undermined by:

(a) Redmond's false statements to three PCNA executives regarding his acceptance of the Quaker offer;

(b) Redmond's unconditional acceptance of the offer from Uzzi when he apparently intended to negotiate for a higher position with his present employer;

(c) Redmond's sworn declaration [*16] describing a business plan of which he knew nothing and his false testimony that he got that information from Uzzi;

(d) The widely varying descriptions of Redmond's job title and duties, starting with his assertion to six PCNA employees that Quaker hired him to be the Chief Operating Officer of Gatorade; and

(e) Redmond's admission in his declaration and Uzzi's denial in the hearing that Redmond's job performance

could be influenced by confidential PepsiCo information.

## VI. PepsiCo's Trade Secrets

### A. Strategic Plan and Marketing Initiatives

PCNA uses a planning process for its business that begins with a Strategic Plan for a three-year time frame, and is revisited annually. The Strategic Plan identifies the areas of the beverage business in which PCNA plans to compete, product strategies, operational strategies relating to manufacturing, selling and distribution, marketing strategies, and financial goals and strategies. The strategic planning process is confidential, because its purpose is to create a competitive advantage by anticipating competitor's moves in the marketplace and preempting those moves.

PCNA's Strategic Plan is developed by Weatherup [*17] and his staff. Because the General Managers of PCNA's business units are involved in the process of developing and directing PCNA's plans, the General Managers understand the nature of the information presented to them and treat the information in those plans as confidential. Although the General Managers are responsible for individual geographic regions, their interest in the strategic plans is not limited to their own region. PepsiCo primarily goes to market on a national basis.

PCNA's Strategic Plan was presented to senior PCNA managers, including Redmond, at a meeting at the Sagamore hotel in upstate New York in July, 1994. Those managers are responsible for the formulation of the plans, as well as for the execution of the Strategic Plan. At that meeting, Weatherup and others presented specific information regarding products, package sizes, financial targets, key operational changes, and timing, among other things. Weatherup and others explained at this meeting that the information being presented was confidential.

Among other times and places where the General Managers, including Redmond, were involved in and exposed to PCNA's strategic planning processes was the July, 1994 [*18] meeting. At that meeting, PCNA presented its confidential strategic marketing information to the General Managers, including, for example, marketing plans relating to the sales of Lipton Original

and Lipton Brisk ready-to-drink teas. PCNA's marketing plans, as presented at Sagamore, are not publicly known. If they became known to a competitor, they could be used by that competitor to create a product or plan designed to challenge PCNA's marketing strategy.

Also presented at the Sagamore meeting was, for example, another strategic initiative related to PCNA's juice drinks, and specifically to new flavors being introduced by PCNA in 1995 and the expansion of flavors in specified package sizes. Knowledge of such confidential information would enable a competitor to block the success of PCNA's planned product introductions.

Still another example of the strategic initiatives presented at the Sagamore meeting related to PCNA's All Sport. That initiative related to the size of the All Sport package and was designed to shift the focus of All Sport's marketing.

PCNA's Strategic Plan has economic value as a result of its not being generally known in the beverage business. That is because [*19] the Strategic Plan shows PCNA's direction, which competitors could use to try to preempt or block PCNA's moves and thereby reap economic benefits. If a competitor obtained PCNA's confidential strategic plans, that competitor would know where PCNA was and was not going to place its competitive and financial resources, what accounts PCNA did and did not plan to focus upon, what size packages PCNA was and was not planning to use, and what PCNA's new innovations are. That information represents the difference between winning (by taking sales and customers away from competitors, and by being profitable) and losing in the marketplace.

### B. Annual Operating Plan

PCNA's strategic plan is focused for a single calendar year in an Annual Operating Plan ("AOP"), in a process beginning in June. That AOP is a nationwide plan developed by reviewing proposals with the field operations, including the business managers of each of the geographic business units. Once finalized, the AOP is delivered to the geographic business units for implementation within each specific region. Business Unit General Managers use their own judgment to implement the national plan on a regional level.

As a result [*20] of the confluence of several events,

1995 U.S. Dist. LEXIS 19437, *20

calendar year 1995 will be a pivotal year for PCNA's success or failure in the non-carbonated soft drink categories that are new areas for PCNA: isotonic beverages, teas and juices. 1995 will be the first full year in which PCNA and the Coca-Cola Company will have products that compete with Quaker's Gatorade product that has for so long dominated the isotonic beverage market.

1995 also is pivotal because the combined Gatorade and Snapple businesses form a greater competitive threat than those entities standing alone. The combined entity will be able to present a more powerful sales effort across sales channels. PepsiCo has formed a task force to address the competitive effects of the combined Gatorade/Snapple entity.

Competition in the tea market also will be remarkably fierce in 1995. A partnership between Coke and Nestea already has been disbanded in that market as a result of the fierce competition. Fierce competition for the sale of juice products is also anticipated in 1995.

PCNA concludes its AOP at the national level in mid- to late summer. That AOP becomes the guideline for all of PCNA's field operations in the U.S. and Canada to execute [*21] all the activities that PepsiCo participates in during the calendar year 1995. Although the specific implementation of the AOP varies among the regional business units, the AOP provides the direction for that implementation. The AOP includes PCNA's financial goals and expectations, marketing plans for each product and package size, promotional event calendars, growth expectations, and operational changes. These plans represent the "strategic bets" that PCNA makes about its business, that will allow PCNA to win or lose in the market.

PCNA's AOP is developed by many people at PCNA over many months. The development group is the same as that for PCNA's strategic plan (including Redmond), and also includes brand managers, PCNA's new product Vice President, joint venture managers and others whose input is necessary to the plan.

PCNA's 1995 AOP was distributed to Barnes' direct reports--the Business Unit General Managers, and senior personnel working at PepsiCo's headquarters in Somers, NY. Barnes has discussed the AOP with Redmond over the last several weeks as Redmond (along with other Business Unit General Managers) prepared the action

plan for his business unit for 1995. Redmond knows [*22] of every initiative contained in the AOP.

The AOP bears a legend that reads "Private and Confidential-Do Not Reproduce," and generally is understood by PCNA managers to contain confidential information. Different information contained within the AOP is competitively sensitive for different periods of time, some of it through December, 1995.

PCNA's competitors could not develop the information contained in PCNA's AOP even if they looked at historical market data. If the information contained in the AOP were to be placed in the hands of one of PCNA's competitors, competitors could take steps to preempt or destroy PCNA's competitive moves.

Among the major PCNA initiatives outlined in the AOP are confidential advertising, campaigns, marketing strategies, including a determination of the timing for specific activities, and packaging tactics. The plans are not generally known and have been kept confidential by PCNA.

Included in the AOP is confidential information about a new piece of merchandising equipment. Although that piece of equipment has been introduced to the public, PCNA's plans with respect to that equipment--targets for placement, capital expenditures, and the like--are not [*23] known to the public. PCNA's AOP also includes an initiative to place other cold merchandising equipment into stores, detailing the type of equipment that PCNA will purchase, and the number of pieces of equipment. Pepsi is in competition with other beverage vendors to place such equipment into stores.

PCNA's plans to expand its business in certain markets that are new to PCNA, using a specific PCNA product, are not publicly known. PCNA's AOP includes details of funding available to PCNA's distributors to spend on an initiative behind PCNA's Lipton Brisk tea product, and other plans (including timing) relating to that product. PCNA's AOP also includes information regarding new product flavors and packages that is not publicly known and that is competitively sensitive.

Although trade press reports may contain information regarding new flavors, that information frequently is incorrect. Readers of the press reports would be unable to discern which of the information contained within such reports is accurate, and which is inaccurate.

Gatorade's president, Uzzi, testified that he did not believe everything that he read in Brand News, Brand Marketing and other trade publications, and that [*24] those publications are not always accurate. Thus, the fact that some of the new flavors and packaging plans identified in PCNA's AOP are mentioned in the press does not preclude trade secret status for PCNA's plans regarding those flavors, because the press statements could not be relied upon by competitors in formulating their own business plans.

### D. Pricing Architecture

"Pricing Architecture" is a key component of PCNA's AOP, relating to how PCNA prices its products in the marketplace. Pricing Architecture goes to great length and detail to determine and establish what prices PCNA will be charging for its products, including All Sport, Lipton and Ocean Spray products, to deliver certain retail prices in the market, on a nationwide basis. Documents reflecting PCNA's Pricing Architecture are labeled as "Private and Confidential."

Pricing Architecture includes PCNA's national pricing approach, specific price points, directions for Customer Development Agreements ("CDAs"), objectives for All Sport, Lipton teas, Ocean Spray juices and lemonade, and PCNA's new (and still under test) water product, Aquafina, by trade channel, package size and other characteristics of PCNA's products [*25] and customers. The pricing alternatives identified in the Pricing Architecture were selected by PCNA from many alternatives. PCNA's Pricing Architecture is not publicly known and is confidential. Because the beverage market is extremely price sensitive, if competitors had access to PCNA's confidential information, they could use that information to calculate their own price points to beat PCNA in the marketplace.

Pricing Architecture also includes information on the guidance that PCNA gives to its sales personnel entering into CDAs with retailers. CDAs are agreements between PCNA and retailers by which the retailer agrees to engage in certain merchandising activities for PCNA products in exchange for the payment of money by PCNA for a one calendar year period. PCNA's CDA information for 1995 is confidential, is not publicly available, and includes using the CDA approach for new products (which has not been a common practice for the types of products that PCNA sells). PCNA's Pricing Architecture includes CDA goals for specific products in

specific channels. Redmond was responsible for developing specific CDAs for California and for working on CDAs for national accounts that are headquartered [*26] in California.

At the time of Redmond's departure on November 10, 1994, PCNA was negotiating CDAs with its customers. One CDA in process at the time of Redmond's departure was a contract with K-Mart, which included specific recommendations regarding merchandising equipment. That information is not publicly known, but competitors could use that information to outbid PCNA in order to obtain a merchandising advantage with the retailer. Similar information was in process regarding a CDA with PCNA's customer, "7-11," and Redmond had access to that information shortly before he left PCNA to work for Quaker.

PCNA developed its Pricing Architecture with the work of five full time staff members and consultant resources over an eighteen-month period. Redmond was a member of PCNA's steering committee for Pricing Architecture, which met with the headquarters group to review work in progress on Pricing Architecture and to give the headquarters group guidance as they developed the Pricing Architecture plan. Redmond concedes that he participated in one Pricing Architecture steering committee meeting; the steering committee also engaged in conference and other telephone calls to provide input.

[*27] Pricing Architecture was presented to PCNA's general managers, including Redmond, in an August 23-24 meeting. The Pricing Architecture document was delivered only to those PCNA personnel having a need to know the contents of the document in order to carry out their jobs: the vice presidents of customer development and financial officers of each of the PCNA business units. At a later date, copies of the Pricing Architecture document would have been provided to the market unit managers who report directly to the business unit general managers. Those persons were involved in the development of Pricing Architecture. Pricing Architecture was not distributed in its entirety to PCNA's franchise bottlers. The information that was received by the bottlers, however, was reasonably expected by PCNA to be kept in confidence by them as a result of their own business and legal incentives to retain that information in confidence, and because PCNA senior employees tell the bottlers to keep the information confidential.

PCNA's Pricing Architecture has major economic value precisely because it is not generally known. That is because there is no variable that has a greater effect on profitability than [*28] pricing. Indeed, there is nothing more important that will influence the success of a business unit, such as the California business unit of which Redmond was in charge, in terms of achieving profit goals than pricing. PCNA's competitors could use PCNA's confidential Pricing Architecture information to preempt PCNA's pricing moves, undercut PCNA's prices, and planning to fight competition from PCNA. PCNA's Pricing Architecture retains its competitive sensitivity through the end of 1995.

The mere fact that a product is priced in the market at a specific dollar amount does not mean that PCNA's 1995 Pricing Architecture is publicly known. Because of the complexity of pricing, which varies by geography, retailer, channel, and time, pricing across the country, PCNA's Pricing Architecture could not be developed with any degree of accuracy by a competitor looking at public data. The best that a competitor could do with public data is speculate as to PCNA's approach to pricing. PCNA's Pricing Architecture deals with ranges of prices, and not the specific prices that PCNA charges to individual customers. Likewise, PCNA's customers do not obtain the entire pricing plan outlined in Pricing Architecture [*29] when they receive information specific to them from PCNA.

Business Unit General Managers (including Redmond) worked on Pricing Architecture, and planned to implement within each regional business unit's market. PCNA's Pricing Architecture must be and could be remembered by management employees such as Barnes and by business unit general managers such as Redmond.

Indeed, Redmond was responsible for implementing the guidelines of Pricing Architecture within the California business unit that he ran until November 10, 1994, to assess price points for the markets within that business unit, to prepare proposals for customers, and to forecast profits. Redmond was required to report to Barnes how he was going to use Pricing Architecture to develop specific plans for California, how he was going to approach customers, and what he was going to achieve with those customers.

Examples of PCNA's Pricing Architecture are found in its pricing approach and objectives to All Sport, Lipton Original and Brisk tea and Ocean Spray products in various channels. That information is competitively sensitive until December, 1995, because competitors do not know what PCNA is going to do with its prices until [*30] after PCNA has priced its products in the marketplace. Even then, competitors would be required to assemble prices from different geographic markets and channels, over the entire year, to obtain the information contained in PCNA's Pricing Architecture. The specifics of PCNA's approach to the marketplace is not generally known. A competitor of PCNA could use this information to block PCNA's efforts in the marketplace by locking up retailer shelf space sooner, by obtaining it for a lower price than PCNA, or by any of several other competitive methods. Redmond was made aware of all of this information.

Pricing Architecture also includes specific targets for All Sport relating to shelf space, which a competitor could use to try to block PCNA's plans by itself obtaining more shelf space in retailers' stores. Likewise, Pricing Architecture includes a new PCNA pricing structure for All Sport. Redmond is attuned to PCNA's pricing strategies against Gatorade.

The manner in which competitive information, of the type included in Pricing Architecture, is used can be shown by what PCNA has done with information that it obtained from the marketplace relating to Quaker's Gatorade product. Parts [*31] of PCNA's plans to take All Sport to market are contained in an October 5, 1994 memorandum.

**E. Selling and Delivery System**

In PCNA's system, products are manufactured and then sold to stores by delivering the product directly from the manufacturing plant to the store shelves for the retailer. Because there are many alternate ways to perform that function, PCNA has, in the last two years, studied those approaches to find the most cost-effective approach to meet its customers' needs. Providing such service will give PCNA an advantage with its retailers as the retailers make decisions regarding shelf space and merchandising activity.

PCNA has initiated a pilot market test of a new and unique beverage selling and delivery system in Laguna, California. The elements of that system are indicated in the record. PCNA's knowledge, gained through the pilot test, is known only by the team studying it. That team included a group of PCNA employees at its headquarters,

the management team in Laguna, California, along with Redmond and his operations staff.

Whether, and if so, when PCNA will begin implementing its now tested selling and delivery system nationwide is not publicly known. Quaker [*32] considers its "vision" of a new distribution system to be very confidential information. PCNA considers its new system to be no less so. CNA developed its new selling and delivery system with the assistance of a consultant, spending more than a million dollars over the past two years.

**V. Redmond Knows PepsiCo's Confidential Information and Trade Secrets.**

As noted above, Redmond participated in the development of PCNA's trade secrets, and received documents and attended presentations relating to those trade secrets. Redmond has acknowledged his possession of PCNA's confidential information, and illustrated his knowledge of PCNA's confidential information by preparing a chart relating to Pricing Architecture during his testimony, and by providing details regarding PCNA's plans during his testimony.

In mid-September, 1994, Weatherup spent a day with Redmond in California reviewing Redmond's California AOP as well as the company's national direction. The AOP is the core of Redmond's job: he "lives and breathes this every single day of every single week." Redmond has not denied having such knowledge, or put on any evidence to suggest that he does not have such knowledge; in [*33] fact, Redmond demonstrated to Weatherup that he could articulate PCNA's strategic plan and Annual Operating plan in 20-30 key respects during Weatherup's visit with Redmond in September, 1994.

**VI. Redmond's And Quaker's Use Of PCNA's Confidential Information And Trade Secrets Will Irreparably Harm PCNA.**

The specific effects of the use of certain of PCNA's trade secrets and confidential information is set forth above. If Redmond's knowledge of PCNA's plans were placed into the hands of a competitor like Quaker, the effects on PCNA would be "catastrophic."

**VII. Redmond And Quaker Will Suffer Little Harm From The Entry Of An Injunction.**

Uzzi had not begun to think about hiring anyone for the positions that Redmond now holds at any time prior to October 20, 1994. By October 21, 1994 there had not been any discussions at Quaker about any potential candidates to lead the effort to integrate the distribution systems. Redmond's name had not been raised in connection with that job at that time. Quaker and Uzzi did not interview anyone for Redmond's position. If Redmond had not accepted that position, Uzzi would have been required to solicit someone else for the position. [*34] Uzzi acknowledges that he would have carried more of the burden of putting the system together himself, had Redmond not accepted. Thus, the court may infer that any injunction precluding Redmond from participating in such efforts will cause little burden to Quaker that Quaker had not already contemplated before Redmond accepted his job, and would have suffered if Redmond had not, in fact, accepted. Uzzi was not surprised that Redmond negotiated with Pepsi following his acceptance of Quaker's job offer, and contemplated the possibility of Redmond's not accepting the job. Uzzi would have hired someone else in that circumstance, and can do so now.

Quaker is still in the process of defining Redmond's role and responsibilities, and does not expect to have his responsibilities defined until later in December, or early next year. Redmond and Uzzi have themselves agreed not to talk about Redmond's job until the end of the proceedings in this matter or were advised by someone not to do so. This tempers Quaker's claim that an injunction would be "devastating" to Quaker.

*CONCLUSIONS OF LAW*

This court has subject matter jurisdiction to hear this dispute based upon the diversity of [*35] citizenship between plaintiff and defendants and the amount in controversy exceeding fifty thousand dollars. *28 U.S.C. § 1332(a) (1994).*

**I. PRELIMINARY INJUNCTION STANDARDS IN THE SEVENTH CIRCUIT**

In determining whether a preliminary injunction should be granted in favor of PepsiCo, this court must consider four factors:

> (1) whether PepsiCo has some likelihood of succeeding on the merits of any of its claims at trial;

(2) whether PepsiCo will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue;

(3) whether the threatened injury to PepsiCo outweighs the threatened harm the injunction may inflict on the defendants; and

(4) whether the granting of the preliminary injunction will disserve the public interest.

*Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n. of St. Louis, 35 F.3d 1134, 1137 (7th Cir. 1994); Duct-O-Wire Co. v. U.S. Crane, Inc., 31 F.3d 506, 509 (7th Cir. 1994); Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1067, (7th Cir. 1994); Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 11-12 (7th Cir. 1992); Roland v. Air Line Employees Ass'n, Int'l, 753 F.2d 1385, 1392 (7th* [*36] *Cir. 1985).* The court concludes that PepsiCo has met its burden with respect to these factors demonstrating that injunctive relief is warranted.

Under the Seventh Circuit's "sliding scale" approach, "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Abbott Labs., 971 F.2d at 12; Gateway Eastern Ry. Co., 35 F.3d at 1137; Duct-O-Wire, 31 F.3d at 509.* In *Abbott Labs.,* the court further clarified its analysis: "While we have at times framed the sliding scale approach in mathematical terms, it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.'" *Abbott Labs., 971 F.2d at 12* (citation omitted) In this case, both the likelihood of success on the merits and the balance of harms that might be suffered if no injunction were to issue weigh heavily in PepsiCo's favor.

## II. PEPSICO IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

It is frequently true in trade secret cases [*37] that "misappropriation and misuse can rarely be proved by convincing direct evidence. In most cases, plaintiffs [like PepsiCo] must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place. Against this often delicate construct of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything." *Si Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1261 (3d Cir. 1985)* (quoting *Greenberg v. Croydon Plastics Co., 378 F. Supp. 806, 814 (E.D. Pa. 1974), vacated, 184 U.S.P.Q. 27 (E.D. Pa. 1974)* (vacating earlier order and substituting more definite injunctive relief)).

### A. PepsiCo is Likely to Prevail on its Illinois Trade Secret Act Claim.

To safeguard intellectual property and confidential business information, Illinois has adopted a version of the Uniform Trade Secrets Act. *765 ILCS 1065/1 et seq.* (1994) (the Illinois Trade Secrets Act, hereinafter "the ITSA"); 14 Uniform L. Ann. 437 *et seq.* (Master ed. 1990). The ITSA was intended to codify [*38] existing Illinois common law relating to trade secrets, and to eliminate any inconsistencies within that body of law. *See Napoli v. Sears, Roebuck & Co., 835 F. Supp. 1053, 1058 (N.D. Ill. 1993)* (Aspen, J.); *Elmer Miller, Inc. v. Landis, 253 Ill. App. 3d 129, 133, 625 N.E.2d 338, 341, 192 Ill. Dec. 378 (1st Dist. 1993); Gillis Assoc. Indus., Inc. v. Cari-All, Inc., 206 Ill. App. 3d 184, 189, 564 N.E.2d 881, 884, 151 Ill. Dec. 426 (1st Dist. 1990); Jager, Trade Secrets Law* § IL.01 (the ITSA corrects some "recent aberrations in the Illinois case law [and resolves] some confusion that existed in the case law"). Although there are very few Illinois cases construing the provisions of the ITSA applicable here, it is appropriate for this court to look to the application of statutory trade secret act claims in other jurisdictions. *LeGout v. Decker, 146 Ill. 2d 389, 397, 586 N.E.2d 1257, 1260-61, 166 Ill. Dec. 928 (1992)* ("To further the goal of uniformity in [uniform] laws, courts generally 'defer to decisions of other states and will construe the statute in accordance with the construction given to the same statute in other jurisdictions.'") (citation omitted); [*39] *Urban v. Loham, 227 Ill. App. 3d 772, 776, 592 N.E.2d 292, 295, 169 Ill. Dec. 805 (1st Dist. 1992)* ("In construing an Illinois statute, decisions of other states construing similar laws are entitled to respect and consideration") (citation omitted).

### 1. PepsiCo's Confidential Information Constitutes Protectible Trade Secrets.

1995 U.S. Dist. LEXIS 19437, *39

The ITSA defines a "Trade Secret" as:

> information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
>
> > (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
> >
> > (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

*765 ILCS 1065/2(d)* (1993). PepsiCo's confidential business information constitutes protectible trade secrets within the ITSA's definition, because they are data, processes, methods, plans and strategies (including pricing, marketing, strategic [*40] and related business information) that derive economic value from not being generally known within the beverage industry.

Further, in this case, defendant Redmond admitted that the PCNA business information at issue is confidential, that he views confidential business information and trade secrets as one and the same, and that he is not free to disclose PepsiCo's confidential information. These admissions alone establish the fact of PepsiCo's trade secrets, for trade secret status may be found when the defendant admits that the information constitutes a trade secret. *Churchill Communications Corp. v. Demyanovich, 668 F. Supp. 207, 213 (S.D.N.Y. 1987)* (admission by a former employee concerning the confidential nature of certain information was relevant in determining whether that information was entitled to trade secret status).

PepsiCo's efforts to maintain the secrecy of its trade secret and confidential information were reasonable and more than required under the ITSA. PepsiCo provided confidential and trade secret information to those employees with an actual need to know it; it regularly marked information "private and confidential;" it required all of its personnel with [*41] access to this information to execute agreements with PepsiCo whereby they agreed not to use or disclose PepsiCo's confidential information; the bottlers with whom some of this information was shared knew the secret and sensitive nature of the material and had strong business and legal incentives to maintain the secrecy of the information; at meetings where strategic and other business plans were discussed, PCNA executives emphasized to the attendees that the information they were to receive at the meeting was confidential. These steps were more than the "reasonable efforts" required by the ITSA.

The case law illustrates the sufficiency of PCNA's effort to safeguard its confidential information. For example, in *Televation Telecommunication Sys., Inc. v. Saindon, 169 Ill. App. 3d 8, 15-17, 522 N.E.2d 1359, 1364-66, 119 Ill. Dec. 500 (2d Dist. 1988), appeal denied, 122 Ill. 2d 595, 530 N.E.2d 266 (1988)*, the court held that the plaintiff took reasonable steps to ensure the secrecy of its proprietary drawings though the drawings were kept in an unlocked file cabinet, portions of those drawings were freely distributed to lower level employees who were not bound by confidentiality [*42] agreements and drawings were given to non-employee third parties. The court reasoned that the plaintiff's policy of disclosing complete drawings to employees only on a need-to-know basis, after orally informing its employees that the drawings were confidential and stamping the drawings proprietary, were reasonable measures to protect the information under the circumstances. *See also Service Ctrs. of Chicago, Inc. v. Minogue, 180 Ill. App. 3d 447, 454, 535 N.E.2d 1132, 1136, 129 Ill. Dec. 367 (1st Dist. 1989)* (disclosure to those who have a need to know the content of the trade secret is adequate protection under the ITSA); *Surgidev Corp. v. Eye Technology, Inc., 828 F.2d 452, 455 (8th Cir. 1987)* (applying Minnesota and California versions of the Uniform Trade Secrets Act, and holding that employee nondisclosure agreements were sufficient protection of secrecy).

Likewise, that a limited amount of PepsiCo's trade secrets and confidential information was distributed to

PCNA's franchise-owned bottlers (FOBOs) does not mean that PepsiCo has used less than reasonable efforts to maintain the secrecy of such information. FOBOs have the same incentives as PepsiCo to keep that information [*43] confidential, and PepsiCo reasonably could expect them to do so. *See Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 475, 40 L. Ed. 2d 315, 94 S. Ct. 1879 (1974)* ("This necessary element of secrecy is not lost, however, if the holder of the trade secret reveals the trade secrets to another in confidence, and under an implied obligation not to use or disclose it."). PepsiCo's witnesses also correctly observe that disclosure of confidential information to competitors and others by FOBOs can in certain circumstances run afoul of the law. *See, e.g., U.S. v. U.S. Gypsum Corp., 438 U.S. 422, 433 n.16, 57 L. Ed. 2d 854, 98 S. Ct. 2864 (1978)* (exchanges of current price information by competitors represents the "greatest potential for generating anticompetitive effects" and consistently have been held to violate the Sherman Act).

### 2. Redmond's Use And Inevitable Disclosure Of PepsiCo's Trade Secrets Constitute Actionable Misappropriate Under The ITSA.

"Misappropriation" is defined under the ITSA in pertinent part as:

> (1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper [*44] means; or

> (2) disclosure or use of a trade secret of a person without express or implied consent by another person who:

>> (A) used improper means to acquire knowledge of the trade secret; or

>> (B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

>>> (I) derived from or through a person who

utilized improper means to acquire it;

>>> (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

>>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

*765 ILCS 1065/2(b)* (1993). Both actual and threatened misappropriation also may by enjoined under the ITSA. *765 ILCS 1065/3(a)* (1993); *George S. May Int'l Co. v. International Profit Assoc., 256 Ill. App. 3d 779, 788, 628 N.E.2d 647, 653, 195 Ill. Dec. 183 (1st Dist. 1993), appeal denied, 156 Ill. 2d 557, 638 N.E.2d 1115 (1994).*

"Improper Means" under the ITSA:

> includes theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through [*45] electronic or other means.

*765 ILCS 1065/2(a)* (1993).

In this case, Redmond's performance of his job at Quaker results in actual misappropriation because he will use PepsiCo's trade secrets and other confidences to perform his duties. Thus, under the ITSA, Redmond has misappropriated PepsiCo's trade secrets by "use of a trade secret of [PepsiCo] without express or implied consent" and because Redmond "used improper means [by breaching his duty to maintain the confidentiality of PepsiCo's trade secrets and other confidential information] to acquire knowledge of the trade secret." Quaker has misappropriated PepsiCo's trade secrets by placing Redmond into a job in which it "knew or had reason to know that knowledge of the [PepsiCo] trade secret was derived from or through a person who utilized improper means to acquire it; [and that the trade secrets were] acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; and that the trade

secrets were] derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." 765 ILCS 1065/2(b)(1), (2)(A)(I), (II) and (III) (1993).

Further, [*46] Redmond and Quaker have "threatened misappropriation" of PepsiCo's trade secrets within the meaning of the ITSA. Threatened misappropriation can occur when an employee who knows of his employer's trade secrets is hired by a competitor to perform a job with similar duties. In such circumstances, the inevitable disclosure or use of the trade secrets by the employee in his new job constitutes misappropriation or threatened misappropriation under the Uniform Trade Secrets Act and under the common law. See, e.g., IBM Corp. v. Seagate Technology, Inc., 1991 U.S. Dist. LEXIS 20406, at *7-12 (D. Minn. 1991), remanded for more specific statement of relief, 962 F.2d 12 (8th Cir. 1992) ("IBM") (court issued an injunction under the Minnesota Trade Secrets Act (the relevant provisions of which are identical to the ITSA) barring a former employee from working for a competitor in a new job with the same responsibilities because the new job would inevitably lead to the disclosure or use of trade secrets); American Totalisator Co. v. Autotote Ltd., LEXIS DEL. Library, DELCH File, 1983 WL 21374, at *5 (Del. Ch. 1983) (court noted that Delaware's adoption of the Uniform Trade Secrets Act authorized an injunction [*47] against threatened misappropriation where it was impossible for an employee not to use his former employer's trade secrets in his job with the plaintiff's competitor); Emery Indus., Inc. v. Cottier, 202 U.S.P.Q. 829, 834 (S.D. Ohio 1978) ("There can be no doubt of the present threat of disclosure in any case in which the transfer of. employment is to a head-to-head competitor and the responsibilities in the employment are comparable."); FMC Corp. v. Varco Int'l, Inc., 677 F.2d 500, 504-05 (5th Cir. 1982) (court enjoined an employee from working in a new job that posed "an inherent threat of disclosure or use of [plaintiff's] trade secrets" because the new job had duties identical to those at the former employer); Den-Tal-Ez, Inc. v. Siemens Capital Corp., 389 Pa. Super. 219, 566 A.2d 1214, 1232-33 (Pa. Super. Ct. 1989) (noting that the trial court may have overstated the situation when it said that trade secret disclosure would be "inevitable," but that there was still ample evidence showing at least a substantial threat of disclosure); Air Prods & Chems., Inc. v. Johnson, 296 Pa. Super. 405, 442 A.2d 1114, 1122-25 (Pa. Super. Ct. 1982) (finding the inevitability [*48] of trade secret

disclosure to a new employer to be a sufficient threat to enjoin the employee from holding certain positions where disclosure was likely to occur); Weed Eater, Inc. v. Dowling, 562 S.W.2d 898, 902 (Tex. Civ. App. 1978) (finding inevitable disclosure notwithstanding former employee's good faith, and enjoining employee from working for competitor in any capacity in which trade secrets of previous employer were likely to be used); Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng'g Corp., 255 F. Supp. 645, 654 (E.D. Mich. 1966) (enjoining former employee from engaging in the same line of work for a competitor because the nature and type of work created "an inference that there is an inevitable and immediate danger of disclosure" of former employer's trade secrets); Fountain v. Hudson Cush-N-Foam Corp., 122 So. 2d 232, 234 (Fla. Dist. Ct. App. 1960) (enjoining former employee from working for a competitor because employee's "knowledge of the trade secrets would be so entwined with his employment as to render ineffective an injunction directed only toward a prevention of disclosure.").

The only court to consider whether "inevitable disclosure" constitutes [*49] a threatened misappropriation under the ITSA concluded that it does. Teradyne, Inc. v. Clear Communications Corp., 707 F. Supp. 353, 355 (N.D. Ill. 1989) (Zagel, J.). In that case, the court considered the adequacy of allegations sufficient to state a claim under the ITSA and observed that "an employer seeking injunctive protection for his trade secrets prior to their disclosure generally alleges either that the ex-employee actually intends to divulge the secrets or that he will inevitably do so, whether consciously or not, because of the type of work in which he will be involved, or that there is a substantial probability of disclosure." Id. at 356 (quoting Standard Brands v. Zumpe, 264 F. Supp. 254, 269 (E.D. La. 1967)). In Teradyne, the claim failed only because there were no allegations of inevitable disclosure. Teradyne, 707 F. Supp. at 356-57. PepsiCo's complaint here makes such allegations.

Inevitable disclosure is not a concept limited to the law of trade secrets and misappropriation. Thus, for example, the courts have recognized that "it is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter [*50] how well intentioned the effort may be to do so." FTC v. Exxon Corp., 205 U.S. App. D.C. 208, 636 F.2d 1336, 1350 (D.C. Cir. 1980); see also Sullivan

*Marketing, Inc. v. Valassis Comm., Inc., 1994 U.S. Dist. LEXIS 5824, *9, 1994 WL 177795 at *3 (S.D.N.Y. 1994).* Those cases recognize that, once a person has knowledge of a competitors business information, when they are called upon to act on behalf of his own company, his ability to compartmentalize the knowledge of his competitor's been is "nigh impossible." *Sullivan, 1994 U.S. Dist. LEXIS 5824, *9, 1994 WL at *3.* The court cannot find that any less is true of Redmond's ability (or inability) to compartmentalize his knowledge of PepsiCo's trade secrets and confidential information and to refrain from using that information in his job at Quaker.

Defendants' reliance upon *AMP Inc. v. Fleischhacker, 823 F.2d 1199 (7th Cir. 1987),* is misplaced. *Fleischhacker* was decided before the ITSA was enacted, and the ITSA provides expressly for injunctive relief upon a showing of threatened misappropriation. *765 ILCS 1065/3(a).* The court in *Fleischhacker* also indicated that injunctive relief would have been warranted if the plaintiff had shown that any of its protectible trade secrets were [*51] misappropriated or "at risk of misappropriation." *Fleischhacker, 823 F.2d at 1207.* Thus, unlike the plaintiff in *Fleischhacker,* who could not prove that it had specific trade secrets, or that those trade secrets (if possessed) would have been of value to the defendant's new employer, PepsiCo here has shown that it has protectible trade secrets and confidences, that Redmond was integrally involved in their development and implementation, and that Quaker will obtain a great and unfair advantage as a result of Redmond's possession and use of PepsiCo's trade secrets and confidences.

In order to determine whether disclosure of trade secrets in such circumstances is inevitable, this court examines (i) the level of competition between the former employer and the new employer; (ii) whether the employee's position with the new employer is comparable to the position he held with the former employer; and (iii) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer. *IBM, 1991 U.S. Dist. LEXIS 20406, at *7* (citing *Surgidev Corp. v. Eye Technology, Inc., 648 F. Supp. 661, 695 (D. Minn. 1986), aff'd,* [*52] *828 F.2d 452 (8th Cir. 1987)).* In this case, there is no dispute that PepsiCo and Quaker are direct competitors in the fiercely competitive soft drink business.

The court also concludes that PepsiCo has shown that Redmond's new position is sufficiently comparable to his former position at PepsiCo to make disclosure of PepsiCo's trade secrets and confidential information inevitable at his new position. Redmond himself characterized his new position at Quaker as Chief Operating Officer of Gatorade. The duties of his new position as Vice President-Field Operations for Gatorade North America will overlap the duties he had while at PepsiCo, and thereby will result in his use or disclosure of PepsiCo's confidential information. *See, e.g., National Starch & Chem. Corp. v. Parker Chem. Corp., 219 N.J. Super. 158, 530 A.2d 31, 32-33 (N.J. Super. Ct. App. Div. 1987)* (former employee enjoined from any employment responsibilities related to his previous employment, despite the fact that 95 percent of his work for the defendant consisted of non-related responsibilities; court found that the circumstances gave "rise to an inference that a substantial threat of disclosure exists" even though [*53] only 5 percent of his current employment was related to his previous work). The testimony of Redmond and Uzzi (in their respective declarations, Uzzi's deposition and testimony of each at the preliminary injunction hearing) establish that the scope of Redmond's job responsibilities at Quaker will be both broad and pertain to the same areas for which Redmond possesses PepsiCo's confidential information, namely sales, distribution, marketing, pricing, customer agreements and promotions. According to both Redmond and Uzzi, Redmond will manage the integration of the distribution systems of Gatorade and Snapple. Redmond also will be responsible for "executing sales and marketing plans, pricing strategies, including Customer Merchandising Agreements, and other types of promotional programs." Redmond's testimony reveals that he will be managing from the top Gatorade's entire North American sales operation at the field level. Although Quaker claims that Redmond will only take charge of previously developed plans and strategies, an executive of his level will implement, improve, and modify existing systems, and Uzzi concedes that Redmond's job will empower him to direct the spending of discretionary [*54] marketing funds. Therefore, regardless of whether Redmond is responsible for developing pricing strategies, his knowledge of PepsiCo's trade secrets will either intentionally or inadvertently be used in improving and implementing Quaker's existing sales and distribution systems. Redmond's position with Quaker presents a substantial threat of disclosure.

Defendants contend that no risk of disclosure exists because Redmond has signed a contract with Quaker that requires him not to disclose PepsiCo's confidential information while at Quaker, and not to induce Quaker to use PepsiCo's information. The court concludes that this Quaker contract is not adequate to protect PepsiCo's information. First, the Quaker contract does not bar Redmond himself from using PepsiCo's information for Quaker's benefit. Further, such contracts and admonitions do not supplant the trade secrets laws and are routinely rejected as insufficient to prevent inevitable disclosure or use. *IBM, 1991 U.S. Dist. LEXIS 20406, at *10* (noting that injunction was appropriate where new employer was unable to explain any specific plan to ensure that employee would not disclose former employer's trade secrets); *FMC Corp., [*55] 677 F.2d at 504-05* (finding that a confidentiality agreement and good faith were insufficient to prevent the use or disclosure of a former employer's trade secrets, the court enjoined employee from disclosing former employer's trade secrets and enjoined new employer from placing employee in position that posed inherent threat of use or disclosure of trade secrets); *Autotote*, LEXIS DEL. Library, DELCH File, 1983 WL 21374, at *5 (noting that promise to not use trade secrets is not possible without an injunction). Moreover, Quaker's effort to preclude such misappropriation--its own confidentiality agreement with Redmond--noticeably fails to prohibit Redmond's use of PepsiCo's information even as it express prohibits him from using Quaker's confidences. PepsiCo therefore is entitled to injunctive relief under the ITSA. *765 ILCS 1065/3(a)* (1993).

PepsiCo has shown that it is likely to prevail on all elements of its claim under the ITSA. Moreover, any shortage in PepsiCo's proof arises from the shifting facts describing Redmond's job that have been provided to PepsiCo and to the court. In such circumstances, it is only fair to shift the burden to defendants, to prove that Redmond will not use or disclose PepsiCo's [*56] confidential information. That is because knowledge as to the scope of Redmond's new job duties and Quaker's job plans for Redmond is peculiarly and exclusively within the control of the defendants. It is a "familiar principle" that

"when the true facts relating to [a] disputed issue lie peculiarly within the

knowledge of" one party, the burden of proof may properly be assigned to that party "in the interest of fairness."

*ITSI TV Prods., Inc. v. Agricultural Assocs., 3 F.3d 1289, 1292 (9th Cir. 1993)* (quoting *United States v. Hayes, 369 F.2d 671, 676 (9th Cir. 1966))*. This principle has been recognized by the United States Supreme Court, the Seventh Circuit, other federal courts, and Illinois courts. As the United States Supreme Court has noted,

The ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary.

