IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RURAL CELLULAR CORPORATION,

        Plaintiff,

v.

ALLTEL COMMUNICATIONS, LLC,

        Defendant.

**Civil Action No. _____**

## COMPLAINT

Plaintiff Rural Cellular Corporation ("RCC") states as follows for its complaint against defendant Alltel Communications, LLC ("Alltel"):

## NATURE OF THE ACTION

1. After selling defined, FCC licensed territories of its business (including all associated customers) to RCC for $48,615,000, Alltel agreed to continue providing services to those customers during a post-sale transitional period, until they could safely be moved into RCC's wireless communications network and business systems. Contrary to its contracts with RCC, and in derogation of state and federal law, Alltel failed to secure customer data for RCC, improperly communicated with customers after the sale, and used the cover provided by the transitional period to surreptitiously use confidential and proprietary customer information to contact some of the sold customers, thereby converting them back into Alltel customers or causing them to terminate their relationships with RCC. As a result of Alltel's misconduct, RCC has suffered damages amounting to millions of dollars. This is an action for breach of contract, breach of the implied covenant of good faith and fair dealing found in all contracts, trade secret

misappropriation, and for violation of the Telecommunications Act of 1996, 47 U.S.C. §§ 222 and 206.

## THE PARTIES

2. Rural Cellular Corporation is a corporation organized and existing under the laws of the State of Minnesota, with its principal place of business at 3905 Dakota Street S.W., Alexandria, Minnesota 56308. RCC is a wireless (cellular) communications company that specializes in serving rural markets located throughout the United States.

3. Alltel Communications, LLC is a limited liability company organized and existing under the laws of the State of Delaware, having its principal place of business at One Allied Drive, Little Rock, Arkansas. Alltel is a wireless (cellular) communications provider to markets located throughout the United States. Alltel is the successor in interest to Alltel Communications, Inc., which was acquired by Alltel's parent, Atlantis Holdings LLC, on November 16, 2007. Alltel is liable to RCC for the wrongful acts and omissions described herein of Alltel Communications, Inc. that occurred prior to the acquisition.

4. Alltel may be served with process at the office of its registered agent in the State of Delaware, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

## JURISDICTION AND VENUE

5. Subject matter jurisdiction is proper in this Court based on diversity of citizenship between the parties, pursuant 28 U.S.C. § 1332(a)(2), because there is complete diversity of citizenship between RCC, as plaintiff, and Alltel, as defendant, and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.  The Court has personal jurisdiction over Alltel because it is incorporated in Delaware and, upon information and belief, transacts business in, or has otherwise established a presence in Delaware sufficient to be subject to personal jurisdiction therein.

7.  Venue lies in the Unites States District Court for the District of Delaware pursuant to the provisions of 28 U.S.C. §§ 1391(a) and (c).

## FACTS COMMON TO ALL COUNTS

8.  Alltel provides cellular telephone and other wireless communications services and has more than 12,000,000 customers. It generates annual revenues of about $8 billion. Alltel has enjoyed rapid growth in recent years and now ranks as the fifth largest provider of wireless communications in the country. Alltel's stock was publicly traded until it went private by means of the leveraged buyout by Atlantis Holdings, LLC, on November 16, 2007.

9.  In 2006, Alltel agreed to purchase substantially all of the assets of Midwest Wireless Holdings, LLC, ("Midwest Wireless") which was another wireless communications provider operating in the largely rural environs of southern Minnesota.

10. In order to complete the Midwest Wireless acquisition, Alltel was required to obtain the consent of the United States Department of Justice, the Federal Communications Commission and the State of Minnesota. Following their review of the proposed transaction, these governmental bodies concluded that Alltel would have to completely divest itself of its entire business (including all customers and service delivery infrastructure) in a predominantly rural area of southern Minnesota, in and near the City of Mankato, Minnesota ("the Divestiture Market"). In a federal court filing, Alltel acknowledged that this forced divestiture was intended to preserve "viable competitors in the provision of mobile wireless telecommunications services" in order to counter the loss of competition in the Divestiture Market that the state and federal

3

governments had determined would otherwise have resulted from Alltel's acquisition of Midwest Wireless.

11. In return for governmental approval of the Midwest Wireless acquisition, Alltel entered into a Preservation of Assets Stipulation with the United States and the State of Minnesota that was filed in the United States District Court for the District of Minnesota, and confirmed in a Final Judgment entered by that court, on or about September 7, 2006 (Case No. 06-cv-03631) (Judge Kyle) ("the Divestiture Lawsuit").

