# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARNAVI SPA, as agent for JILMAR SHIPPING S.A., | C.A. No. _____ |
| Petitioner, | **PETITION TO CONFIRM FOREIGN ARBITRAL AWARD** |
| vs. | |
| ADVANCED POLYMER SCIENCES, INC. | |
| Respondent. | |

## PETITION TO CONFIRM FOREIGN ARBITRAL AWARD

Petitioner, Marnavi, SpA, ("Marnavi"), as agent for Jilmar Shipping, S.A. ("Jilmar", and together with Marnavi, the "Owners"), and by and through its attorneys, respectfully alleges as and for its Petition against Respondents, Advanced Polymer Sciences, Inc. ("APS", or "Respondent"), as follows:

## INTRODUCTION

1.     This is an action for confirmation and enforcement of a foreign arbitral award made in the United Kingdom pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Award (the "New York Convention"), and its implementing legislation, the Federal Arbitration Act, 9 U.S.C. § 201 *et seq.* (the "FAA").  An arbitral award was rendered in favor of Jilmar by an arbitral tribunal established under the rules and procedures of the United Kingdom Arbitration Act of 1996, on or about November 11, 2005.  Neither Marnavi nor Jilmar are citizens of the United States.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action pursuant to 9 U.S.C. § 201, *et seq.*, in that this is an action for confirmation and enforcement of a foreign arbitral award subject to the New York Convention.

3.    The country in which the arbitral award was issued is the United Kingdom of Great Britain and Northern Ireland, which ratified the New York Convention on September 24, 1975 and in which the Convention entered into force on December 23, 1975.

4.    Venue is proper in this Court pursuant to 9 U.S.C. § 204.

## PARTIES

5.    Petitioner Marnavi SpA, is a corporation organized under the laws of Italy and as agent for Jilmar, a corporation organized under the laws of Panama.

6.    Upon information and belief, Respondent APS is a corporation organized under the laws of Delaware.

7.    APS is a proper party to this proceeding to confirm pursuant to Fed.R.Civ.P. 4(k)(1) and/or principles of quasi-in-rem jurisdiction.

## THE AGREEMENT TO ARBITRATE AND THE ARBITRAL AWARD

### A.    The Arbitration Agreement

8.    In July 28 1997, Marnavi S.p.A. ("Marnavi"), acting on behalf of Jilmar, as shipowner; APS, as contractor; Guaranteed Advanced Tank Technology, as contractor ("GATT") and Cantiere Naval SEC ("Cantiere", and together with APS and GATT, the "APS Group") entered into a written agreement to perform certain work on the vessel M/T Joran (the "Joran").  A certified, true and correct copy of the "Agreement to Qualify With IMO the APS Marine Line Coating as Suitable Barrier to Carry IMO II-III Mineral Acid Products on Mild Steel Cargo Tanks" (the "Agreement") is annexed as Exhibit A to the accompanying Affidavit of George Lugg in Support of Petition to Confirm Foreign Arbitral Award", dated June 23, 2008 (the "Lugg Aff."), which is in turn annexed as Exhibit 1 to this Petition.

2

9.      More specifically, the APS Group agreed to supply and install or alternatively supervise the installation of Siloxirane Marine Line Coating ("Siloxirane"), an allegedly high performance tank coating system.

10.      The APS Group understood that the Owners had entered into the Agreement in reliance on the APS Group's representations that the Siloxirane coating would permit the Owners to convert the Joran from a carrier of edible oils into a vessel meeting the International Maritime Organization ("IMO") standards for carrying IMO-II level corrosive substances.

11.      In addition, in further reliance on the APS Group's representations concerning Siloxirane's effectiveness in protecting cargo tanks from the corrosive effects of toxic substances, the Owners removed several stainless steel cargo tanks at great cost and replaced them with standard mild steel tanks in order to increase the Joran's carrying capacity.

12.      Notwithstanding the APS Group's representations, the Siloxirane coating did not achieve the resistance to corrosive and toxic cargoes necessary to permit the Joran to ship them in its cargo tanks.  In addition, a large portion of the cargo tanks' fiberglass surfaces were damaged during the heat curing process used to apply the Siloxirane.

13.      As a result of the APS Group's breach of the Agreement, the Owners suffered substantial losses, including, *inter alia*, the cost of converting the Joran, including the replacement of the cargo tanks, the cost of repairing the defective Siloxirane coating, the cost of repairing the protective fiberglass lining in the cargo tanks damaged by the Siloxirane's coating's failure, and the loss of earnings while the repairs were performed.

**B.      The Appointment of the Arbitrator**

14.      Section I of the Agreement (the "Arbitration Clause"), entitled "**Disputes**", provides for any disputes relating to the Agreement to be resolved by arbitration in London:

> Any dispute arising between the parties as to the performance of
> any portion of this Agreement which cannot be amicably settled by
> the parties shall be referred to arbitration in London.

15.     On or about December 18, 2001, Marnavi, as agent for Jilmar, submitted a

demand for arbitration to APS, GATT and Cantiere.  *See* Affidavit of Michael Lloyd in Support

of Petition to Confirm Foreign Arbitral Award ("Lloyd Aff."), dated June 25, 2008, at ¶ 8, which

is annexed as Exhibit 2 to this Petition.

16.     Pursuant to both section H of the Agreement and also The Arbitration Act,

1996, which governs arbitration in England and Wales (the "TAA"), Marnavi chose Mr. George

Lugg, at 1 White's Row, London, E1 7NF, to act as sole arbitrator.

17.     The APS Group were notified of Mr. Lugg's appointment, but failed to

follow the arbitration procedures specified in the TAA, and thus refused to chose a second

arbitrator or agree to the appointment of Mr. Lugg as sole arbitrator.

18.     As a result, Petitioner, as agent for Jilmar, applied to the High Court of

Justice, Queens Bench Division (the "High Court") for the appointment of an arbitrator.

19.     On June 15, 2001, the High Court issued an order appointing Mr. Lugg as

sole arbitrator (the "Arbitrator").

20.     The appointment of Mr. Lugg as arbitrator was duly authorized under the

TAA and was served upon each of APS, GATT and Cantiere.

**C.     Arbitration Proceedings Commence.**

21.     Following Mr. Lugg's appointment, Marnavi, as agent for Jilmar, served

Points of Claim on each member of the APS Group (the "Points of Claim").

22.     The Owners alleged that the Siloxirane coating applied to the Joran was

defective and claimed damages for substantial losses and expenses arising from the APS Group's

breach of the Agreement.

4

23.     The Arbitrator invited APS, GATT and Cantiere to make submissions in response to the Points of Claim.

24.     Cantiere did not respond.

25.     APS directly notified the Arbitrator that GATT had ceased to trade.

26.     APS acknowledged receipt of and responded to the Points of Claim through its counsel, John M. Manos.

27.     APS admitted in its submissions that:

(a)     APS had supplied the Siloxirane used on the Joran;

(b)     APS had overseen the application of the Siloxirane to the Jilmar's tanks,

(c)     APS had been required under the Agreement to apply the final heat curing of the Siloxirane and in fact did apply the final heat curing;

(d)     the fiberglass linings at the bottom of the Jilmar's tanks had been contaminated because the Siloxirane had failed to protect them; and

(e)     the failure of the Siloxirane coating had failure required the Owners to replace the fiberglass lining at the bottom of the tanks and to repair the large portions of the coating that had failed.

28.     However, APS claimed that the Siloxirane coating failed not because it was defective, but rather because the subcontractors hired by the Owners had improperly applied the Siloxirane coating.

29.     APS argued that the APS Group had been excused from performance because the Owners had allegedly breached the Agreement by not delivering the Joran to Cantiere's shipyard, which the APS Group alleged was required under the Agreement.

30.     APS also claimed that all work on the Joran that had in fact been performed on the Joran was done not under the Agreement, but instead under an alleged separate, oral agreement.

31.     According to APS, the terms of the alleged oral agreement:

(a)     Transferred sole responsibility for the preparing and coating Jilmar's tanks with Siloxirane from APS to the Owners;

(b)     Limited APS' duties to supplying Siloxirane and conducting the final heat curing;

(c)     Required neither the arbitration of disputes, nor that disputes be resolved in London.

32.     The Owners countered that no oral agreement existed.

33.     The Owners further alleged that the delivery of the Joran to Cantiere was not a precondition for the APS Group's performance under the Agreement..

**D.     The First Arbitration Award.**

34.     The APS Group and the Owners requested that prior to any determination of liability or the amount of damages, the Arbitrator issue an interim award resolving the question of the Arbitrator's jurisdiction to settle the dispute between the Owners and Respondents.

35.     In response, on July 15, 2002, the Arbitrator issued a written, interim award finding, *inter alia*, that the Agreement (including the Arbitration Clause) was valid, remained in force and was binding upon the Owners and the APS Group, and that the APS Group had carried out their work on the Joran under the written Agreement, and not some alleged oral agreement.

36.     In sum, the Arbitrator held that the dispute fell within the scope of the Arbitration Clause.

37.     The Arbitrator further held that he had jurisdiction to arbitrate "all disputes between the parties arising out of the contract for the coating of the cargo tanks of the m.v. [sic] 'JORAN' by the Contractors".  Interim Arbitration Award, dated July 15, 2002 (the "First Award").  A certified, true and correct copy of the First Award is attached as **Exhibit G** to the Lugg Aff.

**E.     The Second Interim Award**

38.     After the publication of the First Award, the Owners asked the Arbitrator to determine APS' liability for the failure of the Siloxirane tank coating system.

39.     The Owners ultimately demonstrated that the Siloxirane coating did not have the corrosion resistance advertised in APS' sales literature.

40.     The Joran was not fit to carry the IMO Class II chemicals that it had been intended to carry after the application of the Siloxirane.

41.     The Owners further showed that large portions of the Siloxirane and fiberglass coatings covering the tanks had been damaged during the heat curing process, and that as a result the Owners had incurred substantial losses and expenses repairing such damage.

42.     In spite of invitations from the Arbitrator, the APS Group made no further submissions to the Arbitrator on the question of liability.

43.     Instead, APS' attorney specifically informed the Arbitrator that APS would not make any further submissions to the tribunal.

44.     Thus, the Arbitrator made his determination as to liability based on the original submissions from both the Owners and the APS Group and also additional documentary evidence produced by the Owners.

45.    On February 4, 2003, the Arbitrator issued the Second Award, which held the APS Group jointly and severally liable for breach of the Agreement. (the "Second Award"). A certified, true and correct copy of the Second Award is attached as **Exhibit K** to the Lugg Aff.

46.    Reviewing the submissions that had been submitted by the parties, the Arbitrator concluded that:

(a)    "[t]here was no dispute that the [Siloxirane] coating had failed";

(b)    the Siloxirane coating failed because it was "inadequate", and had not failed due to any acts of the Owners;

(c)    Cantiere, not the Owners, was responsible for supervising the work done on the Joran;

(d)    all of the possible causes of the failure were the responsibility of the APS Group, not the Owners; and

(e)    finally, that the Owners had not breached the Agreement.

**F.    The Final Arbitration Award**

47.    After the determination of liability the Owners requested that the Arbitrator determine the quantum of damages.

48.    In response to this request, the Arbitrator once again requested that each member of the APS Group make submissions on the damages issue.

49.    However, the only communication made by any member of the APS Group was from John Manos, who informed the Arbitrator in writing that APS was in receivership in Ohio.

50.    Although GATT never filed a voluntary petition under chapter 7 or 11 or under the U.S. Bankruptcy Code and was never the subject of a judicial receivership, the APS Group refused to make submissions on the issue of damages.

51.    On November 11, 2005, the Arbitrator issued a final quantum award finding, APS, GATT and Cantiere jointly and severally liable and awarding Jilmar the following:

A.  US $1,800,630.00 for the costs of conversion and recoating of the Joran's cargo tanks to carry corrosive and toxic cargoes, with interest thereon at the rate of 6.1 % per annum, from April 15, 1998;

B.  US $892,556.00 for the costs of conversion and recoating of the Joran's cargo tanks to carry corrosive and toxic cargoes, with interest thereon at the rate of 5.9% per annum, from November 12, 1998;

C.  Italian Lira 144,973,670 for the costs of subsequent repairs following failure of the coating provided and applied by APS, with interest thereon at the rate of 5.7% per annum, from July 10, 1999;

D.  DM 331,999.98, plus US $55,333.33 for damages equivalent to the loss of the hire of the Joran while she was undergoing repair, with interest thereon at the rate of 5.7% per annum, from July 10, 1999;

E.  The Contractors and Owners costs of the reference in full, including (i) the Arbitrator's fees, (ii) the Owners' attorneys fees and expenses, and (iii) the Owners' costs, with interest thereon at the rate of 6.5% per annum, from November 11, 2005;

G.  Interest on all of the above to be compounded at three monthly intervals, from the specified date above until the date of payment of the APS Award.

See Final Arbitration Award on Quantum, dated November 11, 2005 (the "Third Award" and together with the First Award and Second Award, the "APS Award").  A certified, true and correct copy of the Final Award is attached as **Exhibit N** to the Lugg Aff.

52.    The Arbitrator subsequently sent the Arbitration Award to APS.

53.    The time for APS, GATT and Cantiere to appeal the Arbitration Award has expired, and no further appeal is possible.  See Lloyd Aff., ¶ 11.

54.    The APS Award is thus final and binding on the APS Group under the Laws of England and Wales.  See TAA, § 58.

9

## FIRST CLAIM FOR RELIEF
## 9 U.S.C. § 207

55.    The Petitioner repeats and realleges each and every allegation contained in paragraphs 1 through 54 above, inclusive, and incorporates them herein by reference.

56.    The Award was made in the United Kingdom, a nation that is a signatory to the New York Convention and which is a state other than the state where recognition and enforcement is sought hereby.

57.    The APS Award falls under the New York Convention pursuant to 9 U.S.C. § 202, in that it was made in the territory of the United Kingdom, arises out of a commercial legal relationship and is not entirely between citizens of the United States.

58.    The FAA provides that "the court *shall* confirm the award unless it finds that one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York Convention]".  9 U.S.C. § 207.

59.    This Petition is timely made and no cognizable grounds for refusal or deferral of recognition or enforcement of the APS Award exists.

60.    Petitioner is therefore entitled to confirmation of the APS Award.

61.    Under controlling law, Petitioner is entitled to prejudgment interest, calculated at an appropriate rate, on the amount APS Award.

62.    Under controlling law, Petitioner is entitled to an award of costs and expenses, including attorneys fees to bring the arbitration case and to enforce the APS Award.

63.    By reason of the foregoing, Petitioner is entitle to the entry of an order and judgment confirming the Award and entering the APS Award, and each and every term thereof, as a judgment of this Court, as against APS, plus an award including attorneys fees, costs and expenses.

WHEREFORE, Petitioner Marnavi, as agent for Jilmar, respectfully requests that this Court, pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, and its implementing legislation, 9 U.S.C. §§ 1 *et seq.,* enter an Order confirming the aforementioned APS Award and granting judgment in favor of Marnavi, as agent for Jilmar, against APS, jointly and severally, in the following manner:

(a)    US $1,800,630.00, with interest thereon at the rate of 6.1% per annum, from April 15, 1998 to the date of judgment;

(b)    US $892,556.00, with interest thereon at the rate of 5.9% per annum, from November 12, 1998, to the date of judgment;

(c)    Italian Lira 144,973,670, with interest thereon at the rate of 5.7% per annum, from July 10, 1999 to the date of judgment;

(d)    DM 331,999.98, plus US $55,333.33, with interest thereon at the rate of 5.7% per annum, from July 10, 1999 to the date of judgment;

(e)    The Contractors and Owners costs of the arbitration reference in full, including (i) the Arbitrator's fees, (ii) the Owners' attorneys fees and expenses; and (iii) the Owners costs, with interest thereon at the rate of 6.5% per annum, from November 11, 2005 to the date of judgment;

(f)    Interest on all of the above to be compounded at three monthly intervals, from the specified date above until the date of payment of the APS Award or judgment, whichever comes first;

(g)    To convert the Arbitration Award into a money judgment in the amount of no less than, as of the date of the filing of this Petition, $5,702,157.00;

(h)     Interest at the federal judgment rate as set forth in 18 U.S.C. § 3612(f)(2) from the

date of judgment by this Court until complete satisfaction by payment in full of

the judgment;

(i)     Awarding Petitioner Marnavi, as agent for Jilmar, against APS, costs, including

attorneys' fees, in this proceeding; and

(j)     Such other and further relief as the Court may deem to be just and proper.


Dated: June 25, 2008                              **DUANE MORRIS LLP**


                                                  /s/ Frederick B. Rosner
                                                  Frederick B. Rosner (DE # 3995)
                                                  Matt Neiderman (DE # 4018)
                                                  1100 North Market Street
                                                  Suite 1200
                                                  Wilmington, DE 19081-1246
                                                  (302) 657-4900


                                                  - and -

OF COUNSEL:                                       **SALANS**

                                                  Claude D. Montgomery, Esq.
                                                  Paul C. Gunther, Esq.
                                                  620 Fifth Avenue
                                                  Rockefeller Center
                                                  New York, New York 10020
                                                  212-632-5500

                                                  *Attorneys for Marnavi, SpA as agent for*
                                                  *Jilmar Shipping S.A.*

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Marnavi, SpA, as agent for Jilmar Shipping, S.A.

**DEFENDANTS**

Advanced Polymer Sciences, Inc.

(b) County of Residence of First Listed Plaintiff  Italy
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Frederick Rosner, Esq., (I.D. #3995) Duane Morris LLP
1100 North Market Street, Suite 1200, Wilm., DE  19801
(302) 657-4900

Attorneys (If Known)
Unknown

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question (U.S. Government Not a Party)
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES  (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business in This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business in Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT  (Place an "X" in One Box Only)

### CONTRACT
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability

### TORTS

**PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury

**PERSONAL INJURY**
- [ ] 362 Personal Injury— Med. Malpractice
- [ ] 365 Personal Injury— Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

### FORFEITURE/PENALTY
- [ ] 610 Agriculture
- [ ] 620 Other Food & Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 R.R. & Truck
- [ ] 650 Airline Regs.
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

### LABOR
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Mgmt. Relations
- [ ] 730 Labor/Mgmt. Reporting & Disclosure Act
- [ ] 740 Railway Labor Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

### SOCIAL SECURITY
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

### FEDERAL TAX SUITS
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third party 26 USC 7609

### OTHER STATUTES
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce/ICC/Rates/etc.
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 895 Freedom of Information Act
- [ ] 900 Appeal of Fee Determination Under Equal Access to Justice Act
- [ ] 950 Constitutionality of State Statutes
- [x] 890 Other Statutory Actions

### REAL PROPERTY
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

### CIVIL RIGHTS
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 444 Welfare
- [ ] 440 Other Civil Rights

### PRISONER PETITIONS
- [ ] 510 Motions to Vacate Sentence

**Habeas Corpus:**
- [ ] 530 General
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Conditions

## V. ORIGIN  (PLACE AN "X" IN ONE BOX ONLY)

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. (Do not cite jurisdictional statutes unless diversity.)

Breach of contract (Payment due for goods sold and delivered) and unjust enrichment

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND
$5,702,157.00

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes  [x] No

## VIII. RELATED CASE(S) IF ANY

(See Instructions):

JUDGE  Pending

DOCKET NUMBER Pending (Marnavi v. Keehan, et al.)

DATE: June 25, 2008

SIGNATURE OF ATTORNEY OF RECORD: /s/ Frederick B. Rosner (Del. No. 3995)

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MARNAVI SPA as agent for JILMAR SHIPPING S.A., | C.A. _____ |
| Petitioner, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT PETITION TO CONFIRM FOREIGN ARBITRAL AWARD** |
| vs. | |
| ADVANCED POLYMER SCIENCES, INC. | |
| Respondent. | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PETITION
TO CONFIRM FOREIGN ARBITRAL AWARD**

Petitioner, Marnavi SpA ("Marnavi"), as agent for Jilmar Shipping S.A. ("Jilmar", and with Marnavi the "Owners"), by and through its attorneys, submits this memorandum in support of its Petition, pursuant to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. § 201 *et seq.* ("New York Convention") to confirm foreign arbitral award against Advanced Polymer Sciences, Inc. ("APS") (the "Petition"), rendered in England on November 11, 2005, and directing the entry of judgment thereon against APS.

