IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NOVARTIS CORPORATION and NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>　　　　　　Plaintiffs,<br><br>　v.<br><br>TEVA PARENTERAL MEDICINES, INC., TEVA PHARMACEUTICALS USA, INC., and TEVA PHARMACEUTICAL INDUSTRIES LTD., <br><br>　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

　　　　　　　　　　Civil Action No. _____

## **COMPLAINT**

Plaintiffs Novartis Corporation and Novartis Pharmaceuticals Corporation (collectively, "Novartis"), by their attorneys, hereby allege as follows:

### **Nature of the Action**

1.　In this action, Novartis seeks to block Teva Parenteral Medicines, Inc. ("TPM"), Teva Pharmaceuticals USA, Inc.'s ("Teva USA") and Teva Pharmaceutical Industries Ltd's. ("Teva Israel") (collectively, "Teva") improper triggering of the litigation process that Congress has carefully constructed for resolving patent disputes when a drug company seeks approval to market a generic version of a branded drug by filing an Abbreviated New Drug Application ("ANDA").

2.　Upon information and belief, as of June 10, 2008, Teva did not have an ANDA with respect to any zoledronic acid product that had been received by the United States Food and Drug Administration ("FDA"). The receipt of an ANDA by the FDA is a prerequisite that must

be satisfied before Teva can send Novartis proper notification of the ANDA and a "Paragraph IV certification." Such a notice letter, if it were valid, would start a time period in which Novartis must sue for patent infringement in order to obtain a 30-month statutory delay during which the FDA cannot approve Teva's ANDA. However, since, upon information and belief, no Teva ANDA had been received by the FDA as of June 10, 2008, Teva could not send a valid notice letter to Novartis, and therefore, could not trigger Novartis's statutory right to sue for infringement or commence the 30-month stay.

3. Nonetheless, on June 10, 2008, Teva sent two purported Paragraph IV Notices (the "Teva Notice Letters") to Novartis regarding Teva's purported ANDA submissions (ANDA Nos. 78-576 and 78-580) to the FDA under 21 U.S.C. § 355(j)(2)(B) and 21 C.F.R. § 314.95, and stating that Novartis's U.S. Patent No. 4,939,130 (the "'130 patent") is either invalid, unenforceable, or will not be infringed by Teva's generic zoledronic acid products. Since, upon information and belief, Teva's ANDA submissions had not been received by the FDA as of June 10, 2008, the Teva Notice Letters are not lawful, and cannot trigger Novartis's right or obligation to sue Teva or begin the 30-month stay of ANDA approval under 21 U.S.C. § 355(j)(5)(B)(iii) and 21 C.F.R. § 314.107(b)(3).

4. Since Teva's premature attempt to trigger the ANDA patent litigation process is in violation of federal law, this Court should declare the Teva Notice Letters improper and without legal effect.

5. In addition, because Teva's proposed generic product(s) would infringe Novartis's '130 patent, the filing of a proper ANDA which is received by the FDA is an act of infringement under 35 U.S.C. § 271(e)(2). Accordingly, in the alternative, if the Teva Notice Letters are deemed sufficient by the Court to trigger the deadline for Novartis to sue Teva under 21 U.S.C. §

- 2 -

355(j)(5)(B)(iii) and 21 C.F.R. § 314.107(b)(3), Novartis hereby seeks all available relief under the patent laws of the United States, 35 U.S.C. § 100 *et seq.* and other applicable laws for Teva's infringement of the '130 patent.

### Parties

6. Novartis Corporation is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 608 5th Avenue, New York, New York.

7. Novartis Pharmaceuticals Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 59 Route 10, East Hanover, New Jersey.

8. Novartis is engaged in the business of creating, developing, and bringing to market innovative pharmaceutical products to prevent and cure diseases, to ease suffering, and to enhance patients' quality of life.

9. Upon information and belief, Teva Parenteral Medicines, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 19 Hughes, Irvine, California. Upon information and belief, Teva Parenteral Medicines, Inc. is a wholly-owned subsidiary of Teva Pharmaceuticals USA, Inc.

10. Upon information and belief, Teva Pharmaceuticals USA, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania. Upon information and belief, Teva Pharmaceuticals USA, Inc. is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd.

11. Upon information and belief, Teva Pharmaceutical Industries Ltd. is a corporation organized and existing under the laws of Israel, with its principal place of business at 5 Basel Street, Petah Tikva, Israel.

- 3 -

12. Upon information and belief, Teva is engaged in the business of manufacturing and marketing generic pharmaceuticals and TPM, Teva USA and Teva Israel acted collaboratively in the preparation and purported submission of Teva's ANDA Nos. 78-576 and 78-580.

## Jurisdiction and Venue

13. This action arises under the patent laws of the United States of America and this Court has jurisdiction over the subject-matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 1400(b), 2201 and 2202.

14. Teva is subject to personal jurisdiction in this judicial district.

15. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400(b) because TPM and Teva USA are incorporated in Delaware, and Teva Israel is subject to personal jurisdiction in Delaware.

## FACTUAL BACKGROUND

16. A company seeking to market a new pharmaceutical drug in the United States must first obtain approval from the FDA, typically through the filing of a New Drug Application ("NDA"). *See* 21 U.S.C. § 355(a). The sponsor of the NDA is required to submit information on all patents claiming the drug that is the subject of the NDA, or a method of using that drug, to the FDA, and the FDA then lists such patent information in its publication, the *Approved Drug Products with Therapeutic Equivalence Evaluations*, which is referred to as the "Orange Book." *See* 21 U.S.C. § 355(b)(1) and (c)(2).

17. A company seeking to market a generic version of a previously approved drug is not required to submit a full NDA. Instead, it may file an ANDA. *See* 21 U.S.C. § 355(j). The generic drug approval process is considered "abbreviated" because the generic manufacturer may piggyback on and take advantage of the innovator company's data and the FDA's prior finding

- 4 -

of safety and efficacy by demonstrating, among other things, that the generic product is bioequivalent to the previously-approved drug (the "listed" or "branded" drug).

18. In conjunction with this "abbreviated" application process, Congress has put in place a process for resolving patent disputes relating to generic drugs, pursuant to which an ANDA filer must provide certifications addressing each of the patents listed in the Orange Book for the branded drug. *See* 21 U.S.C. § 355(j)(2)(A)(vii); 21 C.F.R. § 314.94(a)(12). An ANDA filer may certify that it believes a patent is invalid or will not be infringed by the manufacture, use, or sale of the generic drug for which the ANDA is submitted. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(IV); 21 C.F.R. § 314.94(a)(12)(i)(A)(4). This certification is known as a "Paragraph IV Certification."

19. When an applicant submits an ANDA to the FDA, the FDA has 60 days to preliminarily review the application to ensure that it is sufficiently complete to permit substantive review. *See* 21 C.F.R. § 314.101. Only after the FDA notifies the applicant that its ANDA is substantially complete is the ANDA deemed to have been "received" or filed by the FDA.

20. The sponsor of an ANDA which is accepted for review by the FDA that contains a Paragraph IV Certification must provide notice to both the owner of the listed patent and the holder of the NDA for the reference listed drug. This "Paragraph IV Notice" must include a detailed statement of the factual and legal bases for the applicant's belief that the challenged patent is invalid or not infringed by the proposed generic product. *See* 21 U.S.C. § 355(j)(2)(B); 21 C.F.R. § 314.95. The federal regulations specifically govern the timing of such Paragraph IV Notifications by directing that the sending of such notices must occur after the FDA has

officially received the ANDA as "sufficiently complete" for review. *See* 21 U.S.C. § 355(j)(2)(B)(ii); 21 C.F.R. § 314.95(b).

21. If the patentee or NDA holder files a patent infringement action within 45 days of receiving a Paragraph IV Notice from an ANDA filer, final approval of the ANDA is generally subject to a 30-month stay. *See* 21 U.S.C. § 355(j)(5)(B)(iii); 21 C.F.R. § 314.107(b)(3). The 30-month stay is important to innovator companies, such as Novartis, because it protects them from the severe financial harm that could otherwise ensue from the FDA granting approval to a potentially infringing product without first providing an opportunity for the infringement case to be resolved. The innovator company is thus assured of a 30-month period during which it may enforce its intellectual property rights and resolve any patent dispute before the generic product enters the market. *See* 21 U.S.C. § 355(j)(5)(B)(iii).

22. There are powerful incentives for generic companies to obtain the earliest possible filing date by jumping the gun with incomplete ANDA filings. The earliest ANDA filer may be entitled to 180 days of market exclusivity, during which time no other ANDA filer may come to market with a competing generic product. *See* 21 U.S.C. § 355(j)(5)(B)(iv). By filing prematurely or notifying the NDA or patent-holder prematurely, the first ANDA filer may also be able to manipulate the rules surrounding the 30-month stay to its advantage and reach the market sooner than would otherwise be permitted.

23. Therefore, one of the important protections built into the ANDA process is that a generic applicant may not even send a Paragraph IV Notice until it "receives from the FDA an acknowledgement letter stating that its abbreviated new drug application is sufficiently complete to permit a substantive review." 21 C.F.R. § 314.95(b). The generic applicant must also include

- 6 -

in its Paragraph IV Notice a "statement that the FDA has received" the ANDA filings. *See* 21 C.F.R. § 314.95(c)(1).

24. These safeguards make simple common sense. Incomplete ANDAs risk burdening the judicial system with premature, and perhaps entirely unnecessary, patent infringement litigation. If the incomplete ANDA is never completed, the parties will be forced to conduct unnecessary and costly infringement litigation. Even if the incomplete ANDA is eventually completed, the premature filing would prejudice not only the innovator company, but also other ANDA filers. Accordingly, the ANDA applicant may not trigger the litigation process by serving a Paragraph IV Notice unless and until it has an ANDA on file that the FDA has accepted for substantive review.

### Novartis's '130 Patent

25. Novartis is the owner of the '130 patent, entitled "Substituted Alkanediphosphonic Acids and Pharmaceutical Use," which the United States Patent and Trademark Office duly and legally issued to inventors Knut A. Jaeggi and Leo Wilder on July 3, 1990. A true and correct copy of the patent is attached hereto as Exhibit A.

26. Novartis markets commercial formulations of zoledronic acid under the trade names Zometa® and Reclast®. Novartis holds two NDAs for Zometa® (NDA Nos. 21-386 and 21-223) and two approved NDAs for Reclast® (Nos. 21-817 and 22-080). The '130 patent is listed in the Orange Book with respect to both Zometa® and Reclast®.

### Teva's Notice Letters and ANDA Filings

27. In the Teva Notice Letters dated June 10, 2008, Teva notified Novartis that, pursuant to 21 U.S.C. § 355(j)(2)(B) and Section 505(j)(2)(B)(ii) of the Federal Food, Drug and Cosmetic Act, Teva was amending ANDA Nos. 78-576 and 78-580, which purportedly were previously submitted to the FDA, to seek approval to engage in the commercial manufacture, use, and sale

- 7 -

of injections containing "Eq. 4 mg Base/Vial" of zoledronic acid ("Teva ANDA Zoledronic Acid Injection") before the expiration date of the '130 patent.

28. Teva also notified Novartis in the Teva Notice Letters that each of its amended ANDA filings contained a "Paragraph IV Certification" asserting that, in Teva's opinion, the claims of the '130 patent are "invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use, or sale of Teva's Zoledronic Acid Injection before the expiration of the '130 patent."

