## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SCOTT AUER<br>169 Place de L'Etoile<br>Lavonia, GA 30553 | :<br>:<br>: |
| Plaintiff, | :<br>:<br>: |
| v. | :<br>: |
| LANIER WORLDWIDE INC.<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, DE 19081 | :<br>:<br>:<br>:<br>: |
| Defendant. | :<br>: |

CIVIL ACTION - LAW

NO.

## <u>COMPLAINT</u>

Plaintiff Scott Auer, by and through his undersigned counsel, brings this Complaint against Defendant Lanier Worldwide Inc. pursuant to Delaware Code Section 10 Del. C. § 4801, *et seq,*, the Delaware Uniform Foreign Money-Judgments Recognition Act, and avers:

1.    Plaintiff Scott Auer is an adult individual residing at 169 Place de L'Etoile, Lavonia, Georgia 30553.

2.    Defendant Lanier Worldwide Inc. is a Delaware business corporation whose registered agent in Delaware is The Corporation Trust Company, whose office is located at the Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

3.    Plaintiff brings this action against Defendant pursuant to the Delaware Uniform Foreign Money-Judgments Recognition Act, Delaware Code Section 10 Del. C. § 4801, *et seq.*

4.      In or about December of 2006, Plaintiff brought suit against Defendant, and others, in the Labor Court of Brussels, 24th Chamber, for breach of an employment contract.

5.      On or about July 2, 2008, the Labor Court of Brussels, 24th Chamber, having personal jurisdiction over Defendant, entered a judgment (the "Judgment") in favor of Plaintiff and against the Defendant in the amount of 472,564.13 Euros, plus interest thereon, calculated at the legal rate on the aforementioned sum since April 18, 2006.

6.      A true and correct copy of the Judgment is attached hereto as "Exhibit A."

7.      The Judgment is a "Foreign Judgment" within the meaning of Delaware Code Section 10 Del. C. § 4801, *et seq.*

8.      The Judgment was entered in a "Foreign State" as that term is defined in Delaware Code Section 10 Del. C. § 4801, *et seq.*

9.      The Judgment is (a) a final, conclusive and enforceable judgment of the Labor Court of Brussels, 24th Chamber, (b) is enforceable even though an appeal therefrom is pending or is subject to appeal, and (c) meets all of the requirements of Delaware Code Section 10 Del. C. § 4801, *et seq.*

7.      The Judgment is conclusive between the parties and is entitled to be enforced in the same manner as the judgment of a sister state which is entitled to full faith and credit within the meaning of Delaware Code Section 10 Del. c. § 4801, *et seq.*

8.      There are no grounds for non-recognition of the Judgment as provided in Delaware Code Section 10 Del. C. § 4801, *et seq.*

9.      The Judgment was entered under a system of government with procedures compatible with the United States of America requirements of due process of law.

10.    The Labor Court of Brussels, 24th Chamber, had personal jurisdiction over Defendant in the action in which the Judgment was entered, the Defendant actively participated in the proceeding before the Labor Court of Brussels which entered the Judgment, and the Defendant was represented by counsel at all times in that proceeding.

11.    Plaintiff is entitled to have the Judgment entered as a final judgment in this court and enforced as any other final judgment for the payment of money.

12.    The Judgment should be entered in this Court in the amount of United States dollars at the exchange rate in effect at the time of the entry of judgment in this matter.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendant in that amount of United States Dollars which is equal to 472,564.13 Euros, plus interest thereon calculated at the legal rate on the aforementioned sum since April 18, 2006, at the then current exchange rate that is in effect at the time of the entry of judgment in this matter.

WEIR & PARTNERS, LLP
A Pennsylvania Limited Liability Partnership

By: _____
Kenneth E. Aaron, Esquire
Attorney No. 4043
824 Market Street Mall, Suite 1001
Wilmington, DE 19801
E-Mail: kaaron@weirpartners.com
(302) 652-8181
(302) 652-8909 Fax

Dated:  August 20, 2008.

# EXHIBIT "A"

315538-1

WE, ALBERT II, KING OF BELGIUM,
ANNOUNCE TO ALL WHO ARE AND WILL BE PRESENT:

**LABOR COURT OF BRUSSELS**
24th chamber – public hearing of April 22nd, 2008
**JUDGMENT**

General docket no. 35/07+06298/07

Hearing no.

Employment contract - employee

Repertory no. 08 / **008106**

*IN THE MATTER OF:*

**Mr SCOTT AUER,**
residing in the UNITED STATES OF AMERICA in LAVONIA – STATE OF
GEORGIA, 169 Place de l'Etoile, designating address for legal notification purposes
at 101-103 rue Neerveld, 1200 BRUSSELS, the plaintiff, who appears in person,
assisted by Mr C. WILLEMS and Mr H. HACHEZ, attorneys-at-law,

*VERSUS:*

**1/ the company incorporated under Dutch law LANIER EUROPE B.V.**
whose registered office is at 10 Veraartlaan, 2288 GM RIJSWIJK ZH, the
NETHERLANDS, with place of business in Belgium at 20 Drève de Willerieken,
1160 AUDERGHEM;

**2/ the company incorporated under Dutch law, RICOH EUROPE BV**
whose registered office is at Prof Keesomlaan 1, 1181 DJ AMSTELVEEN, the
NETHERLANDS,

defendants, appearing through Mr Ph. COLLIFORD in place of Mr B. BLANPAIN,
attorneys-at-law,

*AND VERSUS:*

**LANIER WORLDWIDE INC, a company incorporated under American law,**
whose registered office is located in the UNITED STATES OF AMERICA, 30345
ATLANTA – STATE OF GEORGIA, 2100 Parklake Drive NE,

defendant, appearing through Mr Ph. COLLIFORD in place of Mr B. BLANPAIN,
attorneys-at-law.

2nd sheet

GENERAL DOCKET no. 35/07 + 06298/07

In these cases, deliberated on March 4th, 2008, the court handed down the following judgment:

Having regard to the case's documents and notably:
- in the case registered under general docket number 35 / 2007:
- The summons dated December 21st, 2006, served upon the request of Mr Scott AUER upon the company incorporated under Dutch law LANIER EUROPE b.v. and upon the company incorporated under Dutch law RICOH EUROPE b.v.,
- The appearance of Mr Bruno BLAMPAIN, representing on behalf of LANIER EUROPE n.v. (*sic*) of January 8th, 2006 (*sic*),
- The notification of a letter to the company incorporated under Dutch law RICOH EUROPE b.v. and a legal letter to the company incorporated under Dutch law LANIER EUROPE b.v. dated June 18th, 2007, refused by these recipients,
- The Order handed down on July 12th, 2007 on the basis of article 757 paragraph 2 of the Belgian Judicial Code,
- The notification of this Order on July 19th, 2007 to the company incorporated under Dutch law RICOH EUROPE b.v., returned with the mentions "*unknown*" and "*no longer at this address / uninhabited*",
- The pleadings (statement of case) filed on behalf of the company incorporated under Dutch law LANIER EUROPE b.v. on August 31st, and November 20th, 2007, as well as the additional and summary pleadings filed on behalf of said party on January 7th, 2008,
- The pleadings filed on behalf of the company incorporated under Dutch law RICOH EUROPE b.v. on October 3rd, and December 5th, 2007, as well as the additional and summary pleadings filed on behalf of the company incorporated under Dutch law RICOH EUROPE HOLDING b.v. on January 22nd, 2008,
- The pleadings filed on behalf of Mr Scott AUER on November 5th, 2007 and the additional and summary pleadings filed on behalf of said party on December 20th, 2007,