*Campbell v. United States, 365 U.S. 85, 96, 5 L. Ed. 2d 428, 81 S. Ct. 421 (1961)*; *see also United States v. N.Y., N.H. & Hartford R.R. Co., 355 U.S. 253, 256 n.5, 78 S. Ct. 212, 214-15 n.5, 2 L. Ed. 2d 247 (1957)* (same); [*57] *Old Ben Coal Corp. v. Interior Bd. of Mine Operations Appeals, 523 F.2d 25, 36 (7th Cir. 1975)* (citing 9 Wigmore, Evidence § 2486 (3d ed.)); *Erving Paper Mills v. Hudson-Sharp Mach. Co., 332 F.2d 674, 678 (7th Cir.)* (en banc) (also citing Wigmore), *cert. denied, 379 U.S. 946, 13 L. Ed. 2d 544, 85 S. Ct. 440 (1964)*; *Wohl v. Yelen, 22 Ill. App. 2d 455, 459, 161 N.E.2d 339, 341 (1st Dist. 1959)* (recognizing "that if the evidence with respect to an issue is within the control of an adverse party, it is he who has the burden of proof . . ."); *Snyder v. Ambrose, 266 Ill. App. 3d 163, 639 N.E.2d 639, 640-41, 1994 Ill. App. LEXIS 1210, *6, 203 Ill. Dec. 319 at 319-7 (2d Dist. 1994)*; *Southwest Fed. S. & L. Ass'n v. Cosmopolitan Nat'l Bank, 23 Ill. App. 2d 174, 180-81, 161 N.E.2d 697, 701 (1st Dist. 1959)*.

In light of PepsiCo's showing of the considerable similarities between Redmond's former and present jobs, it is only through such proof by defendants that the court could be assured that PepsiCo's trade secrets would not inevitably be disclosed or used by Redmond. Defendants completely control the evidence as to what duties Redmond will be assigned. Defendants [*58] have failed to prove that Redmond's former position is not comparable to his new position, and that it will not involve the use of PepsiCo's confidential information.

**B. PepsiCo Is Also Likely To Prevail**

### On Its Trade Secrets Misappropriation Claim Under Illinois Common Law.

PepsiCo is likely to prevail on its claim of trade secret misappropriation under the common law. In order to succeed on the merits of a trade secret claim, PepsiCo must demonstrate that (1) it possessed legally cognizable trade secrets, (2) defendants misappropriated those trade secrets in breach of an agreement, confidence, duty, or as a result of discovery by improper means, and (3) the information will be used in the defendants' business. *See Cohn and RLC Enter., Inc. v. Taco Bell Corp., 1994 U.S. Dist. LEXIS 334, *4, No. 92 C 5852, 1994 WL 13769 at *10 (N.D. Ill., Jan. 14, 1994)* (Nordberg, J.); *Syntex Ophthalmics, Inc. v. Novicky, 745 F.2d 1423, 1433 (Fed. Cir. 1984), vacated and remanded on other grounds, 470 U.S. 1047, 105 S. Ct. 1740, 84 L. Ed. 2d 807 (1985)* (applying Illinois law) (citing *Schulenburg v. Signatrol, Inc., 50 Ill. App. 2d 402, 200 N.E.2d 615 (1964), aff'd in part and rev'd in part, 33 Ill. 2d 379, 212 N.E.2d 865 (1965),* [*59] *cert. denied, 383 U.S. 959, 86 S. Ct. 1225, 16 L. Ed. 2d 302 (1966)).*

Under the common law, a trade secret includes "a plan or process, tool, mechanism, compound, or informational data utilized by a person in his business operations and known only to him and such limited other persons to whom it may be necessary to confide it." *ILG Indus., Inc. v. Scott, 49 Ill. 2d 88, 92, 273 N.E.2d 393, 395 (1971); Schulenburg, 33 Ill. 2d at 385, 212 N.E.2d at 868; Victor Chem. Works v. Iliff, 299 Ill. 532, 545-46, 132 N.E. 806, 811 (1921); Televation Telecommunication Sys., Inc. v. Saindon, 169 Ill. App. 3d 8, 13, 522 N.E.2d 1359, 1363, 119 Ill. Dec. 500 (2d Dist. 1988); Junkunc v. S.J. Advanced Technology & Mfg. Corp., 149 Ill. App. 3d 114, 118-19, 498 N.E.2d 1179, 1183, 101 Ill. Dec. 671 (1st Dist. 1986).*

To determine whether a trade secret is entitled to the protection of the common law, the court is required to examine six factors: (1) the extent to which the information is known outside PepsiCo's business; (2) the extent to which it is known by employees and other individuals involved in PepsiCo's business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the [*60] information to PepsiCo and its competitors; (5) the amount of effort or money expended by PepsiCo in developing the information; and (6) the ease or difficulty with which the

information could properly be duplicated or acquired by others. *ILG, 49 Ill. 2d at 93, 273 N.E.2d at 396 (1971); Tie Systems, Inc. v. Telcom Midwest, Inc., 203 Ill. App. 3d 142, 148 560 N.E.2d 1080, 1085, 148 Ill. Dec. 483 (1st Dist. 1990); Service Ctrs., 180 Ill. App. 3d at 453, 535 N.E.2d at 1136; Junkunc, 149 Ill. App. 3d at 118-19, 498 N.E.2d at 1183; Televation, 169 Ill. App. 3d at 13, 522 N.E.2d at 1363; American Wheel & Eng'g Co. v. Dana Molded Prods., Inc., 132 Ill. App. 3d 205, 209, 476 N.E.2d 1291, 1294, 87 Ill. Dec. 299 (1st Dist. 1985).*

PepsiCo seeks injunctive relief for the period of time that the confidentiality of the business information to which Redmond was exposed remains valuable. PepsiCo has established that, during this period of time, the information for which it seeks protection from this court is protectible as a trade secret because it is not known outside of the PepsiCo business family, which includes only select PepsiCo managers and executives, and PepsiCo's [*61] business partners (for example, its franchise operators), on a need-to-know basis. Further, PepsiCo has established that it has taken extensive protective measures to guard the information's secrecy, including confidentiality agreements and frequent indications, orally and in writing, that the information is confidential. PepsiCo's information was developed at great expense and effort by PepsiCo, is of great value to PepsiCo while it is secret, and would be valuable to its competitors if it is revealed to them before the information becomes known in the marketplace in the next several months. And, while Defendants have claimed that discrete elements of this information already are known, the court concludes that the breadth of information and the plans of PepsiCo could not be duplicated by others from publicly available sources during the time period that is critical to the value of the information.

The court concludes that the business information for which PepsiCo seeks this court's protection constitutes protectible trade secrets under Illinois common law because, by not being known to others, they give PepsiCo a significant competitive advantage over other firms in the beverage [*62] industry. *Novicky, 745 F.2d at 1434* (applying Illinois law); *Syntex Ophthalmics, Inc. v. Tsuetaki, 701 F.2d 677, 684 (7th Cir. 1983)* (applying Illinois law). This court concludes that PepsiCo's strategic and annual operating plans for 1995, pricing architecture, new selling and delivery plans (including its new customer representative compensation system) and

customer proposal information are protectible trade secrets. *See, e.g., Elmer Miller, 253 Ill. App. 3d at 133-35, 625 N.E.2d at 342-43* (customer list containing sales and marketing information was a protectible trade secret); *Lyle R. Jager Agency, Inc. v. Steward, 253 Ill. App. 3d 631, 639-41, 625 N.E.2d 397, 402, 192 Ill. Dec. 437 (3d Dist. 1993)* (customer files containing information relating ·to pricing were protectible trade secrets); *Brostron v. Warmann, 190 Ill. App. 3d 87, 90, 546 N.E.2d 3, 5, 137 Ill. Dec. 379 (3d Dist. 1989)* (gross profit information was a protectible trade secret); *Brunswick Corp. v. Jones, 784 F.2d 271 (7th Cir. 1986)* (finding that access to confidential marketing strategies, financial performance and projections, gave a competitor the unfair advantage to cut the time and [*63] costs required to develop a new product, preempt the plaintiff's new products before they reached the market, and enabled the competitor to determine how aggressively to price its products); *American Totalisator Co. v. Autotote Ltd.,* LEXIS DEL. Library, DELCH File, 1983 WL 21374 at *4 (Del. Ch. 1983) (finding plaintiff's bidding information constituted a trade secret because it "necessarily encompasses a philosophy for future operation and, as such, possesses some proprietary value to Amtote and a devastating advantage if it becomes available to its competitors. . . .To know the plan would affect the bidding which would determine profit and loss which would affect everything about this Plaintiff doing business"); *National Starch and Chem. Corp. v. Parker Chem. Corp., 219 N.J. Super. 158, 530 A.2d 31, 32 (N.J. Super. 1987)* (information relating to marketing and sales strategies, manufacturing processes, pricing, research and development, and specialized product specification was protectible as trade secrets); *Metallurgical Indus., Inc. v. Fourtek, Inc., 790 F.2d 1195, 1201 (5th Cir. 1986).*

PepsiCo acted prudently and reasonably to keep its confidential information secret. *See Lincoln Towers Ins. Agency* [*64] *v. Farrell, 99 Ill. App. 3d 353, 358, 425 N.E.2d 1034, 1037, 54 Ill. Dec. 817 (1st Dist. 1981).* PepsiCo protected its confidentiality interests by requiring its employees to sign confidentiality and non-disclosure agreements, and to promise not to divulge confidential or proprietary information relating to PepsiCo's trade secrets to others during and after employment. *Novicky, 591 F. Supp. 28, 37 (N.D. Ill. 1983)* (Decker, J.), *aff'd, 745 F.2d 1423 (Fed. Cir. 1984); Televation, 169 Ill. App. 3d at 15-17, 522 N.E.2d at 1364-66* (disclosure of complete documents on a need-to-know basis was sufficient to ensure the secrecy

of proprietary documents and to maintain trade secret status); *Affiliated Hosp. Prods., Inc. v. Baldwin, 57 Ill. App. 3d 800, 802, 806, 373 N.E.2d 1000, 1002, 1005, 15 Ill. Dec. 528 (1st Dist. 1978)* (disclosure of information to employees under agreement not to disclose or use information constituted sufficient protection to qualify the information as trade secrets at common law); *Greenberg v. Croydon Plastics Co., 378 F. Supp. 806, 812 (E.D. Pa. 1974)* ("The secrecy in which a purported trade secret is shrouded need not be absolute but reasonable [*65] precautions under the circumstances must be taken to prevent disclosure to unauthorized parties"); *Q-CO Indus., Inc. v. Hoffman, 625 F. Supp. 608, 617 (S.D.N.Y. 1985)* ("absolute secrecy is not required"); *Tie Systems, 203 Ill. App. 3d at 148, 560 N.E.2d at 1085* (absence of precautions restricting access to the information did not establish that the information was not confidential).

The court concludes, based upon the law and the evidence presented at the hearing, that PepsiCo is entitled to legal protection for its trade secrets in the business information described above. The underlying principle at work here is simple: "A business which may invest substantial time, money and manpower to develop secret advantages over its competitors, must . be afforded protection against the wrongful appropriation of confidential information by a prior employee, who was in a position of confidence and trust. *ILG Indus., 49 Ill. 2d at 93, 273 N.E.2d at 396.* The defendants are not entitled to use for their own benefit information developed by PepsiCo over substantial time and at great cost. The court concludes that PepsiCo is entitled to preliminary injunctive relief on its trade secrets [*66] claim under the Illinois common law.

### C. PepsiCo Is Likely To Prevail On Its Breach Of Confidentiality Agreement Claim Against Defendant Redmond.

Defendant Redmond entered a confidentiality agreement with PepsiCo which provided, in pertinent part, as follows:

> I will not disclose at any time, to any one other than officers or employees of the Company [PepsiCo] or make use of, confidential information relating to the business of the Company, manufacturing

methods, processes, techniques, products, research or customers lists obtained while in the employ of the Company, which shall not be generally known or available to the public or recognized as standard practices, and on leaving the employ of the Company will not take without the consent of the Company, any drawing, blueprint, or other reproduction, customers list or confidential data.

Actions for breach of confidentiality agreements are properly made under the common law of Illinois. The ITSA provides that "contractual remedies, whether or not based upon misappropriation of a trade secret" are not affected by the ITSA. *765 ILCS 1065/8(b)(1).*

PepsiCo's confidentiality agreement with Redmond is valid [*67] and enforceable. Redmond entered the agreement prior to his employment with PepsiCo, and the agreement was supported by adequate consideration. *See, e.g., Corroon & Black of Illinois, Inc. v. Magner, 145 Ill. App. 3d 151, 163, 494 N.E.2d 785, 791, 98 Ill. Dec. 663 (1st Dist. 1986)* (continued employment for a substantial period of time is adequate consideration for an employment agreement). The parties have both cited to Illinois law in memorandum submitted to the court. The court is convinced that no different result would be reached under New York law, however, because similar agreements have been held valid and enforceable under New York law. *See, e.g., Integrated Cash Management Servs., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 172, 173 (2d Cir. 1990)* (finding valid and enforceable a confidentiality agreement where employees simply agreed "not to disclose or use any confidential or proprietary information of [the employer] upon leaving the company's employ."); *Anacomp., Inc. v. Shell Knob Servs. Inc., 1994 U.S. Dist. LEXIS 223, *10, 1994 WL 9681 at *4, 12 (S.D.N.Y. 1994)* (confidentiality agreement that prohibited disclosure or use of the employer's private and proprietary business information, [*68] trade secrets and other confidential data" held valid and enforceable).

Redmond admitted that he was not free to disclose PepsiCo's confidential information. Redmond's counsel also admitted during closing argument that the Confidentiality Agreement was valid and bound Redmond "to protect the confidential information of the Pepsi Cola Company that he was made privy to while employed by Pepsi Cola." "Statements made by an

attorney in closing argument may be the basis from which a trial court finds a judicial admission." *Lowe v. Kang, 167 Ill. App. 3d 772, 777, 521 N.E.2d 1245, 1248, 118 Ill. Dec. 552 (2d Dist. 1988); accord Williams v. Cahill, 258 Ill. App. 3d 822, 826, 629 N.E.2d 1175, 1179, 196 Ill. Dec. 331 (3d Dist. 1994).* "Judicial admissions are formal acts of a party or his attorney in court, dispensing with proof of a fact claimed to be true, and are used a substitute for legal evidence at trial." *Lowe, 167 Ill. App. 3d at 776, 521 N.E.2d at 1248; accord Dremco, Inc. v. Hartz Constr. Co., 261 Ill. App. 3d 531, 535-36, 633 N.E.2d 884, 888, 199 Ill. Dec. 88 (1st Dist. 1994).* Redmond's counsel affirmatively admitted during his closing argument that Redmond entered [*69] into a valid and enforceable Confidentiality Agreement with PepsiCo:

> The Pepsi Cola agreement I think is absolutely clear that Mr. Redmond is contractually bound to protect the confidential information of the Pepsi Cola Company that he was made privy to while employed by Pepsi Cola.

Thus, this judicial admission binds Redmond and dictates a conclusion that Redmond's confidentiality agreement with PepsiCo is valid and enforceable.

The fact that the confidentiality agreement here has no time limitation does not invalidate the agreement. Rather, the ITSA explicitly provides that "a contractual or other duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographic limitation on the duty." *765 ILCS 1065/8(b)(1).*

Prior to the enactment of the ITSA, a few cases held that confidentiality agreements would not be enforced unless they contained reasonable temporal or geographic limitations. *E.g., Cincinnati Tool Steel Co. v. Breed, 136 Ill. App. 3d 267, 482 N.E.2d 170, 90 Ill. Dec. 463 (2d Dist. 1985).* Section 8(b)(1) of the ITSA superseded and overruled those holdings to the extent they [*70] required durational or geographic limits on contractual duties to maintain secrecy or limit the use of trade secrets. *Abbott Interfast Corp. v. Harkabus, 250 Ill. App. 3d 13, 22, 619 N.E.2d 1337, 1344, 189 Ill. Dec. 288 (2d Dist. 1993)* (contractual prohibition against trade secret disclosure not invalid because it did not contain time limitation; citing Section 8(b)(1) of ITSA); *see also Jager*

at § IL.01[1], p. IL-3; § IL.07, p. IL-19-20.

It is true that, at the termination of employment, an employee is free to take with him "general skills and knowledge acquired during his tenure with his former employer." That employee may not, however, take with him "confidential, particularized plans or processes developed by his employer and disclosed to [the employee] while the employer-employee relationship existed, which are unknown to others in the industry and which give the employer an advantage over his competitors." *AMP, Inc. v. Fleischhacker, 823 F.2d 1199, 1202 (7th Cir. 1987); accord Schulenburg, 33 Ill. 2d at 387, 212 N.E.2d at 869.*

Redmond expressly and contractually agreed to protect PepsiCo's confidential business information and to utilize PepsiCo's trade [*71] secrets exclusively for the benefit of PepsiCo. The confidentiality agreement is evidence that Redmond was informed from the outset that he would not be permitted to use PepsiCo's confidences except in PepsiCo's business.

Redmond's performance of his new job with Quaker, PepsiCo's direct competitor in the soft drink market, will require him to use and to disclose PepsiCo's confidential business information in violation of the confidentiality agreement. The court further concludes that Redmond has thereby breached his contractual non-disclosure obligations to PepsiCo as to valuable confidential business information in which PepsiCo has a protectible business interests *See, e.g., Lawter Int'l., Inc. v. Carroll, 116 Ill. App. 3d 717, 720-23, 451 N.E.2d 1338, 1346-48, 72 Ill. Dec. 15 (1st Dist. 1983).*

The court concludes that a preliminary injunction should issue here against Redmond to protect PepsiCo from any breach of the Confidentiality Agreement and further disclosure or use of its confidential business information. Illinois courts routinely hold confidential customer information, confidential pricing procedures, and other confidential methods, formulas, procedures and equipment [*72] capabilities learned and used in the course of confidential employer-employee relationships as protectible. *See, e.g., Gorman Publ. Co. v. Stillman, 516 F. Supp. 98, 105 (N.D. Ill. 1980)* (Decker, J.) (protectible information found in plaintiff's finances, staffing problems, salary structure, public relations problems, customer lists and distribution methods); *Crocan, 385 F. Supp. at 253* ("knowledge of what constitutes the best way to manufacture, package,

distribute and sell a product may in itself constitute a trade secret of confidential information"); *Millard Maint. Svc. Co. v. Bernero, 207 Ill. App. 3d 736, 746, 566 N.E.2d 379, 385, 152 Ill. Dec. 692 (1st Dist. 1990)* (pricing formula and customer information protected); *Torrence v. Hewitt Assoc., 143 Ill. App. 3d 520, 526, 493 N.E.2d 74, 77-78, 97 Ill. Dec. 592 (1st Dist. 1986)* (protectible confidential information found in financial data, future business plans, client lists and confidential reports); *Tower Oil & Technology Co. v. Buckley, 99 Ill. App. 3d 637, 643, 425 N.E.2d 1060, 1066, 54 Ill. Dec. 843 (1st Dist. 1981)* (particular customer needs, product applications, suppliers were confidential and valuable [*73] information); *Donald McElroy, Inc. v. Delaney, 72 Ill. App. 3d 285, 292-93, 389 N.E.2d 1300, 1306-07, 27 Ill. Dec. 892 (1st Dist. 1979)* (confidential supplier sources and requirements, company procedures, equipment capabilities and other confidential company data); *Wessel Co. v. Busa, 28 Ill. App. 3d 686, 692, 329 N.E.2d 414, 419 (1st Dist. 1975)* (sensitive customer information, confidential pricing procedures and the years of accumulated data upon which it was based); *Smithereen Co. v. Renfroe, 325 Ill. App. 229, 242-43, 59 N.E.2d 545, 550* (confidential methods, processes and formulae used in plaintiff's business); *see also* Restatement of Torts § 759, cmt. b ("Examples of [such] information . . . include . . . the state of one's accounts, the amount of his bid for a contract, his sources of supply, his plans for expansion or retrenchment, and the like. There are no limitations as to the type of information included except that it relate to [secret or confidential] matters in the business."); Restatement (Second) Agency § 395, cmt. b (the rule against nondisclosure of a former employer's confidential information "applies not only to those communications which [*74] are stated to be confidential, but also to information which the agent should know his principal would not care to have revealed to others or used in competition with him. It applies to unique business methods of the employer, trade secrets, lists of names, and all other matters which are peculiarly known in the employer's business.")

The justification for enjoining Redmond from further disclosing PepsiCo's confidential information was stated eloquently by Justice Holmes in *E. I. DuPont de Nemours Powder Co. v. Masland, 244 U.S. 100, 102, 61 L. Ed. 1016, 37 S. Ct. 575 (1917)*

> Whether the plaintiffs have any valuable
> secret or not the defendant knows the

facts, whatever they are, through a special confidence that he accepted. The property may be denied, but the confidence cannot be. Therefore the starting point for the present matter is not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them. These have given place to hostility, and the first thing to be made sure of is that the defendant shall not fraudulently abuse the trust reposed in him. It is the usual incident of confidential relations. If there [*75] is any disadvantage in the fact that he knew the plaintiffs' secrets, he must take the burden with the good.

## D. PepsiCo Is Not Estopped From Obtaining Injunctive Relief.

The court concludes that the fact that PepsiCo did not enter a covenant not to compete with Redmond does not estop PepsiCo from obtaining injunctive relief against the disclosure of its trade secrets and confidential information. Illinois law is well-settled that where an employer seeks to enjoin a former employee from using the employer's trade secrets, as in this case, a covenant not to compete is not required:

> Under Illinois law, an employer has a legitimate business interest in insuring trade secrets not be disclosed for the benefit of third parties or for the employee's use after his employment. (citations omitted). This is true even when there is no noncompetition contract between the parties.

*Pivot Point Int'l, Inc. v. Charlene Prods., Inc., 1994 U.S. Dist. LEXIS 8993, at \*25 (N.D. Ill., July 1, 1994)* (Nordberg, J.); *see also Televation Telecommunication Sys., Inc. v. Saindon, 169 Ill. App. 3d 8, 12, 522 N.E.2d 1359, 1362, 119 Ill. Dec. 500 (2d Dist. 1988).*[2]

> 2    In their Memorandum in Opposition to PepsiCo's Motion for a Temporary Restraining Order, Defendants cited *Fleming Sales Co. v. Bailey, 611 F. Supp. 507 (N.D. Ill. 1985)* (Shadur, J.), and *Colson Co. v. Wittel, 210 Ill. App. 3d*

*1030, 569 N.E.2d 1082, 155 Ill. Dec. 471 (4th Dist. 1991)* to support its proposition that PepsiCo is estopped from obtaining injunctive relief against Redmond and Quaker because they did not enter into a covenant not to compete with Redmond; both cases are inapposite. The courts in both cases cited by the defendants found that the information possessed by the former employees were *not* trade secrets; therefore, that information could not be protected absent some sort of protective agreement. *See Fleming, 611 F. Supp. at 511-16; Colson, 210 Ill. App. 3d at 1040, 589 N.E.2d at 1087-88.* The PepsiCo information Redmond possesses, however, constitutes a trade secret *(see supra,* Conclusions, *supra),* and is therefore protected regardless of whether the parties entered into a covenant not to compete. Moreover, the cases cited by the defendants concern employer/employee relationships where the parties did not execute *either* a covenant not to compete *or* a nondisclosure agreement. *Fleming, 611 F. Supp. at 509; Colson, 210 Ill. App. 3d at 1037, 569 N.E.2d at 1086.* In contrast, as discussed above, Redmond entered into a valid, enforceable confidentiality agreement with PepsiCo that covers both trade secrets and confidential information. (PX3) Redmond's attorney has even conceded in his closing arguments that the agreement restricts Redmond from disclosing PepsiCo's confidential information.

[*76] The court further concludes that Redmond owed PepsiCo common law duties of confidentiality. "The duty to protect an employer's trade secret exists apart from a contract embodying the obligation." *Crocan Corp. v. Sheller--Globe Corp., 385 F. Supp. 251, 253 (N.D. Ill. 1974)* (Bauer, J.); *see also Televation, 169 Ill. App. 3d at 12, 522 N.E.2d at 1362* ("An employer has a recognized business interest in protecting trade secrets disclosed in confidence to the employee during the course of his employment even where . . . there is no enforceable restrictive covenant between the parties.") (citations omitted). For this reason as well, it was not necessary for PepsiCo to enter a non-compete agreement with Redmond to bind him to his non-disclosure obligations.

Further, Defendants have failed to cite any authority, or set forth the applicable legal standard, for estoppel. The Illinois Supreme Court has identified six elements

necessary for equitable estoppel, including the basic elements of (1) a representation made by the party against whom the estoppel is alleged, and (2) the good faith and reasonable reliance on this representation by the party seeking the benefit of the estoppel. [*77] *Vaughn v. Speaker, 126 Ill. 2d 150, 161-63, 533 N.E.2d 885, 890, 127 Ill. Dec. 803 (1988).* Defendants failed to assert or establish any of the necessary elements of estoppel; thus, the court rejects their argument that PepsiCo is estopped from obtaining injunctive relief.

## III. PEPSICO WILL BE IRREPARABLY HARMED IF THE PRELIMINARY INJUNCTION DOES NOT ISSUE, AND THAT INJURY FAR OUTWEIGHS ANY HARM THE INJUNCTION MAY CAUSE THE DEFENDANTS.

The court concludes that the threatened injury to PepsiCo far outweighs any harm the injunction may cause defendants, and PepsiCo will be irreparably harmed if the injunction sought by PepsiCo is not issued.

### A. Because The ITSA Provides For Injunctive Relief, No Showing Of Lack Of Adequate Remedy At Law Or Irreparable Injury Is Required.

Under Illinois law, "where a statute expressly authorizes injunctive relief to enforce the provisions of the statute, the general rules of equity requiring a showing of a lack of an adequate remedy at law and irreparable injury need not be shown." *People v. Fiorini, 143 Ill. 2d 318, 574 N.E.2d 612, 623, 158 Ill. Dec. 499 (1991)* (other citations omitted). This general principle has [*78] been recognized widely by federal and state courts alike. *See, e.g., Illinois Bell Telephone Co. v. Illinois Commerce Commission, 740 F.2d 566, 571 (7th Cir. 1984)* ("where the plaintiff seeks [a preliminary] injunction to prevent the violation of a . . . statute that specifically provides for injunctive relief, it need not show irreparable harm"); *Trailer Train Co. v. State Bd. of Equalization, 697 F.2d 860, 869 (9th Cir.)* ("The standard requirements for equitable relief need not be satisfied when [a preliminary] injunction is sought to prevent the violation of a . . . statute which specifically provides for injunctive relief") (other citations omitted), *cert. denied, 464 U.S. 846, 78 L. Ed. 2d 139, 104 S. Ct. 149 (1983); Environmental Defense Fund, Inc. v. Lamphier, 714 F.2d 331, 338 (4th Cir. 1983)* ("where a statute authorizes

injunctive relief for its enforcement, plaintiffs need not plead and prove irreparable injury") (other citations omitted); *Virginia Beach S.P.C.A., Inc. v. South Hampton Roads Veterinary Ass'n, 229 Va. 349, 329 S.E.2d 10, 13 (1985)* ("When a statute empowers a court to grant injunctive relief, the party seeking an injunction is not required [*79] to establish the traditional prerequisites *i.e.,* irreparable harm and lack of an adequate remedy at law, before the injunction can issue, and all that is required is proof that the statute or regulation has been violated") (citation omitted).

Although no Illinois case has yet been decided under the Illinois Trade Secrets Act squarely addressing this specific issue, federal and state courts in other states adopting the Uniform Trade Secrets Act (like Illinois) have repeatedly invoked this principle in dispensing with the irreparable harm requirement for injunctive relief where a violation of the trade secret statute has been demonstrated. *See, e.g., Capital Tool and Mfg. Co. v. Maschinenfabrik Herkules, 837 F.2d 171, 172 (4th Cir. 1988)* (where a statutory violation is demonstrated, "a complainant need not allege or prove irreparable harm when it invokes a statute that authorizes injunctive relief"); *National League Rsch. Group v. Lathan, 1993 U.S. Dist. LEXIS 6681, *25, 1993 WL 169789 (W.D.Va. 1993)* ("A complainant need not prove irreparable harm when invoking a statute [like the Virginia--and Illinois--Trade Secrets Act] that authorizes injunctive relief, but must only prove that the defendant violated [*80] the statute"); *Boeing Co. v. Sierracin Corp., 108 Wash. 2d 38, 738 P.2d 665, 681 (1987)* (no finding of irreparable harm required under Uniform Trade Secrets Act, as adopted by Washington, in order for injunctive relief properly to issue).

Accordingly, the Illinois Trade Secrets Act expressly authorizes injunctive relief to enforce its provisions (765 ILCS 1065/8), and PepsiCo has demonstrated a violation of the Illinois Trade Secrets Act. Injunctive relief is appropriate in the instant case without any additional findings of irreparable harm or lack of an adequate remedy at law.

### B. PepsiCo Has Amply Demonstrated Irreparable Injury.

In cases such as this, involving threats to trade secrets and confidential information, courts readily presume irreparable injury from a showing that the protectible interest at stake is imperilled by a defendant's

conduct. *See, e.g., AMP, 823 F.2d at 1206* (trade secrets and confidential information); *Refractory Technology, Inc. v. Koski, 1990 U.S. Dist. LEXIS 10489, *2, No. 90 C 4350, 1990 WL 119560, at *3 (N.D. Ill., Aug. 13, 1990)* (Duff, J.) (dissemination of trade secret would cause plaintiff immediate, irreparable harm); *ISC-Bunker Ramo Corp. v. Altech, Inc.,* [*81] *765 F. Supp. 1310, 1334-35, 1339 (N.D. Ill. 1990)* (Marovich, J.) (irreparable harm adequately demonstrated because defendant had misappropriated plaintiff's trade secret and was likely to continue doing so; "irreparable injury is presumed to occur when an ex-employee breaches a confidentiality agreement . . . ."); *CPG Products Corp. v. Mego Corp., 214 U.S.P.Q. 206, 214 (S.D. Ohio 1981)* (threat of disclosure, destruction or dilution of plaintiff's trade secrets constitutes irreparable injury justifying injunctive relief.); *Donald McElroy, Inc. v. Delaney, 72 Ill. App. 3d 285, 294-95, 389 N.E.2d 1300, 1308, 27 Ill. Dec. 892 (1st Dist. 1979)* ("Once a protectible interest has been established, injury to plaintiff will presumably follow if that interest is not protected"; threat of irreparable harm sufficient where former employee violated the terms of a non-disclosure agreement); *Lawter Int'l, 116 Ill. App. 3d at 731, 451 N.E.2d at 1348* (where former employee signed a non-disclosure agreement and was about to use plaintiff's confidential information against the plaintiff, irreparable injury was shown and preliminary injunction was properly granted). An injury is "irreparable" [*82] in these cases because it cannot be remedied through the payment of money damages and, indeed, it is often difficult (if not impossible) to calculate the true extent of the loss. *See, e.g., Vogel v. American Soc. of Appraisers, 744 F.2d 598, 599 (7th Cir. 1984)* ("irreparable harm . . . means . . . plaintiff is unlikely to be made whole by an award of damages or other relief at the end of the trial"); *Cross Wood Products, Inc. v. Suter, 97 Ill. App. 3d 282, 286, 422 N.E.2d 953, 957, 52 Ill. Dec. 744 (1st Dist. 1981)* (holding that loss of competitive position was not readily subject to measurement by any certain pecuniary standard and this no legal remedy would be adequate to compensate for that loss); *Prentice Medical Corp. v. Todd, 145 Ill. App. 3d 692, 701, 495 N.E.2d 1044, 1051, 99 Ill. Dec. 309 (1st Dist. 1986)* (finding that irreparable injury denotes transgressions of a continuous nature resulting in a loss of competition position).

The disclosure of even a single trade secret is sufficient to cause irreparable harm. *Union Carbide Corp. v. UGI Corp., 731 F.2d 1186, 1191-92 (5th Cir. 1984)* ("It is not the number of trade secrets taken that

determines whether [*83] the threat of irreparable harm exists. The fact that a trade secret may be disclosed is enough.") (citation omitted). Moreover, just as it is impossible to unring a bell, once disclosed, trade secrets and confidential information lose their secrecy forever and, "since the confidentiality of this information can never be regained, the [threatened] injuries would indeed be irreparable." *Metropolitan Life Ins. Co. v. Usery, 426 F. Supp. 150, 172 (D.D.C. 1976); see also FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir. 1984)* ("A trade secret once lost is, of course, lost forever").

Here, PepsiCo faces the certain prospect of irreparable harm unless Redmond and Quaker are enjoined. Quaker's access to, and use of, PepsiCo's competitive information in Redmond's possession will result in injury to PepsiCo. That injury is irreparable because there is no way to measure what impact on PepsiCo's sales the defendant's misappropriation will have. It will be difficult, if not impossible, for PepsiCo to prove that it would have made certain sales of its products had the misappropriation not occurred; and its difficulty will be exacerbated by the fact that its All Sport, [*84] Lipton and Ocean Spray brands are products attempting to establish themselves against the market leaders in the isotonic, ready-to-drink tea and fruit drink market niches. PepsiCo also stands to lose its ability to develop market recognition and goodwill that result from an active presence in the marketplace. That loss, too, is irreparable, because PepsiCo cannot place a value on the market share that it is now trying to develop by using its trade secrets to establish a market presence. Because competitive position in an industry defies calculation, the court concludes that it would have no way of calculating a reasonably precise level of pecuniary damage to PepsiCo for its loss of potential competitive position sustained by the disclosure of its trade secrets and confidential information.

Consequently, the court concludes that where trade secrets and confidential information are at issue, as they are here, irreparable harm flows necessarily from the actual or threatened loss of the important protectible business interests at stake. Therefore, a preliminary injunction is the only remedy adequate to curtail the irreparable harm that would otherwise inevitably follow. *See, e.g., Taiwan* [*85] *Tainan, 730 F.2d at 63-64; Franke v. Wiltschek, 209 F.2d 493, 498 (2d Cir. 1953); Penetone Corp. v. Palchem, Inc., 627 F. Supp. 997,*

*1005-07 (N.D. Ohio 1985)*. As Judge Posner stated in *American Hosp. Supply*, a "district judge asked to decide whether to grant or deny a preliminary injunction must choose the course of action that will minimize the costs of being mistaken." *780 F.2d at 593*. Given the choice between either requiring defendants to compete fairly and legitimately by not using PepsiCo's information, even if that means denying Redmond particular head-to-head competitive employment for a period of a few months, or requiring PepsiCo to suffer the inestimable consequences of losing its secret business information to its principal competitor who is the dominant player in the field, the court concludes that the only course of action that would minimize the costs of being mistaken consists of granting PepsiCo's request for a preliminary injunction.

Under the standards for granting a preliminary injunction, "the degree of likelihood of prevailing on the merits that the plaintiff must demonstrate decreases the more heavily the balance of harms weighs in its favor." [*86] *E.g., Brunswick, 784 F.2d at 275*. Consequently, "if the harm to the plaintiff from denial of the preliminary injunction would be very great and the harm to the defendant from granting it very small, then the injunction should be granted even if the defendant has a better chance of prevailing on the merits than the plaintiff, provided the plaintiff's chances are better than negligible. . . ." *Omega Satellite Prods. v. Indianapolis, 694 F.2d 119, 123 (7th Cir. 1982); see also Brunswick, 784 F.2d at 275; IDS Financial Services, Inc. v. Smithson, 843 F. Supp. 415, 419 (N.D. Ill. 1994)* (Norgle, J.); *Samuel Bingham Co. v. Maron, 651 F. Supp. 102, 106 (N.D. Ill. 1986)* (Moran, J.). Moreover, a successful showing of a likelihood of success on the merits alone is strong evidence an injunction should issue. *Adams v. Attorney Registration & Disciplinary Com'n, 801 F.2d 968, 971 (7th Cir. 1986)*. Where the plaintiff is likely to win on the merits and is also likely to sustain greater injury if the injunction is denied than the defendants are likely to sustain if it is granted, "the case for the injunction is made," and no other possibilities need even be considered. *American* [*87] *Civil Liberties Union v. City of St. Charles, 794 F.2d 265, 269 (7th Cir.)* (citing *American Hosp. Supply, 780 F.2d at 598, cert. denied, 479 U.S. 961, 107 S. Ct. 458, 93 L. Ed. 2d 403 (1986))*. The court concludes that such is the case at bar: PepsiCo is likely to prevail on its trade secret and confidentiality agreement claims, and PepsiCo is likely to sustain greater injury if the injunction is not granted than defendants would if the injunction were granted because the potential harm to defendants is slight. A preliminary injunction should be entered in PepsiCo's favor.

## IV. GRANTING A PRELIMINARY INJUNCTION TO PEPSICO WILL NOT DISSERVE THE PUBLIC INTEREST.

Rather than disserving the public interest, the court concludes that granting PepsiCo a preliminary injunction will further the public interest in a number of ways. A variety of public interests and policies impact on any case involving trade secrets and confidentiality agreements. These interests include:

(a) The maintenance of standards of commercial ethics and the encouragement of invention are the broadly stated policies behind trade secret law. "The necessity of good faith and honest, fair dealing, [*88] is the very life and spirit of the commercial world. . . . even though a discovery may not be patentable, that does "not destroy the value of the discovery to one who makes its or advantage to the competitor who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price In labor, money, or machines expended by the discoverer. . . .Trade secret protection [is important] to the subsidization of research and development and to increased economic efficiency within large companies through the dispersion of responsibilities for creative developments." *Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 481-82, 40 L. Ed. 2d 315, 94 S. Ct. 1879 (1974)* (citations omitted).

(b) "Restrictions upon an employee's disclosure of information which was developed as a result of the employer's initiative and investment, and which was entrusted to the employee in confidence, are necessary to the maintenance of decent standards of morality in the business community. Unless protection is given against unauthorized disclosure of confidential business information by employees, employee-employer

relationships will be demoralized; employers [*89] will be compelled to limit communication among employees with a consequent loss in efficiency; and business espionage, deceit, and fraud among employers will be encouraged. *Winston Research Corp. v. Minnesota Mining and Mfg. Co., 350 F.2d 134, 138 (9th Cir. 1965).*

Illinois courts have found it imperative "to recognize a protectible business interest where a trade secret exists and . . . a breach of confidentiality by an employee has occurred in the course of his employment." *Burt Dickens, 144 Ill. App. 3d at 879, 494 N.E.2d at 819 (1st Dist. 1986).* Moreover, "the court should protect the employer's investment of time, money and manpower in developing secret advantages from misappropriation by former employees who occupied a position of trust." *Televation, 169 Ill. App. 3d at 12, 522 N.E.2d at 1362; see also Service Ctrs., 180 Ill. App. 3d at 452, 535 N.E.2d at 1135.*

The integrity of these and other important policies is at stake in the present litigation. If a preliminary injunction is not granted in favor of PepsiCo, the public interests in fair competition, business innovation and economic efficiency will suffer. The court concludes that granting PepsiCo [*90] a preliminary injunction will serve to further these vital public interests.