12. In the Preservation of Assets Stipulation and the confirming Final Judgment, Alltel agreed to sell complete ownership of the customers and infrastructure in the Divestiture Market, within 120 days after its acquisition of Midwest Wireless, to a wireless carrier acceptable to the United States.

13. Under the Final Judgment, Alltel was prohibited from taking "any action" to impede or interfere with the ability of RCC to compete effectively with Alltel after the completion of divestiture.

14. Alltel was also strictly prohibited by the Final Judgment from reacquiring "any part" of the assets to be divested, during the ten-year term of the Final Judgment.

15. The Preservation of Assets Stipulation was confirmed by the federal court and filed of record in the Divestiture Lawsuit. By its own stipulation, Alltel was required to:

    a. Divest itself of all assets in the market including "business and customer records and information, customer contracts, customer lists, credit records, [and] accounts . . . ."

    b. Transfer to the acquiring company the "complete ownership and/or other rights" to the assets.

SL1 813646v1/000000.00000

  c. "[T]ake all reasonable efforts to preserve the confidentiality of information . . . material to" the assets being divested.

  d. Maintain its books, records or competitively sensitive sales, marketing and pricing information for the Divestiture Market in a manner that would prevent access to such information by any Alltel employees who were not providing services for successful divestiture.

 16. Alltel eventually stipulated in the Divestiture Lawsuit to the entry of a Settlement Agreement with the United States and the State of Minnesota, on December 3, 2007, pursuant to which it paid fines of $540,000 to the United States and $745,000 to the State of Minnesota for violating the Preservation of Assets Order and the Final Judgment. Upon information and belief none of these transgressions involved the claims asserted herein by the plaintiff.

 17. In addition, Alltel was ordered by the U.S. Federal Communications Commission, in an order dated October 2, 2006 ("FCC Order"), to comply with the Stipulations and Final Judgment entered in the Divestiture Lawsuit, as a condition of FCC approval of the purchase of Midwest Wireless.

 18. Together, the Stipulations and Final Judgment in the Divestiture Lawsuit, and the FCC Order, are defined as the "Governing Regulatory Documents" in the Purchase Agreement and the Transition Services Agreement (both of which are defined below) between the parties to this action.

 19. Alltel sold the Divestiture Market to RCC pursuant to a "Purchase Agreement" which was closed on or about April 4, 2007. When the deal closed, all of Alltel's right, title and interest in and to the customers in the Divestiture Market, including all confidential customer information and the infrastructure to provide continuing cellular telephone service, was

transferred to RCC, which immediately then became the sole and exclusive owner of those assets. The Purchase Agreement provides that it is to be governed by Delaware law.

20.　　Concurrent with the Purchase Agreement, the parties also entered into a "Transition Services Agreement", which also recites that it is governed by Delaware law. Under that agreement, RCC purchased certain "transitional services" from Alltel to preserve the customer base and other assets sold by Alltel, while RCC completed the steps on its end that were necessary to allow the sold customers to move onto RCC's network and business systems. Those efforts were ongoing from the April 4, 2007 closing until the Divestiture Market was completely severed from Alltel and converted to RCC's domain, starting on or about October 13, 2007 ("the Cut Over"). RCC has paid substantial sums to Alltel for its transitional services.

21.　　Under the Purchase Agreement and the Transition Services Agreement, Alltel promised RCC that it would not violate the Final Judgment or the Preservation of Assets Stipulation. Thus, Alltel was contractually bound to the following conditions that were imposed upon it in the Divestiture Lawsuit:

    a.　　Alltel agreed not to take "any action" to impede or interfere with the ability of RCC to compete effectively with Alltel after divestiture.

    b.　　Alltel agreed that it would not reacquire "any part" of the Divestiture Market, including business and customer records and customer information, customer contracts, customer lists, credit records and accounts of customers, until after September 7, 2016.

    c.　　Alltel agreed to sell to RCC all assets in the Divestiture Market, including business and customer records and information, customer contracts, customer lists, credit records and accounts of customers.

6

    d.    Alltel was obligated to transfer "complete ownership and/or other rights" to the assets in the Divestiture Market to RCC.

    e.    Alltel was required to "take all reasonable efforts to preserve the confidentiality of information" that was material to the assets RCC acquired.

    f.    Alltel was prohibited from maintaining its books, records or competitively sensitive sales, marketing and pricing information in a manner that would allow access to the Divesture Market assets to any Alltel employees who were not providing services limited to successful divestiture.