**FACTUAL BACKGROUND**

The facts underlying this dispute are straightforward. On July 28, 1997, Marnavi, acting on behalf of the Jilmar, as shipowner, entered into a written agreement (the "Agreement") with APS, as contractor; Guaranteed Advanced Tank Technology, as contractor ("GATT") and Cantiere Naval SEC ("Cantiere", and together with APS and GATT, the "APS Group"). Pursuant to the Agreement, the APS Group agreed to supply and install or alternatively supervise the installation of Siloxirane Marine Line Coating ("Siloxirane"), allegedly a high performance tank coating system, to the cargo tanks of the vessel M/T Joran (the "Joran"). The Siloxirane

coating was applied to the cargo tanks with the intent of converting the Joran into a tanker capable of carrying corrosive, toxic cargos.  In further reliance on the Siloxirane, the Owners incurred significant expenses in order to remodel the Joran.

However, the Siloxirane coating did not perform as promised.  As a result, the expenses incurred by the Owners in converting the Joran were wasted, the Joran's cargo tanks were damaged and required expensive repairs, and Marnavi suffered losses due to inactivity while the ship underwent extensive repairs.

The Agreement contained an Arbitration provision requiring that any dispute arising between the parties as to the performance the Agreement be referred to an Arbitration in London.  In an arbitration before the court-appointed arbitrator, and after issuing a two interim awards on jurisdiction and liability, George Lugg, the court-appointed arbitrator in this case (the "Arbitrator"), issued an award in London on November 11, 2005, in favor of Jilmar, jointly and severally against the APS Group (the "APS Award").  The APS Award provided for the payment of damages, fees and costs to the Owners.

To date, neither APS, nor GATT nor Cantiere has paid any of the APS Award. An order and judgment should be entered promptly to permit Marnavi and Jilmar to enforce the entirety APS Award in the United States against APS.

## ARGUMENT

### UNDER AUTHORITY OF THE NEW YORK CONVENTION AND 9 U.S.C. § 207, THIS COURT SHOULD CONFIRM THE ARBITRATION AWARD

International Arbitration awards may be enforced under the terms of the United Nations Conference on International Commercial Arbitration Convention on Recognition and Enforcement of Foreign Arbitral Award (the "New York Convention").  The New York Convention requires courts of contracting countries to give effect to an agreement to arbitrate

and also to recognize and enforce awards made in other States, subject to specific limited exceptions. Both the United States and the United Kingdom are signatories to the New York Convention.

In the United States, the New York Convention is codified at 9 U.S.C. § 201 *et seq*.[1] The New York Convention applies to "arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought." 9 U.S.C. §201, Article I, § 1. Section 202 of the FAA provides that the New York Convention covers all arbitration agreements and awards "arising out of a legal relationship, whether contractual or not, which [are] considered as commercial." 9 U.S.C. § 202. The Convention further provides that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon . . . ." New York Convention, Art. III, reprinted at 9 U.S.C. § 201. Under Section 207 of the FAA, a court shall confirm an arbitration award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the awards specified in the said Convention." 9 U.S.C. § 207.

The APS Award dated November 11, 2005, here should be confirmed pursuant to the New York Convention and 9 U.S.C. § 207. The APS Award falls under the New York Convention, because the arbitrator who rendered the APS award heard the matter and rendered his award upon the authority granted to him by contract and the Arbitration Act 1996 governing arbitrations on England and Wales. The APS Award was issued in London, England, and enforcement now is sought in the United States, a state other than the state in which the recognition and enforcement of the award is subject. The APS Award arose out of a commercial contract between Marnavi, an company organized under the laws of Italy, as agent for Jilmar, a

---

[1] 9 U.S.C. § 201 provides that the New York Convention "shall be enforced in United States courts in accordance with this chapter."

company organized under the laws of Panama; APS, a corporation organized under the state of

Delaware Company; GAAT, a Company organized under the laws of Ohio; and Cantiere Navale

SEC, a Company organized under the laws of Italy.  *See* 9 U.S.C. § 202.[2]

   When the Siloxirane failed to perform as APS had promised, a dispute arose

under the Agreement as to whether APS had breached its obligations.  The Agreement among the

parties required that "[a]ny dispute arising between the parties as to the performance of any

portion of [the] Agreement" be resolved by arbitration in London, England if such dispute could

not be resolved through the efforts of the parties.  Agreement, § I.  After the parties were unable

to resolve the dispute, the matter was referred to final and binding arbitration in London,

England, as per the Agreement.

   In sum, this case provides a textbook example of an award that is subject to – and

should be confirmed in accordance with – the New York Convention and the FAA..

   The New York Convention requires the party seeking recognition and

enforcement of a foreign arbitral award to provide the following:

   (a)  The duly authenticated original award or a duly certified copy thereof; and

   (b)  The original agreement to arbitrate or a duly certified copy thereof.

9 U.S.C. § 201, Article IV, Section 1.

   In this matter, Petitioner has provided a duly authenticated copy of the arbitral

award as well as a duly authenticated copy of the original agreement to arbitrate, which are

annexed as Exhibits G, K, N, and A, to the Affidavit of George Lugg in Support of Petition to

Confirm Foreign Arbitration Award, dated June 25, 2008.  Upon submission of these documents,

---

  [2]  The only exception lies if the relationship is considered "wholly domestic."  *Id.*  As the
Agreement was among two United States and two foreign companies that is not the case here.

the Court is required to recognize and enforce the foreign arbitral awards. 9 U.S.C. § 201,

Article III.

Pursuant to the terms of the New York Convention, recognition and enforcement

may be refused only if the party against whom recognition and enforcement is invoked furnishes

proof of pursuant to pursuant to one of the few exceptions enumerated in Article V of the

Convention. 9 U.S.C. § 201, Article V. In this situation no such proof exists or will be

submitted in this matter.

9 U.S.C. § 207 provides that:

> [w]ithin three years after an arbitral award falling under the
> Convention is made, any party to the arbitration may apply to any
> court having jurisdiction under this chapter for an order confirming
> the award as against any other party to the arbitration. The court
> shall confirm the award unless it finds one of the grounds for
> refusal or deferral of recognition or enforcement of the award
> specified in the said Convention.

Further, Jilmar's Petition for confirmation has been timely filed and, as is readily

apparent from the Award itself, none of the grounds for refusal to recognize or enforce of the

award specified in the New York Convention (see Art. V thereof) are present. Specifically, the

APS Award was validly issued under English law; the respondent was given adequate notice of

the proceedings; the APS Award does not full outside the scope of the arbitrators authority; the

sole arbitrator was properly convened under English law; and the APS award is final and binding

on all parties. Furthermore, no appeal has been taken by APS of the arbitral award in

Petitioner's favor, and the time for doing so under English law has passed, rendering the arbitral

award unchallengeable, final and capable of enforcement.

In light of the foregoing, the APS Award is subject to recognition and enforceable

pursuant to the New York Convention and should be recognized and confirmed as a judgment of

this Court.

## PETITIONER SHOULD BE AWARDED
## ATTORNEYS' FEES AS PART OF THE JUDGMENT

This Court has authority to award reasonable attorneys' fees and costs incurred by Petitioner as a result of APS' failure to satisfy the Arbitration Award rendered in the London arbitration proceedings. *See, e.g., Carpenters Pension Fund v. Eastern Millenium Construction, Inc.*, 2003 WL 2277355, at *3 (S.D.N.Y. Nov. 21, 2003) (noting that there is a "presumption in favor of prejudgment interest"); *Hunt v. Commodity Haulage Corp.*, 647 F.Supp. 797, 799 (E.D.N.Y. 1986) (awarding attorneys fees and costs where respondents submitted to arbitration and unjustifiably refused to pay arbitration award).

It is undisputable that APS agreed to arbitrate this matter in London, as the Arbitrator so found. In fact, APS at first participated in the arbitration by making submissions in opposition to Petitioners' points of claim. It is also undisputable that the Arbitrator awarded the Owners their entirety of their costs incurred in bringing and conducting the arbitration proceedings.

Notwithstanding its agreement to arbitrate, APS has unjustifiably refused or otherwise failed to satisfy the full amount of the arbitral awards, causing the Owners to engage counsel in its collections efforts in the United States. Petitioner respectfully requests that judgment be entered against Defendant for its attorneys fees and costs incurred in the arbitration and also in the enforcement of the Arbitration Award, in an amount to be determined.

## CONCLUSION

For the foregoing reasons, petitioner Jilmar respectfully requests that this Court

enter an Order confirming the Award and enter judgment thereon.


Dated: June 25, 2008

<div style="margin-left:40%">

**DUANE MORRIS LLP**


/s/ Frederick B. Rosner
Frederick B. Rosner (DE 3995)
Matt Neiderman (DE 4018)
Suite 1200
1100 North Market Street
Wilmington, DE 19081-1246
302-657-4900

- and -

</div>

OF COUNSEL:

<div style="margin-left:40%">

**SALANS**

Claude D. Montgomery, Esq.
Paul C. Gunther, Esq.
620 Fifth Avenue
Rockefeller Center
New York, New York 10020
212-632-5500

*Attorneys for Marnavi SpA as agent for*
*Jilmar Shipping S.A.*

</div>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARNAVI, SPA. as agent for JILMAR SHIPPING S.A., | Civil Action No. \_\_\_\_ |
| Petitioner, | AFFIDAVIT OF GEORGE LUGG IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRAL AWARD |
| vs. | |
| ADVANCED POLYMER SCIENCES, INC. | |
| Respondent. | |

## AFFIDAVIT OF GEORGE LUGG IN SUPPORT OF PETITION TO CONFIRM FOREIGN ARBITRATION AWARD

GEORGE LUGG, being duly sworn, deposes and says:

1.     I am over eighteen years of age.

2.     I am competent to make this affidavit, which is based on my own personal knowledge and upon information and documents that I believe to be true and accurate.

3.     I submit this affidavit in support of Petitioner Marnavi Spa's ("Marnavi") Petition to Confirm Foreign Arbitral Award, dated June 24, 2008, issued in favor of Jilmar Shipping S.A. ("Jilmar", and together with Marnavi, the "Owners") (the "Petition"), and brought by Marnavi as agent for Jilmar.

4.     I was formerly associated with the firm of Casebourne Leach & Co., a marine surveying company located at 1 Whites Row, London E1 7NF, England.

5.     In July 28 1997, Marnavi, acting on behalf of the Jilmar, as shipowner; Advanced Polymer Sciences, Inc., as contractor ("APS"), Guaranteed Advanced Tank Technology, as contractor ("GATT") and Cantiere Naval SEC ("Cantiere", together with APS and GATT, the "APS Group") entered into a written contract with respect to the vessel M/V Joran (the "Joran").  A true and correct copy of the "Agreement to Qualify With IMO the APS

Marine Line Coating as Suitable Barrier to Carry IMO II-III Mineral Acid Products on Mild

Steel Cargo Tanks" (the "Agreement") is annexed as **Exhibit A**.

A.       **The Appointment of the Arbitrator**

      6.       Section I of the Agreement, entitled **"Disputes"**, has an arbitration

provision that provides as follows:

> Any dispute arising between the parties as to the performance of
> any portion of this Agreement which cannot be amicably settled by
> the parties shall be referred to arbitration in London.

      7.       The Agreement provides for arbitration before an ad hoc arbitral tribunal

instead of an arbitration association or body.

      8.       The Owners alleged in the Points of Claim that APS Group had breached

their obligations to the Owners under the Agreement, that the Siloxirane coating was defective,

that the Joran had been damaged because of the failure to the coating, and that the Owners were

entitled to damages as a result.

      9.       The Owners subsequently selected me to serve as an arbitrator of the

dispute pursuant to both the Agreement, section I, and also The Arbitration Act, 1996 (the

"TAA"), which governs arbitrations in England and Wales.  A true and correct copy of

provisions of the TAA concerning the commencement of arbitration actions is attached hereto as

**Exhibit B**.

      10.      The APS Group were notified of my appointment as an arbitrator.

      11.      Notwithstanding notice of my appointment, no member of the APS Group

chose a second arbitrator or agreed to the my appointment as sole arbitrator, as provided in the

TAA. *Id* §§ 14-17.

12.     As a result, and as provided for in the TAA, *id* § 18, Marnavi, as agent for Jilmar, applied to the High Court of Justice, Queens Bench Division for the appointment of an arbitrator to resolve all disputes among the parties.

13.     On June 15, 2001, High Court Justice Langley, sitting in the Commercial Court of the Queen's Bench Division of the English High Court of Justice (the "English High Court"), issued an order appointing me sole arbitrator, which appointment was duly authorized under the TAA. A true and correct copy of the Court Order appointing me as sole arbitrator is attached hereto as **Exhibit C**.

**B.     Arbitration Proceedings Commence.**

14.     I gave written and timely notice to each member of the APS Group of my appointment as Arbitrator, and I invited each member of the APS Group to make submissions in response to the Owners' Points of Claim. Cantiere did not respond to my requests.

15.     In response to my notice, APS directly notified me that GATT was no longer in business. *See* Facsimile Transmission from Denise Keehan to George Lugg, dated September 18, 2001, a true and correct copy of which is attached hereto as **Exhibit D.** The following day Ms. Keehan sent me a facsimile transmission requesting that I send to her the Owners' Points of Claim. A true and correct copy of this facsimile transmission is attached hereto as **Exhibit E.**

**C.     The Arbitration Awards.**

16.     Prior to the determination of liability and the quantum of damages, APS and the Owners requested that I issue an interim award to determine my jurisdiction to arbitrate the dispute between the Owners and Respondents.

17.    Through their counsel, APS and GATT submitted their statement of defense on October 2, 2001. *See* Letter from John M. Manos to George Lugg, dated October 2, 2001, a true and correct copy of which is attached as **Exhibit F.**

18.    On July 15, 2002, I issued a written, interim award finding, *inter alia*, that the Agreement was valid, remained in force and was binding upon the Owners and the APS Group. I further found that the dispute fell within the scope of the Arbitration Clause and that I had jurisdiction to arbitrate "all disputes between the parties arising out of the contract for the coating of the cargo tanks of the m.v. [sic] 'JORAN' by the Contractors". Interim Arbitration Award, dated July 15, 2002 (the "First Award"). A true and correct copy of the First Award is annexed hereto as **Exhibit G.**

### D.    The Second Interim Award

19.    After the publication of the First Award, the Owners asked me to decide whether the APS Group was liable for the failure of the Siloxirane coating.

20.    In spite of several invitations from me to make submissions on the question of liability, no member of the APS Group made any further submissions to me on the question of liability. *See* Facsimile Transmissions from George Lugg to John M. Manos dated July 30, 2002; September 2, 2002 and October 18, 2002, true and correct copies of which are attached as **Exhibit H.**

21.    To the contrary, Mr. Manos specifically informed me that APS had "for all intents and purposes ceased to trade" and that Mr. Manos had been directed to discontinue his involvement with this matter. *See* Letter from John M. Manos to George Lugg, dated October 18, 2002, a true and correct copy of which is attached as **Exhibit I.**

22.    As a result of Mr. Manos' communication to me, I subsequently sent an additional invitation to Ms. Denise Keehan, the Vice President of APS, directing APS and GATT

4

to make further submissions on the question of liability. *See* Facsimile transmission from George Lugg to Denise Keehan, dated October 21, 2002, a true and correct copy of which is attached as **Exhibit J.**

23.    Notwithstanding my communications to the members of the APS Group, I received no further submissions from them. Thus, I made my determination as to liability based on documentation previously submitted by the APS Group and additional documentary evidence produced by the Owners.

24.    On February 4, 2003, I issued the Second Award in which I found the APS Group jointly and severally liable for breach of the Agreement. *See* Interim Final Arbitration Award and Reasons for and Forming Part of the Interim Final Award on Liability (the "Second Award"), dated February 4, 2003. A true and correct copy of the Second Award is annexed hereto as **Exhibit K.**

25.    In the Second Award I concluded that:

(a)    there was "no dispute" that the Siloxirane coating had failed;

(b)    the Siloxirane coating failed because of it was "inadequate", and not due to any acts of the Owners;

(c)    Cantiere, not the Owners, were responsible for the supervision of work done on the Joran; and

(d)    all possible causes of failure were the responsibility of the Contractors, not the Owners, and that the Owners had not breached the Agreement.

## E.    The Final Arbitration Award

26.    After my determination of liability the Owners requested that I determine the quantum of damages.

27.    In response, I once again gave repeated notice, over a period of 20 months, to each member of the APS Group requesting that they make submissions on the question of damages. *See* Facsimile Transmissions from George Lugg to APS and GATT, dated February 26, 2004; April 1, 2004; June 28, 2004; September 13, 2004; September 30, 2004; October 19, 2005 and November 1, 2005, true and correct copies of which are attached hereto as **Exhibit L**.

28.    In response, the only communication that I received from any member of the APS Group was from Mr. John Manos. In a letter dated June 28, 2004, Mr. Manos informed me that APS had entered into receivership in the court of Common Pleas in Lorrain County, Ohio. *See* Letter from John M. Manos to Mr. George Lugg, dated June 28, 2004 (the "June 28 Letter") and response of George Lugg dated July 1, 2004, true and correct copies of which are attached hereto as **Exhibit M**.

29.    On November 11, 2005, I issued a final award on quantum finding APS, GATT and Cantiere jointly and severally liable and awarding the Owners the following:

> A. US $1,800,630.00 for the costs of conversion of the vessel to carry corrosive and toxic cargoes, with interest thereon at the rate of 6.1 % per annum, from April 15, 1998;
>
> B. US $892,556.00 for the costs of conversion of the vessel to carry corrosive and toxic cargoes, with interest thereon at the rate of 5.9% per annum, from November 12, 1998;
>
> C. Italiän Lira 144,973,670 for the costs of subsequent repairs following failure of the coating provided and applied by Respondent, with interest thereon at the rate of 5.7% per annum, from July 1999;
>
> D. DM 331,999.98, plus US $55,333.33 for damages equivalent to the loss of the hire of the Joran while she was undergoing repair, with interest thereon at the rate of 5.7% per annum, from July 1999;
>
> E. The Contractors and Owners costs of the reference in full, including my fees Plaintiff and Petitioners' attorneys fees and

expenses with interest thereon at the rate of 6.5% per annum, from November 11, 2005;

G.  Interest on all of the above to be compounded at three monthly intervals, from the specified date above until the date of payment of the Arbitration Award.

30.    *See* Final Arbitration Award on Quantum and Reasons for and Forming

Part of the Arbitrator's Final Award on Quantum, dated November 11, 2005 (the "Third Award"

and together with the First Award and Second Award, the "Arbitration Awards"), ¶ 9.  A true

and correct copy of the Final Award is attached hereto as **Exhibit N**.

31.    After the Petitioner paid my fees I sent the Third Award to APS.  *See*

Facsimile Transmission from George Lugg to APS, dated November 21, 2005, a true and correct

copy of which is attached hereto as **Exhibit O**.

George Lugg

Sworn to before me this 25th day
of June, 2008

Notary Public

7

**APOSTILLE**
(Hague Convention of 5 October 1961 / Convention de La Haye du 5 octobre 1961)

### UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

1. Country: United Kingdom of Great Britain and Northern Ireland
   Pays: Royaume-Uni de Grande-Bretagne et d'Irlande du Nord

   This public document / Le présent acte public

2. Has been signed by          **James Ian Vanner**
   a été signé par

3. Acting in the capacity of    **Notary Public**
   agissant en qualité de

4. Bears the seal/stamp of       **The Said Notary Public**
   est revêtu du sceau/timbre de

                                 Certified/Attesté
5. at London/à Londres           6. the/le   **25 June 2008**

7. by Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs /
   par le Secrétaire d'Etat Principal de Sa Majesté aux Affaires Etrangères et du Commonwealth.

8. Number/sous No        **H826944**

9. Stamp:                                    10. Signature:   **R.Bawden**
   timbre:



                                    *For the Secretary of State / Pour le Secrétaire d'Etat*

**If this document is to be used in a country which is not party to the Hague Convention of 5 October 1961, it should be presented to the consular section of the mission representing that country. An apostille or legalisation certificate only confirms that the signature, seal or stamp on the document is genuine. It does not mean that the contents of the document are correct or that the Foreign & Commonwealth Office approves of the contents.**

# AGREEMENT TO QUALIFY WITH IMO THE APS MARINE LINE COATING AS SUITABLE BARRIER TO CARRY IMO II - III MINERAL ACID PRODUCTS ON MILD STEEL CARGO TANKS

This Agreement is entered into between Guaranteed Advanced tank Technology, Ltd. , an Ohio U.s.A., Limited Liability Company and a subsidiary of Advanced Polymer Sciences, Inc. with principal offices in Avon, Ohio, U.S.A. (hereinafter referred to as "GATT-APS") and Cantiere Navale SEC, Società Esercizio Cantieri Group SpA with principal office in Viareggio, Italy (hereinafter referred to as "SEC" ) and MARNAVI SpA with principal office in Naples, Italy (hereinafter referred to as "MARNAVI") .