29. The Teva Notice Letters do not contain the required "statement that the FDA has received" the ANDA filings. *See* 21 C.F.R. § 314.95(c)(1). The Teva Notice Letters state only that Teva is "submitting" an amendment to ANDA Nos. 78-576 and 78-580. Moreover, the FDA's online listing of reference drugs for which Paragraph IV ANDAs have been filed (http://www.fda.gov/cder/ogd/ppiv.htm), as updated on July 21, 2008, does not indicate that the FDA has received or accepted any Paragraph IV ANDAs for any form of zoledronic acid.

30. The current formulation of Zometa® is a liquid concentrate of zoledronic acid. The original (and discontinued) formulation of Zometa® was a lyophilized powder form of zoledronic acid, Eq. 4 mg Base/Vial. Accordingly, because the Teva Notice Letters refer only to Eq. 4 mg Base/Vial of zoledronic acid, upon information and belief, Teva is seeking approval of one or more generic versions of the discontinued formulation of Zometa®. As such, Teva was required, pursuant to 21 C.F.R. § 314.122, to submit a petition seeking the FDA's determination as to whether the discontinued version of Zometa® was withdrawn from the market for safety or efficacy reasons. Upon information and belief, Teva has not done so.

31. Accordingly, upon information and belief, the Teva Notice Letters were submitted prematurely, in violation of 21 U.S.C. § 355(j)(2)(B)(ii).

- 8 -

32. This action is being commenced before the expiration of forty-five days from the date Novartis received the Teva Notice Letters.

**Count I**

**(A Declaration that Teva's Notice Letters Are Null, Void and Without Legal Effect)**

33. Each of the preceding paragraphs 1-32 is incorporated as if fully set forth herein.

34. The Teva Notice Letters did not include a "statement that the FDA has received" the ANDA filings. Upon information and belief, at the time Teva sent the Teva Notice Letters, the FDA had not received an ANDA from Teva for the Teva ANDA Zoledronic Acid Injection. Therefore, Teva has no legitimate basis to trigger the ANDA patent litigation process.

35. Upon information and belief, Teva is seeking approval of one or more generic versions of the discontinued formulation of Zometa$^{®}$. Teva did not, as it is required to do, submit a petition seeking the FDA's determination as to whether the discontinued version of Zometa$^{®}$ was withdrawn from the market for safety or efficacy reasons.

36. As a consequence, Teva's Notice Letters are improper, null, void, and without legal effect, and Teva has improperly triggered the ANDA litigation process.

37. The controversy concerning the validity and effectiveness of the Teva Notice Letters will cause Novartis to suffer substantial prejudice and unnecessary legal fees and costs unless the controversy and the surrounding cloud of uncertainty is resolved by the Court.

38. Accordingly, Novartis is entitled to a declaration that: (1) the Teva Notice Letters are improper, null, void, and without legal effect and that Teva was not entitled to trigger the ANDA patent litigation process; (2) this Court has no jurisdiction over Novartis's claims regarding the '130 patent because the Teva Notice Letters are null, void, and without legal effect; (3) the Teva Notice Letters did not commence the 45 day period in which to file a patent infringement action pursuant to 21 U.S.C. § 355(j)(5)(B)(iii); (4) if and when the FDA receives and accepts Teva's

ANDA Nos. 78-576 and/or 78-580, Teva must serve new Paragraph IV Notice Letters on Novartis pursuant to 21 U.S.C. § 355(j)(2)(A)(vii); and (5) the 30-month stay will not commence until Teva has sent valid Paragraph IV Notice Letters to Novartis following the FDA's receipt of each of Teva's ANDA Nos. 78-576 and 78-580.

## Count II

### (Infringement of United States Patent No. 4,939,130)

39. Each of the preceding paragraphs 1 to 38 is incorporated as if fully set forth herein.

40. Teva's submission of amended ANDA Nos. 78-576 and 78-580 to obtain approval to engage in the commercial manufacture, use, offer to sell or sale of the Teva ANDA Zoledronic Acid Injection prior to the expiration of the '130 patent constitutes infringement of one or more of the valid claims of the '130 patent under 35 U.S.C. § 271(e)(2)(A).

41. Upon FDA approval of Teva's amended ANDA Nos. 78-576 and 78-580, Teva will further infringe the '130 patent by making, using, offering to sell, and selling the Teva ANDA Zoledronic Acid Injection in the United States, and by actively inducing and contributing to infringement by others, unless enjoined by this Court.

42. Novartis will be substantially and irreparably damaged and harmed if Teva's infringement of the '130 patent is not enjoined. Novartis does not have an adequate remedy at law.

## Prayer for Relief

WHEREFORE, Novartis prays that this Court grant the following relief:

(a)     An Order to preliminarily and permanently enjoin Teva (1) to withdraw its improper and ineffective Notice Letters; and (2) to refrain from sending any new Notice Letters to Novartis unless and until the FDA has notified Teva that its ANDAs have been received for review;

- 10 -

(b)      A declaration that (1) the Teva Notice Letters are improper, null, void, and without legal effect and that Teva was not entitled to trigger the ANDA patent litigation process; (2) this Court has no jurisdiction over Novartis's claims regarding the '130 patent because the Teva Notice Letters are null, void, and without legal effect; (3) the Teva Notice Letters did not commence the 45 day period in which to file a patent infringement action pursuant to 21 U.S.C. § 355(j)(5)(B)(iii); (4) if and when the FDA receives Teva's ANDA Nos. 78-576 and 78-580, Teva must serve new Paragraph IV Notice Letters on Novartis pursuant to 21 U.S.C. § 355(j)(2)(A)(vii); and (5) the 30-month stay will not begin until Teva has sent valid Paragraph IV Notice Letters to Novartis following the FDA's receipt and acceptance of Teva's ANDA Nos. 78-576 and 78-580;

(c)      A declaration that the '130 patent is valid and enforceable;

(d)      A judgment that a claim or claims of the '130 patent are infringed by the Teva ANDA Zoledronic Acid Injection, that Teva's submission of its amended ANDA Nos. 78-576 and 78-580 is an act of infringement, and that Teva's making, using, offering to sell, selling, or importing the Teva ANDA Zoledronic Acid Injection will infringe the '130 patent;

(e)      An Order pursuant to 35 U.S.C. § 271(e)(4)(A) providing that the effective date of any approval of Teva's amended ANDA No. 78-576 shall be a date which is not earlier than the expiration date of the '130 patent;

(f)      An Order pursuant to 35 U.S.C. § 271(e)(4)(A) providing that the effective date of any approval of Teva's amended ANDA No. 78-580 shall be a date which is not earlier than the expiration date of the '130 patent;

(g)      An Order permanently enjoining Teva, and its affiliates and subsidiaries, and each of their officers, agents, servants and employees, from making, using, offering to sell,

selling, or importing the Teva ANDA Zoledronic Acid Injection until after the expiration date of the '130 patent;

(h)    Damages or other monetary relief to Novartis if Teva engages in the commercial manufacture, use, offer to sell, sale, or importation of the Teva ANDA Zoledronic Acid Injection prior to the expiration date of the '130 patent;

(i)    A declaration that this is an exceptional case and an award of attorneys' fees pursuant to 35 U.S.C. § 285;

(j)    Reasonable costs of suit incurred by Novartis in this action; and

(k)    Such further and other relief as this Court deems proper and just.

OF COUNSEL:

William F. Lee
Lisa J. Pirozzolo
Vinita Ferrera
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts  02109
(617) 526-6000

Dated:  July 24, 2008

_Anne Shea Gaza_

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
RICHARDS LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
(302) 651-7700

*Attorneys for*
*NOVARTIS CORPORATION AND NOVARTIS*
*PHARMACEUTICALS CORPORATION*

RLF1-3305890-1

# EXHIBIT A

# United States Patent [19]

## Jaeggi et al.

[11] **Patent Number:** **4,939,130**

[45] **Date of Patent:** **Jul. 3, 1990**

[54] **SUBSTITUTED ALKANEDIPHOSPHONIC ACIDS AND PHARMACEUTICAL USE**

[75] Inventors: Knut A. Jaeggi, Basel; Leo Widler, Müchenstein, both of Switzerland

[73] Assignee: Ciba-Geigy Corporation, Ardsley, N.Y.

[21] Appl. No.: 315,962

[22] Filed: Feb. 27, 1989

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 120,284, Nov. 13, 1987, abandoned.

[30] Foreign Application Priority Data

Nov. 21, 1986 [CH] Switzerland ..................... 4666/86

[51] Int. Cl.$^5$ ..................... A61K 31/675; C07F 9/65
[52] U.S. Cl. ..................... 514/94; 514/92; 514/93; 548/112; 548/119
[58] Field of Search ............. 548/119, 112; 514/92, 514/93, 94

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,503,049 | 3/1985 | Biere et al. | 514/80 |
| 4,687,767 | 8/1987 | Bosies et al. | 514/89 |
| 4,777,163 | 10/1988 | Bosies et al. | 514/80 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0084822 | 8/1983 | European Pat. Off. |
| 186405 | 7/1986 | European Pat. Off. |
| 0258618 | 3/1988 | European Pat. Off. |
| 3203307 | 7/1983 | Fed. Rep. of Germany |
| 3428524 | 2/1986 | Fed. Rep. of Germany |

### OTHER PUBLICATIONS

CA 105:134140r (1986).

*Primary Examiner*—Richard L. Raymond
*Attorney, Agent, or Firm*—JoAnn Villamizar

[57] **ABSTRACT**

Alkanediphosphonic acids, in particular heteroarylalkanediphosphonic acids of formula

$$R_1{-}CH_2{-}\underset{PO_3H_2}{\overset{PO_3H_2}{C}}{-}R_2, \qquad (I)$$

wherein $R_1$ is a 5-membered heteroaryl radical which may be fused with benzene or cyclohexene nuclei and which contains, as hetero atoms, 2 to 4 N-atoms or 1 or 2 N-atoms as well as 1 O- or S-atom, and which is unsubstituted or C-substituted by lower alkyl, phenyl or phenyl which is substituted by lower alkyl, lower alkoxy and/or halogen, or by lower alkoxy, hydroxy, di-lower alkylamino, lower alkylthio and/or halogen, and/or is N-substituted at a N-atom which is capable of substitution by lower alkyl, lower alkoxy and/or halogen, and $R_2$ is hydrogen, hydroxy, amino, lower alkylthio or halogen, and salts thereof, have regulatory action on calcium metabolism and can be used as medicaments for the treatment of diseases associated with impairment of calcium metabolism. The compounds are obtained for example by converting, in a compound of formula

$$R_1{-}CH_2{-}\underset{X_2}{\overset{X_1}{C}}{-}R_2, \qquad (II)$$

wherein $X_1$ is a functionally modified phosphono group and $X_2$ is a free or functionally modified phosphono group, $X_1$ and, if appropriate $X_2$, into the free phosphono group.

5 Claims, No Drawings

4,939,130

1

## SUBSTITUTED ALKANEDIPHOSPHONIC ACIDS AND PHARMACEUTICAL USE

This is a Continuation-in-Part-Application of our patent application Ser. No. 07/120,284, filed November 13, 1987, now abandoned.

The present invention relates to novel substituted alkanediphosphonic acids, in particular to heteroarylalkanediphosphonic acids of formula

$$R_1-CH_2-\overset{\overset{\displaystyle PO_3H_2}{|}}{\underset{\underset{\displaystyle PO_3H_2}{|}}{C}}-R_2, \qquad (I)$$

wherein $R_1$ is a 5-membered heteroaryl radical which contains, as hetero atoms, 2 to 4 N-atoms or 1 or 2 N-atoms as well as 1 O- or S-atom, and which is unsubstituted or C-substituted by lower alkyl, phenyl or phenyl which is substituted by lower alkyl, lower alkoxy and/or halogen, or by lower alkoxy, hydroxy, dilower alkylamino, lower alkylthio and/or halogen, and/or is N-substituted at a N-atom which is capable of substitution by lower alkyl, lower alkoxy and/or halogen, and $R_2$ is hydrogen, hydroxy, amino, lower alkylthio or halogen, and to the salts thereof, to the preparation of said compounds, to pharmaceutical compositions containing them, and to the use thereof as medicaments.