- in the case registered under general docket number 6.298 / 2007:
- The summons of December 28th, 2006, served upon the request of Mr Scott AUER upon the company incorporated under American law LANIER WORLDWIDE INCORPORATED,
- The Order handed down on July 12th, 2007 on the basis of article 747 paragraph 2 of the Belgian Judicial Code,
- The pleadings filed on behalf of the parties and in particular the additional and summary pleadings filed on behalf of the company incorporated under American law LANIER WORLDWIDE INC. on January 7th, 2008 and the pleadings filed on behalf of Mr Scott AUER on November 5th, 2007,

Hearing the counsels of the parties in their reports and statements at the public hearing of March 4th, 2008,

3rd sheet

GENERAL DOCKET no. 35/07 + 06298/07

## I. The subject of the claims

Mr Scott AUER (hereinafter the "employee") pursues, after the two cases have been adjoined for being related cases, the joint and several sentencing of the company incorporated under Dutch law LANIER EUROPE b.v. (hereinafter "LANIER EUROPE"), of the company incorporated under Dutch law RICOH EUROPE b.v. (hereinafter "RICOH EUROPE") and of the company incorporated under American law LANIER WORLDWIDE INCORPORATED (hereinafter "LANIER WORLDWIDE"):

-   to the payment of compensation in lieu of notice equivalent to twenty-seven months' salary,
-   to the payment of additional compensation provided for by the C.C.T. (collective labor agreement) of July 28th, 2005 concluded at the time of the closing down, *inter alia*, of the LANIER EUROPE b.v. coordination centre,
-   to the payment of a bonus *pro rata temporis*,
-   to the payment of early leave pay,
-   to the payment of various salary arrears evaluated provisionally at EUR 1.00,
-   to the payment of damages equivalent to six months' salary by way of non-material damages,
-   to the payment of leave pay,
-   to apply to each of these payments the mechanism of *tax equalization*, evaluated provisionally at EUR 1.00,
-   to the payment of interest on arrears and on compensation then judicial interest on the gross amounts due,
-   to the issuance, subject to a fine, of the labor documents,
-   to all legal costs, including a procedural indemnity of EUR 20,000.00.

Mr AUER finally asks that the judgment to be handed down be declared provisionally enforceable, notwithstanding any recourse, and without security or *cantonnement*[1].

## II. The facts

Briefly - and sometimes to the detriment of an abuse of language -, the court has revealed, in view of settling the dispute, the following main facts:

-   Mr AUER started working for the LANIER Group in 1985,
-   Mr AUER was posted to Europe as of 1998, within the framework of the acquisition by the LANIER Group of some of the AGFA group's activities,
-   On May 30th, 2000, Mr AUER signed an employment contract with LANIER WORLDWIDE in the terms of which he was appointed *Vice President / Human Resources – Europe* and was posted, on a permanent basis as of June 1st, 2000, to Brussels, where he relocated with his family,
-   In April 2001, the Japanese group RICOH bought the LANIER Group,
-   In 2004, the RICOH Group decided to close down, *inter alia*, the LANIER EUROPE coordination centre within which Mr AUER worked,
-   On March 11th, 2005, the mission and the posting of Mr AUER in Europe was extended for one year, to expire on May 31st, 2006,

---

[1] *cantonnement is the custody of a sum of money at a séquestre (Receiver) or – as in this case - at the Caisse de dépôt et de consignations (the Belgian Security Deposit and Lodgement Pay-Office) that serves as a guarantee for debt, i.e. the capital sum, interest and costs, owing from one party to another.*

4th sheet

GENERAL DOCKET no. 35/07 + 06298/07

- On March 15th, 2005, the closing down of the LANIER EUROPE coordination centre was announced to the personnel,
- On October 14th, 2005, Mr TOGASHI, President of RICOH EUROPE, acting on behalf of LANIER WORLDWIDE, informed Mr AUER that within the framework of exploring possibilities of reassigning him, a position of *General Manager* within the *EUROPEAN ADMINISTRATION GROUP* of RICOH EUROPE might be offered to him, according to the detailed terms and conditions attached to the letter, including the end of the benefits related to the status of expatriate employee and with the position to have been commenced in January or February 2006. Mr TOGASHI proposed a discussion if the position would be of interest to Mr AUER,
- On October 17th, 2005, Mrs ARTHUR, *Vice President / Human Resources* within the LANIER Group, indicated to Mr AUER that, in her opinion, the reassignment request would not come from LANIER WORLDWIDE, which would not have been approached on this matter either,
- On the same day, Mr AUER informed Mr FRANKEN, *Director* of the *Administration Group & EAG Staff Office* within RICOH EUROPE, that he was examining the proposal which had been made, indicating certain points which, in his opinion, posed questions, and that he wanted to obtain more information, including on social security, taxation and the cost of living,
- On November 3rd, 2005, Mr FRANKEN specified certain points to Mr AUER, *inter alia* the duration of the posting, which could last up to ten years, would have been located in Amstelveen (the Netherlands), Mr AUER would have been responsible for the TQM personnel of RICOH and NRG; the American options had not yet been explored whilst awaiting the results of the negotiations underway,
- On December 12th, 2005, Mr AUER confirmed to Mr FRANKEN his interest in the position, in consideration of some financially-related compensation,
- On December 15th, 2005, Mr FRANKEN informed Mr AUER of the withdrawal of the proposal of October 14th, 2005 due to the unreasonable nature of the financial terms which Mr AUER had attempted to lay down,
- On December 22nd, 2005, Mr AUER reacted by indicating that the proposal made on October 14th, 2005 implied, *inter alia*, an 8.5% reduction in his annual salary, the loss of more than USD 120,000 in annual allowances, which he felt neither honest nor fair. Mr AUER also deplored the fact that none of the suggestions made to compensate for the effects of these reductions in salary had been accepted and that no counter-offer had been made,
- On February 22nd, 2006, LANIER WORLDWIDE informed Mr AUER of its intention to end his posting to Europe and to call him back to the United States, either in a position of *Management Training & Development Consultant* or in a position of *Region H.R. Manager / Northeast Region,*
- Mr AUER was supposed to give an answer for March 17th, 2006,
- On March 16th, 2006, Mr AUER informed LANIER EUROPE, RICOH EUROPE and LANIER WORLDWIDE of the unreasonable nature of the proposals put forward, both with regard to the level of the positions and with regard financial matters,

GENERAL DOCKET no. 35/07 + 06298/07

- On March 23rd, 2006, Mr TOGASHI, President of RICOH EUROPE, acting on behalf of LANIER WORLDWIDE, informed Mr AUER that the contract of May 2000 stipulated a posting of approximately five years at the end of which a reassignment to the country of origin was provided for, which was currently implemented by proposals of similar job positions, that equivalent financial terms were guaranteed to him for one year, but that the decision had to be made before March 24th, at 4.00 p.m., failing which the refusal would be interpreted as a resignation from his functions within LANIER WORLDWIDE,
- On March 24th, 2006, Mr AUER questioned Messrs TOGASHI and FRANKEN maintaining that the proposals made, on the one hand came further not to a refusal of the position of *General Manager*, since he was open to other suggestions, and on the other hand did not imply the maintenance of the level of functions and remuneration which should accompany such a return to the country of origin. Furthermore, Mr AUER confirmed that he felt bound by an employment contract both with regard to LANIER EUROPE and with regard to RICOH EUROPE,
- On March 24th, 2006, Mr AUER also confirmed to Mrs ARTHUR the fact that what had happened in no way was an act of resignation from any of the companies of the RICOH group,
- On April 13th, 2006, Mrs ARTHUR made a final job offer of *Regional HR Manager / Northeast Region*, with effect as of April 18th, 2006 – an offer which became null and void at the end of that day of April 18th, 2006,
- On April 18th, 2006, Mr AUER wrote to Mrs ARTHUR, Mr TOGASHI, who had then become *Head of International Business Group* within *RICOH COMPANY LIMITED*, Mr SASAKI, President of RICOH EUROPE and of *NRG GROUP*, and Mr FRANKEN, that, on the one hand, he disputed the fact that the end of his posting to Europe would entail the termination of his employment contract with LANIER EUROPE, RICOH EUROPE and LANIER WORLDWIDE, and that, on the other hand, he had not refused to return to the United States, but simply wanted to protect his employee rights which were not guaranteed by the terms of his return to the country of origin,
- On April 28th, 2006, Mr NIX, *Vice President & General Counsel*, informed Mr AUER that it was regrettable that his refusal to accept a reassignment to the United States had not proved satisfactory to both parties, and that he saw himself forced to pronounce the termination of his employment as of that day,
- On May 8th, 2006, Mr AUER asked Messrs FRANKEN and SASAKI to confirm to him the intentions of LANIER EUROPE and of RICOH EUROPE as to the continuation of his employment,
- On May 12th, 2006, both these companies replied to Mr AUER that, in their opinion, there was no contractual relationship binding them, to the extent that they saw no reason to follow up on his request,
- On November 1st, 2006, the American administration accepted that Mr AUER could claim unemployment benefit due to the end of the employment contract binding him to LANIER WORLDWIDE, recognizing that LANIER WORLDWIDE had separated from its employee due to a lack of work to be provided / carried out.