Alternatively, the court would find that plaintiff would be entitled to a preliminary injunction even if the court were to find that defendant Redmond's position with defendant Quaker would not result in the inevitable use of plaitiff's secrets. For plaintiff's secrets to be secure with defendant Redmond in his new position with defendant Quaker would require the utmost sensitivity and good faith on defendant Redmond's part in treating with plaintiff's secrets. A violation by defendant Redmond's using plaintiff's secrets in making decisions for defendant Quaker could be extremely difficult to detect. Defendant Redmond's lack of forthrightness on some occasions, and out and out lies on others, in the period between the time he accepted the position with defendant Quaker and when he informed plaintiff that he had accepted that position leads the court to conclude that defendant Redmond could not be trusted to act with the necessary sensitivity and good faith under circumstances in which the only practical verification that he was not

using plaintiff's secrets would be defendant Redmond's word to that effect. [*91] This constitutes a threatened use of plaintiff's secrets, and would be sufficient of itself to warrant the preliminary injunction being entered.

ORDERED: The motion of defendants, William E. Redmond, Jr., and the Quaker Oats Company, to supplement the record is granted.

The request of plaintiff, PepsiCo, Inc., for a preliminary injunction is granted on the following terms:

IT THEREFORE IS ORDERED, ADJUDGED AND DECREED that a preliminary injunction is hereby issued in favor of plaintiff PepsiCo and against defendants Redmond and Quaker, enjoining:

1. Defendant Redmond and any of his agents, servants, employees, attorneys, and all others in active concert or participation with him from using or disclosing any trade secrets or confidential information of PepsiCo acquired by Redmond in the course of, or arising out of his employment by PepsiCo, including, without limitation, information relating to PepsiCo's strategic and annual operating plans, PepsiCo's pricing of beverage products, PepsiCo's selling and delivery system (including its Customer Representative compensation formula), and any information relating to PepsiCo's customer proposals to national accounts;

2. Defendant Quaker [*92] and its officers, directors, agents, servants, employees, attorneys, and all others in active concert or participation with it, from seeking or acquiring any trade secrets or confidential information of PepsiCo acquired by Redmond in the course of or arising out of his employment by PepsiCo, including, without limitation, information relating to PepsiCo's strategic and annual operating plans, PepsiCo's pricing of beverage products, PepsiCo's selling and delivery system (including its Customer Representative compensation formula), and any information relating to PepsiCo's customer proposals to national accounts;

3. Redmond from assuming or performing any duties for Quaker relating in any way to the pricing of beverages through the end of May 1995;

4. Quaker from permitting Redmond to assume or perform any of the duties described in paragraph 3;

5. Redmond from assuming or performing any duties

for Quaker relating to the development or implementation of any marketing or sales programs for the sale of beverages through May, 1995;

6. Quaker from permitting Redmond to assume or perform any of the duties described in paragraph 5;

7. Redmond from assuming or performing any duties for [*93] Quaker relating to the system for delivering or distributing beverages through May, 1995; and

8. Quaker from permitting Redmond to assume or perform any of the duties described in paragraph 7.

DATED: JANUARY 26, 1995

NUNC PRO TUNC: DECEMBER 15, 1994

GEORGE W. LINDBERG

United States District Judge

# EXHIBIT L

DEC 1 2 1980

# COURT OF CHANCERY
## OF THE
## STATE OF DELAWARE

MAURICE A. HARTNETT, III
*VICE-CHANCELLOR*

December 8, 1980

COURT HOUSE
DOVER, DELAWARE
GEORGETOWN, DELAWARE
WILMINGTON, DELAWARE

F. Michael Parkowski, Esquire
John W. Noble, Esquire
PARKOWSKI, NOBLE & GUERKE
116 West Water Street
Dover, DE  19901

William H. Vaughn, Esquire
VAUGHN & VAUGHN
P. O. Box 454
Dover, DE  19901

RE:  The Perolin Company, Inc. v. Mark A. West et al
     Civil Action #670 (1980) - Kent County
     Date Submitted: October 28, 1980
     ON PLAINTIFF'S MOTION TO COMPEL DEFENDANTS TO RESPOND TO DIS-
          COVERY:  GRANTED IN PART AND DENIED IN PART.

Gentlemen:

This is my decision on plaintiff's Motion To Compel the defend-
ants to respond to plaintiff's Request For Production Of Documents
and to compel Mark A. West to answer certain questions propounded
during deposition, and on defendants' subsequent Motion For a Pro-
tective Order.  The Motion is granted in part and denied in part.

The complaint alleges that defendants have violated a covenant
not to compete in a contract executed by defendant Mark A. West,
have misappropriated trade secrets and trademarks, are guilty of a
breach of employment duties and fiduciary responsibilities and seeks
other relief.

On August 29, 1978, defendant Mark A. West——a former employee
of plaintiff——executed an agreement whereby he agreed not to engage

Messrs. Parkowski, Noble and Vaughn
RE:  The Perolin Co., Inc. v. West et al
Page 2

in competition with plaintiff for a period of one year following
when he ceased to be employed by plaintiff.  He ceased to be em-
ployed by plaintiff on January 14, 1980.  However, on June 15,
1979, Mr. West and a representative of plaintiff executed an
Agreement which states that the Agreement "will be voided when
and if Perolin decides to hire a new man to cover Mark West's
accounts."  A new man was hired early in 1980 after Mark A. West
left plaintiff's employment.

At a hearing on plaintiff's Application for a Preliminary
Injunction, plaintiff contended that the word "voided" as used in
the June 15, 1979, Agreement was ambiguous and did not mean what
it said.  The plaintiff, however, failed to convince the Court of
its contention and, therefore, although the Court did enjoin defend-
ant from using any customer lists of plaintiff which he obtained
while in plaintiff's employ and from selling any product containing
product identification numbers the same as, or similar to, product
identification numbers contained on the products of plaintiff, the
Court refused to enjoin defendant from competing with plaintiff.

Plaintiff claims that defendants have refused to produce the
following items in response to a proper discovery request:

ITEM NO. 1.  Correspondence sent by defendants after
January 14, 1980, to present or former customers of
plaintiff who had been served by Mark A. West while
in the employ of plaintiff.

ITEM NO. 2.  Applications for USDA product authorizations.

ITEM NO. 3.  Invoices and purchase orders for defendant,

Messrs. Parkowski, Noble and Vaughn
RE:  The Perolin Co., Inc. v. West et al
Page 3

Condor Chemical Co., items bearing the same product
identification numbers as plaintiff's comparable
products.

and that Mark A. West has refused to answer the following questions
during depositions:

QUESTION NO. 1.  Defendant, Mark A. West was aked if
defendant Condor Chemical Co. was selling certain
products to former customers of plaintiff to whom
West had sold similar products while in the employ
of plaintiff.

QUESTION NO. 2.  Defendant, Mark A. West, was asked to
identify the compounders of products marketed by defend-
ant, Condor Chemical Co.

Plaintiff contends that the information requested is intended
to show that Mark A. West unfairly criticized plaintiff's products,
used formulas and trade secrets acquired from plaintiff and benefitted
monetarily from designating products similarly to plaintiff's products
and thereby confusing consumers, and that this information is properly
discoverable.

Defendants argue that Mark A. West was free to compete with
plaintiff after January 14, 1980, and have refused to supply any data,
of any nature, that has come into existence after that date. Whether
Mark A. West was free to compete with plaintiff after January 14, 1980,
is a question to be decided at trial and cannot be the reason to fail
to comply with discovery requests.  Defendants also refuse to name
their compounders, customers, suppliers or manufacturers alleging that
plaintiff's argument is an "abuse of discovery in that it is a fishing
expedition" which would "necessitate unjustifiable revelation of busi-

Messrs. Parkowski, Noble and Vaughn
RE:  The Perolin Co., Inc. v. West et al
Page 4

ness records to a competitor" that could cause irreparable harm.

They request the issuance of a protective order pursuant to Chancery

Court Rule 26(c)(7).

The scope of permissible discovery is set forth in Chancery

Court Rule 26(b)(1) as:

> ..."Parties may obtain discovery regarding any matter,
> not privileged, which is relevant to the subject matter
> involved in the pending action ..."

Discovery should be allowed unless to do so would impede the

administration of justice.  Fish Eng'r. Corp. v. Hutchison, Del.

Supr., 162 A.2d 722 (1960).  It is, however, subject to the exercise

of the Court of Chancery's sound discretion.  Dann v. Chrysler Corp.,

Del. Ch., 166 A.2d 431 (1960).  Where the information sought by dis-

covery, inspection or pretrial examination is relevant to the issues

involved, such relief will not be denied merely because trade secrets

of the objecting party will be disclosed.  No absolute privilege pro-

tects trade secrets from disclosure through discovery if the informa-

tion sought is relevant and clearly needed for determination of the

controversy.  Struthers Scientific & Int'l Corp. v. General Foods

Corp., D.C. Del., 51 F.R.D. 149 (1970); Bleacher v. Bristol-Myers

Co., Del. Super., 163 A.2d 526 (1960).  However, before revelation

of trade secrets may be enforced the party seeking the disclosure

must establish a prima facie case raising issues to which the infor-

mation is material and relevant.  Bleacher v. Bristol-Myers Co.,

supra.

Messrs. Parkowski, Noble and Vaughn
RE:  The Perolin Co., Inc. v. West et al
Page 5

Based on their allegation that they were free to compete in
the marketplace with plaintiff after January 14, 1980, defendants
request a trial limited solely to the issue of whether or not
there was a violation of a covenant not to compete, claiming that
this discovery essentially goes to the issue of damages which
would not have to be dealt with given a favorable decision for
defendants on the breach of covenant issue.  This view is incor-
rect.  Although it is true that the breach of covenant issue was
raised in the complaint and must ultimately be determined, regard-
less of the outcome there are separate issues raised by plaintiff
(i.e., misappropriation of trade secrets and trademarks, breach of
fiduciary responsibilities) that are not dependent on a favorable
finding for plaintiff on the breach of covenant issue.  These actions
are not dependent on the contract but may exist in the absence of a
restrictive covenant in an employment contract.  The general rule,
affirmed in many cases dealing with the rights and duties of a former
employee who solicits his former employer's customers or otherwise
uses his knowledge of customer lists obtained in his former employ-
ment, is that even in the absence of a contractual restriction a
former employee is precluded from using for his own advantage, and
to the detriment of his former employer, confidential information
or trade secrets acquired by or imparted to him in the course of
his employment.  Dozor Agency, Inc. v. Rosenberg, Pa. Supr., 218 A.2d
583 (1966); Midland-Ross Corp. v. Yokana, 185 F.Supp. 594, Aff'd, 293

Messrs. Parkowski, Noble and Vaughn
RE:  The Perolin Co., Inc. v. West et al
Page 6


F.2d 411 (CA3 N.J. 1960).  Defendants' suggestion is therefore
without merit.

Moreover, there is no doubt that the information concerning
defendants' contracts with present and former customers of plain-
tiff, in the form of correspondence, invoices, purchase orders,
etc., is necessary in order to permit plaintiff to prove its case.
Plaintiff is entitled to have its day in court and to have the
benefit of discovery in preparation therefor.  Thus plaintiff's
motion to compel discovery is granted with regards to ITEM NOS.
1 and 3 and QUESTION NO. 1.  So ordered.

Plaintiff's request for defendants' applications for USDA
product authorization (ITEM NO. 2) is based on plaintiff's express
desire to determine if defendants used formulas or other trade
secrets acquired from plaintiff.  Defendant, however, states that
copies of these applications have been provided, with only the
supplier's name blocked out.  Given the stated reason for discovery
of these documents, I find that the supplier's name is not essential
and, therefore, that defendant has effectively furnished the infor-
mation requested in ITEM NO. 2.  Plaintiff's Motion as to ITEM NO. 2
is therefore denied.  So ordered.

Moving finally to QUESTION NO. 2, plaintiff requests that Mark
A. West identify the compounders of products marketed by defendants
in order for plaintiff to determine whether the defendants have con-
verted plaintiff's trade secrets to their own use.  However, as I

Messrs. Parkowski, Noble and Vaughn
RE:  The Perolin Co., Inc. v. West et al
Page 7

have previously noted, I fail to see the necessity of identifying

the compounders when it is the formula that is the essential in-

formation sought.  In addition defendants have identified the

person who formulated the competing products, said person being

Harry S. Weaver.  Therefore, plaintiff's Motion To Compel Mark

A. West to identify the compounders of defendants' products, as

applied to QUESTION NO. 2 above, must be denied.  So ordered.

                    Yours truly,

MAH:jds

CC:    Register in Chancery
       The Honorable William Marvel
       The Honorable Grover C. Brown
       File

# EXHIBIT M

LEXSEE 1984 DEL. CH. LEXIS 566

**PFIZER INC., a corporation of the State of Delaware, Plaintiff, v. ICI AMERICAS INC., a corporation of the State of Delaware, and DR. CHARLES LAUDADIO, an individual,**

Civil Action No. 7785

Court of Chancery of Delaware, New Castle

*1984 Del. Ch. LEXIS 566*

October 19, 1984, Submitted
November 21, 1984, Decided

**COUNSEL:** [*1] Paul E. Crawford, Esquire, and Henry E. Gallagher, Jr., Esquire, of Connolly, Bove, Lodge & Hutz, Wilmington, for Plaintiff

Andrew B. Kirkpatrick, Jr., Esquire, Richard D. Allen, Esquire, Donald F. Parsons, Jr., Esquire, and Thomas C. Grimm, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, for Defendant ICI Americas Inc.

**OPINION BY:** BROWN

**OPINION**

BROWN, Chancellor

UNREPORTED OPINION

This is the decision on plaintiff's motion for a preliminary injunction in an action brought to enjoin the alleged improper use or disclosure of that which plaintiff contends to be its trade secrets and proprietary information.

Plaintiff, Pfizer, Inc. ("Pfizer"), a Delaware corporation, has brought this action against ICI Americas, Inc. ("ICI"), also a Delaware corporation, and Dr. Charles Laudadio, a former employee of Pfizer who has now agreed to accept employment by ICI. Pfizer sought initially, and the Court granted, a restraining order which, in its effect, has temporarily prohibited ICI from using Laudadio's services in connection with a research program similar to that in which he had participated at Pfizer prior to his voluntary termination of his employment with that company. The parties [*2] have

since taken depositions and have engaged in some initial discovery. They have also supported their positions with detailed affidavits. Thus, the present application is before the Court on a more expanded record than was presented at the restraining order hearing.

The question for decision at this preliminary injunction stage is whether Pfizer has demonstrated, first, a likelihood that upon a final hearing it will be able to prove that confidential business information of Pfizer which is known to Dr. Laudadio as a direct result of his employment with Pfizer constitutes trade secrets of Pfizer and, second, that Pfizer will suffer immediate irreparable injury if Laudadio is permitted to use his knowledge of that information on behalf of ICI, a competitor of Pfizer, pending a final hearing. This, of course, is but an application to the facts of this case of the settled preliminary injunction standard, namely, that the Court will not exercise its discretion to grant preliminary injunctive relief unless it is satisfied that the moving party has shown a likelihood of success on the merits of its claim and that it will suffer immediate irreparable harm in the event that the motion [*3] is denied. *Gimbel v. Signal Companies, Inc., Del. Ch., 316 A.2d 599, aff'd, Del.Supr., 316 A.2d 619 (1984).* Moreover, even if Pfizer meets this burden, the Court must also consider the comparative hardships to ICI and Laudadio in the event that the injunction is entered as well as, in this case, whether the public interest would be served by the granting of such relief.

As is often true in trade secrets cases, the issue is difficult to define with any degree of precision for the simple reason that the so-called trade secrets are not disclosed with specificity in the course of the litigation.

Carefully worded generalities often provide the prevailing criteria in such cases. This is particularly true in this case since it deals with method rather than with a process or formula. Some brief recitation of the background is necessary to a meaningful understanding of the decision to be reached, although I make no effort at this stage to set forth the controversy in full detail.

Pfizer is a pharmaceutical company with research facilities located in Groton, Connecticut. ICI, through its Stuart Pharmaceutical Division, is also engaged in pharmaceutical development and sales, [*4] and within the industry it is a competitor of Pfizer. Both companies engage in the research and development of new drugs. Presumably, the ultimate goal for any new drug is at least twofold.First it should have curative capabilities without harmful side effects to the users. Secondly, it should be reasonably marketable so as to enable the company to recoup its development costs and realize a profit on its continued sale and usage. Thus, viewed from the standpoint of the pharmaceutical company, the bottom line as to a new drug project is measured in money. Such is the root of the controversy here.

· In 1977 Pfizer embarked on a program designed to develop a drug to combat the degenerative effects of diabetes. Diabetes is a disease which is said to have no known cause and no known cure. It is said to afflict about 5 million persons in the United States alone. Diabetics suffer from a variety of long-term secondary effects from the disease, involving principally loss of nerve function, kidney disease and eye disease. It is estimated that as many as 90% of all diabetics will eventually suffer a loss of nerve function, and that a significant percentage of such cases will involve [*5] a painful nerve condition of the feet and legs which makes walking difficult. As many as 50% of all diabetics suffer from kidney disease, which is a common cause of death in diabetics. And it is estimated that eye disease attributable to diabetes is responsible for 15% of all blindness. Cardiovascular disease is also above average in diabetics.

Studies have indicated that the impairment of the function of the nerves, kidneys and eyes in diabetics is related to a build up in human tissues of a substance known as sorbitol. Sorbitol is formed from glucose, an excess of which is the hallmark of diabetes. Glucose is chemically converted in the body to sorbitol by the action of a human enzyme known as aldose reductase. It is

theorized that increased levels of sorbitol in the body cause tissues to swell, thereby impairing their function. Accordingly, research has been directed to the development of substances which would inhibit the action of the aldose reductase enzyme. These substances are referred to generically as aldose reductase inhibitors.

One such inhibitor is a drug now under investigation by Pfizer known as sorbinil. As indicated, Pfizer began its clinical study of [*6] this drug in 1977. The object of this study is to determine the effectiveness and safety of sorbinil in reducing the production of aldose reductase as well as the impact of such reduction upon the diabetic patient. No new drug such as sorbinil can be marketed in this country until it has received the approval of the federal Food and Drug Administration, and such approval requires extensive and well-controlled clinical studies so as to satisfy the federal administrative agency of its safety and efficacy. This is a costly and time-consuming procedure, it having been estimated in 1980 that the average time and cost required for the research, clinical testing and approval of a new drug being introduced into the United States market was 10 years and $70 million, respectively. With a completely new class of drugs such as aldose reductase inhibitors, the time and cost elements can be expected to be substantially higher. At the same time the potential market for such a new drug, should it be approved -- and particularly the market for the first such drug -- can run into as much as a billion dollars annually.

It is the method and mechanics for the required clinical testing of such a [*7] new drug which lies at the heart of the present dispute. While a direct measurement of the reduction of aldose reductase in animals can be made by dissection and analysis of the animal tissue, such an approach is obviously not feasible with humans, and government approval of sorbinil cannot be obtained without proof as to the effect and safety of the drug as measured by the human standard. Therefore, indirect measurement of the effect of sorbinil on humans is the only means of determining the effectiveness of the drug. Such indirect measurements of aldose reductase inhibition must therefore be done by analyzing subjective symptoms such as nerve pain and nerve velocity. It is the know-how involved in the identification, execution and analysis of such measurement on humans that Pfizer claims to be its trade secrets and which it seeks to protect through this litigation. This contention comes about as follows.

1984 Del. Ch. LEXIS 566, *7

A clinical study of new drugs, of necessity, is conducted at various teaching hospitals, through private physicians, or in public clinics or other health facilities which have access to patients who are willing to cooperate in the testing of new drugs. The testing is done through [*8] physicians who are willing to cooperate with the drug companies in monitoring and reporting the results of the clinical testing. The physicians agreeing to perform such tests are referred to as "investigators."

Pfizer's approach to the clinical testing of sorbinil has followed this generally accepted pattern. It has recruited investigators and, under a requirement of confidentiality, it has furnished them with an investigator's manual explaining the area of inquiry as well as with a detailed, written protocol to be followed by the investigators in administering the drug to the patients. The investigators are required to measure and record patient reaction and to report such information back to Pfizer. Each investigator works with 10 to 20 patients, and overall there are more than 200 patients involved in Pfizer's current study. Other patients, and possibly some investigators, have been eliminated from the program over the years.

Testing of the drug is done on a "blind" basis. That is, the investigators are furnished medication by Pfizer and are directed to administer it to the patients on a prescribed schedule. The medication comes in two identical forms, one of which is [*9] the drug and the other of which is a placebo. Neither the patient nor the investigator knows when the placebo is being administered, and thus there is no way that the investigators can make an accurate subjective evaluation of the effect of the drug on their own. Moreover, a code is employed which is known by Pfizer but not by the investigator. Thus, it is only when the coded information is received by Pfizer from the various investigators that the results of the "blind" administration of the drug can be deciphered by Pfizer and the ongoing progress of the overall clinical study evaluated.

The defendant Laudadio was employed by Pfizer in 1981. He worked as a key figure for Pfizer in its aldose reductase inhibitor study until late September 1984, at which time he advised Pfizer that he was resigning in favor of a new research position being offered to him by ICI. At ICI he is being asked to head up a clinical study for a new aldose reductase inhibitor drug now under development by ICI. Apparently, the drug being

developed by ICI is of a different chemical compound than the drug being developed by Pfizer. Nonetheless, its goal is the same, namely, to reduce the effect of the [*10] aldose reductase enzyme in diabetics. As a competitor of Pfizer, ICI would naturally like to obtain government approval for its drug as fast as possible and thereby get into the potentially lucrative market area with all due speed. Since ICI is just starting on the clinical study of its drug, anything that would serve to cut down the seven-year lead time that Pfizer has over it in the clinical testing of its drug could translate into an element of great value to ICI. Also, as ICI readily concedes, knowledge of the most efficient and expeditious means for testing its new drug could result in the savings of many millions of dollars to ICI.

It is not disputed that the only experience Dr. Laudadio has with aldose reductase inhibitors is that which he has gleaned through his employment with Pfizer. While he had apparently engaged in some drug research with his only other previous employer, that research was in other areas. Thus, as Pfizer contends, whatever knowledge Laudadio has as to the best means to test the effects of an aldose reductase inhibitor has been gained at Pfizer's expense, and overall Pfizer claims to have expended some $20 million in its clinical study of sorbinil [*11] over the past seven years.

Finally, as might be expected, Dr. Laudadio executed an agreement with Pfizer upon the commencement of his employment with that company in which he acknowledged that he would acquire knowledge of "certain secret or confidential information not previously known to him, and not known or used generally" during his employment with Pfizer and in which he agreed that he would not, while in Pfizer's employ or thereafter, "disclose or use such information" without Pfizer's written permission.

Having thus given the general background of the matter, it is significant to note what the case is not about. Pfizer is not contending, as I understand it, that Laudadio is about to disclose to ICI his knowledge of the makeup of sorbinil, its side effects, its effectiveness, etc. ICI is not seeking this information from Laudadio and he is apparently well aware that such information, i.e., the results of the clinical testing of sorbinil to date, does fall within the category of trade secrets belonging to Pfizer and that he has a contractual obligation not to disclose it to Pfizer or anyone else. What the case is about is

1984 Del. Ch. LEXIS 566, *11

Laudadio's knowledge of the best ways to conduct [*12] the clinical testing of an aldose reductase inhibitor. Pfizer contends that this know-how also constitutes trade secrets belonging to it. ICI and Laudadio disagree.

Pfizer contends that its knowledge of how to test for the effectiveness and safety of an aldose reductase inhibitor (no established and approved testing procedure for such a drug having heretofore existed) is derived from a compilation of data gleaned by its research personnel as a result of seven years of clinical testing. This, it says, is a compilation of information developed through trial and error over a period of seven years and at a cost of some $20 million as to the most efficient means of testing such a new drug, i.e., the types of patients to use, the dosage sequence, the means for measuring individual reaction, etc., as well as the things to be avoided as not being beneficial to the testing program.

Pfizer says that it has purposely kept this compilation of information confidential and secret. Since in Pfizer's view it is therefore information which is not generally known to and is not readily ascertainable by proper means by others, it is information from which Pfizer contends it derives independent [*13] economic value and that accordingly it falls within the statutory definition of a trade secret as found at 6 Del.C. § 2001(4).

Pfizer says that the same holds true for its knowledge of which physicians and medical personnel are the most effective investigators. It points out that not all doctors, including those in research fields, are good investigators. Some do not maintain proper records or follow up with patients as they should. Consequently, the information sent to Pfizer by such investigators is virtually worthless to its clinical study efforts. Pfizer says that through its seven-year trial and error effort it has ascertained who are the best investigators for an aldose reductase inhibitor and which investigators' results should be ignored. It says that the compilation of information that is has accumulated which provides the basis for this determination also fits within the statutory definition of a trade secret and thus is entitled to protection.

Pfizer says, and it is not denied, that Dr. Laudadio has this knowledge of the identity of the most efficient investigators, and of the most efficient means of measuring patient reaction, and of the dead ends not to pursue, [*14] etc., and that regardless of how honorable his intentions may be (and it seems to concede that Laudaio is an honorable professional) it will be impossible for him to properly fulfill his obligation to ICI in assisting in the administration of its testing program without calling upon this body of proprietary knowledge and information developed by Pfizer at considerable expense and effort. Pfizer argues that the inevitability that Laudadio will use or disclose this knowledge on behalf of ICI regardless of any good intentions he may have brings the situation squarely within the holding of the leading case of E.I. duPont de Nemours & Co. v. American Potash & Chemical Corp., Del.Ch., 200 A.2d 428 (1964), a case in which injunctive relief was upheld on behalf of a former employer against its former employee under strikingly similar circumstances.

For its part, ICI does not dispute that it wants Laudadio's services for the express purpose of having him lend his experience to its aldose reductase inhibitor research study, nor does it deny that it hopes to save considerable time and money in getting its drug into the market by hiring him. It argues strenuously, however, that Laudadio's [*15] knowledge as to the most efficient and effective means for testing such a new drug cannot rise to the level of trade secrets owned by Pfizer. ICI contends that this is so because the methods and devices for evaluating an aldose reductase inhibitor are generally known within the medical research community, as are the the identities of the investigators working on behalf of Pfizer.

ICI points out that one category of trade secrets claimed by Pfizer in its complaint included "[t]he physical devices and measuring techniques used by Pfizer to quantitatively assess the medical effectiveness" of aldose reductase inhibitors, but that Pfizer has not pressed this aspect of its claim at this preliminary injunction stage. The obvious reason, says ICI, is that the equipment and measuring devices being used by Pfizer are readily available in the market place and in fact are being used by others in similar research studies even though they are of relatively recent origin. Thus, ICI suggests that Pfizer has been forced to abandon its claim that Laudadio's knowledge of the measuring devices used by Pfizer constitutes a trade secret belonging to Pfizer for the simple reason that knowledge of [*16] these measuring devices is in the public domain. This, argues ICI, is illustrative of the weakness of Pfizer's entire case.

In opposition to Pfizer's motion for a preliminary injunction, ICI has offered the affidavits of three independent research doctors, and the deposition of a

1984 Del. Ch. LEXIS 566, *16

fourth, all of whom have been participating in Pfizer's clinical study of sorbinil on a consulting basis, and, as to at least two of them, as investigators as well. All four of these doctors have been working in the area of painful or diabetic neuropathy, i.e., the study of complications deriving from the impairment of the function of the nerves. All four have been participating in studies being made by others as well as the study being conducted by Pfizer. All four indicate that they are fully familiar with the techniques and equipment used in such studies to measure sensory reaction, and that such information is generally known to persons working in the field of clinical research on aldose reductase inhibitors. Moreover, they state that such information is readily ascertainable by legitimate means from sources independent of Pfizer.

Two of these doctors state that they have worked personally with [*17] Dr. Laudadio in connection with Pfizer's study and that they believe that as to many aspects of the clinical testing of an aldose reductase inhibitor their knowledge is as great, if not greater, than his. All four of these doctors assisted in designing the protocols for Pfizer's study, two adivsed Pfizer on the available physicians who were best suited as investigators for its study, and one assisted Pfizer in selecting the physical devises and measuring techniques to be used in the study. Of the four, the doctor who appears to have had the closest connection with Pfizer's study has never been required to execute a confidentiality agreement with Pfizer, and Pfizer agrees that all four are free to work with other, including competitors of Pfizer, on similar studies of aldose reductase inhibitors. ICI argues that all of these factors serve to indicate that Pfizer will be unable to prove upon a final hearing that the clinical testing methods used by it constitute proprietary and trade secret information.

Moreover, ICI argues and asserts through its affidavits that it would be contrary to the public interest as well as to the interests of Pfizer itself to clamp a proprietary lid of [*18] secrecy on information which would tend to promote that most efficient means of such clinical testing. The ultimate purpose of clinical testing is to secure approval by the Food and Drug Administration of a new drug. ICI points out that to achieve such approval it is essential that the tests performed and the equipment and measuring techniques used be recognized as valid by both the medical community and the federal administrative agency. Thus, the more widespread the

use of such techniques, the more likely that they will be accepted as proof of the safety and effectiveness of such new drugs and the quicker the drugs can be made available in the market place to those diabetic patients who need them.

In addition, there is the human factor. ICI points out that the clinical testing here is performed on real people who have real diabetic problems. If during the past seven years Pfizer has subjected patients to testing programs which have proven to be ineffective, then why, asks ICI, should Pfizer be entitled claim knowledge of these ineffective programs as its trade secret and thereby force ICI and other pharmaceutical companies to possibly put other diabetic patients through the [*19] same ineffective tests for no good reason. Moreover, ICI says that to the extent Laudadio's knowledge may save it time and money by preventing it from going down wrong testing trails, it will cause no real harm to Pfizer. Everyone knows, says ICI, that Pfizer is very near to obtaining approval for sorbinil from the Food and Drug Administration. By contrast, ICI is only in the early stages of testing an inhibitor of an entirely different chemical compound, and very likely it is years away from obtaining approval for its drug even if it is permitted to avail itself of Laudadio's clinical testing experience and knowledge.Under these circumstances ICI argues that it is not in the public interest to enjoin it from using Laudadio's services.

Pfizer's position in response to this is that it has used all reasonable in-house effort under the circumstances to keep its information secret, and that regardless of what others might be able to piece together from the knowledge and know-how available within the medical community so as to ultimately duplicate Pfizer's present clinical testing approach, the fact is that Laudadio has this knowledge now. As Pfizer terms it, while others may have [*20] knowledge of bits and pieces, Laudadio knows the "big picture" as developed by Pfizer.

That Laudadio has knowledge of something valuable, Pfizer says, is illustrated by Laudadio's letter to ICI's representatives during the course of efforts by ICI to obtain Laudadio's services in which Laudadio indicated that he was confident that he could save ICI "years of development and millions of dollars" in its aldose reductase inhibitor program and by the fact ICI has offered him a 30% increase in salary over that formerly paid him by Pfizer, thus bringing his salary to some $90,000 per year plus additional benefits. Laudadio's

value to ICI, says Pfizer, derives solely from that which ICI wants now and cannot obtain otherwise, namely, the clinical testing approach to aldose reductase inhibitors that has been developed by Pfizer. This clearly indicates, says Pfizer, that what ICI wants is that which comprises the trade secrets of Pfizer.

The foregoing constitutes a summary of the primary arguments put forth by the parties. It is sufficient to illustrate, I think, that the issue thus presented is a close one, this again being attributable in large part to the fact that the nature of the [*21] action requires the Court to deal in generalities, at least as I perceive the situation. Nonetheless, on the present record I reach the conclusion that Pfizer's motion for a preliminary injunction should be denied.

The law is settled in this State that where an employee has expressly agreed as one of the terms of his contract of employment that he will not disclose to his employer's detriment any trade secrets or confidential information which he has acquired in the course of his employment, the employer is entitled to an injunction against a threatened use or disclosure of such confidential information by its former employee for his own benefit or for the benefit of a third person. *E.I. duPont de Nemours & Co. v. American Pat. & Ch. Corp., supra.* It has also been held that information falling within the classification of "know-how" can be protected by injunction where it is of sufficient novelty and where it has been maintained in secrecy to such an extent as to give rise to a claim of property right. *Gronemeyer v. Hunter Mfg. Corp., Del.Ch., 106 A.2d 519 (1954).* The key to these settled principles, however, is that the information, in order to be protected from disclosure [*22] by injunction, must be such that it derives independent economic value, actual or potential, from not being generally known to others, and from not being readily ascertainable through proper means by others. See the statutory codification of this concept at *6 Del.C. § 2001(4)*. It is here that I think Pfizer's case has a flaw, at least when measured against the standard prevailing at the preliminary injunction stage.

The status of the record here is such that when the general nature of the alleged trade secrets sought to be protected by Pfizer are weighed against the sworn statements of what appears to be four qualified and experienced research physicians, all of whom have worked with Pfizer's study to some degree as well as with

other clinical studies and all of whom state that what Pfizer is claiming as its trade secrets is nothing more than the application of measuring and testing techniques known generally in the medical profession, or which are readily ascertainable through published or available medical information, then it is difficult to conclude that Pfizer has convincingly demonstrated that upon a final hearing it will be able to prove that its current clinical testing [*23] methods are so novel, secret and proprietary to it as to qualify for trade secret classification. Since Laudadio's contract with Pfizer prohibited him only from disclosing information learned by him while in Pfizer's employ which was confidential and secret to Pfizer and which was not "known or used generally," it would seem that to the extent that Pfizer is seeking injunctive relief based upon the employment contract its case is no stronger.

In addition, I am further satisfied on the present record that a balancing between the parties of the hardships that would flow from either a grant or denial of preliminary injunctive relief, particularly when weighed in light of the obvious public interest involved, further points to a denial of Pfizer's application as being the proper result.

As noted at the outset, the root of this controversy is money. Boiled down, Pfizer is contending that it will suffer irreparable injury if the injunction is not granted because in that event ICI, with Laudadio's help, is likely to get federal approval for its version of an inhibitor several years earlier than it would otherwise, and thus cut down on the time during which Pfizer is likely to have an [*24] inhibitor on the market without competition from ICI. If this occurs, it will serve several years from now to reduce the economic advantage which Pfizer feels that it now has over any competing effort from ICI. Thus, the irreparable injury element translates into a loss of future profits.

On the other hand, if the injunction is granted, ICI will be compelled to develop its own clinical testing protocol through persons not having Laudadio's experience, and one possible result will be that ICI will be forced to needlessly expend millions of dollars and perhaps waste considerable amounts of research time and patient involvement in the clinical testing of its prospective inhibitor.

This latter result would seem to guarantee a substantial loss of time and money to ICI in the event that

it should turn out at final hearing that Pfizer is unable to establish that its information qualifies for trade secret protection. Conversely, Pfizer always has a remedy in damages available to it in the event that the preliminary injunction is denied now, but it is able to prove at final hearing that the testing procedures it is attempting to protect truly are trade secrets. See, *6 Del.C. § [*25] 2003.* In the meantime, it is nothing out of pocket immediately and it appears on the present record that its aldose reductase inhibitor is likely to be on the market far ahead of ICI's product anyway.

I think it significant too that we are not dealing here with a competitive rush to develop a new luxury or creature comfort item, or to make a better widget. The competition here is to develop and market a totally new drug intended to ease human pain and suffering; to provide a possible aid to diabetics where none has existed before. Certainly, if Dr. Laudadio's intention was to simply walk across the street, so to speak, and give Pfizer's formula to ICI, plus all that goes with it so as to put ICI instantly on a par with Pfizer, it would be a different story. In such a case an injunction would be appropriate and the granting of it would in no way inhibit research for a needed medical remedy.

But here the search is ongoing, and to grant the preliminary injunctive relief sought by Pfizer in order to protect its anticipated future economic interests would serve to impair the medical research now being sponsored by ICI as to a different form of inhibitor and thus deprive the public, [*26] to a degree, of ICI's best effort to develop a needed medical remedy. I feel that under such circumstances the equities of the situation require Pfizer to make a particularly clear showing that it will be able to prove at a final hearing that what it seeks to protect through a restraint on Laudadio's services is trade secret or proprietary information, and on the status of the present record I find that it has not done so.

In summary, I must confess that I have found this a difficult decision to make. Certainly, there is much to be said for Pfizer's position. On balance, however, I conclude that the motion for the preliminary injunction should be denied and that the restraining order previously entered must be dissolved. Counsel for ICI may submit an appropriate form of order to this effect.

# EXHIBIT N

LEXSEE 2003 DEL. SUPER. LEXIS 388

**Reese v. Wheeler, et al.**

**C.A. No. 99C-04-002 -RFS**

**SUPERIOR COURT OF DELAWARE, KENT**

*2003 Del. Super. LEXIS 388*

**September 2, 2003, Submitted
November 4, 2003, Decided**

**SUBSEQUENT HISTORY:** Summary judgment proceeding at *Reese v. Wheeler, 2004 Del. Super. LEXIS 180 (Del. Super. Ct., June 10, 2004)*

**PRIOR HISTORY:** Reese v. Wheeler, 2001 Del. Super. LEXIS 302 (Del. Super. Ct., July 31, 2001)

**DISPOSITION:** [*1] Third-Party Defendant, Commercial Union's Motion for Summary Judgment denied. Plaintiff's Motion for Summary Judgment granted.

**COUNSEL:** Clayton E. Bunting, Esquire, Wilson, Halbrook & Bayard, Georgetown, Delaware.

Robert B. Young, Esquire, Young and Young, Dover, Delaware.

David L. Baumberger, Esquire, Chrissinger & Baumberger, Wilmington, Delaware.

Kenneth M. Doss, Esquire, Casarino Christman & Shalk, Wilmington, Delaware.

**JUDGES:** RICHARD F. STOKES, JUDGE.

**OPINION BY:** RICHARD F. STOKES

**OPINION**

This is my decision on Third-Party Defendant, Commercial Union Insurance Company's ("Commercial Union") Motion for Summary Judgment and Plaintiffs, Wayne Carroll Reese ("Reese") and Ramona G. Reese's Cross Motion for Summary Judgment. Third-Party Defendant's motion is denied and Plaintiffs' motion is

granted for the reasons set forth herein.

**STATEMENT OF THE CASE**

On April 4, 1997, Wayne Reese, a truck driver for N.M. Corbin, Inc. was injured when a Yard Dog roll-off jockey truck [1] ("Yard Dog") driven by Roy Wheeler ("Wheeler") ran into him on the loading docks of the Draper-King Cole ("Draper") plant in Milton, Delaware. Plaintiffs Wayne and Ramona Reese brought suit against Wheeler, Kaye [*2] Trucking & Leasing Company ("Kaye Trucking"), Draper Canning Company and Draper-King Cole, Inc. in April, 1999. Default judgment was obtained against Wheeler and Kaye Trucking on April 7 and March 3 of 2000, respectively. Commercial Union Insurance, N.M. Corbin, Inc.'s insurer, and State Farm, Reese's insurer, were joined as Third-Party Defendants on Draper's motion for indemnification and contribution pursuant to their uninsured and underinsured motorist ("UM/UIM") coverage. The insurers were originally included in the suit only for notice purposes. Commercial Union made this Motion for Summary Judgment, and Plaintiffs answered with a cross Motion for Summary Judgment.