22.    The Purchase Agreement included still more terms and conditions, pursuant to which Alltel agreed:

    a.    To not take any action that would impede "in any way" the operation or divestiture of the assets acquired by RCC.

    b.    To not use customer information to "directly and specifically target" the customers sold to RCC, for the 12 months ending April 4, 2008.

    c.    To indemnify and hold RCC harmless from any losses resulting from breach of the Purchase Agreement by Alltel, including "any loss, damage, cost, expense . . . and reasonable attorney's fees" that "result from or arise out of" any breach of the Purchase Agreement.

23.    For its part, the Transition Services Agreement included Alltel's undertaking to honor the Final Judgment and Asset Preservation Order from the Divestiture Lawsuit. Section 10(a) of that agreement provided:

> *Compliance with Laws.* Each party shall comply …in all material respects … with the Governing Regulatory Documents, applicable to the performance of its obligations under this Agreement.

SL1 813646v1/000000.00000

In addition, Alltel agreed, in Section 5 of the Transition Services Agreement, that the customers sold to RCC would not be subject to predation by Alltel:

> After the Closing Date and except as may be required in the provision of a particular Transition Service, Seller shall not communicate directly with any customer or end user of Purchaser regarding matters relating to any Transition Service . . . . All notifications to Purchaser's customers or end users regarding . . . [any transitional] event, development or change involving the Transition Services that Seller reasonably believes could impact any customer or end user shall be the responsibility of and initiated exclusively by Purchaser. <u>Seller shall not deal with or attempt to adjust or resolve any complaints by any customer or end user of Purchaser with respect to Transition Services or otherwise affecting Purchaser and Purchaser shall be solely adjusting and resolving all of its customer or end user complaints</u> solely at Purchaser's costs and expense.

(Emphasis supplied.)

24. Alltel further agreed, in Section 11(q)(4) of the Transition Services Agreement, to preserve the confidentiality of all customer information within the meaning of the Telecommunications Act of 1996, 47 U.S.C. § 222.

25. Evidently unable to restrain its predatory instincts, and in derogation and breach of its undertakings to RCC, the United States District Court, the governments and agencies of the United States and the State of Minnesota, and in violation of the laws of the United States and Minnesota, Alltel failed to preserve and protect exclusively for RCC the customer accounts it sold to RCC in the Divestiture Market, because it sent predatory communications to those customers and allowed its sales agents to have "point of sale" access to confidential customer information, thereby allowing its sales agents to use that access to "port" their accounts back to Alltel following the Cut Over, or to otherwise terminate their relationship with RCC. Examples of Alltel's willful breach of duty include, for example and without limitation:

8

    a.    Alltel sent branded "monthly billing stuffers" to the sold customers in the Divestiture Market that lauded the service and pricing of Alltel's offerings on at least one occasion in the spring of 2007.

    b.    Alltel sent a sales pitch in the form of a branded letter to the customers sold to RCC.

    c.    Alltel had a valuable joint marketing alliance with Radio Shack retail stores in the Divestiture Market -- a relationship that Alltel sold to RCC. During the transitional services period, Radio Shack dropped that alliance in the Divestiture Market, even though it continued with its highly successful, virtually identical alliance with RCC in numerous other of its stores located in other parts of the United States. When RCC representatives traveled to Texas in an effort to persuade Radio Shack to continue with the alliance in the Divestiture Market, they were told that Alltel representatives had told them how terminate their relationship with RCC and return to Alltel after a 90 day period.

    d.    When RCC began to receive reports from the sold customers, and its own employees, that Alltel sales agents were improperly obtaining "point of sale" access to customer information, then soliciting and facilitating the conversion of customers to return to Alltel, Alltel cavalierly responded to RCC's objections with repeated assurances that all such "point of sale" access had been eliminated and that the contrary reports were false.

    e.    Alltel provided slipshod and poor quality service to RCC's customers during the transitional services period, resulting in poor or interrupted service to many customers in the Divestiture Market.

9

   f. Alltel provided incomplete or inaccurate information to RCC about the sold customers, leading to confusion or uncertainty in the market that Alltel capitalized on when soliciting customers to convert them back to customers of Alltel.

   g. RCC received information from its customers that suggested that Alltel retail locations had access to confidential and proprietary customer information and were misusing it, including for the purpose of having RCC's customers migrate back to Alltel. When addressing these concerns, Alltel insisted that there were no security breaches in their systems. Eventually, an RCC retail employee called an Alltel retail store representative who detailed how they were accessing RCC customer information. With this information in hand, RCC brought the matter directly to the attention of Phillip Watts, an Alltel employee who dealt with information technology and was a subject matter expert on the Alltel transitional services team. During a conversation in which he initially persisted in repeating Alltel's mantra that point of sale access was a complete impossibility, he eventually admitted that Alltel's programmers had, in fact, failed to secure the data and that, indeed, a back door to RCC customer information existed and was fully accessible to Alltel sales representatives. With these facts, RCC demanded an investigation from Alltel, which documented that no fewer than 47 specific customers had their account inappropriately accessed, utilized and changed by Alltel sales agents.