## W I T N E S S E T H

Background Statement :

a)    WHEREAS, GATT-APS sells fully insured protective lining systems for Maritime chemical tankers utilising the patented Siloxirane "MarineLine" technology and

b)    WHEREAS, GATT-APS wishes to have MarineLine coating fully qualified by IMO as suitable barrier against mineral acid IMO II - III when carried into mild steel cargo tanks ship

c)    WHEREAS, SEC is recognised as a specialised shipyard in newbuilding of chemical tankers, and appointed by GATT-APS as exclusive applicator of the MarineLine for the Territory of Italy.

d)    WHEREAS, MARNAVI wishes to obtain for the M/T "JORAN" the permanent approval for carrying corrosive and toxic goods as Phosphoric Acid, Sulphuric Acid, Formic Acid, Phenol, Hydrogen Peroxide up to 24%, Hydrocloridric Acid.

e)    WHEREAS, MARNAVI wishes to coat the cargo tanks of M/T JORAN" with Marine-Line in order to qualify her for the carriage of the above mentioned corrosive and toxic goods under IMO rules.

f)    WHEREAS, MARNAVI wishes to obtain under a good concessive basis from APS and SEC the option to carry out tank coating with Marine Line on two further vessels for a total area of about 80.000 sqm.

NOW, THEREFORE, in consideration of the mutual agreements herein, the parties hereto agree as follows:

6

## A) Ship board application

1) Marnavi will make available the M/T ""JORAN" for cargo tanks coating;

2) MARNAVI will provide at his own expenses the surface preparation and shot blasting application of the cargo holds to be lined and coated, as per MarineLine technical specification.

3) SEC will care for survey of surface preparation and shot blasting applications, bearing the responsibility of the full compliance with the technical specification issued by GATT-APS;

4) GATT-APS will supply Marine Line coating as necessary to cover 5000 sq.m. of cargo tanks and it will survey the application works and it will duly carry out the final curing as per lining/coating technical specification.

## B) Testing ashore and on board

1) SEC will supply a model of suitable size treated with Marine-Line lining/painting.

2) Such a tank shall be filled with certain products for testing and recording data and results in order to obtain provisional approval of progressive aggressive cargoes.

3) Marnavi will load M/T "JORAN" with the aggressive cargoes according an experimental endorsement issued by the Classification Society and approved by IMO after preliminary successful testing will be carried out as per 2.

4) Marnavi will accept the request of Classification Society as far as compartment limitation, Checking before and after loading of any newly approved cargo; installation of devices intended to control ship structures as ph analysers and H2 gas analyser on board.

## C) Obligations

1) MARNAVI at its own care will supply the acid for the ashore testing as per para B2.

2) MARNAVI will at its own care organise all the meetings among GATT - SEC - MARNAVI and Classification Society in order to develop both the procedure for lining system and vessel qualification for the carriage of dangerous goods referred to in e). The other parties will participate and contribute to the meeting with regard to the relevant competence. On this respect GATT-APS will take care of all the relevant documents and data reading and recording both on the ashore test tank

7

and on board the ship fulfilling the relevant Bodies prescriptions. MARNAVI will give assistance when requested in order to complete procedures with Classification Society.

3) SEC will take care of the proper storage an preservation of the ashore test tank and will give full assistance to the classification Societies personnel during their inspection as well as to the MARNAVI, GATT-APS experts attending the tests.

4) GATT-APS will provide on request all technical sheets, documents, and whatever needed for the successful conduction of the tests.

5) GATT-APS will supply the Marine-Line coating-lining material within 30 days from the contract entering into force.

6) GATT-APS-SEC will complete the entire tank coating within 60 days from the contract in place subject to the full availability of M/T JORAN as per the scheduled work program.

7) MARNAVI will order its subcontractors to shotblast and treat the surfaces to be lined/coated according to GATT-APS-SEC technical requirements.

8) MARNAVI will bear the cost of the Classification Society as for the classification of the M/T JORAN.

9) GATT-APS will bear the cost of the Classification Society as for the permanent approval of Marine Line tank coating/lining system.

10) Although M/T "JORAN" is an IMO II vessel, MARNAVI will assist GATT-APS to obtain IMO approval also for IMO I cargoes for ahore testing and paperworks.

## D) Price

The entire work price at care of GATT-APS-SEC is:
USD 155.750 (one hundred and fifty five thousand seven hundred and fifty US dollars), 20.000 of which directly to SEC.
The above will include paint, lining supply and execution and expertise on site.

## E) Payment

1) Down payment:
Marnavi will pay within 30 days after the contract is in place USD 50.000 to GATT-APS

8

2) Final payment:
   Marnavi will pay the balance to SEC and GATT-APS for the respective due amounts after successful completion of the test campaign and the issuing of the final classification and fitness certificates under IMO Authority by virtue of which the "M/T JORAN" has been recognised as permanently fit for the carriage of IMO II - III mineral acids.

## F) Security

MARNAVI will issue within 30 days from the contract a bank guarantee for the amount due as balance final payment for a period of three years renewable and extendible, in favour of SEC - GATT-APS and subject to the successful classification and fitness certificates under E2.

## G) General Commitment

MARNAVI-GATT-APS-SEC will fully cooperate and assist each other in order to obtain the M/T JORAN and Marine-Line coating approved and qualified for the purpose of class IMO II-III mineral acids transportation. They will supply all necessary information and make available all relevant needed documents and data for the quickest and best completion of the experiments.

## H) Law

This agreement shall be construed in accordance with the laws of England.

## I) Disputes

Any dispute arising between the parties as to the performance of any portion of this Agreement which cannot be amicably settled by the parties shall be referred to arbitration in London.

Viareggio, 28 July 1997

For Approval

GATT-APS

Title _Pres_

MARNAVI

Title _TECH. Director_

SEC

Title _Pres-t_

9

28/07/97APSGATT.DOC

**Addendum to the agreement signed on 28/07/1997 by and between**

**GATT-APS - SEC - MARNAVI**

**WHEREAS**

Guaranteed Advanced tank Technology, Ltd. , an Ohio U.s.A., Limited Liability Company and a subsidiary of Advanced Polymer Sciences, Inc. with principal offices in Avon, Ohio, U.S.A. (hereinafter referred to as "GATT-APS") and Cantiere Navale SEC, Società Esercizio Cantieri Group SpA with principal office in Viareggio, Italy (hereinafter referred to as "SEC" ) and MARNAVI SpA with principal office in Naples, Italy (hereinafter referred to as "MARNAVI"):

**HEREBY AGREE AS FOLLOWS**

1) As a better understanding of art. C-5, Art. D and Art. E-1 of the agreement dated 28/07/1997, the shipment of paint and lining for the treatemnt of the 5000 m2 shall be completed within 20 days and delivery to the Yard in Termoli, via SEC - Viareggio,shall take place within 30 days from the signature of the referred agreement.

2) MARNAVI shall against the shipment notice of paint and lining deliver a bank guarantee to SEC and GATT-APS for the amount indicated in Art. D) (i.e. USD 155.750).

3) On arrival at SEC of the above mentioned material for the treatment of the 5000 m2, MARNAVI shall pay the amount of USD 50.000 to GATT-APS, as per Art. E-1.

4) Should a any delay occur in the delivery of paint and lining, and should such delay exceed 10 days, MARNAVI shall have the right to rescind the contract.
Should the above 10 days delay occur despite shipment has taken place in due time, MARNAVI shall have the right to rescind the contract by paying 50% of the shipment cost sustained by GATT-APS / SEC.

For Approval                                    Viareggio, 28 July 1997

GATT-APS                    MARNAVI                    SEC

Title                    Title TECH - DIR.                    Title

**1 0**



**ADVANCED** POLYMER SCIENCES, INC.

Remit To:

P.O. Box 269
Avon, Ohio  44011
216-871-0134
Telex 985504
E.I.N. #34-1542041

Invoice

| ...TERED | CUSTOMER S ORDER NO —DATE | REPRESENTATIVE 25,000-01 | OUR ORDER NO C-4849 | INVOICE NO T-10530 |
|---|---|---|---|---|

Marnavi, S.P.A.
80133 Napoli
Via S. Brigida 39
ITALY
Attn:  Mr. Claudio Pesce

__C Shipyard
Italy

**TERMS:**  U.S. $50,000.00 on signing of contract. U.S. $107,750.00 on approval by DNV or RINA within 1 year – Details below.

INVOICE DATE  8-12-97

DATE SHIPPED  8-12-97

HOW SHIPPED  Ocean Frt. PPD.

| ...ANTITY ...DERED | DESCRIPTION | UNIT PRICE | BACK ORDERED | SHIPPED | AMOUNT |
|---|---|---|---|---|---|
| | Supply all material, labor, inspection and heat curing for M/V "Joran" – 3500 DWT Tanker (surface preparation, staging, DH, etc. by shipyard). | | | | |
| | 20 tanks – approximately 5000m$^2$ to be coated and lined as follows: | | | | |
| | 1)  All tank tops & 1.5m up side bulkheads to be lined with reinforced MarineLine – 1.5 to 2.0 mm thickness | | | | |
| | 2)  All deckheads and bulkheads down to 1.5m from tanktop to be coated with MarineLine at 300 to 400 microns | | | | |
| | ...grading M/V "Joran" to carry acids for DNV and ...INA approval | | | | $157,750.00 |
| | Terms of Payment:  U.S. $50,000 on signing of Contract.  U.S. $107,750.00 on approval by DNV or RINA to carry acids but no later than 1 year after receipt of approval by DNV or RINA to carry said cargoes. | | | | |
| | Shore side tank to be lined in subscale proportion to above procedure to be used as test bed.  After exposure to various acids such as sulphuric, hydrochloric, acetic, phosphoric and solvents such as methanol, ACN, EDC, etc.  For 30 days a DNV and RINA inspection will be carried out and approval/disapproval to be given based on results. If approval is given ship will then be allowed to carry said cargoes. | | TOTAL DUE U.S. | | $157,750.00 |

IS SUBJECT TO STRIKES, ACCIDENTS, DELAYS OF CARRIERS OR OTHER CAUSES BEYOND OUR CONTROL. IT IS AGREED THAT THE BUYER MUST MAKE CLAIMS FOR DEFICIENCY OR FOR ANY OTHER CAUSE NO LATER THAN 30 DAYS FROM THE DATE OF THIS INVOICE. THE SELLER SHALL NOT BE LIABLE FOR MORE THAN THE PRICE CHARGED FOR SUCH AS MAY PROVE DEFECTIVE OR NOT IN ACCORDANCE WITH SPECIFICATIONS AND IN ANY EVENT SHALL NOT BE LIABLE FOR LABOR REPAIRS OR ALTERATIONS, OR SHIPPED MATERIAL. MATERIAL PROVEN DEFECTIVE WILL BE REPLACED. NO GOODS TO BE RETURNED WITHOUT OUR PERMISSION. GOODS OR SERVICES COVERED BY THIS INVOICE DUCED IN COMPLIANCE WITH THE FAIR LABOR STANDARDS ACT OF 1938 AS AMENDED. SEE REVERSE SIDE FOR TERMS AND CONDITIONS

11

<div align="center">

PART I

ARBITRATION PURSUANT TO AN ARBITRATION AGREEMENT

*Introductory*

</div>

1     **General principles**

     The provisions of this Part are founded on the following principles, and shall be construed accordingly—

        (a)   the object of arbitration is to obtain the fair resolution of disputes by an impartial tribunal without unnecessary delay or expense;

        (b)   the parties should be free to agree how their disputes are resolved, subject only to such safeguards as are necessary in the public interest;

        (c)   in matters governed by this Part the court should not intervene except as provided by this Part.

2     **Scope of application of provisions**

     (1)   The provisions of this Part apply where the seat of the arbitration is in England and Wales or Northern Ireland.

     (2)   The following sections apply even if the seat of the arbitration is outside England and Wales or Northern Ireland or no seat has been designated or determined—

        (a)   sections 9 to 11 (stay of legal proceedings, &c.), and

        (b)   section 66 (enforcement of arbitral awards).

     (3)   The powers conferred by the following sections apply even if the seat of the arbitration is outside England and Wales or Northern Ireland or no seat has been designated or determined—

        (a)   section 43 (securing the attendance of witnesses), and

        (b)   section 44 (court powers exercisable in support of arbitral proceedings);

     but the court may refuse to exercise any such power if, in the opinion of the court, the fact that the seat of the arbitration is outside England and Wales or Northern Ireland, or that when designated or determined the seat is likely to be outside England and Wales or Northern Ireland, makes it inappropriate to do so.

     (4)   The court may exercise a power conferred by any provision of this Part not mentioned in subsection (2) or (3) for the purpose of supporting the arbitral process where—

        (a)   no seat of the arbitration has been designated or determined, and

        (b)   by reason of a connection with England and Wales or Northern Ireland the court is satisfied that it is appropriate to do so.

     (5)   Section 7 (separability of arbitration agreement) and section 8 (death of a party) apply where the law applicable to the arbitration agreement is the law of England and Wales or Northern Ireland even if the seat of the arbitration is outside England and Wales or Northern Ireland or has not been designated or determined.

3     **The seat of the arbitration**

     In this Part "the seat of the arbitration" means the juridical seat of the arbitration designated—

        (a)   by the parties to the arbitration agreement, or

        (b)   by any arbitral or other institution or person vested by the parties with powers in that regard, or

        (c)   by the arbitral tribunal if so authorised by the parties,

     or determined, in the absence of any such designation, having regard to the parties' agreement and all the relevant circumstances.

4     **Mandatory and non-mandatory provisions**

     (1)   The mandatory provisions of this Part are listed in Schedule 1 and have effect notwithstanding any agreement to the contrary.

     (2)   The other provisions of this Part (the "non-mandatory provisions") allow the parties to make their own arrangements by agreement but provide rules which apply in the absence of such agreement.

(3) The parties may make such arrangements by agreeing to the application of institutional rules or providing any other means by which a matter may be decided.

(4) It is immaterial whether or not the law applicable to the parties' agreement is the law of England and Wales or, as the case may be, Northern Ireland.

(5) The choice of a law other than the law of England and Wales or Northern Ireland as the applicable law in respect of a matter provided for by a non-mandatory provision of this Part is equivalent to an agreement making provision about that matter.

   For this purpose an applicable law determined in accordance with the parties' agreement, or which is objectively determined in the absence of any express or implied choice, shall be treated as chosen by the parties.

**5      Agreements to be in writing**

(1) The provisions of this Part apply only where the arbitration agreement is in writing, and any other agreement between the parties as to any matter is effective for the purposes of this Part only if in writing.

   The expressions "agreement", "agree" and "agreed" shall be construed accordingly.

(2) There is an agreement in writing—

   (a)  if the agreement is made in writing (whether or not it is signed by the parties),

   (b)  if the agreement is made by exchange of communications in writing, or

   (c)  if the agreement is evidenced in writing.

(3) Where parties agree otherwise than in writing by reference to terms which are in writing, they make an agreement in writing.

(4) An agreement is evidenced in writing if an agreement made otherwise than in writing is recorded by one of the parties, or by a third party, with the authority of the parties to the agreement.

(5) An exchange of written submissions in arbitral or legal proceedings in which the existence of an agreement otherwise than in writing is alleged by one party against another party and not denied by the other party in his response constitutes as between those parties an agreement in writing to the effect alleged.

(6) References in this Part to anything being written or in writing include its being recorded by any means.

*The arbitration agreement*

**6      Definition of arbitration agreement**

(1) In this Part an "arbitration agreement" means an agreement to submit to arbitration present or future disputes (whether they are contractual or not).

(2) The reference in an agreement to a written form of arbitration clause or to a document containing an arbitration clause constitutes an arbitration agreement if the reference is such as to make that clause part of the agreement.

**7      Separability of arbitration agreement**

   Unless otherwise agreed by the parties, an arbitration agreement which forms or was intended to form part of another agreement (whether or not in writing) shall not be regarded as invalid, non-existent or ineffective because that other agreement is invalid, or did not come into existence or has become ineffective, and it shall for that purpose be treated as a distinct agreement.

**8      Whether agreement discharged by death of a party**

(1) Unless otherwise agreed by the parties, an arbitration agreement is not discharged by the death of a party and may be enforced by or against the personal representatives of that party.

(2) Subsection (1) does not affect the operation of any enactment or rule of law by virtue of which a substantive right or obligation is extinguished by death.

*Stay of legal proceedings*

**9      Stay of legal proceedings**

(1) A party to an arbitration agreement against whom legal proceedings are brought (whether by way of claim or counterclaim) in respect of a matter which under the agreement is to be referred to arbitration may (upon notice to the other parties to the proceedings) apply to the court in which the proceedings have been brought to stay the proceedings so far as they concern that matter.

(2) An application may be made notwithstanding that the matter is to be referred to arbitration only after the exhaustion of other dispute resolution procedures.

(3) An application may not be made by a person before taking the appropriate procedural step (if any) to acknowledge the legal proceedings against him or after he has taken any step in those proceedings to answer the substantive claim.

(4) On an application under this section the court shall grant a stay unless satisfied that the arbitration agreement is null and void, inoperative, or incapable of being performed.

(5) If the court refuses to stay the legal proceedings, any provision that an award is a condition precedent to the bringing of legal proceedings in respect of any matter is of no effect in relation to those proceedings.

## 10   Reference of interpleader issue to arbitration

(1) Where in legal proceedings relief by way of interpleader is granted and any issue between the claimants is one in respect of which there is an arbitration agreement between them, the court granting the relief shall direct that the issue be determined in accordance with the agreement unless the circumstances are such that proceedings brought by a claimant in respect of the matter would not be stayed.

(2) Where subsection (1) applies but the court does not direct that the issue be determined in accordance with the arbitration agreement, any provision that an award is a condition precedent to the bringing of legal proceedings in respect of any matter shall not affect the determination of that issue by the court.

## 11   Retention of security where Admiralty proceedings stayed

(1) Where Admiralty proceedings are stayed on the ground that the dispute in question should be submitted to arbitration, the court granting the stay may, if in those proceedings property has been arrested or bail or other security has been given to prevent or obtain release from arrest—

    (a) order that the property arrested be retained as security for the satisfaction of any award given in the arbitration in respect of that dispute, or

    (b) order that the stay of those proceedings be conditional on the provision of equivalent security for the satisfaction of any such award.

(2) Subject to any provision made by rules of court and to any necessary modifications, the same law and practice shall apply in relation to property retained in pursuance of an order as would apply if it were held for the purposes of proceedings in the court making the order.

*Commencement of arbitral proceedings*

## 12   Power of court to extend time for beginning arbitral proceedings, &c

(1) Where an arbitration agreement to refer future disputes to arbitration provides that a claim shall be barred, or the claimant's right extinguished, unless the claimant takes within a time fixed by the agreement some step—

    (a) to begin arbitral proceedings, or

    (b) to begin other dispute resolution procedures which must be exhausted before arbitral proceedings can be begun,

the court may by order extend the time for taking that step.

(2) Any party to the arbitration agreement may apply for such an order (upon notice to the other parties), but only after a claim has arisen and after exhausting any available arbitral process for obtaining an extension of time.

(3) The court shall make an order only if satisfied—

    (a) that the circumstances are such as were outside the reasonable contemplation of the parties when they agreed the provision in question, and that it would be just to extend the time, or

    (b) that the conduct of one party makes it unjust to hold the other party to the strict terms of the provision in question.

(4) The court may extend the time for such period and on such terms as it thinks fit, and may do so whether or not the

time previously fixed (by agreement or by a previous order) has expired.

(5) An order under this section does not affect the operation of the Limitation Acts (see section 13).

(6) The leave of the court is required for any appeal from a decision of the court under this section.

**13    Application of Limitation Acts**

(1) The Limitation Acts apply to arbitral proceedings as they apply to legal proceedings.

(2) The court may order that in computing the time prescribed by the Limitation Acts for the commencement of proceedings (including arbitral proceedings) in respect of a dispute which was the subject matter—

    (a) of an award which the court orders to be set aside or declares to be of no effect, or

    (b) of the affected part of an award which the court orders to be set aside in part, or declares to be in part of no effect,

the period between the commencement of the arbitration and the date of the order referred to in paragraph (a) or (b) shall be excluded.

(3) In determining for the purposes of the Limitation Acts when a cause of action accrued, any provision that an award is a condition precedent to the bringing of legal proceedings in respect of a matter to which an arbitration agreement applies shall be disregarded.