Examples of 5-membered heteroaryl radicals containing 2 to 4 N-atoms or 1 or 2 N-atoms as well as 1 O- or S-atom as hetero atoms are: imidazolyl, e.g. imidazol-1-yl, imidazol-2-yl or imidazol-4-yl, pyrazolyl, e.g. pyrazol-1-yl or pyrazol-3-yl, thiazolyl, e.g. thiazol-2-yl or thiazol-4-yl, or, less preferably, oxazolyl, e.g. oxazol-2-yl or oxazol-4-yl, isoxazolyl, e.g. isooxazol-3-yl or isooxazol-4-yl, triazolyl, e.g. 1H-1,2,4-triazol-1-yl, 4H-1,2,4-triazol-3-yl or 4H-1,2,4-triazol-4-yl or 2H-1,2,3-triazol-4-yl, tetrazolyl, e.g. tetrazol-5-yl, thiadiazolyl, e.g 1,2,5-thiadazol-3-yl, and oxdiazolyl, e.g. 1,3,4-oxadiazol-2-yl. These radicals may contain one or more identical or different, preferably one or two identical or different, substituents selected from the group mentioned at the outset. Radicals $R_1$, unsubstituted or substituted as indicated, are e.g. imidazol-2-yl or imidazol-4-yl radicals which are unsubstituted or C-substituted by phenyl or phenyl which is substituted as indicated, or which are C- or N-substituted by $C_1$–$C_4$alkyl, e.g. methyl, and are typically imidazol-2-yl, 1-$C_1$–$C_4$alkylimidazol-2-yl such as 1-methylimidazol-2-yl, or 2- or 5-$C_1$–$C_4$alkylimidazol-4-yl such as 2- or 5-methylimidazol-4-yl, unsubstituted thiazolyl radicals, e.g. thiazol-2-yl, or 1H-1,2,4-triazol radicals, unsubstituted or substituted by $C_1$–$C_4$alkyl such as methyl, e.g. 1-$C_1$–$C_4$alkyl-1H-1,2,4-triazol-5-yl such as 1-methyl-1H-1,2,4-triazol-5-yl, or imidazol-1-yl, pyrazolyl-1-yl, 1H-1,2,4-triazol-1-yl, 4H-1,2,4-triazol-4-yl or tetrazol-1-yl radicals, unsubstituted or C-substituted by phenyl or phenyl which is substituted as indicated or by $C_1$–$C_4$alkyl such as methyl, for example imidazol-1-yl, 2-, 4- or 5-$C_1$–$C_4$alkylimidazol-1-yl such as 2-, 4- or 5-methylimidazol-1-yl, pyrazol-1-yl, 3- or 4-$C_1$–$C_4$alkylpyrazol-1-yl such as 3- or 4-methylpyrazol-1-yl, 1H-1,2,4-tetrazol-1-yl, 3-$C_1$–$C_4$alkyl-1H-1,2,4-triazol-1-yl such as 3-methyl-1H-1,2,4-triazol-1-yl, 4H-1,2,4-triazol-

2

1-yl, 3-$C_1$–$C_4$alkyl-4H-1,2,4-triazol-4-yl such as 3-methyl-4H-1,2,4-triazol-4-yl or 1H-1,2,4-tetrazol-1-yl.

Radicals and compounds hereinafter qualified by the term "lower" will be understood as meaning typically those containing up to 7 carbon atoms inclusive, preferably up to 4 carbon atoms inclusive. The general terms have for example the following meanings:

Lower alkyl is for example $C_1$–$C_4$alkyl such as methyl, ethyl, propyl or butyl, and also isobutyl, sec-butyl or tert-butyl, and may further be $C_5$–$C_7$alkyl such as pentyl, hexyl or heptyl.

Phenyl-lower alkyl is for example phenyl-$C_1$–$C_4$alkyl, preferably 1-phenyl-$C_1$–$C_4$alkyl such as benzyl.

Lower alkoxy is for example $C_1$–$C_4$alkoxy such as methoxy, ethoxy, propoxy, isopropoxy, butoxy, isobutoxy, sec-butoxy or tert-butoxy.

Di-lower alkylamino is for example di-$C_1$–$C_4$alkylamino such as dimethylamino, diethylamino, N-ethyl-N-methylamino, dipropylamino, N-methyl-N-propylamino or dibutylamino.

Lower alkylthio is for example $C_1$–$C_4$alkylthio such as methylthio, ethylthio, propylthio or butylthio, and also isobutylthio, sec-butylthio or tert-butylthio.

Halogen is for example halogen having an atomic number of up to 35 inclusive, such as fluorine, chlorine or bromine.

Salts of compounds of formula I are in particular the salts thereof with pharmaceutically acceptable bases, such as non-toxic metal salts derived from metals of groups Ia, Ib, IIa and IIb, e.g. alkali metal salts, preferably sodium or potassium salts, alkaline earth metal salts, preferably calcium or magnesium salts, copper, aluminium or zinc salts, and also ammonium salts with ammonia or organic amines or quaternary ammonium bases such as free or C-hydroxylated aliphatic amines, preferably mono-, di- or tri-lower alkylamines, e.g. methylamine, ethylamine, dimethylamine or diethylamine, mono-, di- or tri(hydroxy-lower alkyl)amines such as ethanolamine, diethanolamine or triethanolamine, tris(hydroxymethyl)aminomethane or 2-hydroxy-tert-butylamine, or N-(hydroxy-lower alkyl)-N,N-di-lower alkylamines or N-(polyhydroxy-lower alkyl)-N-lower alkylamines such as 2-(dimethylamino)ethanol or D-glucamine, or quaternary aliphatic ammonium hydroxides, e.g. with tetrabutylammonium hydroxide.

In this connection it should also be mentioned that the compounds of formula I may also be obtained in the form of inner salts, provided the group $R_1$ is sufficiently basic. These compounds can therefore also be converted into the corresponding acid addition salts by treatment with a strong protic acid such as a hydrohalic acid, sulfuric acid, sulfonic acid, e.g. methanesulfonic acid or p-toluenesulfonic acid, or sulfamic acid, e.g. N-cyclohexylsulfamic acid.

The compounds of formula I and salts thereof have valuable pharmacological properties. In particular, they have a pronounced regulatory action on the calcium metabolism of warm-blooded animals. Most particularly, they effect a marked inhibition of bone resorption in rats, as can be demonstrated in the experimental procedure described in Acta Endrocinol 78, 613–24 (1975), by means of the PTH-induced increase in the serum calcium level after subcutaneous administration of doses in the range from about 0.01 to 1.0 mg/kg, as well as in the TPTX (thyroparathyroidectomised) rat model by means of hypercalcaemia induced by vitamin $D_3$ after subcutaneous administration of a dose of about 0.0003 to 1.0 mg. Tumor calcaemia induced by Walker 256 tu-

4,939,130

| 3 | 4 |

mors is likewise inhibited after peroral administration of about 1.0 to 100 mg/kg. In addition, when administered subcutaneously in a dosage of about 0.001 to 1.0 mg/kg in the experimental procedure according to Newbould, Brit. J. Pharmacology 21, 127 (1963), and according to Kaibara et al., J. Exp. Med. 159, 1388–96 (1984), the compounds of formula I and salts thereof effect a marked inhibition of the progression of arthritic conditions in rats with adjuvant arthritis. They are therefore eminently suitable for use as medicaments for the treatment of diseases which are associated with impairment of calcium metabolism, for example inflammatory conditions in joints, degenerative processes in articular cartilege, of osteoporosis, periodontitis, hyperparathyroidism, and of calcium deposits in blood vessels or prothetic implants. Favourable results are also achieved in the treatment of diseases in which an abnormal deposit of poorly soluble calcium salts is observed, as in arthritic diseases, e.g. ancylosing spondilitis, neuritis, bursitis, periodontitis and tendinitis, fibrodysplasia, osteoarthrosis or arteriosclerosis, as well as those in which an abnormal decomposition of hard body tissue is the principal symptom, e.g. heriditary hypophosphatasia, degenerative states of articular cartilege, osteoporosis of different provenance, Paget's disease and osteodystrophia fibrosa, and also osteolytic conditions induced by tumors.

The invention relates in particular to compounds of formula I, wherein $R_1$ is an imidazolyl, pyrazolyl, 2H-1,2,3-triazolyl, 1H-1,2,4-triazolyl or 4H-1,2,4-triazolyl, tetrazolyl, oxazolyl, isoxazolyl, oxadiazolyl, thiazolyl or thiadiazolyl radical which is unsubstituted or C-substituted by one or two members selected from lower alkyl, lower alkoxy, phenyl or phenyl which is in turn substituted by one or two members selected from lower alkyl, lower alkoxy and/or halogen, hydroxy, di-lower alkylamino, lower alkylthio and/or halogen, and/or is N-substituted at a N-atom which is capable of substitution by lower alkyl or phenyl-lower alkyl which is unsubstituted or substituted by one or two members selected from lower alkyl, lower alkoxy and/or halogen; and $R_2$ is hydrogen, hydroxy, amino, lower alkylthio or halogen, and salts thereof, especially the inner salts and pharmaceutically acceptable salts thereof with bases.

The invention related more particularly for example to compounds of formula I, wherein $R_1$ is an imidazolyl, pyrazolyl, 2H-1,2,3-triazolyl or 4H-1,2,4-triazolyl, tetrazolyl, oxazolyl, isoxazolyl, oxadiazolyl, thiazolyl or thiadiazolyl radical which is unsubstituted or C-substituted by one or two members selected from lower alkyl, lower alkoxy, phenyl or phenyl which is in turn substituted by one or two members selected from lower alkyl, lower alkoxy and/or halogen, hydroxy, di-lower alkylamino, lower alkylthio and/or halogen, and/or is N-substituted at a N-atom which is capable of substitution by lower alkyl or phenyl-lower alkyl which is unsubstituted or substituted by one or two members selected from lower alkyl, lower alkoxy and/or halogen; and $R_2$ is hydrogen, hydroxy, amino, lower alkylthio or halogen, and salts thereof, especially the inner salts and pharmaceutically acceptable salts thereof with bases.

The invention relates most particularly to compounds of formula I, wherein $R_1$ is an imidazolyl radical, such as imidazol-1-yl, imidazol-2-yl or imidazol-4-yl, a 4H-1,2,4-triazolyl radical such as 4H-1,2,4-triazol-4-yl, or a thiazolyl radical such as thiazol-2-yl, which radical is

unsubstituted or C-substituted by one or two members selected from $C_1$–$C_4$alkyl such as methyl, $C_1$–$C_4$alkoxy such as methoxy, phenyl, hydroxy, di-$C_1$–$C_4$alkylamino such as dimethylamino or diethylamino, $C_1$–$C_4$alkylthio such as methylthio, and/or halogen having an atomic number up to 35 inclusive such as chlorine, and/or is N-substituted at a N-atom which is capable of substitution by $C_1$–$C_4$alkyl such as methyl, or phenyl-$C_1$–$C_4$alkyl such as benzyl; and $R_2$ is preferably hydroxy or, less preferably, hydrogen or amino, and salts thereof, especially the inner salts and pharmaceutically acceptable salts thereof with bases.