6th sheet

GENERAL DOCKET no. 35/07 + 06298/07

## III. Adjoining

Mr AUER requests the adjoining of the cases registered under general docket no. 35 / 2007 and 6.298 / 2007 due to the connection between them.

Inasmuch as Mr AUER maintains that the three defendants had the capacity of employer in his respect, there is reason, in the interest of good justice, to adjoin these two cases so as, *inter alia*, to avoid solutions being given to these disputes which might be irreconcilable with each other.

## IV. Discussion

### A. Jurisdiction

The court has the right, particularly when this is contested, to check its jurisdiction with regard to the rules of international private law.

If nothing prevents a party from bringing a dispute (presenting international aspects) before a Belgian court, it shall be the responsibility of the latter to check its jurisdiction in the light of its national law, including its international private law.

At this stage of the examination, there is no need to ascertain the existence of a conflict of law (between Belgian law and the law of the State of Georgia) since this issue concerns the applicable law and the law to be applied by the competent court. Indeed, where appropriate, if the court should feel that it is within its jurisdiction to rule on the case, it might even, in the light of the elements presented, feel it has a duty to apply the law of the State of Georgia. This issue of the applicable substantive law is therefore secondary to the issue of the (international) jurisdiction of the Belgian courts (and, where appropriate, of the courts of Brussels in particular).

The three defendants maintain that the introduction of an article 8 *bis* in the law of March 5th, 2002 transposing Directive 96/71 of the European Parliament and of the Council of December 16th, 1996 concerning the posting of workers in the framework of the provision of services and introducing a simplified system for the maintenance of labor documents by undertakings that post workers to Belgium (which entered in force on August 2nd, 2007) would indicate, *a contrario*, that, before the entry in force of this provision, the Belgian courts would not have had jurisdiction in the matter.

This analysis may not be upheld, particularly given that we may deduce from the introduction of this rule of jurisdiction that, as of August 2nd, 2007, the Belgian legal arsenal has been enhanced by a rule of assignment of jurisdiction, which spares the persons under the jurisdiction of the court the detour or the recourse to international instruments, even to general principles of international law, but nothing indicates that before the introduction of this rule, the jurisdiction of Belgian courts would have, in

7th sheet

GENERAL DOCKET no. 35/07 + 06298/07

all circumstances, been held in check by the absence of such a rule or a provision similar to said new article 8 *bis*.

However, given that Mr AUER cannot invoke this rule due to the date set for its entry in force, there is every right to examine the provisions of internal law, the international instruments which Belgium has ratified and which might, in this case, justify (or invalidate) the jurisdiction of the Belgian courts, as well as, where appropriate, the uses of international law.

Having regard to the companies RICOH EUROPE and LANIER EUROPE, whose registered offices are located in the Netherlands, i.e. in a country that has ratified the Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters signed in Brussels on September 27th, 1968, article 5, paragraph 1, of the Brussels Convention sets forth that these two companies may actually be brought before the Belgian courts since the work has been provided exclusively in Belgium (no party has, moreover, maintained that the location of the activities of Mr AUER should be considered as having been carried out in different countries). This rule assigning jurisdiction is confirmed by the Council Regulation (EC) 44 / 2001 of December 22nd, 2001 (article 19.2, *littera a*), which has not repealed the Convention of September 27th, 1968.

Likewise, by virtue of article 18.2 of the same regulation, an identical rule assigning jurisdiction prevails with regard to the company LANIER WORLDWIDE, without having to refer to articles 96 and 97 of the law of July 16th, 2004 on the International Private Law Code.

The Belgian Courts and Tribunals have jurisdiction to hear the dispute, and the labor court of Brussels in particular, given the location of the workplace of Mr AUER, and given the location of his employer's place of business to which he was posted (Auderghem).

## B. Applicable law

The defendants maintain that the jurisdiction of the requested court would have been excluded by the parties because they would have agreed, in the contract of May 30th, 2000, that the law of the State of Georgia would govern their relations. Now, it has appeared that even though the law of the State of Georgia should be found to be applied, the labor court of Brussels does indeed have jurisdiction so that, once again, the potential conflict of laws shall have to be settled with regard to the rules of Belgian law.

Hence, the court reveals that the defendants, with regard to the grounds of the dispute, invoke a conflict of law, but do not produce the texts which, according to them, should be applied. Neither do they indicate to the court in what way, according to them, this conflict of law should be settled (by virtue of Belgian law).

8th sheet

GENERAL DOCKET no. 35/07 + 06298/07

The defendants, in their procedural reports, in no way refer to the law of the State of Georgia, hence one of two things prevail: either the law of the State of Georgia is actually the applicable substantive law, but then the defendants have recognized, at least implicitly, in Belgian law the status of public order and security laws within the meaning of article 3 of the Belgian Civil Code, or the defendants have accepted that, given that the Belgian courts had jurisdiction, the Belgian law should be applied, independently of its nature of a public order and security law. But in one case as in the other, it is undisputable that, even if the defendants continue to maintain that the applicable substantive law is that of the State of Georgia, it is indeed under the angle of the positive Belgian substantive law that, in concrete terms, each of the points of the claim made by Mr AUER have been covered.

The court shall only examine the dispute with regard to Belgian employment law alone, without having to question the nature of the public order and security laws of the provisions implemented, since such is the desire of the parties, such as emerges from the procedural records filed.

### C. The employer or employers of Mr AUER - The posting - The transfer

Mr AUER maintains that LANIER WORLDWIDE and LANIER EUROPE and RICOH EUROPE would have the capacity of employers in his respect.

The court does not know what legal relations might exist between RICOH EUROPE and RICOH EUROPE HOLDING b.v., but in the absence of an act of continuance of suit or of proof of a simple modification of the company name of RICOH EUROPE into RICOH EUROPE HOLDING, the sole party to the dispute must remain the company incorporated under Dutch law RICOH EUROPE b.v.

First of all, it emerges from the contract signed on May 30th, 2000 that the two co-contracting parties are indeed Mr AUER, on the one hand, and LANIER WORLDWIDE, on the other.

The purpose of this contract is only otherwise specified as that of a mission, or a transfer to Brussels where the title given to the position shall be that of *Vice President, Human Resources – Europe*.

In no place in this contract do the companies LANIER EUROPE and RICOH EUROPE appear. Indeed, having regard to the latter, it is accurate to state that this would be impossible since the merger came subsequent to this date by approximately one year).

It is, however, admitted that Mr AUER had been employed within the coordination centre of the company LANIER EUROPE, located in Belgium, without mention being made of this within a different employment contract in June 2000 or in April 2001.