> 1 A Yard Dog is a vehicle used to move trailers. It was not used on public roads and was not registered or licensed with the Department of Motor Vehicles to be operated on public roads.

On the date of the accident, Wayne Reese arrived at the Draper-King Cole plant with a tractor trailer full of carrots. After backing his truck into the loading [*3] dock, Reese exited it, leaving the engine running and the door open. He walked over to some Draper employees in order to find out if the truck was properly positioned in the dock. After seeing that it was in the right place and

2003 Del. Super. LEXIS 388, *3

that Draper employees had begun to unload it, and while on his way back to the truck, Reese was struck and injured by the Yard Dog jockey truck. The Yard Dog was driven by Roy Wheeler, a driver for Kaye Trucking & Leasing Company. Although it was owned by Draper, Wheeler was operating it without Draper's permission.

Roy Wheeler has since disappeared, and Kaye Trucking has gone out of business. Concerning insurance, Defendant Draper claims that St. Paul Fire & Marine Insurance Company ("St. Paul") initially insured Wheeler and Kaye Trucking. Plaintiffs state that Wheeler and Kay Trucking are uninsured "as to all matters set forth in the Complaint." According to Draper, St. Paul has declined coverage. This was confirmed in a letter, dated December 23, 2002, from Northbrook Property and Casualty Insurance Company which denies coverage on behalf of St. Paul. (Plaintiff's Answering Brief, App. 1.) Thus, Wheeler and Kaye Trucking are uninsured as to this matter.

[*4]    Commercial Union's UM/UIM policy provides:

D. Who is Insured

1. "You" or any "family member."

2. Anyone else "occupying" a "covered auto" or a temporary substitute for a "covered auto." The "covered auto" must be out of service because of its breakdown, repair, servicing, "loss" or destruction.

3. Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured."

The policy further provides:

"Family member" means a person related to you by blood, marriage or adoption who· is a resident of "your" household, including a ward or foster child.

"Occupying" means in, upon, getting in, on, out or off.

"Uninsured motor vehicle" means a land motor vehicle or trailer;

a. For which neither a liability bond or policy nor cash or securities on file with the Virginia Commission of Motor Vehicles at the time of an "accident" provides at least the amounts required by the Virginia Motor Vehicle Safety Responsibility Act; . . .

c. For which an insuring or bonding company denies coverage or is or becomes insolvent; . . . .

## ISSUES PRESENTED

1. Should summary judgment be granted in favor of Third-Party Defendant, [*5] Commercial Union Insurance Company, on the basis that Wayne Reese is not covered in N.M. Corbin, Inc.'s Uninsured Motorist coverage?

2. Should summary judgment be granted in favor of Plaintiffs, Wayne and Ramona Reese, on the basis that Wayne Reese is covered by the policy?

## DISCUSSION

A. Standard of Review

This Court will grant summary judgment only when no material issues of fact exist, and the moving party bears the burden of establishing the nonexistence of material issues of fact. *Moore v. Sizemore, 405 A.2d 679, 680 (Del. 1979).* Once the moving party meets its burden, the burden shifts to the nonmoving party to establish the existence of material issues of fact. *Id. at 681.* The Court views the evidence in a light most favorable to the nonmoving party. *Id. at 680.*

Where the moving party produces an affidavit or other evidence sufficient under *Superior Court Civil Rule 56* in support of its motion and the burden shifts, the nonmoving party may not rest on its own pleadings, but must provide evidence showing a genuine issue of material fact for trial. *Super. Ct. Civ. R. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* [*6] When cross motions for summary judgment are filed, "the parties implicitly concede the absence of material factual disputes and acknowledge the sufficiency of the record to support their respective motions." *Merrill v. Crothall-American, Inc.,*

2003 Del. Super. LEXIS 388, *6

*606 A.2d 96, 100 (Del. 1992).* If material issues of fact exist or if the Court determines that it does not have sufficient facts to enable it to apply the law to the facts before it, then summary judgment is inappropriate. *Ebersole v. Lowengrub, 54 Del. 463, 180 A.2d 467, 470, 4 Storey 463 (Del. 1962).*

B. Choice of Law

1. Right to contribution and indemnification

A question arises as to whether Virginia or Delaware law applies to the claims of contribution and indemnification. Under Virginia law, one tortfeasor does not have a right of contribution from the UM/UIM insurer of the injured party. *See Hall v. Hickman, 1987 Del. Super. LEXIS 1287, 1987 WL 17176 (Del. Super. Ct.), citing, Harleysville Mut. Ins. Co. v. Nationwide Mut. Ins. Co., 605 F. Supp. 133 (W.D.Va. 1985), aff'd in part and rev'd in part by 789 F.2d 272 (4th Cir. 1986).* Under Delaware law, a tortfeasor does have a right of contribution [*7] from the injured party's UM/UIM insurer. *See Hall, 1987 Del. Super. LEXIS 1287, 1987 WL 17176.* Because this is an issue relating to the damages and liability arising from the tort, Delaware Courts apply the law of the state where the injury took place, unless another state has a more significant relationship to the issue in question. *Restatement (Second) of Conflicts § 146 (1971).* [2] *See Travelers Indemnity Co. v. Lake, 594 A.2d 38, 47 (Del. 1991).* To determine which state has priority, the Courts apply the most significant relationship test as laid out in the *Restatement (Second) of Conflicts § 145(1)* (1971). [3]

> 2  In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.
> 3  (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law

applicable to an issue include:

> (a) the place where the injury occurred
>
> (b) the place where the conduct causing the injury occurred
>
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

[*8] In this case, the injury and the conduct causing the injury took place in Delaware. Draper Company and Draper-King Cole, Inc. are Delaware Corporations. These facts tip the scales in favor of the application of Delaware law, although Virginia also has significant connections to this case. The insurance policy is a Virginia policy, created in Virginia for a Virginia corporation. Wayne Reese is a Virginia resident. In situations such as this one in which each state's relationship involves competing interests, the Courts also take into consideration certain other factors, including the policy of the forum state, other interested states' policies and the expectations of the parties. *Restatement (Second) of Conflicts § 6 (1971).* [4]

> 4  (2) . . . the factors relevant to the choice of the applicable rule of law include
>
> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

[*9] In this regard, Delaware policy favors recovery by injured parties and disapproves of any limitations placed on recovery. *See Marks v. Messick & Gray Construction, Inc.,* 2000 WL 703657 (Del. Super. Ct.) (applying Delaware law in part because Maryland law provided for a cap ·on noneconomic damages). This includes the adjustment of damages between responsible parties. Since application of Virginia law would contravene this important policy of Delaware, in which Draper, as a corporate citizen, has an interest, this Court will apply Delaware law to the issue of contribution and indemnification. Thus, as a preliminary issue, Defendant's claim of direct contribution is not barred.

2. Interpretation of the insurance policy

Delaware applies the "most significant relationship" test for choice of law issues in a contract case. *Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc., 394 A.2d 1160, 1166 (Del. 1978).* An action to ascertain the scope of uninsured motorist benefits in a policy is an action in contract, not in tort. *Allstate Ins. Co. v. Spinelli, 443 A.2d 1286, 1287 (Del. 1981).* Although in *Travelers Indemnity Co. v. Lake, 594 A.2d 38 (1991),* [*10] the Supreme Court applied the torts choice of law test, *Restatement (Second) of Conflict of Laws § 145,* to determine limits on the amount of damages recoverable under the UM/UIM policy, the contracts test still applies when interpreting the language in a policy to determine whether a claimant is covered. The relevant test is the "most significant relationship" test as laid out in the *Restatement (Second) of Conflict of Laws § 188* (1971). [5] *Oliver B. Cannon & Son, Inc., 394 A.2d at 1166 (Del. 1978). See also Travelers Indemnity Co. v. Lake, 594 A.2d 38 (Del. 1991).* The Court's interpretation of an insurance policy is a matter of law. *Nat'l Union Fire Ins.*

*Co. v. Fisher, 692 A.2d 892 (Del. 1997); Universal Underwriters Ins. Co. v. The Travelers Ins. Co., 669 A.2d 45, 47 (Del. 1995).*

[5] (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contact and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189-199 and 203.

[*11] This case involves a Virginia policy issued in Virginia to a Virginia Corporation. The covered truck has Virginia plates, and the driver, Reese, is licensed in and lives in Virginia. The only connection this issue has to Delaware is that the accident occurred in Delaware. [6] While the contract itself does not have a choice of law clause governing the whole contract, it refers several times to Virginia law, stating for example that recovery will be in accordance with *Virginia Uninsured Motorists Law.* [7] The Court will apply Virginia law in the interpretation of this policy.

[6] The defendant, Roy Wheeler, is an Indiana resident, and the defendants Draper Company and Draper-King Cole, Inc., are Delaware corporations. Kaye Trucking, Inc., is an Ohio corporation. The location of these defendants is

inapposite to the issue of whether Reese is covered under the UM/UIM policy, and it is not considered for the purposes of resolving this conflict of law.

7 B. WE WILL PAY

> 1. "We" will pay in accordance with the Virginia Uninsured Motorists Insurance Law all sums the "insured" is legally entitled to recover as damages from the owner or driver of an "uninsured motor vehicle." . . .

> 2. If this insurance provides a limit in excess of the amounts required by the Virginia Motor Vehicle Safety Responsibility Act, "we" will pay only after all liability bonds or policies have been exhausted by judgments or payments.

[*12] C. Application of Virginia Law: Who is Insured

1. "'You' or 'any family member'"

Plaintiffs argue that Reese is a named insured under the policy because he was included in a Schedule of Drivers in the policy documentation and was not listed as an excluded driver. They point out that the definition of "insured" refers to "You" but does not mention that scheduled drivers be excluded from that designation. Usually, however, an employee or driver cannot be included in the definition of "insured" under the designation "You."

In this regard, cases considering this issue generally have dealt with whether a corporation reasonably expected its employees to be covered as a result of the ambiguity of the phrase "'you' or "any 'family member'" (emphasis added). See, e.g., Fisher v. Nat'l Union Fire Ins. Co., 1997 Del. Super. LEXIS 515, 1997 WL 817893 aff'd by 719 A.2d 490 (Table), 1998 WL 665074 (Del.); Harleysville Mut. Ins. Co. v. Grzbowski, 2002 Del. Super. LEXIS 199, 2002 WL 1859193 (Del. Super. Ct.); Nationwide Mut. Ins. Co. v. Hockessin Constr., 1996 Del. Super. LEXIS 263, 1996 WL 453325 (Del. Super. Ct.); Great American Ins. Co. v. Cassell, 239 Va. 421,

1988 WL 626029 (Va. Cir. Ct.) "You" [*13] is singular and refers to the owner of the vehicle, i.e. the individual or corporation listed on the title. See also Del Collo v. Houston, 1986 Del. Super. LEXIS 1236, 1986 WL 5841, 3 (Del. Super. Ct.) ("It is clear under the policies that 'you' refers to the corporation.") On the other hand, Reese would be a named insured if he is included under the language "any family member."

Only one Virginia Court has approached the issue of whether an employee could be a named insured under the theory that an employee is a "family member" of the corporation. The Circuit Court, in Great American Ins. Co. v. Cassell, 239 Va. 421, 1988 WL 626029, 3 held that an employee of the City of Roanoke was not a "family member" because the parties could not have intended to extend the UM/UIM coverage to all 1,750 "family members" of the city. The Court pointed out that the dictionary definition of family is not limited to blood or marital relationships, stating, "the term by common conception includes a 'group of kindred persons' or 'an association of people with common characteristics.'" Id. at 2. The Court also pointed out the imprudence of the insurance company's use of such "boilerplate" language:

> Such [*14] careless, inappropriate and irresponsible language chosen by an insurance company and supposedly crafted by experts skilled in the profession of words and language should not be lightly cast aside nor interpreted as unintended surplusage. The excuse or justification that it was merely carried over as "boilerplate" language falls on unsympathetic ears. . . . Cassell's position on this point is not so far-fetched as Great American suggests.

Id.

In this case, Merle Corbin, president of M.N. Corbin, Inc., provided an affidavit stating that he believed Wayne Reese was a named insured under the policy. Normally, a policy for an individual includes all family members unless they are specifically excluded from the policy. It is logical that, instead of excluding persons, as in an individual's policy, a corporation, likely to have any number of employees, would designate those drivers or "family members" to be covered. This idea is consistent with the listing of the ten drivers in the Schedule. Moreover, Virginia Courts interpret doubtful, ambiguous

language in a policy to grant coverage rather than to withhold it. *See Government Employees Ins. Co. v. Moore, 266 Va. 155, 580 S.E.2d 823, 829 (Va. 2003),* [*15] *quoting, Granite State Ins. Co. v. Bottoms, 243 Va. 228, 415 S.E.2d 131, 134, 8 Va. Law Rep. 2136 (Va. 1992).*

Although this Court is not applying Delaware law, it is helpful to look to Delaware cases for guidance and to note that the result would be the same under Delaware law. Delaware Courts have consistently found language referring to any "family member" in corporate UM/UIM insurance policies to be ambiguous. *See, e.g., Harleysville Mut. Ins. Co. v. Grzbowski, 2002 Del. Super. LEXIS 199, 2002 WL 1859193, 2* ("Delaware courts have held that business entities cannot sustain bodily injury or have family members. Thus, a commercial auto insurance policy which includes language referring to family members is ambiguous because familial relations cannot exist." (Citations omitted).) *See also Fisher v. Nat'l Union Fire Ins. Co., 1997 Del. Super. LEXIS 515, 1997 WL 817893, aff'd by 719 A.2d 490 (Table), 1998 WL 665074 (Del.);* Nationwide Mut. v. Hockessin Const., Inc., 1996 Del. Super. LEXIS 263, 1996 WL 453325 (Del. Super. Ct.). *But see Del Collo v. Houston, 1986 Del. Super. LEXIS 1236, 1986 WL 5841, 3 (Del. Super. Ct.)* (finding reference to family members in insurance policy to be unambiguous and clearly inapplicable [*16] to a corporation). Ambiguous language is construed against the insurer and with the reasonable expectations of the insured. *Nationwide Mut. v. Hockessin,* 1996 Del. Super. LEXIS 263, 1996 WL 453325, 2 (Del. Super. Ct.).

In *Fisher,* Judge Quillen of the Superior Court found the language "if you are an individual, any 'family member'" in the definition of "insured" to be ambiguous. *1997 Del. Super. LEXIS 515, 1997 WL 817893, aff'd by 719 A.2d 490 (Table), 1998 WL 665074 (Del.)* The named insured, New Castle County, said Judge Quillen, does not have families, therefore the language could be construed to cover the driver of a county vehicle. *Id. at 4.* He found that New Castle County could reasonably have expected to insure the users of its vehicles, but that they would only have reasonably expected employees authorized to drive the vehicles to be covered (as opposed to all of the Union members). *Id.*

In sum, the language, "'You' or any 'family member'" under "Who is insured" is ambiguous. It makes no difference that the policy further defines "family member" as "a person related to you by blood, marriage or adoption who is a resident of 'your' household, including a ward or foster child. [*17] " *See Cassell, 239 Va. 421, 1988 WL 626029, 2.* Since the ambiguity arises from the use of the language "family members" in a corporate policy, it does not ameliorate the ambiguity to further define it. The definition only makes the use of such language in a corporate policy more problematical. Given that a Schedule of Drivers was included with the policy documents, the insured reasonably expected the UM/UIM coverage to extend to those listed drivers. As indicated above, where language in a policy is ambiguous, an interpretation finding coverage will be applied given the sound public interest for UM/UIM coverage in both Virginia and Delaware. *See Nat'l Union Fire Ins. Co. v. Fisher, 692 A.2d 892 (Del. 1997); Bryant v. State Farm Mut. Automobile Ins. Co., 205 Va. 897, 140 S.E.2d 817 (Va. 1965).*

2. Any person who "uses" the vehicle

By law, in Virginia, an insurer who provides liability insurance relating to the ownership of a vehicle must also provide uninsured motorist coverage which covers the "insured" in an amount equal to the coverage of the liability insurance. *Va. Code § 38.2-2206(A).* [8] The "insured," includes [*18] the named insured *and* any person who *uses* the covered vehicle with the permission of the named insured. *Va. Code § 38.2-2206(B).* [9] An "uninsured motor vehicle" includes not only a vehicle which is not insured, but also includes a tortfeasor's vehicle for which the insurer refuses to extend liability coverage to the injured party. *Id.* [10] The insurer for Wheeler and Kaye trucking, St. Paul, has denied coverage for this accident. Draper has general liability insurance through Liberty Mutual Insurance Company; however, Wheeler was not employed by and was not operating the Yard Dog with Draper's permission. The Yard Dog is therefore an "uninsured motor vehicle" for the purposes of Virginia law.

> 8   Except as provided in subsection J of this section, no policy or contract of bodily injury or property damage liability insurance relating to the ownership, maintenance, or use of a motor vehicle shall be issued or delivered in this Commonwealth to the owner of such vehicle or shall be issued or delivered by any insurer licensed in this Commonwealth upon any motor vehicle principally garaged or used in this

Commonwealth unless it contains an endorsement or provisions undertaking to pay the insured all sums that he is legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle, within limits not less than the requirements of § 46.2-472. Those limits shall equal but not exceed the limits of the liability insurance provided by the policy, unless any one named insured rejects the additional uninsured motorist insurance coverage by notifying the insurer as provided in subsection B of § 38.2-2202.

[*19]

9  "Insured" as used in subsections A, D, G and H of this section means the named insured and . . . any person who used the motor vehicle to which the policy applies, with the expressed or implied consent of the named insured."

10  "Uninsured motor vehicle" means a motor vehicle for which (i) there is no bodily injury liability insurance and property damage liability insurance in the amounts specified by § 46.2-472, (ii) there is such insurance but the insurer writing the insurance denies coverage for any reason whatsoever, including failure or refusal to cooperate with the insurer . . . ."

Virginia courts apply two distinct analyses to determine whether an injured person qualifies for UM/UIM coverage. In the first instance the Court determines if the injured party was "using" the vehicle at the time of the injury for the purposes of the statute. Separately, the Court determines whether the injured party was "occupying" or "using" the vehicle for the purposes of determining who is an "insured" according to the language of the policy. *See Edwards v. Government Employees Ins. Co., 256 Va. 128, 500 S.E.2d 819 (Va. 1998).* [*20] If the claimant qualifies under either test, he is covered by the policy.

An injured party is "using" a vehicle if there is a causal relationship between his use of the vehicle as a vehicle and the accident. *Edwards, 500 S.E.2d at 821.* A causal relationship exists if the injured party's use of the vehicle is "an integral part of his mission when he is injured." Coverage "is not limited to the transportation function of the vehicle." *Id.* In *Edwards,* the Virginia Supreme Court found that a man injured while changing a tire was "using" the vehicle because his changing of the tire was an integral part of his mission to drive the car to

a service station to get the tire fixed. *Id.*

In *Provencher v. Virginia Municipal Liability Pool, 48 Va. Cir. 119, 1999 WL 58736 (Va. Cir. Ct.),* a sheriff's deputy, injured by an uninsured motorist who struck a disabled vehicle the officer was helping to move from an overpass, was "using" his vehicle. The officer had illuminated the scene with his car's headlights and had turned on his emergency lights. His mission, according to the Court, was to assist in the moving of the vehicle. He was using the car to protect the people [*21] moving the vehicle and "to protect passing motorists from the disabled vehicle." *Id. at 2.* Thus, the Court concluded that at the time he was injured the officer was "using" the car and that use was an integral part of his mission.

Under similar circumstances, in *Great American Ins. Co. v. Cassell, 239 Va. 421, 389 S.E.2d 476, 6 Va. Law Rep. 1642 (Va. 1990),* a firefighter killed by a hit and run driver while fighting a car fire was found to be "using" the covered fire truck at the time of the accident. The mission was to put out a fire. Since the truck was being used to restrict traffic, protect the firefighters and as the water supply, use of the truck was integral to accomplishing the mission (which at the time of the accident had not yet been completed).

In contrast, a police officer serving a warrant, who was struck and killed by an uninsured motorist while around 150 feet away from his parked cruiser was not "using" the vehicle and was therefore not an "insured" under the Virginia uninsured motorist statute. *Ins. Co. of North America v. Carl Perry, 204 Va. 833, 134 S.E.2d 418 (Va. 1964).*

In this case, Reese was using his truck when he was hit by the Yard Dog. [*22] He had backed his truck up to the loading dock. He left the engine running, exited the truck and leaving the door open, walked over to some Draper employees to ask if it was positioned correctly in the dock. The Yard Dog hit Reese as he walked back to the truck to turn off the engine and close the door. Reese's mission was to deliver carrots, and the docking and unloading process is an integral part of that mission. Since Reese was still engaged in the act of docking his truck when the accident occurred, he was using the truck.

3. "Anyone else 'occupying' a 'covered auto'"

Whether a claimant is "occupying" a vehicle depends upon the specific language in the policy. This policy

2003 Del. Super. LEXIS 388, *22

defines "occupying" as "in, upon, getting in, on, out or off." Virginia Courts interpret the language in the policy narrowly, stating that "the word 'occupying' 'denotes a physical presence in or on a place or object.'" *Newman v. Erie Ins. Exchange, 256 Va. 501, 507 S.E.2d 348, 350 (Va. 1998), quoting, Stern v. Cincinnati Ins. Co., 252 Va. 307, 477 S.E.2d 517, 519 (Va. 1996).* Each term in the definition is distinct, but each must be interpreted as having some connection to [*23] "occupying" the vehicle. *See Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Bristow, 207 Va. 381, 150 S.E.2d 125, 128 (Va. 1966).*

It is clear that Reese was neither "in" nor "upon" the covered truck at the time of the accident, as he had walked away from it. *See Edwards v. Government Employees Ins. Co., 256 Va. 128, 500 S.E.2d 819, 822 (Va. 1998)* (finding that changing a tire is not an act related to occupancy of the vehicle, nor could the claimant be considered to be physically in or on the covered vehicle); *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Bristow, 207 Va. 381, 150 S.E.2d 125 (Va. 1966)* (finding "good samaritan" leaning against vehicle while looking under the hood was not "upon" the vehicle for the purposes of the definition of "occupying").

The terms "getting in" and "getting off" require close proximity to the vehicle. *Newman, 507 S.E.2d at 350.* A child crossing the street to get into a school bus would not be close enough to be "getting in" to the vehicle under the definition of "occupying" in a policy. *Id.* However, the Western District Court of Virginia found that a man, hit by an uninsured motorist while [*24] standing in the road having a conversation after exiting a vehicle, to be covered by the UM/UIM policy. *Roberts v. GEICO, 686 F. Supp. 135 (W.D. Va. 1988)* (interpreting the term "alighting from").

Reese was not "getting out" or "getting off" of the truck as he had completed the act of exiting the truck and moved onto his next task of asking about its placement at the docking bay. In addition, Reese could not have been "getting in" or "getting on" because, although he was heading back to his truck to turn it off, at the time he was hit he had not yet reached the truck and had stepped aside

to avoid another truck in the loading dock. From the evidence, it appears that Reese was some distance from his tractor trailer when he was hit by the Yard Dog. He was clearly not touching the vehicle. This case is most similar to the situation in *Newman,* in which the injured child was crossing the street to reach the school bus. Reese's actions cannot be likened to the events in *Roberts* because in that case, the injured man was still standing next to the vehicle when he was hit. (In addition, the District Court in that case opted to follow the reasoning in a South Carolina [*25] case; at the time, Virginia treatment of this issue was very limited. *Roberts, 686 F. Supp. 135, citing, Whitmire v. Nationwide Mut. Ins. Co., 254 S.C. 184, 174 S.E.2d 391.)* In conclusion, Reese was not occupying the vehicle according to the Virginia Courts' interpretation of this term. [11]

> 11    Coverage would likely be found under Delaware law as well. *Nat'l Union Fire Ins. Co. v. Fisher, 692 A.2d 892, 894 (Del. 1977).* Reese would be engaged in both a job-related task for which the truck was an integral part and a task related to the vehicle's operation. Although docking the truck is also a task related to Reese's work, i.e. delivery of the goods, walking around the truck to check its placement for docking is related to the operation of the truck much like checking the fasteners on a loaded trailer would be. *Id. at 897-8.*

## CONCLUSION

For the foregoing reasons, Third-Party Defendant, Commercial Union's Motion for Summary Judgment is denied. [*26] Plaintiff's Motion for Summary Judgment is granted. Reese is covered under the UM/UIM policy as a named insured under the designation "any family member" and he is covered under the policy as a user of the covered vehicle pursuant to Virginia law.

*IT IS SO ORDERED.*

Richard F. Stokes

# EXHIBIT O

22

1        IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2              IN AND FOR NEW CASTLE COUNTY

3  ROBERT M. BASS GROUP, INC.,   )
    a Texas corporation,        )

4                       )

5           Plaintiff,      )
                       )

6      v.           )   C.A. No. 9953
                       )

7  EDWARD P. EVANS, et al.,    )
                       )

8          Defendants.    )
    -------------------------------

9  HARRY POLIKOFF, et al.,     )

10         Plaintiffs,     )
                       )

11      v.         )   C.A. No. 9909
                       )

12  MACMILLAN, INC., et al.,    )
                       )

13         Defendants.   )

14                  - - -

15                Courtroom No. 1, 4th Floor
                U.S. District Courthouse

16                Wilmington, Delaware
                Friday, June 10, 1988

17                10:00 a.m.

18                - - -

19  BEFORE:     HON. JACK B. JACOBS, Vice Chancellor.

20                - - -

21        RULING OF THE COURT ON PLAINTIFFS'
      MOTION FOR A TEMPORARY RESTRAINING ORDER

22                - - -

23

24

2

1    APPEARANCES:

2              BRUCE M. STARGATT, ESQ.,
          DAVID C. McBRIDE, ESQ.,
3         JOSY W. INGERSOLL, ESQ., and
          MELANIE K. SHARP, ESQ.
4         Young, Conaway, Stargatt & Taylor
                    -and-
5         MICHAEL R. KLEIN, ESQ., and
          RICHARD W. CASS, ESQ. (Washington, D.C. Bar)
6         Wilmer, Cutler & Pickering
            for the Plaintiff in C.A. No. 9953.
7

          JOSEPH A. ROSENTHAL, ESQ., and
8         NORMAN M. MONHAIT, ESQ.
          Morris, Rosenthal, Monhait & Gross, P.A.
9                   -and-
          ARTHUR N. ABBEY, ESQ. (New York Bar)
10        Abbey & Ellis
                    -and-
11        RICHARD BEMPORAD, ESQ. (New York Bar)
          Lowey, Dannenberg & Knapp
12                  -and-
          ROBERT M. KORNREICH, ESQ. (New York Bar)
13        Wolf Popper Ross Wolf & Jones
            for the Plaintiffs in C.A. No. 9909.
14

          A. GILCHRIST SPARKS, III, ESQ.
15        Morris, Nichols, Arsht & Tunnell
                    -and-
16        BERNARD W. NUSSBAUM, ESQ.,
          PAUL K. ROWE, ESQ., and
17        ANDREW C. HOUSTON, ESQ. (New York Bar)
          Wachtell, Lipton, Rosen & Katz
18          for the individual defendants,
            other than Evans and Reilly.
19

          STEPHEN E. HERRMANN, ESQ.,
20        NATHAN B. PLOENER, ESQ., and
          JAMES C. STRUM, ESQ.
21        Richards, Layton & Funger
                    -and-
22        DENNIS J. BLOCK, ESQ. (New York Bar)
          Weil, Gotshal & Manges
23          for Defendants Macmillan, Inc.,
            Edward P. Evans and William F. Reilly.
24
                        - - -

3

<u>P R O C E E D I N G S</u>

1

2

3          THE COURT:  Good morning, ladies and

4    gentlemen.

5          Before beginning my ruling and my comments,

6    I do have a couple of housekeeping matters.

7          While the ruling is being made, in order

8    to maintain order in the courtroom, I'm going to require

9    that no one be allowed to enter or leave.  So if anyone

10   wishes to leave the courtroom, I would suggest that

11   they do so now.

12          Moreover, if there are electronic

13   communications devices, such as telephones, radio

14   telephones, none of those will be permitted to be used

15   until this proceeding is concluded.

16          Despite the extreme shortness of time,

17   the pending motion for a temporary restraining order

18   was briefed very professionally and was argued very

19   eloquently by all counsel.  I would say just by way

20   of personal observation that to have the luxury of

21   such presentations is one of the unique benefits of

22   being able to serve on this Court.  And for their

23   efforts, counsel are to be congratulated.

24          I regret that this ruling will be less

4

1   than worthy of those efforts because the plain fact

2   is that time did not permit a more eloquent expression

3   of my thoughts in written form.

4           I propose to follow Mr. Stargatt's

5   organizational lead, beginning with the standards for

6   a temporary restraining order, moving to the question

7   of irreparable damage and balancing of equities, and

8   concluding with a discussion of the merit-related issues.

9   The exposition will be less than fulsome and the

10  underlying facts will be repeated only where necessary

11  as background for the treatment of the issues.

12          I start with the standard for a temporary

13  restraining order. To emphasize what this ruling does

14  not involve,  it does not involve a decision on the

15  merits.  It does not involve, as in the case of

16  a preliminary injunction, an assessment of the moving

17  party's probability of success.  What is sought here

18  is a temporary restraining order, which is an extremely

19  limited form of injunction designed to preserve the

20  status quo for a short period until the matter can

21  be presented in an orderly way on a motion for

22  a preliminary injunction.

23          On a temporary restraining order the

24  inquiry is whether the moving party, here the plaintiff,

5

has made a showing sufficient to justify holding up
the challenged act or transaction for the brief period
necessary to develop an evidentiary record and to make
an orderly presentation on a preliminary injunction
motion.

What showing is required for that purpose?
Chancellor Allen addressed that question in Cottle v.
Carr, where he held that the moving party must show
a threat of imminent irreparable damage and claims
that are colorable, litigable, or that raise questions
deserving serious attention.

Because a temporary restraining order
must be decided before any discovery can be had, the
primary emphasis is upon the irreparability of the
injury, and only secondarily on the merits of the claims.
Where the required showing is made, a temporary restraining
order will issue, unless the risk of harm in granting
the remedy exceeds the risk of harm in denying it,
or the moving party is guilty of laches.

From this there flow two brief observations
of a prefatory nature. First, the granting of a temporary
restraining order decides nothing as far as the merits
are concerned. The fact that a temporary restraining
order issues does not mean that the moving party will

6

necessarily win his case or that he will even succeed
in obtaining a preliminary injunction.  The recent
Newmont Mining case is a good example.  All that the
grant of a temporary restraining order means is that
the moving party has earned the right to proceed to
the next step, a motion for a preliminary injunction,
and to have the status quo preserved while that motion
is being litigated and decided.

Second, it has been suggested that recent
articulations of the temporary restraining order standards
by this Court signal a relaxation of the traditional
requirements, with the result that anyone having
a typewriter capable of printing out a colorable complaint
can obtain a temporary restraining order.  Any such
perception is not correct.  Nothing in the recent
decisions changes what this Court has always done on
a motion for a temporary restraining order.  What is
new has been an effort to describe that process in
appropriate words.

This Court, on a motion for a temporary
restraining order, exercises to the best of its ability
its sound discretion, balancing all of the affected
interests.  It does not myopically or mechanically
restrain transactions simply because there is a litigable

7

1    issue.

2            The need for stability and predictability

3    in corporate affairs is a goal of which this Court

4    is constantly mindful.  On the other hand, it is the

5    function of this Court and of the Supreme Court to

6    hold fiduciaries accountable to those persons whom they

7    are supposed to serve, and where the circumstances

8    so require, this Court will not hesitate to invoke its

9    injunctive processes to prevent corporate fiduciaries

10   from evading that accountability.

11           That brings me to the issues at hand,

12   which are, first:  Have the plaintiffs shown that they

13   will suffer imminent irreparable damage unless a temporary

14   restraining order is granted, that outweighs any injury

15   that would result from the grant of that relief?  Second,

16   if so, have the plaintiffs demonstrated claims that

17   are litigable, colorable, or that raise questions that

18   merit serious exploration on a more extensive preliminary

19   injunction record?

20           For the reasons now discussed, I conclude

21   that the plaintiffs have made such a showing and that

22   a temporary restraining order should issue.

23           The restructuring sought to be restrained

24   is complex.  I disclaim any undertaking to describe it

8

1    in all its nuances.  The transaction does, however,

2    have certain basic features that may be summarized.

3                Effective beginning this afternoon at

4    5:00 p.m., Macmillan will dividend to its shareholders

5    one-half share of a corporation called MIC, or Information,

6    which presently is a wholly-owned subsidiary.  It will

7    also dividend $25.20 in cash for each outstanding share

8    of Macmillan common stock.

9                On the following day, June 11, 1988,

10   MIC will dividend to the same shareholders $27.15 in

11   cash plus a $4.15 debenture for each share of Macmillan.

12   Thus, MIC will be spun off and will end up as

13   a freestanding company owning valuable assets, which

14   will include Macmillan's present instructional businesses,

15   "Que" magazine and an office building in New York City.

16   The traditional publishing business will remain with

17   Macmillan, which will be named Macmillan Publishing.

18                In order to pay the cash component of

19   the dividend, both companies, Macmillan Publishing and

20   MIC, will borrow extensively and will become severely

21   leveraged.  Moreofer, the relative ownership interest

22   as among management, the employee stock ownership plan,

23   called the ESOP, and the public shareholders, will chang

24   At present Macmillan's senior management owns about

9

1   2 percent of Macmillan's outstanding shares. The public

2   stockholders own about 88.5 percent and the ESOP and

3   benefit plans own the rest.

4           If the restructuring is allowed to proceed

5   the public shareholders would own 65.2 percent of

6   Macmillan Publishing and 56.5 percent of MIC, with

7   the management group owning approximately 39 percent

8   of the MIC shares.

9           This transaction, if found to constitute

10  a breach of the defendants' fiduciary duty to the

11  plaintiffs, unless restrained, will result in irreparable

12  damage to Macmillan shaeholders, including the Bass Group.

13  The harm is imminent because the dividend will become

14  effective as of 5:00 p.m. today. And it would be

15  irreparable, because the restructuring will irretrievably

16  alter Macmillan's capital and corporate structure and

17  would adversely affect the quality of the shareholders'

18  investment and prevent or drastically reduce the

19  shareholders' opportunity to realize greater value

20  for their shares than is being afforded by the

21  restructuring, all without any opportunity for the

22  shareholders to have any say. At least the present

23  record so discloses.

24           Specifically, the restructuring will

1    split Macmillan into two highly leveraged companies

2    in which the public shareholders will own a lesser

3    percentage.  In MIC, which will own the more potentially

4    valuable businesses and properties, the public

5    shareholder interest will decrease from 88 percent

6    to 56 percent, in round numbers, and management will

7    own about 39 percent.  Management's stock interest

8    would be sufficient to enable management to block the

9    two-thirds vote required to render inapplicable certain

10    provisions of the New York takeover statute, thereby

11    deterring acquisition proposals to which management

12    does not accede.

13              Management has no such blocking power

14    in Macmillan at the present time.  There are other

15    provisions that would similarly deter acquisition

16    opportunities.  In their Information Statement the

17    defendants admit that the debt financing agreements

18    and golden parachute agreements to which Macmillan

19    Publishing is a party, provide that a change of control

20    would constitute a default under those agreements, and

21    that such arrangements may inhibit a change of control

22    that would deprive stockholders of the opportunity

23    to realize a premium for their shares, including the

24    current Bass proposal, which on the present record

11

1  appears to exceed the highest value attributed to the

2  restructuring by the investment bankers for the defendants.

3        Equally critically, once the restructuring

4  takes place most of its features could not be undone.

5  It is undisputed that there would be no effective way

6  to undo the dividend, the division of the corporation

7  into two parts, and the borrowing and mortgaging of

8  corporate assets.  Moreover, since MIC is a New York

9  corporation, there is a significant risk that the Court

10  would not have jurisdiction over MIC for purposes of

11  granting any relief which would involve that corporation.

12        The defendants do not dispute these facts

13  as such.  They argue simply that those facts do not

14  amount legally to irreparable harm, because the

15  restructuring will benefit Macmillan stockholders by

16  placing cash and stock in their hands.  To that extent

17  it is correct that the restructuring will benefit

18  shareholders.  But that fact alone does not conclude

19  the analysis.  If a corporate transaction, wrongfully

20  and in breach of directors' fiduciary duty, forces

21  shareholders to forego a greater benefit (or opportunity

22  for a greater benefit) and to accept a lesser benefit

23  in its place, that transaction cannot, simply because

24  it confers a benefit, be immunized from judicial scrutiny

12

1   or from being a subject for appropriate injunctive

2   relief, assuming that the proper showing is made.

3           The defendants argue that even if the

4   restructuring threatens irreparable harm, no restraining

5   order should issue because, first, injunctive relief

6   would cause even greater harm to the shareholders and,

7   second, because plaintiffs are guilty of laches.

8   Neither contention in my opinion is supported by the

9   record.  The primary "balancing of equities" argument

10  is that a delay in the payment of dividends would result

11  in lost interest to the shareholders.  That harm, to

12  the extent that any exists, appears on this record

13  to be minimal and highly speculative.

14          Under the resolution declaring the dividend,

15  the cash component need not be paid until August 9th,

16  1988, a date well beyond the time required to decide

17  a preliminary injunction motion.  Any loss of interest

18  occasioned by delayed payment of the cash dividend

19  would be offset by the savings to the corporation of

20  interest payable on the debt that must be incurred

21  to finance the dividend itself.  But, in any event,

22  if there is any harm in this respect, it is minimal

23  in relation to the risk of harm threatened to shareholders

24  if a temporary restraining order is not granted.

13

The defendants argue that the plaintiffs are guilty of laches.  That argument has no basis in this record.  For reasons yet to be explained, the defendants first announced the restructuring on May 31st, 1988, leaving only ten days before that transaction was to be effected.  The plaintiffs filed suit on June 6, 1988, together with their motion for a temporary restraining order, only four business days later, and after the Bass Group had unsuccessfully attempted to negotiate an amicable resolution with the defendants.

Given the extremely short time frame that the defendants have imposed, I find that the plaintiffs proceeded both diligently and reasonably in prosecuting this action and the motion for a temporary restraining order.

For those reasons, the plaintiffs have made the requisite showing of irreparable harm and the balancing of equities.

That brings us to the merit-related questions.  The final issue is whether the plaintiffs have demonstrated claims that are colorable, litigable or that involve questions requiring serious attention.  As stated previously, I conclude that they have.

14

1          It is unnecessary to discuss, and therefore

2     I do not, all of the plaintiffs' fiduciary claims.

3     It is sufficient to say that the record discloses

4     colorable, litigable claims, involving serious

5     questions as to whether the Macmillan board has properly

6     discharged its duties under Unocal in adopting the

7     restructuring in these circumstances.  Under Unocal

8     a board of directors, even one comprised of a majority

9     of independent directors, in defending the adoption

10    of a so-called "anti-takeover defensive measure," has

11    the burden to show that they, the board, have reasonable

12    grounds for believing that there existed a danger to

13    corporate policy and effectiveness and that the challenged

14    defensive measure was reasonable in relation to the

15    threat posed.