26. Prior to the Cut Over, RCC observed that it was suffering a much larger than normal "churn" of Alltel's customers in the Divestiture Market. That is, a disproportionately large percentage of the customers sold by Alltel were opting to drop their contract with RCC. In the end, the churn amounted to some 13% of the customer base purchased by RCC -- in contrast to an expectable "worst case" churn of just 3%.

10

27. Even more remarkable was the proportion of those departing customers who also opted to "port" their cellular telephone services back to Alltel. The wireless industry is required by federal law to allow customers to retain their cell telephone numbers when they change service providers. After Congress enacted legislation guaranteeing "portability" to cell numbers, the industry refers to instances when a customer elects to keep their telephone number when changing carriers as "porting." The process of porting is not without costs, in terms of time (customers lose the use of their cell phones for up to 48 hours during porting) and inconvenience, and so "porting" has historically accounted for less than 20% of all churn, on average. While Alltel was providing transitional services to RCC, the percentage of the churn that "ported" ranged from 41% to 53% -- the vast preponderance of which ported directly back to Alltel! That astonishing level of porting was no accident.

28. RCC has determined that the customers it lost due to the wrongful conduct of Alltel had a fair market value in excess of $4,000,000. RCC brings this action to recover those actual damages, together with its costs and attorneys' fees incurred in prosecuting this claim.

## COUNT I

## BREACH OF CONTRACT

### (Purchase Agreement)

29. RCC incorporates by reference paragraphs 1 - 28 of this complaint, as if fully set forth herein.

30. Alltel has breached the Purchase Agreement.

31. As a result, RCC has been damaged.

11

## COUNT II

## BREACH OF CONTRACT

**(Transition Services Agreement)**

32.　　RCC incorporates by reference paragraphs 1- 28 of this complaint, as if fully set forth herein.

33.　　Alltel has breached the Transition Services Agreement.

34.　　As a result, RCC has been damaged.

## COUNT III

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

**(Delaware Law)**

35.　　RCC incorporates by reference paragraphs 1- 28 of this complaint, as if fully set forth herein.

36.　　Under Delaware law, every contract includes a covenant of good faith and fair dealing that requires a party to refrain from conduct having the effect of preventing the other party to the contract from receiving the fruit of the bargain. Thus, a contracting party is liable for breaching this covenant when their conduct frustrates the overarching purpose of the contract by taking advantage of their position to control the implementation of the agreement.

37.　　Here, Alltel's abuse of its control of RCC's customer and proprietary information, combined with its ongoing control of point of sale customer relationships during the transition period, deprived RCC of the benefit of continued ownership of a valuable portion of the very same customers that RCC had, just months prior, acquired for good and sufficient consideration.

SL1 813646v1/000000.00000

38. As a result, RCC has been damaged by Alltel's breach of the covenant of good faith and fair dealing implied, as a matter of law, in both the Purchase Agreement and the Transition Services Agreement.

## COUNT IV

### TRADE SECRET MISAPPROPRIATION

**(Minnesota Law or Delaware Law)**

39. RCC incorporates by reference paragraphs 1 - 28 of this complaint, as if fully set forth herein.

40. Alltel willfully and maliciously misappropriated RCC's trade secret information, in violation of Minnesota's Uniform Trade Secrets Act, Minn. Stat. §§ 325C.01, *et seq.*  In the alternate, assuming Delaware law is held to apply, Alltel's conduct violated Delaware's Trade Secrets Act, 6 *Del. Code* § 2001, *et. seq.*

41. As a result, RCC has been damaged.

## COUNT V

### IMPROPER USE OF CUSTOMER PROPRIETARY NETWORK INFORMATION

**(7 U.S.C. § 222(b))**

42. RCC incorporates by reference paragraphs 1- 28 of this complaint, as if fully set forth herein.

43. Alltel used the "customer proprietary network information" concerning RCC's customers in violation of the Telecommunications Act of 1996, 47 U.S.C. §§ 222 and 206.