(4) In this Part "the Limitation Acts" means—

    (a) in England and Wales, the [1980 c. 58.] Limitation Act 1980, the [1984 c. 16.] Foreign Limitation Periods Act 1984 and any other enactment (whenever passed) relating to the limitation of actions;

    (b) in Northern Ireland, the [S.I. 1989/1339 (N.I. 11).] Limitation (Northern Ireland) Order 1989, the [S.I. 1985/754 (N.I. 5).] Foreign Limitation Periods (Northern Ireland) Order 1985 and any other enactment (whenever passed) relating to the limitation of actions.

**14    Commencement of arbitral proceedings**

(1) The parties are free to agree when arbitral proceedings are to be regarded as commenced for the purposes of this Part and for the purposes of the Limitation Acts.

(2) If there is no such agreement the following provisions apply.

(3) Where the arbitrator is named or designated in the arbitration agreement, arbitral proceedings are commenced in respect of a matter when one party serves on the other party or parties a notice in writing requiring him or them to submit that matter to the person so named or designated.

(4) Where the arbitrator or arbitrators are to be appointed by the parties, arbitral proceedings are commenced in respect of a matter when one party serves on the other party or parties notice in writing requiring him or them to appoint an arbitrator or to agree to the appointment of an arbitrator in respect of that matter.

(5) Where the arbitrator or arbitrators are to be appointed by a person other than a party to the proceedings, arbitral proceedings are commenced in respect of a matter when one party gives notice in writing to that person requesting him to make the appointment in respect of that matter.

*The arbitral tribunal*

**15    The arbitral tribunal**

(1) The parties are free to agree on the number of arbitrators to form the tribunal and whether there is to be a chairman or umpire.

(2) Unless otherwise agreed by the parties, an agreement that the number of arbitrators shall be two or any other even number shall be understood as requiring the appointment of an additional arbitrator as chairman of the tribunal.

(3) If there is no agreement as to the number of arbitrators, the tribunal shall consist of a sole arbitrator.

**16    Procedure for appointment of arbitrators**

(1) The parties are free to agree on the procedure for appointing the arbitrator or arbitrators, including the procedure for appointing any chairman or umpire.

(2) If or to the extent that there is no such agreement, the following provisions apply.

(3) If the tribunal is to consist of a sole arbitrator, the parties shall jointly appoint the arbitrator not later than 28 days after service of a request in writing by either party to do so.

(4) If the tribunal is to consist of two arbitrators, each party shall appoint one arbitrator not later than 14 days after service of a request in writing by either party to do so.

(5) If the tribunal is to consist of three arbitrators—

    (a) each party shall appoint one arbitrator not later than 14 days after service of a request in writing by either party to do so, and

    (b) the two so appointed shall forthwith appoint a third arbitrator as the chairman of the tribunal.

(6) If the tribunal is to consist of two arbitrators and an umpire—

    (a) each party shall appoint one arbitrator not later than 14 days after service of a request in writing by either party to do so, and

    (b) the two so appointed may appoint an umpire at any time after they themselves are appointed and shall do so before any substantive hearing or forthwith if they cannot agree on a matter relating to the arbitration.

(7) In any other case (in particular, if there are more than two parties) section 18 applies as in the case of a failure of the agreed appointment procedure.

**17      Power in case of default to appoint sole arbitrator**

(1) Unless the parties otherwise agree, where each of two parties to an arbitration agreement is to appoint an arbitrator and one party ("the party in default") refuses to do so, or fails to do so within the time specified, the other party, having duly appointed his arbitrator, may give notice in writing to the party in default that he proposes to appoint his arbitrator to act as sole arbitrator.

(2) If the party in default does not within 7 clear days of that notice being given—

    (a) make the required appointment, and

    (b) notify the other party that he has done so,

the other party may appoint his arbitrator as sole arbitrator whose award shall be binding on both parties as if he had been so appointed by agreement.

(3) Where a sole arbitrator has been appointed under subsection (2), the party in default may (upon notice to the appointing party) apply to the court which may set aside the appointment.

(4) The leave of the court is required for any appeal from a decision of the court under this section.

**18      Failure of appointment procedure**

(1) The parties are free to agree what is to happen in the event of a failure of the procedure for the appointment of the arbitral tribunal.

There is no failure if an appointment is duly made under section 17 (power in case of default to appoint sole arbitrator), unless that appointment is set aside.

(2) If or to the extent that there is no such agreement any party to the arbitration agreement may (upon notice to the other parties) apply to the court to exercise its powers under this section.

(3) Those powers are—

    (a) to give directions as to the making of any necessary appointments;

    (b) to direct that the tribunal shall be constituted by such appointments (or any one or more of them) as have been made;

    (c) to revoke any appointments already made;

    (d) to make any necessary appointments itself.

(4) An appointment made by the court under this section has effect as if made with the agreement of the parties.

(5) The leave of the court is required for any appeal from a decision of the court under this section.

**19      Court to have regard to agreed qualifications**

In deciding whether to exercise, and in considering how to exercise, any of its powers under section 16 (procedure for appointment of arbitrators) or section 18 (failure of appointment procedure), the court shall have due regard to

any agreement of the parties as to the qualifications required of the arbitrators.

**20    Chairman**

(1)    Where the parties have agreed that there is to be a chairman, they are free to agree what the functions of the chairman are to be in relation to the making of decisions, orders and awards.

(2)    If or to the extent that there is no such agreement, the following provisions apply.

(3)    Decisions, orders and awards shall be made by all or a majority of the arbitrators (including the chairman).

(4)    The view of the chairman shall prevail in relation to a decision, order or award in respect of which there is neither unanimity nor a majority under subsection (3).

**21    Umpire**

(1)    Where the parties have agreed that there is to be an umpire, they are free to agree what the functions of the umpire are to be, and in particular—

    (a)    whether he is to attend the proceedings, and

    (b)    when he is to replace the other arbitrators as the tribunal with power to make decisions, orders and awards.

(2)    If or to the extent that there is no such agreement, the following provisions apply.

(3)    The umpire shall attend the proceedings and be supplied with the same documents and other materials as are supplied to the other arbitrators.

(4)    Decisions, orders and awards shall be made by the other arbitrators unless and until they cannot agree on a matter relating to the arbitration.

In that event they shall forthwith give notice in writing to the parties and the umpire, whereupon the umpire shall replace them as the tribunal with power to make decisions, orders and awards as if he were sole arbitrator.

(5)    If the arbitrators cannot agree but fail to give notice of that fact, or if any of them fails to join in the giving of notice, any party to the arbitral proceedings may (upon notice to the other parties and to the tribunal) apply to the court which may order that the umpire shall replace the other arbitrators as the tribunal with power to make decisions, orders and awards as if he were sole arbitrator.

(6)    The leave of the court is required for any appeal from a decision of the court under this section.

**22    Decision-making where no chairman or umpire**

(1)    Where the parties agree that there shall be two or more arbitrators with no chairman or umpire, the parties are free to agree how the tribunal is to make decisions, orders and awards.

(2)    If there is no such agreement, decisions, orders and awards shall be made by all or a majority of the arbitrators.

**23    Revocation of arbitrator's authority**

(1)    The parties are free to agree in what circumstances the authority of an arbitrator may be revoked.

(2)    If or to the extent that there is no such agreement the following provisions apply.

(3)    The authority of an arbitrator may not be revoked except—

    (a)    by the parties acting jointly, or

    (b)    by an arbitral or other institution or person vested by the parties with powers in that regard.

(4)    Revocation of the authority of an arbitrator by the parties acting jointly must be agreed in writing unless the parties also agree (whether or not in writing) to terminate the arbitration agreement.

(5)    Nothing in this section affects the power of the court—

    (a)    to revoke an appointment under section 18 (powers exercisable in case of failure of appointment procedure), or

    (b)    to remove an arbitrator on the grounds specified in section 24.

**24    Power of court to remove arbitrator**

(1) A party to arbitral proceedings may (upon notice to the other parties, to the arbitrator concerned and to any other arbitrator) apply to the court to remove an arbitrator on any of the following grounds—

    (a) that circumstances exist that give rise to justifiable doubts as to his impartiality;

    (b) that he does not possess the qualifications required by the arbitration agreement;

    (c) that he is physically or mentally incapable of conducting the proceedings or there are justifiable doubts as to his capacity to do so;

    (d) that he has refused or failed—

        (i) properly to conduct the proceedings, or

        (ii) to use all reasonable despatch in conducting the proceedings or making an award,

    and that substantial injustice has been or will be caused to the applicant.

(2) If there is an arbitral or other institution or person vested by the parties with power to remove an arbitrator, the court shall not exercise its power of removal unless satisfied that the applicant has first exhausted any available recourse to that institution or person.

(3) The arbitral tribunal may continue the arbitral proceedings and make an award while an application to the court under this section is pending.

(4) Where the court removes an arbitrator, it may make such order as it thinks fit with respect to his entitlement (if any) to fees or expenses, or the repayment of any fees or expenses already paid.

(5) The arbitrator concerned is entitled to appear and be heard by the court before it makes any order under this section.

(6) The leave of the court is required for any appeal from a decision of the court under this section.

## 25    Resignation of arbitrator

(1) The parties are free to agree with an arbitrator as to the consequences of his resignation as regards—

    (a) his entitlement (if any) to fees or expenses, and

    (b) any liability thereby incurred by him.

(2) If or to the extent that there is no such agreement the following provisions apply.

(3) An arbitrator who resigns his appointment may (upon notice to the parties) apply to the court—

    (a) to grant him relief from any liability thereby incurred by him, and

    (b) to make such order as it thinks fit with respect to his entitlement (if any) to fees or expenses or the repayment of any fees or expenses already paid.

(4) If the court is satisfied that in all the circumstances it was reasonable for the arbitrator to resign, it may grant such relief as is mentioned in subsection (3)(a) on such terms as it thinks fit.

(5) The leave of the court is required for any appeal from a decision of the court under this section.

## 26    Death of arbitrator or person appointing him

(1) The authority of an arbitrator is personal and ceases on his death.

(2) Unless otherwise agreed by the parties, the death of the person by whom an arbitrator was appointed does not revoke the arbitrator's authority.

## 27    Filling of vacancy, &c

(1) Where an arbitrator ceases to hold office, the parties are free to agree—

    (a) whether and if so how the vacancy is to be filled,

    (b) whether and if so to what extent the previous proceedings should stand, and

    (c) what effect (if any) his ceasing to hold office has on any appointment made by him (alone or jointly).

(2) If or to the extent that there is no such agreement, the following provisions apply.

(3) The provisions of sections 16 (procedure for appointment of arbitrators) and 18 (failure of appointment procedure) apply in relation to the filling of the vacancy as in relation to an original appointment.

(4)   The tribunal (when reconstituted) shall determine whether and if so to what extent the previous proceedings should stand.

This does not affect any right of a party to challenge those proceedings on any ground which had arisen before the arbitrator ceased to hold office.

(5)   His ceasing to hold office does not affect any appointment by him (alone or jointly) of another arbitrator, in particular any appointment of a chairman or umpire.

**28     Joint and several liability of parties to arbitrators for fees and expenses**

(1)   The parties are jointly and severally liable to pay to the arbitrators such reasonable fees and expenses (if any) as are appropriate in the circumstances.

(2)   Any party may apply to the court (upon notice to the other parties and to the arbitrators) which may order that the amount of the arbitrators' fees and expenses shall be considered and adjusted by such means and upon such terms as it may direct.

(3)   If the application is made after any amount has been paid to the arbitrators by way of fees or expenses, the court may order the repayment of such amount (if any) as is shown to be excessive, but shall not do so unless it is shown that it is reasonable in the circumstances to order repayment.

(4)   The above provisions have effect subject to any order of the court under section 24(4) or 25(3)(b) (order as to entitlement to fees or expenses in case of removal or resignation of arbitrator).

(5)   Nothing in this section affects any liability of a party to any other party to pay all or any of the costs of the arbitration (see sections 59 to 65) or any contractual right of an arbitrator to payment of his fees and expenses.

(6)   In this section references to arbitrators include an arbitrator who has ceased to act and an umpire who has not replaced the other arbitrators.

**29     Immunity of arbitrator**

(1)   An arbitrator is not liable for anything done or omitted in the discharge or purported discharge of his functions as arbitrator unless the act or omission is shown to have been in bad faith.

(2)   Subsection (1) applies to an employee or agent of an arbitrator as it applies to the arbitrator himself.

(3)   This section does not affect any liability incurred by an arbitrator by reason of his resigning (but see section 25).

*Jurisdiction of the arbitral tribunal*

**30     Competence of tribunal to rule on its own jurisdiction**

(1)   Unless otherwise agreed by the parties, the arbitral tribunal may rule on its own substantive jurisdiction, that is, as to—

(a)   whether there is a valid arbitration agreement,

(b)   whether the tribunal is properly constituted, and

(c)   what matters have been submitted to arbitration in accordance with the arbitration agreement.

(2)   Any such ruling may be challenged by any available arbitral process of appeal or review or in accordance with the provisions of this Part.

**31     Objection to substantive jurisdiction of tribunal**

(1)   An objection that the arbitral tribunal lacks substantive jurisdiction at the outset of the proceedings must be raised by a party not later than the time he takes the first step in the proceedings to contest the merits of any matter in relation to which he challenges the tribunal's jurisdiction.

A party is not precluded from raising such an objection by the fact that he has appointed or participated in the appointment of an arbitrator.

(2)   Any objection during the course of the arbitral proceedings that the arbitral tribunal is exceeding its substantive jurisdiction must be made as soon as possible after the matter alleged to be beyond its jurisdiction is raised.

(3)   The arbitral tribunal may admit an objection later than the time specified in subsection (1) or (2) if it considers the delay justified.

(4)  Where an objection is duly taken to the tribunal's substantive jurisdiction and the tribunal has power to rule on its own jurisdiction, it may—

    (a)  rule on the matter in an award as to jurisdiction, or

    (b)  deal with the objection in its award on the merits.

If the parties agree which of these courses the tribunal should take, the tribunal shall proceed accordingly.

(5)  The tribunal may in any case, and shall if the parties so agree, stay proceedings whilst an application is made to the court under section 32 (determination of preliminary point of jurisdiction).



IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

BETWEEN:

MR. JUSTICE LANGLEY

2001 FOLIO NO 378

JILMAR SHIPPING SA

**Applicant**

-and-

(1)    GUARANTEED ADVANCED TANK TECHNOLOGY LIMITED
(2)    ADVANCED POLYMER SCIENCES INC
(3)    CANTIERE NAVALE SEC, SOCIETA ESERCIZIO CANTIERI
GROUP SpA

**Respondents**

---

**ORDER**

---

**UPON READING** the statement of Michael William Aubrey Lloyd and

**UPON HEARING** the applicants' solicitors

**IT IS ORDERED** that

Pursuant to section 18 of the Arbitration Act 1996, Mr. George Lugg be appointed as
sole arbitrator in the intended arbitration between the parties.

DATED this  day of June 2001

 

**FAX**

**ADVANCED POLYMER SCIENCES**

Avon, Ohio 44011 U.S.A.

(+01) 440.937.6218   {800-334-7193} PHONE
(+01) 440.937.5046   {800-515-0233} FAX

| Company: | George Lugg, L.M.A.A. | Date: | September 18, 2001 |
|---|---|---|---|
| Attention: | Mr. George Lugg | Fax Number: | 44.171.375.2595 |
| From: | Denise Keehan | No. of Pages: | 1 |
| Reference: | Your faxes 10th & 18th September 2001 — M/V "Joran" | | |
| Copies: | | | |

**Text of Message:**

Dear Mr. Lugg,

Please be advised that Guaranteed Advanced Tank Technology Ltd., Limited Liability Company nor Advanced Polymer Sciences, Inc. has ever entered into any contracts with Jilmar Shipping SA.

Also, be advised that Advanced Polymer Sciences, Inc. was a minor shareholder in the Limited Liability Company GATT, Ltd.. GATT is no longer in business due to loss of over $569,000.00 U.S.D. from non-payment of invoices by Mamavi. Please be further advised that APS, Inc. being a shareholder in GATT Ltd., LLC, which was an independent limited liability company, has no fiduciary responsibility to said company.

I hope this clears this matter up and I apologize for any inconvenience which may have caused you.

Very truly yours,

Denise Keehan
Vice President





**ADVANCED**
**POLYMER SCIENCES**

Avon, Ohio 44011 U.S.A.

(+01) 440.937.6218   {800-334-7193} PHONE
(+01) 440.937.5046   {800-615-0233} FAX

| Company: | George Lugg, L.M.A.A. | Date: | September 19, 2001 |
|---|---|---|---|
| Attention: | Mr. George Lugg | Fax Number: | 44.20.7375.2595 |
| From: | Denise Keehan | No. of Pages: | 1 |
| Reference: | M.V. "Joran" | | |
| Copies: | | | |

**Text of Message:**

Dear Mr. Lugg,

We have received a copy of Lloyd and Co.'s fax to you.

As you will note only the invoicing was changed at the request of Marnavi. There was no addendum's or changes to the contract, especially pertaining to the interested parties.

Since we do not have copies of the points of claim we would appreciate you forwarding all documentation filed in this matter.

Please also advise Cantlere Navale Sec's response to Jilmar's filing.

Our defense will be based upon our review of all filings.

Very truly yours,

Denise Keehan

October 2, 2001

**VIA FACSIMILE 020 7375 2595**
**VIA E-MAIL casebourne.leach@bigfoot.com**
Mr. George Lugg
1 Whites Row
London E1 7NF

Re:    *my "JORAN"*
        *Tank Coating Agreement dated 28th July 1997*

Dear Mr Lugg:

    The undersigned serves as the secretary and corporate counsel for Advanced Polymer Sciences, Inc., a Delaware Corporation with principal offices in Avon, Ohio and Guaranteed Advanced Tank Technology Ltd., an Ohio limited liability company with principal offices in Avon, Ohio. I transmit herewith my clients' statement of defense. The original statement of defense with attached exhibits is being sent via Airborne courier service today.

    As set forth in the points of defense and proven by the exhibits attached thereto, no work was performed pursuant to the captioned agreement and there exists no document under which Advanced Polymer Sciences, Inc. consented to arbitration under the rules of the London Maritime Arbitrators Association. Before forcing Advance Polymer Sciences, Inc. or Guaranteed Advanced Tank Technology Ltd. to incur unnecessary legal expense, it is respectfully requested that you pass upon and make reasoned findings as to the contractual relationships, if any, which exist between Jilmar Shipping and these respondents and based upon those findings determine whether jurisdiction exists for you to hear the dispute without the consent of Advanced Polymer Sciences, Inc. and Guaranteed Advanced Tank Technology Ltd.

Very Truly Yours,

John M. Marios

JMM/eac
Enclosures

Addressee
October 2, 2001
Page 2

cc:   Michael Lloyd

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

BETWEEN

JILMAR SHIPPING SA

Claimants

- AND -

(1)   GUARANTEED ADVANCED TANK TECHNOLOGY LTD.

(2)   ADVANCED POLYMER SCIENCES INC.

(3)   CANTIERE NAVALE SEC

Respondents

m.v. "JORAN"

Tank Coating Agreement Dated 28th July 1997

INTERIM ARBITRATION AWARD

WHEREAS:

1.  By the terms of an Agreement dated 28th July 1997 with an Addendum, between Guaranteed Advanced Tank Technology Ltd ("GATT"), Advanced Polymer Sciences Inc ("APS"), Cantiere Navale Sec ("SEC") (hereinafter referred to as "the Contractors") and Marnavi SpA acting on behalf of the Claimants (hereinafter referred to as "the Owners"), GATT, APS and SEC agreed to supply and install, or alternatively supervise the installation of, a high performance tank coating system for application to the cargo tanks of the m.v. "JORAN".

2.  Paragraph H of the said Agreement provided that it should be construed in accordance with the laws of England. Paragraph I of the Agreement provided that any disputes arising between the parties to the Agreement which could not be amicably settled should be referred to arbitration in London.

3.  Disputes did arise between the parties as hereafter particularised. The Owners appointed me, George Lugg, of 1 Whites Row, London E1 7NF to act as an arbitrator. Notice of my appointment was given to each of the Contractors but they failed to appoint arbitrators in response or to agree to my appointment as sole arbitrator. The Owners then applied to the High Court in England to appoint an arbitrator to resolve all disputes arising from the Agreement. By an order dated 15th June 2001 made by Mr. Justice Langley, sitting in the Commercial Court of the Queen's Bench Division of the English High Court of Justice, I was appointed as sole arbitrator in the arbitration between the parties.