The invention preferably relates on the one hand to compound of formula I, wherein $R_1$ is an imidazol-2- or -4-yl radical which is unsubstituted or C-substituted by phenyl or C- or N-substituted by $C_1$–$C_4$alkyl such as methyl, e.g. imidazol-2-yl, 1-$C_1$–$C_4$alkylimidazol-2-yl such as 1-methylimidazol-2-yl, or 2- or 5-$C_1$–$C_4$alkylimidazol-4-yl such as 2- or 5-methylimidazol-4-yl, or is an unsubstituted thiazolyl radical, e.g. thiazol-2-yl, or is a 1H-1,2,4-triazolyl radical which is unsubstituted or substituted by $C_1$–$C_4$alkyl such as methyl, e.g. 1C$_1$–C$_4$alkyl-1H-1,2,4-triazol-5-yl such as 1-methyl-1H-1,2,4-triazol-5-yl, and $R_2$ is hydroxy or, less preferably, hydrogen, and salts, especially pharmaceutically acceptable salts, thereof.

The invention preferably relates on the other hand to compounds of formula I, wherein $R_1$ is an imidazol-1-yl, pyrazol-1-yl, 1H-1,2,4-triazol-1-yl, 4H-1,2,4-triazol-4-yl or tetrazol-1-yl radical which is unsubstituted or C-substituted by phenyl or $C_1$–$C_4$alkyl such as methyl, e.g. imidazol-1-yl, 2-, 4- or 5-$C_1$–$C_4$alkylimidazol-1-yl such as 2-, 4- or 5-methylimidazol-1-yl, pyrazol-1-yl, 3- or 4-$C_1$–$C_4$alkylpyrazol-1-yl such as 3- or 4-methylpyrazol-1-yl, 1H-1,2,4-tetrazol-1-yl, 3-$C_1$–$C_4$alkyl-1H-1,2,4-triazol-1-yl such as 3-methyl-1H-1,2,4-triazol-1-yl, 4H-1,2,4-triazol-1-yl, 3-$C_1$–$C_4$alkyl-4H-1,2,4-triazol-4-yl such as 3-methyl-4H-1,2,4-triazol-4-yl or 1H-tetrazol-1-yl, and $R_2$ is hydroxy or, less preferably, hydrogen, and salts, especially pharmaceutically acceptable salts, thereof.

The invention relates first and foremost to compounds of formula I, wherein $R_1$ is an imidazolyl radical which is unsubstituted or substituted by $C_1$–$C_4$alkyl such as methyl, e.g. imidazol-1-yl, imidazol-2-yl, 1-methylimidazol-2-yl, imidazol-4-yl or 2- or 5-methylimidazol-4-yl, and $R_2$ is hydroxy or, less preferably, hydrogen, and salts, especially pharmaceutically acceptable salts, thereof.

The invention relates specifically to the compounds of formula I and the salts thereof, especially the inner salts and pharmaceutically acceptable salts thereof with bases mentioned in the Examples.

The invention further relates to a process based on per se known methods for the preparation of compounds of formula I and salts thereof, which process comprises

(a) in a compound of formula

$$R_1{-}CH_2{-}\overset{\displaystyle X_1}{\underset{\displaystyle X_2}{C}}{-}R_2. \qquad (II)$$

wherein $X_1$ is a functionally modified phosphono group and $X_2$ is a free or functionally modified phosphono group, which compound may be temporarily protected

4,939,130

5

at a N-atom of the radical $R_1$ which is capable of substitution, converting $X_1$ and, if appropriate $X_2$, into the free phosphono group; or

(b) reacting a compound of formula

$$R_1—CH_2—X_3, \tag{III}$$

wherein $X_3$ is a carboxy, carbamyl, imino ether, imino ester or cyano group, which compound may be temporarily protected at a N-atom of the radical $R_1$ which is capable of substitution, with phosphorous acid and phosphorus trichloride, and where a start is made from a compound of formula III, wherein $X_3$ is a carbamyl, imino ether, imino ester or cyano group, the subsequent hydrolysis yields a compound of formula I, wherein $R_2$ is amino, and, if desired, converting a resultant compound into another compound of formula I and/or a resultant free compound into a salt or a resultant salt into the free compound or into another salt.

In process variant (a), functionally modified phosphono groups to be converted into phosphono are for example in ester form, preferably in a diester form of formula —$P(=O)(OR)_2$ (IV), wherein OR is e.g. lower alkoxy or a phenoxy group which is unsubstituted or substituted by lower alkyl, lower alkoxy, halogen, trifluoromethyl and/or hydroxy.

The conversion of a functionally modified phosphono group into the free phosphono group is effected in conventional manner by hydrolysis, for example in the presence of a mineral acid such as hydrobromic acid, hydrochloric acid or sulfuric acid, or by reaction with a tri-lower alkylhalosilane, e.g. with trimethylchlorosilane in the presence of sodium iodide, or preferably with trimethyliodosilane or trimethylbromosilane, preferably with cooling, e.g. in the temperature range from about 0° to 25° C.

The starting materials of formula II, wherein $R_2$ is hydroxy or amino, can be prepared for example by reacting a compound of formula

$$R_1—CH_2—COOH \tag{IIa}$$

or preferably the nitrile or acid chloride thereof, with a suitable triphosphite of formula $P(OR)_3$ (IIb), wherein R is e.g. lower alkyl, in the presence of a tri-lower alkylamine, e.g. triethylamine, to give an intermediate, presumably a compound of formula

$$R_1—CH_2—\overset{\overset{\displaystyle OR}{|}}{\underset{\underset{\displaystyle R_2'}{||}}{C}}—\overset{\displaystyle ||}{P}—OR \qquad \text{(IIc; } R_2' = \text{oxo, imino)}$$

and subsequently reacting said compound with a diphosphite of formula H—$P(=O)(OR)_2$ (IId) or $P(OH)$-$(OR)_2$ (IIe), wherein R is e.g. lower alkyl, in the presence of a di-lower alkylamine, e.g. diethylamine, or of an alkali metal lower alkanolate, e.g. sodium methanolate, to the corresponding compound of formula

$$R_1—CH_2—\overset{\overset{\displaystyle O=\overset{\displaystyle OR}{\overset{|}{P}}—OR}{|}}{\underset{\underset{\displaystyle OR}{|}}{\underset{\displaystyle O=P—OR}{C}}}—R_2'' \qquad \text{(IIf; } R_2'' = \text{hydroxy, amino)}$$

6

Compounds of formula IIa are obtained for example by converting a suitable compound of formula

$$R_1—CH_3 \tag{IIIa}$$

with a strong base, for example one of the metal bases mentioned in process variant (a), into the carbenate salt, and reacting said salt with carbon dioxide, or by converting a compound of formula

$$R_1—CH_2—Y \tag{IIg}$$

wherein Y is reactive esterified hydroxy, preferably halogen such as bromine, with an alkali metal cyanide, e.g. with sodium or potassium cyanide, into the corresponding nitrile (IIg; Y=CN), and hydrolysing the nitrile to the acid, preferably under basic conditions.

Starting materials II, wherein $R_2$ is hydrogen, are obtained for example by reacting a compound of formula

$$R_1—CH_2—Y \tag{IIg}$$

wherein Y is reactive esterified hydroxy, preferably halogen such as bromine, in the presence of a metal base such as the hydride, an amide or a hydrocarbon compound of an alkali metal, e.g. sodium hydride, sodium amide, ditrimethylsilyl sodium amide or butyl lithium, with a methane diphosphonate, e.g. of formula

$$\begin{array}{c} OR \\ | \\ O=P—OR \\ | \\ CH_2 \\ | \\ O=P—OR, \\ | \\ OR \end{array} \tag{IIh}$$

wherein R is for example lower alkyl.

Starting materials of formula II, wherein the radical $R_1$ is bound through a N-atom and $R_2$ is hydrogen or hydroxy, can also be prepared by reacting an appropriate compound of formula

$$R_1—H \tag{IIi}$$

in the presence of a strong metal base such as an alkali metal hydride or an alkaline earth metal hydride, e.g. sodium hydride, with a compound of formula

$$\begin{array}{cc} \overset{\displaystyle X_1}{|} & \overset{\displaystyle O}{\diagup}\overset{\displaystyle X_1}{} \\ CH_2{=}C{—}X_2 \text{ (IIj1) bzw } CH_2{=}C{\diagdown}X_2 & \text{(IIj2).} \end{array}$$

wherein $X_1$ and $X_2$ are preferably groups of formula IV.

Compounds of formula II, wherein $R_2$ is lower alkylthio or halogen, can be prepared for example starting from the corresponding compounds II, wherein $R_2$ is hydrogen, by converting these with a strong base, e.g. one of those mentioned above, into the carbenate salt and subsequently reacting said salt with a lower alkylthio donor, for example a di-lower alkyl disulfide or a lower alkanesulfenyl chloride, or with a halogen donor, for example a halogen such as chlorine or bromine, perchloryl fluoride (FClO$_3$) or the like.

In starting materials of formula III for process variant (b), imino ether and imino ester groups are for example

4,939,130

7

those of formula —C(=NH)-$X_3'$ (III'), wherein $X_3'$ is etherified or esterified hydroxy such as lower alkoxy, a phenoxy group, lower alkanoyloxy, a benzoyloxy group or a halogen atom, e.g. a chlorine atom. Compounds of formula III, wherein $X_3$ is a group of formula III', can also be in the form of salts such as mineral acid salts, e.g. hydrohalides.

The reaction of compounds of formula III with phosphorous acid and phosphorus trichloride is carried out in conventional manner, such that the phosphorous acid component is preferably formed in situ by reacting excess phosphorus trichloride with aqueous phosphoric acid, e.g. with commercial phosphoric acid having a strength of about 75 to 95%, preferably of about 85%. The reaction is conveniently carried out with heating, e.g. in the temperature range from about 70° to 120° C., in a suitable solvent such as tetrachloroethane, trichloroethane, chlorobenzene, chlorotoluene or paraffin oil, and with working up by hydrolysis.

The starting materials of formula III, if not known, can be prepared for example by converting an appropriate compound of formula

$$R_1—CH_3 \qquad\qquad (III_a)$$

with a strong base, for example with one of the metal bases mentioned in process variant (a), into the carbeniate salt and reacting said salt with carbon dioxide or with a compound of formula Y-$X_3$ (IIIb), wherein Y is halogen such as chlorine or bromine, e.g. with a carbamyl halide, imino ether halide or, preferably, with a cyanogen halide such as cyanogen chloride.

For the temporary protection of a N-atom of the radical $R_1$ which is capable of substitution there may be suitably employed the customary N-protective groups and methods of introducing and removing same, for example di-lower alkoxymethyl groups such as dimethoxymethyl, which can be removed by treatment with an acid, and 2,2,2-trihaloethoxycarbonyl radicals such as 2,2,2-triiodo-, 2,2,2-tribromo- or 2,2,2-trichloroethoxycarbonyl radicals, which may be removed for example by treatment with zinc in acetic acid, α-phenyl-lower alkoxycarbonyl radicals such as carbobenzoxy or trityl, which can be removed for example by catalytic hydrogenation, as well as lower alkanesulfonyl groups such as methanesulfonyl, which can be removed for example by treatment with bis(2-methoxyethoxy) sodium aluminium hydride; and also α-phenylalkyl or alkyl groups, the removal of which will be discussed below.

Compounds of formula I obtained by the process of this invention or by other per se known processes can be converted into other compounds of formula I in a manner known per se.