9th sheet

GENERAL DOCKET no. 35/07 + 06298/07

Hence, without having regard, for the time being, to the potential consequences of the merger, it is indeed the mutual intention of the parties that there is a need to seek on the date of May 30th, 2001, given these elements.

Indeed, if it is accurate that nothing opposes the fact that the same worker may be assigned to several employers, there is a need to make a difference of this position since different legal mechanisms, quite similar, may be implemented to obtain the same result, without necessarily the capacity of employer being modified during the process or at the end thereof.

On the one hand, a transfer of companies, which necessarily assumes the modification of the (legal) entity of the employer, would imply the end of an initial contract with a previous employer and the conclusion of a second one with a new employer, which is manifestly not the case here, such that it could not be a question of a succession of employers in the sense of a conventional transfer from one legal entity to another.

On the other hand, a posting (*intra-group*) enables the initial employment contract to be left in place, whose execution was simply suspended, whilst instituting a new commitment by a series of interpositions of the company in which the worker is posted, which in this capacity is authorized to exercise all or part of the employer's authority.

In this last case, this cannot be a *completely general mandate* which would be *contrary to the speciality of the mandate* and which rendered *impossible any control by the principal* - as Mr AUER maintains -, since, on the one hand, if the mandate can only concern legal acts, the transfer of the exercise of the employer's authority, through an interposition of entity, within the framework of a posting process, corresponds fully to the definition of the mandate and does not derogate to its specific character, even if it is actually clearly understood and that, on the other hand, the potential control exercised by the principal on the acts posed by its agent only concerns the relationship between these two parties to which third parties remain totally foreign such that they can draw no argument from it. There is, furthermore, need to reveal that the possibilities for the employer – principal - of ending the worker's posting at any time might be analyzed, *de facto*, as the revocation *ad nutum* of the mandate given to the agent company.

Hence, between June 1st, 2000 and March 31st, 2000, it cannot be disputed that Mr AUER was posted within the coordination centre attached to LANIER EUROPE, and no contract could be concluded between him and LANIER EUROPE since the principles governing the (international) posting mechanism opposed it – unless the contract with the original employer is terminated and a new employment contract is concluded with the employer within which the worker has been posted initially, which is not the case here since it is in no way alleged that the contract of May 30th, 2000 would have been terminated.

Hence, and since on the date of April 1st, 2001 no modification had been made to the contract of May 30th, 2000, if a new relationship had been able to be concluded between

10th sheet

GENERAL DOCKET no. 35/07 + 06298/07

Mr AUER on the one hand and LANIER EUROPE and / or RICOH EUROPE on the other hand, it can only be distinct employment contracts which could have co-existed.

In order to determine whether an employment relationship was able to have been concluded between these parties, it is indeed the constitutive elements of an employment contract such as defined by the law of July 3rd, 1978 which have to be drawn up by the party which is accepted as the existence of such a contract (articles 1315 paragraph 1 of the Belgian Civil Code and 870 of the Belgian Judicial Code).

Traditionally, the employment contract is the one within the framework of which a worker provides services, in consideration of remuneration, in a relationship of subordination with regard to an employer.

It is also admitted that the services must not be provided to the exclusive and direct benefit of the employer. Likewise, the remuneration must not necessarily be paid by the employer itself. Or even the employer authority must not actually be exercised personally by the employer.

Likewise, it is entirely accurate that with regard to a (legal) fact, proof may be reported by all legal means.

However, the circumstance that the fact of having several concomitant employers is possible does not imply that this is the case here.

Effectively, proof has to be provided that Mr AUER worked for LANIER EUROPE and / or RICOH EUROPE and no longer (exclusively) for LANIER WORLDWIDE, that these latter remunerated him, or at least had the intention of remunerating him even if this remuneration was (partially) paid by a third party, and that they were capable of exercising (concomitantly) on him the employer prerogatives of injunction, management and control other than through an interposition mechanism.

Now, none of the elements put forward by Mr AUER is incompatible with a case of a posting and none of these elements taken individually or together enables us to conclude on the existence of a working relationship with LANIER EUROPE and / or RICOH EUROPE.

In other words, and *mutatis mutandis*, given the jurisprudence of the Court of Cassation in terms of distinction between independent workers and salaried workers (See, inter alia: <u>Cass.</u>, May 22nd, 2006, General Docket no. S.05.0014.F, *www.jure.juridat.just.fgov.be*), there shall be need only for a *"re-qualification"* of the working relationship if the elements of fact are incompatible with the qualification that the parties, basically, wished to give to their contractual relationships.

As, for multiple employers to be admitted, it must be clearly understood that an employment relationship can continue to exist with each of the legal entities qualified as employer. And in this specific case, Mr AUER was already and undisputedly bound by a written contract with LANIER WORLDWIDE, such that the employment

11th sheet

GENERAL DOCKET no. 35/07 + 06298/07

contracts invoked by LANIER EUROPE and / or RICOH EUROPE could only be verbal agreements (with everything that this implies, i.e. a full time employment system, an open-ended period, and the difficulty of establishing the reality of the exact constitutive elements of this employment relationship).

Indeed, even if the rider to the contract of May 30th, 2000 was signed on March 11th, 2005 with Mr Tim VELLEK, *Chief Operating Officer* within LANIER EUROPE, it is indeed the contract of May 30th, 2000 which is extended and whose terms are maintained, without, at any moment before this date, it being able to be a question of a transfer within the LANIER group entailing a change of employer or the conclusion of a separate employment contract with LANIER EUROPE.

Hence, Mr AUER does not establish a separate remuneration which would have been agreed with LANIER EUROPE and / or RICOH EUROPE within the framework of tacit employment contracts which would have been concluded between them and him. Now, even paid by a third party, the remuneration remains one of the essential elements of an employment contract.

A separate remuneration might not have been required if, in the course of the execution of the employment relationship, it appeared that LANIER EUROPE and / or RICOH EUROPE had wished to take over such an obligation themselves exclusively, at least to undertake jointly alongside LANIER WORLDWIDE in the capacity of employer. Now, the expression of such a desire emerges from no element of the case file.

The same applies with regard to the purpose of the services to be provided. There are no specific services, distinct from those stipulated, in a very wide and completely general manner, by the contract of May 30th, 2000, which LANIER EUROPE and / or RICOH EUROPE could claim of Mr AUER.

Neither can it be a question of a novation of the contract of May 30th, 2000 by change of creditor / debtor, given that this intention of the parties and this desire is not established with certainty.

It is right that the defendants maintain that it is the posting mechanism which has effectively been implemented, even if, since no prior authorization was required with regard to an *intra-group* posting, the information sent to the manager responsible set forth in article 32, paragraph 1, subsection 3 of the law of July 24th, 1987 on temporary employment, part time employment and making workers available to users is not established, and even if Mr AUER had already been posted to Belgium, within the framework of the acquisition of certain activities of the AGFA group in 1998.

The main employer prerogative remained exclusively in the hands of LANIER WORLDWIDE, since this entity alone could end the services of Mr AUER on the Belgian territory. Neither LANIER EUROPE nor RICOH EUROPE had the power to send Mr AUER back to the United States, only LANIER WORLDWIDE had this power to call back Mr AUER to his country of origin.

12th sheet

GENERAL DOCKET no. 35/07 + 06298/07

Furthermore, with regard to the several employment contracts co-existing – *quad non* -, it is hardly likely and hardly plausible that, in the actual circumstances of this case, if one of these contracts had to be terminated or ended, that the others could have subsisted, so much is it the case that the nature of the services, provided within the framework of the contract of May 30th, 2000 – which must continue to exist in order to be able to invoke multiple employers including LANIER WORLDWIDE -, is closely related to any service which Mr AUER might have been led to provide to LANIER EUROPE and / or RICOH EUROPE during his employment in Belgium.