16          The present record discloses serious

17    questions with respect to both prongs of the Unocal

18    test.  The defendants argue that the initial Bass

19    proposal, which was for $64 per share, was a threat

20    because that proposal was inadequate and had certain

21    conditions.  However, that proposal, as well as the

22    increased proposal, which involved in part $73 per

23    share, are worlds apart from the type of hostile, two-

24    tier, coercive tender offer involved in Unocal.

15

1    The Bass proposal contemplated an all-
2    cash offer for any and all shares of Macmillan.
3    By its terms it was to be consensual, not hostile.
4    The proposal stated that the price was negotiable and
5    could be higher than $64.  The directors and management
6    responded by refusing to discuss or explore with the
7    Bass Group how much more they would be willing to pay.
8    Instead they caused their investment bankers to evaluate
9    the Bass proposal on the basis of the $64 price, a price
10   the bankers and the board concluded was not adequate.
11          On that basis, as well as on the basis
12   of the involvement of certain Bass family members in
13   unrelated acquisitions, the defendants concluded that
14   their proposal constituted a threat.  They then proceeded
15   to approve on a rapid-fire schedule a restructuring
16   that would deprive shareholders of any opportunity
17   to approve a massive reordering of the company and
18   of the opportunity to consider the Bass proposal or
19   other alternatives.
20          The point here is not that the defendants,
21   by taking these steps, have necessarily acted improperly.
22   That issue is not before me and cannot be and is not
23   decided today.  Rather, the point is that the record
24   at this stage is sufficient to raise serious questions

1    as to whether the Bass proposal constituted a threat

2    under Unocal that would justify defensive measures,

3    and, if so, whether the restructuring was

4    a disproportionate response.

5              With respect to the reasonableness of

6    the response, the record indicates that the board had

7    available less drastic weapons to resist a coercive

8    or inadequate offer.  What requires exploration is

9    why the board found it necessary to respond with

10   a restructuring that, insofar as this record indicates,

11   may well be worth less to shareholders than the present

12   Bass proposal  and that would preclude consideration

13   of that proposal by shareholders, all without the

14   shareholders having any opportunity for a choice

15   on the matter.

16              To say, as I have, that the record discloses

17   serious litigable questions going to the merits is

18   not to express a view that the restructuring will be

19   found invalid, either preliminarily or finally.  The

20   defendants have proffered many reasons by way of

21   justification for their actions.  On a motion for

22   a preliminary injunction on a more expanded record,

23   those arguments may well carry the day.  But that must

24   await the development of the case on a preliminary

17

1   injunction record.

2          By this ruling I decide only that the

3   showing made by the plaintiffs is sufficient to require

4   the defendants to be accountable in the sense of having

5   to defend the propriety of the restructuring on a motion

6   for a preliminary injunction before the transaction

7   will be allowed to go forward.

8          For those reasons, a temporary restraining

9   order will issue restraining the implementation of the

10   restructuring until this Court decides the plaintiffs'

11   motion for a preliminary injunction.

12          I would request counsel to confer on

13   an appropriate form of order, and counsel may schedule

14   an office conference this afternoon, if need be, to

15   schedule further proceedings in this matter.

16          Do counsel have anything else before

17   we recess?

18          (Further on-the-record discussion

19   transcribed under separate cover.)

20                  - - -

21

22

23

24

18

## C E R T I F I C A T E

I, JACK P. WHITE, Official Reporter

for the Court of Chancery of the State of Delaware,

do hereby certify that the foregoing pages numbered

3 through 17 contain a true and correct transcription

of the proceedings as stenographically reported by

me at the hearing in the above stated cause, before

the Vice Chancellor of the State of Delaware, on the

date therein indicated.

IN WITNESS WHEREOF, I have hereunto set

my hand at Wilmington this 10th day of June 1988.



_____

Official Reporter for the
Court of Chancery of the
State of Delaware

Transcribed by:
Ann B. Nolan

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY



ROBERT M. BASS GROUP, INC.,   §
a Texas corporation,          §
                              §
            Plaintiff,        §
                              §
      v.                      §    Civil Action No. 9953
                              §
EDWARD P. EVANS, et al.,      §
                              §
            Defendants.       §

HARRY POLIKOFF, et al.,       §
                              §
            Plaintiffs,       §
                              §
      v.                      §    Civil Action No. 9909
                              §
MACMILLAN, INC., et al.,      §
                              §
            Defendants.       §

ORDER

This _10_TH_ day of June, 1988, in accordance with this Court's opinion dated June _16_, 1988,

IT IS HEREBY ORDERED that:

1.    Defendants and their directors, officers, agents, employees, attorneys, servants, subsidiaries and any persons acting in concert with them are temporarily restrained, pending a decision on plaintiff's application for a preliminary injunction, from effectuating the proposed Restructuring of Macmillan as described in the press release issued May 31, 1988 (Exhibit E to the Verified Complaint) and in the Information Statement (Exhibit 1 to the Ploener

Affidavit) or any subsequent reformulation or modification thereof, including, but not limited to, the payment of any dividends by Macmillan or Information or the issuance of any common shares of Macmillan or Information to the ESOP or to any officers, directors, executives or employees of Macmillan or Information in such a restructuring.

2.    Pursuant to Rule 65(c) of this Court, plaintiff shall post a bond in the sum of $ _1,000,000_ _(million)_ with corporate surety by _5:00_ p.m. on June _13_, 1988, for the payment of such costs and expenses as may be incurred or suffered by defendants or the stockholders of Macmillan should it later be determined that defendants have been wrongfully enjoined or restrained.

3.    This Order shall become effective upon execution, provided that the above-described bond with surety is filed with the Court not later than as set forth above.

_Josh B. Jacolin_
Vice Chancellor

- 2 -

# EXHIBIT P

LEXSEE 2007 DEL. SUPER. LEXIS 402

**SUN-TIMES MEDIA GROUP, INC., et al., Plaintiffs, v. ROYAL & SUNALLIANCE INS. CO. OF CANADA, et al., Defendants.**

**C.A. No. 06C-11-108 RRC**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*2007 Del. Super. LEXIS 402*

**April 9, 2007, Submitted
June 20, 2007, Decided**

**NOTICE:**

[*1]    THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**PRIOR HISTORY:** *Sun-Times Media Group, Inc. v. Royal & Sunalliance Ins. Co., 2007 Del. Super. LEXIS 401 (Del. Super. Ct., June 20, 2007)*

**DISPOSITION:**    On Plaintiffs Sun-Times Media Group, Inc., Dwayne O. Andreas, Richard R. Burt, Raymond G. Chambers, Marie-Josee Kravis, Robert S. Strauss, A. Alfred Taubman, James R. Thompson, Lord Weidenfeld of Chelsea, and Leslie H. Wexner's "Motion for Partial Summary Judgment Against Certain Defendants on The Duty to Pay Defense Costs." GRANTED.

**COUNSEL:** John E. James, Esquire and Richard L. Horwitz, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, Attorneys for Plaintiffs.

James W. Semple, Esquire and Matthew F. Lintner, Esquire, Morris James LLP, Wilmington, Delaware, Attorneys for Defendants.

**JUDGES:** Richard R. Cooch.

**OPINION BY:** Richard R. Cooch

**OPINION**

**MEMORANDUM OPINION**

COOCH, J.

Before the Court is Plaintiffs' motion for partial summary judgment that seeks a declaratory judgment from this Court that certain insurer Defendants have a duty under the applicable policies to pay Plaintiffs' defense costs with respect to a related civil action in Illinois. The issues raised by this motion are (1) whether there is a genuine issue of material fact regarding choice of law that would preclude summary judgment; (2) whether the "personal conduct" exclusions contained in the insurance [*2] policies, as a matter of law, prevent the present advancement of defense costs; (3) whether either the consent-to-settle or cooperation clauses of the insurance polices have been violated, as a matter of law, thereby preventing the present advancement of defense costs; and, (4) whether the priority-of-payments clause of the insurance polices prevents, as a matter of law, the present advancement of defense costs to Plaintiffs.

This Court has determined that there is no genuine issue of material fact regarding choice of law that precludes summary judgment as to defense costs. In addition, the Court has determined that, at this juncture, there has been no showing by Defendants that the personal conduct exclusions have been violated so as to preclude the advancement of defense costs. Furthermore, this Court has also determined that, at this juncture, Defendants have not made a sufficient showing that either the cooperation clause or the consent-to-settle provision have been violated, so as to preclude advancement of defense costs. Lastly, the Court has determined, on the present record, that the priority-of-payments clause does not prevent the present

2007 Del. Super. LEXIS 402, *2

advancement of defense costs. [1] Therefore, [*3] Plaintiffs' motion is **GRANTED**.

> 1 If it can be shown at a later appropriate time that the insureds were not entitled to defense costs, the insurers can presumably recover any defense costs that are found to have been improperly paid out, pursuant to the terms of the applicable policies. Van Horn Aff., E-File 13594161, Ex.1, at 10. (James Van Horn was general counsel for International, and is now working as a consultant for International. Van Horn Aff. at P 2.)

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs' complaint seeks a declaration of coverage under their excess directors' and officers' ("D&O") insurance policies issued by Defendants. Plaintiffs claim to have incurred over $ 20 million (and expect to incur over $ 40 million) in defense costs as a result of defending themselves in multiple lawsuits that arose out of an alleged fraudulent scheme devised by certain inside directors of Plaintiff Sun-Times Media Group, Inc. f/k/a Hollinger International, Inc. ("International"). The complaint further asserts that Defendants are obligated to pay those defense costs and have wrongfully refused to do so.

Plaintiff International is a Delaware corporation with its principal place of business [*4] in Illinois. International's Canadian parent companies are Hollinger Inc. [2] and Ravelston Corporation Limited ("Ravelston"). [3] Plaintiffs Dwayne O. Andreas, Richard R. Burt, Raymond G. Chambers, Marie-Josee Kravis, Robert S. Strauss, A. Alfred Taubman, James R. Thompson, Lord Weidenfeld of Chelsea, and Leslie H. Wexner (collectively the "Outside Directors") are nine of International's former outside directors. Eight of the above Outside Directors are citizens of the United States and one (Lord Weidenfeld) is a citizen of the United Kingdom.

> 2 Hollinger Inc. presently owns approximately 17% of the equity of International and beneficially holds approximately 67% of the overall voting power of International. Van Horn Aff., at P 3.
> 3 At all material times Ravelston beneficially owned 78% of Hollinger Inc. Van Horn Aff., at P 4.

In 2002, International purchased liability insurance in a tower of insurance totaling $ 130 million in limits with a policy period of July 1, 2002 to July 1, 2003. The policies cover International, Ravelston, Hollinger Inc., and the individual directors and officers of those entities.

American Home Assurance Company ("American Home") and Chubb Insurance Company ("Chubb") [*5] sold the primary and the first two excess insurance policies in the tower. The American Home and Chubb policies have combined limits of $ 50 million, constituting the first $ 50 million of the insurance tower.

Defendants Royal & SunAlliance Insurance Company of Canada, ACE INA Insurance Company, and Zurich Insurance Company (collectively the "Third Layer Insurers") also sold excess D&O liability insurance. The Third Layer Policy has a $ 40 million limit of liability and is excess of the $ 50 million in underlying insurance sold by American Home and Chubb.

Defendants AXA Corporate Solutions Assurance, Temple Insurance Company, Continental Casualty Company, Lloyd's Underwriters, GCAN Insurance Company f/k/a Gerling Global Canada, and ACE INA Insurance Company (collectively the "Fourth Layer Insurers") additionally sold excess D&O insurance that has a $ 40 million limit of liability and is excess of the $ 90 million in underlying insurance.

The Third Layer Insurers promised to insure Plaintiffs as follows:

> The Insurer agrees to provide to the Insureds insurance coverage excess of the Underlying Polices for Claims first made during the Policy Period against the Insured Persons for Wrongful [*6] Acts. Such coverage shall be in accordance with and subject to the same warranties, terms, conditions, exclusions and limitations (except as regards the premium, the amount and limits of liability, the Policy Period, and except as otherwise provided herein) as are contained in or as may be added to the Primary Policy and, to the extent coverage is further limited or restricted thereby, to any other Underlying Policy. In no event shall this Policy grant broader coverage than the coverage provided by the most restrictive of any of

the Underlying Policies. [4]

4  Van Horn Aff., Ex. 4, at 1.

As described in the insuring agreements of the underlying American Home Policy, the Third Layer Insurers agreed to pay all "Loss" arising out of any claims made against International and/or the Outside Directors during the policy period for "Wrongful Acts."

Coverage A under the policies insures the Outside Directors and states in pertinent part:

> This policy shall pay the Loss of any Insured Person arising from a Claim...made against such Insured Person for any Wrongful Act of such Insured Person, except when and to the extent that an Organization has indemnified such Insured Person.... [5]

5  Van Horn Aff., Ex. 1, [*7] at 1.

Coverage B under the policies insures International and provides:

> (i) *Organization Liability:* This policy shall pay the Loss of any Organization arising from:
>
> a. a Securities Claim;
>
> b. an Oppressive Conduct Claim; or
>
> c. a Canadian Pollution Claim,
>
> made against such Organization for any Wrongful Act of such Organization.
>
> (ii) *Indemnification of Insured Person:* This policy shall pay for the Loss of an Organization arising from a Claim made against an Insured Person...for any Wrongful Act of such Insured Person, but only to the extent that such Organization

has indemnified such Insured Person. [6]

6  *Id.*

"Loss" is defined to include:

> [D]amages (including aggravated damages), settlements, judgments (including pre/post-judgment interest on a covered judgment), Defence Costs and Crisis Loss; [7]

7  *Id.* at 4.

The term "Wrongful Act" is defined as:

> (1) any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act...:
>
>> (i) with respect to an Executive of an Organization, by such Executive in his or her capacity as such or any matter claimed against such Executive solely by reason of his or her status as such....
>
> (2) with respect to an Organization, any actual or alleged [*8] breach of duty, neglect, error, misstatement, mis-leading statement, omission or act by such Organization, but solely in regard to (a) any Securities Claim or Oppressive Conduct Claim.... [8]

8  *Id.* at 6.

The policy also dictates the order in which claims are to be paid and gives priority to individual insureds:

> 22. In the event of Loss arising from a covered Claim for which payment is due

2007 Del. Super. LEXIS 402, *8

under the provisions of this policy, then the Insurer shall in all events:

(a) first, pay Loss for which coverage is provided under Coverage A and Coverage C of this policy; then

(b) only after payment of Loss has been made pursuant to Clause 22(a) above, with respect to whatever remaining amount of the Limit of Liability is available after such payment, at the written request of the chief executive officer of the Named Entity, either pay or withhold payment of such other Loss for which coverage is provided under Coverage B(ii) of this policy; and then

(c) only after payment of Loss has been made pursuant to Clause 22(a) and Clause 22(b) above, with respect to whatever remaining amount of the Limit of Liability is available after such payment, at the written request of the chief executive officer of the Named [*9] Entity, either pay or withhold payment of such other Loss for which coverage is provided under Coverage B(i) and D of this policy. [9]

9 *Id.* at 15-16.

In addition, the policy contains a "cooperation" clause that states:

The Insurer shall at all times have the right, but not the duty, to participate in the investigation, settlement, or defence of any Claim covered by this Policy which appears to the Insurer to be likely to involve the Insurer, even if the Underlying Limit has not been exhausted. The Parent Company and the Insureds shall give the Insurer full co-operation and such information as it may require. [10]

10 Van Horn Aff., Ex. 4, at 2-3.

Moreover, the policy contains a "consent-to-settle" provision that states:

The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defence Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defence Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer shall be entitled to effectively associate [*10] in the defence, the prosecution, and the negotiation of any settlement of any Claim that involves or appears reasonably likely to involve the Insurer. [11]

11 Van Horn Aff., Ex. 1, at 10.

Furthermore, the policy creates a duty to advance defense costs as follows:

THE INSURER MUST ADVANCE DEFENCE COSTS, EXCESS OF THE APPLICABLE RETNETION, PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM. [12]

12 *Id.* at 1.

The Primary Policy also contains certain exclusions that define when there is no coverage. The relevant exclusions read as follows:

The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured:

(a) arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which the Insured was not legally entitled;

(c) arising out of, based upon or attributable to the committing in fact of any deliberate criminal or deliberate fraudulent act by the Insured;

For the purpose of determining the applicability of the forgoing Exclusions 4(a) through 4(c)...only facts pertaining to and knowledge possessed by any past, present, or future chairman of the board, president, chief executive officer, chief operating [*11] officer, chief financial officer or General Counsel (or equivalent position) of an Organization shall be imputed to an Organization. [13]

13   *Id.* at 7-8.

The Policy also provides a way for insurers to recover defense costs that are later shown to have been improperly advanced by stating:

Such advance payments by the Insurer shall be repaid to the Insurer by each and every insured or Organization, severally according to their respective interests, in the event and to the extent that any such insured or Organization shall not be entitled under this policy to payment of such Loss. [14]

14   *Id.* at 10.

Lastly, the policy contains a provision known as the Worldwide Extension that provides that certain parts of the policies will be superseded by filings in the United States with various regulatory officials that are more favorable to the Insured than the terms and conditions of the American Home primary policy. The Extension states:

In regard to Claims brought and maintained solely in a Foreign Jurisdiction against an Organization formed and operating in such Foreign Jurisdiction or an Insured Person thereof for Wrongful Acts committed in such Foreign

Jurisdiction, the Insurer shall apply to such Claim(s) [*12] those terms and conditions (and related provisions) of the Foreign Policy registered with the appropriate regulatory body in such Foreign Jurisdiction that are more favourable to such Insured than the terms and conditions of this policy. [15]

15   *Id.* at 6.

* * *

From January 1999 until about May 2001, International's inside directors, Lord Conrad Black, David Radler, John Boultbee, and Peter Atkinson (collectively the "Inside Directors") allegedly took part in a scheme to defraud International, its public shareholders, and Canadian tax authorities. After receiving a demand letter from a major shareholder in May 2003, International formed a Special Committee of the Board to conduct an independent investigation of the allegations. That committee issued a report in August 2004 that described how the Inside Directors allegedly ran a "corporate kleptocracy" that supposedly looted International of hundreds of millions of dollars. [16]

16   Smick Aff., E-File 13769450, Ex. H, at 4. (Joseph M. Smick is a partner at the firm of Sedgwick, Detert, Morgan & Arnold, LLP. In that capacity, he was retained by Defendant Zurich Insurance Company. Smick Aff., at 2.)

Subsequently, in August 2005, federal criminal [*13] charges were brought against Ravelston, Radler, and Mark Kipnis (International's former General Counsel) in the United States District Court for the Northern District of Illinois. The indictment was later amended to add Black, Boultbee, and Atkinson as defendants. The criminal action alleged that the defendants "devised, intended to devise, and participated in a scheme to defraud International and International's public shareholders of money, property, and their intangible right of honest services, to defraud the Canadian tax authorities of tax revenue, and to obtain money and property from these victims by means of materially false and fraudulent pretenses, representations, promises and omissions." [17] Radler entered into a voluntary plea agreement with the U.S. Attorney whereby

he voluntarily pled guilty to count one of the indictment and admitted to the underlying facts involving the fraudulent scheme. Recently, Ravelston also entered into a plea agreement. [18] The Court understands that the criminal trial, which began March 14, 2007, is still continuing.

> 17  Def. Opposition to Pl. Mot. for Partial Summ.
> J., E-file 13751962, Ex G, at PP 7-8.
> 18  Tr. of March 16, 2007 Oral Argument, E-File
> [*14] 14506275, at 11.

The alleged fraudulent scheme also spawned numerous civil lawsuits. On December 9, 2003, Cardinal Value Equity Partners, LP filed a derivative action on behalf of International in the Delaware Court of Chancery (the "Cardinal Derivative Action"). Pursuant to a settlement agreement executed on May 2, 2005, American Home and Chubb funded a settlement of the Cardinal Derivative Action in the amount of $ 50 million, thereby exhausting all insurance coverage beneath the Third Layer Policy. The Superior Court of Justice in Ontario, Canada (the "Canadian Court" where related legal proceedings have taken place) and the Court of Chancery have each approved the Cardinal Derivative Action settlement.

Moreover, several securities class actions were filed on behalf of International's shareholders in Illinois and Canada, naming International, Hollinger Inc., Ravelston, the Inside Directors and the Outside Directors as defendants. Three separate complaints originally filed between February 2, 2004 and April 4, 2004 in Illinois Federal Court were consolidated in August 2004 ("Illinois Class Action"). Six of eight counts are alleged securities violations, and the remaining two counts [*15] allege breach of fiduciary duty. [19] In addition to the alleged securities violations, the Illinois Class Action alleges that the Outside Directors recklessly disregarded the facts regarding the self-dealing and related party transactions. In addition, the Illinois Class Action complaint alleges that the Outside Directors, by virtue of their positions at International, knew or were reckless in not knowing that public disclosures regarding certain of International's asset sales and management services agreements were false or incomplete. Furthermore, that complaint alleges various "Wrongful Acts" in connection with specific transactions involving International and allegations regarding management services between International and its subsidiaries.

> 19  Id. at 58.

Both International and the Outside Directors have incurred costs in defending the Illinois Class Action, and now seek reimbursement from the Third Layer Insurers, who have denied coverage for the Illinois Class Action. International has been funding the Illinois Class Action ongoing defense costs of the Outside Directors.

At the time International filed its complaint in this Court on November 9, 2006, [20] there were two related pending [*16] "applications" [21] in the Canadian Court. [22] On May 13, 2005, Hollinger Inc. had filed an application against American Home, Chubb, the Third Layer Insurers, the Fourth Layer Insurers, International, Ravelston, Cardinal, the Inside Directors, the Outside Directors, [23] and others seeking an order:

> a. declaring that the payment by [American Home and Chubb] for the Cardinal Settlement would not exhaust, diminish, or otherwise alter the obligations owed by [American Home and Chubb] to [Hollinger] Inc.;
>
> b. in the alternative, enjoining [American Home and Chubb] from entering into the Cardinal Settlement;
>
> c. declaring that [American Home and Chubb] and [the Third and Fourth Layer Insurers] have a duty to indemnify [Hollinger] Inc. and pay all defense costs and expenses in certain of the Underlying Actions, including, inter alia, the Illinois Securities Litigation; and
>
> d. any further relief that the court deems just. [24]

Similarly, on that same date, Black and his wife, Lady Barbara Amiel Black, had filed an application in the Canadian Court against American Home, Chubb, the Third Layer Insurers, and the Fourth Layer Insurers seeking an order:

> a. declaring that the payment by [American Home and Chubb] [*17] for the Cardinal Settlement would not exhaust, diminish, or otherwise alter the obligations owed by [American Home and Chubb] to Black;

b. declaring that [American Home and Chubb] and [the Third and Fourth Layer Insurers] have a duty to indemnify Black and pay all defense costs and expenses in certain of the Underlying Actions, including, inter alia, the Illinois Securities Litigation; and

c. any further relief that the court deems just. [25]

20   International amended the complaint on November 13, 2006 to add the Outside Directors as plaintiffs.

21   An application is apparently a type of legal proceeding in Canada usually reserved for cases where material facts are not in dispute. It appears that there is no right to conduct or receive documentary discovery and evidence is usually presented to the court through affidavits. Hoaken Aff., E-File 13655555, at P 3. (Eric R. Hoaken is lead Canadian counsel for International in its insurance-related litigation. Hoaken Aff., at P 5.)

22   Two other applications had also been filed in Canada: one by International on May 12, 2005 and one by American Home and Chubb on May 13, 2005. However, both of these applications were essentially resolved by the Canadian [*18] Court's authorization of the Cardinal Settlement. Def. Opening Brief in Support of their Mot. to Dismiss or Stay, E-File 13594161, at 10-11.

23   Although the Outside Directors were named as respondents in this application, it is undisputed that none of them "ever attorned to the jurisdiction of Ontario or participated in any way in the various applications." Hoaken Aff., at P 15.

24   Def. Opening Brief in Support of their Mot. to Dismiss or Stay, at 8. *See also id.* at Ex F.

25   *Id.* at 11. *See also id.* at, Ex 1.

On January 10, 2007, Plaintiffs filed the instant motion for partial summary judgment seeking an order declaring that the Third Layer Insurers have a duty to pay past and future defense costs incurred by Plaintiffs in the Illinois Class Action (*In Re Hollinger International Securities Litigation, No. 04C-0834, 2006 U.S. Dist. LEXIS 47173 (N.D. Ill.)*). [26] Subsequently, on January 18, 2007, Defendants filed a motion to stay first-party discovery. The motion to stay first-party discovery was

followed by a motion to dismiss or stay Plaintiffs' complaint filed on January 25, 2007. [27]

26   As stated previously, International and the Outside Directors have been sued in numerous actions arising from the Inside Directors' alleged [*19] fraudulent scheme; however, Plaintiffs have limited this motion to seeking a declaration that the Third Layer Insurers have a duty to pay past and future defense costs in one specific case, *In Re Hollinger International Securities Litigation.* Plaintiffs state that the parties "may be able to use the Court's ruling on this motion to resolve the Third Layer Insurers' obligations regarding the other actions at issue." Pl. Opening Brief in Support of their Mot. for Partial Summ. J., E-file 13418024, at 1.

27   In a separate opinion issued today, the Court has denied Defendants' motion to dismiss and their motion to stay first-party discovery. *Sun-Times Media Group, Inc., et al. v. Royal & SunAlliance Ins. Co. of Canada, et al., C.A. No. 06C-11-108 RRC, 2007 Del. Super. LEXIS 401, Cooch, J. (June 20, 2007).*

The Canadian Court issued a decision on March 22, 2007 dismissing both the Hollinger Inc. and the Blacks applications as "premature." The Canadian Court held that "the knowledge possessed by Radler is imputed to [Hollinger] Inc." [28] However, the Canadian Court held further that "until [*20] more is known, the plea and settlement by Radler and the Agreement made by [Hollinger] Inc., at the very least require further exploration." [29] In addition, the Canadian Court determined the insurance policy was one of indemnity. The Canadian Court went on to state that in an indemnity policy, "one must look to see which claims could result in indemnity. If they cannot, there is no obligation to advance defence costs." [30]

28   Def. March 23, 2007 letter to the Court, E-File 14233870, Ex 1, at P 43.

29   *Id.* at P 46.

30   *Id.* at P 28.

The Canadian Court reasoned that it did not have enough information to determine whether the underlying claims could result in indemnity, as well as whether the personal conduct exclusions contained in the applicable policies would preclude either indemnification or advancement of defense costs to either the Blacks or

Hollinger Inc. Similarly, the Canadian Court declared that "[i]f Conrad Black is acquitted and civil proceedings do not proceed, he may well be entitled to claim defence costs of the civil proceedings named above and can renew his request at that time." [31] Hollinger Inc. has apparently appealed the decision. [32] The record does not indicate whether the [*21] Blacks have also appealed the Canadian Court's decision.

> 31   *Id.* at P 47.
> 32   Pl. April 9, 2007 letter to the Court, E-File 14421046.

## II. THE PARTIES' CONTENTIONS

In this motion for partial summary judgment, the Plaintiffs seek advancement of defense costs for expenses incurred defending the Illinois Class Action. Plaintiffs assert that courts routinely decide an insurer's defense obligations as a matter of law on summary judgment. [33] Plaintiffs contend that it is undisputed that certain of the claims in the Illinois Class Action are securities claims. Plaintiffs further contend that the plain language of the policy guarantees advancement of such defense costs. In addition, Plaintiffs point out that, unlike here, the Canadian applications dealt with "oppressive conduct" claims. [34]

> 33   Pl. Opening Brief in Support of their Mot. for Partial Summ. J., at 9.
> 34   "Oppressive conduct" claims are defined in the insurance policy as: "a Claim brought by or on behalf of a shareholder of an Organization against the Organization or any Executive of the Organization with respect to such shareholder's interest in securities of such Organization, whether directly or by class action, which alleges a violation of [*22] the oppression or unfairly prejudicial provisions of the Canada Business Corporations Act...." Van Horn Aff., Ex. 1, at 5.

Moreover, Plaintiffs assert that none of the exclusions contained in the policy should preclude the present advancement by the Third Layer Insurers of defense costs. Plaintiffs claim that Radler's plea agreement cannot apply to them because the Illinois Class Action includes transactions that were not part of Radler's guilty plea. Therefore, Plaintiffs contend that none of the exclusions contained in the policy apply because as a matter of law the fraudulent acts of Radler are not imputed to International or to the Outside Directors.

Moreover, Plaintiffs assert that, on the present record, there has been no breach of the cooperation clause that now precludes advancement of defense costs. In addition, Plaintiffs argue that the consent-to-settle provisions of the policies were not breached by the settlement in the Cardinal action, and should not be used to preclude the advancement of defense costs. Therefore, Plaintiffs contend that both the Outside Directors and International are entitled at this time to the advancement of defense costs. [35]

> 35   Plaintiffs request further [*23] proceedings to determine the amount of defense costs. Pl. Opening Brief in Support of their Mot. for Partial Summ. J., at 23.

Although Plaintiffs concede that they theoretically might ultimately have to repay the advanced defense costs to the Third Layer Insurers, they argue that that possibility is no reason not to grant their present requests for defense costs. Plaintiffs assert that now is not the appropriate time to decide the applicability of any exclusions. [36] Plaintiffs contend that even if it is shown at a later time that they were not now entitled to defense costs (because of their falling within the exclusions), the Third Layer Insurers can recover any defense costs that are found to have been improperly paid out.

> 36   Pl. Reply Brief in Support of their Mot. for Partial Summ. J., E-file 13864146, at 8.

In response, Defendants argue that partial summary judgment for advancement of defense costs is not appropriate. Defendants argue that the Court must first determine choice of law in order to apply the appropriate insurance principles. [37] Defendants argue that because Plaintiffs do not advance an argument as to which state law applies with respect to interpretation of the insurance [*24] contracts, [38] but rather make only general statements that the law of some state in the United States will apply, summary judgment is improper. [39] In addition, Defendants argue that a choice of law determination is necessary to determine applicable policy provisions because without a choice of law determination, it is impossible to know whether the Worldwide Extension applies. Defendants assert that without knowing whether the Worldwide Extension applies, there exists a material issue of fact that should defeat summary judgment. [40] Defendants have not suggested the need for further discovery and contend that the present record is enough to defeat summary

judgment. [41]

37  Tr. of March 16, 2007 Oral Argument, at 74.
38  Pl. Reply Brief in Support of their Mot. for Partial Summ. J., at 4 ("Defendants have failed to demonstrate any conflict of law between Canada and any potentially applicable law in the United States (i.e., Illinois, New York, or Delaware).").
39  Tr. of March 16, 2007 Oral Argument, at 73-74.
40  Def. Opposition to Pl. Mot. for Partial Summ. J., at 8.
41  Defendants advised the Court that they did not bring their own summary judgment motion because of their pending motion to dismiss [*25] or stay. Tr. of March 16, 2007 Oral Argument, at 71.

Moreover, the Defendants argue that the Outside Directors have no claim for defense costs as a matter of law because International is currently advancing their costs in the Illinois Class Action, and that therefore only International has a ripe claim for reimbursement of defense costs under the policy. Defendants further assert that International is not entitled to defense costs because it is precluded under two exclusions in the applicable policies. Defendants specifically cite exclusion 4(a) stating;

> [T]he Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured] arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which the Insured was not legally entitled: [42]

And 4(c)

> [T]he Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured] arising out of, based upon or attributable to the committing in fact of any deliberate criminal or deliberate fraudulent act by the Insured. [43]

42  Van Horn Aff., Ex. 1, at 7.
43  *Id.*

Defendants also rely on the imputation clause contained at the end of the exclusions [*26] stating that:

> For the purpose of determining the applicability of the forgoing Exclusions 4(a) through 4(c)...only facts pertaining to and knowledge possessed by any past, present, or future chairman of the board, president, chief executive officer, chief operating officer, chief financial officer or General Counsel (or equivalent position) of an Organization shall be imputed to the Organization. [44]

44  *Id.* at 8.

Defendants argue that Radler's fraudulent, criminal acts are imputed to International because Radler was the President, Chief Operating Officer, and a director of both International and Hollinger Inc. Because, Defendants argue, the exclusions release the Insurers from their duty to advance defense costs, and because the Outside Directors have no present claim because they are not currently being indemnified under the policy, the Defendants state there is no duty to advance costs at this time as a matter of law.

Furthermore, Defendants assert that the Cardinal Settlement violated the consent-to-settle and cooperation clauses defined in the policy, and violation of these clauses should release the Third Layer Insurers from the duty to advance costs.

Lastly, the Defendants state that [*27] the policy contains a priority-of-payment clause, which states that Insured Persons are to receive compensation before any Organization. The Third Layer Insurers argue that because Black's application for coverage was dismissed in Canada, it is impossible to advance costs to International because there has been no determination as to whether any Insured Person is allowed coverage. Defendants suggest that the Court must wait to see if any Insured Persons are owed coverage before any defense costs can be advanced to International. [45]

45  Def. Opposition to Pl. Mot. for Partial Summ. J., at 11.

## III. DISCUSSION

2007 Del. Super. LEXIS 402, *27

### A. Standard of Review

Partial or full summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [46] If, however, the record indicates that material facts are in dispute, or if "it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances," then summary judgment will not be granted. [47] Although **[*28]** the moving party has the burden of demonstrating that no material issues of fact are in dispute and it is entitled to judgment as a matter of law, the facts must be viewed "in the light most favorable to the nonmoving party." [48] Furthermore, "[f]rom those accepted facts the court will draw all rational inferences which favor the non-moving party." [49]

46  Super. Ct. Civ. R. 56(c).
47  *Cook v. City of Harrington, 1990 Del. Super. LEXIS 101 . 1990 WL 35244, at *3 (Del. Super.)* (citing *Ebersole v. Lowengrub, 54 Del. 463, 180 A.2d 467, 4 Storey 463 (Del. 1962)).*
48  *Mason v. United Servs. Auto. Ass'n, 697 A.2d 388, 392 (Del. 1997).*
49  *Merrill v. Crothall-American, Inc., 606 A.2d 96, 99 (Del. 1992).*

In the instant motion, the Defendants argue issue of fact only in connection with the choice of law issue and the applicability of the Worldwide Extension. All other Defendants' contentions are issues of law.

### B. The Choice of Law Issue Does Not Preclude Summary Judgment Because There Is No Conflict Between United States And Canadian Law

The Court must first decide whether the choice of law issue would preclude summary judgment. Defendants assert that Canadian law will apply to the interpretation of the policy and, absent a determination of applicable law, summary **[*29]** judgment is inappropriate. Defendants contend that choice of law presents an issue of fact that warrants the denial of all aspects of Plaintiffs' motion for partial summary judgment. Specifically, Defendants argue that "there exists an issue of material fact as to what terms and conditions apply to coverage for the Underlying Actions." [50]

50  Def. Opposition to Pl. Mot. for Partial Summ. J., at 8

In *Eon Labs Manufacturing, Inc. v. Reliance Insurance Co.,* the Delaware Supreme Court stated that, absent any conflict, the Court may apply general principles that are consistent with the law of either jurisdiction. [51] In the instant motion, choice of law is not an issue that otherwise precludes the grant of summary judgment at this time because there is no demonstrated conflict between applicable U.S. and Canadian law. [52]

51  *Eon Labs Mfg., Inc. v. Reliance Ins. Co., 756 A.2d 889, 892 (Del. 2000)* (applying general insurance contract principles where the principles are consistent with the law of both jurisdictions).
52  *See C M, Inc. v. Canadian Indem. Co., 482 F.Supp 780, 782 (D.S.D. 1980) rev'd on other grounds* (noting similarities between U.S and Canadian law, and stating that in insurance matters **[*30]** both Canadian and U.S. courts look at the laws of the other jurisdiction).

Despite Defendants' assertion that the Court must now decide which law will apply, Defendants, who carry the burden of demonstrating a conflict, fail to provide any authorities evidencing a conflict between U.S. and Canadian law on the issue of interpretation of insurance contracts. [53] Even though Defendants urge the Court to apply the "most significant relationship" test of the *Restatement (Second) of Conflict of Law § 188* (1971), the Court does not need to undergo such analysis because there is no demonstrated conflict. [54] Therefore, like the Delaware Supreme Court did in *Eon Labs,* the Court will apply general insurance contract principles. [55] Because it is unnecessary to decide choice of law at this time, the still-unsettled choice of law question does not preclude partial summary judgment in the instant motion.

53  Def. Opposition to Pl. Mot. for Partial Summ. J., at 9-10. The Court also notes that Defendants provided the Court with very little substantive Canadian law, citing to only five Canadian sources. *See Enigma Holdings, Inc. v. Gemplus Intern. S.A., 2006 U.S. Dist. LEXIS 72996, at *22, 2006 WL 2859369, at *8 (N.D. Texas)* (stating that the **[*31]** "[d]efendants as the party seeking to apply foreign law have the burden of proving its substance to a reasonable certainty").
54  15A C.J.S. *Conflict of Laws § 28* (2002) ("The Court need not engage in any choice of law

analysis where no conflict is established between laws of the states which are potentially applicable."). *See also Atchison, Topeka & Santa Fe Railway Co. v. Stonewall Ins. Co., 275 Kan. 698, 71 P. 3d 1097, 2000 WL 34001583 (D. Kan.)* (holding that the defendant insurers had the burden to demonstrate a conflict of laws and absent such a demonstration there would be no need to apply conflict of law rules).
55  *Eon Labs, 756 A.2d at 892.*

Furthermore, because the Court is not required to make a choice of law determination, there is no need to decide now the possible applicability of the Worldwide Extension. Plaintiffs argue that regardless of the ultimate terms of coverage, the Third Layer Insurers would have no stronger defenses to coverage than they assert now. 56 Because the Court does not need to determine choice of law in the instant motion, there is no need to address the possible applicability of the Worldwide Extension at this time, and therefore no genuine issue of material fact exists in connection [*32] with this issue.

56  Pl. Reply Brief in Support of their Mot. for Partial Summ. J., at 3.

**C. The Two Personal Conduct Exclusions Do Not Override The Present Duty Of The Third Layer Insurers to Advance Defense Costs Contained In The Policy.**

The plain language of the insurance policy states:

THE INSURER MUST ADVANCE DEFENCE COSTS, EXCESS OF THE APPLICABLE RETNETION, PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM. 57

In the instant motion, both the Outside Directors and International seek defense costs for the Illinois Class Action. The insurance policy specifically provides coverage for both "Wrongful Acts" and "Securities Actions." Because six of the eight counts in the Illinois Class Action are securities claims against International and the remaining two counts are breach of fiduciary duty, and that action consists of allegations of "Wrongful Acts" against the Outside Directors, the Illinois Class Action is covered by the plain language of the insurance policy. Furthermore, the present motion for partial

summary judgment seeking defense costs for the Illinois Class Action is different from the claims considered by the Canadian Court because the claims at issue there [*33] were oppressive conduct claims, not securities actions or wrongful conduct allegations against individuals, which are the claims at issue here.