44. As a result, RCC has been damaged.

**PRAYER FOR RELIEF**

WHEREFORE, Rural Cellular Corporation prays that it be awarded judgment against Alltel Communications, Inc., as follows:

A.     An award of compensatory damages in amount greater than $4 million;

B.     An award of punitive damages in an amount equal to twice the Court's award of compensatory damages;

C.     An award of the reasonable attorneys' fees and costs incurred herein by RCC;

D.     An award of interest on the damages awarded to RCC herein, including interest prior to and after entry of judgment; and

E.     All further relief that this Court deems equitable in the premises.

Dated: April 30, 2008                                   **STEVENS & LEE, P.C.**


By  */s/ Joseph Grey*
    Joseph Grey (ID 2358)
1105 North Market Street, 7th Floor
Wilmington, DE  19801
Telephone:  (302) 654-5180
Facsimile:  (302) 654-5181
E-Mail:  jg@stevenslee.com

Of Counsel:

**MOSS & BARNETT**
A Professional Association
Thomas J. Shroyer
Attorneys for Plaintiff
4800 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-4129
Telephone:  (612) 877-5000
Facsimile:  (612) 877-5999
E-Mail:  ShroyerT@moss-barnett.com

*Attorneys for Plaintiff Rural Cellular Corporation*

SL1 813646v1/000000.00000

AO 440 (Rev. 3/08) Civil Summons

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RURAL CELLULAR CORPORATION ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civil Action No. _____ |
| ALLTEL COMMUNICATIONS, LLC ) | |
| ) | |
| Defendant ) | |
| ) | |

## SUMMONS IN A CIVIL ACTION

**TO:**

    Alltel Communications, LLC
    c/o The Corporation Trust Company
    Corporation Trust Center
    1209 Orange Street
    Wilmington, DE  19801

A lawsuit has been filed against you.

    Within ____ days after service of this summons on you (not counting the day you received it), you must serve on the Plaintiff an answer to the attached Complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the Plaintiff's attorney, whose name and address are:

    Joseph Grey, Esquire
    Stevens & Lee, P.C.
    1105 North Market Street, Seventh Floor
    Wilmington, DE  19801

If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the Court.

    Dr. Peter T. Dalleo
    CLERK OF COURT

_____    _____
DATE    DEPUTY CLERK'S SIGNATURE

*(Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States allowed 60 days by Rule 12(a)(3).)*

SL1 814152v1/103584.00001

AO 440 (Rev. 3/08) Civil Summons

## PROOF OF SERVICE

I declare under penalty of perjury that I served the summons and complaint in this case on _____ by:

      (1) personally delivering a copy of each to the individual at this place, _____; or

      (2) leaving a copy of each at the individual's dwelling place or usual place of abode with _____, who resides there and is of suitable age and discretion; or

      (3) delivering a copy of each to an agent authorized by appointment or by law to receive it whose name is _____; or

      (4) returning the summons unexecuted to the court clerk on _____.

My fees are $_____ for travel and $_____ for services, for a total of $_____.

Date: _____     _____
                                                                    Server's signature

                                                                    _____
                                                                    Printed Name and Title

                                                                    _____
                                                                    Server's Address

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
RURAL CELLULAR CORPORATION

**DEFENDANTS**
ALLTEL COMMUNICATIONS, LLC

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
DOUGLAS COUNTY, MN
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
NEW CASTLE COUNTY, DE
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER
Joseph Grey, Esquire
Stevens & Lee, P.C.
1105 North Market Street, Seventh Floor
Wilmington, DE 19801
(302) 654-5180

ATTORNEYS (IF KNOWN)
Not Known

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties In Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal place of Business in This State | ☐ 4 | ☒ 4 |
| Citizens of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholder's Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability

**TORTS**
PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employer's Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Right

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
HABEAS CORPUS:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus – Alien Detainee
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS - Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/CC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access of Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- Appeal to District Judge from ☐ 7 Magistrate Judgment

## VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH ARE FILING (DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY): 28 U.S.C. §1332(A)(2)
BRIEF DESCRIPTION OF CAUSE: BREACH OF CONTRACT AND VIOLATION OF STATE AND FEDERAL STATUTES

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

**DEMAND** $4 million, plus interest, attorneys fees, costs, and puntives

CHECK YES only if demanded in complaint:
**JURY DEMAND** ☐ YES  ☒ NO

## VIII. RELATED CASE(S) IF ANY
(See instructions):  JUDGE _____  DOCKET NUMBER _____

DATE
April 30, 2008

SIGNATURE OF ATTORNEY OF RECORD
/s/ Joseph Grey

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

SL1 814057v1/103584.00001