4.  Following my appointment by the Court, the Owners served Points of Claim on the Contractors. They claimed that the coating which the Contractors had supplied to the vessel was defective and unable to provide its claimed resistance to many cargoes. They further claimed that a large part of the coating was burned during the specialised heat curing process and that there

were many pinholes, craters, de-laminations and hairline cracks in the coating after it had been applied. They claimed damages for substantial losses and expenses to which they said they had been exposed because of the defects in the coating which, they said, was the responsibility of the Contractors.

5.    GATT and SEC did not respond to the Points of Claim. APS responded, informing me that GATT had ceased to trade. They also denied that they were bound by the Agreement because it had never been performed. This, they said, was because the Owners had never presented the vessel to SEC for the work to be performed as set out in the Agreement. Accordingly, they said, no work had been performed under the Agreement and accordingly they were not bound to defend in London arbitration any claims arising from work which they said had been performed under a different, oral, agreement. The oral agreement, they said, was concluded outside England and did not include a requirement that disputes should be referred to arbitration in London, with English law to apply.

6.    The Owners denied that they had been required to deliver the vessel to SEC. They drew attention to the reference in paragraph C7 of the Agreement to supervision of the Owners' sub contractors by GATT, APS and SEC and said that it was clear from this and paragraph A3 of the Agreement that the Owners were to appoint sub contractors to carry out the initial part of the work under the supervision of the Contractors. They denied they had entered into any oral agreement under which the coating of the vessel's tanks might have been carried out. They maintained that the work involved in coating the tanks had been performed under the terms of the Agreement.

7.    Both APS and the Owners requested that I make an Interim Award as to whether or not I have jurisdiction to arbitrate in these disputes. APS also requested that I make my findings in the form of a reasoned Award. Accordingly I set out below the facts upon which I relied and the reasons for my findings.

8.    The Agreement dated 28 July 1997 was an agreement covering work to be carried out in connection with the coating of the cargo tanks of the Owners' vessel m.v. "JORAN" by and / or under the supervision of the Contractors. The Owners and APS agreed that recoating work was carried out on the vessel after the agreement had been concluded, under the supervision of one or more of the Contractors.

9.    The Agreement provided *inter alia* as follows:-

*A) Ship board application*

*...........*

*2) MARNAVI will provide at his own expenses the surface preparation and shot blasting application of the cargo holds to be lined and coated, as per MarineLine technical specification.*

*3) SEC will care for survey of surface preparation and shot blasting applications, bearing the responsibility of the full compliance with the technical specification issued by GATT – APS;*

*4) GATT – APS will supply Marine Line coating as necessary to cover 5000 sq.m. of cargo tanks and it will survey the application works and it will duly carry out the final curing as per lining/coating technical specification.*

*................*

*C) Obligations*

*.............*

*5) GATT-APS will supply the Marine-Line coating-lining material within 30 days from the contract entering into force.*

*6) GATT – APS – SEC will complete the entire tank coating within 60 days from the contract in place subject to the full availability of M/T JORAN as per the scheduled work program.*

*7) MARNAVI will order its subcontractors to shotblast and treat the surfaces to be lined/coated according to GATT-APS-SEC technical requirements.*

..................

There was an addendum to the Agreement, also dated 28th July, 1997 which read in part as follows:-

*Addendum to the agreement signed on 28/07/1997 by and between GATT-APS-SEC-MARNAVI*

*..................*

*1) As a better understanding of art. C-5, Art. D and Art. E-1 of the agreement dated 28/07/1997, the shipment of paint and lining for the treatemnt (sic) of the 5000 m2 shall be completed within 20 days and delivery to the yard in Termoli, via SEC – Viareggio, shall take place within 30 days from the signature of the referred agreement.*

*..................*

*4) Should a any (sic) delay occur in the delivery of paint and lining, and should such delay exceed 10 days, MARNAVI shall have the right to rescind the contract.*

*..................*

10.    Recoating work on the "JORAN" was carried out at the Termoli Shipyard in Italy. I was not informed of the date when the work commenced but, from correspondence attached to the submissions made by APS, it was clearly continuing during February, 1998. It is clear that the work was extending well beyond the 60 days that were provided for in paragraph C6 of the Agreement, but the only cancellation clause in the Agreement was clause 4 of the Addendum, quoted above, which operated in the Owners' favour. APS did not claim that they or any of the Contractors had rescinded the Agreement, or that they had any right under the terms of the Agreement to do so.

11.    Clause 1 of the Addendum to the Agreement, also dated 28th July, 1997, specifically provided that the materials necessary for the work should be delivered by the Contractors to Termoli Shipyard. It is apparent from this that it was always intended that the work should be carried out in this location.

Further, clause C7 of the Agreement clearly stated that subcontractors appointed by MARNAVI will carry out shot blasting and treatment of the cargo tank surfaces in accordance with the technical requirements of GATT, APS and SEC. Accordingly I find that work which was carried out by the Contractors when coating the cargo tanks of the "JORAN" was carried out pursuant to the terms of the Agreement and that the Agreement remains in force.

NOW I, the undersigned George Lugg, having taken upon myself the burden of this reference, having considered the evidence put before me DO HEREBY MAKE, ISSUE AND PUBLISH this my INTERIM ARBITRATION AWARD as follows:

I FIND  HOLD AND DECLARE that I have jurisdiction to act as arbitrator for all disputes between the parties arising out of the contract for the coating of the cargo tanks of the m.v. "JORAN" by the Contractors.

I FURTHER AWARD AND DIRECT that the Contractors shall be jointly and severally liable to bear their own and the Owners' costs of the reference insofar as these relate to this INTERIM AWARD, together with the costs of this INTERIM AWARD which I hereby tax and settle in the sum of £900.00, PROVIDED  that if, in the first instance, the Owners shall have paid any part of the said costs they shall be entitled to immediate reimbursement by the Contractors of the sum so paid, together with  interest thereon at the rate of 7% per annum from the date of this INTERIM AWARD until the date of payment.

Given under my hand this   15th day of July, 2002

George Lugg

....................................

George Lugg

....................................

Witness

## GEORGE LUGG

TEL: 020 7375 2575

FAX: 020 7375 2595

1 WHITES ROW,
LONDON E1 7NF



L.M.A.A.

## FACSIMILE

**Email : lugg@casebourne-leach.co.uk**

To:- Manos & Stefanski Co.
Att. John M. Manos, Esq.
Fax No. 001 216 348 1557                                30th July, 2002

And:- Cantiere Navale Sec.
Fax No. 0039 0584 39 31 69

c.c. Michael Lloyd & Co.
Att Michael Lloyd
Fax No. 7248 3339

Subject :- m.v. "JORAN"
Tank Coating Agreement dated 28th July 1997

---

Further to my fax dated 18th July, by which I advised you that Michael Lloyd and Co. had picked up my Interim Award which dealt with my jurisdiction to arbitrate in the dispute between the Owners of this vessel and the Contractors involved in coating her cargo tanks, each of you should by now have received a copy of the award.

I have been asked by the Owners to order that the Respondents submit their Points of Defence to the substantive issues in this reference. I can see no reason why such an order should not be made and accordingly I propose to order that Points of Defence should be submitted within 28 days of today, that is by 27th August.

Unless I hear from you by 1700 hrs London time on Friday, 2nd August with cogent reasons why such an order should not be made, please take it that Points of Defence should be submitted within that time limit.

With best regards,

George Lugg

# GEORGE LUGG

TEL.: 020 7375 2575

FAX: 020 7375 2595

1 WHITES ROW,
LONDON  E1 7NF



L.M.A.A.

## FACSIMILE

**Email : lugg@casebourne-leach.co.uk**

To:-     Manos & Stefanski Co.
Att.     John M. Manos, Esq.
Fax No.     001 216 348 1557          2nd September, 2002

And:-     Cantiere Navale Scc.
Fax No.     0039 0584 39 31 69

c.c.     Michael Lloyd & Co.
Att.     Michael Lloyd
Fax No.     7248 3339

Subject :-     m.v. "JORAN"
              Tank Coating Agreement dated 28th July 1997

---

You will have seen the fax from Michael Lloyd & Co dated 30th August requesting that I issue an award on liability. You will also recall that I ordered that you serve your Points of Defence by 27th August, which you have failed to do.

Please may I hear from you by noon on Friday 6th September with your reasons for not complying with the order for submission of your Defence, together with your expectation of when you will be in a position to do so.

Please note that unless I hear from you as above by noon on 6th September then the following FINAL ORDER will apply:

The Respondents are to submit their Points of Defence to the Claimants and to the Tribunal by close of business in London on Friday 20th September, 2002. If your Defence is not received within this time limit the Tribunal may proceed to an award on liability without considering any further evidence or submissions from the Respondents.

With best regards,

George Lugg



# GEORGE LUGG

TEL: 020 7375 2575

FAX: 020 7375 2595



L.M.A.A.

1 WHITES ROW,
LONDON EI 7NF

## FACSIMILE

Email : lugg@casebourne-leach.co.uk

To:-     Michael Lloyd & Co.
Att.     Michael Lloyd
Fax No:     7248 3339

18th October 2002

And:     Manos & Stefanski Co.
Attn:     John M Manos, Esq.
Fax No:     001 216 348 1557

c.c.     Cantiere Navale Sec.
Fax No:     0039 0584 39 31 69

Subject :-     m.v. "JORAN"
Tank Coating Agreement dated 28th July 1997

---

Thank you for your letter of 17th October with which you enclosed a substantial further quantity of documentation which had not been previously been placed before me. Although I appreciate that the Respondents have already seen much of this, they clearly must have an opportunity for further comment in the light of the pleadings to date.

Accordingly I now order that the Respondents shall serve any further Points of Defence and/or any further comments which they may wish to make in the light of this disclosure within 28 days of today, that is by the 15th November.

With best regards,

George Lugg

# GEORGE LUGG

TEL: 020 7375 2575

FAX: 020 7375 2595

1 WHITES ROW,
LONDON E1 7NF



**L.M.A.A.**

## FACSIMILE

Email : lugg@casebourne-leach.co.uk

| | | |
|---|---|---|
| To:- | John M. Manos Co. LPA | |
| Att: | John M. Manos, Esq. | |
| Fax No. | 001 216 681 1810 | 21st October, 2002 |

And:- Advanced Polymer Sciences Ltd
And:- Guaranteed Advanced Tank Technology Ltd.
Att: Denise Keehan
Fax No. 001 440 937 5046

And:- Cantiere Navale Sec.
Fax No. 0039 0584 39 31 69

c.c. Michael Lloyd & Co.
Att. Michael Lloyd
Fax No. 7248 3339

Subject :- m.v. "JORAN"
Tank Coating Agreement dated 28th July 1997

This is to thank Mr Manos for his fax of 18th October from which I note that he is no longer instructed by Advanced Polymer Sciences, Inc. By copy of this fax to the last fax number which I have for them, I invite APS Inc. to make any further submissions directly to me within 15th November, whereafter I shall consider my Award on liability. I would be obliged if Mr Manos could advise me if the fax number I have used for APS Inc. is wrong. In the absence of any such notification from him I shall assume that they have received this fax.

I await any comments which Cantiere Navale SEC may wish to make, also before 15th November.

With best regards,

*George Lugg*

# John M. Manos Co. LPA
### 739 East 140th Street, Cleveland, Ohio 44110
### Telephone: 216-681-1818 • Fax: 216-681-1810

October 18, 2002

Mr. George Lugg
1 Whites Row
London, England E1 7NF

*Via Facsimile: 020 7375 2595*

Re:   mv "JORAN"
Tank Coating Agreement dated July 28, 1997

Dear Mr. Lugg:

I acknowledge receipt of your facsimile of October 18, 2002 and thank you for the professional courtesy you extended. Please note my new contact information.

The undersigned will not be presenting any further points of defense in this matter. Advance Polymer Sciences, Inc. has for all intents and purposes ceased trading and I have been directed to discontinue my involvement with this matter. I adhere to the belief that the points of defense previously raised require that the petition be denied.

Very truly yours,

John M. Manos

JMM/ck

cc:   Michael Lloyd - Via Facsimile

# GEORGE LUGG

TEL: 020 7375 2575

FAX: 020 7375 2595



**L.M.A.A.**

1 WHITES ROW,
LONDON  E1 7NF

## FACSIMILE

Email : lugg@casebourne-leach.co.uk

| | |
|---|---|
| To:- | John M. Manos  Co. LPA |
| Att: | John M. Manos, Esq. |
| Fax No: | 001 216 681 1810 |

21st October, 2002

| | |
|---|---|
| And:- | Advanced Polymer Sciences Ltd |
| And:- | Guaranteed Advanced Tank Technology Ltd. |
| Att: | Denise Keehan |
| Fax No: | 001 440 937 5046 |

| | |
|---|---|
| And:- | Cantiere Navale Sec. |
| Fax No: | 0039 0584 39 31 69 |

| | |
|---|---|
| c.c. | Michael Lloyd & Co. |
| Att: | Michael Lloyd |
| Fax No: | 7248 3339 |

| | |
|---|---|
| Subject :- | m.v. "JORAN" |
| | Tank Coating Agreement dated 28th July 1997 |

This is to thank Mr Manos for his fax of 18th October from which I note that he is no longer instructed by Advanced Polymer Sciences, Inc. By copy of this fax to the last fax number which I have for them, I invite APS Inc. to make any further submissions directly to me within 15th November, whereafter I shall consider my Award on liability. I would be obliged if Mr Manos could advise me if the fax number I have used for APS Inc. is wrong. In the absence of any such notification from him I shall assume that they have received this fax.

I await any comments which Cantiere Navale SEC may wish to make, also before 15th November.

With best regards,

George Lugg

<u>IN THE MATTER OF THE ARBITRATION ACT 1996</u>

<u>AND</u>

<u>IN THE MATTER OF AN ARBITRATION</u>

<u>BETWEEN</u>

<div align="center">

JILMAR SHIPPING SA

</div>

<div align="right">

<u>Claimants</u>

</div>

<div align="center">

- AND -

</div>

(1)    <u>GUARANTEED ADVANCED TANK TECHNOLOGY LTD.</u>

(2)    <u>ADVANCED POLYMER SCIENCES INC.</u>

(3)    <u>CANTIERE NAVALE SEC</u>

<div align="right">

<u>Respondents</u>

</div>

<div align="center">

m.v. **"JORAN"**

<u>Tank Coating Agreement Dated 28th July 1997</u>

<u>INTERIM FINAL ARBITRATION AWARD</u>

</div>

WHEREAS:

1.    By the terms of an Agreement dated 28th July 1997 with an Addendum,
      between Guaranteed Advanced Tank Technology Ltd ("GATT"), Advanced
      Polymer Sciences Inc ("APS"), Cantiere Navale Sec ("SEC") (hereinafter
      referred to as "the Contractors") and Marnavi SpA acting on behalf of the
      Claimants (hereinafter referred to as "the Owners"), GATT, APS and SEC
      agreed to supply and install or alternatively supervise the installation of, a high
      performance tank coating system for application to the cargo tanks of the m.v
      "JORAN".

2.    Paragraph H of the said Agreement provided that it should be construed in
      accordance with the laws of England.  Paragraph I of the Agreement provided
      that any disputes arising between the parties to the Agreement which could not
      be amicably settled should be referred to arbitration in London.

3.    Disputes did arise between the parties as hereinafter particularised.  The
      Owners appointed me, George Lugg, of 1 Whites row, London E1 7NF to act
      as an arbitrator.  Notice of my appointment was given to each of the
      Contractors but they failed to appoint arbitrators in response or to agree to my
      appointment as sole arbitrator.  The Owners then applied to the High Court in
      England to appoint an arbitrator to resolve all disputes arising from the
      Agreement.  By an order dated 15th June 2001 made by Mr. Justice Langley,
      sitting in the Commercial Court of the Queen's Bench Division of the English
      High Court of Justice, I was appointed as sole arbitrator in the arbitration
      between the parties.

4.    Following my appointment by the Court, the Owners served Points of Claim
      on the Contractors.  Both APS and the Owners requested that I make an
      Interim Award as to whether or not I had jurisdiction to arbitrate in these
      disputes.  I made an Interim Award which I published on 15th July, 2002 in
      which I found that I did have jurisdiction to arbitrate in respect of the disputes
      arising out of the coating by the Contractors of the tanks of the "JORAN" with

Siloxirane Marine Line Coating (hereinafter referred to as Siloxirane), a patented coating supplied by APS.

5.      Following publication of my Interim Award on my jurisdiction, which was collected by the Owners, the Owners asked me to consider the matter of the liability of the Contractors for the alleged failure of the tank coating system, based upon the original Points of Claim but supplemented by further documentary evidence which they then produced. The Points of Claim alleged that the coating which the Contractors supplied and installed in №s 1 to 20 cargo tanks of the vessel was unable to achieve the resistance to corrosive and toxic cargoes which the Contractors had claimed for it in their sales literature. They further claimed that a large part of the coating had been damaged during the heat curing process and that there were many pinholes, craters de-laminations and hairline cracks in the coating after it had been applied. They said that they had been exposed to substantial losses and expenses because of the defects in the coating which, they said, were the responsibility of the Contractors. They requested that I rule on the liability of the Contractors for those losses

6.      The Owners also claimed that the following terms were to be implied by law into the Agreement in order to give it business efficacy:-

    (a)    The coating system supplied would be of the same standard and type as generally marketed by APS and with the same characteristics and attributes as advised.

    (b)    The coating system supplied would comply with the Cargo Resistance Guide published by APS.

    (c)    The coating system supplied would be reasonably fit for the purpose, namely to coat the cargo tanks of "JORAN" for the carriage of corrosive and toxic cargoes under IMO Rules as well as, if not better than stainless steel.

    (d)    That each of SEC, GATT and APS would exercise all reasonable care and diligence in carrying out their obligations under the Agreement.

7.    None of the Contractors made any further submissions to me, other than those which they had made to assist me with my Interim Award.  The Attorney who had been instructed by APS advised me that his instructions had been withdrawn and that APS would not be making any further submissions. Despite my invitations to SEC to take part in the reference, I received no correspondence or submissions from them at any time prior to the publication of this award.

8.    In their original Defence Submissions, APS had said that, although they agreed that they had supplied the coating for the works, had observed the application of it to the tanks of the vessel and had contracted to carry out the final heat curing of the coating, all surface preparation of the ship's tanks and application of the coating was carried out by subcontractors appointed by the Owners and accordingly all that work was done at the Owners risk and expense.  This, they said, was the real cause of the failure of the coating. Additionally, they said, APS had incurred greatly increased costs as a result of delays resulting from this action by the Owners.

9.    The Owners asked for a Reasoned Award and accordingly my Reasons are attached to and form part of this Award.

NOW I, the undersigned George Lugg, having taken upon myself the burden of this reference, having considered the evidence put before me and the submissions made to me, DO HEREBY MAKE, ISSUE AND PUBLISH this my INTERIM FINAL AWARD as follows:

A.    I FIND HOLD AND DECLARE that the application of Siloxirane coating to cargo tanks №s 1 to 20 of the m.v. "JORAN" in 1997 and 1998 at the Termoli Shipyard in Italy was carried out under the Agreement between the parties darted 28th July 1997 and the Addendum thereto of the same date.

B    I FURTHER FIND AND HOLD that the failure of the coating in service, discovered in February 1999, was the result of the inadequate nature of the coating,

which was unable to withstand attack from some of the chemicals to which it was said by APS to be resistant. Such chemicals are normally carried as cargo in chemical tankers of the International Maritime Organisation Class II, the grade of service into which it was intended that the vessel would be converted as a result of the application of the Siloxirane coating.

C.    I FURTHER AWARD AND DIRECT that the Contractors shall be jointly and severally liable to bear their own and the Owners' costs of the reference insofar as these relate to this INTERIM FINAL AWARD, together with the cost of this INTERIM FINAL AWARD which I hereby assess in the sum of U.K.£3,270.00, PROVIDED that if, in the first instance the Owners shall have paid any part of the said costs they shall be entitled to immediate reimbursement by the Contractors of the sum so paid, together with interest thereon at the rate of 6% per annum, compounded at three monthly intervals, from the date of this INTERIM FINAL AWARD until the date of payment.

D.    I DECLARE that this Award is final as to the matters dealt with herein but I RESERVE TO MYSELF jurisdiction to deal with any other matters which may arise, including questions of Quantum, upon receipt of further submissions.