Thus, for example, compounds of formula I, wherein $R_2$ is amino, can be converted by treatment with nitrous acid into the corresponding compounds of formula I', wherein $R_2$ is hydroxy. The treatment with nitrous acid is effected in conventional manner with formation of same in aqueous solution from a salt thereof, e.g. from sodium nitrite, by treatment with an acid, e.g. hydrochloric acid, to form a corresponding unstable diazonium salt as intermediate, e.g. diazonium chloride, which splits off nitrogen upon introduction of the α-hydroxy group.

In compounds of formula I, wherein the radical $R_1$ is N-substituted by lower alkyl or by phenyl-lower alkyl which is unsubstituted or substituted by lower alkyl, lower alkoxy and/or halogen, it is also possible to remove the N-sustituent lower alkyl for example by treat-

8

ment with a haloformate such as a lower alkyl bromoformate or lower alkylchloroformate, and subsequent hydrolysis of the resultant carbamate, and α-phenyl-lower alkyl radicals by hydrogenolysis, e.g. treatment with hydrogen in the presence of a hydrogenation catalyst, e.g. palladium on carbon and/or platinum oxide, or by reduction with a metal, e.g. treatment with an alkali metal in ammonia.

Free compounds of formula I, including the inner salts thereof of formula I, can be converted into basic salts by partial or complete neutralisation with one of the bases mentioned at the outset. In similar manner, it is also possible to convert acid addition salts into the corresponding free compounds or their inner salts.

Conversely, free compounds of formula I can be converted into acid addition salts of formula I'' by treatment with one of the protic acids mentioned at the outset.

Salts can be converted in a manner known per se into the free compounds, for example by treatment with an acid reagent such as a mineral acid, or a base, e.g. an alkali metal hydroxide solution.

The compounds, including their salts, can also be obtained in the form of hydrates or may contain the solvent used for crystallisation in their crystal structure.

Because of the close relationship between the novel compounds in the free form and in the form of their salts, the references made throughout this specification to the free compounds and their salts also apply by analogy to the corresponding salts and free compounds.

The invention also relates to those embodiments of the process in which a compound obtainable as intermediate at any stage of the process is used as starting material and the remaining steps are carried out, or a starting material is used in the form of a salt or, preferably, is formed under the reaction conditions.

In the process of this invention it is preferred to use those starting materials that result in the compounds described at the outset as being especially preferred. Novel starting materials and processes for the preparation thereof likewise constitute further objects of the invention.

The pharmaceutical compositions which contain the compounds of formula I, or pharmaceutically acceptable non-toxic salts thereof, are those for enteral such as oral, or rectal and parenteral, administration to warmblooded animals, the pharmacological active ingredient being present alone or together with a pharmaceutically suitable carrier.

The novel pharmaceutical compositions contain e.g. from about 10 to 80%, preferably from about 20 to 60%, of the active ingredient. Pharmaceutical compositions for enteral or parenteral administration are e.g. those in dosage unit forms such as dragées, tablets, capsules or suppositories, as well as ampoules. These pharmaceutical compositions are prepared in a manner known per se, for example by conventional mixing, granulating, confectioning, dissolving or lyophilising methods. For example, pharmaceutical compositions for oral administration can be obtained by combining the active ingredient with solid carriers, optionally granulating a resulting mixture and processing the mixture or granulate, if desired or necessary after the addition of suitable excipients, to tablets or dragée cores.

Suitable carriers are in particular fillers such as sugar, for example lactose, saccharose, mannitol or sorbitol, cellulose preparations and/or calcium phosphates, e.g.

4,939,130

9

tricalcium phosphate or calcium biphosphate, and also binders such as starch pastes, e.g. maize, corn, rice or potato starch, gelatin, tragacanth, methyl cellulose and-/or polyvinylpyrrolidone, and/or, if desired, disintegrators, such as the abovementioned starches, also carboxymethyl starch, crosslinked polyvinylpyrrolidone, agar, alginic acid or a salt thereof such as sodium alginate. Excipients are in particular glidants and lubricants, for example silica, talcum, stearic acid or salts thereof such as magnesium stearate or calcium stearate, and/or polyethylene glycol. Dragée cores are provided with suitable coatings which can be resistant to gastric juices, using inter alia concentrated sugar solutions which may contain gum arabic, talcum, polyvinylpyrrolidone, polyethylene glycol and/or titanium dioxide, shellac solutions in suitable organic solvents or mixtures of solvents or, for the preparation of coatings which are resistant to gastric juices, solutions of suitable cellulose preparations such as acetyl cellulose phthalate or hydroxypropyl methyl cellulose phthalate. Dyes or pigments can be added to the tablets or dragée coatings, for example to identify or indicate different doses of active ingredient.

Further pharmaceutical compositions for oral administration are dry-filled capsules made of gelatin and also soft sealed capsules consisting of gelatin and a plasticiser such as glycerol or sorbitol. The dry-filled capsules can contain the active ingredient in the form of granules, for example in admixture with fillers such as lactose, binders such as starches, and/or glidants such as talcum or magnesium stearate, and optionally stabilisers. In soft capsules, the active ingredient is preferably dissolved or suspended in a suitable liquid, such as a fatty oil, paraffin oil or a liquid polyethylene glycol, to which a stabiliser can also be added.

Suitable pharmaceutical compositions for rectal administration are e.g. suppositories, which consist of a combination of the active ingredient with a suppository base. Examples of suitable suppository bases are natural or synthetic triglycerides, paraffin hydrocarbons, polyethylene glycols and higher alkanols. It is also possible to use gelatin rectal capsules which contain a combination of the active ingredient with a base material. Suitable base materials are e.g. liquid triglycerides, polyethylene glycols and paraffin hydrocarbons.

Particularly suitable dosage forms for parenteral administration are aqueous solutions of an active ingredient in water-soluble form, for example a water-soluble salt, and also suspensions of the active ingredient, such as corresponding oily injection suspensions, for which there are used suitable lipophilic solvents or vehicles such as fatty oils, for example sesame oil, or synthetic fatty acid esters, for example ethyl oleate or triglycerides, or aqueous injection suspensions which contain substances which increase the viscosity, for example sodium carboxymethyl cellulose, sorbitol and/or dextran, and optionally also stabilisers.

The present invention also relates to the use of the compounds of formula I and salts thereof preferably for the treatment of inflammatory conditions, primarily to diseases associated with impairment of calcium metabolism, e.g. rheumatic diseases and, in particular, osteoporoses.

Doses below 0.001 mg/kg of body weight affect pathological sclerosis and the decomposition of hard tissue only insignificantly. Long-term toxic side-effects may occur at doses of over 100 mg/kg of body weight. The compounds of formula I and salts thereof can be

10

administered orally, as well as subcutaneously, intramuscularly or intravenously in hypertonic solution. Preferred daily doses are, for oral administration, in the range from about 0.1 to 5 mg/kg, for subcutaneous and intramuscular administration in the range from about 0.1 to 1 mg/kg and, for intravenous administration, in the range from about 0.01. to 2 mg/kg.

The dosage of the compounds of formula I and salts thereof is, however, variable and depends on the respective conditions such as the nature and severity of the illness, the duration of treatment and on the respective compound. Single doses contain for example from 0.01 to 10 mg; dosage unit form for parenteral, e.g. intravenous, administration contain e.g. from 0.01 to 0.1 mg, preferably from 0.02 to 0.08 mg; and oral dosage unit forms contain e.g. from 0.2 to 2.5 mg, preferably from 0.3 to 1.5 mg per kg of body weight. The preferred single dose for oral administration is from 10 to 100 mg and, for intravenous administration, from 0.5 to 5 mg. It is, however, possible to administer up to four single doses daily. The higher doses for oral administration are necessary on account of the limited absorption. In prolonged treatment, the dosage can normally be reduced to a lower level after an initially higher dosage in order to maintain the desired effect.

The following Examples illustrate the invention without in any way limiting the scope thereof.

## EXAMPLE 1

With stirring and under reflux, 8.6 g (0.053 mole) of imidazol-4-ylacetic acid hydrochloride, 7.1 ml of 85% phosphoric acid and 25 ml of chlorobenzene are heated to 100° C. Then 13.9 ml of phosphorus trichloride are added dropwise at 100° C., whereupon evolution of gas occurs. Over the course of 30 minutes a dense mass precipitates from the reaction mixture. The batch is heated for 3 hours to 100° C. and the supernatant chlorobenzene is removed by decantation. With stirring and under reflux, the residual viscous mass is heated to the boil for 3 hours with 40 ml of 9N hydrochloric acid. The batch is filtered hot with the addition of carbon and the filtrate is diluted with acetone, whereupon the crude 2-(imidazol-4-yl)-1-hydroxy-ethane-1,1-diphosphonic acid precipitates. This product is recrystallised from water. Melting point: 238°–240° C. (dec.).

## EXAMPLE 2

Reaction of 1-methylimidazol-2-ylmethyl bromide, benzylimidazol-2-ylmethyl chloride, (imidazol-1-methyl)toluenesulfonate, imidazol-4-ylmethyl chloride and thiazolyl-2-ylmethyl bromide with tetraethyl methanediphosphonate and hydrolysis of the resultant primary ethanediphosphonates in accordance with Example 9 or 12 also gives 2-(1-methylimidazol-2-yl)ethane-1,1-diphosphonic acid, m.p. 295° C. (dec.); 2-(1-benzylimidazol-2-yl)ethane-1,1-diphosphonic acid monohydrate, m.p. 181°–183° C.; 2-(imidazol-1-yl)ethane-1,1-diphosphonic acid, m.p. 255° C. (dec.); 2-(imidazol-4-yl)ethane-1,1-diphosphonic acid, and 2-(thiazol-2-yl)ethane-1,1-diphosphonic acid, m.p. 259° C. (dec.), and salts thereof, e.g. disodium salts.

## EXAMPLE 3

The procedure of Example 1 is repeated, starting from 1-methylimidazol-2-acetic acid hydrochloride, to give 2-(1-methylimidazol-2-yl)-1-hydroxyethane-1,1-diphosphonic acid monohydrate, m.p. 261° C. (dec.).

4,939,130

11

The starting material can be prepared as follows: 0.5 g (0.032 mole) of 1-methyl-2-cyanomethylimidazole hydrochloride, 15 ml of glacial acetic and 15 ml of 36% hydrochlorid acid are heated for 24 hours to the boil under reflux. The reaction mixture is then evaporated to dryness under reduced pressure and the residue is taken up in 30 ml of hot glacial acetic acid and undissolved ammonium chloride is removed by filtration. The filtrate is concentrated by evaporation and the residue is taken up in acetone, affording 1-methyl-2-carboxymethylimidazole hydrochloride, m.p. 163°–164° C.

### EXAMPLE 4

The procedure of Example 1 is repeated, starting from 4(5)-methylimidazol-5(4)-acetic acid hydrochloride, to give 2-[4(5)-methylimidazol-5(4)-yl]-1-hydroxyethane-1,1-diphosphonic acid, m.p. 217°–218° C. (dec.). The starting 4(5)-methylimidazol-5(4)-acetic acid hydrochlroide can be obtained in a manner similar to that described in Example 3.

### EXAMPLE 5

The procedure of Example 1 is repeated, starting from 1-benzylimidazol-2-acetic acid hydrochloride and 1-methylimidazol-2-acetic acid hydrochloride, to give respectively 2-(1-benzylimidazol-2-yl)-1-hydroxyethane-1,1-diphosphonic acid of m.p. 171° C. (dec.), and 2-(1-methylimidazol-2-yl)-1-hydroxyethane-1,1-diphosphonic acid monohydrate of m.p. 261° C (dec.), and salts thereof, e.g. sodium salts. The starting 1-benzylimidazol-2-acetic acid hydrochloric acid, m.p. 124°–125° C, can be obtained in a manner similar to that described in Example 2.