And the circumstance that Mr AUER, feeling bound also to LANIER EUROPE and / or RICOH EUROPE by an employment contract, acted with regard to these companies as of the start of the year 2006, as if they were his employer, cannot provide proof of this capacity since this is a unilateral behavior of the party that intends, at present, to provide this proof.

Whilst the same factual context to cover several distinct legal realities among which it is the responsibility of the parties, and, where appropriate of the court, to indicate the one which has gained their favor, it does not suffice to claim that all these elements of fact can enter into a specific legal mould to retain this legal construction exclusively, as the parties still had the intention of retaining this legal form, by waiving the others.

In this case, it emerges from the elements submitted to the court that if, as Mr AUER claims, there is nothing preventing us from considering that he was faced with multiple employers, the situation of the parties corresponds also perfectly - and sometimes more - to the implementation of an *intra*-group posting mechanism, and none of these elements enables us to establish a modification of this situation or, above all, the desire of the parties to modify the nature of their legal relations such as laid down by the contract of May 30th, 2000.

Hence, nothing indicates that we should confer the capacity of employer to the companies LANIER EUROPE and / or RICOH EUROPE as of April 1st, 2001, or even at a later date.

The claims directed against the parties LANIER EUROPE b.v. and RICOH EUROPE b.v., both companies incorporated under Dutch law, in their capacity of employer, shall have to be declared unfounded.

D. The author of the termination

Dismissal is a unilateral, receiving, immediate and irrevocable act.

If the law of July 3rd, 1978 on employment contracts stipulates that an employment contract may end in the same way as all other obligations of a contractual nature, it adds the exercising of some of these specific termination methods.

13th sheet

GENERAL DOCKET no. 35/07 + 06298/07

Constructive dismissal constitutes a specific termination method since, *inter alia*, the desire to terminate the contract is implicit and deduced from the substantial modification of an essential element of the employment contract, which cannot be interpreted otherwise than as the termination of the initial contract in view of the conclusion of a new contract incorporating this modified essential element.

In this case, LANIER WORLDWIDE maintains that the refusal of Mr AUER to accept his return to the United States constitutes the expression of his desire to resign from his employment contract concluded with LANIER WORLDWIDE and implying his employment within the LANIER group, where Mr AUER sees in the attitude of LANIER WORLDWIDE the expression of an implicit desire to terminate the employment relationship.

It is admitted that an employment contract can no longer be terminated when it has already been ended (C.T. Brussels, April 11th, 1994, *R.W.*, 1995 – 1996, *partim*, p. 787), such that Mr AUER could only have resigned if LANIER WORLDWIDE was guilty of committing an act of constructive dismissal before the date of April 28th, 2006.

None of the parties has maintained that the negotiations started in October 2005 on the matter of the position of *General Manager* within the *EUROPEAN ADMINISTRATION GROUP*, based in Amstelveen, should be considered has having led to the end of the employment relationship – even if they could have played a role -, such that the court finds that it does not have to address the issue of knowing whether this proposal had to lead to a dummy proposal, as the position ceased to exist before even being created due to the closing down of the *TQM* department in Amstelveen, and due to its relocation to London.

Neither can it be argued from the circumstance that if the initial proposal to relocate to Amstelveen related, initially over ten years, to the fact that the relocation of the *TQM* department from Amstelveen to London in 2007 could have constituted for LANIER WORLDWIDE (or RICOH EUROPE), a *culpa in contrahendo*, given that the location of the workplace cannot, as such and in an isolated manner, be considered as an essential element of the employment contract of Mr AUER.

Furthermore, nothing indicates that even after the relocation of the *TQM* department from Amstelveen to London, Mr AUER should have, where appropriate, also have been relocated to Great Britain, or even, quite simply, that his position would have become obsolete.

Mr AUER refused this proposal, or at least made a counter-offer which was not approved by LANIER WORLDWIDE and / or by RICOH EUROPE (in this last case, undoubtedly a new employment contract would have been concluded directly with RICOH EUROPE since the *EUROPEAN ADMINISTRATION GROUP* was indeed part of RICOH EUROPE b.v., which emerges also from the removal of all the benefits related to the status of expatriate), such that he accepted the risk of seeing other proposals presented, or indeed of having to return to the United States.

14th sheet

GENERAL DOCKET no. 35/07 + 06298/07

Of course, there is not, for LANIER WORLDWIDE, any reason to draw the slightest argument, irrespective of its nature, from the break down in these negotiations.

It is therefore, in this context, that there is a need to examine the proposals made by LANIER WORLDWIDE and the refusals which MR AUER made to them.
On February 22nd, 2006, LANIER WORLDWIDE indicated to Mr AUER that his posting to Belgium would end on March 31st, 2006 (and there is no doubt that LANIER WORLDWIDE was contractually authorized to do so).

LANIER WORLDWIDE proposed to Mr AUER the position of a consultant in *Management training & development*, in consideration of an annual salary of US$ 90,000.00, or a position of *Region HR Manager* for the north-east region of the United States, in consideration of an annual salary of US$ 105,000.00

The position of Mr AUER, at that time, was that of *Vice President, Human Resources – Europe*, in consideration of a basic salary of US$ 140,600.00.

The job descriptions indicate that they are comparable, with regard to the first, to a position of *Sr. Sales Trainers*, of *Sr. Management Trainer* or of *Compensation Consultant*. As for the second one, it requires, *inter alia*, at least ten years' experience in the domain of human resources, whereas Mr AUER joined the LANIER Group, in functions of this nature, close to twenty years ago.

It emerges from these elements, on the one hand, that the purpose of the services requested of Mr AUER is fundamentally different, both with regard to the content and to the responsibilities they imply, from those exercised in Belgium and, on the other hand, a substantial loss of remuneration in terms of basic salary (which is not compensated by a possible bonus), of around 35% in the first case and 25% in the second.

As of February 28th, 2006, Mr AUER shared with LANIER WORLDWIDE his concerns in terms of remuneration.

However, as of March 1st, 2006, Mrs ARTHUR invited (*summoned*, Mr AUER would say) Mr AUER to make a decision on both proposals made before March 17th, 2006 (due to imperatives related to the reorganization of work).

On March 16th, 2006, Mr AUER indicated that he understood that there was no position similar to his in the United States, but refused for his response to be considered as a resignation. He asked to be able to be included in the plans to close down the LANIER EUROPE coordination centre in Brussels, as well as to be able to continue to be employed up until May 31st, 2006 as initially planned, in order to be able to find an equitable solution for all parties.

15th sheet

GENERAL DOCKET no. 35/07 + 06298/07

On March 23rd, 2006, LANIER WORLDWIDE replied to Mr AUER that, in its opinion, the positions proposed were equivalent to the one he had in Brussels and that the remuneration proposed corresponded to the remuneration standards for similar positions in the United States, but as an act of good will LANIER WORLDWIDE was disposed to guarantee him, for one year, an equivalent salary. A response was expected for the next day, at 4.00 p.m.

On March 24th, 2006, Mr AUER reported to LANIER WORLDWIDE that the proposals made within the framework of his return to the United States were absolutely not comparable in terms of remuneration – he further asked to be told the amount of remunerations of other *Vice Presidents, Human Resources* based in the United States so as to be convinced, as LANIER WORLDWIDE maintained, that the level of remuneration which was proposed to him did indeed correspond to that of people exercising functions similar to his own, but in the United States - information which never seems to have been given by LANIER WORLDWIDE – and similar responsibilities to his own. Mr AUER repeated his request that a fair solution be found.