57  Van Horn Aff., Ex. 1, at 1.

Because the claims in the Illinois Class Action are specifically covered by the policy, and the policy is one of indemnity, one must look to see which claims could result in indemnity because only claims that could potentially result in indemnity lead to an obligation to advance defense costs. Because the claims in the Illinois Class Action are specifically covered under the insurance policy, and could potentially result in indemnity, the duty to advance defense costs is now triggered. 58

58  *See In re Worldcom, Inc. Sec. Litig., 354 F. Supp. 2d 455, 464 (S.D.N.Y. 2005)* (stating that the duty to defend arises whenever a claim could potentially fall within the terms of the policy); *Wedtech Corp. v. Federal Ins. Co.; 740 F. Supp. 214, 221 (S.D.N.Y. 1990)*; *PepsiCo v. Continental Casualty Co., 640 F. Supp. 656, 659-60 (S.D.N.Y. 1986)*; *see also Brady v. i2 Techs. Inc., 2005 Del. Ch. LEXIS 194, at *10, 2005 WL 3691286, *3 (Del. Ch.)* (stating that [a]dvancement is an option to borrow, triggered upon the initiation of a lawsuit or proceeding)

In addition, because [*34] the Outside Directors and International are defined separately under the policy, the Court must consider the claim of International and the claims of the Outside Directors separately. Both parties have a right to seek declaratory relief under *10 Del. C. § 6503*, which authorizes a cause of action for a declaration of a party's rights. 59 The Outside Directors are defined as "Insured Persons" under the policy, and although they are currently being reimbursed by International, 60 they have incurred defense costs as a result of the Illinois Class Action even though International is paying the costs. The fact that International has paid some or all of the costs does not relieve the Third Layer Insurers from their duty under the policy to advance defense costs.

59  *Gilmour v. PEP Modular Computers, Inc., 1995 Del. Super. LEXIS 556, at *5, 1995 WL 791001, at *2 (Del. Super.)* (stating a party may seek declaratory relief when a legal relationship is

called into question); *see also Energy Partners Ltd. v. Stone Energy Corp., 2006 Del. Ch. LEXIS 182, at \*20, 2006 WL 2947483, at \*6 (Del. Ch.)* (noting that "[p]arties to a contract can seek declaratory judgment to determine 'any question of construction or validity' and can seek a declaration of 'rights, status or [*35] other legal relations thereunder.'").

60  Def. Opposition to Pl. Mot. for Partial Summ. J., at 11.

Furthermore, the Outside Directors are not precluded from seeking defense costs by either of the two personal conduct exclusions, both related to the Radler plea agreement. The plain language of the imputation clause states:

For the purpose of determining the applicability of the forgoing Exclusions 4(a) through 4(c)...only facts pertaining to an knowledge possessed by any past, present, or future chairman of the board, president, chief executive officer, chief operating officer, chief financial officer or General Counsel (or equivalent position) of an Organization shall be imputed to the Organization. 61

This language specifically refers to an "Organization," not an individual. Even though Defendants argue that the Radler plea agreement should preclude coverage because of the imputation of fraud, this logic does not apply to the Outside Directors because they are not defined as an "Organization" under the terms of the policy. All parties agree that the personal conduct exclusions would not apply to the Outside Directors.

61  Van Horn Aff., Ex. 1 at 8.

Moreover, International, in addition to the [*36] Outside Directors, is permitted to recover its own defense costs as well as the costs it paid the Outside Directors, and is not precluded from coverage by the either of the two personal conduct exclusions. Even though the Third Layer Insurers rely on the imputation of the two personal conduct exclusions to preclude coverage, the policy contains an unequivocal duty to advance defense costs prior to the final disposition of a claim by stating:

THE INSURER MUST ADVANCE

DEFENCE COSTS, EXCESS OF THE APPLICABLE RETNETION, PURSUANT TO THE TERMS HEREIN PRIOR TO THE FINAL DISPOSITION OF A CLAIM. 62

In addition, the policy is one of indemnity, so one must look to see which claims could result in indemnity because only claims that could potentially result in indemnity lead to an obligation to advance defense costs. Because the claims in the Illinois Class Action are specifically covered under the insurance policy, and could potentially result in indemnity, the duty to advance defense costs is triggered. 63

62  *Id.* at 1.

63  *See In re Worldcom, 354 F. Supp. 2d at 464* ("The duty to pay defense costs 'exists whenever a complaint against the insured alleges claims that may be covered under the insurer's [*37] policy.'").

Furthermore, the personal exclusions do not override a present contractual duty to advance defense costs unless the Defendants can unequivocally now show that all of the allegations in the Illinois Class Action complaint fall within the personal conduct exclusions. 64 Defendants have failed to show at this juncture that any of the exclusions are definitely imputed to International. Even though Defendants argue that Radler's guilty plea imputes the exclusions to International, the Illinois Glass Action includes transactions that were not part of Radler's guilty plea. Defendants attempt to expand the scope of Radler's guilty plea by arguing the exclusions require a broad reading. However, an exclusion clause in an insurance contract is construed strictly to give the interpretation most beneficial to the insured. 65 Because the Defendants have failed to show at this time the applicability of the exclusions to International, the Court need not decide the potential applicability of the exclusions at this time. 66

64  *See Int'l Paper Co. v. Cont'l Casualty Co., 320 N.E.2d 619, 621, 35 N.Y. 2d 322, 361 N.Y.S.2d 873 (N.Y. 1974)* (stating that if an insurer seeks to be relieved of a duty to defend, it carries the burden [*38] of showing the policy exclusions apply); *see also Happy House Amusement v. New Hampshire Ins. Co., 135 N.H. 719, 609 A.2d 1231, 1232-33 (N.H. 1992); United States Fidelity & Guar. Co. v. Johnson Shoes, 123*

*N.H. 148, 461 A.2d 85, 87 (N.H. 1983).*

65 *See, e.g., Alstrin v. St. Paul Mercury Ins. Co., 179 F. Supp. 2d 376, 400 (D. Del. 2002)* (stating that an "illegal profit" exclusion should be construed strictly); *see also Cochran v. State Farm Mut. Auto. Ins. Co., 298 So. 2d 173, 174 (Fla. Dist. Ct. App. 1974)* (stating that "grants of coverage must be interpreted broadly in favor of the existence of insurance while limitations thereon, or exclusions, must be interpreted narrowly against the insurance company").

66 Pl. Reply Brief in Support of their Mot. for Partial Summ. J., at 8.

Even if it were shown at a later time that the exclusions apply, this still does not prevent the advancement of defense costs at the present time because the policy provides that the Insured must pay back money they received but were not entitled to. The policy specifically says that: .

> Such advance payments by the Insurer shall be repaid to the Insurer by each and every insured or Organization, severally according to their respective interests, [*39] in the event and to the extent that any such insured or Organization shall not be entitled under this policy to payment of such Loss. [67]

Therefore, the plain language of the policy guaranteeing an advancement of defense costs is not precluded by any imputation of exclusions to International, as well as (as explained earlier) to the Outside Directors.

67 Van Horn Aff., Ex. 1, at 10.

**D. The Consent-to-Settle And Cooperation Clauses Were Not Breached As A Result Of The Cardinal Settlement, And Do Not Preclude The Advancement Of Defense Costs.**

The cooperation clause and the consent-to-settle provisions also do not preclude the present advancement of defense costs. The cooperation clause allows the insurer the opportunity to participate in the case by stating in pertinent part:

> The Insurer shall at all times have the right, but not the duty, to participate...settlement...of any Claim

covered by this Policy which appears to the Insurer to be likely to involve the Insurer. [68]

However, this cooperation clause implies that the insurer must accept coverage in order to involve itself in the litigation because an insurer that has not accepted coverage should not have a right to force the insureds to forgo [*40] a settlement that is in their best interests. [69] Here, the Third Layer Insurers never accepted coverage for the Cardinal action and never consented to the Cardinal settlement. [70] Defendants contend that they had only reserved their rights with respect to coverage as of the time of the Cardinal settlement, [71] but Defendants have not shown that the Plaintiffs violated the cooperation clause. Because the Defendants reserved their rights with respect to coverage and later denied coverage, they should not have "veto power" [72] over the settlement process. [73] When the Defendants reserved their rights to accept coverage, Plaintiffs were allowed to take reasonable measures to defend themselves, including settlement. [74]

68 Van Horn Aff., Ex. 4, at 2-3.

69 *Miller v. Shugart, 316 N.W.2d 729, 733-34 (Minn. 1982)* (stating that "while the...insureds have a duty to cooperate with the insurer, they also have a right to protect themselves against plaintiffs claim...Nor, do we think, can the insurer who is disputing coverage compel the insureds to forgo a settlement which is in their best interests").

70 Reidy Aff., E-file 13864146, Ex.4, at 4. (Andrew M. Reidy is a partner in the law firm of Howrey LLP in Washington [*41] D.C. and counsel for both International and the Outside Directors. Reidy Aff. at P 3.)

71 Def. Opposition to Pl. Mot. for Partial Summ. J., at 20.

72 Plaintiffs state that they fear that non-participating insurers could hold a "veto" over a settlement not within their limits. Pl. Reply Brief in Support of their Mot. for Partial Summ. J., at 13.

73 *See, e.g., Miller, 316 N.W.2d at 733-34* (stating that an insured did not breach the cooperation clause when the insurer was contesting coverage).

74 *Ins. Co. of N. Am. v. Spangler, 881 F. Supp. 539, 545 (D. Wy. 1995)* ("The insurer's insertion

of a policy defense by way of reservation or nonwaiver agreement narrows the reach of the cooperation clause and permits the insured to take reasonable measures to protect himself against the danger of personal liability.").

In addition, the consent-to-settle provision does not preclude the advancement of defense costs because the consent of the Third Layer Insurers was not required. The consent-to-settle provision states:

> The Insureds shall not...enter into any settlement agreement...or incur any Defence Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defence [*42] Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer shall .be entitled to effectively associate in the defence, the prosecution, and the negotiation of any settlement of any Claim that involves or appears reasonably likely to involve the Insurer. [75]

All the policy requires is that consent is obtained from the parties actually funding the settlement. Because no funds from the Third Layer Insurers were used to fund the Cardinal Settlement, Plaintiffs were not required to obtain consent. [76]

[75]  Van Horn Aff., Ex. 1, at 10.
[76]  Pl. Reply Brief in Support of their Mot. For Partial Summ. J., at 13-14.

Furthermore, the Cardinal Settlement did not prejudice the Defendants. [77] Even though Defendants argue that they are prejudiced because they are involved in coverage litigation and face the prospect of paying for claims other than the Cardinal Settlement, this argument fails because Defendants have failed to prove that the outcome of the underlying case would have been different had there been cooperation. [78] Because the Defendants were not prejudiced by the [*43] Cardinal Settlement and never accepted any coverage for the Settlement, neither the cooperation clause nor the consent-to-settle provision was breached. [79] Therefore,

there is a duty to advance defense costs.

[77]  *M.F.A. Mut. Ins. Co. v. Cheek, 66 Ill. 2d 492, 363 N.E.2d 809, 813, 6 Ill. Dec. 862 (Ill. 1977)* ("[U]nless the alleged breach of the cooperation clause substantially prejudices the insurer in defending the primary action, it is not a defense under the contract").
[78]  22 HOLMES' APPLEMAN ON INSURANCE 2D § 138.7 (2003) ("To prove actual prejudice, the insurer must prove that the outcome of the underlying case would have been different had the insurer received the cooperation of the insured.")
[79]  Despite Plaintiffs' arguments that Joseph Smick's affidavit is prejudicial against their case, it is unnecessary for the Court to discuss credibility at this time. Tr. of March 16, 2007 Oral Argument, at 63-64.

## E.  The Priority-of-Payments Clause Does Not Preclude The Advancement of Defense Costs.

Lastly, the priority-of-payment provision is not an issue in the current motion because the Outside Directors will receive advancement of defense costs. Although the Defendants argue that they cannot pay International because the priority-of-payments [*44] provision states that Insured Persons must be paid before an Organization, this argument is not persuasive here because the Outside Directors are going to receive advancement of defense costs. Therefore, both the Outside Directors and International are entitled to compensation under the policy.

## IV. CONCLUSION

For the above reasons, Plaintiffs' motion for partial summary judgment against the Third Layer Insurers on the duty to pay defense costs is **GRANTED**. [80]

[80]  The Court will undertake appropriate proceedings, as requested by Plaintiffs, to determine the amount of defense costs that the Third Layer Insurers must now pay.

**IT IS SO ORDERED.**

Richard R. Cooch

# EXHIBIT Q

UNREPORTED OPINION
Berger
(18)

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

TECHNICON DATA SYSTEMS CORP.  )
                              )
                              )
                              )
              v.              )    Civil Action No. 7644
                              )
                              )
                              )
CURTIS 1000 INC.              )

(Unreported)

ON PLAINTIFF'S APPLICATION FOR PRELIMINARY
INJUNCTION:  GRANTED

Submitted:  August 8, 1984
Dated:      August 21, 1984

Douglas E. Whitney, Esquire, Donald F. Parsons, Jr., Esquire
    and Jeffrey S. Welch, Esquire, MORRIS, NICHOLS, ARSHT
    & TUNNELL, Wilmington, Attorneys for Plaintiff

John H. Small, Esquire and Wayne J. Carey, Esquire, PRICKETT,
    JONES, ELLIOTT, KRISTOL & SCHNEE, Attorneys for Defendant

BERGER, Vice Chancellor

the prescription may be printed out at the pharmacist's VMT and the appropriate nursing station VMT.

Technicon contends that a portion of the computer technology which enables the host computer and VMTs to communicate with each other (the communications interface) is proprietary trade secret information improperly obtained and used to develop defendant's MSI 1000 system. The MSI 1000 consists of a printed circuit board and an emulation program that were designed to enable an IBM personal computer ("IBM PC") to be connected to the MIS host computer and function as a Technicon VMT. Plaintiff contends that, among other things, the non-standard control and function codes, the characters used to begin and end data transmissions, the combination of error checking and acknowledgment messages used and the data screen coordinates and lightpen codes are trade secrets.

Technicon argues that the evidence presented at this preliminary stage establishes that the individuals who developed defendant's MSI 1000 obtained these trade secrets from confidential schematics and other written materials and from their improper manipulation of operating MISs at various hospitals.

At the TRO stage of this litigation, plaintiff argued that Kurt Lawrence ("Lawrence") had misappropriated a Technicon emulation program allegedly used to develop

MIS, decided to develop an interface which would allow a microcomputer such as the IBM PC to emulate the Technicon VMT. By that time, Technicon had been working on a physicians' office system for almost one year. Using a Convergent Technology microcomputer (the "CT"), Technicon was developing a system whereby a doctor would be able to computerize his office records and also use his CT as a remote VMT capable of interfacing with the hospital's host computer. Lawrence had been working on an aspect of this project for Technicon since July, 1982. In early 1983, at about the same time that he decided to develop the VMT interface, Bridgmon attended a demonstration by Lawrence of Technicon's prototype of its physicians' office system. This meeting apparently marks the beginning of the Bridgmon/Lawrence association that eventually led to the formation of Medsoft.

After unsuccessfully attempting to recruit two Technicon employees to design the VMT interface for him, Bridgmon contacted General Technology Corporation to work on the project. At his first meeting with General Technology in September, 1983, Bridgmon met Cline, an electrical engineer who was a consultant to the company. When Cline and Bridgmon met again a few weeks later, Cline told Bridgmon that he would need access to an operational MIS in order to develop and later test an interface board.

and repair department at Zentec, explained to Zentec that Jewish Hospital was using the Technicon system and was setting up a repair facility for that system and asked for "whatever information was freely available" for the VMT and its lightpen.

As a result of that phone call and other similar requests made during the period from September, 1980 through May, 1982, Bridgmon received packets of information from Zentec including the schematics he later gave to Cline. Bridgmon says that none of the diagrams or other documents contained any proprietary notice and that Bridgmon had no reason to think that the information provided was confidential. The schematics produced by Cline during discovery do not contain any proprietary notice other than the confidential stamp used in the course of the litigation.

Although defendant contends that Cline never used the schematics provided by Bridgmon, Cline testified that he studied the schematics, highlighted different portions of the circuitry shown on the diagrams and identi- fied an error in one of those circuits. Cline's admis- sions, together with plaintiff's evidence that the schematics would have been helpful in deciphering the communications interface, make it reasonable to conclude that Cline used the schematics in developing the MSI 1000.

him on January 12, 1984, that the card and interface protocol were completed and that work was continuing on the lightpen software and color monitor. Day agreed to allow Bridgmon to test his product at Methodist Hospital at a time when Day understood from Bridgmon that "the development of the circuit board had been substantially completed...." In fact, as of January 12, 1984, Bridgmon and Cline still were unable to trap and store MIS data in the IBM PC and, as late as April, 1984, Bridgmon and Cline were unable to display all of Technicon's different screens on the IBM PC and were unable to display any screens through direct instructions on the IBM PC. Instead, the instructions had to be given by the VMT to which the IBM PC was connected. In other words, the interface project was far from complete.

More recently, Bridgmon and Cline have continued the development and testing of their interface project at the University of California at Irvine Medical Center ("UCI"). UCI hired Bridgmon in April, 1984, to help oversee the installation of the MIS there. Cline and Bridgmon, who were not authorized by UCI to use its facilities for this purpose, worked in the evenings on further development of their interface project. At UCI, as they did at Presbyterian and Methodist Hospitals, Bridgmon and Cline tapped into the MIS to monitor and trap information being communicated between the VMT and the host computer.

tiality agreement with Technicon. Bridgmon replied that to the best of his knowledge he had not. In fact, Bridgmon had signed such an agreement with Technicon.

On March 31, 1984, Curtis entered into an exclusive license agreement with Medsoft to market the MSI 1000. The contract includes warranties by Medsoft that neither the corporation nor any of its officers, directors or employees has entered into any confidentiality agreement restricting Medsoft's rights to use or license the MSI 1000 and that licensing of the product by Curtis will not violate any proprietary interest or intellectual property rights of any third party. In addition, the contract requires Medsoft to provide an opinion of counsel confirming the warranties and requires Medsoft to indemnify Curtis for various potential damages including damages resulting from violation of proprietary or intellectual property rights.

Since early April, 1984, Curtis has been actively promoting the MSI 1000. As of last month, approximately 55 MSI 1000s had been ordered from Curtis although it is unclear whether any of those orders have been filled.

In determining whether plaintiff has established a reasonable likelihood of success on the merits, a threshold question has been raised as to the appropriate choice of law governing the claimed misappropriation of plain-

can obtain economic value from its
disclosure or use; and

b. is the subject of efforts that
are reasonable under the circum-
stances to maintain its secrecy.

6 Del. C. §2001(4).

Curtis argues that the function and control codes and
other aspects of the MIS communications interface claimed
by Technicon to be trade secrets are both readily ascer-
tainable by proper means and have not been the subject
of reasonable efforts to maintain their secrecy.

The record evidence supports the conclusion, at
this preliminary stage, that the MIS communications inter-
face, as a whole, is not readily ascertainable by proper
means. Even assuming for the moment that the wiretap
method of intercepting transmissions used by Bridgmon
and Cline is a proper means of obtaining the information,
by their own testimony Bridgmon and Cline devoted more
than 2,000 man hours to this project. Moreover, Dr. Lewis
testified that, as of a few weeks ago, the MSI 1000 still
is unable to fully emulate the Technicon VMT. Although
only a portion of the time spent on this project was
devoted to deciphering Technicon's alleged trade secrets,
the evidence indicates that the alleged "reverse
engineering" done by Bridgmon and Cline was a time
consuming process. Defendant's expert witness, Ronald
Hutchins, confirms this conclusion. Hutchins' affidavit
states that the documents produced by Bridgmon and Cline

-13-

confidentiality provisions; those Technicon manuals which contain schematics and other technical information about the communications interface are marked confidential at the beginning of the manual; and Zentec, the manufacturer of the VMT, is under a written obligation to maintain the confidentiality of Technicon's system.

Defendant argues that the hospital confidentiality provisions are too vague and overbroad to be meaningful and points out that Technicon failed to take numerous other protective measures. For example, neither the VMTs nor the cables connecting them to the host computer bear any proprietary legend; the first screen display on the VMT does not warn the user of any confidentiality requirements; the VMTs are not restricted to "secure" areas of the hospital; the cables connecting the VMTs with the host computer do not contain any special locking plugs; and the hospitals routinely issue access codes to hundreds of people apparently without any restriction or supervision by Technicon.

However, the law does not require that every conceivable security device be installed to protect a trade secret. See E. I. duPont de Nemours & Co. v. Christopher, 431 F.2d 1012 (5th Cir. 1970). If the MIS is to serve its purpose, it is reasonable to expect that hospitals would provide access codes to many of its employees and would place the VMTs at accessible locations throughout

not be believed. Plaintiff points to a Zentec official's affidavit as evidence that Zentec has maintained the confidentiality of Technicon's trade secrets and would not have sent the schematics to Bridgmon. Alternatively, plaintiff says that it would make no sense for Zentec to send Bridgmon only a partial set of schematics as loose sheets without any cover letter. For these reasons, Technicon argues that Bridgmon must have obtained the schematics he gave to Cline from the T4201 Theory of Operation & Maintenance Manual which bears a proprietary notice on the inside of the cover.

Although the evidence, when weighed after trial, may support this conclusion, I accept Bridgmon's version of how he obtained those documents for present purposes. In doing so, however, I do not accept Bridgmon's conclusion that he had no reason to know that the schematics were confidential. By Bridgmon's account, before obtaining any information from Zentec, he explained that Jewish Hospital was using a Technicon MIS and needed technical data with which to set up an in-house repair facility for the Technicon equipment. In subsequent telephone calls, Bridgmon states that he obtained additional information from Zentec after explaining that he had been given similar documents in the past. In other words, Bridgmon obtained Technicon data from Zentec not as a member of the general public but as a representative of a hospital

-17-

wise analyzed to determine the manner in which the product was created. Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470 (1974). Plaintiff agrees with the general proposition that trade secrets may be legitimately discovered through reverse engineering. However plaintiff argues that the MIS communications interface has never been made available to the public and, thus, could not be reverse engineered by proper means.

Technicon does not sell its software or documentation to its customers. Under its contracts, Technicon licenses its software and technical data to the customer for the customer's use subject to confidentiality provisions contained in the contracts. Even customer modifications to Technicon's software are covered by Technicon's confidentiality provisions. For example, several years after NIH contracted with Technicon to obtain the MIS, NIH acquired a perpetual software license from Technicon. The parties contemplated that NIH would be modifying the licensed Technicon software for specific programs needed by NIH. Pursuant to contract modification No. 44, NIH agreed, among other things, that any enhancements or modifications to Technicon's software which retain or reveal any of Technicon's software shall continue to be subject to the non-disclosure provisions of the original agreement. Technicon maintains that this type of non-disclosure requirement prohibits anyone from tapping

the consulting agreements pursuant ~to~ which Bridgmon was given access to the facilities. At Methodist Hospital, Bridgmon and Cline were given permission to use the MIS but the evidence indicates that that permission was given pursuant to a misrepresentation made by Bridgmon as to the stage of completion of his project.

Based upon this preliminary determination that plaintiff has established a likelihood of establishing that Bridgmon misappropriated trade secrets, it follows that Technicon is likely to establish that defendant, also, misappropriated trade secrets. At the very least, as a result of the discovery taken to date, Curtis knows or has reason to know that the MSI 1000 was developed, in part, using trade secrets "derived from or through a person who had utilized improper means to acquire [them];...acquired under circumstances giving rise to a duty to maintain [their] secrecy or limit [their] use; or...derived from or through a person who owed a duty to [Technicon] to maintain [their] secrecy or limit [their] use...." 6 Del. C. §2001(2)b.2.

Even if plaintiff establishes misappropriation, defendant contends that plaintiff should not obtain relief because plaintiff's alleged anti-competitive practices constitute unclean hands. Defendant's unclean hands defense does not appear to be supported by the facts or law and, thus, does not alter my conclusion that

-21-

with the new product.   Since there is no immediate com-
petition in the newly developed product market, the tech-
nological tie cannot foreclose competition.    The court
held that:

> [The] development and introduction of
> a system of technologically inter-
> related products is not sufficient
> alone to establish a per se unlawful
> tying arrangement even if the new products
> are incompatible with the products
> then offered by the competition and effective
> use of any one of the new products neces-
> sitates purchase of some or all of
> the others.

Id. at 543.

At this point, the evidence establishes that when Technicon
developed the MIS it, like Kodak, was introducing new
technology.   There being no comparable computer system
on the market, it follows that there was nothing with
which the MIS could have been made compatible.

In addition to establishing a probability of success
on the merits, Technicon must demonstrate both that it
will suffer irreparable injury and that the harm to plain-
tiff if injunctive relief is denied will be greater than
that which defendant will suffer if the injunction is
granted.   Bayard v. Martin, Del. Supr., 101 A.2d 329
(1953).   Plaintiff claims that defendant's wrongful acts
are damaging its good will and that, absent injunctive
relief, others will be encouraged to misappropriate
Technicon's trade secrets.   Bridgmon himself   described
the Technicon MIS as the "Cadillac" of the industry.
If defendant's MSI 1000 is connected to the Technicon

F. M. C. Corp. v. Varco International, Inc., 677 F.2d 500 (5th Cir. 1982). Nor does it appear that the financial impact on defendant or the public interest expressed by the hospitals outweighs the harm to plaintiff. Although the hospitals' interest in a more economical and versatile computer system is understandable, there is no evidence that the quality of patient care is at stake. Cf. Dickinson Medical Group, P.A. v. Foote, Del. Ch., C.A. No. 834-K, Brown, C. (May 10, 1984).

Based upon the foregoing, plaintiff's motion for a preliminary injunction will be granted. However, the parties have not addressed the question of the bond to be posted by plaintiff. Accordingly, the Court will hear argument on this issue alone on Thursday, August 23, 1984 at 4 p.m. I request that plaintiff submit a proposed form of order, on notice, for the Court's consideration on or before Thursday, August 23rd.

# EXHIBIT R

LEXSEE 1986 DEL. CH. LEXIS 468

**Trinity Transport, Inc. v. James Ryan et al**

**Civil Action No. 922**

**Court of Chancery of Delaware, Kent**

*1986 Del. Ch. LEXIS 468*

**September 23, 1986, Submitted**
**October 1, 1986, Decided**

**COUNSEL:** [*1] Myron T. Steele, Esq., PRICKETT, JONES, ELLIOTT, KRISTOL & SCHNEE.

James T. Vaughn, Jr., Esq., VAUGHN & VAUGHN

**JUDGES:** MAURICE A. HARTNETT, III, Vice-Chancellor

**OPINION BY:** HARTNETT

**OPINION**

ON PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER: DENIED.

HARTNETT, V.C.

Plaintiff seeks a Temporary Restraining Order enjoining defendant James Ryan from breaching a "non-compete agreement" dated July 21, 1985, and a "confidentiality agreement" dated January 21, 1985, and enjoining defendant Scott Ballard from breaching a "non-compete agreement" dated August 22, 1985. It is not disputed that the agreements were executed by defendants although defendants claim that one or more of the agreements were executed at dates later than shown on the face of the agreements and were back-dated by plaintiff.

It is also not controverted that the agreements were executed in Maryland and that Maryland law controls. One of the "non-compete" agreements provides that the defendant will not enter any field of competition with plaintiff for a period of one year within a geographical area of 100 miles of Federalsburg, Maryland, after the termination of employment for any reason. The other "non-compete" agreement [*2] contains a 500 mile 5-year limitation but plaintiff seeks only to enforce the 100 mile 1-year restriction. The confidentiality agreement executed by Mr. Ryan prohibits his use of proprietary information or trade secrets of the plaintiff. It is not disputed that defendants' employment with plaintiff has recently terminated and defendants are engaged in working for another employer in a similar business as that of plaintiff from an office in Dover, Delaware, which is within 100 miles of Federalsburg, Maryland.

II

A temporary restraining order or preliminary injunction are extraordinary remedies which are granted only in order to prevent truly irreparable injury. *Wylain, Inc. v. TRE Corp., Del. Ch., 412 A.2d 338 (1979); Gimbel v. Signal Companies, Inc., Del. Ch., 316 A.2d 599 (1974), aff'd, Del. Supr., 316 A.2d 619 (1974); Turek v. Tull, Del. Ch., 139 A.2d 368 (1958); Sandler v. Schenley Indus., Inc., Del. Ch., 79 A.2d 606 (1951).* They are, however, granted only to maintain the true status quo. *Smith v. Delaware Coach Co., Del. Ch., 70 A.2d 257 (1949); Thomas C. Marshall, Inc. v. Holiday Inn, Inc., Del. Ch., 174 A.2d 27 (1961).* An applicant [*3] always has the burden of showing a reasonable probability of ultimate success on the merits although this burden is lesser in the case of an application for a temporary restraining order. *Sandler v. Schenley Indus., Inc., supra; Gropper v. North Cent. Tex. Oil Co., Del. Ch., 114 A.2d 231 (1955); Bayard v. Martin, Del. Supr., 101 A.2d 329 (1953).* Even if the probability of irreparable harm is shown, the Court must still balance the competing equities between the parties. *Thomas C. Marshall, Inc. v. Holiday Inn, Inc., supra; Hollingsworth v. Szczesiak, Del. Ch., 84 A.2d 816 (1951).* The preliminary injunctive relief must be denied when hardship outweighs benefit.

*Eastern Shore Natural Gas Co. v. Stauffer Chemical Co., Del. Supr., 298 A.2d 322 (1972).* A Court has broad discretion in granting or refusing to grant interim injunctive relief. *Data General Corp. v. Digital Computer Controls, Inc., Del. Supr., 297 A.2d 437 (1972)* and preliminary relief is to be avoided, if possible, because controversies-should only be determined after all the parties have had a full opportunity to present the facts. Experience has shown that the true facts and the [*4] correct law are often difficult to ascertain without the advantage of a full hearing or discovery. This Court is also especially reluctant to grant preliminary relief if by doing so it will grant all the relief which the applicant may ultimately be entitled to after trial. *Thomas C. Marshall, Inc. v. Holiday Inn, Inc., supra.*

While contracts of employees not to compete are specifically enforceable, if reasonable, they are given great scrutiny by the court. *Original Vincent and Joseph v. Schiavone, Del. Ch., 134 A.2d 845 (1957).* This is especially true where the interim injunctive relief being sought is brought as a motion for a temporary restraining order, thus possibly denying the employee of an opportunity to properly mount a defense and summarily jeopardizing the employee's means of a livelihood.

### III

The law of Maryland relating to the enforcement of covenants not to compete is similar to the law of Delaware. It is set forth in *John Roane, Inc. v. Tweed, Del. Supr., 89 A.2d 548 (1952).* In that case our Supreme Court stated:

"From all of the reported Maryland decisions, the rule to be drawn is that, in Maryland, restrictive covenants in employment contracts [*5] will be enforced after termination of employment if (1) the contract was a prerequisite of the employment or was supported by consideration, (2) the purpose to be obtained is fair and reasonable, (3) the restriction does not injuriously affect the public, (4) the enforcement of the restriction will not do greater harm to the employee than good to the employer, and (5) the enforcement of the restriction is necessary for the protection of the employer's business. I find as a fact that such is the law of Maryland applicable in this case." Cf. *Faw, Casson & Co. v. Cranston, Del. Ch., 375 A.2d 463 (1977).*

On the present record it appears that the purposes of the agreements are fair and reasonable; the restrictions

will not injuriously affect the public; the enforcement of the relatively mild 100 mile provision will not do greater harm to the employee than good to the employer considering the nature of the business involved which is national in scope; and the enforcement of the restriction may be reasonably necessary for the protection of the employer's business. It also appears, however, that there is a question of fact as to whether the agreements were entered into as prerequisites [*6] of employment.

### IV

Defendants assert a number of legal defenses. They first assert that plaintiff has not shown that defendants' present employer is in actual competition with plaintiff. The verified complaint, however, in paragraph 16 states that defendants are employed in a freight brokerage business for their new employer in direct competition with plaintiff. The complaint also sets forth their former duties with plaintiff. Defendants' own affidavits set forth that they worked as dispatchers for plaintiff and that they now work as dispatchers for their new employers. This defense, therefore, is without merit.

Defendants, in effect, next claim that plaintiff has not shown any real or threatened effect on its goodwill by the defendants. It is not necessary, however, for the plaintiff to show that a loss of goodwill has already occurred. The nature of the employment by defendants with plaintiff and with their new employer is so similar in a highly competitive industry, as appears from defendants' own affidavits, that it seems reasonably likely that an affect on goodwill will occur. *Ruhl v. F. A. Bartlett Tree Expert Co., Md. Ct. of App., 225 A.2d 288 (1967).*

Defendants also [*7] claim that the circumstances of defendants' termination somehow precludes injunctive relief. The agreements, however, specifically state that they apply should employment terminate *for any reason.*

Defendants also claim that plaintiff has not shown that an injunction is reasonably necessary for its protection. I disagree. Defendants are obviously engaged in competition with plaintiff in a highly competitive industry within 50 miles of plaintiff's place of business. It is therefore reasonably probable that if defendants violate the agreements, irreparable harm will inure to plaintiff.

### V

A more valid defense raised by defendants is that

1986 Del. Ch. LEXIS 468, *7

plaintiff was sold after the agreements were executed and just before defendants left plaintiff's employment. The law seems to be that an agreement for personal services is not assignable. It is not disputed that plaintiff, a corporation, has been sold to another corporation and its office moved to the office of the acquiring corporation. It is unclear from the present limited record whether plaintiff is actually still engaged in the same business that it conducted while defendants worked for it.

VI

On the present record, therefore, I find that [*8]

plaintiff has not sustained its heavy burden of showing a reasonable probability of success on the merits as to the issue of whether plaintiff is the same entity as existed when the agreements were entered into and whether the working conditions are sufficiently similar. I also find that there is a *bona fide* dispute as to whether the agreements were executed as a prerequisite to employment and that there is no evidence that defendant Ryan is breaching, or is about to breach, the confidentiality agreement. I therefore decline to enter a temporary restraining order. IT IS SO ORDERED.

# EXHIBIT S

$\begin{pmatrix} 34 \end{pmatrix}$

## COURT OF CHANCERY
### OF THE
## STATE OF DELAWARE

WILLIAM T. ALLEN
CHANCELLOR

COURT HOUSE
WILMINGTON, DELAWARE 19801

October 6, 1987

Edward B. Maxwell, 2nd, Esquire
Josy W. Ingersoll, Esquire
Young, Conaway, Stargatt & Taylor
P.O. Box 391
Wilmington, Delaware    19899

Irving Morris, Esquire
Morris & Rosenthal
P.O. Box 1070
Wilmington, Delaware    19899

Lawrence A. Hamermesh, Esquire
Kenneth Nachbar, Esquire
Morris, Nichols, Arsht & Tunnell
P.O. Box 1347
Wilmington, Delaware    19899

R. Franklin Balotti, Esquire
Jesse A. Finkelstein, Esquire
Richards, Layton & Finger
P.O. Box 551
Wilmington, Delaware    19899

Re:  UIS, Inc. v. Walbro Corp., et al.
     Civil Action No. 9323
     Submitted:  October 5, 1987

Dear Counsel:

Plaintiff, UIS, Inc. a New York corporation is presently extending a tender offer for the purchase of up to 2,105,000 shares of common stock of Walbro Corporation, a Delaware company.  The offer, which is for 58.7% of Walbro's outstanding common stock is for $27.25 per share.  UIS has

Edward B. Maxwell, 2nd, Esquire, and Josy W. Ingersoll, Esquire
Irving Morris, Esquire
Lawrence A. Hamermesh, Esquire and Kenneth Nachbar, Esquire
R. Franklin Balotti, Esquire and Jesse A. Finkelstein, Esquire
October 6, 1987
Page 2 (Revised October 7, 1987)

not announced its intention, if any, with respect to a follow-up transaction if its offer is closed, which can occur no earlier than October 7, 1987.

Defendants are Walbro, the seven individuals who comprise its board of directors and General Electric Credit Corporation ("GECC"), a New York corporation. The Walbro board has apparently determined that UIS's partial offer is for less than a fair price and it has taken steps to encourage its defeat.

This suit seeks rescission of a recent issuance to GECC of a block of preferred stock that constitutes 23% of the voting power of the corporation; an order enjoining pendente lite Walbro from purchasing shares of its stock in the market or through negotiated transactions; and an order requiring Walbro to hold separate and maintain the $35,000,000 consideration paid by GECC for the Walbro preferred stock, so that rescission of that transaction may be effectuated after final hearing.

The suit was filed on October 5th and an application for a temporary restraining order was entertained that afternoon. The emergency relief sought is of three kinds. First, it is requested that GECC be temporarily restrained

Edward B. Maxwell, 2nd, Esquire, and Josy W. Ingersoll, Esquire
Irving Morris, Esquire
Lawrence A. Hamermesh, Esquire and Kenneth Nachbar, Esquire
R. Franklin Balotti, Esquire and Jesse A. Finkelstein, Esquire
October 6, 1987
Page 3

from voting its Walbro stock. Second, it is requested that
Walbro itself be restrained from purchasing any of its own
stock. Finally, an order requiring Walbro to segregate the
proceeds of the GECC stock issuance and to maintain those
funds so that rescission may be effectuated is sought.

While the pending motion was presented on short notice,
all defendants appeared at the argument and were heard.
GECC, however, filed a motion to dismiss for lack of per-
sonal jurisdiction. In addressing the merits of the appli-
cation, GECC took care not to waive that position.

I.

A temporary restraining order is a very special remedy
of short duration and available ex parte. It is designed
primarily to prevent imminent irreparable injury. In
assessing whether this remedy is to be granted, a court
must, of course, be persuaded that a colorable claim has
been made out if the facts alleged are treated as true. In
contrast to the situation when there is an application for
preliminary injunction — which is heard after the parties
have had an opportunity to take discovery and develop a

Edward B. Maxwell, 2nd, Esquire, and Josy W. Ingersoll, Esquire
Irving Morris, Esquire
Lawrence A. Hamermesh, Esquire and Kenneth Nachbar, Esquire
R. Franklin Balotti, Esquire and Jesse A. Finkelstein, Esquire
October 6, 1987
Page 4

record — the focus of the court on such a motion is not importantly upon an assessment of the probability of ultimate success, but is primarily upon the injury to plaintiff that is threatened and the possible injury to defendant if the remedy is improvidently granted. Practical concerns and limitations underlie this distinction between the inquiry on an application for preliminary injunction and for a restraining order. Typically, a court will be able to quickly evaluate the nature and impact of a threatened consequence; it is a much more difficult task to preliminarily evaluate the merits of a legal claim that frequently will turn upon contested facts.