Given under my hand this  4th  day of  February, 2003

George Lugg                                   Witness

5

"JORAN"

Agreement Dated 28th July 1997

Reasons For and Forming Part of the Interim Final Award on Liability

Facts

1.    The vessel is a small tanker of about 3,300 deadweight tons built in Finland in

1971 as a wine tanker.  She was bought by the Claimants, Jilmar Shipping S.A. in 1996

with a view to her conversion into a chemical tanker and for this reason she was taken

to a shipyard in Constanza, Romania in order for works associated with this conversion

and for other general repairs to be carried out.  However, the Owners managers,

Marnavi S.p.A., were dissatisfied with the work of the Constanza Shipyard and moved

the vessel to a shipyard in Termoli on the Adriatic coast of Italy.

2.    The vessel was originally built with 32 cargo tanks of which 12 were

cylindrical stainless steel centre tanks which the Owners intended to keep.  The other

cargo tanks were constructed of normal shipbuilding quality steel coated with a

proprietary coating.  This coating required complete renewal and the vessel required a

general refit before she would be able to re-enter service.  The Owners intended to

employ her in the chemical trade carrying cargoes covered by the International

Maritime Organisation (IMO) code for bulk chemical tankers carrying dangerous

chemicals in bulk.  Accordingly it would be necessary for the mild steel tanks to be

coated with a paint which would be resistant to chemical action by the various cargos

which the vessel was likely to carry.

3.      During the early stages of the work the Owners representative was introduced

to Siloxirane Marine Line Coating (Siloxirane) which was produced and marketed by

Advanced Polymer Sciences of Avon, Ohio, U.S.A.  The introduction was affected by

Cantiere Navale SEC (SEC) who were the exclusive agents for Siloxirane in Italy at

the time.  The Owners were provided with sales literature, some of which was also

provided to me, which described Siloxirane as being resistant to a large range of

cargoes including alkalies, several acids and other products commonly carried by

chemical tankers.  Indeed, the literature described Siloxirane as being resistant to more

than 98% of all chemicals and to have a better resistance to corrosive attack than

stainless steel.


4.      The Owners were persuaded that Siloxirane was a suitable coating for mild

steel tanks of a tanker in the chemical trade and that mild steel tanks coated with

Siloxirane would be better than stainless steel tanks. They decided to remove the

cylindrical stainless steel tanks and replace them with rectangular tanks constructed of

normal shipbuilding steel.  These tanks and most of the other cargo tanks would then

be coated with Siloxirane.  The new tank arrangement would increase the capacity of

the ship to carry dangerous chemicals and since the IMO rules forbade such cargoes to

be carried in tanks below the crew accommodation, modifications to the ship's

superstructure would also be required.


5.      An agreement was drawn up dated 28th July 1997, together with an addendum

also dated 28th July 1997, whereby Owners' Managing Agents, Marnavi, agreed on

behalf of the Owners to co-operate with APS and SEC in coating the cargo tanks of the

2

"JORAN" with Siloxirane. At this time a subsidiary company of APS appeared on the scene, Guaranteed Advanced Tank Technology Limited, who were intended to carry out the duties of APS under the Agreement and Addendum. The responsibilities of this subsidiary and its parent company, APS appear to have been identical and I propose to refer to both companies simply as APS.

6.     The Agreement set out the background to the work, describing the three parties and their motives for entering into the Agreement and then specifying the responsibilities for each part of the work as follows:

*A) Ship board application*

*1)     Marnavi will make available the M/T "JORAN" for cargo tanks coating;*

*2)     MARNAVI will provide at his own expenses the surface preparation and shot blasting application of the cargo holds to be lined and coated, as per MarineLine technical specification.*

*3)     SEC will care for survey of surface preparation and shot blasting applications, bearing the responsibility of the full compliance with the technical specification issued by GATT-APS;*

*4)     GATT-APS will supply Marine Line coating as necessary to cover 5000 sq.m. of cargo tanks and it will survey the application works and it will duly carry out the final curing as per lining/coating technical specification.*

        ........................

*C) Obligations*

        ........................

*5)     GATT-APS will supply the Marine-Line coating-lining material within 30 days from the contract entering into force.*

*6)     GATT-APS-SEC will complete the entire tank coating within 60 days from the*

contract in place subject to the full availability of M/T JORAN as per the
scheduled work program.

7)      MARNAVI will order its subcontractors to shotblast and treat the surfaces to
        be lined/coated according to GATT-APS-SEC technical requirements.

        ........................

D) Price

        The entire work price at care of GATT-APS-SEC is:
        USD  155.750 (one hundred and fifty five thousand seven hundred and fifty US
        dollars), 20.000 of which directly to SEC.
        The above will include paint, lining supply and execution and expertise on site.

E) Payment

1)      Down payment:
        Marnavi will pay within 30 days after the contract is in place USD 50.000 to
        GATT-APS.

2)      Final payment:
        Marnavi will pay the balance to SEC and GATT-APS for the respective due
        amounts after successful completion of the test campaign and the issuing of
        the final classification and fitness certificates under IMO Authority by virtue
        of which the "M/T JORAN" has been recognised as permanently fit for the
        carriage of IMO II-III mineral acids.

The following section of the Addendum to the agreement is also relevant.

        ...........................

1)      As a better understanding of art. C-5, Art. D and Art. E-1 of the agreement
        dated 28/07/1997, the shipment of paint and lining for the treatment of the 5000
        m2 shall be completed within 20 days and delivery to theYard in Termoli, via
        SEC - Viareggio shall take place within 30 days from the signature of the
        referred agreement.

7.      Concurrently with the work described in the Agreement, a test tank was to be

built on shore by SEC, coated with Siloxirane and filled with various chemicals to test

the claims by APS for the resistance of the coating to those chemicals (the Shore

Tests).  This was to be done under the supervision of the vessel's Classification Society

4

to obtain provisional approval for the vessel to carry various dangerous cargoes. After completion of the Shore Tests and the coating work it was intended that the vessel should carry a series of dangerous cargoes, during which the ship's tanks and their coatings were to be examined by the Classification Society from time to time to ensure that the coating was working as intended. The responsibilities of the Parties for the various duties associated with the shore testing procedure were also set out in the Agreement.

8.     Although the vessel was primarily classed with the Italian Classification Society, Registro Italiano Navale (RINa) the Owners asked Det Norske Veritas (DNV) to advise them on the coating and testing since they had had considerable previous experience with this type of coating. They also requested DNV to deal with the certification in connection with the IMO certificates for the carriage of dangerous chemicals. The Owners understood that DNV had had previous experience of Siloxirane.

9.     After the stainless steel tanks had been removed and the new mild steel tanks had been installed the vessel had 28 separate cargo tanks. The Owners elected to coat Numbers 1 to 20 cargo tanks with Siloxirane and the other 8 tanks were coated with another product and were not involved in this dispute.

10.    Work was started during September 1997 but, despite the time scale indicated in the Agreement, was not completed for about a year. Problems were experienced with cleaning the tanks in preparation for the coating, also with pinholes and cracks in

the coating after curing had been completed.  Heat damage was sustained in a number

of tanks as a result of incorrect heating during the curing process.  Problems were also

experienced with the fibreglass lining which had to be attached to the coating on the

bottoms of the tanks and for the lower 1.2 metres of the vertical tank sides.

11.    Eventually, on the 28th September 1998, APS issued a certificate in which they

vouched that they had supervised and approved the surface preparation of the tanks and

the application and curing of the Siloxirane and fibreglass coating.  They recorded that

they were satisfied that the cargo tanks of the vessel were suitable and fit for the

carriage of cargoes listed in their resistance list for Siloxirane.

12.    Despite this, DNV expressed concerns about the condition of the coating,

saying that in their opinion the bottom lining of the tanks was susceptible to cracking

and de-lamination of the top coat.  Accordingly, the Owners decided to start trading the

vessel in edible products in order to check whether the coating would remain intact in

service.

13.    She later started carrying toxic chemical cargoes..Early in 1999, after having

carried several cargoes of sulphuric acid and caustic soda, on the 12th February a joint

survey revealed that the fibreglass at the bottom of many of the tanks was cracked and

had lifted in many places, and that significant residues of both the last and previous

cargoes were lying below the surface and leaking out.

14.    The Owners invited APS to advise them as to how the problems could be cured but APS declined to become involved.

15.    Repairs were attempted but were unsatisfactory. The tanks were eventually grit blasted to remove all the Siloxirane coating and were then recoated with a different type of coating altogether.

Owners' Submissions

16.    The Owners said that they had been induced to enter into the Contract by APS and SEC because they had been told by their representatives that Siloxirane Marine Line Coating had a better resistance to corrosive attack by chemical cargos than had stainless steel. They said that these representations were false and that the coating in fact was likely to break down when the ship was loaded with such cargoes. In support of this allegation they adduced as evidence a report from Scientific & Technical Services Limited, (STS) of Blaydon, UK, specialists in paint coatings, who had carried out tests on various tank coating materials during a period before the Owners had become involved with APS. Siloxirane had been one of those coatings tested. These tests had concerned both static tests and cycling tests. In the former, steel panels coated with Siloxirane had been immersed in various chemicals for periods of up to 90 days to see whether they withstood chemical attack. Although I was not provided with the entire report, the parts which I did receive indicated that Siloxirane had started to blister during static immersion tests in 6% Acetic Acid, Acrylonitrile, Methyl Chloride and Methanol. It had also shown blistering during the cycling tests, in which the panels were immersed for various periods in a number of different chemical cargoes

and in water. All these tests had been carried out in 1993 and 1994 and, the Owners said, clearly showed that the coating was not resistant to attack by these fluids, all of which were likely to be carried as cargo by a vessel such as "JORAN" was intended to become.

17.    The Owners said that although the results of these tests had been known to APS and SEC prior to July 1997, they had not made them available to the Owners. The Owners said that they had been led to believe that the coating was resistant to any chemicals which could be carried in stainless steel tanks and to others which could not.

18.    Additionally, the Owners said that during the coating of the tanks, APS and SEC had not acted prudently, as a result of which the coating had been burned during heat curing so as to impair its effectiveness. On inspection after curing, pinholes, craters, delamination and hairline cracks were found in the surface of the coating which had required repair by "touching up". As a result, the coating was not fit to carry many of the chemical cargos which APS had said it would be able to carry.

19.    The Owners produced a report which had been prepared by a surveyor appointed by the Italian Court in Genoa, who attended on board to inspect the tanks on the 14th April, 1999, after the coating was found to have broken down. The surveyor reported on those tanks which had been coated with Siloxirane which were available for his inspection, Numbers 1, 2, 3, 4, 5, 6, 8, 12 and 18. The other tanks were not available because sand blasting had already commenced within them to remove the Siloxirane coating.

20.    The surveyor reported that the tanks had previously carried sulphuric acid and /

or caustic soda cargoes, both of which were common cargoes on such a tanker and

which Siloxirane had been intended to be capable of containing.  The main areas of the

damage in the tanks which were surveyed were at the bottom where the Siloxirane

coating was laid with a fibreglass layer to prevent impact damage to the coating of the

tank bottoms.  In this area there was dark staining and small holes indicating cargo and

washing water had penetrated the coating.  The coating in the upper parts of the tanks

appeared to be sound although it was noted to be easily detachable in places where it

had been "touched up".  Those tanks which had carried caustic soda showed lighter

staining but still indicated penetration of the cargo into the coating.  The Court

surveyor concluded that, in all the tanks which he had inspected, the cargo had

penetrated the coating in the area of the fibreglass but the damage was most severe in

those which had carried sulphuric acid.  These all showed coating film failures.


21.    Repairs were attempted by the Owners but they said that both APS and SEC

refused to co-operate.  The repaired coating later failed again.  Subsequently all the

coating had to be removed and all 20 tanks had to be recoated with another coating

provided by different manufacturers.  That coating was not resistant to as many of the

cargoes as Owners had been led to believe Siloxirane would be.


22.    The Owners produced a statement from their Technical Director who had

attended the vessel during the re-coating of the tanks, Mr Claudio Pesce.  Mr Pesce

described how he was approached by SEC, who were the sole agents in Italy for

Siloxirane, with a view to coating the cargo tanks of one of their tankers.  He said that

9

the nature of the coating and its resistance to chemical attack was described to him by

SEC and the description indicated that Siloxirane would be a much better coating than

any of the other available epoxy coatings and as good as or better than stainless steel.

He described in his statement how he visited DNV in Oslo who he was told had had

previous experience with Siloxirane and discussed with them how approval could be

obtained for the carriage of IMO dangerous chemical cargos in mild steel tanks with a

Siloxirane coating.  He also discussed the situation with RINa.


23.    Mr Pesce said that he was shown a report by Dr. Norbert Ackermann who had

acted as an inspector representing APS during the final stages of the coating work and

who had also previously carried out tests on Siloxirane for SEC.  His full report on the

tests had been shown to Mr Pesce although it was not made available to me.  Mr Pesce

said that it had indicated that Siloxirane could cope with more cargos than stainless

steel.  However, despite this, DNV had requested the Shore Tests of Siloxirane before

certifying provisionally that the ship could commence service in the chemical trade and

that subsequent inspections in service after the vessel commenced this trade would also

be required.


24.    Mr Pesce described the problems which had arisen during the coating and

curing of the tanks and drew my attention to overheating which had occurred and

which led to pinholes and hairline cracks in the surface.  I was provided with copies of

contemporary correspondence which dealt with these problems and the nature of the

repairs which were recommended by APS and carried out.  Mr Pesce described how,

following completion of the coating and curing, and after testing the integrity of the

10

coating by high voltage spark testing, all Siloxirane coated tanks were tested by filling

them with sea water, then draining them and leaving them for several days to see if rust

spots developed beneath the coating.  These tests disclosed what Mr Pesce described as

numerous defects which had not been discovered before.  These were further repaired

by "touching up" the coating but later, further defects were found which also required

repair.

25.    The Owners also served a statement by Mr Per Strom, a Norwegian corrosion

expert who had had previous experience with Siloxirane between 1993 and 1996.  He

said that he had been interested in the potential of this coating but, after arranging for

trials of it in ballast and cargo tanks of four different tankers, it was found not to be

suitable for coating of ships tanks, either cargo tanks or ballast tanks.  He had also been

involved in the tests which had been performed by STS when APS had supplied steel

panels, already fully coated by them with Siloxirane, for the immersion tests in various

common chemical cargos.  He confirmed that Siloxirane had failed the tests in respect

of Acetic Acid, Acrylonitrile, Methyl Chloride and Methanol.

26.    Mr Strom also said that he had been involved in other tests with Siloxirane

which had also failed, and particularly that Siloxirane coating was found to be very

brittle and with elongation properties no better than most epoxy coatings, contrary to

the literature provided by APS.

27.    A statement by Dr. George Mills was also served by the Owners.  He had been

retained as an expert witness in another arbitration concerning Siloxirane and had

carried out extensive testing of the coating.  The main point made by him was that the

temperature at which the curing of the Siloxirane was carried out was critical and errors of a few degrees could make a significant difference to the quality of the final coating. He remarked that oven curing was the best method of ensuring proper temperature control but that this could not be achieved with a ship.

28.    The Owners also claimed breach of implied terms of the Agreement that Siloxirane would be of the same type and standard as that advertised by them, would be resistant to cargos listed in the APS cargo resistance guide, it would be reasonably fit for carriage of corrosive and toxic cargos under IMO rules and that APS and SEC would exercise all reasonable care in performing their duties under the Agreement.

Respondents' Submissions

29.    Points of defence were submitted by APS but SEC ignored the proceedings throughout, despite being invited to make submissions and being copied in for all correspondence.

30.    The main thrust of the defence submitted by APS was that none of the work had been carried out under the Agreement dated 28th July 1997 because the Agreement required SEC to apply the coating at their own premises and the vessel was never delivered to them for this work to be performed. Instead, said APS, a second Oral Agreement was made under which responsibility for the preparation and the coating of the tanks with Siloxirane was transferred to the Owners, APS being responsible only for the supply of Siloxirane and for final heat curing. The Oral Agreement provided that each party assumed responsibility for their own financial risks in the event that the coating would fail.

12

31.    APS agreed that the coating had failed. They accepted that the fibreglass lining at the bottom of the tanks had absorbed oil during the carriage of cargoes prior to the final sulphuric acid cargo and that this had been responsible for the contamination which had occurred. They recommended replacement of the fibreglass lining at the bottom of the tanks which would also have involved renewal of large parts of the coating.

32.    APS also claimed that the test tanks built by SEC and subjected to the Shore Tests had passed all the tests and as a consequence they had obtained certification and approval for Siloxirane to be used in tankers carrying acid cargos. In support of this they submitted a small article published in the magazine "Shipping World & Shipbuilder" in July/August 2001 in which it was said that a Latvian ship had performed in chemical service since 1994 with tanks lined with Siloxirane. This, they said, showed that Siloxirane coating itself was entirely satisfactory for the purpose for which it was intended and they implied that failure of the coatings in "JORAN" was the fault of the Owners due to the poor workmanship of their contractors.

Conclusions

33.    I published an Interim Award on 15th July 2002 in which I found that I had jurisdiction to act as arbitrator for all disputes arising out of the Agreement dated 28th July 1997. I found that the work carried out by the Respondents when coating the tanks of the "JORAN" was done pursuant to the terms of the Agreement and that the Agreement remained in force.

34.     There was no dispute that the coating had failed.  Survey of the cargo tanks was carried out by Dr. Ricardo Cosulich on the 3rd February 1999 and he reported to APS that the coating had become damaged in way of the fibreglass.  A joint survey was held on the 12th February at which Mr Daniel Decker, who I understood to have represented APS, and Messrs Attilio Ieroli, Michele Isolde and Dr. Cosulich representing the Owners, had confirmed these findings.  Finally, the surveyor appointed by the Court at Genoa, Ing. Carmelo Vaccara, inspected the tanks on the 14th April and reported the same problems.

35.     I considered that the failure of the coating might have been due to inadequacy of the Siloxirane coating, to inadequate preparation of the surfaces of the steel tanks, to improper or inadequate application of the coating to the surfaces in the tanks, to inadequate curing of the coating, to damage done during the heat curing of the coating or to problems associated with the fibreglass lining.  Certainly, major faults had been found in the area of the fibreglass but some problems had also been experienced earlier with pin-holes and cracks in the coating in the upper reaches of the tanks which had needed repair before the vessel went into service.  Ing. Vaccara's report referred to the paint being "easily detachable" and "friable, not very adherent" although it was not clear whether this was a reference to paint at the top or the bottom of the tank. Accordingly the problem could have been caused by any one of the above failings or by a combination of several or all of them.

36.     All the above possible causes were the responsibility of either APS or SEC.

Although the surface preparation was to be carried out by contractors appointed by the

Owners, at the Owners' expense, supervision of their work was the responsibility of

SEC. If the surface preparation had been inadequate it was their responsibility to insist

that it be done again or that different contractors be employed.


37.     Similarly, APS were responsible for the supervision of the application of the

coating and the fibreglass and for heat curing of the coating. Much of this work was

carried out by another contractor but always under the supervision of APS. Indeed, one

of the complaints by APS was that, due to the slow progress of the coating by the

contractor, their supervisor had been kept on the ship for much longer than they had

anticipated, resulting in increased costs to themselves.


38.     The Addendum of the same date as the original Agreement provided for the

coating material to be supplied to the ship at the Termoli Shipyard via SEC. It was

therefore always clear that the work was to be carried out at the Termoli Shipyard.

Accordingly I concluded that APS were wrong to say that the Owners were in breach

of the Agreement in failing to deliver the vessel to the SEC yard.


39.     There was evidence to suggest that Siloxirane was not suitable for various

cargoes but, from the sales literature from APS with which I was provided, there

appeared to have been several variations of this product, each identified by a different

suffix number and some with different temperature requirements for curing. It is

possible that one of the other variations might have been successful but no submissions

15

on this matter were made to me by APS. The fact that DNV required the Shore Tests to be carried out before they would issue even a provisional certificate for toxic cargoes was a clear indication that they, at least, had not previously witnessed satisfactory testing of Siloxirane.

40.    I was not very impressed with the very short article in "Shipping World & Shipbuilder." Although approval of the coating was said to have been obtained, it was not stated under which controlling organisation the Latvian vessel had been upgraded to be an acid carrier. I would have preferred to have been provided with a Certificate of Class or a report from an equivalent independent body as evidence of this success. Accordingly I viewed this short magazine article with considerable reserve.

41.    Opposing the evidence of the article in "Shipping World & Shipbuilder" were the reports of STS, Mr Per Strom and Dr. George Mills, all of which indicated that Siloxirane was inadequate for the intended service.  I did not receive a copy of the report which should have been made on the results of the Shore Tests carried out by Dr. Cosulich's firm concurrently with the work on "JORAN", although Mr Pesce remarked that these tests had found that the coating failed when tested with formic acid. This was disputed by APS. Accordingly I could not rely on the Shore Tests in reaching my conclusion.