### EXAMPLE 6

14.8 g (0.051 mole) of tetraethyl methanediphosphonate are added dropwise to a suspension of 2.4 g of sodium hydride in 35 ml of absolute tetrahydrofuran, and the reaction mixture is stirred at room temperature until the evolution of gas has ceased. Then 11.3 g (0.0465 mole) of 1-benzyl-2-chloromethylimidazole hydrochloride are added in portions. With stirring, the reaction mixture is heated under reflux for 20 hours to the boil. Precipitated sodium chloride is then removed by filtration and the filtrate is concentrated by evaporation under reduced pressure to give crude tetraethyl (1-benzylimidazol-2-ylmethyl)-methanediphosphonate. 3.0 g (0.065 mole) of tetraethyl (1-benzylimidazol-2-ylmethyl)-methanediphosphonate and 12 ml of 36% hydrochloric acid are heated under reflux for 20 hours to the boil. The reaction mixture is then concentrated by evaporation and the residue is crystallised from aqueous methanol, to give 2-(1-benzylimidazol-2-yl)ethane-1,1-diphosphonic acid monohydrate of m.p. 181°–183° C. Yield: 80% of theory.

### EXAMPLE 7

Following the procedure of Example 6, reaction of 1-methyl-2-chloromethylimidazole hydrochloride, 1-methyl-5-chloromethyl-1H-1,2,4-triazole hydrochloride, and 2-chloromethylthiazole hydrochloride to the corresponding tetraethyl ethanediphosphonates and subsequent ester cleavage with trimethylbromosilane in the described manner affords: 2-(1-methylimidazol-2-yl)ethane-1,1-diphosphonic acid, m.p. 295° C. (dec.), 2-(1-methyl-1H-1,2,4-triazol-5-yl)ethane-1,1-diphosphonic acid, m.p. 274°–275° C, 2-thiazol-2-yl)ethane-

12

1,1-diphosphonic acid, m.p. 259° C. (dec.), and salts thereof, e.g. disodium salts, and hydrates.

The starting 1-methyl-5-chloromethyl-1H-1,2,4-triazole hydrochloride can be prepared as follows: 11.1 g (0.10 mole) of 5-hydroxymethyl-1-methyl-1,2,4-triazole are dissolved in 25 ml of dichloromethane. While cooling with ice and with stirring, 29.7 g of thionyl chloride are added dropwise. The reaction mixture is then stirred for 1 hour at room temperature and thereafter for 20 minutes at boiling temperature under reflux. The precipitate is filtered with suction, washed with diethyl ether and vacuum dried. Melting point: 136°–137° C.

### EXAMPLE 8

The procedure of Example 1 is repeated, starting from 1-imidazoleacetic acid hydrochloride, 1-(1H-1,2,4-triazole)acetic acid hydrochloride and 1-pyrazoleacetic acid hydrochloride, to give the following compounds: 2-(imidazol-1-yl)-1-hydroxyethane-1,1-diphosphonic acid, m.p. 239° C. (dec.), 2-(1H-1,2,4-triazol-1-yl)-1-hydroxyethane-1,1-diphosphonic acid, m.p. 255° C. (dec.) and 2-(pyrazol-1-yl)-1-hydroxyethane-1,1-diphosphonic acid, m.p. 234° C. (dec.).

### EXAMPLE 9

3.3 g (0.0072 mole) of tetraethyl 2-(benzylimidazol-2-yl)ethane-1,1-diphosphonate are dissolved in 50 ml of liquid ammonia and, with stirring, 1.0 g of sodium is added gradually in small portions until the blue colour of the solution is maintained for some time. Then 2.35 g of ammonium chloride are added in portions. The ammonia is then removed by evaporation, the residue is taken up in diethyl ether, the solution is filtered and the filtrate is concentrated by evaporation, affording tetraethyl 2-(imidazol-2-yl)ethane-1,1-diphosphonate as a colourless oil.

2.3 g (0.0062 mole) of tetraethyl 2-(imidazol-2-yl)ethane-1,1-diphosphonate are dissolved in 20 ml of methylene chloride. To the solution are added 4.8 ml of trimethylbromosilane and the reaction mixture is allowed to stand for 24 hours at room temperature and then concentrated by evaporation under reduced pressure. The residue is dissolved from 10 ml of methanol and 1 ml of water, to give 2-(imidazol-2-yl)ethane-1,1-diphosphonic acid of m.p. 279°–282° C. (dec.).

### EXAMPLE 10

With stirring and under reflux, 8.6 g (0.053 mole) of imidazol-1-ylacetic acid hydrochloride, 7.1 ml of 85% phosphoric acid and 25 ml of chlorobenzene are heated to 100° C. Then 13.9 ml of phosphorus trichloride are added dropwise at 100° C., whereupon evolution of gas occurs. Over the course of 30 minutes a dense mass precipitates from the reaction mixture. The batch is heated for 3 hours to 100° C. and the supernatant chlorobenzene is removed by decantation. The residual viscous mass is heated for 3 hours to the boil, with stirring and under reflux, with 40 ml of 9N hydrochloric acid. The batch is then filtered hot with the addition of carbon and the filtrate is diluted with acetone, whereupon the crude 2-(imidazol-1-yl)-1-hydroxyethane-1,1-diphosphonic acid precipitates. This product is recrystallised from water. Melting point: 239° C. (dec.). Yield: 41% of theory.

4,939,130

13

## EXAMPLE 11

The procedure of Example 9 is repeated, starting from tetraethyl 2-(pyrazol-1-yl)ethane-1,1-diphosphonate and tetraethyl 2-(imidazol-1-yl)ethane-1,1-diphosphonate. Treatment with trimethylbromosilane and working up with aqueous methanol gives 2-(pyrazol-1-yl)ethane-1,1-diphosphonic acid, m.p. 227° C. (dec.), and 2-(imidazol-1-yl)ethane-1,1-diphosphonic acid, m.p. 255° C. (dec.).

The starting esters can be prepared e.g. as follows: 0.10 g of sodium hydride is suspended in 4.0 ml of absolute tetrahydrofuran. A solution of 0.27 g (0.04 mole) of pyrazole in 2.0 ml of tetrahydrofuran is slowly added dropwise and to the clear reaction solution are added 1.2 g of tetraethyl vinylidenediphosphonate and the reaction mixture is kept for 24 hours at room temperature. Then 2 ml of 2N ethanolic hydrochloric acid are added. Precipitated sodium chloride is removed by filtration and the filtrate is concentrated by evaporation.

## EXAMPLE 12

The procedure of Example 10 is repeated, starting from 0.05 mole of 4H-1,2,4-triazol-2-ylacetic acid, to give 2-(4H-1,2,4-triazol-4-yl)-1-hydroxyethane-1,1-diphosphonic acid of m.p. 255° C. (dec.) and salts thereof, e.g. disodium salts.

## EXAMPLE 13

Reaction of (imidazol-1-ylmethyl) p-toluenesulfonate with tetraethyl methanediphosphonate and hydrolysis of the primary ethanediphosphonate in accordance with Example 2 gives 2-(imidazol-1-yl)ethane-1,1-diphosphonic acid of m.p. 255° C. (dec.) and salts thereof, e.g. the disodium salt.

## EXAMPLE 14

Following the procedure of Example 3, 1-benzyl-2-carboxymethylimidazole hydrochloride of m.p. 124°–125° C. is obtained from 1-benzyl-2-cyanomethylimidazole.

Following the procedure of Example 10, 2-(1-benzylimidazol-2-yl)-1-hydroxyethane-1,1-diphosphonic acid of m.p. 171° C. (dec.) is obtained from 1-benzyl-2-carboxymethylimidazole hydrochloride.

## EXAMPLE 15

3.4 g (0.0094 mole) of 2-(1-benzylimidazol-2-yl)-1-hydroxyethanediphosphonic acid are dissolved in 40 ml of liquid ammonia and then 1 g of sodium is added gradually, with stirring, in small portions until the blue colour of the solution is maintained for some considerable time. Then 2.35 g of ammonium chloride are added in portions. The ammonia is then removed by evaporation, the residue is taken up in 20 ml of hot water, the solution is filtered and then 10 ml of concentrated hydrochloric acid are added to the filtrate. The precipitated crystals are isolated by filtration and recrystallised from aqueous methanol, to give 2-(imidazol-2-yl)-1-hydroxyethanediphosphonic acid of m.p. 235° C. (dec.).

## EXAMPLE 16

3.59 g (0.01 mole) of 1-amino-2-(1-benzylimidazol-2-yl)ethane-1,1-diphosphonic acid are dissolved in 20 ml of 1N sodium hydroxide solution, 0.82 g of sodium nitrite is added, and the solution is cooled to 0° C. With stirring, 18 ml of 2N hydrochloric acid are slowly added dropwise. Stirring is continued for 1 hour at

14

0°–10° C. and the precipitated product is isolated by filtration. Recrystallisation from water gives 2-(1-benzylimidazol-2)-1-hydroxyethane-1,1-disphosphonic acid of m.p. 171° C. (dec.).

## EXAMPLE 17

In accordance with the procedures described in Examples 1 to 16 it is also possible to prepare 2-[2-methylimidazol-4(5)-yl]-1-hydroxy-ethane-1,1-diphosphonic acid, m.p. 261°–262° C. (dec.); 2-[2-phenylimidazol-4(5)-yl]-1-hydroxy-ethane-1,1-diphosphonic acid, m.p. 223°–224° C.; 2-(4,5-dimethylimidazol-1-yl)-1-hydroxyethane-1,1-diphosphonic acid, m.p. 251°–252° C., and 2-(2-methylimidazol-1-yl)-1-hydroxyethane-1,1-diphosphonic acid, m.p 245°–246° C. (dec.), and salts thereof, e.g. disodium salts.

## EXAMPLE 18

With stirring and under reflux, 11.95 g of 2-phenylimidazol-4-ylacetic acid hydrochloride, 7.1 ml of 85% phosphoric acid and 25 ml of chlorobenzene are heated to 100° C. Then 13.9 ml of phosphorus trichloride are added dropwise at 100° C., whereupon evolution of gas occurs. Over the course of 30 minutes a dense mass precipitates from the reaction mixture. The batch is heated for 3 hours to 100° C. and the supernatant chlorobenzene is removed by decantation. With stirring and under reflux, the residual viscous mass is heated to the boil for 3 hours with 40 ml of 9N hydrochloric acid. The batch is filtered hot with the addition of carbon and the filtrate is diluted with acetone, whereupon the crude 2-(2-phenylimidazol-4-yl)-1-hydroxyethane-1,1-diphosphonic acid precipitates. This product is recrystallised from water, yielding the sesquihydrate of m.p. 223°–224° C.

## EXAMPLE 19

10 ml of 2N aqueous sodium hydroxide solution are added, with stirring, to a suspension of 3,36 g of 2-(2-phenylimidazol-4-yl)-1-hydroxy-ethane-1,1-diphosphonic acid in 10 ml of water. The resulting solution is evaporated to dryness. The residue is triturated with 40 ml of methanol. The crystalline precipitate formed is filtered off and dried yielding disodium 2-(2-phenylimidazol-4-yl)-1-hydroxyethane-1,1-diphosphonate-dihydrate m.p. 281°–283° C. (dec.).