On April 12th, 2006, LANIER WORLDWIDE summoned Mr AUER to make a decision on the job proposal as *Region HR Manager / Northeast Region*, a proposal which remained valid until April 18th, 2006, the date on which, in case of refusal, LANIER WORLDWIDE would consider the resignation of Mr AUER as real and effective.

On April 18th, 2006, Mr AUER replied that he had not refused to return to the United States, but that he felt that he had been treated differently to other employees of the LANIER group further to the restructuring operations related to the merger with the RICOH group.

On April 28th, 2006, LANIER WORLDWIDE informed Mr AUER that it had taken note of his resignation.

The issue is therefore to check whether, by refusing the modification of the workplace, the modification of the content of the functions and the modification of the basic salary proposed, Mr AUER was able to end the employment contract binding him to LANIER WORLDWIDE, or whether, to the contrary, by intending to modify unilaterally and significantly the workplace, the content of the functions and the remuneration of Mr AUER, LANIER WORLDWIDE would have implicitly, but not certainly, expressed the desire to terminate the employment relationship.

It cannot be legitimately contested that the modification of the nature of the services to be provided can, alone, constitute a constructive dismissal; as such a conclusion would deny any possibility of exercising an *ius variandi* by the employer. However, neither can this modification of the content of the functions be of a disparaging nature due to the extent of the modification. In this case, the return to the exercising of a previous function or to a lower level of responsibility cannot, alone, constitute the expression of the desire to terminate the employment contract, when such a regression

GENERAL DOCKET no. 35/07 + 06298/07

– which cannot be significant at the risk of seeing an essential element modified unilaterally and significantly – can be rendered necessary by the effects of a restructuring operation.

However, when this modification of the purpose of the functions is accompanied by as substantial a loss of remuneration, it can no longer simply be a question of the exercising of the employer's right to reorganize the activity of its company in accordance with the needs of the moment.

Neither can there be any doubt that the (more than) substantial modification of the level of remuneration of Mr AUER (independently also of the repercussions on the pension plan of Mr AUER), at least the definitive decision to proceed with such a modification, is constitutive of constructive dismissal.

The reactions of Mr AUER, in order to avoid the modification of his function being accompanied by such a loss in salary, received no response.

By maintaining the proposal made on February 22nd, 2006, LANIER WORLDWIDE showed the certain desire to modify an essential element of the employment relationship and the proposal of March 23rd, 2006 of maintaining, for one year, the level of remuneration acquired is not likely to invalidate this finding.

By the ultimatum given to Mr AUER expiring on April 18th, 2006, LANIER WORLDWIDE modified, unilaterally, an essential element of the employment contract of Mr AUER such that it was also, on this date, guilty of an act of constructive dismissal.

The circumstance that Mr AUER continued to work after the date of April 18th is barely relevant given that it appears that the workplaces had been returned to the owner on March 31st, 2006, such that if the employment contract had continued to exist, its execution could have been suspended by the employer or that, in any event, the purpose of the services should have been re-determined.

In consequence thereof, Mr AUER could not have resigned either on April 18th, 2005 or on a later date since the employment contract had ended on this date due to the constructive dismissal made by the employer.

Compensation in lieu of notice is due to Mr AUER.


E. Compensation in lieu of notice – The application of the redundancy program

The compensation in lieu of notice must enable the worker to find employment equivalent to the one he or she has just lost.

Mr AUER feels that the compensation related to the end of his employment contract must be calculated in accordance with the principles laid down by the collective

GENERAL DOCKET no. 35/07 + 06298/07

labor agreement concluded within the framework of the closing down of the LANIER EUROPE coordination centre.

Now, this C.L.A. of July 29th, 2005 limits its scope to workers employed by LANIER EUROPE (without a distinction being made between employers bound to LANIER EUROPE by virtue of an employment contract concluded with it, and the employees made available to LANIER EUROPE), whose redundancy fell within the framework of the closing down of LANIER EUROPE.

In this case, whilst the return to the country of origin of Mr AUER is linked with the closing down of the LANIER EUROPE coordination centre, the fact remains that the end of the employment contract finds its cause in the attitude of LANIER WORLDWIDE which did not respect all its employer obligations and not in the closing down of the LANIER EUROPE coordination centre. Indeed, the *quasi-simultaneousness* of the events does not enable the termination of the employment contract of Mr AUER to be switched to a hypothesis of redundancy, by LANIER EUROPE – furthermore -, of a worker in its employment, within the framework of the closing down of its activities.

There is therefore a need to return to the general principles of the calculation of the compensation in lieu of notice, i.e. the application of article 39 of the law of July 3rd, 1978 which sets forth that such compensation is calculated by taking account of the current remuneration at the time of the dismissal.

This relates to the basic salary equal to US$ 140,600.00.

This also relates to the bonus, even if the court does not know whether a bonus had been paid to Mr AUER, on the basis of the services provided in the course of the year 2005 and whether there is any certainty that a bonus should have been paid to Mr AUER at the end of the year 2006 such that account should only be taken of a bonus *pro rata temporis* and of the hope of a bonus *pro rata temporis* for the twelve months which precede the termination of the employment contract.

However, the court notes that it emerges from the contract of May 30th, 2000 that the annual basic salary plus a 75% bonus maximum shall be taken into consideration for the calculation of any compensation whatsoever and that it emerges from documents no. 27 to 29 of Mr AUER that this maximum bonus amounts to US$ 24,100.00, so that the amount to be taken into consideration in this respect amounts to US$ 18,075.00.

It does not emerge, however, from this clause that Mr AUER had intended to waive the right for other items to be taken into consideration for the calculation, *inter alia*, a compensation in lieu of notice, such that it also concerns benefits in kind such as medical insurance, pension plans and the private use of a company car.

These benefits may be evaluated, according to the figures indicated on the pay slips, at an amount of 42,177.00 + 9,823.00 = US$ 52,000.00.

GENERAL DOCKET no. 35/07 + 06298/07

Indeed, with Mr AUER benefiting from a Mercedes class E, the court estimates *ex aequo et bono* the value of the private part of this benefit at a sum of US$ 9,823.00, on an annual basis, i.e. somewhat more than US$ 800.00 per month.

As the *foreign service premium* is not defined otherwise than as constituting a fixed annual amount, due by virtue of the labor agreement, there is need to include it in the calculation basis for the annual basic salary of Mr AUER.
The court, in the absence of information on the subject of the special "officer master" bonus and of an indication of its legal or contractual grounds, cannot retain this item.

The same applies, with regard to the compensation related to the expatriate status of Mr AUER, which cannot be of a remuneration nature given that it is not established that it exceeds to this point the costs and expenses that they are deemed to cover that they would acquire such a character.

In consequence thereof, the basic remuneration of Mr AUER can be fixed at 140,600.00 + 18,075.00 + 52,000.00 + 15,000.00 = US$ 225,675.00, which gives an annual basic salary of US$ 261,783.00.

Converted at the rate used by Mr AUER – and which is not contested by LANIER WORLDWIDE -, this amount is equivalent to EUR 210.028.50.

When the employment contract was terminated, Mr AUER was 56 years and nine months old and had 21 years and 1 months' service within the Lanier group.

Given the professional past of Mr AUER, his professional experience and the level of his remuneration, a period of 27 months constitutes a reasonable timeframe to enable him to find an equivalent job, both in terms of responsibilities and in terms of remuneration.

Mr AUER can claim compensation in lieu of notice equal to 210,028.50 : 12 x 27 = EUR 472,564.13.

### F. The damages for abuse of the right to dismiss

In general, it is accepted that there may be abuse of law when the law is exercised with the intention of harming, when the right is exercised without interest or without legitimate reason causing thus damage which could have been avoided, or when the benefit withdrawn is disproportionate to the charges imposed or even when faced with several means, the creditor chooses the most damaging one for its debtor, without specific justification (P. VAN OMMESLAGHE, "Note sous Cass., September 10[th], 1971 - *Abus de droit, fraude aux droits des tiers et fraude à la loi*", *R.C.J.B.*, 1976, pp. 335 and 336).