This case nicely illustrates that difficulty. At this time, I will not recite the theory which plaintiff offers to support its claim for relief. It suffices for the moment to say that that theory turns importantly upon the assertion that GECC's power to vote its Walbro stock is, by virtue of the terms of the preferred stock purchase agreement (or perhaps by virtue of the economic terms of the preferred stock), virtually under the control of the Walbro board. Thus, the issuance of that stock is attacked as a transparent entrenchment device designed simply to insure that no

Edward B. Maxwell, 2nd, Esquire, and Josy W. Ingersoll, Esquire
Irving Morris, Esquire
Lawrence A. Hamermesh, Esquire and Kenneth Nachbar, Esquire
R. Franklin Balotti, Esquire and Jesse A. Finkelstein, Esquire
October 6, 1987
Page 5

outside force — such as UIS — may mount a successful
attack upon control of Walbro.[1]

Defendants sharply disagree with UIS about the rela-
tionship between GECC and Walbro. It is asserted that GECC
is a huge financial enterprise not likely to be controlled
by Walbro but, rather, with respect to its Walbro invest-
ment, to act in whatever way is in its best interest.

One cannot at this stage responsibly form any tentative
judgment about the relative merits of these positions beyond
a conclusion that plaintiffs' claims are colorably valid.
Much of what plaintiffs say is troubling. Defendants'
failure to explore to any extent whether UIS would make a
higher offer for all shares surely is worthy of further
inquiry. A board's duty is to act with due care and that

---

[1]Members of Walbro's management, their relations, and
friends, and perhaps a few other stockholders, entered into
a Stockholders' Agreement giving the Walbro board exclusive
control over the disposition of their Walbro stock until the
end of 1988. All told, at least 79 Walbro stockholders
entered into the Stockholders' Agreement. The shares held
by the signatories to the agreement amount to approximately
30% of Walbro's common stock. Adding GECC's preferred stock
together with the common stock covered by the Stockholders'
Agreement, UIS faces a block controlling approximately 46%
of the voting power of Walbro's shareholders.

Edward B. Maxwell, 2nd, Esquire, and Josy W. Ingersoll, Esquire
Irving Morris, Esquire
Lawrence A. Hamermesh, Esquire and Kenneth Nachbar, Esquire
R. Franklin Balotti, Esquire and Jesse A. Finkelstein, Esquire
October 6, 1987
Page 6

duty includes the responsibility to reasonably inform
oneself of alternatives. But that inquiry cannot be under-
taken at this point in time.

II.

Thus, I turn to what is the central inquiry at this
stage: the threat of immediate irreparable injury.

A.

To dispose first of what is easiest, I will decline to
enjoin the voting by GECC of its shares at this time.
Plaintiff has shown no threat that GECC will vote those
shares before a preliminary injunction may be heard. No
shareholder meeting is currently scheduled and there is no
record basis to believe that action under Section 228 is
contemplated. Restraining orders will not issue merely to
still apprehensions but rather only upon a showing of
immediate threatened injury. With respect to the possible
voting of the block of preferred shares sold to GECC, there
has been no such showing.

Edward B. Maxwell, 2nd, Esquire, and Josy W. Ingersoll, Esquire
Irving Morris, Esquire
Lawrence A. Hamermesh, Esquire and Kenneth Nachbar, Esquire
R. Franklin Balotti, Esquire and Jesse A. Finkelstein, Esquire
October 6, 1987
Page 7


                                    B.


       The next aspect of the current motion in degree of
difficulty is the application to restrain Walbro from
expending the $35,000,000 paid by GECC for the preferred
stock. This relief is required, it is said, to assure that
the remedy of rescission is possible at final hearing when
plaintiff will show that the sale was a breach of duty and
that GECC knew or should have known of that fact. Should
Walbro, however, spend the proceeds of the sale (in, for
example, acquiring a new business), it may or likely will be
unable to offer to restore GECC to its prior position and,
thus, the corporation may be saddled for an extended period
with a capital structure that was the result of a breach of
duty, to the disadvantage of other shareholders.

       I am not persuaded that sufficient justification has
been shown to warrant the entry of this aspect of the relief
sought. First, to grant emergency relief of this kind,
while possible, would represent a dramatic incursion into
the area of responsibility created by Section 141 of our
law. The directors of Walbro, not this court, are charged
with deciding what is and what is not a prudent or

Edward B. Maxwell, 2nd, Esquire, and Josy W. Ingersoll, Esquire
Irving Morris, Esquire
Lawrence A. Hamermesh, Esquire and Kenneth Nachbar, Esquire
R. Franklin Balotti, Esquire and Jesse A. Finkelstein, Esquire
October 6, 1987
Page 8

attractive investment opportunity for the Company's funds. Yet, to restrain _pendente lite_ the expending of the capital here involved — which apparently represents about 25% of the Company's entire capitalization — would necessarily transfer a significant portion of the responsibility of managing the Company's affairs to the court which would be asked — in the guise of an application to lift the restraint for specific projects — to approve capital expenditures. While such relief may be appropriate in some instances, I do not think enough has been shown here to justify that result.

Second, it is well established that a tender offeror has no right to freeze the business he seeks to acquire while his offer goes forward. Not only has a board the responsibility to continue to manage the enterprise generally, but a board, if it acts in good faith and with due care, may also take steps to defeat a tender offer that it finds to be unfair to some shareholders. In taking such action, a board necessarily acts under the suspicion that it seeks to protect its personal interests. Thus, those actions must pass later judicial review as being reasonable in relation to a threat to corporate or shareholder welfare.

Edward B. Maxwell, 2nd, Esquire, and Josy W. Ingersoll, Esquire
Irving Morris, Esquire
Lawrence A. Hamermesh, Esquire and Kenneth Nachbar, Esquire
R. Franklin Balotti, Esquire and Jesse A. Finkelstein, Esquire
October 6, 1987
Page 9

But action designed to defeat a tender offer that the board
finds to be at an unfair price — particularly an offer that
is for less than all of the stock and has no announced
second step at all — is not _ipso facto_ invalid simply
because it is effective and thus does deprive some share-
holders of an option they might have taken. With these
generalities in mind, it seems a stretch to seek to enjoin
as yet unproposed transactions that may have the effect of
making the Company a less desirable or less practically
achievable target to a particular tender offeror.

Finally, even if plaintiff does show that the GECC
preferred stock transaction represented a breach of duty, I
am not satisfied that the court could not shape relief that
would be fully adequate even if Walbro no longer had the
liquid funds to effect a rescission. A number of alterna-
tives to the relief plaintiffs envision as necessitating the
presently sought restraining order would be possible:
refinancing is the most obvious; court imposed restraints on
voting rights is another. Accordingly, I conclude that no
need or justification for the emergency relief of freezing
the proceeds of the GECC stock issuance has been shown.

Edward B. Maxwell, 2nd, Esquire, and Josy W. Ingersoll, Esquire
Irving Morris, Esquire
Lawrence A. Hamermesh, Esquire and Kenneth Nachbar, Esquire
R. Franklin Balotti, Esquire and Jesse A. Finkelstein, Esquire
October 6, 1987
Page 10

## C.

Lastly, I turn to the most difficult aspect of the
current application: the request that the Company be
restrained pending a preliminary injunction hearing from
acquiring its own stock. The request is premised upon the
factual assertion that, unless this relief is now granted,
UIS's pending tender offer will lose any chance of accep-
tance it has. That offer is conditioned upon the tendering
of 58% of Walbro's common stock. The directors, officers
and persons allied with them (79 in all) apparently control
30% of the common stock and have bound themselves con-
tractually to be governed by the board's determination how
to respond to the offer. Thus, since it already owns 8% of
Walbro's outstanding stock, UIS has conditioned its offer on
all but 4% of the remaining shares tendering. Its price
represents a premium of approximately 10% over the price

Edward B. Maxwell, 2nd, Esquire, and Josy W. Ingersoll, Esquire
Irving Morris, Esquire
Lawrence A. Hamermesh, Esquire and Kenneth Nachbar, Esquire
R. Franklin Balotti, Esquire and Jesse A. Finkelstein, Esquire
October 6, 1987
Page 11

during the weeks immediately prior to the announcement of its offer.[2]

In these circumstances, it might seem unlikely that UIS's present offer will be accepted by the demanded proportion of Walbro shareholders. But UIS complains that if Walbro is permitted to go into the market, as it plans to do, and buy up to 8% of its stock, it will be mathematically impossible for it to achieve its goal. For, in the event that 8% of the Company's stock is retired, then (in terms of voting power since the preferred votes with the common) voting control over the company will lie clearly in the hands of GECC and the incumbent board (pursuant to the Shareholder Agreement). It is, as mentioned above, contested as to whether there is any basis, legally (in the Preferred Stock Purchase Agreement) or factually (in the economics of the transaction) to support the assertion that,

---

[2]The September 9, 1987 tender offer is at $27.25; prior to that date, Walbro's stock traded around $25. On September 1, for example, it traded at $26.25; following announcement the price immediately rose to around $30 only to retreat to its pre-offer price of about $25 upon the announcement of the GECC preferred stock purchase.

Edward B. Maxwell, 2nd, Esquire, and Josy W. Ingersoll, Esquire
Irving Morris, Esquire
Lawrence A. Hamermesh, Esquire and Kenneth Nachbar, Esquire
R. Franklin Balotti, Esquire and Jesse A. Finkelstein, Esquire
October 6, 1987
Page 12

with respect to its Walbro investment, GECC is simply a cat's paw for the incumbent board. One is entitled to suspect that the truth of the matter, whatever it may be, is more likely to be uncovered in the economics of the relationship rather than the formal arrangements. That, however, and indeed the whole of the issue, is not something that can sensibly be addressed in this procedural setting.

I am satisfied, at least for purposes of this motion, that plaintiff has stated colorable claims of breach of duty; the claims are not frivolous. I am also persuaded for present purposes that the completion of the presently planned purchase of Walbro stock, if it constitutes a wrong, threatens legal injury to UIS in its capacity as a shareholder of Walbro seeking to increase its ownership of the firm and that injury may be irreparable.[3]

---

[3]The question of standing of a tender offeror to assert breach of fiduciary duty claims in his capacity as a shareholder of the target corporation (to whom duties are owed under state law) was not argued by the parties and is addressed here only in a tentative fashion. The rights of existing shareholders as sellers of stock and of buyers of stock is a question of complexity that has been touched upon in such cases as Moran v. Household International, Inc.,

(Footnote Continued)

Edward B. Maxwell, 2nd, Esquire, and Josy W. Ingersoll, Esquire
Irving Morris, Esquire
Lawrence A. Hamermesh, Esquire and Kenneth Nachbar, Esquire
R. Franklin Balotti, Esquire and Jesse A. Finkelstein, Esquire
October 6, 1987
Page 13


Assuming the allegations of the complaint to be true,
those purchases also appear to threaten legal injury as well
to shareholders who may desire to tender; while shareholders
have no right to prevent the board from taking actions that
the board, in the good faith exercise of its judgment
believes are necessary or beneficial to the corporation,
even if those actions makes an unsolicited tender offer less
likely or unlikely, shareholders do have an enforceable
right to demand that all board action be designed and
intended principally to promote corporate interests and not
personal interests of incumbent board members.  Considering
the allegations of the complaint, the public shareholders[4]
are threatened with possible injury resulting from wrongful
conduct, should the UIS offer be made unavailable.


_____

(Footnote Continued)
Del.Supr., 500 A.2d 1346 (1985). Whether those rights are
different will remain for another day.

[4] I note in a hurried way that plaintiffs in a
stockholder class action filed by public shareholders in
this court which attacks the same transactions as are
attacked by this complaint, appeared at the hearing of this
motion and supported plaintiff's application.

Edward B. Maxwell, 2nd, Esquire, and Josy W. Ingersoll, Esquire
Irving Morris, Esquire
Lawrence A. Hamermesh, Esquire and Kenneth Nachbar, Esquire
R. Franklin Balotti, Esquire and Jesse A. Finkelstein, Esquire
October 6, 1987
Page 14 (Revised October 7, 1987)

It is easy enough to speculate that UIS may extend or reinstitute its offer after final hearing, as I have done, and thus to conclude that any injury is not necessarily irreparable. But events do not remain static and it does seem excessively academic to pretend that there can be reasonable assurance that, if after final hearing Walbro were required to reissue to the market the shares it is now planning to assign to its treasury, the true status quo would be restored and an offer from UIS could then be expected to go forward.

Thus, I am persuaded that the sine qua non of restraining order relief is present: a practical injury that is irreparable. As indicated above, I also believe a colorable claim has been stated. The last aspect of the question presented is one of balancing the interests of the parties — a step that a court of equity can never properly avoid in granting injunctive relief. In this connection, I am once more sensitive to the allocation of responsibility made by Section 141 and, thus, seek to interfere as little as possible with the board in its exercise of its responsibilities. Moreover, I am, of course, aware that the power to purchase its own stock is one that is specifically conferred

Edward B. Maxwell, 2nd, Esquire, and Josy W. Ingersoll, Esquire
Irving Morris, Esquire
Lawrence A. Hamermesh, Esquire and Kenneth Nachbar, Esquire
R. Franklin Balotti, Esquire and Jesse A. Finkelstein, Esquire
October 6, 1987
Page 15

by Section 160(a) of our corporation law. See Cheff v. Mathes, Del.Supr., 199 A.2d 548 (1964).

In these circumstances, it is, in my judgment, appropriate to issue an order maintaining the status quo insofar as Walbro's purchase of its own stock is concerned for a short period to allow a more thoughtful treatment of the issues presented after some discovery has occurred. I will, therefore, enter an order enjoining the Company for a period of twenty days from purchasing or contracting to purchase any of its outstanding stock. In all other respects the application will be denied.

Very truly yours,

WTA/vll

cc: Register in Chancery

# EXHIBIT T

LEXSEE 2006 DEL. CH. LEXIS 176

**W.L. Gore & Associates, Inc., Plaintiff, v. Huey Shen Wu (a/k/a Ben H. Wu, a/k/a Ben Wu), Meichi Wu (a/k/a Meichi Lu), ABC Health International, Inc., Fountain Technology, LLC, and Fulfill America, Inc., Defendants.**

**Civil Action No. 263-N**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2006 Del. Ch. LEXIS 176*

**May 3, 2006, Submitted
September 15, 2006, Decided**

**PRIOR HISTORY:** *W.L. Gore & Assocs. v. Wu, 2006 Del. Ch. LEXIS 65 (Del. Ch., Mar. 30, 2006)*

**COUNSEL:** **[\*1]** For Plaintiff W. L. Gore & Associates, Inc.: Martin S. Lessner, Esquire, Michael P. Stafford, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Charles F. Knapp, Esquire, FAEGRE & BENSON, Minneapolis, Minnesota.

Huey-Shen Wu, Defendant, Pro se.

For Defendant Huey-Shen Wu pursuant to a limited entry of appearance for purposes of the trial only: William M. Kelleher, Esquire, Jan I. Berlage, Esquire, Leslie C. Heilman, Esquire, BALLARD SPAHR ANDREWS & INGERSOLL, LLP, Wilmington, Delaware.

**JUDGES:** PARSONS, Vice Chancellor.

**OPINION BY:** PARSONS

**OPINION**

*PUBLIC VERSION REDACTED MATERIAL*

**MEMORANDUM OPINION**

**PARSONS, Vice Chancellor.**

W.L. Gore & Associates, Inc. ("Gore") filed this case on February 18, 2004, alleging that one of its former scientists, defendant Huey-Shen Wu ("Wu"), breached the contractual non-compete and confidentiality

obligations he had with Gore, breached his duty of loyalty to Gore, misappropriated and conspired to misappropriate Gore trade secrets, unlawfully converted Gore property, violated the Delaware Deceptive Trade Practices Act, interfered with Gore's contracts and business relations, and engaged in a civil conspiracy to **[\*2]** misappropriate Gore's intellectual and other property.

The parties engaged in extensive pre-trial discovery and motion practice. As a result of some of these proceedings, Wu has been and remains subject to a series of orders enjoining him from disclosing or using Gore's trade secrets and from working in a segment of the chemical industry closely related to Gore's business pending final resolution of this matter.

The Court scheduled a trial on the merits for November 2005. Shortly before the trial date, however, Wu entered into a Consent Judgment whereby he admitted all of the allegations in the Verified Complaint (the "Complaint"), and agreed to the entry of judgment against him, including an award of certain damages and injunctive relief. Among other things, the Consent Judgment permanently enjoined Wu from disclosing or using any confidential, proprietary or trade secret research, information, know-how, or material of Gore that Wu worked on or with during his employment with Gore. [1] The Consent Judgment, however, expressly left open for further proceedings whether additional injunctive relief was appropriate and, if so, the proper scope of such additional relief. [2]

1  Consent J. P 8.

**[\*3]**

2  *Id.* P 11.

The additional injunctive relief referred to in the Consent Judgment would restrict Wu from engaging in certain activities for specified periods of time. The court conducted a trial on Gore's request for additional injunctive relief in November 2005. This memorandum opinion reflects the Court's post-trial findings of fact and conclusions of law on that issue.

In light of the egregiousness of Wu's misconduct, the overwhelming evidence that Wu cannot be trusted to police himself, evidence that Wu took electronic files from Gore and has not accounted to the Court's satisfaction as to the whereabouts of such files, and the ongoing harm that Wu can cause Gore if he continues to work in the same areas he worked at Gore, the Court concludes that some additional injunctive relief is warranted. Therefore, the Court will enjoin Wu (a) for a period of five years from March 1, 2006 from engaging or participating in any activity involving the research or development of, or the sale of research or development concerning, any TFE-containing polymers or products made from such polymers [*4] or the manufacture of such polymers or products; and (b) for a period of ten years from engaging or participating in any activity involving the research or development of, or the sale of research or development concerning, the polymers Gore previously identified that Wu worked on or with during his employment at Gore or products made from such polymers or the manufacture of such polymers or products. The Court denies, however, the additional injunctive relief Gore requested to prohibit Wu from working in the protective coating fabrics and fuel cell membranes industries or with such products.

**I. FACTS**

**A. Background**

**1. The parties**

Gore is a privately held Delaware corporation that employs approximately 7,000 associates in 45 locations around the world. [3] It researches, develops, manufactures and sells fluoropolymer products, including selectively permeable barriers for chemical and biological agents and membranes for fuel cell separation applications. [4] Gore's proprietary technologies encompass polymers made or derived from tetrafluoroethylene (TFE), including the versatile polymer polytetrafluoroethylene (PTFE). TFE

and PTFE have resulted in numerous products [*5] for electronic signal transmission, fabric laminates, and medical implants, as well as membrane, filtration, sealant, and fiber applications in diverse industries. [5]

3  Compl. PP 5-6; Tr. at 53, 90-91. Gore refers to its employees as "associates." *See* Tr. at 16. Citations in the form "Tr." are to the transcript of the trial held on November 16-18, 2005. Where it is relevant and not clear from the text, the identity of the witness testifying is indicated parenthetically.
4  Compl. P 5. Because Wu, in the Consent Judgment, admitted all factual allegations in the Complaint against him, many of the record citations are to the Complaint. Consent J. P 7.
5  Compl. P 6.

On April 16, 1990, Wu began working for Gore as a scientist shortly after receiving his Ph.D. [6] His employment with Gore continued until he was fired in February 2004 due to circumstances that led Gore to file this suit. Before he was terminated, Wu held the position of senior scientist at Gore's Elkton, Maryland facility. [*6] [7] Wu had a very successful career at Gore, being named as an inventor on more than 20 U.S. patents and many associated foreign patents and having helped develop trade secrets used by Gore in its various products. [8]

6  Compl. P 12.
7  *Id.* P 2.
8  *Id.* P 14.

**2.   Wu's   non-competition   and   confidentiality agreements with Gore**

Gore spends substantial time, effort and money developing and maintaining the confidentiality of its trade secrets. [9] Accordingly, Gore only discloses its trade secrets and confidential information on a need to know basis, requires employees to sign confidentiality agreements and trains all its associates on the importance of keeping such information confidential. [10] Further, all associates that have access to Gore's confidential fluoropolymer processing information must sign additional confidentiality agreements and undertake additional obligations to Gore.

9  *Id.* P 16.
[*7]

10  *Id.* PP 16, 18.

Because his job required access to highly confidential Gore trade secrets, Wu signed two different agreements. At the inception of his employment, Wu executed a standard Gore service agreement (the "Service Agreement"). [11] In the Service Agreement, Wu acknowledged that "customer lists, manufacturing processes, devices, techniques, plans, methods, drawings, blueprints, reproductions, data, tables, calculations, letters or other paper work, documents and know-how of Gore ... are secret and confidential." [12] He further agreed that if he violated the Service Agreement, Gore could obtain preliminary and permanent injunctive relief against him and an equitable accounting of all profits or benefits arising out of the violation from any court of competent jurisdiction. [13] The Service Agreement also contains a one year non-competition agreement. It provides: "Upon termination of this employment, the undersigned agrees that he will not engage in any business activity in competition with Gore for a period of one (1) year thereafter." [14]

11  Compl. P 19; Pl. Ex. 1.

[*8]

12  Service Agreement P 1.

13  *Id.* P 4.

14  *Id.* P 6.

In the course of his activities at Gore, Wu had access to Gore's valuable TFE technology (including PTFE technology), used specific details of PTFE processing and had the opportunity to improve or change those details. Consequently, Gore required Wu to sign a second agreement entitled "Tetrafluoroethylene Polymers Confidentiality and Non-Competition Agreement" (the "TFE Agreement"). [15] Beginning in 1993, Wu signed a TFE Agreement during each year of his employment with Gore. [16]

15  Pl. Exs. 3-12.

16  The TFE Agreements Wu signed in 1994-2000 are each entitled "Polytetrafluoroethylene Confidentiality and Non-Competition Agreement." Pl. Exs. 5-11. The TFE Agreement Wu signed in 1993 is entitled "PTFE Confidentiality and Non-Competition Agreement." Pl. Ex. 12.

In pertinent part the TFE Agreement provides:

III. TRADE [*9]  SECRETS, KNOW HOW,  CONFIDENTIAL INFORMATION

ASSOCIATE, during the course of employment with GORE, under this Agreement will have access to and become familiar with various confidential know-how and trade secrets including formulae, patterns, devices, secret inventions, processes, machines and compilations of information, records and specifications which are owned by GORE, and which are used by GORE in: manufacture, selection, purchasing and transportation of PTFE and other polymers containing TFE, the manufacturing of products from PTFE and other polymers containing TFE, dealing in products made therefrom, or research and development concerning the same. ASSOCIATE shall not disclose any GORE confidential know-how or trade secrets, directly or indirectly, nor use them in any way, either during the term of this Agreement or at any time thereafter, except in a manner authorized by GORE. All files, records, documents, drawings, specifications, equipment, and similar items relating to GORE's business or research activities, whether prepared by ASSOCIATE or otherwise coming into his/her possession, shall remain the exclusive property of GORE and the ASSOCIATE agrees to safeguard their [*10] confidentiality and return them to GORE when (s)he terminates.

\* \* \* \*

V.  NON-COMPETITION  BY ASSOCIATE

During the term of this Agreement, ASSOCIATE shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, corporate officer, director or in any other individual or representative capacity, engage or participate in any business that is involved in the

manufacture, purchasing, selecting or transportation of PTFE and other polymers containing TFE, manufacturing products from PTFE and other polymers containing TFE, dealing in products made therefrom, or conducting research and development concerning the same.

## VI. RESTRICTIVE COVENANTS

In return for the consideration received by ASSOCIATE under the Agreement, ASSOCIATE agrees as part of and ancillary to this Agreement that ASSOCIATE for a reasonable period of time after the termination of his/her employment by GORE, shall not for any reason directly or indirectly, by any means or device whatsoever, for himself/herself or on behalf of, or in conjunction with any person or entity, do any one or more of the following:

> (a) compete with GORE by - associating himself/herself [*11] in any way with a person or entity that is involved in the manufacturing, purchasing, selecting or transportation of PTFE and other polymers containing TFE or manufacturing of products from PTFE and other polymers containing TFE or dealing in products made therefrom, or conducting research and development concerning the same.

> (b) induce, entice, hire or attempt to hire or employ any ASSOCIATE of GORE for the purpose of (a).

GORE & ASSOCIATE expressly agree that "a reasonable period of time" as used in this section shall be two (2) years.

In February 2004, Gore terminated Wu after receiving information that he had breached these agreements and misappropriated Gore trade secrets.

### 3. Wu's involvement in ABC Health International, Inc., Fountain Technology, LLC and Fulfill America, Inc.

The information Gore discovered included evidence that Wu and his family had formed three separate companies, ABC Health International, Inc. ("ABC"), Fulfill America, Inc. ("Fulfill") and Fountain Technology, LLC ("Fountain"), for the purpose of implementing an illicit scheme to misappropriate and convert Gore resources, know-how and confidential information and trade secrets for their [*12] own, unjust enrichment. [17] I will discuss each company and Wu's involvement in that company in turn.

> 17  Compl. PP 2-3.

ABC is a Delaware corporation with its principal place of business in Downey, California. [18] Meichi Wu (a/k/a Meichi Lu), Wu's wife, allegedly founded ABC in 1994. [19] A "Corporate Resolution" dated December 22, 1999, indicates that Wu became Chairman of ABC as of that date. [20]

> 18  *Id.* P 9.
> 19  *Id.* PP 8-9.
> 20  *Id.* Ex. D.

Fountain is a California limited liability corporation with its principal place of business in Rosemead, California. [21] A marketing brochure found on Wu's computer describes Fountain as a "world leader in fluorinated material technologies, including PEM fuel cell membranes, protective fluorinated polymer coatings, fluorinated rubbers, fluorinated fluids, and fluorinated [*13] surfactants." [22]

> 21  *Id.* P 10.
> 22  *Id.* Ex. K.

Fulfill is a California corporation with its principal place of business in Rosemead, California. [23] Meichi Lu allegedly serves as its "manager" [24] and Wu serves as its registered agent and "principal investigator." [25] Wu evidently received an annual salary of almost $ 100,000 for his position at Fulfill during a period when he was

2006 Del. Ch. LEXIS 176, *13

still employed by Gore. [26]

23  Compl. P 11.
24  Id. P 8.
25  Id. P 11; Compl. Ex. E.
26  Id.

While Wu was employed by Gore, he used ABC, Fountain and Fulfill to enter into several contracts. For example, the Army [TEXT REDACTED BY THE COURT] awarded Fulfill at least two contracts in areas in which it directly competed with Gore. [27] Both contracts list Wu as the principal investigator and contain [*14] a large amount of Gore confidential, proprietary and trade secret information. [28]

27  Compl. PP 39, 40, 42. [TEXT REDACTED BY THE COURT]
28  Id. PP 40, 42, 44.

While still employed by Gore, Wu also surreptitiously drafted several joint venture "feasibility studies," which contemplate joint ventures between Fulfill and a Chinese manufacturer, [TEXT REDACTED BY THE COURT], as well as between Fountain and [TEXT REDACTED BY THE COURT]. [29] These studies include a substantial amount of Gore confidential information. In particular, some of this information directly relates to Wu's research work on the commercialization of fluoroionomers for fuel cell technology, which Wu was working on shortly before Gore terminated him. [30] These joint ventures planned to use Gore technology as Fountain and Fulfill's capital contribution to a business that would produce an [TEXT REDACTED BY THE COURT] and polymers with TFE and [TEXT REDACTED BY THE COURT] that are used as [TEXT REDACTED BY THE COURT]. [*15] [31]

29  Id. P 48.
30  Id.
31  Id. P 49.

After Gore became aware of Wu's activities, it found several draft patent applications on his computer that contain Gore technology. [32] These applications are for "nano-emulsions of fluoro ionomers," [33] "High Temperature Ionic Polymers and Membranes Made Therefrom" [34] and "Selectively Permeable Elastomeric Composite Materials." [35]

32  Compl. P 53; Id. Exs. G, H, I.
33  Id. Ex. G.
34  Id. Ex. H.
35  Id. Ex. I.

Wu's computer also contained several other documents that disclosed Gore trade secrets. These include a joint venture contract between [TEXT REDACTED BY THE COURT] and Fountain to produce and sell "fluorinated material products, including but not limited to fluorinated rubber latex and fluorinated resin latex [*16] products and fluorinated fine chemicals including but not limited to [HFPO] [sic], fluorinated alkyl vinyl ethers and fluorinated sultones." [36] Other examples include several feasibility studies Wu prepared that relate to commercial applications for Gore confidential and proprietary research and knowledge. [37]

36  Compl. P 54 (internal quotations omitted).
37  See Id. PP 56-59.

**B. Procedural History**

Gore commenced this action against Wu on February 18, 2004. The Complaint accuses Wu, Meichi Lu, ABC, Fountain, and Fulfill of one or more of the following: breach of contract, breach of the duty of loyalty, conversion, tortious interference with contract and business relations, misappropriation of trade secrets, violating Delaware's Uniform Deceptive Trade Practices Act ("UDTPA"), aiding and abetting and civil conspiracy. [38] The next day I issued a temporary restraining order prohibiting Wu from disclosing any confidential, proprietary or trade secret information he gained as a scientist [*17] at Gore and from competing with Gore. [39] Subsequently, on March 10, 2004, the parties stipulated to a more comprehensive preliminary injunction in lieu of proceeding to a hearing on Gore's motion for such relief. Beginning a few months later and continuing to the present time, Wu vigorously has contested the scope of the successive preliminary injunction orders, arguing that they are too broad and prevent him from obtaining employment.

38  On May 24, 2005, I ordered default judgments entered against Fountain and Fulfill for failure to appear. For similar reasons, I ordered a default judgment against ABC on November 11, 2005.
39  TRO (Feb. 19, 2004).

Because significant time had passed since entry of the stipulated preliminary injunction, and the parties' settlement negotiations had failed, the Court treated Wu's motions to narrow the scope of the injunction as reflecting his intention to retract his prior agreement to it and heard argument on them as if Gore were seeking a preliminary injunction [*18] in the first instance. On May 5, 2005, I granted Gore's request and entered a preliminary injunction (the "Preliminary Injunction") similar in scope to the previous, stipulated injunction, thereby denying, in large part, Wu's motions to amend. Paragraph 2 of the Preliminary Injunction enjoined Wu from "engaging or participating in any business activity involving the manufacturing, purchasing, selecting, transporting, selling, or research and development of TFE containing polymers and other fluoropolymers that Wu worked on or with during his employment with Gore."

Dissatisfied with the May 5 ruling, Wu moved to reargue. On November 14, 2005, I issued a letter opinion denying reargument, except as to one aspect of paragraph 2 of the Preliminary Injunction. [40] After receiving further submissions regarding the scope of the Preliminary Injunction, the Court entered another opinion on March 30, 2006, limiting the scope of paragraph 2 to specifically identified compounds Wu worked on or with at Gore. [41]

> 40  *W.L. Gore & Assocs., Inc. v. Wu, 2005 Del. Ch. LEXIS 177, 2005 WL 3111998, at *4 (Del. Ch. Nov. 14, 2005)* ("*Gore I*").

[*19]

> 41  *W.L. Gore & Assocs., Inc. v. Wu, 2006 Del. Ch. LEXIS 65, 2006 WL 905346, at *5 (Del. Ch. Mar. 30, 2006)* ("*Gore II*").

Roughly contemporaneously with my November 14, 2005 ruling, the parties entered into the Consent Judgment, including an order for permanent injunction and other relief described below. [42] As described above, the Consent Judgment left unresolved certain provisions in Gore's request for a final injunction. I held trial on those issues on November 16-18, 2005. After post-trial briefing, I heard argument in May, 2006. At the argument, I awarded damages pursuant to the default judgments against Fulfill ($ 516,651 in actual damages and $ 1,033,032 in exemplary damages) and Fountain ($ 793,243 in actual damages and exemplary damages of an additional $ 1,586,486). [43]

> 42  *See* discussion *infra* Part I.C.
> 43  Post-trial Tr. at 13-14, 19-20.

## C. The Consent Judgment

Gore and Wu entered [*20] into the Consent Judgment on November 14, 2005.

Pursuant to the Consent Judgment this Court entered judgment against ABC, Meichi Lu and Wu as to all of the claims brought against them, and Wu admitted as true all the factual allegations in the Complaint. [44] Thus, for example, Wu has admitted that he misappropriated Gore trade secrets and sold them to the United States Army [TEXT REDACTED BY THE COURT], and [TEXT REDACTED BY THE COURT]

> 44  Consent J. P 7.

The Consent Judgment broadly defines "Gore Technology" as:

> [C]onfidential, proprietary or trade secret research, information, know-how and/or material known or used by Gore, including without limitation, information, know-how and materials related to TFE-containing polymers and other fluoropolymers defendant Huey Shen Wu learned or used during his employment at Gore, including but not limited to: (1) confidential and proprietary information known to or used by Gore relating to starting materials, processes, equipment, manufacturing techniques, [*21] resulting characteristics, testing techniques and results, and predictive modeling methods and results for fluoropolymers; and (2) confidential and proprietary information known or used by Gore relating to the selection, processing, equipment and testing techniques for converting fluoropolymers into product form. [45]

> 45  *Id.* P 5.

It also contains the following provisions regarding injunctive relief against Wu:

> 8. Defendants Wu, Meichi Lu and ABC shall be and hereby are FOREVER AND

2006 Del. Ch. LEXIS 176, *21

PERMANENTLY ENJOINED and restrained from disclosing or using any confidential, proprietary or trade secret research, information, know-how, and/or material of Gore, including without limitation any such research, information, know-how and materials related to TFE-containing polymers and other fluoropolymers that Wu worked on or with during his employment with Gore.

* * * *

11. Additional injunctive relief, if any, regarding a prohibition on Wu engaging in or participating in any activity, either alone [*22] or in association with any other person or entity, related to polymers he worked on or with while he was employed by Gore and all TFE-containing polymers shall be determined by the Court after an evidentiary hearing to be held the week of November 14, 2005. Such relief, if any, shall be ordered as set forth in the Proposed Order pursuant to the form attached hereto.

The referenced Proposed Order specifies two categories of activities related to polymers that Wu cannot engage or participate in either alone or in association with any other person or entity, and it leaves open the time period during which Wu will be prohibited from engaging in those activities. One category relates to TFE-containing polymers; the other relates to polymers Wu worked on or with during his employment at Gore or products made from such polymers. The Proposed Order describes the proscribed activities as follows:

[1](a) the research and/or development of, or the sale of research and/or development concerning, TFE-containing polymers or products made from such polymers; (b) the manufacture of TFE-containing polymers or products made from such polymers; and (c) the purchasing, selecting, selling, [*23] or transporting of TFE-containing polymers or products made from such polymers; and

[2(a)] the research and/or development of, or the sale of research and/or development concerning, polymers Wu worked on or with during his employment at Gore or products made from such polymers; (b) the manufacture of polymers Wu worked on or with during his employment at Gore or products made from such polymers; and (c) the purchasing, selecting, selling, or transporting of polymers Wu worked on or with during his employment at Gore, or products made from such polymers. [46]

46 Proposed Order PP 4, 5.

The Consent Judgment also required Wu and his co-defendants to pay an agreed upon sum of money and, within specified time limits, to: (1) identify all patents and patent applications that have been assigned to them or filed by them or on their behalf in the last 14 years relating in any way to Gore Technology and assign those patents to Gore; [47] (2) identify each person or entity to whom they and any person or entity [*24] acting in concert with them have disclosed or provided information or documents that constitute or describe in whole or part Gore Technology and any persons acting in concert with them that have sold or otherwise provided any material or product derived or created through the use or disclosure of the Gore Technology; [48] (3) list all material goods removed from Gore facilities, the dollar value of those materials and the current whereabouts of those materials; [49] (4) gather all documents or other resources that (a) contain information about the Gore Technology or any product derived or created from the Gore Technology; "(b) constitute material goods removed from Gore's facilities, paid for with Gore's funds; or (c) constitute funds received from third parties" for all sales that relate in any way to the Gore Technology and give those materials to Gore. [50]

47 Consent J. P 14.
48 Id. P 15.
49 Id. P 16.
50 Id. P 17.

In the Consent Judgment, Wu also explicitly agreed [*25] that he would in good faith and with his best efforts "cooperate with Gore and ... its counsel ... to carry

out each and every provision" to which he stipulated. Despite the overwhelming evidence of his misappropriation of Gore Technology and his admission of the same, however, Wu repeatedly has refused to comply with the terms of the Consent Judgment that require him to identify the persons to whom he has disclosed Gore Technology, thereby preventing Gore from engaging in self-help to seek the return of such information. In assessing Wu's compliance with the Consent Judgment, the Court cannot ignore the staggering extent of Wu's misconduct, such as, for example, selling Gore's trade secrets to the U.S. Army and charging the Army for large amounts of his time, during a period when he was a full-time employee of Gore. When viewed in that context, the paucity of information Wu provided pursuant to his obligations under the Consent Judgment makes it highly unlikely that he has satisfied those obligations. This fact supports the need for additional and clearly defined injunctive relief.

### D. Wu's Unreliability and Lack of Trustworthiness

Throughout this litigation, Wu has proven [*26] that he has no moral compass and cannot police himself or take responsibility for his actions. He has hidden evidence, destroyed evidence, manufactured evidence, testified evasively or unbelievably, and repeatedly failed to comply with this Court's Orders. Furthermore, Wu consistently has resisted legitimate discovery. Accordingly, I issued at least nine orders granting various motions to compel filed by Gore. [51] Without attempting to catalog all of Wu's actions, I will describe a few of those incidents to illustrate the problems he has caused.

> 51 *See* Orders entered on June 7, 16 and 24, November 24 and December 22, 2004, and June 3 and 16 and July 13 and 15, 2005.

**The Lost Computer**

At trial Wu admitted that in March 2004, shortly after Gore filed this action, he saved certain Fulfill files from his home computer onto a diskette that he gave to his counsel at the time, Morris, Nichols, Arsht & Tunnell. [52] Wu acknowledged that he also might have copied other files from his Gore laptop [*27] computer onto his home computer, but could not recall. [53] According to Wu, however, his home computer has gone "missing," and he has offered several conflicting explanations for what happened to it.

> 52  Tr. at 426-28 (Wu).
> 53  Tr. at 428 (Wu).

When initially questioned on this subject, Wu asserted his *Fifth Amendment* privilege against self-incrimination. [54] Then, at his deposition, Wu testified that "[w]ell, the hard drive crashed . . . . And I put it in the garage waiting for repair and it's missing." [55] He went on to testify that it "was probably stolen by Gore people because they followed me to my home and it could be stolen by them. It's trash to me, so I don't care." [56] At trial, however, Wu admitted that his deposition testimony was untrue. [57] Instead, he stated that after the computer crashed he put it in the garage, then took it to a store to determine if the computer was repairable, and after learning the store could not fix the computer, he left it there. [58]

> 54  Tr. at 429 (Wu).

[*28]

> 55  Wu Dep. at 716-17; Tr. at 449-50 (Wu).
> 56  Wu Dep. at 716-17; Tr. at 450.
> 57  "Q: So if you testified in your deposition that you left the computer in your garage and it went missing, would that have been untrue? . . . A: No, it's not true." Tr. at 430-31 (Wu).
> 58  Tr. at 429-32, 451 (Wu).

Even if one of Wu's explanations is true, his inconsistent testimony and admitted failure to safeguard his computer after the commencement of this litigation reflect a flagrant disregard for the legal process and the Court's orders. For example, the transfer of files to Wu's home computer and its convenient disappearance all occurred after the Court issued a TRO on February 19, 2004. Paragraph 2 of that order explicitly provides:

> Pursuant to Chancery Court Rule 26(c), defendants and their officers, agent, servants, employees, attorneys, and all persons in concert or participation with them, shall not alter, conceal, transfer and/or destroy any documents, data, electronic storage media, or any other tangible or intangible material in their possession or under their [*29] control which in any manner relate to Gore's allegations in this matter, including an[y] information stored on computer or other electronic, magnetic, or optical data

storage medium.