42.    Although on the evidence available concerning the failure of the "JORAN" coating I could not rule out any of the possible causes of failure, I concluded, on the balance of probabilities, that the most likely cause of the failure of these coatings in a period of no more than a few months was the unsuitability of Siloxirane for the purpose

16

for which it was intended, that is, it was incapable of resisting the corrosive attack of the cargo of sulphuric acid. Accordingly I found that the Claimants succeeded on the question of liability for damages arising from the failure of that coating.

43.    I noted that Mr. Pesce, who had been responsible on behalf of the Owners for the work carried out on "JORAN", had subsequently been employed by SEC. I recognised that this might have involved a conflict of interest but I found his statement to be fully supported by independent documentation in those areas relevant to the coating failure and accordingly I had no hesitation in accepting those relevant areas.



# GEORGE LUGG

TEL: 020 7375 2575

FAX: 020 7375 2595



1 WHITES ROW,
LONDON E1 7NF

L.M.A.A.

## FACSIMILE

Email : lugg@casebourne-leach.co.uk

To:-     Advanced Polymer Sciences Ltd
And:-    Guaranteed Advanced Tank Technology Ltd.
Att.      Denise Keehan
Fax No.   001 440 937 5046

26th February, 2004

And:-    Cantiere Navale Sec.
Fax No.   0039 0584 39 31 69

c.c.       Lloyd & Co.
Att       Michael Lloyd
Fax No.   7628 7661

Subject :-   m.v. "JORAN"
          Tank coating agreement dated 28th July, 1997

     I refer to the previous proceedings in this matter which culminated in an Award on Liability which I published on 4th February, 2003. I trust you will by now have received a letter from Michael Lloyd & Co. dated 20th February in which they ask for an Award on Quantum on behalf of Jilmar Shipping S.A.

     It is customary in London arbitration that a Respondent is allowed 28 days to respond to such an application and I propose to make such an Order in the present case, unless I receive an objection from you giving good reason why you cannot comply with this time table.

     Please note that, unless I hear from you by 8th March, 2004, giving me good reason why you cannot comply, I order that you must serve any submissions which you wish to make in defence of the Claimants' application by Monday 29th March, 2004.

     I look forward to hearing from you within this time frame.

Yours faithfully,

George Lugg

01-APR-04 15.07 FROM: CASEBOURNE LEACH                    ID: 0207375255            PAGE 1

# GEORGE LUGG

TEL: 020 7375 2575

FAX: 020 7375 2595

1 WHITES ROW,
LONDON  E1 7NF



L.M.A.A.

## FACSIMILE

Email : lugg@casebourne-leach.co.uk

| | |
|---|---|
| To:- | Advanced Polymer Sciences Ltd. |
| And:- | Guaranteed Advanced Tank Technology Ltd. |
| Att:- | Denise Keehan |
| Fax No. | 001 440 937 5046 |

1st April, 2004

| | |
|---|---|
| And:- | Cantiere Navale Sec |
| Fax No. | 0039 0584 39 31 69 |

| | |
|---|---|
| And | Lloyd & Co. |
| Att | Michael Lloyd |
| Fax No. | 7628 7661 |

Subject :-  m.v. "JORAN"
Tank coating agreement dated 28th July, 1997

Following my letters and faxes to the Parties dated 26th February, I have heard nothing from the Respondents. Accordingly, unless I hear from the Respondents within the next seven days, that is by 8th April, 2004, that they wish to make submissions to me, I will proceed to my award.

In the mean time, may I request clarification from the Claimants on two points. Firstly, Mr. Pesce says that the eventual Buyers, Belluna, agreed to reimburse Jithor for the cost of fuel and cash on board. If this forms part of the claim can the Claimants confirm that the amounts referred to were included as part of the payments set out on page 11 of the documents attached to Mr. Pesce's statement and, if so, do they have any documents supporting those amounts. Secondly, do they have any documents to support the costs of converting the ship as set out in Mr. Pesce's memorandum at page 31.

With best regards,

George Lugg

# GEORGE LUGG

TEL: 020 7375 2575

FAX: 020 7375 2595



1 WHITES ROW,
LONDON  E1 7NF

L.M.A.A.

## FACSIMILE

Email : lugg@casebourne-leach.co.uk

To:-      Lloyd & Co.
Att       Michael Lloyd
Fax No.   7248 3339

And:-     Advanced Polymer Sciences Ltd
And:-     Guaranteed Advanced Tank Technology Ltd.
Att.      Denise Keehan
Fax No.   001 440 937 5046

28th June, 2004

And:-     Cantiere Navale Sec.
Fax No.   0039 0584 39 31 69

Subject :-   m.v. "JORAN"
             Tank Coating Agreement dated 28th July 1997

I refer to my fax of 1st April, 2004. I have still had no response to either my fax
or to my letters of 26th February, sent to both Respondents by recorded delivery.
Accordingly I am satisfied that neither Respondent wishes to make any submissions to
me on quantum.

I also refer to the fax from Michael Lloyd & Co. dated 20th April concerning
documents evidencing their Clients Claim. Can I please hear from them as to whether
they will be able produce any such documents.

With best regards,

George Lugg



# GEORGE LUGG

TEL: 020 7375 2575

FAX: 020 7375 2595

1 WHITES ROW,
LONDON E1 7NF

L.M.A.A.

## FACSIMILE

Email : lugg@casebourne-leach.co.uk

| | |
|---|---|
| To:- | Advanced Polymer Sciences Ltd |
| And:- | Guaranteed Advanced Tank Technology Ltd. |
| Att. | Denise Keehan |
| Fax No. | 001 440 937 5046 |

13th September, 2004

| | |
|---|---|
| And:- | Cantiere Navale Sec. |
| Fax No. | 0039 0583 29 76 71 |

| | |
|---|---|
| c.c. | Lloyd & Co. |
| Att. | Michael Lloyd |
| Fax No. | 7628 7661 |

| | |
|---|---|
| Subject :- | m.v. "JORAN" |
| | Tank coating agreement dated 28th July, 1997 |

I refer to recent correspondence and understand that Dr. Del Prete is dealing with this matter on behalf of SEC. I have been requested to send copies of all correspondence since 1st August to him at his new fax address and accordingly three pages of such correspondence are forwarded, to him only, with this fax.

The recent correspondence indicates that I have queried one point in the Claimants' original Points of Claim dated 18th December, 2000. The Claimants' response is contained in their fax of 7th September.

I NOW ORDER that the Respondents reply within the next 14 days, that is by close of business in London on 27th September, with any comments which they wish to make on this last exchange or on any other matter regarding quantum. If I do not hear from either of the Respondents within this time I will proceed to determine my Final Award on Quantum and will publish it without further reference to either Party.

With best regards,

George Lugg

GE LUGG

1 WHITES ROW,
LONDON  E1 7NF

020 7375 2575
X: 020 7375 2595



L.M.A.A.

# FACSIMILE

**Email : lugg@casebourne-leach.co.uk**

| | |
|---|---|
| To: | Advanced Polymer Sciences Ltd. |
| And: | Guaranteed Advanced Tank Technology Ltd. |
| Att. | Denise Keehan |
| Fax No. | 001 440 937 5046 |

30th September, 2004

| | |
|---|---|
| And: | Cantiere Navale Sec. |
| Fax No. | 0039 0583 29 76 71 |

| | |
|---|---|
| c.c. | Lloyd & Co. |
| Att | Michael Lloyd |
| Fax No. | 7628 7661 |

| | |
|---|---|
| Subject : | m.v. "JORAN" |
| | Tank coating agreement dated 28th July, 1997 |

I refer to my ORDER contained in my fax of 13th September. I have received no comments from either of the Respondents.

Accordingly I now confirm that submissions on quantum are closed. I will proceed to draw up my Final Award on Quantum without further reference to either Party.

With best regards,

George Lugg



# GEORGE LUGG

TEL: 020 7375 2575

FAX: 020 7375 2595



**1 WHITES ROW,
LONDON E1 7NF**

L.M.A.A.

## FACSIMILE

Email : lugg@casebourne-leach.co.uk

| | |
|---|---|
| To:- | Advanced Polymer Sciences Ltd |
| And:- | Guaranteed Advanced Tank Technology Ltd. |
| Att. | Denise Keehan |
| Fax No. | 001 440 937 5046 |

19th October, 2005

| | |
|---|---|
| And:- | Cantiere Navale Sec. |
| Fax No. | 0039 0583 29 76 71 |

| | |
|---|---|
| c.c. | Lloyd & Co. |
| Att | Michael Lloyd |
| Fax No. | 7628 7661 |

Subject :-   m.v. "JORAN"
            Tank coating agreement dated 28th July, 1997

I refer to the letter from Michael Lloyd & Co dated 23rd August, enclosing further documentation associated with this matter, which was also forwarded to Advanced Polymer Sciences and Cantieri Navale Sec. I have received no response from either of these Parties.

I am now ready to start compiling my Final Award covering the quantum of the Owners' claim. If either of the respondents wishes to make any submissions to me concerning these latest documents will they please let me know urgently.

If I do not hear from either Respondent within 7 days, that is by 26th October, that they wish to comment on the latest documentation I will proceed to my Award on the basis of the documents in my possession now.

With best regards,

George Lugg

# GEORGE LUGG

**TEL: 020 7375 2575**

**FAX: 020 7375 2595**

1 WHITES ROW,
LONDON  E1 7NF



L.M.A.A.

## FACSIMILE

**Email : lugg@easebourne-leach.co.uk**

| | |
|---|---|
| To:- | Advanced Polymer Sciences Ltd |
| And:- | Guaranteed Advanced Tank Technology Ltd. |
| Att. | Denise Keehan |
| Fax No. | 001 440 937 5046 |

1st November, 2005

| | |
|---|---|
| And:- | Cantiere Navale Sec. |
| Fax No. | 0039 0583 29 76 71 |

| | |
|---|---|
| c.c. | Lloyd & Co. |
| Att. | Michael Lloyd |
| Fax No. | 7628 7661 |

| | |
|---|---|
| Subject :- | m.v. "JORAN" |
| | Tank coating agreement dated 28th July, 1997 |

Further to my fax of 19th October, I have had no response from either of the Respondents and I conclude that, as before, they do not want to make any submissions to me regarding the quantum of the claim. Submissions are therefore now closed.

I will now proceed to my award on Quantum and will publish it as soon as it is ready.

With best regards,

*[signature: George Lugg]*

M. Manos Co., LPA
East 140th Street   Cleveland, Ohio 44110
Tel: (216) 681-1818    Fax: (216) 681-1810
e-mail: jmmanos@aol.com



Attorney at Law
John M. Manos

June 28, 2004

Mr. George Lugg
1 Whites Row
London, England  E1 7NF

*Via Facsimile: 020 7375 2595*

Re:    my "JORAN"
        Tank Coating Agreement dated July 28, 1997

Dear Mr. Lugg:

    I have not responded to any of the transmittals sent by you or Michael Lloyd
because I have no clients to represent in this matter.  Advanced Polymer Sciences, Inc.
was placed into judicial receivership in December 2002 in the Court of Common Pleas,
Lorain County, Ohio, Case No. 02-CV-133448.  On February 1, 2004, the Honorable
Judge Glavas approved the sale liquidating all of the assets of the corporation for the
benefit of its secured creditor.

    I do not communicate with you in a representative capacity.  This is a personal
communication made as a professional courtesy.  This will be my last communication.

            Very truly yours,

            John M. Manos

JMM/ck

cc:   Michael Lloyd - Via Facsimile

(31-10-97) is for test
Service

CASEBOURNE LEACH

## GEORGE LUGG

**TEL: 020 7375 2575**

**FAX: 020 7375 2595**

1 WHITES ROW,
LONDON  E1 7NF



L.M.A.A.

# FACSIMILE

**Email : lugg@casebourne-leach.co.uk**

To:-          John M. Manos  Co, LPA
Att.          John M. Manos, Esq.
Fax No.    001 216 681 1810                                    1st July, 2004

c.c.          Michael Lloyd & Co.
Att           Michael Lloyd
Fax No.    7628 7661

Subject :   m.v. "JORAN"
               Tank Coating Agreement dated 28th July 1997

This is to thank Mr. Manos for his fax advising me that APS no longer exists.

I assume from the fact that you responded so quickly to my own fax of 28th June that you are receiving all communications addressed to APS. I note that you do not intend to communicate with me in respect of this case any more.

I await a response from Michael Lloyd & Co. as to how he intends to proceed.

With best regards,

George Lugg

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

BETWEEN

JILMAR SHIPPING SA

Claimants

- AND -

(1)     GUARANTEED ADVANCED TANK TECHNOLOGY LTD.

(2)     ADVANCED POLYMER SCIENCES INC.

(3)     CANTIERE NAVALE SEC

Respondents

m.v. "JORAN"

Tank Coating Agreement Dated 28th July 1997

FINAL ARBITRATION AWARD ON QUANTUM

WHEREAS:

1.    By the terms of an Agreement dated 28th July 1997 with an Addendum, between Guaranteed Advanced Tank Technology Ltd ("GATT"), Advanced Polymer Sciences Inc ("APS"), Cantiere Navale Sec ("SEC") (hereinafter referred to as "the Contractors") and Marnavi SpA acting on behalf of the Claimants (hereinafter referred to as "the Owners"), GATT, APS and SEC agreed to supply and install or alternatively supervise the installation of, a high performance tank coating system for application to the cargo tanks of the m.v "JORAN".

2.    Paragraph H of the said Agreement provided that it should be construed in accordance with the laws of England.  Paragraph I of the Agreement provided that any disputes arising between the parties to the Agreement which could not be amicably settled should be referred to arbitration in London.

3.    Disputes did arise between the parties as hereinafter particularised.  The Owners appointed me, George Lugg, of 1 Whites Row, London E1 7NF to act as an arbitrator.  Notice of my appointment was given to each of the Contractors but they failed to appoint arbitrators in response or to agree to my appointment as sole arbitrator.  The Owners then applied to the High Court in England to appoint an arbitrator to resolve all disputes arising from the Agreement.  By an order dated 15th June 2001 made by Mr. Justice Langley, sitting in the Commercial Court of the Queen's Bench Division of the English High Court of Justice, I was appointed as sole arbitrator in the arbitration between the parties.  The seat of the arbitration is England.

4.    Following my appointment by the Court, the Owners served Points of Claim on the Contractors.  Both APS and the Owners requested that I make an Interim Award as to whether or not I had jurisdiction to arbitrate in these disputes.  I made an Interim Award which I published on 15th July, 2002 in which I found that I did have jurisdiction to arbitrate in respect of the disputes arising out of the coating by the Contractors of the tanks of the "JORAN" with Siloxirane Marine Line Coating (hereinafter referred to as "Siloxirane"), a patented coating supplied by APS.

5.     Following publication of my Interim Award on my jurisdiction the Owners asked me to consider the matter of the liability of the Contractors for the alleged failure of the tank coating system. The Points of Claim alleged that the coating which the Contractors had supplied and installed in №s 1 to 20 cargo tanks of the vessel was unable to achieve the resistance to corrosive and toxic cargoes which the Contractors had claimed.

6.     None of the Contractors made any further submissions to me, other than those which they had made to assist me with my Interim Award. The Attorney who had been instructed by APS advised me that his instructions had been withdrawn and that APS would not be making any further submissions. Despite my invitations to SEC to take part in the reference, I received no correspondence or submissions from them at any time.

7.     I published a further Interim Final Award on 4th February, 2003 in which I found that the coating supplied and installed in the cargo tanks of the vessel by the Contractors was unable to withstand attack from some of the chemicals to which it was said by the Contractors to be resistant.

8.     Following publication of my Interim Final Award I was requested by the Owners to deal with the quantum of their claim. This they had pleaded as follows:-

Loss of value under the terms of an M.o.A for the sale of the vessel dated 11th December, 1997, amounting to US$3,000,000.00.

Damages equivalent to the cost of repairs to the coating at the bottom of the cargo tanks amounting to Lit.481,448,980.

Damages equivalent to the loss of the hire of the vessel under her applicable charterparty for the time taken to carry out the above repairs, amounting to D.M.331,999.98 plus US$55,333.33.

Damages amounting to US$3,700,000.00 for the cost of the conversion and recoating of the cargo tanks which had been carried out with a view to enabling the vessel to carry toxic and corrosive cargoes, which she would have been able to carry if the representations made by the Contractors had been true. The Owners claimed that these costs had been wasted due to the failure of the coating to perform as promised by the Respondents.

Alternatively, damages equal to the diminution in value of the vessel because of her inability to carry the cargoes which the Contractors had represented that she would be able to carry with tanks coated with Siloxirane.

Alternatively, damages equal to the diminution in the value of the vessel, lacking as she did any effective coating at all on completion of the works.

9.    None of the Contractors made any submissions to me on quantum, despite my invitations to them to do so.  I received a communication from the Attorney who had previously represented APS and GATT, who informed me that APS had ceased to trade and had been declared bankrupt by the Court in Ohio, U.S.A.

10.    The reference proceeded on documents alone.  The Claimants asked for a Reasoned Award and my reasons are attached to and form part of this Award.

NOW I, the undersigned George Lugg, having taken upon myself the burden of this reference, having considered the written evidence put before me and the submissions made to me, DO HEREBY MAKE, ISSUE AND PUBLISH this my FINAL AWARD ON QUANTUM as follows:

4

A.    I FIND AND HOLD that the Claimants' claims succeed in the following sums and no more:-

In respect of the costs of conversion of the vessel to carry corrosive and toxic cargoes, US$1,800,630.00 plus US$892,556.00.

In respect of the costs of subsequent repairs following failure of the Siloxirane coating, also survey fees and agency expenses, Lit.144,973,670.

In respect of loss of hire whilst the above repairs were being carried out to the coating, D.M.331,999.98 plus US$55,333.33

B.    I ACCORDINGLY AWARD AND DIRECT that the Contractors shall be jointly and severally liable to pay the Claimants the sums of US$2,748,519.33 plus Lit.144,973,670 plus D.M.331,999.98, together with interest thereon at the following rates:-

i)    On the sum of US$1,800,630.00 at the rate of 6.1% per annum, from 15th April, 1998,

(ii)    On the sum of US$892,556.00 at the rate of 5.9% per annum, from 12th November, 1998 and

(iii)    On the sums of US$55,333.33,  Lit.144,973,670  and D.M.331,999.98 at the rate of 5.7% per annum from 10th July, 1999,

all three rates of interest compounded at three monthly intervals from the relevant date until the date of payment under this Award.

C.      I FURTHER AWARD AND DIRECT that the Contractors shall be jointly and
severally liable to bear their own and the Owners' costs of the reference, together with
interest thereon at the rate of 6½% per annum, compounded at three monthly intervals
from the date of this Award until the date of payment.

D.      I FURTHER AWARD AND DIRECT that the Contractors shall be jointly and
severally liable to pay the cost of this my FINAL AWARD ON QUANTUM which I
hereby assess in the sum of U.K.£7,500.00, PROVIDED THAT if, in the first instance
the Owners shall have paid any part of the said costs they shall be entitled to
immediate reimbursement by the Contractors of the sum so paid, together with
interest thereon at the rate of 6½% per annum, compounded at three monthly
intervals, from the date of payment until the date of reimbursement.

E.      I DECLARE that this Award is final as to the matters dealt with herein but I
RESERVE TO MYSELF jurisdiction to deal with any other matters which may arise,
including the assessment of costs, upon receipt of further submissions.

Given under my hand this   11th   day of November, 2005

George Lugg                          Witness

### m.v. "JORAN"

Tank Coating Agreement dated 28th July, 1997

Reasons For and Forming Part of the Arbitrator's Final Award on Quantum

1.     By my first Award dated 15th July 2002 I found that I had jurisdiction to act as Arbitrator for all disputes arising out of the contract between the parties dated 28th July 1997 for the coating of the cargo tanks of this vessel.  By my second Award dated 4th February 2003 I found that the work involved in coating of the cargo tanks in 1997 and 1998 was carried out pursuant to that contract and that the subsequent failure of the coating was, on the balance of probabilities, due to the inadequacy of the coating itself.  I made no Award as to Quantum in either of my earlier Awards and have now been requested by the Claimants to deal with this matter.