## EXAMPLE 20

In an analogous manner as described in Example 19, the following disodium salts can be prepared: disodium 2-(2-methylimidazol-4-yl)-1-hydroxy-ethane-1,1-diphosphonate-monohydrate, m.p. 292°–295° C. (dec.); disodium 2-(2-methylimidazol-1-yl)-1-hydroxy-ethane-1,1-diphosphonate-dihydrate, m.p. 295°–297° C. (dec.); disodium 2-(4,5-dimethylimidazol-1-yl)-1-hydroxy-ethane-1,1-diphosphonate-dihydrate, m.p. 286°–290° C. (dec.); disodium 2-(imidazol-1-yl)-1-hydroxy-ethane-1,1-diphosphonate-dihydrate, m.p. 291°–293° C. (dec.); and disodium 2-(pyrazol-1-yl)-1-hydroxy-ethane-1,1-diphosphonate-monohydrate, m.p. >300° C. (dec.).

## EXAMPLE 21

A solution of 0.121 g of tris(hydroxymethyl)methylamine in 2 ml of water is added to a solution of 0.141 g of 2-(imidazol-1-yl)-1-hydroxy-ethane-1,1-diphosphonic acid in 1 ml of water. The resulting solution is concentrated by evaporation in vacuo and triturated with 6 ml of warm methanol. After cooling, a cristalline precipi-

4,939,130

15

tate is formed which is filtered off and dried for 1 hour
in vacuo at 80° yielding pure mono-tris(hydroxyme-
thyl)methylammonium     2-(imidazol-1-yl)-1-hydroxy-
ethane-1,1-diphosphonate of m.p. 170°–175°.

### EXAMPLE 22

In an analogous manner as described in Example 21
the following  tris(hydroxymethyl)methylammonium
salts can be prepared: di-tris(hydroxymethyl)methylam-
monium      2-(imidazol-4-yl)-1-hydroxy-ethane-1,1-
diphosphonate, m.p. 116°–117° C. (dec.); di-tris(hydrox-
ymethyl)methylammonium  2-(4,5-dimethylimidazol-1-
yl)-1-hydroxy-ethane-1,1-diphosphonate-monohydrate
m.p. 110°–113° C. (dec.); di-tris(hydroxymethyl)me-
thylammonium   2-(5-methylimidazol-4-yl)-1-hydroxy-
ethane-1,1-diphosphonate, m.p. 122°–126° C. (dec.) and
di-tris(hydroxymethyl)methylammonium    2-(1-ben-
zylimidazol-1-yl)-1-hydroxy-ethane-1,1-diphosphonate-
monohydrate, m.p. >300° C. (dec.).

### EXAMPLE 23

Tablets containing 100 mg of active ingredient, e.g.
2-(imidazol-4-yl)-1-hydroxyethane-1,1-diphosphonic
acid or a salt thereof, e.g. the disodium salt, can be
prepared as follows:

| Composition (for 100 tablets) | |
|---|---|
| active ingredient | 100.0 g |
| lactose | 100.0 g |
| corn starch | 47.0 g |
| magnesium stearate | 3.0 g |

#### Procedure

All the solid constituents are sieved through a sieve
having a mesh size of 0.6 mm. The active ingredient is
then mixed with lactose, talcum, magnesium stearate
and half of the starch in a suitable mixer. The other half
of the starch is suspended in 40 ml of water and the
suspension is added to a boiling solution of polyethene
glycol in 100 ml of water. The resultant mixture is gran-
ulated, if necessary with the further addition of water.
The granulate is dried overnight at 35° C., sieved
through a sieve having a mesh size of 1.2 mm, and com-
pressed to tablets of 6 mm diameter which are concave
on both sides.

In like manner, tablets each containing 100 mg of
another compound of formula I obtained in Examples
1–22 can also be prepared which compounds may also
be in the form of salts with bases, e.g. as sodium salt.

### EXAMPLE 24

Lozenges containing 75 mg of active ingredient, e.g.
2-(imidazol-4-yl)-1-hydroxyethane-1,1-diphosphonic
acid or a salt thereof, e.g. the disodium salt, can be
prepared as follows:

| Composition (for 100 tablets) | |
|---|---|
| active ingredient | 75.0 g |
| mannitol | 230.0 g |
| lactose | 100.0 g |
| talcum | 21.0 g |
| glycine | 12.5 g |
| stearic acid | 10.0 g |
| saccharine | 1.5 g |
| 5% gelatin solution | q.s. |

16

#### Procedure

All solid ingredients are first sieved through a sieve
having a mesh size of 0.25 mm. The mannitol and lac-
tose are mixed, the mixture is granulated while adding
gelatin solution, sieved through a sieve having a mesh
size of 2 mm, dried at 50° C. and once more sieved
through a sieve having a mesh size of 1.7 mm. The
active ingredient, glycine and saccharine are carefully
mixed, then the mannitol, lactose granulate, stearic acid
and the talcum are added. All the ingredients are thor-
oughly mixed and compressed to lozenges having a
diameter of about 10 mm which are concave on both
sides and provided with a breaking notch on the top-
side.

In like manner, lozenges containing 75 mg of another
compound of formula I obtained in Examples 1–22 can
also be prepared, which compounds can also be in the
form of salts with bases, e.g. the sodium salt.

### EXAMPLE 25

Tablets containing 10 mg of active ingredient, e.g.
2-(imidazol-4-yl)-hydroxyethane-1,1-diphosphonic acid
or a salt thereof, e.g. the disodium salt, can be prepared
as follows:

| Composition (for 1000 tablets) | |
|---|---|
| active ingredient | 10.0 g |
| lactose | 115.7 g |
| corn starch | 17.5 g |
| polyethylene glycol 6000 | 5.0 g |
| talcum | 5.0 g |
| magnesium stearate | 4.0 g |
| demineralised water | q.s. |

#### Procedure

The solid constituents are sieved through a sieve
having a mesh size of 0.6 mm. The active ingredient is
then mixed with lactose, talcum, magnesium stearate
and half of the starch in a suitable mixer. The other half
of the starch is suspended in 65 ml of water and the
suspension is added to a boiling solution of polyethene
glycol in 260 ml of water. The resultant paste is added
to the powders and granulated, optionally with the
further addition of water. The granulate is dried over-
night at 35° C., sieved through a sieve having a mesh
size of 1.2 mm, and compressed to tablets of 10 mm
diameter with a breaking notch on the topside and
which are concave on both sides.

In like manner, tablets containing 10 mg of another
compound of formula I obtained in examples 1–22 can
also be prepared, which compounds can also be in the
form of salts with bases, e.g. the sodium salt.

### EXAMPLE 26

Hard gelatin capsules containing 100 mg of active
ingredient, e.g. 2-(imidazol-4-yl)-1-hydroxyethane-1,1-
diphosphonic acid or a salt thereof, e.g. the disodium
salt, can be prepared as follows:

| Composition (for 1000 capsules) | |
|---|---|
| active ingredient | 350.0 g |
| microcrystalline cellulose | 30.0 g |
| sodium lauryl sulfate | 2.0 g |
| magnesium stearate | 8.0 g |

4,939,130

17

The sodium lauryl sulfate is sieved through a sieve having a mesh size of 0.2 mm and added to the active ingredient (lyophilised) and both components are intimately mixed for 10 minutes. Then the microcrystalline cellulose is sieved through a sieve having a mesh size of 0.9 mm, added to the above mixture, and the ingredients are intimately mixed for 10 minutes. Finally, the magnesium is sieved through a sieve having a mesh size of 0.8 mm, added to the mixture, and all the ingredients are mixed for 3 minutes. Size 0 hard gelatin capsules (elongated) are filled with 390 mg of this mixture.

In like manner, capsules containing 100 mg of another compound of formula I obtained in Examples 1–22 can also be prepared, which compounds can also be in the form of salts with bases, e.g. the disodium salt.

EXAMPLE 27

A 0.2% injection or infusion solution can be prepared e.g. as follows:

| | |
|---|---|
| active ingredient, e.g. 2-(imidazol-4-yl)-1-hydroxyethane-1,1-di-phosphonic acid or a salt thereof | 5.0 g |
| sodium chloride | 22.5 g |
| phosphate buffer (pH = 7.4) | 300.0 g |
| demineralised water to make up | 2500.0 ml |

The active ingredient is dissolved in 1000 ml of water and filtered through a microfilter. The buffer solution is added, followed by the addition of water to make up 2500 ml. To prepare dosage unit forms, 1.0 or 2.5 ml of

18

the solution are filled into glass ampoules (each containing 2.0 or 5.0 mg of active ingredient).

What is claimed is:

1. A heteroarylalkanediphosphonic acid of the formula

$$R_1-CH_2-\overset{\overset{\displaystyle PO_3H_2}{|}}{\underset{\underset{\displaystyle PO_3H_2}{|}}{C}}-R_2, \qquad (I)$$

wherein $R_1$ denotes an 1-imidazolyl or 2-(1-methyl)imidazolyl radical and $R_2$ represents hydroxy, or a salt thereof.

2. A compound as claimed in claim 1 being 2-(imidazol-1-yl)-1-hydroxy-ethane-1,1-diphosphonic acid or a salt thereof.

3. A compound as claimed in claim 1 being 2-(1-methylimidazol-2-yl)-1-hydroxyethane-1,1-diphosphonic acid or a salt thereof.

4. A pharmaceutical composition for the treatment or prophylaxis of diseases associated with impaired calcium metabolism, containing a therapeutically effective amount of a compound claimed in claim 1 in the free form or in a pharmaceutically acceptable salt form, together with conventional pharmaceutical carriers.

5. A method of treating diseases associated with impaired calcium metabolism which comprises administering a therapeutically effective amount of a compound claimed in claim 1 in the free form or in a pharmaceutically acceptable salt form to a warm-blooded animal in need thereof.

*  *  *  *  *

JS 44 (Rev 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provide by local rules of court  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiatin the civil docket sheet  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM )

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| NOVARTIS CORPORATION and NOVARTIS PHARMACEUTICALS CORPORATION | TEVA PARENTERAL MEDICINES, INC , TEVA PHARMACEUTICALS USA, INC , and TEVA PHARMACEUTICAL INDUSTRIES LTD |

(b)    County of Residence of First Listed Plaintiff  New York County
        (EXCEPT IN U S  PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U S  PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED

(c)    Attorney's (Firm Name, Address, and Telephone Number)
Frederick L. Cottrell, III, Esquire
Anne Shea Gaza, Esquire
Richards, Layton & Finger
One Rodney Square - 920 North King Street
Wilmington, DE 19801
302-651-7700

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

O 1  U.S. Government
      Plaintiff

● 3  Federal Question
      (U.S. Government Not a Party)

O 2  U.S. Government
      Defendant

O 4  Diversity
      (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)