19th sheet

GENERAL DOCKET no. 35/07 + 06298/07

In the search for these criteria, there is a need to take account of all the circumstances of the case (Cass., January 30th, 1992, *R.C.J.B.*, 1994, 189, with note of P.-A. FORIERS).

Furthermore, given the fixed nature of the compensation in lieu of notice, it must relate to damage distinct from the one which the compensation in lieu of notice is deemed to repair, both physically and morally.

The burden of proof of these elements is incumbent upon Mr AUER, in his capacity as plaintiff (articles 1315 of the Belgian Civil Code and 870 of the Belgian Judicial Code).
Mr AUER maintains that LANIER WORLDWIDE, LANIER EUROPE and RICOH EUROPE would have orchestrated all these events, from the month of July 2005, in order to get rid of him more easily.

The absence of capacity of employer in the person of LANIER EUROPE and RICOH EUROPE does not prevent the fact that, in terms of extra-contractual responsibility, their behavior can be qualified, where appropriate, as negligent within the meaning of articles 1382 and 1383 of the Belgian Civil Code.

Whilst it is accurate that a certain amount of pressure was exerted on Mr AUER during the course of the discussions (particularly short time given to make decisions, *inter alia*), the fact nevertheless remains the Mr AUER, with his experience, his years' service within the LANIER group and his level of functions was able to cope with such pressure, as exerted as it may have been.

The sole reproach which can be made with regard to LANIER WORLDWIDE is its intransigence and its categorical refusal to undertake real negotiations, implying, notably, offers, counter-offers and mutual concessions. By standing firm and by leaving no alternative branch open, LANIER WORLDWIDE did nothing however other than to confirm its desire to modify, unilaterally, (at least) one essential element of the employment contract of Mr AUER, whose sole sanction can only reside in the granting of compensation in lieu of notice.

This is furthermore what is confirmed by the unemployment administration of the State of Georgia when it accepted the eligibility of Mr AUER with regard to unemployment benefits.

If at that LANIER WORLDWIDE has committed negligence – *quod non* – by adopting a rigid and unshakeable attitude, Mr AUER does not prove that he suffered distinct damage from that for which the compensation in lieu of notice is deemed to compensate.

And the manifestly passive attitude of LANIER EUROPE and of RICOH EUROPE does not enable us to conclude on the existence of negligence in their respect.

This item of the claim cannot be retained.

GENERAL DOCKET no. 35/07 + 06298/07

### G. The tax equalization mechanism applied to the compensation in lieu of notice

The compensation in lieu of notice is deemed to compensate the fact that a worker made redundant has been, knowingly or not, prevented from performing his or her employment contract up to its final term.

Hence, there is a need to apply the benefit of a tax equalization mechanism to the compensation in lieu of notice – a mechanism which would have been applied to the remunerations which should have been paid to Mr AUER if the notice to which he could claim had been able to be respected.

According to LANIER WORLDWIDE, the contract of May 30th, 2000 did not set forth the application of a tax equalization mechanism to a compensation for termination. This contract of May 30th, 2000 does not exclude it either – neither explicitly nor implicitly.

In accordance with the rules of interpretation of contracts, the provisions subject to interpretation must be interpreted against the party which has stipulated (art. 1162 of the Belgian Civil Code), which is the party which invokes the clause in view of reducing his or her commitments (Cass., June 23rd, 1983, *Pas.*, 1983, I, p. 1196).

There is therefore a need to sentence LANIER WORLDWIDE to compensate Mr AUER the difference in tax which he will have to pay the Belgian tax authority, in relation to the taxes that he would have paid in the United States, calculated in accordance with the terms and conditions and exclusions contained in the contract of May 30th, 2000.

There is no need to hand down a provisional sentence given that the sentence to be handed down contains all the elements which permit or should permit, when the time comes, its value to be evaluated.

### H. The interest

Article 1 of the Royal Decree of July 3rd, 2005 fixes the entry in force of article 10 of the law of April 12th, 1965 concerning the protection of the remuneration of workers, as at July 1st, 2005, independently of the entry in force date of said Royal Decree itself.

According to LANIER WORLDWIDE, this provision of the Royal Decree should be ruled out as one of the validity conditions of a regulatory act is to have to be submitted to the opinion of the Council of State, except for the exceptions provided on this matter, *inter alia* the urgency invoked and duly motivated (article 3 of the consolidated laws on the Council of State).

Now, the Council of State has been able to assess the scope of this obligation and has decided, in an order no. 18.939 of April 26th, 1978 that *considering that the order attacked which (...) merely sets down the time of the general entry in force of the provisions (...), contains no provision whatsoever which has an organic nature; that neither does it create any new rule which is already established by the provisions*

21st sheet

GENERAL DOCKET no. 35/07 + 06298/07

*which this article enters into force; that it does not therefore possess any normative character per se and cannot therefore constitute an organic or regulatory order within the meaning of article 3 of the consolidated laws on the Council of State.*

This regulatory act responds therefore to the substantial conditions of the validity of an act of such a nature, even if it is obvious that nothing prevents the Legislation Section from giving an opinion on such an act when this is requested of it.

A royal decree is, in essence, a regulatory act, but this does not imply that it is a regulatory act within the meaning of article 3 of the consolidated laws on the Council of State.

Article 2 of this royal decree, which sets forth that it shall only apply to the sums stipulated which would fall due as of July 1st, 2005, is not invoked in the case such that the validity or the lack of validity of this provision has no impact on the implementation of article 1.

It follows that it is right that Mr AUER claims that the late interest is calculated, at the legal rate, on the gross amounts which are due to him.

I. The other claim items

Mr AUER pursues the payment of a bonus *pro rata temporis*, leave pay and early leave pay, as well as remuneration arrears evaluated provisionally at the sum of EUR 1.00.

Mr AUER gives no explanation and does not develop these claims in any way whatsoever.

They cannot therefore, in this case, be declared justified.

First of all, Mr AUER never claimed these payments before instituting his legal action, whereas they would have been due independently of a claim for compensation in lieu of notice.

Then, the granting of a bonus is a discretionary power of the employer, without the worker being able to uphold the right to obtaining such a bonus.

Then, Mr AUER does not establish that the Royal Decree of March 30th, 1967 determining the execution terms of the laws related to the annual leave of salaried employees should be applied in this case given that it is not excluded that this matter emerges from the social security of the country of origin, which remains applicable due to the existence of an international posting. Mr AUER does not, either, maintain that this would be a public order and security law such that it should be applied

GENERAL DOCKET no. 35/07 + 06298/07

irrespective of the foreign legislation applicable to the matter.

But above all, Mr AUER does not establish that such pay would have been paid to him in the past.

Furthermore, it is impossible for the court, given the absence of development of this claim item, to determine the stipulated leave pay (has the prescription been achieved for certain sums?) or the amounts to be used for the potential calculation basis for this claim item.

As for the remuneration arrears, Mr AUER provides no element which could enable the court to believe that LANIER WORLDWIDE would still owe sums in this respect.

Mr AUER cannot hide behind the lack of labor documents which would enable him to be able to provide exact figures for the amount of his claim. Indeed, pursuant to articles 1315, paragraph 1 of the Belgian Civil Code and 870 of the Belgian Judicial Code, it is his responsibility first of all to determine the amounts he deems owed to him, with LANIER WORLDWIDE simply being responsible for establishing, pursuant to article 1315, paragraph 2 of the Belgian Civil Code, that it does not or no longer owes these sums, even if LANIER WORLDWIDE is the party in the best position to provide this proof of the reality of the payments claimed, as imposing such proof upon the employer, on the sole statement of the worker, would imply a reversal of the burden of proof which is justified by nothing.