Wu's disregard for his home computer's whereabouts or transfer and abandonment of it to a repair shop, plainly violates the temporary restraining order.

### James Wang

Wu's testimony regarding an alleged consultant, James Wang, was not credible. Wu first identified Wang to Gore and the Court in May 2005. In 2004, however, Gore asked Wu in written discovery to identify all consultants and independent contractors of Fulfill; Wu replied that the company had none. [59] Yet, at trial, Wu testified that Wang did the research for Fulfill's SBIR reports. [60] When asked why he had not identified Wang in response to Gore's 2004 interrogatories, Wu replied that Wang was Wu's personal consultant and not Fulfill's consultant. [61]

> 59   Tr. at 463-64.
> 60   Tr. at 461, 463 (Wu).
> 61   Tr. at 464.

Based on the [*30] evidence presented, I do not find Wu's testimony credible. Indeed, the evidence strongly suggests that Wang does not exist. According to Wu, he never reported Wang on any tax forms, communicated to him only by mail, paid him in cash, only met him three or four times at a hotel in California, and does not know where he currently resides. [62] When viewed as a whole, I infer from this evidence that Wang is more likely than not a figment of Wu's imagination.

> 62   Tr. at 461-64, 467, 488 (Wu). *See also* Tr. at 488 (Wu) ("Q: Can you explain how this document [referring to summary demonstrative Exhibit 3] on the left was on your laptop computer? A: I think it was a draft and Mr. James Wang did all the work for me. Q: How did that get on your computer then if you only corresponded with him by mail? A: Because I make the draft first and then mail it to him.").

### Improper Transfer and Destruction of Evidence in California

Wu also failed to disclose documents and property that he had shipped to California [*31] before the litigation, and thereafter transferred those documents and property on multiple occasions in violation of the Court's

Temporary Restraining Order and Preliminary Injunction Orders. [63] Again, Wu invoked the *Fifth Amendment* in lieu of disclosing this information, and this Court ultimately issued Orders requiring that Wu allow Gore to inspect the property. [64] After one inspection was cut short, however, Wu returned alone to the facility and ordered the destruction of the evidence. [65] The evidence was, in fact, destroyed, with the exception of two large crates containing an Autoclave reactor that had been Gore's. [66]

> 63   Tr. at 452-58, 355-56; Pl. Exs. 262-65, 267, 325, 346, 352; Yu ("Kevin") Guan Dep. at 4, 6-9, 26-29; *See* Pl.'s Mem. in Supp. of its Mot. for J. on the Pleadings as to Def. Huey Shen Wu, or in the Alternative, For Default (Dec. 8, 2004) at 9-11.
> 64   *See* Pl. Exs. 299, 300.
> 65   Pines Dep. at 2-9, 11-28; K. Guan Dep. at 4, 6-9, 14-15, 19-26, 29-36, 38-39, 41, 49; Pl. Exs. 267, 267a; G. Young Dep. at 4, 10, 15-18, 28-38, 42-44.
> 66   *Id.*

### [*32] II. ANALYSIS

#### A. Standard

To obtain a permanent injunction the moving party must demonstrate that: (1) it has proven actual success on the merits of its claims; (2) irreparable harm will be suffered if injunctive relief is not granted; and (3) the harm that will result if an injunction is not granted outweighs the harm that will befall the defendant if an injunction is granted. [67] In this case, by virtue of the Consent Judgment, Wu has admitted that Gore has proven actual success on the merits, and Wu is permanently enjoined from using any confidential, proprietary or trade secret research, information, know how or material of Gore. [68]

> 67   *Nutzz.com, LLC v. Vertrue Inc.*, 2006 Del. Ch. LEXIS 137, 2006 WL 2220971, at *3 (Del. Ch. July 25, 2006)* (internal quotations omitted).
> 68   Consent J. P 8.

To obtain the additional injunctive relief it requests against Wu, Gore must show that: (1) a misappropriation of trade secrets is clearly established; (2) the facts surrounding the misappropriation [*33] and subsequent litigation cast serious doubts on Wu's trustworthiness or

ability to police himself; or (3) the nature of the trade secrets and the business they relate to are such that their disclosure would be inevitable if Wu were allowed to resume working in that particular area of the chemical industry. [69]

> [69]   See *Wyeth v. Natural Biologics, Inc.*, 2003 U.S. Dist. LEXIS 17713, No. 98-2469 (JNE/JGL) (D. Minn. Oct. 2, 2003), aff'd, 395 F.3d 897 (8th Cir. 2005) (permanent injunction prohibiting defendant from engaging in the manufacturing of estrogen from mares' urine); *Monovis, Inc. v. Aquino*, 905 F. Supp. 1205 (W.D.N.Y. 1994) (permanently enjoining defendant from working in same industry as former employer); *Christopher M's Hand Poured Fudge v. Hennon*, 699 A.2d 1272 (Pa. Super. Ct. 1997), appeal denied, 553 Pa. 686, 717 A.2d 1026 (Pa. 1998) (permanent injunction prohibiting defendant from manufacturing fudge); *Weed Eater, Inc. v. Dowling*, 562 S.W.2d 898 (Tex. Civ. App. 1978) (enjoining defendant from overseeing competitor's assembly line for producing lawn and garden products due to inevitable disclosure of trade secrets); *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500 (5th Cir. 1982) (enjoining defendant from working for competitor in any capacity that would risk inevitable disclosure of trade secrets); *Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng'g Co.*, 255 F. Supp. 645 (E.D. Mich. 1966) (injunction prohibiting defendant from manufacturing or producing distributor-type fuel injection engines); *American Can Co. v. Mansukhani*, 814 F.2d 421 (7th Cir. 1987) (affirming grant of permanent injunction precluding defendant from producing or selling plaintiff's inks); *Phillips v. Frey*, 20 F.3d 623 (5th Cir. 1994) (affirming grant of permanent injunction prohibiting defendant from manufacturing or developing deer stands where defendant procured plaintiff's trade secrets under the guise of purchasing plaintiff's business).

[*34] **B. Gore's Proposed Injunction**

Gore currently seeks an injunction that will restrict Wu's activities in four categories beyond the time period required by the TFE Agreement. Those categories, in general, relate to (1) polymers Wu worked on or with during his employment at Gore or products made from

such polymers, (2) an "industry-specific" restriction covering (a) protective fabric coatings or membranes for apparel and (b) fuel cell membranes inclusive of the protein exchange membrane and membrane electrode assemblies technologies, and (3) any TFE-containing polymers or products made from such polymers. These categories are set forth in a proposed form of order Gore filed with its opening post-trial brief (the "Proposed Injunction"). [70]

> [70]   The Proposed Injunction differs from the Proposed Order attached to the Consent Judgment in that, among other things, it adds the industry-specific restriction, specifies the temporal duration of the various proposed restrictions, omits language from the Proposed Order that would have proscribed "the purchasing selecting, selling, or transporting" of the polymers involved, and seeks to add a requirement that Wu meet periodically with representatives from Gore and the Court to ensure his compliance.

[*35] The Proposed Injunction provides in pertinent part:

> 1. For the time period of March 1, 2006 [71] through March 1, 2016, defendant Wu shall be ENJOINED from engaging or participating in any activity, either alone or in association with any other person or entity, involving:
>
>> (a) the research and/or development of, or the sale of research and/or development concerning, polymers Wu worked on or with during his employment at Gore or products made from such polymers; and
>>
>> (b) the manufacture of polymers Wu worked on or with during his employment at Gore or products made from such polymers.

* * * *

2. For the time period of March 1, 2006 through March 1, 2016, defendant Wu shall be ENJOINED from engaging or participating in any activity, either alone or in association with any other person or entity, specifically involving the following specified industries and/or products: (1) protective fabric coatings or membranes for apparel, and (2) fuel cell membranes inclusive of the protein exchange membrane ("PEM") and membrane electrode assemblies ("MEA") technologies.

3. For the time period of March 1, 2006 through March 1, 2011, defendant Wu shall be ENJOINED [*36] from engaging or participating in any activity, either alone or in association with any person or entity, involving:

(a) The research and/or development of, or the sale of research and/or development concerning, any TFE-containing polymers or products made from such polymers; and

(b) the manufacture of TFE-containing polymers or products made from such polymers.

71    The two-year non-competition period provided for in the TFE Agreement would have expired in February 2006. The Preliminary Injunction, as last modified on April 17, 2006, has extended comparable restrictions until the present time.

Wu objects to each of the categories of restrictions in the Proposed Injunction. I turn now to those objections.

**C. The Proposed Injunction Against Wu Working on Polymers he Worked on or with During his Employment at Gore**

Wu makes several objections to Gore's proposed 10 year injunction as to polymers he worked on or with while at Gore. A list of such polymers has been submitted under seal [*37] to this Court and reviewed in camera (henceforth, the "Listed Polymers"). 72 In particular, Wu asserts that: (1) because the Listed Polymers would only be viewable on an attorneys-eyes-only basis, and thus not viewable by Wu, the proposed injunction violates his procedural due process rights under the *Fourteenth Amendment of the U.S. Constitution*; and (2) injunctive relief is not appropriate because (a) Gore has not established that it has any trade secrets worthy of protection; (b) if Gore has such trade secrets, they were not communicated to Wu; and (c) Gore did not prove that Wu disclosed its trade secrets.

72    As explained in *Gore II*, the Listed Polymers are identified in two separate lists filed by Gore: "one limited to TFE containing fluoropolymers Wu worked on or with while at Gore and the other identifying other fluoropolymers Gore alleges Wu worked on or with while in their employ." *2006 Del. Ch. LEXIS 65, 2006 WL 905346, at *3-4.*

**1. Wu's due process objection**

First, Wu contends that he has a constitutional [*38] right to see the Listed Polymers. Specifically, he argues that not allowing him to examine the list of those polymers violates his procedural due process rights under the *Fourteenth Amendment of the U.S. Constitution.* Gore responds that Wu cannot make this argument because I already ruled on this issue in my March 30, 2006 opinion; therefore, the doctrine of the law of the case bars reconsideration. 73

73    Citing *Gore II, 2006 Del. Ch. LEXIS 65, 2006 WL 905346, at *3-4* (rejecting Wu's due process argument).

The law of the case is established "when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation." 74 Thus, once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reasons to do so appear. 75 The law of the case doctrine is neither inflexible nor an absolute bar to reconsideration of a prior [*39] decision that is "clearly wrong, produces an injustice, or should be revisited because of changed

circumstances." [76]

74  *Kenton v. Kenton, 571 A.2d 778, 784 (Del. 1990).*
75  *Frank v. Carol, 457 A.2d 715, 718-19 (Del. 1983).*
76  *Hamilton v. State, 831 A.2d 881, 887 (Del. 2003)* (two exceptions to the law of the case doctrine are: when "the previous ruling was clearly in error or there has been an important change in circumstances," or when "the equitable concern of preventing injustice" trumps the doctrine); *Gannett Co. v. Kanaga, 750 A.2d 1174, 1181 (Del. 2000).*

In this case, Wu now makes the same argument he advanced unsuccessfully in his challenge to the scope of the preliminary injunction. [77] I find no reason to deviate from the conclusion I reached earlier. However, because Wu proceeded *pro se* at the time of the earlier argument, but had the benefit of counsel at trial, I briefly address the merits of his argument. [*40]

77  *See Gore II, 2006 Del. Ch. LEXIS 65, 2006 WL 905346, at *3-4.*

Wu contends that his due process rights have been violated as a matter of black letter law. [78] He also relies on Lord Edward Coke and an analogy to the Star Chamber in arguing that a defendant must have notice of the bill of charges against him or otherwise he need not answer it.

78  Def.'s Post-trial Br. at 14.

I find *E. I. du Pont de Nemours Powder Co. v. Masland* [79] instructive in this situation. Although not a due process case, *Masland* contains relevant facts and arguments because it was a trade secret case. [80] In *Masland*, the trial court only allowed counsel, and not any experts or the defendant, to know what plaintiff's alleged trade secrets were. [81] The defendant objected to this procedure on the grounds that it presented a conflict between a property [*41] right and his ability to defend himself in the case. He argued that if disclosure of the alleged trade secrets is forbidden to one who denies that there is a trade secret, the merits of his defense would effectively be adjudged against him before he had a chance to be heard or to prove his case. [82]

79  *244 U.S. 100, 37 S. Ct. 575, 61 L. Ed. 1016,*

*1917 Dec. Comm'r Pat. 426 (1917)* (Holmes, J.).
80  *Id. at 101.*
81  *Id. at 101-02.*
82  *Id. at 102.*

The Supreme Court upheld the lower court's decision. The court reasoned that the injunction would not prevent the defendant from directing questions to his counsel that would bring out whatever public facts were nearest to the alleged secrets. [83] Consequently, the court said "[i]t will be understood that if, in the opinion of the trial judge, it is or should become necessary to reveal the secrets it will rest in the judge's discretion to determine whether, to whom, and under what precautions, the revelation should be made." [84]

83  *Id. at 103.*
[*42]
84  *Id. at 103.*

The procedural safeguards available in this case are at least equal to those available in *Masland*, including at a minimum allowing Wu's attorney to view the Listed Polymers on an attorneys' eyes only basis. Therefore, I find no reason to alter my prior decision rejecting Wu's due process argument. On the facts of this case, I have determined that Wu cannot be given access to Gore's Listed Polymers without creating an undue risk of misappropriation of such valuable confidential information.

## 2. Wu's challenges to the existence and misappropriation of Gore trade secrets

Wu's argument that Gore has not established that it has any trade secrets worthy of protection also lacks merit. I previously held that the Listed Polymers Wu worked on or with at Gore, for example, constitute valuable trade secrets. [85] Moreover, through the Consent Judgment, Wu has admitted that Gore has valuable trade secrets and that he cannot be trusted. In this context, Wu's argument that Gore's trade secrets can easily be reverse engineered is unpersuasive. [86]

85  *Gore II, 2006 Del. Ch. LEXIS 65, 2006 WL 905346, at *4.*
[*43]
86  Wu relies on the testimony of a Gore scientist, Dr. Jack Hegenbarth. Dr. Hegenbarth, however, only testified that it would take Gore several weeks to take a sample of PTFE made by

another company and determine whether it could be used in Gore's process for making expanded PTFE, or ePTFE. Tr. at 392-94. This process is quite different from completely reverse engineering a product. In fact, John Kramer, a senior research scientist at Gore, expressed skepticism about whether Gore could reverse engineer a competitor's product, stating:

> I doubt they could reverse-engineer it. There are many things about making these products that are unique and special in our processes, so [TEXT REDACTED BY THE COURT] - So we can examine and measure the properties of something. That does not tell us how it is made. That does not allow us to completely make by reverse-engineering a product that is exactly the same. Tr. at 206-07.

I also reject Wu's contention that Gore did not disclose trade secrets to him. The evidence presented at trial and reasonable inferences drawn from it and the Consent [*44] Judgment compel the conclusion that Wu's assertion that he did not come into contact with Gore trade secrets is false. Of Gore's 7,000 associates, Wu was one of approximately 20 associates who were involved on a regular basis with Gore's core technology and TFE polymerization processes. [87] Wu signed both the TFE Agreement and the Service Agreement so that he could have access to highly confidential Gore information. Wu was one of Gore's most prolific inventors and was involved in research and development efforts in each of the company's four divisions. [88] He not only created and worked on Gore's core technologies, but also collected research and development findings of others for compilation in highly confidential, internal monthly "TFE Polymerization Platform" reports. [89]

87   Tr. at 102 (Kramer).
88   Tr. at 173.
89   Tr. at 58-60, 126-27, 174, 299-302; Pl.'s Exs. 62-65.

Wu also contends that injunctive relief is not appropriate because Gore did not prove that he disclosed

its trade secrets. [*45] This argument, however, contradicts Wu's admissions of portions of the Complaint by virtue of the Consent Judgment. Specifically, Wu has admitted that he misappropriated Gore's trade secrets. [90] In addition, at trial, Wu admitted that the Fulfill SBIR reports contained Gore trade secrets. [91] Thus, his argument that Gore did not *prove* that he disclosed its trade secrets is spurious.

90   *See* Compl. PP 91-98.
91   "Q: What trade secrets do you think you disclosed in the Fulfill reports? A: If you combine all of them together, all of the polymers with the Geomet test results, the combination of them could be called a trade secret, yes." Tr. at 619 (Wu).

Furthermore, just by making these arguments, Wu raises serious doubt about whether he could be trusted to police himself and comply with the injunction in the Consent Judgment, if he were allowed to work on the development of polymers he worked on or with while at Gore or products made from them. Wu consented to a permanent injunction against [*46] his "disclosing or using any confidential, proprietary or trade secret research, information, know-how, and/or material of Gore." [92] Wu also consented to a broad definition of "Gore Technology." His current arguments contradict the Consent Judgment and suggest that without additional safeguards Wu cannot be expected to adhere to its restrictions.

92   Consent J. P 8.

### 3. The scope of the injunction

Having addressed Wu's general objections, I now discuss the appropriate scope of an injunction. Although Wu has agreed not to disclose Gore's trade secrets, I have concluded that, if he were to work at another company having polymer technology or products similar to Gore's, there is a significant risk that Wu would disclose Gore trade secrets, notwithstanding the Consent Judgment. Other courts have issued production injunctions in similar circumstances.

In *Wyeth v. Natural Biologics, Inc.*, [93] the defendant misappropriated valuable trade secrets involving the production of estrogen from mares' urine. [*47] The defendant was able to reproduce Wyeth's secret process for producing estrogen only after numerous illicit

contacts with one of Wyeth's former top scientists. Because the defendant gave false testimony, improperly redacted documents and "lost" or destroyed evidence in its efforts to hide its misappropriation, the court found that the defendant could not be trusted to obey a court order that allowed him to police himself in terms of his future employment and non-use of Wyeth's trade secrets. [94]

> 93 *2003 U.S. Dist. LEXIS 17713, No. 98-2469 (JNE/JGL) (D. Minn. Oct. 2, 2003), aff'd, 395 F.3d 897 (8th Cir. 2005).*
> 94 *Id. 2003 U.S. Dist. LEXIS 17713 at *73-74.*

Moreover, the court in *Wyeth* found that even if the defendant were trustworthy, the misappropriated trade secrets were "inextricably connected" to the defendant's manufacturing processes and that he would not be able to "unlearn" or otherwise abandon the trade secrets in future production efforts. [95] For these reasons, the court issued [*48] a permanent injunction that, among other things, barred the defendant from engaging in the research and development of, or working for someone engaged in the research and development of, any process for the removal of estrogens from mares' urine. [96]

> 95 *Id.*
> 96 *Id. 2003 U.S. Dist. LEXIS 17713 at *74-79.*

In *Weed Eater, Inc. v. Dowling,* [97] a former employee of the plaintiff was enjoined from working for a competitor who manufactured and developed lawn and garden products. The defendant was a former vice president of manufacturing who had designed and organized an assembly line for the production of string-line trimmers. He left the plaintiff's employment to supervise an assembly line at a company that wanted to start producing the trimmers itself, rather than buy them from Weed Eater. The court found that prohibiting the defendant from using the plaintiff's trade secrets would be insufficient because the defendant inevitably would disclose his knowledge of the trade secrets if allowed to work in the same area of [*49] production. Thus, the court prohibited the defendant from working in any capacity relating to the manufacturing of trimmers. As the court reasoned,

> Even in the best of good faith, Dowling can hardly prevent his knowledge of his former employer's confidential methods from showing up in his work. The only

effective relief for Weed Eater is to restrain Dowling from working for Hawaiian Motor Company in any capacity related to the manufacture by Hawaiian Motor Company of a flexible line trimming device. [98]

> 97 *562 S.W.2d 898 (Tex. Civ. App. 1978).*
> 98
>
> *Id. at 902.*

As in *Wyeth,* Wu cannot be trusted to avoid using Gore's trade secrets. He has given evasive testimony, obstructed discovery, lost or destroyed evidence and disobeyed previous court orders. On this record, the Court has no confidence that Wu will refrain from using Gore trade secrets if he is allowed to work in areas where he will have to exercise the discretion and judgment to not use them.

Moreover, [*50] as in both *Wyeth* and *Weed Eater,* there exists a substantial likelihood of "inevitable disclosure" of Gore trade secrets if Wu is allowed to work with Listed Polymers. Wu cannot "unlearn" what he learned while working at Gore. If he is allowed to work with Listed Polymers, his extensive knowledge would almost certainly filter into his work and result in disclosure of Gore trade secrets.

Further bolstering the case for a 10-year injunction is the fact that the Court does not know exactly what trade secrets Wu misappropriated or continues to have available to him. For example, he claims to have lost his computer, but as far as the Court knows he still may have the computer in his possession or otherwise subject to his control. He may have hidden other Gore documents. In addition, the evidence at trial showed that the Gore technology in issue has a lengthy shelf-life on the order of 10 years or more. [99] Based on these factors and the egregious nature of this case, I believe it is appropriate to enter an injunction prohibiting Wu for a period of 10 years beginning March 1, 2006 and ending March 1, 2016 from working on polymers he worked on or with during his employment at Gore, [*51] namely, the Listed Polymers, or products made from such polymers.

> 99 *See* Tr. at 86-87, 209, 408-14.

### D. The Industry Specific Injunction

The second paragraph of the Proposed Injunction would preclude Wu for 10 years from engaging in any activity

> specifically involving the following specified industries and/or products: (1) protective fabric coatings or membranes for apparel, and (2) fuel cell membranes inclusive of the protein exchange membrane ("PEM") and membrane electrode assemblies ("MEA") technologies. [100]

Wu asserts that an industry specific ban is improper injunctive relief because it goes beyond the potential additional relief agreed to in the Consent Judgment. Gore responds that it proposed the industry-specific restriction in lieu of its original request for longer temporal restrictions and a broader scope of restricted activity (*i.e.*, covering selling, transporting, purchasing and selecting of competitive fluoropolymers). Therefore, they contend that the Court has [*52] the inherent power to modify the Consent Judgment to permit consideration of an industry specific ban, if the modification would make the terms more reasonable.

100   Proposed Inj. P 2.

A settlement agreement is construed using the principles of contract interpretation. [101] When interpreting a contract, the role of a court is to effectuate the parties' intent. [102] In doing so, the court is constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended. [103] Clear and unambiguous language should be given its ordinary and usual meaning. [104]

> Absent some ambiguity, Delaware courts will not destroy or twist [insurance] policy language under the guise of construing it. When the language of a . . . contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented .... [*53]

A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. Ambiguity does not exist where a court can determine the meaning of a contract without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends. Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty. The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. [105]

101   *Rowe v. Rowe, 2002 Del. Ch. LEXIS 63, 2002 WL 1271679, at *3 (Del. Ch. May 28, 2002).*

102   *Lorillard Tobacco Co. v. Am. Legacy Found., 903 A.2d 728, 2006 Del. LEXIS 400, at *7-8, No. 579 (Del. July 17, 2006).*

103   *Id.*

104   *Id.*

105   *Id.* (internal quotations omitted).

[*54] In this case, the parties agreed that the Court would determine whether a limited amount of additional injunctive relief against Wu was warranted. In particular, they agreed that:

> Additional injunctive relief, if any, regarding a prohibition on Wu engaging in or participating in any activity, either alone or in association with any other person or entity, *related to polymers he worked on or with while he was employed by Gore and all TFE-containing polymers* shall be determined by the Court . . . . Such relief, if any, shall be ordered as set forth in the Proposed Order pursuant to the form attached hereto. [106]

The Proposed Order contains only two categories of additional restrictions: one that relates to all TFE-containing polymers and another that relates to all polymers Wu worked on or with during his employment at Gore. At trial and in its post-trial briefing and argument, Gore has sought to impose a further, industry specific ban against Wu that relates to protective fabric coatings or membranes for apparel and fuel cell membranes. I do not believe that the parties envisioned the Court granting Gore this type of relief when they agreed to settle all issues [*55] except the possibility of additional injunctive relief relating to polymers Wu worked on or with and TFE-containing polymers.

    106 Consent J. P 11 (emphasis added).

Gore effectively acknowledged this fact at argument and stated that it offered this new provision as a compromise. [107] Had Gore desired to reach a "compromise" along these lines they should have included it in the settlement agreement and Consent Judgment they negotiated with Wu in November 2005. They did not do so. Thus, Gore essentially asks this Court to re-write or modify the terms of the Consent Judgment to effectuate their suggested compromise. The facts of this case do not support such relief.

    107 Post-trial Tr. at 39.

While the Court has equitable powers to make incidental modifications to a settlement agreement, the Court will not rewrite a settlement agreement [*56] in a way that substantially modifies the understanding negotiated between the parties. [108] In my opinion, Gore's industry specific injunction substantially modifies the contract. Furthermore, even if the Court did have discretion to alter the parties' agreement, the facts here do not warrant such a modification. Up until the time of trial, the focus of the parties' dispute was on the Listed Polymers and TFE-containing polymers. Broadening the focus of possible injunctive relief to include the protective fabric coatings and fuel cell industries, therefore, would raise a number of new factual issues as to which Wu did not receive fair notice. Hence, entertaining these additional categories of requested relief at this late stage of the proceeding would be unduly prejudicial to Wu.

    108 *In re ML-Lee Acquisition Fund II*, 1999 WL 184135, at *2 (D. Del. Mar. 23, 1999). *See also Matter of EN\* Corp.*, 604 A.2d 404, 414 (Del.

*1992)* (In a statutory appraisal action the Court of Chancery was not authorized to substantially modify the parties' settlement agreement in the guise of imposing "just terms" as a condition of its approval.).

[*57] Consequently, I reject Gore's request for an injunction barring Wu from working in certain specific industries for a period of years because it exceeds what the parties agreed to in the Consent Judgment. This does not mean, however, that Wu has unfettered license to engage in activities related to fuel cells and fabrics. Wu remains subject to several substantial restrictions on his activities as they relate to Listed Polymers and TFE-containing polymers or products made from such polymers. In addition, he may not disclose or use any of Gore's trade secrets.

## E. TFE-Containing Polymers

Finally, Gore seeks a 5-year injunction prohibiting Wu from working in the research and development of any TFE-containing polymers. Specifically, for the period beginning March 1, 2006 through March 1, 2011, Gore asks that Wu be enjoined

> from engaging or participating in any activity, either alone or in association with any other person or entity, involving: (a) the research and/or development of, or the sale of research and/or development concerning, any TFE-containing polymers or products made from such polymers; and (b) the manufacture of TFE-containing polymers or products made from [*58] such polymers.

Most of Wu's objections to this aspect of the Proposed Injunction mirror his objections to the 10-year injunction as to the Listed Polymers and are equally lacking in merit. This restriction, however, is broader in scope because it prohibits Wu from working with any TFE-containing polymers, regardless of whether he actually worked on or with them at Gore. Nevertheless, I believe this injunction is reasonable in scope because of Wu's lack of trustworthiness and the serious risk of inevitable disclosure of Gore's trade secrets.

A court may limit a defendant from working in a particular field if his doing so poses a substantial risk of

the inevitable disclosure of trade secrets. [109] In *Allis-Chalmers*, the defendant employee was the former head of the fuel systems laboratory at Allis-Chalmers. While employed with the plaintiff, he had been intimately involved in the development of a distributor-type fuel injection pump that was exceptionally difficult to produce. [110] A competitor seeking to develop a similar type of pump ultimately hired the defendant. The court recognized the tension between the right of an employee to change his employment for any reason he [*59] wishes and to utilize his general skills and knowledge to his advantage, versus the right of an employer to protect information gained through its research and its expenditures of time and money. [111] The court enjoined the defendant from working in any capacity at the competitor involving the manufacture and production of distributor-type fuel injection pumps. The court found that there was a "an inevitable and imminent danger of disclosure of Allis-Chalmers trade secrets to [competitor] and use of these trade secrets by [competitor]." [112] The court further noted that:

> [t]he virtual impossibility of [defendant] performing all of his prospective duties for [competitor] to the best of his ability, without in effect giving it the benefit of Allis-Chalmer's confidential information, makes a simple injunction against disclosure and use of this information inadequate. [113]

109    *Wyeth v. Natural Biologics, Inc., 2003 U.S. Dist. LEXIS 17713, No. 98-2469 (JNE/JGL) (D. Minn. Oct. 2, 2003), aff'd, 395 F.3d 897 (8th Cir. 2005); Monovis, Inc. v. Aquino, 905 F. Supp. 1205 (W.D.N.Y. 1994); Christopher M's Hand Poured Fudge v. Hennon, 699 A.2d 1272 (Pa. Super. Ct. 1997), appeal denied, 553 Pa. 686, 717 A.2d 1026 (Pa. 1998); Weed Eater, Inc. v. Dowling, 562 S.W.2d 898 (Tex. Civ. App. 1978); FMC Corp. v. Varco Int'l, Inc., 677 F.2d 500 (5th Cir. 1982); Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng'g Co., 255 F. Supp. 645 (E.D. Mich. 1966).*

[*60]

110    *Allis-Chalmers, 255 F. Supp. at 650.*
111    *Id. at 652-53.*
112    *Id. at 654.*

113    *Id.*

The court in *Christopher M's Hand Poured Fudge v. Hennon* applied a similar rationale. [114] In *Christopher M's*, a former trusted employee misappropriated, among other things, a valuable, trade secret fudge recipe and used it in his own competing business. The parties had not entered into a confidentiality or non-competition agreement; nonetheless, the court held that the defendant had a duty not to reveal or misappropriate the recipe. The court reasoned that the employment relationship, and the confidentiality with which the recipe was held, created a duty in the employee to not disclose or misappropriate the recipe even in the absence of an explicit agreement. [115] Because the defendant had no prior fudge-making experience, and because he had misappropriated the plaintiff's trade secrets, the court found that there was an "inextricable connection" between the stolen trade secrets and the defendant's manufacturing [*61] of fudge. [116] Therefore, the court upheld the trial court's granting of a permanent injunction prohibiting the defendant from engaging in the manufacturing of any fudge.

114    *699 A.2d 1272 (Pa. Super. Ct. 1997), appeal denied, 553 Pa. 686, 717 A.2d 1026 (Pa. 1998).*
115    *Id. at 1276.*
116    *Id. at 1277-78.*

As in *Allis-Chalmers* and *Christopher M's*, Wu's general knowledge of TFE-containing polymers is substantially derived from his former employment at Gore. The evidence also demonstrates that Wu misappropriated valuable trade secrets and may still have unauthorized access to some confidential Gore Technology. Because much of the stolen trade secrets and confidential information involves TFE-containing polymers, it would be very difficult, even assuming good faith, for him to not reveal Gore trade secrets if he were allowed to work with such polymers. Moreover, for the reasons stated in this opinion, good faith cannot be assumed in this [*62] case. Based on that fact, Wu's lack of trustworthiness and the likelihood of inevitable disclosure of Gore trade secrets, the court finds that a 5-year injunction prohibiting Wu from working with TFE-containing polymers is appropriate under the circumstances here.

## III. CONCLUSION

For the reasons stated the Court grants in part and denies in part Gore's request for additional injunctive

relief. In particular, the Court grants the additional injunctive relief set forth in paragraphs 1 and 3 of Gore's Proposed Injunction and denies the relief sought in paragraph 2 thereof. As to paragraph 1, the injunction will be limited to the Listed Polymers previously identified to the Court. [117] In that regard, the Court notes that all proceedings to date in this action have focused on fluoropolymers and TFE-containing fluoropolymers. I understand that the Listed Polymers all fall within those categories. The Proposed Order and the later Proposed Injunction, however, refer to "polymers" that Wu worked on or with during his employment at Gore and "TFE-containing polymers." Although this language may be intended to encompass more than the Listed Polymers, Gore did not present any evidence [*63] or argument explaining the extent of the difference, if any, either in the abstract or in terms of how it will affect Wu. Accordingly, I am not prepared to approve paragraph 1 of the Proposed Injunction to an extent that would go beyond the Listed Polymers on the present record.

117   The portion of paragraph 1 of the Proposed Injunction relating to the submission of a list of

polymers Wu worked on or with while at Gore is therefore unnecessary. Consistent with the Proposed Injunction, however, the Listed Polymers shall be for "Attorney's Eyes Only" and handled as provided in paragraph 1, except that the "penalty of contempt" language should be stricken and replaced with a requirement that attorneys having access to the Listed Polymers agree to submit to the jurisdiction of this Court for purposes of enforcement of their undertaking of confidentiality.

Lastly, the Court considers the requirement for periodic meetings specified in paragraph 5 of the Proposed Injunction to be unduly burdensome and intrusive. [*64] For those reasons and because the Proposed Order attached to the Consent Judgment did not include such a requirement, I deny that aspect of Gore's requested relief.

Gore's counsel shall prepare and file promptly a revised final order for additional injunctive relief consistent with this opinion.

**EXHIBIT F**

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

W.L. Gore. & Associates, Inc.,

        Plaintiff,    C.A. No. _____

vs.

Charles Thomas Rosenmayer, PhD.,

        Defendant.

**MOTION FOR APPOINTMENT OF SPECIAL PROCESS SERVER**

   Plaintiff hereby moves pursuant to Court of Chancery Rules 4(a) and 4(c) for an Order appointing as a special process server any employee of Parcels, Inc., or of Young Conaway Stargatt & Taylor, LLP, over the age of 18 and who is not a party to this action to effect service of process upon the defendant.  The ground for this Motion is that the appointment of a special process server will result in a material saving of time and expense in effecting service of process in this proceeding.

       YOUNG CONAWAY STARGATT & TAYLOR, LLP

        */s/ Martin S. Lessner*
        Martin S. Lessner, Esquire (No. 3109)
        Michael P. Stafford, Esquire (No. 4461)
        The Brandywine Building
        1000 West Street, 17th Floor, P.O. Box 391
        Wilmington, Delaware  19899-0391
        Telephone: (302) 571-6698
        Facsimile: (302) 571-3309

        Attorneys for Plaintiff W.L. Gore & Associates, Inc.

Of Counsel:

Charles F. Knapp
FAEGRE & BENSON
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000
Facsimile:  (612) 766-1600

Dated: March 28, 2008

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

W.L. Gore. & Associates, Inc.,

Plaintiff,

C.A. No. _____

vs.

Charles Thomas Rosenmayer, PhD.,

Defendant.

## AFFIDAVIT OF MICHAEL P. STAFFORD IN SUPPORT OF
## PLAINTIFF'S MOTION FOR APPOINTMENT OF A SPECIAL PROCESS SERVER

STATE OF DELAWARE      )
                       )      SS.
NEW CASTLE COUNTY      )

MICHAEL P. STAFFORD, being duly sworn, deposes and says:

1.     I am an attorney with the law firm of Young Conaway Stargatt & Taylor, LLP, counsel to plaintiff, and am admitted to practice before, and am in good standing with, the Bar of the Supreme Court of the State of Delaware.

2.     I make this affidavit in support of plaintiff's motion, pursuant to Rules 4(a) and 4(c) of this Court, for the appointment of a special process server.

3.    The appointment of a special process server will result in a material saving of

time in effecting service of process in this proceeding.

Michael P. Stafford  (No. 4461)

SWORN TO AND SUBSCRIBED before me, this 28th day of March, 2008.

Notary Public

My Commission Expires: 2/16/09

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

W.L. Gore. & Associates, Inc.,

                  Plaintiff,           C.A. No. _____

vs.

Charles Thomas Rosenmayer, PhD.,

                  Defendant.

## <u>ORDER APPOINTING SPECIAL PROCESS SERVER</u>

This ___ day of March 2008, The Court having been presented with Plaintiff's motion, pursuant to Court of Chancery Rules 4(a) and 4(c), for the appointment of a special process server,

      IT IS HEREBY ORDERED as follows:

      Any employee of Parcels Inc. or of Young Conaway Stargatt & Taylor LLP over the age of 18 and who is not a party to this action, is hereby specifically appointed pursuant to Court of Chancery Rules 4(a) and 4(c) and is directed to take such actions as may be necessary to effect prompt service of the Summons, Complaint, the aforementioned motion of Plaintiff, and a copy of this Order upon defendant and to make the return of service promptly upon completion of service of process.

                                   _____

                                   Chancellor/ Vice Chancellor/Master

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff  New Castle, DE
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Chester, PA
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Martin S. Lessner
Young Conaway Stargatt & Taylor, LLP

Attorneys (If Known)

Jami B. Nimeroff

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane  ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product  Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability  ☐ 365 Personal Injury - | of Property 21 USC 881 |  | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &  Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander  ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'  Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability  Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine  **PERSONAL PROPERTY** | Safety/Health |  | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product  ☐ 370 Other Fraud | ☐ 690 Other |  | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability  ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle  ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle  Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability  ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal  Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting  ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment  Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/  **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations  ☐ 530 General |  | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare  ☐ 535 Death Penalty | **IMMIGRATION** |  | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -  ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application |  | Under Equal Access |
|  | Employment  ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - |  | to Justice |
|  | ☐ 446 Amer. w/Disabilities -  ☐ 555 Prison Condition | Alien Detainee |  | ☐ 950 Constitutionality of |
|  | Other | ☐ 465 Other Immigration |  | State Statutes |
|  | ☐ 440 Other Civil Rights | Actions |  |  |

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding

☒ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. sections 1332, 1441 and 1446

Brief description of cause:
breach of contract

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE  3/30/08

SIGNATURE OF ATTORNEY OF RECORD  No. 4049

## FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

Attorney addresses Cont'd:

The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19801

t(302)571-6698

Brown Stone Nimeroff LLC
4 East 8th Street, Suite 400
Wilmington, DE  19801

t(302)428-8142

✎ AO 440 (Rev. 03/08) Civil Summons

# UNITED STATES DISTRICT COURT

for the

District of Delaware

| | |
|---|---|
| W.L. Gore & Associates, Inc. | ) |
| Plaintiff | ) |
| v. | ) Civil Action No. |
| Charles Thomas Rosenmayer, Ph.D. | ) |
| Defendant | ) |

**Summons in a Civil Action**

To: *(Defendant's name and address)*

Charles Thomas Rosenmayer, Ph.D.
4 Edward Drive
Avondale, Pennsylvania 19311

A lawsuit has been filed against you.

Within  20  days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, whose name and address are:

Martin S. Lessner, Esquire
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_____

Name of clerk of court

Date: _____     _____

Deputy clerk's signature

*(Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States allowed 60 days by Rule 12(a)(3).)*

✎ AO 440 (Rev. 03/08)  Civil Summons (Page 2)

**Proof of Service**

I declare under penalty of perjury that I served the summons and complaint in this case on _____ ,
by:

    (1) personally delivering a copy of each to the individual at this place, _____

        _____ ; or

    (2) leaving a copy of each at the individual's dwelling or usual place of abode with _____
        who resides there and is of suitable age and discretion; or

    (3) delivering a copy of each to an agent authorized by appointment or by law to receive it whose name is
        _____ ; or

    (4) returning the summons unexecuted to the court clerk on _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00_____ .

Date: _____

_____
Server's signature

_____
Printed name and title

_____
Server's address