2.     The vessel was owned by Jilmar Shipping S.A. of Panama, R.P. [hereinafter referred to as "Jilmar"]. The vessel had been purchased by Jilmar in March 1996 and had originally been entrusted to Black Sea Shipyard at Constanza, Romania for general maintenance work but was subsequently transferred to Cantieri Navali SEC at Termoli in Italy in April, 1997 because the repairs in Romania were progressing very slowly. She had moved to Termoli by the time the decision was made to convert the vessel so as to enable her to carry corrosive and toxic cargoes.  Resistance of the structure of the vessel to corrosion by the cargoes to be carried was intended to be achieved by coating the cargo tanks with a type of coating known as Siloxirane Marine Line Coating [hereinafter "Siloxirane"] which was to be supplied by the second Respondents, Advanced Polymer Sciences Inc. of Avon, Ohio, U.S.A. [hereinafter "APS"].

3.     Whilst the conversion of the vessel and the coating work was still being performed Jilmar sold the vessel to Eoliana Gestao e Navegacao of Madeira [hereinafter "Eoliana"] under a Memorandum of Agreement on a Norwegian Saleform dated 11th December 1997.  This Memorandum provided for the vessel to be delivered to Eoliana between 15th and 30th December, 1997 with a cancelling date of 30th January, 1998. Conversion work continued after delivery and was completed in October, 1998.  The vessel then returned to service and soon thereafter started to carry corrosive cargoes.

1

## Submissions

4.      Jilmar set out the quantum of their claim in Paragraph 12 of their original Points of Claim dated 18th December 2000.  The sums claimed were as follows:

(a)     Loss of sale value of the vessel amounting to $3,000,000.00 arising from the terms of the sale  of the vessel.  Jilmar had sold the vessel to Eoliana for a price of $5,800,000.00 but Addendum № 1 to the sale contract recorded that, if the vessel failed to achieve certification for the carriage of corrosive and toxic cargoes as permitted by the Rules of the International Maritime Organisation [hereinafter "I.M.O."], then US $3,000,000.00 of the sale price should be forfeited and refunded to the Buyers.

(b)     The costs incurred by Eoliana in 1999, following failure of the coating in service, for repairing the defective coating and the protective fibreglass lining at the bottoms of the cargo tanks.  Sr. Pesce said in his second statement that the paint coating was actually renewed at that time, see paragraph 8 below.  The cost of this work, including tank cleaning, gas freeing, port costs and survey fees, amounted to Italian Lire (Lit.) 481,448,980.

(c)     Loss of earnings during the period of 55 days and 8 hours during which the recoating work claimed above was carried out.  The vessel had been chartered by Eoliana back to Marnavi on a three year Charterparty dated 7th October 1998, Addendum № 1 of which set out rates of hire of D.M.6,000.00 per day plus U.S. $1,000.00 per day.  These figures were used to compute the total loss of earnings which amounted to D.M. 331,999.98 plus U.S. $55,333.33.

(d)     Damages equal to the cost of carrying out remedial works on the vessel to enable her to carry corrosive and toxic cargoes as if the vessel had been fitted with stainless steel tanks.  This item was subsequently dropped by Jilmar and replaced by a claim set out in their subsequent submissions dated 20th February, 2004.  In these submissions Jilmar claimed damages amounting to US$3,700,000.00 which

they said had been the cost of carrying out the conversion of the vessel to carry toxic and corrosive cargoes, and which was thrown away as a result of the Siloxirane coating not having the properties attributed to it by APS.

5.    Jilmar also made two alternative claims for diminution in value as follows:

(e)    Damages equivalent to diminution in value of the vessel because of her inability to carry the cargo range which had been promised by the Respondents.

(f)    Damages equivalent to the diminution in value of the vessel in view of the ineffective condition of the tank coating on completion of the alterations.

6.    The original Points of Claim had been dated 18th December 2000. APS had submitted their Points of Defence on 2nd October 2001 in which they strenuously disputed liability for any losses sustained by Jilmar. I dealt with their defence as to liability in my earlier Awards and will not repeat my comments here. APS made no submissions as to quantum in their defence and failed to make any further submissions when they were advised that Jilmar were pursuing their claim as to quantum. The third Respondents, Cantieri Navali SEC (hereinafter "SEC") made no submissions at any time, despite having been copied in on all correspondence and despite receiving copies of my earlier Awards.

7.    Jilmar made further short submissions on quantum in their letter of 20th February 2004 in which they amended their claim as described in Paragraph 4(d) above. They also submitted a second statement by Sr. Pesce who had been Technical Director of Marnavi S.p.A, Jilmar's Technical Managers, at the time that the work was carried out. Sr. Pesce stated that various payments had been made by Eoliana to Jilmar towards the purchase price of the vessel, followed by a series of reimbursements by Jilmar to Eoliana, over the period from 23rd January 1998 to the 22nd December 2000. These had resulted in a net payment to Jilmar of U.S. $2,827,974.65 for a vessel for which the original agreed price had been $5,800,000.00. After making allowance for bunkers remaining on board on delivery of the vessel to Eoliana, plus a sum of cash which had also be on board at the time of delivery, Jilmar had received a net sum slightly less than $2,800,000.00 for the ship, a reduction in the originally agreed price of slightly over $3,000,000.00.

8.    Sr. Pesce also stated that Jilmar had been pressed by Eoliana to pay for repair work to the coatings of the cargo tanks which were found to be seriously defective in February 1999 after the vessel had carried a few aggressive cargoes. I dealt with this matter in my second Award dated 4th February, 2003 and found that the coating of the cargo tanks had failed due to the inability of Siloxirane to resist certain corrosive cargoes. Sr. Pesce had dealt with this in his second statement at paragraph 9 where he said that a complete new paint system had to be applied. This work, he said, was carried out at La Spezia and Genoa in March, April and May, 1999 and had been completed at Genoa in March and April, 2000.

9.    Following receipt of Jilmar's submissions on quantum I invited APS and SEC to comment on them. This invitation was sent by Recorded Delivery Mail dispatched on 26th February 2004 and by fax on the same date. I received confirmation by Royal Mail in the United Kingdom that the letter had been delivered to APS in Avon, Ohio on the 3rd March 2004. My letter to SEC was not returned to me by Royal Mail [as I would have expected if it could not have been delivered] and I concluded that it had indeed been successfully delivered.

10.    On the 1st April, 2004 I again invited both APS and SEC by fax to let me know whether they wished to make any submissions on Quantum. I gave them 7 days in which to reply to me but again received no replies. By the same fax I invited Jilmar to supply further supporting documentary evidence of the Quantum of their claim. On the 28th June I again tried to contact both APS and SEC by fax but again I received no response. However, I received a response the same day from Mr John M. Manos, the Attorney who had previously handled the matter on behalf of APS, advising me that APS had been declared bankrupt by the Court in Ohio.

11.    On the 9th August 2004 Jilmar provided me with two invoices, both written in the Italian language, the first dated October 1997 and addressed to Jilmar, amounting to Lit. 3,200,000,000 and the second dated October 1998 and addressed to Eoliana, amounting to Lit. 3,600,000,000. Jilmar explained that no invoices were available covering the repairs done in Romania but that the invoices now produced covered the conversion

4

work carried out at the Termoli shipyard in Italy. The first of those invoices referred to conversion of the vessel to carry IMO class II and III cargoes and the second referred to various modifications carried out and other work done on the vessel, also concerned with her upgrading to enable her to carry IMO Class II and III cargoes.

12.    I questioned the inclusion in the claim of the invoice addressed to Eoliana and asked for proof of payment having been made by Jilmar. In August, 2005 I was provided with a third statement by Sr. Pesce in which he informed me that, although the work covered by the second invoice had been ordered by Jilmar and carried out by SEC and various sub-contractors, due to cash flow problems experienced by Jilmar, Eoliana had agreed to advance money to Jilmar to cover this invoice pending resolution of this dispute. In the event, said Sr. Pesce, only Lit.1,603,932,206 was paid in respect of the second invoice, the balance being deducted for damages claimed against the shipyard for delay in the completion of the work. The net sum paid to the yard by Jilmar was therefore Lit. 3,200,000,000, which appears to have been finally settled by 15th March, 1998. The sum paid by Eoliana as a loan to Jilmar was Lit. 1,603,932,206, the final instalment of which was paid on 12th October, 1998.

**Discussion**

13.    Jilmar argued that the Respondents had made a negligent representation as to the properties of Siloxirane by saying that the coating was as resistant to corrosive chemicals as was stainless steel. In my earlier Award I found that on the balance of probabilities, the coating did not have the properties claimed for it by APS and had failed in normal service when carrying cargoes to which the Respondents had said it was impervious. Accordingly the representation which the Respondents had made regarding the resistance of the coating to various cargoes had been wrong and had been negligently made. Jilmar drew my attention to passages in Chitty on "Contracts" which dealt with both fraudulent and negligent misrepresentation and the interpretation of the Misrepresentation Act of 1967. Having studied the passages to which my attention had been drawn, I concluded that the measure of damages to be awarded in cases of either fraudulent and negligent misrepresentation were the same and were covered by section 2 (1) of the Misrepresentation Act. I concluded that the Claimants were entitled to be placed in the position in which they would have been if they had not been persuaded to recoat their

5

vessel with Siloxirane as a major part of a conversion to enable it to carry corrosive and toxic cargoes.

14.    Jilmar had bought the vessel in 1996 intending to trade her in the carriage of normal cargoes, including edible oils. For this she needed a refit and recoating of cargo tanks with a coating suitable for the carriage of edible oils. During the course of the refit they had been persuaded by APS that Siloxirane, produced by them, was of a quality that would permit the vessel to carry corrosive and toxic cargoes. Jilmar concluded that if this could be achieved it would substantially increase the value of the vessel and permit her to operate in a more lucrative trade. Accordingly they decided to coat the vessel with Siloxirane and carry out extensive alterations to the hull, machinery and equipment in order to achieve this aim.

15.    Once Jilmar had decided to change the service of the vessel from normal cargoes to hazardous cargoes it was to be expected that IMO would apply their most recent Rules & Regulations to the construction and outfitting of the vessel. It is normal practice in my experience for IMO to do this where a ship undergoes what they would consider to be a major alteration. IMO required the location of the accommodation superstructure to be adjusted to ensure that it did not extend above any of the cargo tanks, also major alterations were required to the cargo handling system, tank ventilation system, fire fighting and other emergency systems etc. If the representations made by the Respondents had never been made, none of this would have been necessary to enable the vessel to carry normal cargoes including edible oils. However, the cleaning and de-scaling of the cargo tanks and the coating of them with a coating suitable for the carriage of normal cargoes would have been necessary, even if there had been no modifications.

16.    Whilst the coating work was continuing Jilmar had agreed to sell the vessel to Eoliana for an agreed price of $5,800,000.00 but, by Addendum № 1 to the MOA, it was further agreed as follows:

-    *The Buyers have purchased the vessel "Joran" only under the condition that upon completion of conversion works at Canlieri Navali Termoli S.r.l. the above vessel is qualified for the carriage of the corrosive and toxic goods under IMO rules so*

6

*that to obtain the permanent approval for carrying corrosive and toxic goods as Phosphoric Acid, Sulphuric Acid, Formic Acid, Phenol and so on;*

*All that premised, the parties agreed the following:*

. . . . . . . . . . . . . .

*2)     should the vessel "Joran" upon completion of works actually being carried at Cantieri Navali Termoli is not qualified (now or subsequent) because of defective materials, poor workmanship or otherwise howsoever for the carriage of the said acid and toxic goods, and should the Class Register does not issue a "clean" certificate of Fitness for all the corrosive and toxic acids under IMO rules, then the contractual price will be deemed of US$ 2'800'000. - (two million eight hundred thousand US Dollars) and the Sellers will return back to the Buyers the amount of US$ 3'000'000. - (three million US Dollars) and will pay the damages suffered by the Buyers in connection with.*

17.    This is an indication that the value of the vessel, if capable of carrying toxic and corrosive cargoes, would be $3,000,000.00 higher than it would be if she was capable of carrying only passive cargoes such as edible oils. In the event, Eoliana paid slightly less than 2.8 million for the vessel so I accepted that Jilmar had lost $3,000,000.00 on the sale of the vessel as a result of the failure of the Siloxirane coating. However, since the value of the vessel would not have been increased if the negligent representation had not been made, and since Jilmar then would not have been able to offer the vessel for sale as a vessel capable of carrying corrosive and toxic cargoes, this loss would never have been sustained. I therefore rejected the claim for loss of value and, for the same reason, the alternative claim for diminution in value due to the inability to carry the promised cargo range.

18.    I now turn to consider the claim for the cost of re-coating of the cargo tanks carried out at La Spezia and Genoa in March, April and May, 1999 and in March and April, 2000. Sr. Pesce said in his second statement that this work was all concerned with replacing the Siloxirane coating by another paint system. If the representation had not been made by APS and the vessel had not been converted to carry corrosive cargoes, it

would still have been necessary to recoat the cargo tanks with an alternative coating which would have been similar to the one which was used at La Spezia and Genoa.

19.    Eoliana had claimed the cost of this work from Jilmar pursuant to the terms of sub paragraph 2 of Addendum No. 1 of the M.o.A. dated 11th December, 1997, quoted above. They claimed that these costs were damages suffered by them in connection with the failure of the coating as provided in that sub paragraph. Sr. Pesce said in his second statement that he had considered that Jilmar were liable under the M.o.A. for these costs and that Jilmar had reimbursed Eoliana for them. Jilmar claimed them in turn from the Respondents as damages suffered by them due to the negligent representation made by APS concerning the qualities of Siloxirane.

20.    However, I concluded that much of this work would have been necessary as part of the initial repair plan which Jilmar had intended to carry out before they were persuaded to embark on the coating of the tanks with Siloxirane and the expensive upgrading of the vessel. Sr. Pesce said in his first statement that the vessel had originally been built with twelve stainless steel cargo tanks with a total capacity of about 790 cu.m. He said that, had the Owners not been persuaded to convert the vessel, these tanks would have been retained. The remaining mild steel cargo tanks would have required blasting and recoating in order to permit the vessel to carry normal cargoes. The Owners would therefore have had to incur the cost of recoating the original mild steel cargo tanks in any event.

21.    The final capacity of all cargo tanks, as shown by the tank plan produced by SEC showing the arrangement after the conversion, was about 3,400 cu.m. so about 25% of the original capacity had comprised stainless steel tanks which would not have required recoating. I was not provided with any evidence showing the surface areas of the various cargo tanks, but I concluded that a rough estimate could be made by comparing the volumetric capacities. I accordingly accepted as a valid part of the claim the cost of recoating 25% of the surface area of the cargo tanks but discounted the remaining 75% which would have required recoating in any event.

8

22.    The sum claimed by the Owners for recoating the tanks at La Spezia and Genoa was Lit. 448,633,750.  25% of this amounts to Lit. 112,158,440 and to this must be added survey fees for Dr. Cosulich, Lit. 6,366,500 and agency expenses, Lit. 26,448,730 bringing the total to Lit. 144,973,670.  I concluded that this item covered all additional work associated with the recoating of the cargo tanks following failure of the Siloxirane coating and I dismissed, for the same reason, the alternative claim for diminution in value due to the lack of any effective tank coating on completion of the alterations.

23.    Jilmar claimed loss of hire for the vessel for 55 days and 8 hours whilst this work was performed.  This additional loss of time, over and above the time spent on the upgrading of the vessel, would not have been necessary under normal circumstances. The vessel had undergone thorough overhaul during 1996, 1997 and 1998 and the grit blasting and coating of the tanks would have been done concurrently if the decision to convert the vessel had not been taken..  The vessel had only been back in service for a relatively short period before the re-coating of the cargo tanks was carried out at La Spezia and Genoa.  Accordingly I accepted the claim for loss of hire.

24.    Finally I consider the claim for the cost of the conversion of the vessel from a standard products tanker to one certified by I.M.O. to be capable of carrying corrosive and toxic cargoes.  This had originally been claimed by Jilmar to have cost US$3,700,000.00 and the claim had been supported by two invoices from Cantieri Navali SEC in Italian Lire.  It transpired that, although the first invoice had been paid in full by Jilmar, the second invoice had been only partly paid, the unpaid portion having been retained by Eoliana as compensation for late delivery of the ship by the yard.  Late delivery of the vessel by SEC had not been pleaded by Jilmar and no claim had been made for loss of time due to late delivery by SEC.  I concluded that the unpaid portion of the second invoice did not form part of the claim against the Contractors.

25.    I therefore accepted the claim by Jilmar for the first invoice amounting to Lit.3,200,000,000 in full but I accepted only that part of the second invoice which had actually been paid to the shipyard, Lit.1,603,932,206. No submissions were made to me concerning applicable conversion rates but, in his third statement, Sr. Pesce had used an exchange rate of US$1.00 = Lit.1,777.16 in respect of the first of the two main invoices and a rate of Lit.1,797.01 in respect of the second.  These are in line with exchange rates

9

published in The Financial Times in February and April, 1999. I accepted them and awarded the Owners the equivalent sums in US Dollars, namely US$1,800,630.00 and US$892,556.00.

## Summary

26.    I rejected the claim for loss of value and the alternative claim for diminution in value of the vessel due to the inability to carry the promised cargo since, had Jilmar not been persuaded to convert the vessel to carry toxic and corrosive cargoes, the modifications intended to permit her to carry such cargoes would not have been performed and the value of the vessel would not have been inflated by 3 million dollars or at all. I also rejected the claim for diminution in value due to the lack of any effective coating on completion of the alterations because, having made due allowance in Paragraph 22 above for the cost of coating the surfaces which replaced the stainless steel tanks, this had been the condition of the remainder of the vessel before the alterations were commenced. Recoating of these tanks would have been necessary in any event.

27.    I found that the Respondents were liable to the Claimants for the following items of claim.

(a)    Cost of recoating 25% of the internal cargo tank surfaces with an alternative coating, Lit.112,158,440.

(b)    Cost of agency expenses and survey fees incurred during recoating of the cargo tanks at La Spezia and Genoa following the failure of the Siloxirane coating, Lit.32,815,230.

(c)    Cost of hire for 55 days and 8 hours whilst re-coating of the cargo tanks was being performed, D.M.331,999.98 plus US$55,333.33

(d)    Invoices paid by Jilmar, and by Eoliana as loans to Jilmar, for modifications to the structure of the vessel and various items of machinery, including cargo handling equipment, emergency equipment etc as stated by Sr. Pesce and supported by invoices and bank statements produced to me, US$1,800,630.00 plus US$892,556.00.

I accordingly awarded the Claimants these sums.

28.    Some of the minor items of claim had been made in currencies that no longer exist. No submissions were made to me regarding their conversion to either Euros or US

Dollars and I awarded them in the original currencies. Had I been asked to convert them to US Dollars I would have used the appropriate exchange rates published in the Financial Times for 5th July, 1999, namely US$1.00 = Lit.1,894.68 and D.M.1.9138.

**Interest.**

29.     I awarded interest at 2½% above the applicable US Dollar LIBOR rate because two of the Respondents were US Companies and, no doubt because the US Dollar is the most frequently used currency in merchant shipping business, the bulk of the claim had originally been made in US Dollars. The invoices from Eoliana covering the costs involved in the recoating carried out in 1999 and their claim for "Off Hire" were dated 10th June 1999. The major invoice for conversion work which was paid by Jilmar was finally settled on 15th March, 1998. The invoice for conversion work which was paid by Eoliana as a loan to Jilmar had been finally settled on 12th October, 1998. I awarded interest at the appropriate rate to run from one month after each of the above dates.

**Costs**

30.     The Claimants have been substantially successful in their claims and I see no reason to vary the customary practice that costs should follow the event. Accordingly I find that the Claimants, Jilmar, are entitled to their costs in full.

# GEORGE LUGG

TEL: 020 7375 2575

FAX: 020 7375 2595



L.M.A.A.

1 WHITES ROW,
LONDON  E1 7NF

## FACSIMILE

Email : lugg@casebourne-leach.co.uk

To:-     Advanced Polymer Sciences Ltd
And:-     Guaranteed Advanced Tank Technology Ltd.
Att.     Denise Keehan
Fax No.     001 440 937 5046

21st November, 2005

And:-     Cantiere Navale Sec.
Fax No:     0039 0583 29 76 71

c.c.     Lloyd & Co.
Att     Michael Lloyd
Fax No:     7628 7661

Subject :-     m.v. "JORAN"
          Tank coating agreement dated 28th July, 1997

    The Final Arbitration Award on Quantum has been despatched to the Claimants' Solicitors after they paid my fees. A copy of the Award is attached to this fax and hard copies of the Award and the Reasons will be posted to APS tonight.

    If Dr. Del Prete will tell me the address to which he would like the Award and Reasons sent I will post them to him as soon as I receive that information.

With best regards,

George Lugg