(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | O 1 | O 1 | Incorporated or Principal Place of Business In This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business In Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Onl)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| O 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | O 610 Agriculture | O 422 Appeal 28 USC 158 | O 400 State Reapportionment |
| O 120 Marine | O 310 Airplane | O 362 Personal Injury - | O 620 Other Food & Drug | O 423 Withdrawal | O 410 Antitrust |
| O 130 Miller Act | O 315 Airplane Product | Med. Malpractice | O 625 Drug Related Seizure | 28 USC 157 | O 430 Banks and Banking |
| O 140 Negotiable Instrument | Liability | O 365 Personal Injury - | of Property 21 USC 881 | | O 450 Commerce |
| O 150 Recovery of Overpayment | O 320 Assault, Libel & | Product Liability | O 630 Liquor Laws | PROPERTY RIGHTS | O 460 Deportation |
| & Enforcement of Judgment | Slander | O 368 Asbestos Personal | O 640 R.R. & Truck | O 820 Copyrights | O 470 Racketeer Influenced and |
| O 151 Medicare Act | O 330 Federal Employers' | Injury Product | O 650 Airline Regs. | ● 830 Patent | Corrupt Organizations |
| O 152 Recovery of Defaulted | Liability | Liability | O 660 Occupational | O 840 Trademark | O 480 Consumer Credit |
| Student Loans | O 340 Marine | PERSONAL PROPERTY | Safety/Health | | O 490 Cable/Sat TV |
| (Excl  Veterans) | O 345 Marine Product | O 370 Other Fraud | O 690 Other | | O 810 Selective Service |
| O 153 Recovery of Overpayment | Liability | O 371 Truth in Lending | | | O 850 Securities/Commodities/ |
| of Veteran's Benefits | O 350 Motor Vehicle | O 380 Other Personal | LABOR | SOCIAL SECURITY | Exchange |
| O 160 Stockholders' Suits | O 355 Motor Vehicle | Property Damage | O 710 Fair Labor Standards | O 861 HIA (1395ff) | O 875 Customer Challenge |
| O 190 Other Contract | Product Liability | O 385 Property Damage | Act | O 862 Black Lung (923) | 12 USC 3410 |
| O 195 Contract Product Liability | O 360 Other Personal | Product Liability | O 720 Labor/Mgmt. Relations | O 863 DIWC/DIWW (405(g)) | O 890 Other Statutory Actions |
| O 196 Franchise | Injury | | O 730 Labor/Mgmt.Reporting | O 864 SSID Title XVI | O 891 Agricultural Acts |
| | | | & Disclosure Act | O 865 RSI (405(g)) | O 892 Economic Stabilization Act |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | O 740 Railway Labor Act | FEDERAL TAX SUITS | O 893 Environmental Matters |
| O 210 Land Condemnation | O 441 Voting | O 510 Motions to Vacate | O 790 Other Labor Litigation | O 870 Taxes (U S  Plaintiff | O 894 Energy Allocation Act |
| O 220 Foreclosure | O 442 Employment | Sentence | O 791 Empl. Ret. Inc | or Defendant) | O 895 Freedom of Information |
| O 230 Rent Lease & Ejectment | O 443 Housing/ | Habeas Corpus: | Security Act | O 871 IRS—Third Party | Act |
| O 240 Torts to Land | Accommodations | O 530 General | | 26 USC 7609 | O 900 Appeal of Fee |
| O 245 Tort Product Liability | O 444 Welfare | O 535 Death Penalty | IMMIGRATION | | Determination |
| O 290 All Other Real Property | O 445 Amer  w/Disabilities - | O 540 Mandamus & Other | O 462 Naturalization Application | | Under Equal Access |
| | Employment | O 550 Civil Rights | O 463 Habeas Corpus - | | to Justice |
| | O 446 Amer  w/Disabilities - | O 555 Prison Condition | Alien Detainee | | O 950 Constitutionality of |
| | Other | | O 465 Other Immigration | | State Statutes |
| | O 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

● 1  Original
      Proceeding

O 2  Removed from
      State Court

O 3  Remanded from
      Appellate Court

O 4  Reinstated or
      Reopened

O 5  Transferred from
      another district
      (specify)

O 6  Multidistrict
      Litigation

O 7  Judge from
      Magistrate Judgment

Appeal to District

## VI. CAUSE OF ACTION

Cite the U S  Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity)

Brief description of cause:    Action for infringement of U.S. Patent No. 4,939,130 arising under 35 U S C  §§271 et seq

## VII. REQUESTED IN
COMPLAINT:

O CHECK IF THIS IS A CLASS ACTION

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:    O Yes  ●No

## VIII. RELATED CASE(S)
        IF ANY

(See instructions):

DOCKET NUMBER:

DATE    JULY 24, 2008

SIGNATURE OF ATTORNEY OF RECORD

*Anne Shea Gaza*

FOR OFFICE USE ONLY

RECEIPT #_____    AMOUNT_____    APPLYING IFP_____    JUDGE_____    MAG JUDGE_____

RLF1-3305905-1

JS 44 Reverse (Rev 12/07)

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44**

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed The attorney filing a case should complete the form as follows:

**I. (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official. giving both name and title

(b) County of Residence For each civil case filed, except U S plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing In U S plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved )

(c) Attorneys Enter the firm name, address, telephone number, and attorney of record If there are several attorneys, list them on an attachment, noting in this section ' (see attachment)"

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F R C P , which requires that jurisdictions be shown in pleadings Place an "X" in one of the boxes If there is more than one basis of jurisdiction. precedence is given in the order shown below

United States plaintiff. (1) Jurisdiction based on 28 U S C 1345 and 1348 Suits by agencies and officers of the United States are

included here United States defendant (2) When the plaintiff is suing the United States, its officers or agencies, place an ' X" in

this box

Federal question (3) This refers to suits under 28 U S C 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution. an act of Congress or a treaty of the United States In cases where the U S is a party, the U S plaintiff or defendant code takes precedence, and box 1 or 2 should be marked

Diversity of citizenship (4) This refers to suits under 28 U S C 1332, where parties are citizens of different states When Box 4 is checked. the citizenship of the different parties must be checked (See Section III below; federal question actions take precedence over diversity cases )

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above Mark this section for each principal party

**IV. Nature of Suit.** Place an `X" in the appropriate box If the nature of suit cannot be determined, be sure the cause of action, in Section VI below. is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit If the cause fits more than one nature of suit. select the most definitive

**V.** **Origin.** Place an "X" in one of the seven boxes

Original Proceedings (1) Cases which originate in the United States district courts

Removed from State Court (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U S C , Section 1441 When the petition for removal is granted. check this box

Remanded from Appellate Court (3) Check this box for cases remanded to the district court for further action Use the date of remand as

the filing date Reinstated or Reopened (4) Check this box for cases reinstated or reopened in the district court Use the reopening date as

the filing date

Transferred from Another District (5) For cases transferred under Title 28 U S C Section 1404(a) Do not use this for within district transfers or multidistrict litigation transfers

Multidistrict Litigation (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U S C Section 1407 When this box is checked, do not check (5) above

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause **Do not cite jurisdictional statutes unless diversity.**                Example:                U S Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII. Requested in Complaint.** Class Action Place an "X" in this box if you are filing a class action under Rule 23, F R Cv P

Demand In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a

preliminary injunction Jury Demand Check the appropriate box to indicate whether or not a jury is being demanded

**VIII. Related Cases.** This section of the JS 44 is used to reference related pending cases if any If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases
**Date and Attorney Signature.** Date and sign the civil cover sheet

AO (Rev. 03/08) Civil Summons

# United States District Court

District Of Delaware

| | |
|---|---|
| NOVARTIS CORPORATION and NOVARTIS PHARMACEUTICALS CORPORATION, <br>    Plaintiffs, <br><br> v. <br><br> TEVA PARENTERAL MEDICINES, INC., TEVA PHARMACEUTICALS USA, INC., and TEVA PHARMACEUTICAL INDUSTRIES LTD., <br>    Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     Civil Action No. |

## SUMMONS IN A CIVIL ACTION

TO:        Teva Parenteral Medicines, Inc.
           c/o Corporate Creations Network, Inc.
           3411 Silverside Road
           Rodney Building #104
           Wilmington, DE   19810

A lawsuit has been filed against you.

Within twenty (20) days after service of this summons on you (not counting the day you received it), you must serve on the plaintiffs an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiffs' attorney, whose name and address are:

**Frederick L. Cottrell, III, Esquire**
**Anne Shea Gaza, Esquire**
**Richards, Layton & Finger**
**One Rodney Square**
**920 North King Street**
**Wilmington, DE 19801**
**(302) 651-7700**

If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_____
Name of Clerk of Court

Date:_____          _____
Deputy Clerk's Signature

*(Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States allowed 60 days by Rule 12(a)(3) )*
RLF1-3305884-1

AO (Rev. 03/08) Civil Summons (Page 2)

| PROOF OF SERVICE |
|---|

I declare under penalty of perjury that I served the summons and complaint in this case on _____.

       (1)    personally delivering a copy of each to the individual at this place, _____
_____; or

       (2)    leaving a copy of each at the individual's dwelling or usual place of abode with _____
_____who resides there and is of
suitable age and discretion; or

       (3)    delivering a copy of each to an agent authorized by appointment or by law to receive it whose
name is _____; or

       (4)    returning the summons unexecuted to the court clerk on _____.

My fees are $_____travel and $_____ for services, for a total of $_____.

Date:_____      _____
                                               Server's Signature

                                            _____
                                            Printed name and title

                                            _____
                                            Server's address

*(Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States allowed 60 days by Rule 12(a)(3) )*
RLF1-3305884-1

AO (Rev. 03/08) Civil Summons

# United States District Court

District Of Delaware

| | |
|---|---|
| NOVARTIS CORPORATION and NOVARTIS PHARMACEUTICALS CORPORATION,    Plaintiffs,  v.  TEVA PARENTERAL MEDICINES, INC., TEVA PHARMACEUTICALS USA, INC., and TEVA PHARMACEUTICAL INDUSTRIES LTD.,    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. |

## SUMMONS IN A CIVIL ACTION

TO:     Teva Pharmaceuticals USA, Inc.
          c/o Corporate Creations Network, Inc.
          3411 Silverside Road
          Rodney Building #104
          Wilmington, DE   19810

A lawsuit has been filed against you.

Within twenty (20) days after service of this summons on you (not counting the day you received it), you must serve on the plaintiffs an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiffs' attorney, whose name and address are:

> **Frederick L. Cottrell, III, Esquire**
> **Anne Shea Gaza, Esquire**
> **Richards, Layton & Finger**
> **One Rodney Square**
> **920 North King Street**
> **Wilmington, DE 19801**
> **(302) 651-7700**

If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_____
Name of Clerk of Court

Date:_____    _____
Deputy Clerk's Signature

*(Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States allowed 60 days by Rule 12(a)(3) )*
RLF1-3305901-1

AO (Rev. 03/08) Civil Summons (Page 2)

| PROOF OF SERVICE |
|---|

I declare under penalty of perjury that I served the summons and complaint in this case on _____ .

      (1)     personally delivering a copy of each to the individual at this place, _____
_____ ; or

      (2)     leaving a copy of each at the individual's dwelling or usual place of abode with _____
_____who resides there and is of
suitable age and discretion; or

      (3)     delivering a copy of each to an agent authorized by appointment or by law to receive it whose
name is _____ ; or

      (4)     returning the summons unexecuted to the court clerk on _____ .

My fees are $_____travel and $_____ for services, for a total of $_____ .

Date:_____           _____

                                                  Server's Signature

                                                  _____

                                                  Printed name and title

                                                  _____

                                                  Server's address

*(Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States allowed 60 days by Rule 12(a)(3) )*
RLF1-3305901-1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NOVARTIS CORPORATION and
NOVARTIS PHARMACEUTICALS
CORPORATION,

        Plaintiffs,

        v.

TEVA PARENTERAL MEDICINES, INC.,
TEVA PHARMACEUTICALS USA, INC.,
and TEVA PHARMACEUTICAL
INDUSTRIES LTD ,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. _____

## RULE 7.1 DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. P. 7.1(a), Plaintiffs, through their undersigned counsel, state that

Novartis Pharmaceuticals Corporation and Novartis Corporation are either direct or indirect

wholly-owned subsidiaries of Novartis AG, which is a publicly held company.

OF COUNSEL:

William F. Lee
Lisa J. Pirozzolo
Vinita Ferrera
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts  02109
(617) 526-6000

Dated:  July 24, 2008

*Anne Shea Gaza*

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
RICHARDS LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
(302) 651-7700

*Attorneys for*
*NOVARTIS CORPORATION AND NOVARTIS*
*PHARMACEUTICALS CORPORATION*