Mr AUER also solicits the issuance of labor documents.

Insofar as these documents relate to the compensation in lieu of notice, it is appropriate to grant this request.

There is not, however, any reason to add a fine to this conviction, as the claim is not motivated in any way.

### J. The expenses

The parties agree on stating that the procedural compensation due is the one which corresponds to a claim within a range of EUR 500,000.01 to EUR 1,000,000.00.

Mr AUER feels he is able to claim the maximum procedural compensation whereas the defendants target the basic compensation.

Mr AUER has succumbed in his claim in respect of LANIER EUROPE and RICOH EUROPE, and has partially triumphed in his claim against LANIER WORLDWIDE.

23rd sheet

GENERAL DOCKET no. 35/07 + 06298/07

RICOH EUROPE, on the one hand, LANIER EUROPE and LANIER WORLDWIDE, on the other hand, have paid the procedural compensation they claim respectively at EUR 223.10 + EUR 223.10.

Given the amounts retained by the Royal Decree of October 26th, 2007, it is necessary to stay proceedings in respect of the procedural compensation due to these parties, except on the principle.

As Mr AUER has succumbed in his claims against LANIER EUROPE and RICOH EUROPE, it is his responsibility to bear the expenses of these parties.

It is necessary to take account, for the taxation of the expenses, of the identical argument developed by RICOH EUROPE, on the one hand, LANIER EUROPE and LANIER WORLDWIDE, on the other.

However, given the complexity of the entire case against LANIER WORLDWIDE, it is necessary to retain the maximum procedural compensation in respect of Mr AUER, and to reserve, also, a decision on the expenses potentially claimed by LANIER WORLDWIDE.

However, as Mr AUER has only partially obtained compensation, it is necessary to pay him 30% of these expenses.

The procedural compensation thus presented – and whose minima and maxima may be determined – remain lower than double the maximum procedural compensation which lays down the absolute limit of the procedural compensation which may be taxed within the framework of the proceedings herein.

As for the summons fees, which are also part of the expenses, it is necessary, with regard to LANIER EUROPE and to RICOH EUROPE, to have them borne by Mr AUER, and with regard to LANIER WORLDWIDE, to apply to them the same breakdown as the one used for the procedural compensation.

### K. The enforcement by provision

Mr AUER provides absolutely no justification for his claim.

Pursuant to article 1398, paragraph 2 of the Belgian Judicial Code, the forced execution of a judgment declared enforceable by provision can only take place at the risk and peril of the party pursuing it.

24th sheet

GENERAL DOCKET no. 35/07 + 06298/07

It is the responsibility of each of the parties to assume their liabilities, but given the attitude – hardly conciliatory, even if in itself no argument on another register can be drawn from it – of LANIER WORLDWIDE, and in order to avoid an appeal with purely dilatory purposes, it is necessary to grant this request.

However, in the absence of the least motivation, the cantonment which is a right of the debtor cannot be excluded.

**ON THESE GROUNDS,**
**THE COURT,**

After ascertaining the failure of the attempted reconciliation provided for by article 734 of the Belgian Judicial Code,

Ruling in a defended action after hearing all parties,

Orders the adjoining of the cases registered in the general docket under numbers 35 / 2007 and 6.298 / 2007 due to the connection between them,

Declares the actions admissible,

States the claims made against the company incorporated under Dutch law LANIER EUROPE b.v. and the company incorporated under Dutch law RICOH EUROPE b.v. unfounded,

In consequence thereof,

Rejects the claims made by Mr Scott AUER,

25th sheet

GENERAL DOCKET no. 35/07 + 06298/07

States the claim brought against the company incorporated under American law LANIER WORLDWIDE INCORPORATED justified and admitted in the measure hereinafter,

States that the company incorporated under American law LANIER WORLDWIDE INCORPORATED committed an act of constructive dismissal on April 18th, 2006,

In consequence thereof,

Sentences the company incorporated under American law LANIER WORLDWIDE INCORPORATED to pay Mr Scott AUER the sum of EUR 472,564.13 by virtue of compensation in lieu of notice,

Sentences the company incorporated under American law LANIER WORLDWIDE INCORPORATED to pay Mr Scott AUER the interest calculated at the legal rate on the sum of EUR 472,564.13 since April 18th, 2006,

Sentences the company incorporated under American law LANIER WORLDWIDE INCORPORATED to keep Mr Scott AUER free of all consequences related to the taxation in Belgium of these sums and, in particular, to keep him free of the taxes to be paid on the difference between the tax established by Belgian taxation and the theoretical tax that he would have had to pay the treasury of the United States on equivalent sums, calculated in accordance with the terms and the exclusions set forth by the contract of May 30th, 2000,

Sentences the company incorporated under American law LANIER WORLDWIDE INCORPORATED to give Mr Scott AUER the labor documents related to these payments,

Rejects the other claim items of Mr Scott AUER,

Sentences Mr Scott AUER to pay the expenses in respect of the companies incorporated under Dutch law LANIER EUROPE b.v. and RICOH EUROPE b.v., not estimated for them.

Sentences the company incorporated under American law LANIER WORLDWIDE INCORPORATED to pay 7/10[th] of the expenses, estimated in respect of Mr Scott AUER at the sum of EUR 277.28 (summons) + EUR 20,000.00 (procedural compensation), and not estimated in respect of the company incorporated under American law LANIER WORLDWIDE INCORPORATED, and hence taxed provisionally at the sum of EUR 194.10 + EUR 14,000.00 in favor of Mr Scott AUER.

Orders the provisional enforcement of the judgment herein notwithstanding any recourse, and without security.

26th sheet

GENERAL DOCKET no. 35/07 + 06298/07

Thus judged by the 24th chamber of the Labor court of Brussels at which the following were present and ruled:

| | |
|---|---|
| Mr J.-H. TASSET, | Judge |
| Mr D. COULON | Judge in labor matters, Employer |
| Mr C. VANDENPLAS, | Judge in labor matters, Employee |

And handed down at the public hearing of April 22nd, 2008, at which the following were present:

| | |
|---|---|
| Mr J.-H. TASSET | Judge |
| assisted by Mrs S. VAN DER POORTEN | Acting Deputy Clerk of the Court. |

The Clerk of the Court,          The Judges in labor matters,          The Judge

VAN DER POORTEN          COULON    VANDENPLAS    TASSET

27th and last sheet

GENERAL DOCKET no. 35/07 + 06298/07

| | |
|---|---|
| In the matter of: | Mr SCOT AUER |
| versus: | 1/ the company incorporated under Dutch law LANIER EUROPE B.V.<br>2/ the company incorporated under Dutch law RICOH EUROPE BV |
| And versus: | LANIER WORLDWIDE INC. Company incorporated under American law |

Order that all thereto summoned process servers will execute this judgment;

That our Procurators-General and our Crown Prosecutors at the Courts judging in First Instance will support this judgment and that all commanders and officers of the public authorities will support law and order when this is legally demanded from them.

In witness whereof this judgment was signed and sealed with a seal of the Court.

Certified true copy, issued to the plaintiff SCOTT AUER

The Head Registrar,

[Seal: Labor Court Brussels]

Registry of the Labor court
of Brussels

Date: July 2nd, 2008

RER No. 1827

26 pages x 0.75 euros

Duties paid: 19.50 euros

TRUE COPY

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| SCOTT AUER | LANIER WORLDWIDE INC. |

**(b)** County of Residence of First Listed Plaintiff   Franklin County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Weir & Partners, LLP, 824 Market Street Mall, Suite 1001
Wilmington, DE 19801 (302) 652-8181

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
10 Del C. Section 4801
Brief description of cause:
Delaware Uniform Foreign Money-Judgments Recognition Act

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE
08/20/2008

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____